No. 25 - _____

# In the United States Court of Appeals for the Ninth Circuit

In re CORONAVIRUS REPORTER CORPORATION, CALID INC., and GREENFLIGHT VENTURE CORPORATION,

*Petitioners,*

*v.*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

*and*

APPLE INC.

*Real Party in Interest.*

On Petition for a Writ of Mandamus to the United States District Court for the Northern District of California No. 3:24-cv-08660 (Chen, J)

**EXCERPTS OF RECORD –VOLUME 2**

KEITH MATHEWS
AMERICAN WEALTH PROTECTION
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorney for Petitioners*

ER 022

ADRMOP,RELATE

# U.S. District Court
# California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:24-cv-08660-EMC

| | |
|---|---|
| Coronavirus Reporter Corporation et al v. Apple Inc | Date Filed: 12/03/2024 |
| Assigned to: Judge Edward M Chen | Jury Demand: Plaintiff |
| Relate Case Case: 3:21-cv-05567-EMC | Nature of Suit: 410 Anti-Trust |
| Case in other court: United States District Court for the District of W, 1:24-cv-00053-SWS | Jurisdiction: Federal Question |
| Cause: 15:1 Antitrust Litigation | |

## Plaintiff

**Coronavirus Reporter Corporation**
*on behalf of themselves and all others similarly situated*

represented by **Keith Mathews**
Associated Attorneys of New England
1000 Elm Street, #800
Manchester, NH 03101
(603) 622-8100
Email: Keith@aaone.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith Mathews , Esq.**
American Wealth Protection
1000 Elm Street, Ste 800
03101
Manchester, NH 03101
603-552-5244
Email: keith@awplegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa R Theriault**
Woodhouse Roden Ames & Brennan, LLC
1912 Capitol Avenue
Suite 500
Cheyenne, WY 82001
307-432-9399
Email: melissa@wrablaw.com
*TERMINATED: 05/19/2025*
*LEAD ATTORNEY*

**Daniel de Zouza Clasen**

ER 023

Immigrant Law Center
7901 4th St N #17567
St Petersburg, FL 33702
727-275-1816
Email: info@clasen.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Calid Inc**
*on behalf of themselves and all others
similarly situated*

represented by **Keith Mathews , Esq.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa R Theriault**
(See above for address)
*TERMINATED: 05/19/2025*
*LEAD ATTORNEY*

**Plaintiff**

**Greenflight Venture Corporation**
*on behalf of themselves and all others
similarly situated*

represented by **Keith Mathews**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith Mathews , Esq.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa R Theriault**
(See above for address)
*TERMINATED: 05/19/2025*
*LEAD ATTORNEY*

V.

**Defendant**

**Apple Inc**

represented by **Julian Kleinbrodt**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8382
Email: jkleinbrodt@gibsondunn.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C Schwartz**
PARSONS BEHLE & LATIMER
20 East Simpson Ave.
P. O. Box 3890
Jackson, WY 83001
307-733-5130
Email: LSchwartz@parsonsbehle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel S. Brass**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8293
Fax: 415-393-8306
Email: rbrass@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julian Wolfe Kleinbrodt**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8382
Email: JKleinbrodt@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Rachel S. Brass**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2024 | 1 | COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF with Jury Demand. ( Filing fee $405 receipt #CHY 2-2787.), filed by Coronavirus Reporter Corporation, CALID Inc. (Attachments: # 1 Civil Cover Sheet) (Court Staff, stbd) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
| 03/05/2024 | 2 | NOTICE of Attorney Appearance by Melissa R Theriault on behalf of CALID Inc, Coronavirus Reporter Corporation. (Court Staff, stbd) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |

| 03/05/2024 | 3 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Keith Mathews to appear pro hac vice; Check not tendered; filed by Plaintiffs Did not select all filers. CALID Inc, Coronavirus Reporter Corporation. (Court Staff, stbd) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
|---|---|---|
| 03/05/2024 | 5 | Praecipe for Summons filed by Plaintiffs CALID Inc, Coronavirus Reporter Corporation, 1 issued. (Attachments: # 1 Summons) (Court Staff, stbd) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
| 03/05/2024 | | FINANCIAL ENTRY: PAYMENT OF $100 RECEIVED FOR PRO HAC VICE FEE FOR KEITH MATTHEWS. RECEIPT 2-2787. (Court Staff, smek) (Entered: 03/06/2024) |
| 03/06/2024 | 4 | ORDER by the Honorable Kelly H Rankin denying 3 MOTION for Keith Mathews to appear pro hac vice filed by Coronavirus Reporter Corporation, CALID Inc (Court Staff, semt) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
| 03/06/2024 | 6 | MOTION REFERRED TO Judge Kelly H Rankin. Amended MOTION for Keith Matthews to appear pro hac vice; Check not tendered; filed by Plaintiff Coronavirus Reporter Corporation and CALID Inc. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Theriault, Melissa) Modified text and filers on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
| 03/06/2024 | 7 | ORDER by the Honorable Kelly H Rankin granting 6 Amended MOTION for Keith Matthews to appear pro hac vice filed by Coronavirus Reporter Corporation and and CALID Inc. (cc: Counsel via email) (Court Staff, semt) Modified text on 3/12/2024 (Court Staff, sjlg). (Entered: 03/06/2024) |
| 03/25/2024 | 8 | Praecipe for Alias Summons filed by Defendant Apple Inc, Alias Summons Returned Unexecuted by Coronavirus Reporter Corporation, CALID Inc as to All Defendants. (Attachments: # 1 Supplement Alias Summons) (Theriault, Melissa) (Entered: 03/25/2024) |
| 03/26/2024 | 9 | 1 Alias Summons Issued (Court Staff, semt) (Entered: 03/26/2024) |
| 04/30/2024 | 10 | NOTICE OF FILING from Counsel for Plaintiff Louis Levine in MDL No. 3113 of Response in Opposition to the Motion of the Chiuchiarelli Plaintiffs to Transfer Actions to The Northern District Of California and in Support of Transfer of Actions to The United Stated District Court for the District of New Jersey for Coordinated or Consolidated Proceedings Pursuant To 28 U.S.C § 1407. (Attachments: # 1 Proof of Service) (Court Staff, stbd) (Entered: 04/30/2024) |
| 05/22/2024 | 11 | (TEXT-ONLY) ORDER REASSIGNING REFERRAL JUDGE. Case has been reassigned to US Magistrate Judge Mark L. Carman as Referral Judge for all further proceedings; US Magistrate Judge Stephanie A. Hambrick no longer assigned to case by the Honorable Scott W. Skavdahl.(Court Staff, szf) (Entered: 05/22/2024) |
| 05/31/2024 | 12 | ALIAS SUMMONS Returned Executed by Coronavirus Reporter Corporation, CALID Inc. Apple Inc served on 5/31/2024, answer due on 6/21/2024 (Theriault, Melissa) (Entered: 05/31/2024) |

| 06/03/2024 | 13 | ALIAS SUMMONS Returned Executed by Coronavirus Reporter Corporation, CALID Inc. (Theriault, Melissa) (Entered: 06/03/2024) |
|---|---|---|
| 06/14/2024 | 14 | Stipulated MOTION for Extension of Time (Dispositive) requesting extension of Answer or Responsive Motion and Related Briefing filed by Defendant Apple Inc. (Attachments: # 1 Proposed Order)(Schwartz, Leah) (Entered: 06/14/2024) |
| 06/17/2024 | 15 | ORDER by the US Magistrate Judge Mark L Carman granting 14 Stipulated Motion for Extension of Time. Defendant shall answer or otherwise respond to the Complaint by 7/30/24. See Order for additional deadlines. (Court Staff, sal) (Entered: 06/17/2024) |
| 06/28/2024 | 16 | NOTICE of Attorney Appearance by Leah C Schwartz on behalf of Apple Inc (Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 17 | MOTION REFERRED TO Judge Mark L Carman. MOTION for Julian Kleinbrodt to appear pro hac vice; Check tendered; filed by Defendant Apple Inc. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 18 | MOTION REFERRED TO Judge Mark L Carman. MOTION for Rachel Brass to appear pro hac vice; Check tendered; filed by Defendant Apple Inc. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 19 | MOTION to Change Venue filed by Defendant Apple Inc. (Attachments: # 1 Proposed Order)(Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 20 | MEMORANDUM in Support of 19 Motion to Change Venue filed by Defendant Apple Inc. (Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 21 | AFFIDAVIT of Mark Rolllins re 20 Memorandum in Support of Motion *to Transfer Venue* filed by Defendant Apple Inc. (Attachments: # 1 Exhibit A) (Schwartz, Leah) (Entered: 06/28/2024) |
| 06/28/2024 | 22 | AFFIDAVIT of Julian W. Kleinbrodt re 20 Memorandum in Support of Motion *to Transfer Venue* filed by Defendant Apple Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14) (Schwartz, Leah) (Entered: 06/28/2024) |
| 07/01/2024 | 23 | ORDER by the US Magistrate Judge Mark L Carman granting 17 MOTION for Julian Kleinbrodt to appear pro hac vice, filed by Apple Inc; granting 18 MOTION for Rachel Brass to appear pro hac vice, filed by Apple Inc. (cc: counsel via email) (Court Staff, semt) Modified text on 7/5/2024 (Court Staff, semt). (Entered: 07/01/2024) |
| 07/02/2024 | 24 | Notice of Pro Hac Vice Attorney Appearance by Julian Kleinbrodt on behalf of Apple Inc Filing fee $ 100, receipt number BWYDC-2455300. (Kleinbrodt, Julian) (Entered: 07/02/2024) |
| 07/02/2024 | 25 | Notice of Pro Hac Vice Attorney Appearance by Rachel Susan Brass on behalf of Apple Inc Filing fee $ 100, receipt number AWYDC-2455371. (Brass, Rachel) (Entered: 07/02/2024) |

| 07/12/2024 | 26 | MOTION REFERRED TO Judge Mark L Carman. MOTION for Extension of Time (Non-Dispositive) requesting extension of Extension of Time for Responding to Apple Incs Motion to Transfer Venue filed by Plaintiffs CALID Inc, Coronavirus Reporter Corporation. (Theriault, Melissa) (Entered: 07/12/2024) |
|---|---|---|
| 07/12/2024 | 27 | ERRATA re 26 MOTION for Extension of Time (Non-Dispositive) requesting extension of Extension of Time for Responding to Apple Incs Motion to Transfer Venue by Plaintiffs CALID Inc, Coronavirus Reporter Corporation. (Attachments: # 1 Proposed Order Tolling MTV pending JPML Rule 6.1 Decision) (Mathews, Keith) (Entered: 07/12/2024) |
| 07/15/2024 | 28 | RESPONSE in Opposition re 26 MOTION for Extension of Time (Non-Dispositive) requesting extension of Extension of Time for Responding to Apple Incs Motion to Transfer Venue filed by Defendant Apple Inc. (Attachments: # 1 Proposed Order) (Schwartz, Leah) (Entered: 07/15/2024) |
| 07/16/2024 | 29 | ORDER by the US Magistrate Judge Mark L Carman granting in part and denying in part 26 Motion for Extension of Time. Please see Order for details. (Court Staff, sjlg) (Entered: 07/16/2024) |
| 07/26/2024 | 30 | AMENDED COMPLAINT against Defendant Apple Inc, filed by Coronavirus Reporter Corporation, CALID Inc. (Theriault, Melissa) (Entered: 07/26/2024) |
| 07/26/2024 | 31 | APPENDIX re 30 Amended Complaint filed by Plaintiffs CALID Inc, Coronavirus Reporter Corporation, Greenflight Venture Corporation. (Attachments: # 1 Exhibit A - United States Department of Justice v. Apple Inc. (New Jersey District), # 2 Exhibit B - Dr. Robert Roberts' CV, # 3 Exhibit C - Congressional Subcommittee Report, # 4 Exhibit D - Class Action for COVID Apps (DC District)) (Mathews, Keith) (Entered: 07/26/2024) |
| 08/01/2024 | 32 | OBJECTION to 19 Motion to Change Venue filed by Plaintiffs CALID Inc, Coronavirus Reporter Corporation, Greenflight Venture Corporation. (Mathews, Keith) (Entered: 08/01/2024) |
| 08/05/2024 | 33 | (TEXT-ONLY) ORDER STAYING CASE by the Honorable Scott W Skavdahl. Based on the petition to join District of New Jersey MDL No. 3113 currently pending before the JPML, this action will be stayed pending the JPML's decision. If the JPML denies the petition, this Court will reset the briefing and decision schedule on Apple's motion to transfer this case to the Northern District of California 19 and the Plaintiffs' responsive motion for a more definite statement regarding motion to change venue 32 . (Court Staff, swe) (Entered: 08/05/2024) |
| 08/06/2024 | 34 | NOTICE of Pro Hac Vice Attorney Appearance by Keith Mathews on behalf of Coronavirus Reporter Corporation, Greenflight Venture Corporation (Mathews, Keith) Modified event text on 8/9/2024 (Court Staff, semt). (Entered: 08/06/2024) |
| 08/30/2024 | 35 | PLEADING FILED IN ERROR, PLEASE DISREGARD - ~~EX-PARTE DOCUMENT - RESPONSE filed by Plaintiffs Greenflight Venture Corporation, Coronavirus Reporter Corporation, CALID Inc, Defendant Apple Inc.~~ (Mathews, Keith) Modified text on 9/3/2024 (Court Staff, sjlg). (Entered: 08/30/2024) |

| | | |
|---|---|---|
| 09/18/2024 | 36 | (TEXT-ONLY) ORDER REASSIGNING REFERRAL JUDGE. Case reassigned to Chief US Magistrate Judge Scott P Klosterman for all further non-dispositive matters; US Magistrate Judge Mark L Carman no longer assigned to case by the Honorable Scott W Skavdahl. (Court Staff, sjlg) (Entered: 09/18/2024) |
| 10/03/2024 | 37 | ORDER DENYING TRANSFER re: pldg. (2 in DC/1:24-cv-00786, 134 in MDL No. 3113, 3 in WY/1:24-cv-00053), (7 in DC/1:24-cv-00786, 147 in MDL No. 3113, 10 in WY/1:24-cv-00053) The tag-along motion to transfer, pursuant to 28 U.S.C. 1407, is DENIED Signed by Judge Nathaniel M. Gorton, Acting Chair, PANEL ON MULTIDISTRICT LITIGATION, on 10/3/2024. Associated Cases: MDL No. 3113, DC/1:24-cv-00786, WY/1:24-cv-00053 (Court Staff, stbd) (Entered: 10/03/2024) |
| 10/11/2024 | 38 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Order to Enter Briefing Schedule re 19 Motion to Change Venue/Transfer filed by Defendant Apple Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Kleinbrodt, Julian) Added links and link text on 11/4/2024 (Court Staff, semt). (Entered: 10/11/2024) |
| 10/15/2024 | 39 | RESPONSE in Opposition re 38 MOTION for Order to Enter Briefing Schedule filed by Plaintiffs Coronavirus Reporter Corporation, Greenflight Venture Corporation. (Attachments: # 1 Exhibit A - Apple Answering Brief Declaring Coronavirus Reporter App Non-Entity, # 2 Exhibit B - Related case proceeding in DC, # 3 Exhibit C - Apple delays in government proceeding) (Mathews, Keith) Modified event text on 10/15/2024 (Court Staff, semt). (Entered: 10/15/2024) |
| 10/21/2024 | 40 | REPLY to 39 Response in Opposition to Motion, *to Enter Briefing Schedule* filed by Defendant Apple Inc. (Schwartz, Leah) (Entered: 10/21/2024) |
| 10/25/2024 | 41 | ORDER ENTERING BRIEFING SCHEDULE by the Honorable Scott W Skavdahl re 38 Motion for Order to Enter Briefing Schedule. IT IS THEREFORE ORDERED that Defendant Apple's supplemental briefing be filed with the Court by November 1, 2024 and Plaintiff's response brief be filed by November 14, 2024. The parties' filings are limited to ten pages, including attachments. (Court Staff, semt) (Entered: 10/25/2024) |
| 11/01/2024 | 42 | *Supplemental* BRIEF *In Support of 19 Motion to Transfer* re 41 Order Entering Briefing Schedule, filed by Defendant Apple Inc. (Attachments: # 1 Supplemental Declaration of Catherine Spevak) (Kleinbrodt, Julian) Modified links and event text on 11/4/2024 (Court Staff, semt). (Entered: 11/01/2024) |
| 11/14/2024 | 43 | RESPONSE in Opposition re 19 MOTION to Change Venue filed by Plaintiffs Coronavirus Reporter Corporation, Greenflight Venture Corporation. (Mathews, Keith) (Entered: 11/14/2024) |
| 11/21/2024 | 44 | ORDER by the Honorable Scott W Skavdahl granting 19 Motion to Change Venue. The clerk of court shall transfer this case to the Northern District of California. (Court Staff, semt) (Entered: 11/21/2024) |
| 12/03/2024 | 45 | Case Transferred in from United States District Court for the District of Wyoming (Casper); Case Number 1:24-cv-00053-SWS. Original file certified copy of transfer order and docket sheet received. (Entered: 12/03/2024) |

| 12/03/2024 | 46 | **Initial Case Management Scheduling Order with ADR Deadlines: Joint Case Management Statement due by 2/26/2025. Initial Case Management Conference set for 3/5/2025 at 2:00 PM in San Francisco - Videoconference Only. (tn, COURT STAFF) (Filed on 12/3/2024) (Entered: 12/03/2024)** |
|---|---|---|
| 12/04/2024 | 47 | CLERK'S NOTICE Re: Consent or Declination: Plaintiffs/Defendants shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. (Party/parties were also notified via telephone or email.)<br><br>Consent/Declination due by 12/18/2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (klh, COURT STAFF) (Filed on 12/4/2024) (Entered: 12/04/2024) |
| 12/09/2024 | 48 | NOTICE by Coronavirus Reporter Corporation *of filing objection to relate case to No. 21-cv-5567, argument is judicially estopped by Apple's plain declaration of Coronavirus Reporter being a legal non-entity* (Attachments: # 1 Exhibit A - Apple declaration that "Coronavirus Reporter" is a legal non-entity)(Mathews, Keith) (Filed on 12/9/2024) (Entered: 12/09/2024) |
| 12/17/2024 | 49 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Apple Inc.. (Kleinbrodt, Julian) (Filed on 12/17/2024) (Entered: 12/17/2024) |
| 12/18/2024 | 50 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (klh, COURT STAFF) (Filed on 12/18/2024) (Entered: 12/18/2024) |
| 12/18/2024 | 51 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Eumi K Lee for all further proceedings. Magistrate Judge Joseph C. Spero no longer assigned to case. Signed by Clerk on 12/18/2024. (mbc, COURT STAFF) (Filed on 12/18/2024) (Entered: 12/18/2024)** |
| 12/18/2024 | 52 | CLERK'S NOTICE RESETTING CASE MANAGEMENT STATEMENT DEADLINE AND CONFERENCE FOLLOWING REASSIGNMENT. Case Management Statement due by 3/19/2025. Initial Case Management Conference set for 4/2/2025 at 01:30 PM before Judge Eumi K. Lee. This proceeding will be held via a Zoom meeting. |

**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at eklcrd@cand.uscourts.gov no later than March 31, 2025 at 5:00PM PT.

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Filed on 12/18/2024) (Entered: 12/18/2024)

| | | |
|---|---|---|
| 01/09/2025 | 53 | **ORDER RELATING CASE.. Signed by Judge Edward M. Chen on 1/9/2025. (vla, COURT STAFF) (Filed on 1/9/2025) (Entered: 01/09/2025)** |
| 01/09/2025 | 54 | **ORDER REASSIGNING CASE. Case reassigned to Judge Edward M Chen for all further proceedings. Judge Eumi K Lee no longer assigned to case.**<br><br>**Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. (Attachments: # 1 Notice of Eligibility for Video Recording)(smc, COURT STAFF) (Filed on 1/9/2025) (Entered: 01/09/2025)** |
| 01/20/2025 | 55 | MOTION for Entry of Default *for Apple Inc.'s two month failure to file responsive pleading* filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. (Attachments: # 1 Declaration of Keith Mathews)(Mathews, Keith) (Filed on 1/20/2025) (Entered: 01/20/2025) |
| 01/22/2025 | 56 | NOTICE of Appearance filed by Daniel de Zouza Clasen on behalf of Coronavirus Reporter Corporation ( Clasen, Daniel) (Filed on 1/22/2025) (Entered: 01/22/2025) |
| 01/24/2025 | 57 | OPPOSITION/RESPONSE (re 55 MOTION for Entry of Default *for Apple Inc.'s two month failure to file responsive pleading* ) filed byApple Inc. (Kleinbrodt, Julian) (Filed on 1/24/2025) (Entered: 01/24/2025) |
| 01/26/2025 | 58 | REPLY (re 55 MOTION for Entry of Default *for Apple Inc.'s two month failure to file responsive pleading* ) filed byCoronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. (Mathews, Keith) (Filed on 1/26/2025) (Entered: 01/26/2025) |
| 01/29/2025 | 59 | Clerk's DECLINATION OF DEFAULT pursuant to FRCP 55(a). *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Related documents(s) 55 )(slh, COURT STAFF) (Filed on 1/29/2025) (Entered: 01/29/2025) |
| 02/03/2025 | 60 | STIPULATION WITH PROPOSED ORDER *Regarding Briefing Schedule for Defendant's Motion to Dismiss* filed by Apple Inc. (Kleinbrodt, Julian) (Filed on 2/3/2025) (Entered: 02/03/2025) |
| 02/04/2025 | 61 | **Order by Judge Edward M Chen GRANTING 60 STIPULATION REGARDING** |

| | | |
|---|---|---|
| | | **BRIEFING SCHEDULE FOR DEFENDANT'S MOTION TO DISMISS.**(vla, COURT STAFF) (Filed on 2/4/2025) (Entered: 02/04/2025) |
| 03/06/2025 | 62 | MOTION to Dismiss *First Amended Complaint* filed by Apple Inc. Motion to Dismiss Hearing set for 5/22/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor. Responses due by 4/7/2025. Replies due by 4/28/2025. (Attachments: # 1 Declaration of Julian W.Kleinbrodt, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Proposed Order)(Kleinbrodt, Julian) (Filed on 3/6/2025) (Entered: 03/06/2025) |
| 04/07/2025 | 63 | OPPOSITION/RESPONSE (re 62 MOTION to Dismiss *First Amended Complaint* ) filed byCoronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. (Attachments: # 1 Exhibit A - Pending Ninth Circuit Notary Stamp Rule 60 Summary, # 2 Exhibit B - Gibson Dunn "got Apple out of a $200 billion lawsuit" Law Firm Promotional Materials, # 3 Exhibit C - Wyoming Secretary of State Status for Coronavirus Reporter Corporation)(Mathews, Keith) (Filed on 4/7/2025) (Entered: 04/07/2025) |
| 04/28/2025 | 64 | REPLY in Support (re 62 MOTION to Dismiss *First Amended Complaint*) filed by Apple Inc. (Kleinbrodt, Julian) (Filed on 4/28/2025) (Entered: 04/28/2025) |
| 05/05/2025 | 65 | **CLERK'S NOTICE RESCHEDULING MOTION HEARING.**<br><br>**Motion Hearing as to 62 MOTION to Dismiss *First Amended Complaint* reset from 5/22/2025 to 7/10/2025, at 1:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.**<br><br>**ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO ARRIVE IN COURTROOM 5, 17TH FLOOR NO LATER THAN 1:10 PM TO CHECK-IN WITH THE COURTROOM DEPUTY.**<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 5/5/2025) (Entered: 05/05/2025) |
| 05/19/2025 | 66 | NOTICE of Withdrawal filed by Melissa R Theriault, no longer appearing on behalf of Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation in this case *3:24-cv-08660-EMC* (Theriault, Melissa) (Filed on 5/19/2025) (Entered: 05/19/2025) |
| 05/26/2025 | 67 | MOTION for Leave to File *Sur-Reply and Rule 12(d) conversion to Summary Judgment* filed by Coronavirus Reporter Corporation, Greenflight Venture Corporation. (Attachments: # 1 Exhibit A - Proposed Sur-Reply, # 2 Declaration of Attorney Keith A. Mathews pursuant to FRCP 56(d), # 3 Proposed Order)(Mathews, Keith) (Filed on 5/26/2025) (Entered: 05/26/2025) |
| 05/28/2025 | 68 | **ORDER by Judge Edward M. Chen granting 67 Motion for Leave to File.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (emclc3, COURT STAFF) (Filed on 5/28/2025) (Entered: 05/28/2025) |
| 05/30/2025 | 69 | **Clarification on Order at Dkt. 68 .** |

|  |  | |
|---|---|---|
|  |  | **The Court clarifies that it only grants Plaintiffs' motion for leave to file a surreply. It does not grant any additional relief sought in Plaintiffs' motion at Dkt. 67 . Defendant shall file an opposition to Plaintiffs' additional request for relief in accordance with the schedule set by the Local Rules.** <br><br> **Further, at this juncture, the only motion that the Court will hear in this case on July 10, 2025 is Defendant's motion to dismiss at Dkt. 62 .** <br><br> **. Signed by Judge Edward M. Chen on 5/30/2025.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(emclc3, COURT STAFF) (Filed on 5/30/2025) (Entered: 05/30/2025)** |
| 05/30/2025 | 70 | MOTION for Sanctions filed by Apple Inc. Motion Hearing set for 7/10/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 6/13/2025. Replies due by 6/20/2025. (Attachments: # 1 Declaration of Julian W. Kleinbrodt in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(Brass, Rachel) (Filed on 5/30/2025) (Entered: 05/30/2025) |
| 06/04/2025 | 71 | AMENDED NOTICE and Proposed Order by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation re 66 Notice of Appearance/Substitution/Withdrawal of Attorney *Melissa R. Theriault* (Attachments: # 1 Proposed Order)(Theriault, Melissa) (Filed on 6/4/2025) (Entered: 06/04/2025) |
| 06/09/2025 | 72 | Brief re 69 Order,, *Opposition to Plaintiffs' Motion for Rule 12(d) Conversion* filed byApple Inc. (Related document(s) 69 ) (Kleinbrodt, Julian) (Filed on 6/9/2025) (Entered: 06/09/2025) |
| 06/11/2025 |  | Electronic filing error re: 71 Notice (Other), filed by Coronavirus Reporter Corporation, Greenflight Venture Corporation, Calid Inc. Incorrect event used. Please re-file as a Motion or Proposed Order. (slh, COURT STAFF) (Filed on 6/11/2025) (Entered: 06/11/2025) |
| 06/12/2025 | 73 | **CLERK'S NOTICE RESCHEDULING MOTIONS HEARING.** <br><br> **Motions Hearing as to 62 MOTION to Dismiss *First Amended Complaint and* , 70 MOTION for Sanctions reset from 7/10/2025 to 7/11/2025, at 9:00 AM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.** <br><br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(vla, COURT STAFF) (Filed on 6/12/2025) (Entered: 06/12/2025)** |
| 06/13/2025 | 74 | MOTION to Strike 70 MOTION for Sanctions *Pursuant to California anti-SLAPP statutory Civil Code Procedure § 425.16* filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Motion Hearing set for 8/21/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 6/27/2025. Replies due by 7/7/2025. (Attachments: # 1 Exhibit A - Timeline, # 2 Proposed Order)(Mathews, Keith) (Filed on 6/13/2025) (Entered: 06/13/2025) |

| 06/16/2025 | 75 | REPLY (re 62 MOTION to Dismiss *First Amended Complaint* ) *Rule 12(d) Motion* filed byCoronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. (Mathews, Keith) (Filed on 6/16/2025) (Entered: 06/16/2025) |
|---|---|---|
| 06/18/2025 | 76 | **ORDER Amending Briefing Schedule for Plaintiffs' Mot. at Dkt. 74 . Defendant shall file its opposition by June 24, 2025. Plaintiffs shall file their reply by June 27, 2025. Signed by Judge Edward M. Chen on 06/18/2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (emclc3, COURT STAFF) (Filed on 6/18/2025) (Entered: 06/18/2025)** |
| 06/19/2025 | 77 | MOTION to Amend/Correct 66 Notice of Appearance/Substitution/Withdrawal of Attorney *Melissa Theriault* filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Responses due by 7/3/2025. Replies due by 7/10/2025. (Attachments: # 1 Proposed Order)(Theriault, Melissa) (Filed on 6/19/2025) (Entered: 06/19/2025) |
| 06/20/2025 | 78 | REPLY in Support (re 70 MOTION for Sanctions) filed by Apple Inc. (Brass, Rachel) (Filed on 6/20/2025) (Entered: 06/20/2025) |
| 06/24/2025 | 79 | **CLERK'S NOTICE: MOTION [#62] SCHEDULED FOR HEARING ON 7/11/2025, AT 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (vla, COURT STAFF) (Filed on 6/24/2025) (Entered: 06/24/2025)** |
| 06/24/2025 | 80 | **CLERK'S NOTICE RESCHEDULING MOTION HEARING.**<br><br>**Motion Hearing as to 70 MOTION for Sanctions reset from 7/11/2025 to 8/21/2025, at 1:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.**<br><br>**ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO ARRIVE IN COURTROOM 5, 17TH FLOOR NO LATER THAN 1:10 PM TO CHECK-IN WITH THE COURTROOM DEPUTY.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 6/24/2025) (Entered: 06/24/2025)** |
| 06/24/2025 | 81 | OPPOSITION/RESPONSE (re 74 MOTION to Strike 70 MOTION for Sanctions *Pursuant to California anti-SLAPP statutory Civil Code Procedure § 425.16* ) filed byApple Inc. (Attachments: # 1 Declaration of Julian W. Kleinbrodt in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order)(Brass, Rachel) (Filed on 6/24/2025) (Entered: 06/24/2025) |
| 06/25/2025 | 82 | **ORDER by Judge Edward M. Chen granting 62 Motion to Dismiss. (emclc3, COURT STAFF) (Filed on 6/25/2025) (Entered: 06/25/2025)** |
| 06/27/2025 | 83 | Emergency MOTION to Stay *Due To Apple's Non-Compliance With Supreme Court* |

ER 034

| | | |
|---|---|---|
| | | *Prohibition Against Universal Injunctions In Today's Trump V Casa Ruling, And Counsel Status Conference Necessity* filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Motion Hearing set for 8/21/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 7/11/2025. Replies due by 7/18/2025. (Attachments: # 1 Proposed Order, # 2 Exhibit A - Supreme Court Trump v. CASA slip order dated June 27 barring "Universal" Injunctions)(Mathews, Keith) (Filed on 6/27/2025) (Entered: 06/27/2025) |
| 06/28/2025 | 84 | ADMINISTRATIVE MOTION for Pre-Emptive Amicus Invitation and Limited Public-Input Procedure filed by Coronavirus Reporter Corporation, Greenflight Venture Corporation. Responses due by 7/2/2025. (Attachments: # 1 Proposed Order, # 2 Exhibit A - Petition for Apple CEO Tim Cook to resign for 1) cause shown re contempt of court and developer retaliation in Epic, 2) Refusal to comply with SCOTUS June 27 2025 TRUMP V CASA order, 3) Permitting ongoing abuse of a disabled individual by his personal counsel at Gibson Dunn, 4) Executing a decade+ long campaign for Apple to subvert felony antitrust law enforcement)(Mathews, Keith) (Filed on 6/28/2025) Modified on 7/3/2025 (slh, COURT STAFF). (Entered: 06/28/2025) |
| 06/30/2025 | 85 | Amended ADMINISTRATIVE MOTION for Pre-Emptive Amicus Invitation and Limited Public-Input Procedure re 84 filed by Coronavirus Reporter Corporation, Greenflight Venture Corporation. Responses due by 7/7/2025. (Attachments: # 1 Exhibit A - Petition for Petition for Apple CEO Tim Cook to resign for contempt of court and developer retaliation in Epic & for attempt to silence First Amendment critics, in violation of SCOTUS June 27 2025 TRUMP V CASA order)(Mathews, Keith) (Filed on 6/30/2025) (Entered: 06/30/2025) |
| 06/30/2025 | 86 | MOTION for Sanctions *pursuant to the Courts Inherent Powers, Fed. R. Civ. P. 11(c) (3), and 28 U.S.C. § 1927 Against Apple Inc. and Gibson Dunn & Crutcher LLP for Fraud-on-the-Court, Retaliatory Litigation, and Bad-Faith Misconduct; Request for $20 Million Joint-and-Several Monetary Sanction, Vacatur of Prior Judgment, Disqualification of Counsel, Expedited Discovery* filed by Coronavirus Reporter Corporation. Motion Hearing set for 8/21/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 7/14/2025. Replies due by 7/21/2025. (Attachments: # 1 Proposed Order)(Mathews, Keith) (Filed on 6/30/2025) (Entered: 06/30/2025) |
| 07/01/2025 | 87 | Amended MOTION to Stay re 83 Emergency MOTION to Stay *Due To Apple's Non-Compliance With Supreme Court Prohibition Against Universal Injunctions In Today's Trump V Casa Ruling, And Counsel Status Conference Necessity* , MOTION to Shorten Time *Under L.R. 6-3* filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Motion Hearing set for 7/15/2025 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 7/8/2025. Replies due by 7/10/2025. (Attachments: # 1 Proposed Order)(Mathews, Keith) (Filed on 7/1/2025) (Entered: 07/01/2025) |
| 07/02/2025 | 88 | **Order by Judge Edward M Chen GRANTING 77 MOTION FOR WITHDRAWAL OF COUNSEL AS TO Melissa R. Theriault.(vla, COURT STAFF) (Filed on 7/2/2025) (Entered: 07/02/2025)** |

| 07/06/2025 | 89 | ADMINISTRATIVE MOTION to Relate Cases and for Expedited Stay Pending Resolution filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Responses due by 7/10/2025. (Attachments: # 1 Proposed Order, # 2 Exhibit A - Pending Motion for Sanctions for Witness Intimidation, Developer Retaliation against Apple Inc, # 3 Exhibit B - Petition for Apple Board of Directors concerning Litigation Misconduct)(Mathews, Keith) (Filed on 7/6/2025) Modified on 7/7/2025 (slh, COURT STAFF). (Entered: 07/06/2025) |
| --- | --- | --- |
| 07/07/2025 | 90 | OPPOSITION/RESPONSE (re 85 Amended ADMINISTRATIVE MOTION for Pre-Emptive Amicus Invitation and Limited Public-Input Procedure re 84 ) filed byApple Inc. (Attachments: # 1 Declaration of Julian W. Kleinbrodt, # 2 Proposed Order)(Brass, Rachel) (Filed on 7/7/2025) (Entered: 07/07/2025) |
| 07/07/2025 | 91 | OPPOSITION/RESPONSE (re 87 Amended MOTION to Stay re 83 Emergency MOTION to Stay *Due To Apple's Non-Compliance With Supreme Court Prohibition Against Universal Injunctions In Today's Trump V Casa Ruling, And Counsel Status Conference Necessity* MOTION to Shorten Time *Under L.R. 6-3 ) Opposition to Motion for L.R. 6-3 Order Shortening Time Only* filed byApple Inc. (Attachments: # 1 Declaration of Julian W. Kleinbrodt)(Brass, Rachel) (Filed on 7/7/2025) (Entered: 07/07/2025) |
| 07/08/2025 | 92 | **ORDER on Plaintiffs' Pending Motions**<br><br>**. Signed by Judge Edward M. Chen on 07/8/2025. (emclc3, COURT STAFF) (Filed on 7/8/2025) (Entered: 07/08/2025)** |
| 07/08/2025 | 93 | **RELATED CASE ORDER. 20-cv-5640-YGR is not related to 24-cv-8660-EMC. Signed by Judge Yvonne Gonzalez Rogers on 7/8/2025. (eac, COURT STAFF) (Filed on 7/8/2025) (Entered: 07/08/2025)** |
| 07/08/2025 | 94 | Declaration of Keith Allen Mathews in Support of 93 Order Relating Case, 89 ADMINISTRATIVE MOTION to Relate Cases and for Expedited Stay Pending Resolution *and Request for Reconsideration in Light of Factual Evidence Plaintiffs are Cameron opt-outs and lawfully followed all procedures to opt-out of Cameron* filed byCalid Inc, Greenflight Venture Corporation. (Related document(s) 93 , 89 ) (Mathews, Keith) (Filed on 7/8/2025) (Entered: 07/08/2025) |
| 07/10/2025 | 95 | **ORDER**<br><br>**Plaintiffs shall file a brief not to exceed 10 pages showing cause why its filing of motions at Dkts. 74, 83-87, and 89 has not violated Rule 11(b). See Fed. R. Civ. P. 11(c)(3). Plaintiffs shall file this brief by July 14, 2025. Defendant shall file a response not to exceed 10 pages by July 17, 2025.**<br><br>**. Signed by Judge Edward M. Chen on 07/10/2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (emclc3, COURT STAFF) (Filed on 7/10/2025) (Entered: 07/10/2025)** |
| 07/14/2025 | 96 | Brief *Opposition to Coronavirus Reporter Corporation's Motion for Sanctions (Dkt. 86 )* filed byApple Inc. (Attachments: # 1 Proposed Order)(Brass, Rachel) (Filed on |

| | | |
|---|---|---|
| | | 7/14/2025) (Entered: 07/14/2025) |
| 07/14/2025 | 97 | Brief re 95 Order,, *Memorandum in Response to Order to Show Cause* filed byCoronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. (Attachments: # 1 Declaration of Keith Allen Mathews, # 2 Exhibit - Proposed Reply to AntiSLAPP motion)(Related document(s) 95 ) (Mathews, Keith) (Filed on 7/14/2025) (Entered: 07/14/2025) |
| 07/17/2025 | 98 | RESPONSE re 97 Brief, *(Defendant's Response to Plaintiffs' Response to July 10, 2025, Order to Show Cause)* by Apple Inc. (Brass, Rachel) (Filed on 7/17/2025) (Entered: 07/17/2025) |
| 07/22/2025 | 99 | ADMINISTRATIVE MOTION Leave to File Motion for Reconsideration Based upon new authorities stemming from Shields, Proton AG, Pure Sweat, DOJ, and Gamboa ; Balance of Equities; Non-Adjudication of Tying Theories despite five years best efforts, new RICO predicate acts, Non-Privity of Greenflight and its founder , MOTION for Leave to File filed by Coronavirus Reporter Corporation, Calid Inc, Greenflight Venture Corporation. Responses due by 7/28/2025. (Attachments: # 1 Proposed Order)(Mathews, Keith) (Filed on 7/22/2025) (Entered: 07/22/2025) |
| 07/28/2025 | 100 | OPPOSITION/RESPONSE (re 99 ADMINISTRATIVE MOTION Leave to File Motion for Reconsideration Based upon new authorities stemming from Shields, Proton AG, Pure Sweat, DOJ, and Gamboa ; Balance of Equities; Non-Adjudication of Tying Theories despite five years best efforts, new RICO MOTION for Leave to File ) filed byApple Inc. (Attachments: # 1 Declaration of Julian W. Kleinbrodt, # 2 Exhibit 1)(Kleinbrodt, Julian) (Filed on 7/28/2025) (Entered: 07/28/2025) |
| 07/30/2025 | 101 | **CLERK'S NOTICE: MOTION 70 SCHEDULED FOR HEARING ON 8/21/2025, AT 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED.** <br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(vla, COURT STAFF) (Filed on 7/30/2025) (Entered: 07/30/2025)** |
| 07/30/2025 | 102 | **ORDER by Judge Edward M. Chen granting in part and denying in part 70 Motion for Sanctions; denying 99 Administrative Motion ; denying 99 Motion for Leave to File. (emclc3, COURT STAFF) (Filed on 7/30/2025) (Entered: 07/30/2025)** |



| PACER Service Center | | | |
|---|---|---|---|
| | | | |
| **PACER Login:** | ▮▮▮ | ▮▮▮: | |
| **Description:** | Docket Report | ▮▮▮ | |
| ▮▮▮ | ▮ | ▮▮ | ▮ |

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE RECONSIDERATION**<br><br><br>Date: September 4, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

ER 038

**NOTICE OF ADMINISTRATIVE MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

(Civ. L.R. 7-11)

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation ("Plaintiffs") respectfully move pursuant to Federal Rules of Civil Procedure 54(b), 59(e), and 60(b)(6) and Civil Local Rule 7-11 for leave to file the attached Motion for Reconsideration of the Court's June 25 2025 Order (ECF 82) dismissing this action on res judicata grounds.

Plaintiffs recognize that, as of this filing, the Clerk has not entered a separate judgment under Rule 58(a). Accordingly, the Court's June 25, 2025 dismissal order is presently interlocutory and subject to the Court's inherent authority to revise it "at any time before entry of a final judgment" under Fed. R. Civ. P. 54(b) and Civil L.R. 7-9. Out of an abundance of caution, Plaintiffs respectfully request either

(i) that the Court treat this motion as a Rule 54(b)/Local Rule 7-9 motion for reconsideration of an interlocutory order, or

(ii) in the alternative, that the Court enter judgment forthwith and instruct Plaintiffs to file a timely Rule 59(e)/60(b)(6) motion wholly similar to the attached Proposed Motion.

This dual request ensures that the Court may reach the merits without procedural delay, decide whether to reconsider under interlocutory or final judgement criteria, and that no party is prejudiced by the clerical status of the judgment.

A proposed hearing is provisionally scheduled for September 4 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the United States Courthouse, 450 Golden Gate Avenue, San Francisco,

ER 039

This motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; and Proposed Motion attached thereto; the pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and such oral argument as may be presented at the hearing.

## MEMORANDUM OF POINTS & AUTHORITIES

(Rule 7-11(b)(4))

*Exceptional New Authority Justifies Reconsideration*

1.  *Shields v. World Aquatics*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. Sept. 17, 2024) –clarified that direct evidence of anticompetitive effects obviates rigid market definition pleading. Experienced Harvard-educated competition counsel at Berger Montague applied *Shields* one week ago to Defendant Apple's censorship of COVID apps in *PhantomALERT v. Apple* (D.C. Cir. No. 25-7017), a case Apple itself calls "identical." Undersigned is grateful for the diligent investigation of the Berger Montague team and their objective determination that *Shields* overcomes the market definition obstacles that had plagued these related cases for five years. Undersigned fully concurs with Berger Montague's newly filed analysis and incorporates it herein.

2.  *United States v. Apple*, USDJ Neals (D.N.J. June 28, 2025) – DOJ monopolization suit survived Apple's Rule 12(b)(6) motion, rejecting the very defenses Apple advanced here.

3.  *Gamboa v. Apple*, (N.D. Cal. June 16, 2025) – Judge Eumi K. Lee allowed § 2 technological tying claims based on Apple's design restrictions.

4.  *Proton AG v. Apple* (filed June 30, 2025) & *Pure Sweat Basketball v. Apple* (filed May 2, 2025) – two developer class actions replicate Plaintiffs' theories.

5.  *Epic Games v. Apple* contempt order (Apr. 30 2025) – finding Apple submitted "false and misleading" testimony, now a fresh RICO predicate.

    *Apple Forfeited Objections to Shields and the Equities*

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Plaintiffs' OSC filing (July 14, 2025) directly invoked *Shields* and detailed the balance-of-equities factors. Apple's OSC response was silent on these material issues. Under Ninth Circuit law, failure to address an argument constitutes waiver; Apple cannot resurrect those objections now.

*Good Cause Under L.R. 7-11*

Narrow timing: These authorities surfaced only after the Court's dismissal or Reply briefing was complete.

No prior opportunity: Plaintiffs could not reasonably present them earlier.

No prejudice: Apple is already litigating the same questions (DOJ, *Proton, Pure Sweat*).

Underlying motion effectively unopposed: Apple's forfeiture means the merits stand unrebutted.

*Meet and Confer*

Pursuant to L.R. 7-11(a), undersigned counsel emailed Apple's counsel on July 21, 2025, summarized the new authority, and requested stipulation to file. Counsel informed Apple of their forfeiture of *Shields* and equities. Apple declined to respond as of filing.

## CONCLUSION

Because the dismissal order is interlocutory and because overwhelming, unrebutted authority now demonstrates Plaintiffs' claims are viable—and Apple has forfeited its opposition—Plaintiffs respectfully ask the Court to grant leave to file the attached Motion for Reconsideration.

Dated: July 21, 2025               Keith A. Mathews, Esq.

**DECLARATION OF KEITH MATHEWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

I, Keith Mathews, declare as follows:

I am counsel of record for Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation. I am admitted pro hac vice in this matter. I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

On July 21, 2025 at 2 p.m. PDT, I emailed Apple's lead counsel, and copied all counsel of record, requesting stipulation for this Administrative Motion and the accompanying Motion for Reconsideration. The email (a) notified Apple that Plaintiffs intended to file under Civil Local Rule 7-11, (b) mentioned new authorities such as *Shields*, and (c) explained that Plaintiffs believed Apple had forfeited any opposition to the *Shields* and balance-of-equities arguments by failing to address them in its July 17, 2025 OSC response. No Response. As of the execution of this declaration—more than 48 hours later—I have received no response from Apple's counsel, written or oral, despite a follow-up voicemail left on 20 July 2025 at 4:30 p.m. Because Apple has declined to stipulate or even respond, a stipulation "could not be obtained," satisfying Civ. L.R. 7-11(a).

Plaintiffs had initially assumed the had entered a Rule 58 judgment and therefore sought a litigation stay to deal with overwhelming new issues affecting this case. While no judgment has apparently yet been entered, the legal landscape has moved swiftly: the DOJ decision, *Gamboa*, the filing of *Proton*, the *Pure Sweat* contempt-based class action, and Berger Montague's *PhantomALERT* brief applying *Shields*. These developments, combined with Apple's forfeiture of *Shields* and equities arguments, create an urgent and compelling need for reconsideration now—before conflicting rulings or mandates issue.

ER 042

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

This motion and the underlying request for reconsideration are made in good faith, not for purposes of delay. All newly cited authorities post-date the dismissal briefing (or could not reasonably have been presented earlier), and Plaintiffs believe they fundamentally alter the legal and equitable calculus. Granting leave will not prejudice Apple, which is already defending identical theories in the DOJ and developer class actions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of July 2025 in Manchester, New Hampshire.

/s/ Keith Mathews

Keith Mathews

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................I

INTRODUCTION...........................................................................................................1

BACKGROUND AND RECENT DEVELOPMENTS.................................................2

INTERVENING DEVELOPMENTS.............................................................................3

LEGAL STANDARDS FOR RECONSIDERATION .................................................6

ARGUMENT ..................................................................................................................8

    *I.    Res Judicata Should Not Be Rigidly Applied Where the Equities Strongly Favor Adjudicating Plaintiffs' Claims Alongside the Parallel Proceedings* ............................................................. 8

    *II.    Apple's "Unclean Hands" Strengthens the Equitable Case for Re-Opening* ............................. 9

    *III.    New Violations Give Rise to New Claims that Lawlor Protects*.................................................... 11

    *IV.    Per Se Tying Claim and "Direct Evidence" Theory Were Never Adjudicated in CR I; They Survive and Are Now Bolstered by New Authority* ............................................................................ 12

    *V.    RICO: Apple's Epic Contempt Is Not Unrelated - It Falls Within the Developer Retaliation Pattern Pleaded in CR I and Justifies Leave to Amend* ...................................................................... 15

    *VI.    The Pending DOJ Action Creates "Contingent Finality" that Justifies Equitable Relief* ......... 19

    *VII.    The Prior Dismissal Was a Procedural Termination; No Court Has Ever Adjudicated Whether Apple's Conduct Is Lawful*........................................................................................................................ 20

    *VIII.    The Court's Finding of Privity Between Isaacs and Greenflight Was Clearly Erroneous and Requires Reconsideration* .......................................................................................................................... 21

CONCLUSION..............................................................................................................23

CERTIFICATE OF SERVICE....................................................................................24

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

# TABLE OF AUTHORITIES

C<small>ASES</small>

*Ackermann v. United States*,
 340 U.S. 193, 202 (1950) ------------------------------------------------------------------------------ 7

*Allstate Ins. Co. v. Herron*,
 634 F.3d 1101, 1111 (9th Cir. 2011) ------------------------------------------------------------ 6

*Citizens State Bank v. O'Leary*,
 856 F.2d 282, 287-88 (8th Cir. 1988) ----------------------------------------------------------10

*Coronavirus Reporter v. Apple Inc.*,
 85 F.4th 948 (9th Cir. 2023)------------------------------------------------------------------------ 2

*Coronavirus Reporter v. Apple Inc.*,
 No. 21-cv-05567-EMC------------------------------------------------------------------------------ 2

*EEOC v. Recruit U.S.A., Inc.*,
 939 F.2d 746, 753 (9th Cir. 1991) -------------------------------------------------------------- 9

*Foman v. Davis*,
 371 U.S. 178 (1962) ----------------------------------------------------------------------------------17

*Frank v. United Airlines, Inc.*,
 216 F.3d 845, 851–52 (9th Cir. 2000) ----------------------------------------------------------13

*FTC v. Indiana Fed'n of Dentists*,
 476 U.S. 447 (1986) ---------------------------------------------------------------------------------- 5

*Gamboa v. Apple Inc.*,
 No. 5:24-cv-01270-EKL -------------------------------------------------------------------------- 5

*Headwaters Inc. v. U.S. Forest Serv.*,
 399 F.3d 1047, 1054 (9th Cir. 2005) ------------------------------------------------------------21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2, 15–18 (1984) ------------------------------------------------------------------------13

*Johnson v. Yellow Cab Transit Co.*,
 21 U.S. 383, 387 (1944) ------------------------------------------------------------------------ 9

*Lawlor v. Nat'l Screen Serv. Corp.*,
 349 U.S. 322, 328 (1955) ------------------------------------------------------------------------ 7

*Liljeberg v. Health Servs. Acquisition Corp.*,
 486 U.S. 847, 863–64 (1988) ------------------------------------------------------------------ 7

*Living Designs v. DuPont*,
 431 F.3d 353, 362 (9th Cir. 2005) --------------------------------------------------------------16

*Montana v. United States*,
 440 U.S. 147, 154–55 (1979) ----------------------------------------------------------------------22

*PhantomALERT v. Apple*,
 No. 25-7017 (D.C. Cir) -------------------------------------------------------------------------- 4

*Phelps v. Alameida*,
 569 F.3d 1120, 1135-36 (9th Cir. 2009) ---------------------------------------------------- 6

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
 324 U.S. 806, 814 (1945) ------------------------------------------------------------------------ 9

*Proton AG v. Apple*,
 No. 4:25-cv-05450-------------------------------------------------------------------------------- 4

i

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

*Rowland v. California Men's Colony,*
  506 U.S. 194, 201–03 (1993) --------------------------------------------------------------------------------22
*Shields v. NCAA (World Aquatics),*
  92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024) -------------------------------------------------------- 5
*Sys. Fed'n No. 91 v. Wright,*
  364 U.S. 642, 647–48 (1961) -----------------------------------------------------------------------------19
*Taylor v. Sturgell,*
  553 U.S. 880, 893–95 (2008) -----------------------------------------------------------------------------21
*United States v. Apple,*
  No. 2:24-cv-4055-JXN(D.N.J.), -------------------------------------------------------------------------- 3
*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) (en banc)-------------------------------------------------------------------- 5

<u>S</u>TATUTES

18 U.S.C. § 1503 -----------------------------------------------------------------------------------------------16
18 U.S.C. § 1621 -----------------------------------------------------------------------------------------------16
18 U.S.C. § 1961 -----------------------------------------------------------------------------------------------16

<u>R</u>ULES

*Fed. R. Civ. P. 35(a)* ----------------------------------------------------------------------------------------18

**INTRODUCTION**

Plaintiffs respectfully seek reconsideration of the Court's June 25, 2025 Order (Dkt. 82) dismissing this action on res judicata grounds. In the short time since the dismissal briefing, no fewer than five major developments have overwhelmingly validated Plaintiffs' claims and theories. A U.S. Department of Justice antitrust suit against Apple survived a motion to dismiss raising identical defenses; a recent Ninth Circuit decision (*Shields*) undercuts the basis of the prior dismissal according to Berger Montague's appeal filed last week for *PhantomALERT*, an "identical" COVID app case; an app developer (*Gamboa*) prevailed on similar tying allegations in this District; and two separate class actions (*Proton* and *Pure Sweat*) have been filed by developers challenging the same App Store practices as the FAC. What was once dismissed as implausible "hinterlands" is now the subject of serious litigation and enforcement. It would be manifestly unjust to lock Plaintiffs out of this industry-wide reckoning. The Court has the equitable power under Fed. R. Civ. P. 59(e) and 60(b)(6) to prevent such injustice and to harmonize this case with the parallel proceedings examining Apple's conduct.

Importantly, Plaintiffs' claims have never been heard on the merits. The prior *Coronavirus Reporter I* ("*CR I*") case was dismissed at the pleading stage on technical grounds (market definition), with no adjudication of whether Apple's App Store practices are lawful. Fundamental fairness dictates Plaintiffs now be allowed to participate in the ongoing scrutiny of Apple's conduct. Apple will suffer no unfair prejudice by litigating this case on the merits: it is already defending identical allegations against the DOJ and private plaintiffs. Indeed, Apple has likely marshalled the very defenses needed here in those parallel cases, so proceeding will impose minimal additional burden. By contrast, denying reconsideration would irreparably prejudice Plaintiffs, leaving them the only affected developers with no forum to vindicate their rights, despite events proving they were right all along. Such equity disparity plainly all but proves Gibson Dunn and Apple's relentless tactics to oppress and discredit the Plaintiffs worked.

Notably, in its recent briefing (in response to the Court's Order to Show Cause), Apple tellingly failed to address two key points Plaintiffs raised: the equities warranting relief and the Ninth Circuit's intervening *Shields* decision. In other words, Apple forfeited any opposition to Plaintiffs' equity-based arguments and offered no answer to the new legal authority undermining the underlying market definition dismissal. The law is clear that a party who fails to respond to an argument effectively concedes it. Apple should therefore

ER 047

be estopped from taking a new position now. This silence speaks volumes and is hardly an accidental omission: Apple has no compelling rebuttal to the extraordinary circumstances justifying relief. Given the confluence of new support for Plaintiffs' claims and Apple's inability (for fear of repercussions to mounting judicially estopped positions) to refute the equitable and legal grounds for reopening the case, this motion presents a compelling case for relief. Plaintiffs respectfully urge the Court to reconsider and vacate the dismissal, and to allow this case to proceed alongside the related actions addressing Apple's alleged App Store monopoly.

## BACKGROUND AND RECENT DEVELOPMENTS

**Prior CR I Litigation (2020–2023)**: *Coronavirus Reporter v. Apple Inc.*, No. 21-cv-05567-EMC, was a suit alleging that Apple's App Store practices – including excluding third-party apps and charging developers a $99 annual fee and 30% commission – violated antitrust and other laws. On November 30, 2021, Judge Chen dismissed the CR I complaint with prejudice, finding Plaintiffs had not plausibly alleged a relevant product market or antitrust injury and that further amendment would be futile. The dismissal was a Rule 12(b)(6) ruling, effectively a pleading-stage defeat, not a factual determination on Apple's conduct. The Ninth Circuit affirmed in 2023, agreeing that Plaintiffs' allegations (as pled at the time) were insufficient. See *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948 (9th Cir. 2023). Crucially, neither Judge Chen nor the Ninth Circuit made any finding on whether the alleged per se App Store tying in fact violated antitrust laws – those merits questions were left unanswered, in part due to Apple taking a judicially estopped position that the tying involved software, rather than hardware.

**Current CR II Action (2024–present)**: On March 3, 2024, Plaintiffs filed this action in the District of Wyoming (later transferred to N.D. Cal.) raising renewed antitrust claims against Apple's App Store practices. The First Amended Complaint ("FAC") in this case builds on the DOJ antitrust complaint with a broad set of facts applicable to its generalized, putative developer class. Plaintiffs detail Apple's ongoing conduct since 2021 – for example, new efforts to subvert antitrust enforcement, new developer retaliation claims, and Apple's yearly updates to its Developer Program License Agreement (DPLA) and continued exaction of the annual $99 developer fee – as part of a persistent pattern of exclusionary behavior mostly after the CR I judgment. The FAC also refines the relevant market allegations (identifying distinct markets for iOS app distribution and apps themselves) and details antitrust injury to developers and innovation

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

through reduced app output and lowered app quality. Apple moved to dismiss the FAC, arguing that all claims are barred by res judicata (claim preclusion) due to the CR I judgment. On June 25, 2025, this Court granted Apple's motion and dismissed the case, holding that (i) this suit involved the same "nucleus of facts" as CR I, and that parties here are the same or in privity with those in CR I. (Dkt. 82, at 4–8.) The Court concluded that under res judicata, Plaintiffs could not relitigate their claims in this forum.

## INTERVENING DEVELOPMENTS

Since the dismissal of this case (and indeed, in the period after CR I's 2021 judgment), the landscape has changed dramatically. Multiple parallel actions and decisions have emerged that powerfully support Plaintiffs' position. These include government enforcement, new private class actions, and evolving case law, all directly relevant to the claims at issue:

United States v. Apple Inc. (D.N.J.) – *DOJ Antitrust Suit:* On March 21, 2024, the U.S. Department of Justice and several states sued Apple for monopolization, targeting Apple's smartphone app distribution practices. In June 2025, U.S. District Judge Julien Neals denied Apple's motion to dismiss the DOJ case, allowing the government's claims to proceed. In rejecting Apple's arguments, the court agreed that Apple's alleged conduct – far from being a lawful unilateral refusal to deal – involves exclusionary conditions and restraints that are actionable under the antitrust laws (see *United States v. Apple*, No. 2:24-cv-4055-JXN(D.N.J.), Order dated June 28, 2025). Apple had argued that it has a right to control its platform (suggesting a *Colgate* or *Aspen Skiing* "right to refuse to deal" defense), but the DOJ successfully countered that the case is about Apple's coercive tying and restrictive policies imposed on developers and users, not a simple refusal to license its IP or software. The court agreed that the refusal-to-deal doctrine does not shield Apple's conduct, because Apple is accused of leveraging its monopoly power by imposing anticompetitive terms and technological restrictions on those who wish to reach iPhone users, rather than merely declining to do business with a rival. In short, the DOJ case confirms that the very theories Plaintiffs advanced – that Apple's integration of its hardware, operating system (iOS), and App Store allows it to lock in users and exclude competition – present legally viable claims of monopolization. Most significantly, the D.N.J. rejected the same pretextual arguments Apple raised in both CR I and CR II regarding IP licensing fees, tying and refusal-to-deal exceptions.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Proton AG v. Apple Inc. (N.D. Cal.) – *Developer Class Action:* On June 30, 2025, Proton AG – the Swiss-based developer of ProtonMail filed a nationwide class action in this District alleging that Apple's App Store policies violate the Sherman Act. *See Proton AG v. Apple*, No. 4:25-cv-05450. Proton's 73-page complaint (backed by prominent antitrust counsel) reiterates many of the same relevant market definitions and anticompetitive conduct theories that Plaintiffs have long asserted. For example, Proton claims that Apple unlawfully ties app distribution on iOS to the iPhone device. This theory was first advanced by Undersigned five years ago, and is finally taking root.

PhantomALERT v. Apple Inc. (D.D.C. & D.C. Cir.) – *Parallel Developer Case on Appeal:* PhantomALERT, a small app developer, filed an antitrust suit in 2024 challenging Apple's exclusion of its COVID-related app and other App Store practices (claims very akin to Plaintiffs'). In January 2025, the U.S. District Court for D.C. (Judge McFadden) dismissed PhantomALERT's case (granting Apple's motion to dismiss) and denied leave to amend, citing issues such as timeliness and sufficiency of market allegations. PhantomALERT has since appealed, and as of July 2025 its appeal is pending before the D.C. Circuit (No. 25-7017). Notably, in its opening brief filed July 11, 2025, PhantomALERT argues that the district court erred and that output restriction of COVID apps alone suffices as direct injury pursuant to *Shields* (*see infra*). Hence, in the weeks since CR II dismissal, leading antitrust counsel at Berger Montague has reviewed the anticompetitive effects of an "identical" (Apple's words) COVID censorship case and deemed recent *Shields* law saves the cases from 12(b)(6) pleading deficiency (see Brief for Appellant, *PhantomALERT v. Apple*, No. 25-7017 (D.C. Cir. filed July 11, 2025)).  That alone suffices to reopen this case; *Shields* is unambiguous and Apple's didn't even try to argue otherwise in last week's OSC briefing. They have waived their right to object to *Shields'* implications, so the case must be reopened in deference to *Shields*. Basic fairness suggests Plaintiffs should have the same opportunity to have their claims heard as PhantomALERT (who studied CR I's progression through the courts for five years), rather than being uniquely shut out.

On May 2, 2025 (after Apple's reply was filed for the MTD), a putative class of iOS developers led by *Pure Sweat Basketball* filed another lawsuit in this District (Case No. 5:25-cv-03858) focusing on Apple's willful violation of a court-ordered injunction and its continued extraction of supracompetitive commissions. By way of background, in the *Epic Games v. Apple* litigation, Judge Yvonne Gonzalez Rogers had issued a nationwide injunction in 2021 (effective January 2022) prohibiting Apple's anti-steering rules. Rather than

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

comply in good faith, Apple devised new tactics to stymie competition including a "link tax"). Plaintiffs' FAC sought redress for this matter in March 2024, calling the conduct "malicious compliance" which harmed the putative developer class. In April 2025, Judge Gonzalez Rogers found Apple in contempt of the injunction. In the wake of these findings, Pure Sweat's class action seeks overlapping relief with Plaintiffs' FAC for developers who were harmed by Apple's conduct. In sum, *Pure Sweat* and the *Epic* contempt finding evidence Plaintiffs' UCL retaliation claim had merit, and concerned post-2021 conduct. This Court's failure to address the UCL retaliation claims constitutes manifest error, and *Pure Sweat's* filing supports the reopening of our first-to-file lawsuit.

In addition to the above enforcement and litigation developments, the legal landscape within the Ninth Circuit has seen important doctrinal shifts. In September 2024, the Ninth Circuit decided *Shields v. NCAA (World Aquatics)*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024). In *Shields*, the Ninth Circuit held that under the rule of reason, a plaintiff can rely on direct evidence of anticompetitive effects (such as reduced output or quality) to establish an antitrust violation even without defining the relevant market in detail. *Id.* at *3 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986), and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc)). This clarification is directly relevant here: one of the main reasons CR I was dismissed was the perceived failure to plead a precise market definition. *Shields* confirms that such precision is not necessary if the conduct's harm to competition can be shown directly – a principle that Plaintiffs invoked by alleging restriction and censorship of apps like COVID apps and others, but which was overlooked in CR I. Hence, not only did the CR I Court and Ninth Circuit never adjudicate per se tying, but even either of those courts had determined Rule of Reason applies (it doesn't), *Shields* allows the case to progress on direct evidence.

Furthermore, just last month (June 16, 2025), Judge Eumi K. Lee of this District issued an order in *Gamboa v. Apple Inc.*, No. 5:24-cv-01270-EKL, that resonates with Plaintiffs' claims. In *Gamboa*, the plaintiff challenged Apple's restriction of certain "iCloud Photos" features to Apple's own iCloud service (alleging that Apple effectively forced users to use iCloud by technologically disabling the ability to freely manage certain photo files on iPhones). Judge Lee denied Apple's motion to dismiss, holding that Apple's technological tying of its products/services could plausibly violate §2 of the Sherman Act. Specifically, the court recognized that Apple's design decision (making iPhones treat non-iCloud photo libraries as "restricted

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

files") might be an exclusionary act intended to coerce adoption of Apple's complementary service (iCloud), thus reinforcing its dominance. *Gamboa* illustrates that antitrust law in this Circuit is adapting to account for Apple's tying strategies, even when those strategies are implemented via unilateral technical restrictions rather than explicit contractual ties. Notably, the CR II FAC adds Section 2 tying allegations which were not present in CR I. *Gamboa* is persuasive authority that such Section 2 technical restriction tying allegations deserve scrutiny. Plaintiffs here allege the same leverage: Apple conditions full access to iPhone (and critical device functionality) on submission to its exclusive App Store terms and $99 annual fee, thereby reinforcing monopolies in both performance smartphones and iOS app distribution. FAC ¶¶ 299-306. *Gamboa* confirms that such unilateral, design-based tying is actionable under § 2. Those holdings directly contradict Apple's contention (Mot. to Dismiss at 5-6) that Plaintiffs must plead traditional § 1 "conditioning" plus a fully articulated relevant market at the complaint stage. At the time CR I was dismissed, no court in this Circuit had allowed an Apple tying claim past the pleadings. *Gamboa* (2025), *Proton AG v. Apple* (2025), and the DOJ action now show that Plaintiffs' leveraging theories are legally plausible, if not ahead of their time. Treating the 2021 CR I dismissal as a permanent bar—while identical theories proceed for other plaintiffs— would 'work a manifest injustice.' *Phelps v. Alameida*, 569 F.3d 1120, 1135-36 (9th Cir. 2009).

Together, *Shields* and *Gamboa* represent an important shift: they validate approaches to antitrust liability (direct evidence, and non-traditional tying) that support Plaintiffs' theories. These cases did not exist or were not available at the time of the CR I judgment, but now provide judicial reinforcement that Plaintiffs' claims are far from fanciful – to the contrary, they are on the cutting edge of current antitrust adjudication. Plaintiffs have researched and adapted App Store tying claims for five years, evident from these developing cases which show Plaintiffs efforts to be grounded in accuracy and relevancy; this is far from the picture of vexatiousness Apple advances, but in fact, compelling (if not mandatory) grounds to reopen the case.

## LEGAL STANDARDS FOR RECONSIDERATION

A Rule 59(e) *Alteration or Amendment of Judgment* motion is an "extraordinary remedy" used to prevent manifest injustice or to correct clear errors of law or fact. *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). Grounds for Rule 59(e) include: (1) an intervening change in controlling law; (2) the emergence of new evidence not previously available; or (3) the need to correct a clear error or prevent

manifest injustice. *Id.* Here, Plaintiffs invoke Rule 59(e) because significant events and law changes after the dismissal have reshaped the case, and adherence to the original judgment would result in manifest injustice.

Rule 60(b)(6) allows a court to relieve a party from a final judgment for "any other reason that justifies relief." This is a grand reservoir of equitable power, to be used sparingly and only in extraordinary circumstances. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988). The moving party must show both injury (or undue hardship) and that extraordinary circumstances justify reopening the judgment. Intervening changes in law, new evidence, or a showing that the prior judgment is no longer equitable are recognized bases for 60(b)(6) relief. *See id.*; *Phelps v. Alameida*, 569 F.3d 1120, 1135–40 (9th Cir. 2009) (granting Rule 60(b)(6) relief where an intervening Supreme Court decision undermined the legal basis of the prior judgment, and emphasizing that courts must balance finality against the need to do justice in light of new developments). The Ninth Circuit instructs that courts considering Rule 60(b)(6) should examine a variety of factors, including the nature of the intervening change, the diligence of the movant, and the potential injustice of denying relief. *Phelps*, 569 F.3d at 1135–39.

Res Judicata vs. Equitable Power: While claim preclusion is a doctrine of general application, it is equitable in nature and should not be applied mechanically if doing so would work an injustice. The Supreme Court has cautioned that res judicata cannot be given the effect of extinguishing claims which did not even exist at the time of the prior judgment, and which could not have been sued upon in the previous case. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955). Thus, a judgment does not grant a defendant perpetual immunity from liability for all future conduct of the same type (*id.* at 327), nor does it bar claims that were not actually litigated or decided previously. In the Ninth Circuit, claim preclusion applies when a later suit involves the same claim or nucleus of facts as an earlier suit that resulted in a final judgment on the merits between the same parties. However, even where these technical elements are met, courts retain discretion to decline to enforce claim preclusion if unusual circumstances demand flexibility (for example, where significant new facts have arisen, or where applying preclusion would contravene the public interest). *See Ackermann v. United States*, 340 U.S. 193, 202 (1950) (res judicata is grounded in equity and should not be applied in a way that is manifestly unjust).

ER 053

**ARGUMENT**

**I.      Res Judicata Should Not Be Rigidly Applied Where the Equities Strongly Favor Adjudicating Plaintiffs' Claims Alongside the Parallel Proceedings**

Claim preclusion serves important goals of finality and judicial economy, but it is not an iron mold that must be enforced without regard to context or fairness. Courts have long recognized that rigid application of res judicata may be inappropriate if it would lead to inequitable results. *See, e.g., Ackermann*, 340 U.S. at 202 (even where procedural requirements of res judicata are satisfied, relief may be warranted if upholding the judgment would be manifestly unfair). This is such a case. The balance of equities tips decisively in favor of allowing Plaintiffs' lawsuit to proceed. Plaintiffs' claims involve matters of substantial public importance – allegations that Apple has abused its monopoly power over app distribution to stifle competition and innovation. In 2021, when CR I was dismissed, these allegations were relatively novel. But in 2025, they are being taken very seriously by courts, enforcers, and industry stakeholders. Apple is now defending virtually identical claims in multiple forums, as discussed above: The DOJ, *Proton*, *Pure Sweat*, *PhantomALERT*, and *Gamboa*. The controversy over Apple's App Store practices has expanded far beyond Plaintiffs; it is now a nationwide, multi-front battle over the future of app competition. Against this backdrop, insisting that Plaintiffs alone be bound by a 2021 dismissal – which occurred at a time when these issues lacked the critical mass validation they now have – would work a substantial injustice.

Equitable factors favor reopening. Plaintiffs have been diligent and acted in good faith. They promptly filed this new action after the Ninth Circuit's mandate in CR I issued, seeking to plead their case with the benefit of AUSA counsel with antitrust experience, who reviewed the entire matter and concurred a viable case remained, with new post-2021 facts and curing of any jurisdictional naming defects. Apple cannot claim any *unfair* prejudice if this case proceeds. Apple is already deeply engaged in defending these same issues – it faces overlapping discovery, economic analysis, and witnesses in the DOJ case and developer class actions. In fact, coordination of this case with those actions could yield efficiencies. The marginal burden to Apple of including Plaintiffs' claims in the broader adjudication is negligible. By contrast, the prejudice to Plaintiffs from a strict res judicata bar would be profound: they would suffer the unique fate of having their allegations never examined on the merits, while others obtain relief for the very same alleged wrongdoing. Such an outcome would essentially penalize Plaintiffs for being early movers. It would also

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

create an inconsistent patchwork of justice: Apple potentially could be held accountable to every other injured party *except* these Plaintiffs, simply due to timing and procedural happenstance.

Res judicata is meant to protect against duplicative litigation, but allowing this case to proceed does not threaten that interest. There has been no prior merits litigation of Plaintiffs' claims – CR I was cut off at the pleading stage. Therefore, there is no risk of undermining a jury verdict or factual finding from CR I, because none exists. Nor would Apple face double liability for the *same* harm; Plaintiffs seek their own damages (for their lost opportunities) and injunctive relief, distinct from what other cases seek, and despite all the other recent cases, still provide the only Developer Compensation Fund for a general class of zero-priced apps. If anything, resolving Plaintiffs' claims in tandem with the other proceedings would promote consistent outcomes and comprehensive relief. It is far more anomalous to carve Plaintiffs out and leave them with nothing if, say, the DOJ or Proton ultimately succeed in forcing changes to Apple's practices from which Plaintiffs will indirectly benefit. Equity abhors such asymmetry.

In essence, finality concerns must yield to fairness here. The policies underlying res judicata do not demand Plaintiffs' exclusion. This is a case where the *context surrounding the prior judgment has so changed* that continuing to give that judgment preclusive effect would sanction an unfair result. As the Supreme Court noted in *Lawlor*, a judgment cannot immunize a defendant against a continuing course of conduct indefinitely. 349 U.S. at 327–28. Apple's alleged misconduct did not cease in 2021 – it continued and even intensified in various ways (new developer fees and rules, defiance of court orders, etc.) The extraordinary circumstances here – including the mobilization of the federal government and new plaintiffs to tackle Apple's conduct – make this an exceptional situation where the Court's equitable intervention is justified.

## II.   Apple's "Unclean Hands" Strengthens the Equitable Case for Re-Opening

Equity will not 'lend its aid' to a party that has been guilty of unconscionable conduct in connection with the matter in controversy. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). When a defendant's own misconduct infects the litigation—or the underlying transactions—courts routinely refuse to allow that defendant to invoke equitable doctrines such as claim preclusion. See *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (res judicata is grounded in equity and may yield where enforcement would perpetuate manifest injustice); *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991) (unclean hands considerations inform application of res judicata).

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Here, substantial post-dismissal facts show Apple's hands are anything but clean. Judge Gonzalez Rogers has already referred Apple witnesses and counsel for possible criminal contempt after finding that Apple provided "false and misleading" testimony designed to evade antitrust relief in *Epic Games v. Apple* (N.D. Cal., Apr. 30 2025 order at 15-18), thereby the subject of "harming" developers in the FAC. Moreover, in *DOJ v. Apple*, the government alleges Apple misrepresented technical restrictions "it knew were self-imposed" to regulators (¶¶ 214-221), directly applicable to Plaintiffs allegations that Apple misrepresented to this Court that notarization was an 'inseparable' component of an operating system. And similarly applicable to this case, Apple's June 2025 anti-SLAPP opposition serves as a new concession of prior witness intimidation when it admits that counsel Keith Mathews never represented Greenflight/Isaacs in CR I. That means opposing counsel chilled Isaacs's participation, a classic *witness intimidation* predicate act (18 U.S.C. § 1512). Faced with this allegation, Apple's OSC Reply only suggests that because Isaacs participated in the *CR I* live hearing, he couldn't have been intimidated. That is analogous to a schoolyard bully caught stealing lunch money using the defense "he still ate some lunch and didn't starve."

Taken together, these facts show Apple has leveraged litigation tactics, including inaccurate or misleading testimony, to insulate its App Store control. Equity does not allow a party to secure the shield of res judicata while simultaneously tainting the judicial process through perjury, contempt, or intimidation. See *Citizens State Bank v. O'Leary*, 856 F.2d 282, 287-88 (8th Cir. 1988) (unclean hands bars res judicata where prior judgment was procured by bad faith).

Accordingly, even if the ordinary elements of claim preclusion were satisfied (and there are many reasons the Court should reconsider that premise), the Court should exercise its equitable discretion under Rule 54(b)/60(b)(6) to vacate the dismissal. Allowing Apple to reap the benefit of its own litigation misconduct would perpetuate a fraud on the courts and produce precisely the "manifest injustice" the unclean hands doctrine exists to prevent. In sum, strict application of res judicata would produce a result at odds with the current reality and with fundamental fairness. This Court has the discretion to prevent that outcome. We respectfully urge the Court to exercise its equitable power to allow Plaintiffs' claims to be heard on their merits.

**III.     New Violations Give Rise to New Claims that Lawlor Protects**

An independent reason to grant this motion is that much of what Plaintiffs allege in the FAC involves Apple's conduct after the CR I judgment, meaning those specific claims could not have been litigated in CR I and thus fall outside res judicata's scope. The Supreme Court's decision in *Lawlor v. National Screen* is directly on point. In that case, the plaintiff's second suit alleged antitrust violations that continued after the first suit's judgment; the Supreme Court allowed the second suit, emphasizing that a series of similar acts over time can be split into separate claims if they occur post-judgment.

Here, Apple's alleged wrongful conduct is continuing and iterative. For example: Apple imposes a $99 annual fee on developers every year. Each year's imposition (and each year a developer must pay anew or be excluded) is a fresh act that injures Plaintiffs. (FAC ¶¶ 148–151, 378.) Similarly, Apple updated its DPLA terms yearly, adding or modifying restrictions forming the total consideration for the $99 fee. Notably, after *Epic's* partial injunction, Apple added terms about external linking that have spawned a contempt ruling and follow-on class actions, including ours. Those actions in 2023–2024 are new antitrust violations that did not exist during CR I. (FAC ¶¶ 228–234.)

Apple's continued refusal to allow competing COVID-19 or public health apps (or broadly, competing app stores) in 2022–2024 perpetuated the alleged monopoly. And as alleged in last week's *PhantomALERT* appeal, Apple took great efforts to invalidate their own 'endorsement option' which should have allowed Dr. Roberts' University of Arizona endorsement to promptly place Coronavirus Reporter onto the App Store. That conduct – subverting their own endorsement contractual option – happened well after CR I was filed, and indeed, Plaintiffs only learned about much of it from last week's Berger Montague filing documenting years of investigation into that matter by PhantomALERT. Res judicata should not be construed to give Apple a "perpetual license" to continue violating the law simply because it fended off one lawsuit in 2021.

The Court's dismissal order in this case did not specifically address *Lawlor*. It found the "same nucleus of facts" between CR I and CR II, focusing on the broad course of Apple's App Store policies. (Dkt. 82 at 5–6.) But respectfully, that analysis overlooked that new facts after 2021 significantly broaden the nucleus. It left out paragraphs about retaliation claims (clearly post-2021) that were alleged under UCL:

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

"Apple is similarly [like CTF] in malicious compliance of a verdict in Epic v. Apple. This conduct again seeks to charge for notary stamps and IAP fees, through an improper commission on developers (FAC ¶ 76)… Apple is presently in malicious compliance with an Epic order from the CAND District, whereby they charge developers for links to non-Apple payment systems. These charges, like the EU CTF, are only feasible and/or enforceable because of Apple's notary stamp padlock on iOS. Apple's malicious compliance with the Epic order therefore serves as evidence that Apple intends to charge, directly or indirectly, for notary stamps and/or notarization services. (FAC ¶ 223) …Apple's CTF practices are similarly unlawful [under UCL] as they contravene the legal rules set out in the European Union's Digital Markets Act (DMA)…. Although the DMA is European legislation, its principles reflect global standards for fair competition, and … non-compliance affects [i.e. damages] US-based developers who wish to distribute apps in Europe, including Greenflight and CRC." (FAC ¶ 340.)

Correcting this error alone justifies relief under Rule 59(e) (to prevent clear legal error) or 60(b)(6) (to avoid an unjust extension of preclusion). Repeatedly failing to adjudicate core allegations, such as tying and retaliation is clear manifest error. At the very least, Plaintiffs should be allowed to proceed on claims based on Apple's post-2021 actions. Outright dismissal with prejudice sweeps too broadly by barring claims that could not have been raised in the first case. Furthermore, even regarding pre-2022 conduct, the law distinguishes between claims that were actually adjudicated previously and those that were not. As we explain next, several of Plaintiffs' specific legal theories were never actually litigated in CR I (they were effectively ignored due to the way that case was resolved). Res judicata does not attach to issues that were left undecided. Thus, the Court is free to consider those issues now – and given the new authorities and arguments on those issues, it should.

### IV.    Per Se Tying Claim and "Direct Evidence" Theory Were Never Adjudicated in CR I; They Survive and Are Now Bolstered by New Authority

One of Undersigned's primary claim theories has always been that Apple's conduct constitutes an unlawful tying arrangement – specifically, that Apple ties the use of its App Store to the iPhone, such that iPhone users and iOS developers are forced to use Apple's distribution and payment services if they want to participate in the iOS app market. In antitrust terms, the *"tying product"* is the iPhone device, and the *"tied product"* is app distribution via App Store, or notarization fees themselves. In CR I, Plaintiffs were the first to plead a *per se* tying claim under Sherman Act §1 (see CR I Count V) alleging Apple conditioned access to iPhone on developers and users using Apple's App Store, thereby restraining trade.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

This *per se* tying theory is important because, under established law, a *per se* unlawful tying claim does not require detailed market definition or proof of market power in the tying product – those are presumed if the tie is shown between distinct products and the defendant has appreciable economic power. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15–18 (1984). In other words, if Apple indeed required that iPhone owners (and developers) use only Apple's App Store to obtain apps – which it did – and if iPhones are sufficiently desired by consumers (which confers power to Apple), then the law considers that arrangement inherently suspect.

In the CR I dismissal, however, the Court never addressed Plaintiffs' *per se* tying claim at all. The order made no mention of "tying," and it did not discuss the two-product test or whether Apple's conduct could be viewed as conditioning one product on another. Instead, the Court (and later the Ninth Circuit) analyzed the complaint as if it were solely a Rule of Reason monopoly case requiring market definition. This was a critical oversight. Despite voluminous briefing by all parties on the *Microsoft* platform exception – which Undersigned argued Apple was judicially estopped from raising because of Tim Cook's testimony that Apple sells devices – the Ninth Circuit was silent. Apple's OSC Response cites the same platform exception cases, which have never been adjudicated with regard to CR I or CR II and are judicially estopped. In short, the Ninth Circuit's decision said nothing about tying; it affirmed the dismissal on the narrow ground of insufficient market allegations and lack of antitrust injury framework. But it never recognized the tying claim, nor did it decide whether it was per se or Rule of Reason under the well-known *Jefferson Parish* framework test. Thus, no court has actually litigated or decided the merits of the CR I or CR II tying claims.

Why does this matter for res judicata? Because claim preclusion bars only those claims that were or *could have been* decided in the prior action. Here, the CR I Plaintiffs' tying theory *could not have been decided* if it was never acknowledged or analyzed. This is less a case of CR I failing to raise it – they did raise it and argue it extensively through the Supreme Court – and more a case of the prior courts perhaps overlooking it. That means there is no "final judgment on the merits" of the tying claim. It simply went unadjudicated. Under Ninth Circuit law, when a particular claim or issue was not actually litigated to a final decision, it generally isn't barred in a subsequent suit. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 851–52 (9th Cir. 2000) (res judicata applies to claims that were resolved or could have been resolved with

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

reasonable diligence in the first action; if an issue was not raised and the judgment did not encompass it, preclusion may be inapt especially if the issue is of a different nature).

Apple might argue that CR I Plaintiffs "could have" pressed the tying issue harder or appealed it – but they did. They argued on appeal that the *per se* tying analysis should have been applied. The Ninth Circuit did not engage, nor did the Supreme Court after heavily focused cert petitions concerning tying. In short, Undersigned and his clients have been totally deprived any day in court[1] on formidable theories that have been vindicated over the past five years. Regardless, the net result is that the tying claim remains unresolved. It is effectively a live claim that survived the prior litigation by omission.

This Court should therefore recognize that res judicata does not automatically wipe out the tying claim. In fact, continuing to preclude it would reward what was arguably a legal error in CR I (failing to consider a valid theory).  Significantly, the viability of Plaintiffs' tying theory is now stronger than ever. The Ninth Circuit's decision in *Shields* (2024) emphasizes that even outside the formal *per se* context, antitrust plaintiffs can prevail via *direct evidence of restricted output or consumer harm*, without needing meticulous market definitions. If *Shields* had been available and cited in CR I, the Court might have been more receptive to Plaintiffs' argument that Apple's outright ban on alternative app stores and non-institutional COVID apps was *inherently anticompetitive* behavior observable without complex market studies, even under the Rule of Reason. Apple's silence on this fact in their OSC Response is not accidental; if Gibson Dunn were arguing the other side, there is little question they would be seeking FRCP 60 re-opening of CR I on the basis of *Shields*. *Shields* shields any dismissal under res judicata for market definition, and it shields any allegation that the FAC is vexatious.

Similarly, the new *Gamboa v. Apple* decision (July 2025) further supports Plaintiffs' tying/leveraging theory under §2 of the Sherman Act. *Gamboa* recognizes that Apple's use of technical restrictions to favor its own iCloud service over others could constitute exclusionary conduct. By analogy, Apple's ban on other

---

[1] Apple complains that a related Petition (sent to DOJ and Apple's Board of Directors) has false statements that we never received a fair hearing. But the Petition is true; the CR I Count V tying claim never had its day in Court. Even if the 12(b)(6) dismissal analyzed tying (it didn't) the Petition would still be true as public-interest petitioning generally acknowledges "day in court" to mean a jury trial, not a pleading-technicality dismissal. This Honorable Court has a duty to fix this repeat, manifest error, where four years of diligently pled tying allegations worked their way all the way to the Supreme Court, yet were never adjudicated. There can't be a stronger case against res judicata.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

app stores is a technical and contractual restriction to favor its own services. In fact, Apple's conduct in our case is an even clearer tie: Apple doesn't just make alternatives less convenient, it *categorically prohibits* them. Other plaintiffs in 2025 (*Proton*, etc.) directly plead almost identical tying. *Proton's* complaint repeatedly uses the language of tying: e.g., Apple "forces developers to distribute iOS apps exclusively through Apple's App Store and to use Apple's payment processing, tying the use of its platform to its own monopoly services" (*Proton AG Class Action Compl*. ¶¶ 3, 11). The fact that this framing is front-and-center in a new case – and that case was found related to *Epic* – indicates that the tying theory is considered credible, non-frivolous, and integral by those with deep knowledge of the subject.

Because the Ninth Circuit never discussed tying, Apple's position essentially asks this Court to extend the prior judgment to an issue never decided – effectively to decide it adversely to Plaintiffs without briefing on the merits. That is not how res judicata works. If anything, it demonstrates why the Court should reopen the judgment: to actually grapple with the tying issue now that it's ripe and supported by new authority.

Apple has suggested in other filings that Plaintiffs' renewed claims are frivolous or sanction-worthy (indeed, Apple filed a Rule 11 sanctions motion, arguing that re-filing these antitrust claims was baseless under the prior judgment). But the discussion above should dispel that notion. The legal foundation for Plaintiffs' claims is solid and growing more so by the day. When a DOJ case, a Ninth Circuit precedent (*Shields*), and multiple developer complaints all support the same theories, one can hardly label those theories frivolous. Plaintiffs' persistence in pressing these claims has been vindicated by external events – far from abusing the system, they identified a legitimate issue that is now broadly recognized. This context should reassure the Court that granting reconsideration is not indulging a vexatious litigant, but rather correcting course to allow meritorious claims to be heard.

**V. RICO: Apple's *Epic* Contempt Is Not Unrelated - It Falls Within the Developer Retaliation Pattern Pleaded in CR I and Justifies Leave to Amend**

The *CR I* (¶¶ 267-308) plaintiffs pleaded a pattern in which Apple (i) wields App Store gatekeeping to punish outspoken or non-compliant developers, (ii) issues false pretextual communications, and (iii) deploys outside lawyers and PR agents to smear or intimidate critics. The *CR II* First Amended Complaint repeats that "developer retaliation" (FAC ¶ 350) is a core UCL and antitrust theory—Apple preserves its monopoly by retaliating against any developer who tries to bypass or criticize its rules.

The *Epic* contempt order is the latest installment of that pattern. Apple lied under oath about its compliance with the anti-steering injunction; senior executives directed engineers to implement "deterrent" pop-ups and a 27 % "link tax" to punish developers who dared steer users to alternative payments; the Court referred Apple and an executive to the U.S. Attorney for possible criminal contempt. These findings are hardly unrelated coincidence; they are *precisely* the sort of retaliatory, deceptive conduct CR I and CR II describe: using false statements, aggressive lobbying, and technological coercion to stifle developers who threaten Apple's rents.

Under 18 U.S.C. § 1961(1), both perjury (18 U.S.C. § 1621) and obstruction of justice (18 U.S.C. § 1503) are RICO predicates that revive the RICO claim. The *Epic* contempt findings supply at least two new predicate acts (false sworn compliance declarations; obstruction through intentional injunction-evasion design changes).  They occurred in 2023-2025, long after CR I was dismissed, and therefore could not have been pled earlier.

Apple's "unrelated case" objection fails for three independent reasons. The enterprise alleged in CR I is Apple plus outside enablers who "exploit the work of developers by screening, suppressing, and retaliating."  The *Epic* contempt acts were executed by the same Apple legal chain of command to preserve the same monopoly rents; Plaintiffs call this the "Apple Antitrust Team."  That satisfies *Living Designs v. DuPont*, 431 F.3d 353, 362 (9th Cir. 2005): enterprise may consist of the corporation and outside actors furthering a common scheme. The contempt acts target *developers who provide competing monetization routes*—the identical victim class (independent developers) and identical goal (preserve the "Apple tax" and grip over internet censorship) pleaded before.  They therefore extend the pattern; they do not introduce a new, unrelated scheme. *Lawlor* bars claim preclusion for "new wrongful acts" post judgment, *even if they resemble the prior misconduct.*  Apple's perjury and obstruction happened in 2023-25, well after the November 2021 CR I dismissal; they are new wrongful acts that automatically escape res judicata.

Other developers have already invoked the same misconduct—demonstrating materiality. The *Pure Sweat Basketball* class action (N.D. Cal. No. 5:25-cv-03858) pleads that Apple's contemptuous conduct injured developers. *Microsoft* (*amicus* brief, *Epic* appeal, Apr. 2023) likewise cited Apple's anti-steering retaliation as ongoing exclusionary conduct. These independent complaints confirm that the contempt

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

findings are not idiosyncratic to *Epic* but part of a systemic developer retaliation scheme first spotlighted by Plaintiffs.

Leave to amend is not futile and cures the enterprise identity concern. By adding the new predicates Plaintiffs can (a) plead the enterprise as *Apple + identified outside law firms/PR agencies implementing the contempt strategy*, eliminating any person/enterprise merger issue, and (b) allege continuity through 2025. Under *Foman v. Davis*, 371 U.S. 178 (1962), such an amendment must be allowed absent prejudice—none exists because Apple is already litigating these very facts in *Epic* and *Pure Sweat*.

Apple also concedes a predicate violation in CR I. In its June 24, 2025 anti-SLAPP opposition and in the July 7, 2025 sanctions reply, Apple finally admits that attorney Keith Mathews did not appear for Greenflight Venture or Dr. Isaacs in CR I. Hence it is now uncontested that Apple muzzled a pro se Plaintiff in CR I and blocked his court-related proceedings. *Threatening or attempting to intimidate a witness or potential witness* is a predicate act under 18 U.S.C. § 1512(b) and therefore qualifies as "racketeering activity" for civil RICO purposes. Apple's new concession is critical: it establishes that Mathews was never counsel of record, so its ongoing attempt to silence Isaacs served no legitimate litigation purpose and can only be read as a tactic "to harass, intimidate, or silence" a percipient witness—exactly what § 1512(b) prohibits. Because Apple's concession was first made after the CR I dismissal (and indeed after briefing on the CR II motion-to-dismiss closed), it is a *newly revealed* predicate act—one that Plaintiffs could not have pleaded earlier, and by definition, happened after the CR I operative complaint was filed which joined Dr. Isaacs to the case.

The intimidation of Isaacs dovetails with the broader pattern alleged in CR I Count X: Apple and its agents "discredit developers and their advocates" and use procedural threats to chill testimony about Apple's anticompetitive conduct. Apple's latest filings demonstrate that pattern is ongoing and directed at anyone who might bolster developers' claims—as indeed Isaacs succeeded in bringing attention to tying conduct. RICO's "continuity" requirement is satisfied where predicate acts "amount to or pose a threat of continued criminal activity." Apple's 2022 intimidation of Isaacs—combined with the 2023-25 contempt findings in *Epic*—shows precisely that continuing threat. This new predicate, acknowledged only this summer, independently justifies reopening judgment and granting leave to amend the RICO count to plead (i) Apple's

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

§ 1512(b) witness tampering as a fresh predicate act; and (ii) a refined enterprise theory that avoids any person/enterprise merger concern.

The Court should (i) reopen judgment under Rule 59(e) or 60(b)(2)/(b)(6); (ii) vacate dismissal of Count X[2]; and (iii) grant leave for a Second Amended Complaint adding Apple's 2023-25 perjury/obstruction as fresh RICO predicates. Denying that relief would bias the record by shielding Apple from RICO scrutiny even as other developers and the Court itself have now documented Apple's retaliatory deceit.

### *Apple's Double-Standard on "Psychiatric" Assertions Evidences Its Unclean Hands and Adds a New Predicate Act of Witness Harassment*

*Plaintiffs'* July 2025 OSC Memorandum states that Apple's litigation intent has become central and the Court should authorize independent forensic psychiatric evaluation of Apple's dedicated "Antitrust Team." The request was made only after Apple outrageously characterized Plaintiffs' anti-SLAPP[3] petitioning as "harassment" and suggested sanctions. A neutral mental state assessment is a well recognized discovery tool whenever a party's good faith intent or capacity is in dispute. See *Fed. R. Civ. P. 35(a).* In its OSC Response, Apple now calls the medical evaluation request "ad hominem attack," accusing Plaintiffs of unnecessarily injecting psychiatry into the litigation. That position itself is judicially estopped by Apple's own conduct. Throughout CR I and the related appeals, Apple repeatedly asserted that co-founder Dr. Isaacs "suffers from neuro-psychiatric disability" and implied his condition explained Plaintiffs' "hinterlands" litigation posture. Apple cannot both (a) wield psychiatric labels to discredit Plaintiffs, and (b) condemn Plaintiffs as "ad hominem" for requesting an objective mental state evaluation of Apple executives who—according to Judge Gonzalez Rogers—lied under oath and were referred for criminal contempt.

---

[2] Plaintiffs' preferred vehicle for adjudicating this case is *competition law*, e.g. the Sherman Act of 1890 and the California Unfair Competition Law. Assuming Apple agrees it has forfeited opposing the reopening of the Tying claims under *Shields*, Plaintiffs hereby waive their right to reopen the RICO cause of action. In the alternative, should Apple thwart forfeiture case law, RICO is the necessary vehicle for this case to proceed. The ball is in Apple's court.

[3] When a lawsuit alleges the largest monopoly in history retaliates against antitrust advocates, it is textbook protected petitioning. When that monopoly effectively countersues seeking a review of five years of Supreme Court filings and broad, future-based injunctions against antitrust enforcement (violating *Trump v. CASA*), anti-SLAPP is the preferred remedy under California Law. When the monopoly plants the seed that the Court should strike the anti-SLAPP proceeding as harassment, it is time to evaluate the small "Apple Antitrust Team" that is commandeering the internet and this litigation.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

This 180-degree switch once again[4] exemplifies Apple's DARVO pattern: Deny the misconduct, Attack the accuser, Reverse Victim and Offender.  Weaponizing mental health innuendo against Plaintiffs while decrying the same tool when pointed back at Apple is not merely hypocrisy; it substantiates that witness intimidation took place under 18 U.S.C. § 1512—*a qualifying RICO predicate*: Apple lied under oath, Undersigned sought their medical evaluation as part of his prosecution of developer retaliation claims, Apple moved[or supported] sanctions for the request, effectively proving their harassing mens rea/ intent in raising Isaacs' own psychiatry condition. Apple's shifting stance on psychiatric evidence—first as a sword, now as a shield—reinforces why this Court should (a) reopen the case, (b) permit amendment of the RICO count to reflect the newly revealed predicate acts, and (c) deny related sanctions motion in entirety.

**VI.    The Pending DOJ Action Creates "Contingent Finality" that Justifies Equitable Relief**

Moreover, the Supreme Court has recognized that when parallel government proceedings may lead to remedies or outcomes inconsistent with a prior private judgment, courts should treat the prior judgment as "contingent" rather than strictly final. See *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961) (district courts have equitable authority to revisit and modify earlier decrees or judgments once the government obtains broader or conflicting relief in related litigation). This principle is grounded in the court's inherent equitable discretion to prevent injustice or inconsistency, particularly in antitrust contexts where private litigation and government enforcement overlap.

Here, the pending DOJ antitrust action against Apple—now moving beyond a motion to dismiss— poses exactly such a scenario. If the DOJ ultimately obtains broad remedial measures (for example, mandatory sideloading, removal of restrictive App Store policies, or other pro-competitive structural relief), maintaining a rigid claim-preclusion bar based on the earlier CR I judgment would create precisely the type of inconsistent or conflicting mandate the Supreme Court cautioned against. It would unjustly leave Plaintiffs as the only affected party without recourse, despite having sounded the alarm years earlier. Thus, equitable principles embodied in Wright favor reopening this matter now, before a potentially conflicting final judgment is entered in the DOJ litigation.

---

[4] Undersigned has a bookshelf containing nearly a dozen Supreme Court *certiorari* petitions, which collectively serve as a case study of Apple and/or opposing counsel's judicially estopped contradictions over time.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

The fact that the U.S. Department of Justice — after extensive investigation — decided to sue Apple in 2024 is immensely significant and omitted from the Court's order. The DOJ's complaint and its successful defeat of Apple's motion to dismiss demonstrate that at least one federal court finds claims like Plaintiffs' to be plausible and legally sufficient; indeed the FAC is DOJ verbatim intended to represent a putative developer class; clearly this includes non-*CR I* conduct. Even if it were the same conduct, which it wasn't, the Ninth Circuit's decision in *Shields (2024)* clarified that plaintiffs need not satisfy rigid market-definition requirements if they have direct evidence of harm. If *Shields* had been law in 2021 (or if its principle had been applied), the outcome certainly would have differed – Plaintiffs had alleged that Apple's conduct reduced output (by excluding apps) and diminished consumer choice, which is direct evidence of harm.

Thus, continuing to enforce the prior judgment without reconsideration would effectively perpetuate a ruling that is at odds with the current state of the world.  Beyond legal doctrine and new evidence, there is a compelling equitable narrative here: Plaintiffs were among the first to call out Apple's alleged misconduct, yet they risk being the only ones left without a remedy.  In a real sense, Plaintiffs (or their related entities) were the canary in the coal mine. They spotted an antitrust problem before most others. It took a few years for the rest of the legal system to catch up, but it has. Now, imagine the outcome if reconsideration is denied. The DOJ might win relief that forces Apple to change certain App Store rules (perhaps allowing third-party app stores). *Proton* or *Pure Sweat* might secure damages or injunctions that compensate developers for Apple's past conduct and prevent future abuses. All the while, Plaintiffs – who sounded the alarm early – are left with nothing but accusations of 'vexatiousness.' This would be a bitter pill and frankly an inequitable outcome. Our justice system generally seeks to avoid depriving a party of a chance to be heard when circumstances permit a fair hearing. Here, Plaintiffs have *never* had a chance to fully present their case with the benefit of discovery and expert testimony.

### VII.    The Prior Dismissal Was a Procedural Termination; No Court Has Ever Adjudicated Whether Apple's Conduct Is Lawful

Finally, reconsideration is warranted because CR I's dismissal with prejudice, while a "final judgment" in form, was not an adjudication on the merits of the allegations in any substantive sense. It was a determination that Plaintiffs had not met technical pleading requirements (relevant market definition), made in a context where those Plaintiffs were intimidated and muzzled by Apple. The policy of res judicata is at

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

its weakest when the prior judgment did not actually involve a full and fair opportunity for the plaintiff to present evidence and argument on the substance of the claim. Here, Plaintiffs have never had their day in court regarding whether Apple's App Store policies violate antitrust laws. Basic fairness suggests they should have that chance, especially in light of everything discussed above.

It is instructive to consider what *did not* happen in CR I: There was no discovery. Plaintiffs never obtained documents from Apple, never took depositions, never had expert economic analysis to support their claims. The dismissal was purely on the face of the complaint. There was no evidentiary hearing or trial. No factfinder weighed Apple's justifications versus the harms, because the case ended before that stage. There were no substantive legal conclusions about Apple's conduct. For instance, the court in CR I did *not* hold, "Apple's $99 developer fee is lawful," or "Apple's App Store monopoly is not anticompetitive." It held only that the plaintiffs hadn't adequately alleged a relevant market and antitrust injury. That leaves open the possibility that with proper allegations, new case law, new DOJ compiled evidence, the claims could succeed.

The Ninth Circuit in *Phelps* noted that one factor favoring relief was that the prior judgment was based on now-defunct law, which meant the plaintiff never got a proper merits determination. Analogously, here the prior judgment was based on a legal understanding (market definition requirements) that is now in incorrect given new authority of *Shields* (and the fact tying was never even addressed for *per se* allegations). Plaintiffs effectively never got a "proper merits determination" of their core grievance.

### VIII. The Court's Finding of Privity Between Isaacs and Greenflight Was Clearly Erroneous and Requires Reconsideration

The Court's dismissal order incorrectly found privity between Jeffrey Isaacs and Greenflight Venture Corporation based solely on Apple's unsupported assertions and mischaracterizations of the record. Under established law, privity is the exception rather than the rule; a corporation enjoys its own legal identity separate and distinct from its investors, officers, and representatives. See, e.g., *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (a party's mere alignment of interests or common ownership is insufficient to establish privity for res judicata purposes); *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054 (9th Cir. 2005) (Privity is narrowly construed, and corporate entities are presumed distinct from their investors or representatives absent extraordinary circumstances).

Here, Greenflight is a bona fide corporation with an independent legal and business identity. It served over 200 million customers with products and services entirely separate from Isaacs's personal dealings.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Indeed, public records from the United States Patent and Trademark Office (USPTO) recognize Greenflight—not Isaacs—as the holder of patents, including inventions developed by Isaacs himself. Far from merely being Isaacs's alter ego, Greenflight has an independent market presence, corporate history, and asset portfolio. Yet, the Court accepted Apple's misleading narrative—based solely on counsel's shorthand reference to Isaacs as a "client," rather than the more precise "client representative"—as sufficient to establish privity. (See Dkt. 82 at 6–8.)

Critically, this finding was made without any evidentiary inquiry or factual due diligence. Instead, Apple's counsel at Gibson Dunn offered only conclusory mischaracterizations to create the illusion of privity. At no point has Apple provided documentation, sworn testimony, or any credible proof sufficient to treat them as identical parties. Indeed, the available record directly contradicts Apple's portrayal. Isaacs appeared in CR I as a *pro se* individual investor "representing his interests," not as counsel or representative for Greenflight. Isaacs' role as an investor, or even his status as an inventor who licensed patents to Greenflight, does not convert Greenflight into Isaacs' legal alter ego. Such a standard would eviscerate basic corporate separateness principles universally recognized by U.S. law.

The Court's finding also overlooked that Isaacs was effectively "muzzled" from fully representing or advocating Greenflight's interests in CR I. As Apple itself now breathtakingly concedes in the anti-SLAPP reply, attorney Keith Mathews did not represent Greenflight or Isaacs in CR I. Thus, Greenflight has never been represented by counsel in prior litigation. It is axiomatic under federal and state law that a corporation cannot appear pro se—it must appear through counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 201–03 (1993). Accordingly, Greenflight as a corporation was never properly before the court in CR I, and never had a full and fair opportunity to litigate its claims. The Court effectively and improperly assigned Isaacs—a non-attorney founder/investor—the role of pro se representative for Greenflight, without Greenflight's consent, counsel, or participation. That procedural anomaly alone compels reconsideration and relief from judgment.

Under the federal standard for privity, one party's litigation conduct binds another only when the second party was adequately represented and had actual control or input into the first litigation. *Taylor*, 553 U.S. at 894–95; *Montana v. United States*, 440 U.S. 147, 154–55 (1979). Neither condition is met here: Isaacs never legally represented Greenflight, nor did Greenflight have counsel or adequate representation at all.

22

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Furthermore, Isaacs's own appearance in CR I was as an individual investor and inventor, not as an officer, director, or authorized representative of Greenflight. Apple provided no evidence to the contrary, and the Court conducted no hearing or factual inquiry to justify its opposite conclusion.

Therefore, Greenflight's independent corporate identity must be respected. The mere presence of a common investor or inventor does not suffice to collapse separate legal identities into a single entity for purposes of res judicata. Allowing Apple's unsupported misrepresentations to stand uncorrected would not only improperly punish Greenflight, but also set a troubling precedent that undermines corporate separateness and fairness in litigation. Justice demands reconsideration: Greenflight must be permitted to pursue its own claims independently, free of an incorrect and unjust privity determination.

Accordingly, Plaintiffs respectfully request the Court to reconsider and correct its erroneous finding of privity between Isaacs and Greenflight, vacate the dismissal as to Greenflight's independent claims, and permit Greenflight's claims to proceed on their own merits alongside the related ongoing actions. Importantly, Greenflight seeks to serve as a class representative of entities similarly situated – i.e. developers who paid the Apple Tax. Isaacs never paid the Apple Tax – Greenflight did. Ten years of receipts, which Undersigned may provide to the Court if so requested, proves this beyond any doubt. That simple fact alone warrants reopening so this class action may proceed without delay.

## CONCLUSION

For all the above reasons, Plaintiffs respectfully request that the Court grant this motion for reconsideration. Specifically, Plaintiffs ask that the Court vacate its June 25, 2025 dismissal order (and the accompanying judgment) and reopen the case. Upon reconsideration, the Court should hold that res judicata does not bar Plaintiffs' claims in light of the significant new developments and extraordinary circumstances that have arisen since the prior judgment. At a minimum, any portions of the FAC addressing post-2021 conduct or legal theories not previously adjudicated (such as Plaintiffs' tying claims) should be allowed to proceed on their merits.

Plaintiffs are prepared to move forward expeditiously. Apple will not be unduly burdened, as it is already litigating these issues. The important point is that Plaintiffs be permitted a fair opportunity to present their case. Given the overwhelming new support for their claims – from the DOJ action, the *Proton* and *Pure Sweat* lawsuits, the *PhantomALERT* appeal, and the *Shields* and *Gamboa* decisions – fundamental fairness

means the Plaintiffs should continue to participate in the ongoing litigation. Apple, in its responses, has not articulated any substantial prejudice or addressed the equity and new law points, effectively conceding that if the Court has the power to grant relief, it should.

In our justice system, finality is not meant to eclipse fairness. This is a compelling case where the interests of justice require relaxing finality to allow adjudication on the merits. Plaintiffs respectfully urge the Court to exercise its discretion under Rule 59(e) and 60(b)(6) to prevent manifest injustice. The motion should be granted, and Plaintiffs' First Amended Complaint should be reinstated so that this matter can proceed to a resolution consistent with the industry wide examination of Apple's App Store practices.

Dated: July 21, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Motion for Leave to File Reconsideration was delivered via ECF to all interested parties.

Executed on this 21st day of July, 2025.

/s/ Keith Mathews

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION,<br>CALID INC.,<br>GREENFLIGHT VENTURE CORPORATION<br><br>    *on behalf of themselves and*<br>    *all others similarly situated*<br><br>                    Plaintiffs,<br><br>*vs.*<br><br><br>APPLE INC.<br>                    Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br><br><br>**PLAINTIFFS' SHOW CAUSE<br>MEMORANDUM**<br><br><br><br>The Honorable Edward M. Chen |

ER 071

**MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO
ORDER TO SHOW CAUSE**

**<u>Introduction</u>**

Plaintiffs submit this memorandum in response to the Court's July 10, 2025 Order to Show Cause, explaining why their recent motions – including a motion for sanctions, a motion for anti-SLAPP relief, a motion to stay, and related administrative requests – were filed in good faith and not for any frivolous, harassing, or improper purpose under Federal Rule of Civil Procedure 11(b). Plaintiffs, a group of small app developers and scientists, earnestly pursued these filings as a sincere and reasoned response to Defendant Apple Inc.'s aggressive litigation tactics and underlying conduct that seeks to subvert Sherman Act enforcement. The motions aimed to vindicate legitimate grievances about Apple's behavior: its documented retaliation against developers including Plaintiffs during this litigation, anti-competitive enforcement of App Store policies, and even defiance of court orders (as evidenced in the *Epic* litigation). Plaintiffs acknowledge that the posture of this case has become, for lack of a better word, intense. This intensity, however, reflects the severity of harm they have experienced – including censorship of their software and baseless sanctions threats to destroy their livelihoods – rather than any improper animus toward Apple or its counsel. Treating such advocacy as sanctionable "frivolity" would chill the exercise of constitutional rights to petition and to speak out against perceived injustice. Plaintiffs respectfully urge the Court to consider the substance and context of their filings – as the work product of under-resourced individuals pushing back against one of the world's most powerful corporations – and to find that Rule 11(b) has not been violated. To impose severe sanctions (potentially exceeding $500,000) in these circumstances would raise profound fairness issues, exacerbate the power asymmetry at play, and risk undermining confidence in the neutrality of the forum.

Plaintiffs, related individuals, and/or Undersigned have been attempting for years to challenge Apple's alleged monopolization of the iOS app distribution market through exclusionary App Store practices. The initial CR I case and its progeny wound through several amended complaints (only out of necessity) and appeals, ultimately resulting in a dismissal on grounds that it had not stated an antitrust claim. Undersigned maintains that this outcome was driven by aggressive procedural tactics that repeatedly prevented a full merits hearing. Indeed, between 2020 and 2024, every time Undersigned challenged the monopoly, sometimes reformulating theories, Apple would argue some non-merits-based fatal defect or preclusion.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

It is against this history of hard-fought, asymmetrical litigation that Plaintiffs' recent post-dismissal motions must be understood. After the Court's dismissal order (Dkt. 82), Plaintiffs swiftly filed several motions to protect Plaintiffs' continued efforts to petition and speak out against Apple from what they perceive as retaliatory legal tactics. A Motion to Stay the proceedings and for a status conference (Dkt. 85), in light of overwhelming new matters (loss of counsel, new SCOTUS law on injunctions, etc) was (and still is) desperately necessary to allow Undersigned to fully and diligently research remaining matters and, ideally, locate new conflict-free counsel. If anything, the flurry of filings proves that Undersigned is overwhelmed with the loss of an AUSA that (could have) provided substantial help on the remaining docket items (ie sanctions and reconsideration. Plaintiffs filed these motions not to vex or burden the Court, but to preserve their rights and spotlight Apple's behavior. Notably, Apple had signaled it will still seek a "global anti-suit injunction" which we interpret as flying in the face of new SCOTUS law. Faced with these threats, Plaintiffs reasonably felt it necessary to request sanctions against Apple for what they describe as five years of bad-faith litigation tactics, and invoking anti-SLAPP protections as a shield against what they view as Apple's attempt to punish and silence them as antitrust petitioners. (*See incorporated Declaration of Keith Mathews*).

Importantly, the evidence of Apple's conduct extends beyond this case alone. Plaintiffs' grievances align with broader concerns about Apple's treatment of developers and compliance with the law. Judge Yvonne Gonzalez Rogers sharply rebuked Apple's CEO Tim Cook and other executives and even referred Apple and one of its executives to the U.S. Department of Justice for possible criminal contempt. This Epic contempt ruling exemplifies the kind of brazen behavior by Apple that Plaintiffs have endured and decried. Likewise, Apple's pattern of retaliating against developers who challenge its rules is well documented. In the Epic case, the court explicitly prohibited Apple from 'Retaliating against developers who use external payment systems' as part of its injunction, implying that such retaliation was a real concern. In short, Plaintiffs' characterizations of Apple's conduct – whether describing developer "oppression," censorship, or abuse of monopoly power – are not fantasy or personal vendetta; they are grounded in well-publicized reality. Indeed, the U.S. Department of Justice, along with 16 states, has sued Apple for exactly such anti-competitive practices, alleging that Apple's "broad-based, exclusionary conduct" in the smartphone industry has "impose[d] extraordinary costs on developers" and "throttle[d] competitive alternatives," all to the detriment of innovation and consumers. As Assistant Attorney General Jonathan Kanter put it, Apple spent years

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

playing 'Whac-A-Mole' game of rules and restrictions; Deputy Attorney General Lisa Monaco remarked in that same case, no matter how powerful, no matter how prominent, no matter how popular — no company is above the law. This context vindicates Plaintiffs' sense of urgency and oppression at the hands of Apple.

**Legal Standard Under Rule 11(b)**

Federal Rule of Civil Procedure 11(b) provides that when an attorney or unrepresented party presents a filing to the court, they certify that to the best of their knowledge, information, and belief, after an inquiry reasonable under the circumstances: (1) the filing "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"; (2) the legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing the law; (3) the factual contentions have or likely will have evidentiary support; and (4) any denials of factual contentions are warranted on the evidence or lack of information. The Rule is intended to prevent baseless filings and abuses of the judicial system, but it is not meant to deter zealous, good-faith advocacy – especially by those with legitimate grievances. Courts have cautioned that Rule 11 sanctions are a serious measure to be imposed only in the clearest of cases of misconduct, lest they chill creative advocacy or the assertion of novel but plausible legal theories. A filing is frivolous under Rule 11 if it is both baseless (i.e. without factual foundation or legal merit) and made without a reasonable and competent inquiry.

In evaluating Plaintiffs' motions, the Court should be mindful that Plaintiffs are exercising their First Amendment right "to petition the Government for a redress of grievances," which includes the right to seek relief in court. The Supreme Court has recognized that litigation is an important form of political expression and a means to seek justice, protected so long as the litigant's claims are not objectively baseless. The Noerr-Pennington doctrine embodies a similar principle: those who petition the government (including courts) for redress are generally immune from liability for that petitioning, unless their actions constitute a "sham." Here, Plaintiffs' filings were an extension of their petition for redress – efforts to ensure their antitrust theories are heard fully and fairly. They were not shams; they were earnest attempts to highlight wrongdoing and preserve rights. California's anti-SLAPP statute, which Plaintiffs invoked, likewise reflects the strong public policy of protecting individuals' participation in issues of public significance through the courts. The statute "is intended to protect against lawsuits filed for the purpose of chilling free speech…to encourage continued participation in matters of public significance." Plaintiffs here genuinely believe their cause –

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

challenging Apple's alleged abuse of monopoly power in a marketplace that affects billions – is such a matter of public significance. This does not excuse disregard for procedural rules, but it counsels that the Court should interpret Plaintiffs' actions in light of their good-faith intent to advocate a cause, not as harassment.

## **Argument**

Against this backdrop, we now provide general argument on the validity of the claims, then turn to how each motion had a proper purpose and a plausible foundation in fact and law. Plaintiffs also hereby note that the four day, ten page deadline imposed by the Court is simply unrealistic and that despite best efforts, they have not been able to fully address all of Apple's motion opposition documents in this limited time and space. If this generalized Show Cause memorandum leaves remaining issues for the Court, focused OSC items are requested, as is live evidentiary cross-examination of the parties' representatives.

### **The FAC states an objectively colorable claim, because the law requires actual adjudication of a claim for res judicata (claim preclusion) to apply.**

It is well settled in the Ninth Circuit that claim preclusion (res judicata) bars only claims that were actually adjudicated or necessarily decided in prior litigation. See *Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) (holding claim preclusion does not apply unless the claim was actually decided); *Hells Canyon Preservation Council v. U.S. Forest Serv*., 403 F.3d 683, 686-87 (9th Cir. 2005) (claim preclusion only applies to claims adjudicated explicitly or by direct implication). A claim cannot be considered adjudicated if neither the district court nor the appellate court addressed, analyzed, or even mentioned it. See *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995); *Snow-Erlin v. United States*,470 F.3d 804, 807 (9th Cir. 2006) (Res judicata does not bar claims that were not litigated and decided.)

**Plaintiffs' per se tying claim was never adjudicated in CR I at any level.** CR I explicitly pled that Apple's tying of its App Store (tied product) to ownership of Apple smartphones (tying product) was unlawful *per se* under Sherman Act § 1. This *per se* tying theory required no relevant market definition or independent antitrust injury pleading. See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9-15 (1984). However, Judge Chen's CR I dismissal rested exclusively on Plaintiffs' alleged failure to define relevant markets and antitrust injury under a rule-of-reason analysis. The CR I order does not mention tying claims at all—not even in passing. Similarly, the Ninth Circuit's summary affirmance in CR I addressed only the market definition and injury issues analyzed by Judge Chen; the Ninth Circuit also never referenced or adjudicated the *per se* tying claim. This complete absence of adjudication or analysis of Plaintiffs' explicitly

pleaded per se tying claim at both the district and appellate levels means no court has ever resolved it. Under Ninth Circuit precedent, claims never actually decided cannot be precluded by res judicata. See *Frank*, 216 F.3d at 851; *Snow-Erlin*, 470 F.3d at 807. **The absence of adjudication eliminates any possible basis for sanctions.** Because res judicata does not apply, there can be no sanctions for "frivolously" or refiling "harassing" claims that were never previously adjudicated.[1] Indeed, Ninth Circuit and Supreme Court precedent are unequivocal: Rule 11 sanctions cannot be imposed unless the filing is legally or factually frivolous under clearly established precedent. See *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362-67 (9th Cir. 1991) (en banc). If no court ever addressed a properly pled *per se* tying claim, it cannot be frivolous or sanctionable to reassert it. See id. at 1362 (Rule 11 sanctions are reserved for exceptional circumstances; the mere fact that a party lost a prior related case does not render later litigation frivolous.)

Furthermore, the Ninth Circuit explicitly holds that where an appellate court has not addressed an issue, that issue is not governed by the law of the case or mandate doctrine. See *United States v. Kellington*, 217 F.3d 1084, 1092-93 (9th Cir. 2000) (law of the mandate doctrine is only as broad as the mandate itself); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("issues not decided previously do not become the law of the case"). Here, neither Judge Chen's CR I order nor the Ninth Circuit's mandate discussed the per se tying claims at all. Thus, no "law of the mandate" precludes re-asserting claims.

Similarly, Berger Montague, one of the leading antitrust firms representing *PhantomALERT* against Apple in related litigation, last Friday cited *Shields v. World Aquatics*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024), affirming that direct anticompetitive effects (such as the forced tie-in here) obviate detailed market definition pleading under the rule-of-reason analysis, let alone under the more lenient *per se* standard. The fact that leading antitrust counsel, including Quinn Emanuel representing *Proton AG v. Apple*, continue actively litigating these same tying claims against Apple demonstrates conclusively that Undersigned's claim theories have always been—and remain—non-frivolous, plausible, and consistent with governing law. Far from sanctionable, our tying theory is actively endorsed and litigated by major federal enforcers and prominent antitrust practitioners today. Finally, equity strongly disfavors imposing sanctions under these

---

[1] Undersigned recognizes the Court has halted filings of new motions, but respectively requests leave to file a (routine) Rule 60 Reconsideration Motion fully addressing these bases for reconsideration of the dismissal. Given that the subject matter of sanctions is intricately tied to the reasonableness of the underlying lawsuit (i.e. res judicata & balance of equities), briefing on the balance of equities will better inform the Court on intent re sanctions, generally, and therefore is in the interest of judicial economy.

circumstances. The CR I Plaintiffs pled per se tying claims that required no elaborate market definition. The CR I dismissal overlooked and ignored a clearly pled *per se* tying theory. The appellate courts similarly never addressed this claim. Therefore, CR I never received a fair adjudication of per se tying allegations, and res judicata cannot equitably bar their pursuit in *CR II* when many others are now litigating this landmark theory.

**Plaintiffs' Motions Had Substantive Merit or a Good-Faith Basis and Thus Were Not Frivolous**

Each of the challenged motions was grounded in legitimate factual and legal concerns, even if the Court ultimately disagrees with Plaintiffs' positions. The question under Rule 11 is not whether the motions will succeed, but whether they were so devoid of factual or legal support as to be objectively unreasonable. Here, far from being random or wanton, the motions responded directly to Apple's conduct in the litigation and to new developments, seeking relief that, while assertive, was reasonably supported by evidence.

First, the **Motion for Sanctions** (Dkt. 86): Plaintiffs moved for sanctions against Apple and its counsel under the Court's inherent powers, citing what they described as egregious litigation misconduct over five years. This motion was detailed and contained specific allegations: for example, that Apple (through counsel) made misrepresentations to the Court, such as flip-flopping on Roberts or Isaacs involvement and standing in CR I. This is a real concern; whether it was fraud on the court is to be decided, but it is a colorable issue anytime a party is blocked from participating in litigation, and therefore non-frivolous. Plaintiffs pointed to Apple's effort to obtain a "global anti-suit injunction" again barring them from participating in litigation – characterizing it as an abusive attempt to silence a critic from even *future* harms to *non-parties*. Plaintiffs argued that Apple's conduct warranted a thorough investigation – including discovery into Apple's litigation communications and an evidentiary hearing. While this is an aggressive stance, it is not frivolous. Plaintiffs' belief about Apple's conduct may be debatable, but it is sincerely held and backed by notable facts (e.g., Apple's counsel allegedly threatening Plaintiffs with personal ruin, repeated flip-flopping in violation of judicial estoppel law, constant references to neuropsychiatric issues, etc). Filing such a motion to call attention to perceived litigation abuses is consistent with Rule 11's allowance for vigorous advocacy. Furthermore, we take very seriously that Gibson Dunn prevented Dr. Isaacs from participating in CR I, but now want to preclude Greenflight based on his purported presence. This violates countless principles of fairness and statutory laws on witness intimidation. We are willing (and hereby request) to testify on the fear and harm such improper tactics caused Plaintiffs.

**Motion for Anti-SLAPP Relief** (Dkt. 83): Plaintiffs also filed what amounts to a special motion to strike or for equivalent relief under California's anti-SLAPP statute (Cal. Code Civ. Proc. § 425.16). The deployment of anti-SLAPP in this context is novel or perhaps first impression. Here, Plaintiffs were the original claimants, so at first glance it may seem counter-intuitive for them to invoke anti-SLAPP. However, the substance of Plaintiffs' anti-SLAPP motion was to prevent Apple from using procedural motions (like the threatened anti-suit injunction and $400,000) to punish Plaintiffs for their protected advocacy. In effect, Plaintiffs argued that Apple's request was itself a form of Strategic Lawsuit Against Public Participation (SLAPP) tactic by a powerful entity to intimidate and silence a weaker opponent. The anti-SLAPP motion sought to strike or nullify Apple's attempts to obtain such punitive relief, and to recover attorney's fees for having to defend their right to continue litigating issues of public importance (App Store competition and free speech in app distribution). Plaintiffs anchored this request in the broad language of §425.16 and its purpose of protecting petitioning activity "in connection with a public issue". Given that Apple was effectively seeking to penalize Plaintiffs for bringing a lawsuit (by labeling it frivolous and asking for broad injunctions and fees), Plaintiffs had a reasonable argument that this situation fell within the spirit of anti-SLAPP protections, if not the letter. At minimum, Plaintiffs' anti-SLAPP filing served as a vehicle to force a focused discussion on whether Apple's aggressive counter-litigation moves were aimed at the issues or at the people raising them. That is a legitimate point of contention. Sanctioning Plaintiffs for this would send a message that litigants must never think outside the box or assert novel legal theories, even when motivated by legitimate (and serious) perceived free speech concerns. Rule 11 is not so draconian; it allows room for good-faith innovation in legal advocacy. Finally, case law is sparse on the underlying issue here – when can a motion qualify as an action under §425.16? Apple's opposition cites joinder motions and other narrow motions as nonqualifying. There is no case law saying a motion as wide ranging as Apple's nationwide injunction covering past JPML proceedings, SCOTUS petitions and future claims can't be considered an action. And that action, if it is one, clearly falls under state law (indeed, UCL is pled and invokes it) abuse of process claims. *See proposed reply[2]*. This is a colorable issue that could be ripe for first impression by the Ninth Circuit. Hence, it is not in violation of Rule 11 by any stretch.

---

[2] Due to the overwhelming posture of the case, Plaintiffs' sought a stay before the antiSLAPP reply was due. The stay was not granted, and it is unclear if the Courts' Order (Dkt. 92) on the briefings disallowed a Reply. In light of this, Plaintiffs' attach a proposed Reply, which the Court may recognize if it so wishes.

Plaintiffs sought a **Motion to Stay** (Dkt. 85) for several reasons that were plainly articulated. For instance, Plaintiffs referenced the *Trump v. CASA decision*, which was issued by the Supreme Court on June 27, 2025, just days earlier. In *Trump v. CASA*, the Supreme Court addressed the scope of injunctive relief and curtailed lower courts' ability to issue nationwide injunctions absent class certification. While that case involved immigration policy (an executive order on birthright citizenship), the principle for which Plaintiffs cited it is that courts are moving toward more measured, party-specific remedies and away from sweeping orders like Apple seeks against unnamed non-parties ("associates" of Isaacs). Analogously, Plaintiffs suggested that any relief or sanctions in their case should be narrowly tailored and mindful of due process, and that a stay could ensure that any action taken does not overshoot (especially in light of high court guidance). Far from frivolous, this shows Plaintiffs' awareness of current Supreme Court doctrine and an attempt to align this Court's actions with emerging jurisprudence. The Court may or may not agree with granting a stay, but the motion's rationale is grounded in common litigation practice (stays pending related proceedings are not unusual) and certainly not filed to harass. It was an attempt to conserve judicial resources and avoid irreversible prejudice. It was also an attempt of a severely under-resourced solo practitioner to manage workflow accordingly.

Finally, the **Administrative and Miscellaneous Requests** (Dkts. 84, 87, 89): Frankly, the amicus motion was a call for help from Plaintiffs, which is quite distinct, really the polar opposite from harassment. Similarly, the motion to relate had objective basis: Plaintiffs are opt-outs of Cameron, like many other cases that were related. Moreover, Judge Gonzalez Rogers has deep expertise with Apple retaliation claims that exist here -- a second, objective basis for relation.   And while it is uncommon for a private litigant to ask a court to refer a matter to DOJ, it is neither unheard-of nor prohibited. If a litigant genuinely believes their opponent has violated criminal laws (e.g. obstruction in litigation, violation of criminal antitrust laws), bringing that to the court's attention is not sanctionable – the court can simply decline if it finds the request meritless. Finally, multiple requests for stay were in light of Undersigned being overwhelmed by the totality of events currently transpiring and seeking a status conference for orderly adjudication and guidance. How can that be sanctionable? It is not.

That Reply demonstrates colorable areas for debate, left unresolved by Apple's opposition, therefore proving that the antiSLAPP motion is, if not meritorious, certainly objectively reasonable.

**Plaintiffs' Filings Were a Proportional and Reasonable Reaction to Apple's Litigation Tactics**

To evaluate improper purpose, context is key. As described in the background, Apple's approach to this litigation has been exceptionally aggressive. By the time of Plaintiffs' contested filings, Apple had: won dismissal of the case on procedural grounds and indicated it would seek to bar any further litigation by Plaintiffs on these issues. In other words, from Plaintiffs' perspective, Apple was attempting to shut them down entirely, not just in this case but in any forum, and to do so not by disproving the merits, but by wielding the sheer weight of its legal resources. Plaintiffs' cohort of motions was essentially an act of self-defense in the face of this [perceived] onslaught. Rather than an intent to harass Apple, the filings show an intent to level the playing field and obtain a fair opportunity to be heard.

**The Imposition of Severe Sanctions Here Would Raise Serious Questions of Fairness, Power Asymmetry, and the Appearance of Judicial Neutrality**

Finally, Plaintiffs urge the Court to consider the equities of the situation. Plaintiffs are ordinary individuals and tiny entities near or at bankruptcy; Defendant Apple is one of the most powerful and wealthy corporations in history. This lawsuit was an attempt to hold Apple accountable under laws (antitrust, etc.) that exist precisely to check concentrated power. Throughout the litigation, however, that power imbalance has loomed large. Apple is represented by a top-tier law firm, able to deploy virtually unlimited resources. Plaintiffs have proceeded without comparable means, sometimes officers appearing pro se or with minimal counsel assistance. Despite this, Plaintiffs persisted out of a belief that justice does not depend on one's bank account – that in an American court, even the lowliest can demand answers from the elite. This belief is now being tested. Apple has swung back with demands not only for dismissal but for hundreds of thousands of dollars in sanctions against Plaintiffs and their counsel. A sanctions award of that magnitude is ruinous, sending a stark warning to every other developer or small business: "Challenge us and risk annihilation."

**Undersigned and Plaintiffs have never been sanctioned before. Fairness dictates a warning before actual formal sanctions.**

A sister court recently contemplated–and rejected–the very misconduct narrative Apple now peddles. In *Greenflight Venture Corp. v. Google LLC*, (FLSD USDJ Rosenberg), Greenflight sued Google for monopolizing the "Internet Content Access Methods" ("ICAM") market and for retaliating against Greenflight.  Apple was identified as a co-monopolist but was not a defendant. Judge Rosenberg dismissed

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

under Rule 12(b)(6) because the market definition was insufficient. Yet she made a point that nothing in the record impugns counsel's candor or motive, but rather, relevant markets are simply a challenging obstacle.

Rule 11's "objective reasonableness" test (see Cooter & Gell v. Hartmarx, 496 U.S. 384, 399 (1990)) cannot be met where a contemporaneous district court analyzed the same lawyer's similar antitrust litigation approach and deemed it appropriate. That Court, and Google's highly qualified counsel at Williams & Connelly, had reviewed undersigned's antitrust and UCL theories, were fully aware of CR I, the JPML docket, and even this case, and still found no bad faith to request sanctions. Their fresh, on-the-merits assessments are powerful evidence that the positions Apple now brands a five year 'pattern' of 'multiplied' proceedings are, at minimum, debatable under existing law—which is all Rule 11 requires to defeat sanctions. See Christian v. Mattel, 286 F.3d 1118, 1127 (9th Cir. 2002) (court must deny sanctions where argument is "warranted by existing law or a nonfrivolous extension"). Apple's selective omission of the Google order is itself a reason to doubt its sanctions narrative. Apple asks this Court to scour five years of filings for "vexatiousness," yet fails to mention a four-month-old decision squarely the validity of counsel's antitrust filings, involving related, overlapping alleged antitrust markets and allegations, and issued with full knowledge of CR I and CR II. That omission undercuts Apple's claim of pervasive bad faith and suggests the present motion is tactical overkill, not a good-faith defense of judicial economy.

When evaluating whether an attorney has "unreasonably and vexatiously multiplied" proceedings, courts look to whether other tribunals confronting the same conduct found it sanctionable. The unbroken line of decisions declining to sanction Plaintiffs or counsel (*Greenflight v. Google*, a decade of Caller-ID Patent Litigation) is compelling, contemporaneous proof that counsel and Plaintiffs' strategies, while aggressive, and sometimes cringeworthy evidence that Undersigned is not a career antitrust lawyer, are not "in bad faith" nor "objectively baseless."

### Conclusion

Plaintiffs respectfully request that the Court discharge the Order to Show Cause and decline to impose Rule 11 sanctions. Plaintiffs' recent motions were not frivolous: they were tethered to real events and genuine legal arguments, aimed at protecting Plaintiffs' rights and calling out misconduct. As Justice Robert Jackson famously observed, courts are not "seminaries" of genteel understatement; they are arenas for dispute where feelings may run high, yet out of the clash of zeal and conviction, truth and justice can emerge.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Submitted on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing SHOW CAUSE MEMORANDUM was delivered via ECF to all interested parties.

Executed on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr>
<td>CORONAVIRUS REPORTER CORPORATION,<br>CALID INC.,<br>GREENFLIGHT VENTURE CORPORATION<br><br><i>on behalf of themselves and<br>all others similarly situated</i><br><br>    Plaintiffs,<br><br><i>vs.</i><br><br><br>APPLE INC.<br>    Defendant.</td>
<td>Case No. 3:24-cv-8660-EMC<br><br><br><br><b>DECLARATION OF<br>KEITH A. MATHEWS IN<br>SUPPORT OF SHOW CAUSE<br>MEMORANDUM</b><br><br><br><br><br>The Honorable Edward M. Chen</td>
</tr>
</table>

ER 083

**DECLARATION OF KEITH ALLEN MATHEWS IN SUPPORT OF MEMORANDUM IN RESPONSE TO ORDER TO SHOW CAUSE**

I, Keith Mathews, Esq., declare as follows:

1. I am an attorney licensed to practice law and counsel of record for Plaintiffs in *Coronavirus Reporter Corp., et al. v. Apple Inc.*, No. 3:24-cv-08660-EMC (N.D. Cal.). I make this sworn declaration in support of Plaintiffs' Memorandum response to the Order to Show Cause ("OSC"). The statements herein are based on my personal knowledge and a review of relevant documents, and are made to affirm the good faith, academic, and public interest motivations behind Plaintiffs' litigation against Apple. Certainly some matters herein constitute my legal opinion, which is made to the best of my ability.

2. *Plaintiffs' Academic and Public Interest Motivation*: The Plaintiffs' lawsuit against Apple was never intended to harass, but was driven by academic curiosity, public interest concerns, and principled legal objectives. Dr. Robert Roberts (a distinguished cardiologist involved in NASA's John Glenn shuttle mission), and his co-founder Jeffrey Isaacs developed apparently the first COVID-19 contact-tracing application in early 2020. Their goal in filing antitrust claims against Apple, which was done with caution, reluctance, and hesitation initially, was to 'liberate the way smartphones are controlled and censored by Big Tech' – in other words, to challenge Apple's gatekeeping of the App Store in the interest of innovation, democratic flow of information, and public health. This motivation is inherently public minded and academic-theoretical in nature, focusing on the novel intersection of smartphone monopoly power and healthcare technology, in conjunction with challenging antitrust law, rather than any personal vendetta against Apple. From the outset, we approached the case as a serious scholarly challenge at the frontier of digital markets and medical innovation. Dr Isaacs stated early on he felt his unique interdisciplinary training and experience could provide useful insight into the ongoing challenges that, frankly, have stumped many governments for two decades.

3. *LSAC Recommendation Letter (Evidence of scholarly focus)*: A true and correct copy of a law school recommendation letter I wrote on November 11, 2024 for Dr. Isaacs is attached hereto. In that letter (addressed to the Law School Admissions Committee), I documented Dr. Isaacs' learning centered, intellectual approach to our complex antitrust litigation against Apple. For example, I observed that when we embarked on the Apple case with limited antitrust experience, Dr. Isaacs' "relentless intellectual curiosity and analytical prowess quickly became invaluable," as we together "developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple [and now, directly by others like Quinn Emmanuel and Berger Montague]." As their client representative, Isaacs' approach to this matter reflects Plaintiffs' corporate intent of treating the litigation as a rigorous academic endeavor – studying market economics, antitrust law, digital product evolution, and constitutional principles – rather than as a vehicle for harassment. Indeed, Dr. Isaacs was so intellectually invested in the issues that he applied to law school to formally become an antitrust professor, and my recommendation letter (Exhibit A) chronicles his aptitude for legal analysis and genuine commitment to the rule of law. It highlights how he *"truly loves teaching and problem solving as rewarding goals in their own right,"* thriving on challenging subjects and reducing them to intuitive terms. Such qualities are incompatible with any intent to merely annoy or harass; instead they demonstrate a desire to learn, debate, and advance novel legal theories for the public good.

4. Plaintiffs – via representatives Dr. Roberts and his team– always viewed this case as a serious legal challenge with broad implications, including constitutional dimensions, rather than a private dispute. The founders come from professional and academic backgrounds (medicine, economics, and technology) that informed their approach. They saw Apple's exclusion of the Coronavirus Reporter app as raising fundamental questions about competition and innovation in a pandemic – effectively a test case on how far a dominant digital platform can go in controlling our everyday communications. In CR I, we early on indicated the different founders' projects were 'case studies' and joinder of the cases was meant to highlight these cases, like in an MBA or law teaching method. Apple has said the joinder of cases was in and of itself harassment, which, frankly, is absurd and at the very least, insulting. We likened the case to an academic project, examining whether such platform control could be checked by antitrust principles. Dr. Isaacs applied principles from his medical and MBA training, treating the litigation as an extension of his interdisciplinary research into market failures and public health. Likewise, Dr. Roberts lent his medical expertise to underscore the public interest stakes of the case (i.e. getting lifesaving technology to users). Far from being frivolous or harassing, the lawsuit was pursued as an earnest constitutional and economic experiment to clarify the law in a "novel intersection" of industries. This is evidenced by Plaintiffs' extensive legal briefing on issues like relevant market definition, and by their willingness to invest years in appeals and related proceedings to get answers to these cutting-edge questions. Put very, very simply, we thought we were smart problem-solvers tackling a major social issue; we can and will testify as to such intent and hereby request public evidentiary hearing to prove our innocence. We'd also (see below) like the Apple Antitrust Team to be cross-examined, in the interest of fairness.

5. ***Plaintiffs' Active Engagement and Long-Term Commitment***: Plaintiffs' (and their client representatives and counsel) conduct throughout the litigation confirms their good faith and long-term commitment to lawful petitioning and regulatory accountability. They did not simply file complaints and disappear (as true harassers with no underlying academic insight might); rather, they actively participated in hearings, oral arguments, conducted CNBC interviews, and multiple rounds of briefing over several years. I can attest that Dr. Isaacs and/or Dr. Roberts were present (either in person or via remote access) at every significant court hearing in *Coronavirus Reporter I* (Case No. 3:21-cv-05567-EMC) and subsequent proceedings and apprised of comprehensive updates. Dr. Isaacs even presented oral argument himself during a crucial federal court hearing on a preliminary injunction in 2021, when a technical issue cut off my audio feed. With the Court's permission, Dr. Isaacs "seamlessly stepped in" and "articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues" at stake. His performance under pressure upheld our case and impressed observers (even a Department of Justice attorney contacted us to commend how confidently Dr. Isaacs debated Apple's counsel). This level of engaged, constructive participation is the opposite of harassment – it demonstrates respect for the judicial process and a desire to litigate properly on the merits. Dr Isaacs was proud of this accomplishment, speaking to this Court on a difficult and controversial subject such as the iPhone relevant market and *Amex* platforms. Apple counsel's attempt to diminish such admirable petitioning is part of a long, shameful campaign to deride and harm us. This Court refused to release the video of that hearing, when requested in 2021, and I hereby again request its release to the public, as it now forms critical evidence as to the Plaintiffs' intent and conduct.

6. Plaintiffs and I have shown persistent, good faith engagement with every aspect of this litigation, further belying any notion of a vexatious motive. Over the past five years, I have diligently pursued related claims through trial court dismissals and into the appellate courts. I personally argued our theories before the Ninth Circuit Court of Appeals and even petitioned the Judicial Panel on Multidistrict Litigation (JPML) in an effort to take a leadership role (for a proposed Developer track) with our case with similar app store antitrust cases – steps indicating a strategic, long-term effort to

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

clarify the law. I worked overtime to secure the MDL Majority' Plaintiffs counsel lifting an objection to our joinder. There is no reason the JPML could not have added a developer track to that MDL, and I still believe it would have been in the public interest. It certainly wasn't 'harassment.' Quite to the contrary. Apple moved to discredit us to the JPML, who seemingly decided to 'stay out' of the mess *Defendant* has created.

7.   Dr. Isaacs in particular has devoted extraordinary time and effort to antitrust reform advocacy, as evidenced by the fact that "even his opponents recognize his tireless work ethic," noting his "maintained focus on antitrust reform spanning five years." Rather than abandoning the fight or resorting to out-of-court tactics, Plaintiffs and I consistently pressed our claims through proper legal channels – from motion practice, to discovery attempts, to appeals – demonstrating sincere commitment to addressing what we perceive as Apple's unlawful conduct. Such longterm, constructive engagement is a hallmark of lawful petitioning and is wholly inconsistent with any intent to merely harass Apple.

8.   **Validation of Plaintiffs' Theories by Subsequent Developments**: The substantive antitrust theories Plaintiffs advanced have been vindicated by events and other litigants, proving that Plaintiffs' case was neither frivolous nor malicious. In particular, Plaintiffs were early to allege that Apple's conduct constituted an illegal tying arrangement between two distinct products: (a) Apple's iPhone (and iOS operating system) in the foremarket, and (b) Apple's App Store (iOS app distribution services) in the aftermarket. Dr. Isaacs and I, in particular, spent literally years advocating this theory Isaacs refined, which to this date was never addressed by this Court or the Ninth Circuit. Apple, about a half dozen times, tried to steer the courts awry with a strawman shift of this theory to *Microsoft* platform tying, which the iPhone-App Store bundle simply is not. This is not a trivial validation. Again, years have been spent advocating this theory in particular. Nobody in their right mind could pursue such focused persistence, reading Hovenkamp on weekends and evenings, but for a sincere love for the intellectual scholarly challenge. We contended that Apple was using its dominance in smartphones to lock app developers and users into using the App Store, to the exclusion of any alternative distribution channels – a novel theory at the time we filed, and indeed, we stood alone for years. Today, multiple high-profile lawsuits and enforcement actions now echo this same tying theory. For example, in *Proton AG v. Apple Inc.*, filed June 2025, a prominent app developer and the esteemed Quinn Emmanuel allege that Apple leveraged its smartphone monopoly to monopolize the iOS app distribution and payment markets, designing the iPhone such that the App Store is *'the sole gateway for iOS users to obtain applications,'* foreclosing any rival app stores. Likewise, in *PhantomALERT v. Apple Inc.*, another developer's case focusing on Apple's COVID app policies, the plaintiff plainly alleges that "Apple unlawfully tied its devices to the App Store, making the App Store the exclusive means for users to obtain apps" (thereby barring alternative distribution channels). They did so after their seasoned team of antitrust lawyers engaged in hours long conferrals with Dr. Isaacs. Most significantly, the United States Department of Justice and over a dozen state Attorneys General have sued Apple in a massive antitrust action (filed 2024) on very similar grounds – challenging Apple's exclusionary control of iOS app distribution and other restraints. In that DOJ-led case, the court recently denied Apple's motion to dismiss, allowing the inherent claims to proceed. In other words, the core theories that we pioneered in Coronavirus Reporter – far from being crackpot or harassing – have now been adopted and validated by mainstream enforcers and credible plaintiffs. This trend powerfully corroborates the good faith basis of Plaintiffs' litigation: their claims were rooted in genuine legal and economic issues that are now front-and-center in global antitrust enforcement, not in any intent to harass. We should not be punished for being ahead of the curve on issues that are now widely recognized as serious and real.

ER 086

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

9. **Rebutting Apple's "Harassers" Label – Need for Evidentiary Review**: Apple's attempt to paint Plaintiffs as "harassers" or vexatious litigants is utterly incompatible with the documented record of Plaintiffs' conduct and intent. As detailed in my LSAC recommendation letter, Dr. Isaacs and his colleagues approached this litigation as principled, intellectually-driven litigants. In that letter, I described Dr. Isaacs as *"an unyielding advocate for justice"* guided by a *"strong ethical compass"* and *"motivated by a commitment to justice above all else,"* which led him to take on extraordinarily difficult cases as a matter of principle. This contemporary, candid assessment belies any notion that the lawsuit was a sham or harassment. Nothing in the extensive paper trail of this case suggests an intent to annoy or burden Apple without cause. To the contrary, the record shows Plaintiffs doggedly trying to litigate meritorious issues (often at personal expense and effort) in order to hold Apple accountable under the law. Apple's pejorative labeling of Plaintiffs as bad-faith actors is unsubstantiated and improper. In our legal system, if there is an allegation that a litigant acted with dubious intent, the proper course is to allow evidentiary development on that issue – not to summarily sanction the litigant based on the opponent's say-so. Here, determining Plaintiffs' litigation intent (i.e. whether their aim was legitimate enforcement of rights or mere harassment) requires a fact-driven inquiry into their actions, communications, and then testimony. Plaintiffs welcome such an inquiry, as we are confident it will confirm their good faith. But it would be unjust to impose OSC sanctions without first developing a full evidentiary record on intent. Apple's rhetoric cannot substitute for evidence. Given the stark contrast between Apple's accusations and the documented reality (Plaintiffs' academic approach, presence at hearings, persistence in courts, and even my own written impressions of their integrity), Plaintiffs respectfully submit that any decision about their motives should be reserved for after proper fact-finding – if it even remains an issue – rather than short-circuited by sanctions at this juncture.

10. From the outset, I have sincerely believed that our antitrust claims against Apple were meritorious and important. Our goal was never to harass Apple, but to vindicate the rights of developers and consumers affected by Apple's App Store practices. Over the past several years, time has proven that our concerns were valid. As detailed in a soon to be filed Motion for Reconsideration, numerous independent developments have echoed our core allegations. In addition to Proton, PhantomALERT, and the DOJ cases, a new developer class action (Pure Sweat Basketball) has emerged after Apple was held in contempt for trying to preserve its App Store fees despite a court injunction, with a claim we filed a year before, demonstrating our deep knowledge of the Apple Antitrust situation. In light of these developments, I know as fact our First Amended Complaint raised substantial issues of Apple's unlawful conduct. I approached this litigation with an *innocent intent*, aiming to address what we saw as a serious competition problem. The fact that government enforcers and other plaintiffs are now pursuing the same issues confirms that our claims were far from frivolous or fanciful – they were early. We simply sought a chance to prove them on the merits, and our advocacy was passionate but grounded in facts and law.

11. **Five Years of Hard-Fought Litigation and Personal Toll:** This case (and its prior iteration) has been a five-year struggle for us. We have fought hard through multiple courts and procedural hurdles since 2020, all in a good-faith effort to get a fair hearing, which to us means a jury trial. That fight has taken a significant toll on everyone involved. We perceive ourselves as *victims of Apple's oppressive litigation strategy*, as Apple has vast resources to wear down challengers. In our case, a key financial backer of our efforts – a Greenflight business named OkCaller – abruptly was shut down by Google exactly one year after I filed the first Coronavirus Reporter lawsuit, for reasons that remain unclear. We were alarmed enough by the timing that we even filed a civil complaint citing 18 U.S.C. § 1512 (witness tampering/obstruction) out of concern that there might have been interference, though that matter was never investigated, and dismissed on failure to state a relevant market in the

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

FLSD. Regardless, the end of that funding source severely hampered our ability to continue. Despite these setbacks, we pressed on, motivated by the conviction that Apple's conduct was wrong. But there is no denying the personal and financial strain. Dr. Roberts is 85 years old; As CRC's Chief Legal Officer, I would not feel comfortable extending this case with any other new lawsuits, if the Court will not permit a prompt path forward. Likewise, another team member, Dr. Isaacs, plans to complete his legal studies he began at Vanderbilt (he intends to study antitrust law for two years) and he *hopes that by the time he graduates, someone else will have successfully tackled the "Apple problem."* In short, all Plaintiffs' representatives/founders and I have poured our hearts into this battle for half a decade, and we are proud of the work we've done. We believe we helped lay the factual and legal foundation – such as identifying Apple's tying of the iPhone to the App Store – that others are now building upon. However, we also recognize the realities of life and litigation. Apple is a formidable opponent with enormous resources, and we have already devoted five intense years to this cause. That is enough. Unless this case can *finally proceed swiftly to an actual trial on the merits*, we do not intend to spend further years on these issues. We have other endeavors and responsibilities to turn to. This hard decision comes from reflection on the toll it has taken on us, not from any belief that our cause was wrong. We still firmly believe in the justice of our claims, but we also value our wellbeing and the principle that litigation should not consume one's entire life.

12. **No Need for Sanctions or Injunctive Orders – Plaintiffs Will Not Refile and Have No Designs to Vex Apple:** In view of the above, I respectfully submit that sanctions against us are neither necessary nor appropriate. The Court's inherent power to sanction should be exercised only as needed to prevent abuse, and here there is nothing to prevent going forward. We have made our case; if the Court ultimately decides not to let it proceed after reconsideration, we will accept that outcome and move on once a mandate issues or cert is denied. We have no intent to file another lawsuit against Apple based on the COVID app rejection. (To clarify, we dispute Apple's characterization that this *second* suit was duplicative – we view it as a continuation with new facts and new parties, on unadjudicated tying claims – but either way, we will not file a third 'free app' censorship lawsuit.) Our focus is already shifting to other areas and projects. In other words, there is zero risk of "repeat offenses" by us that would warrant deterrent sanctions. Should anything come close to changing, we would agree to stipulate to asking the court for a pre-filing abbreviated review(for CAND matters), so long as it isn't viewed as a formal sanction. We want nothing further to do with Apple once this matter (whether one calls it CR I or CR II) is concluded. We simply sought our day in court; if that is ultimately denied, we will spend our time on what we perceive as more fair endeavors. Future scrutiny of Apple will be left to others (and indeed is already underway by Epic, the DOJ, Proton, Pure Sweat, and more). We are fairly confident that over time Apple's true practices will be exposed and checked by the proper authorities – but we do not need to be the ones driving that any longer, and indeed, our funding largely ran out for unexplained reasons.

13. Because we are deescalating voluntarily, punitive measures are unwarranted. In fact, imposing harsh sanctions would only compound the harm to the wrong parties. Any monetary sanction would be devastating to us: I personally do not have anywhere near $250,000 (the figure Apple seeks), after working over a decade as a small-town lawyer, and Plaintiff Greenflight Venture Corp. likewise has extremely limited resources and verges on insolvency after the shutdown of OkCaller. *Even a sanction of $50,000 would cause severe financial hardship* for us. Such a penalty would essentially bankrupt the very small companies and individuals who dared to challenge a trillion-dollar corporation. That outcome is not only unjust; it is unnecessary for any legitimate purpose. We have not acted in bad faith, and we are not continuing to burden the courts – so no sanction is needed to protect the Court or Apple going forward. Time will possibly show Apple as the aggressor, not us, it seems. We respectfully urge the Court to recognize our good faith and the extraordinary circumstances here. This case was brought with a proper motive and a belief in its merit, supported

by significant parallel evidence and validation from external events. While the Court has found the case barred on technical grounds, our conduct in pursuing it was reasonable and done in the sincere interest of justice.

14. I note that the inherent power sanctions doctrine counsels restraint. Sanctions under the Court's inherent authority must be tailored to what is necessary to address the misconduct. Here, there is no ongoing misconduct to address; another judge closed a case four months ago involving Apple's monopolization and specifically exonerated me of any wrongdoing. Thus, any sanction would serve only as retroactive punishment, which is not warranted absent truly egregious or bad-faith behavior (and I humbly maintain we engaged in no bad faith). The dismissal of our case is punishment enough. We have lost after years of tireless effort, and that is a heavy blow for us. We think Apple and Gibson Dunn had unfair advantages, to say the least. In short, nationwide injunctions or monetary penalties are unnecessary to "correct" anything here – our First Amended Complaint was a meritorious filing made in good faith, and its termination effectively concludes the matter from our perspective. There is nothing left that requires deterrence.

15. On to another specific motion at issue in this OSC, I respectfully respond to Apple's Opposition (Dkt. 90), which argues that our Amended Administrative Motion (Dkt. 85) seeking limited public input and amicus participation was procedurally improper and unjustified. Apple fundamentally misunderstands the scope and purpose of administrative motions under Local Rule 7-11(a), and wrongly asserts that our efforts were unrelated to this litigation. Local Rule 7-11(a) permits administrative motions for miscellaneous relief "not otherwise governed" by federal rules or statutes. While Apple claims our motion exceeded the intended scope of Rule 7-11 by seeking limited public and amicus input, courts in this district commonly permit amicus participation, public comment, or other forms of input even after dismissal or in unique circumstances where important public issues are at stake. Apple's cited cases (e.g., *Morgenstein v. AT&T Mobility LLC, Omoregie v. Boardwalk Auto Ctr.*) address motions for full litigation stays or major substantive rulings, not limited amicus participation or narrow public-input procedures. Thus, those cases are clearly distinguishable and do not apply here. Given the unique nature of our proposed class action—which directly addresses broader concerns of antitrust harm affecting thousands of developers and millions of consumers— our request for limited public input is neither inappropriate nor unprecedented. It is precisely the type of miscellaneous relief appropriately sought under Rule 7-11. I did attempt a stipulation, and Apple declined to do so; I do not fully understand their argument that I somehow violated procedure. In any event, in a substance over form context, I complied with Rule 7-11's intent.

16. As proposed class representatives in antitrust litigation, Plaintiffs are empowered—and indeed encouraged—to gather input, assistance, and perspective from similarly situated individuals, third parties, and the public. Courts widely recognize the important role of amicus briefing and public input in antitrust litigation of significant public impact. Plaintiffs here are seeking precisely such input in what we have openly described as a state of extreme vulnerability and perceived oppression, having encountered extraordinary resistance and retaliatory behavior from Apple. Our request for public comment and amicus participation is entirely consistent with established norms in complex litigation addressing significant antitrust issues, especially where the defendant commands vastly disproportionate resources. I am able to provide legal authority for all of my above points, should the Court wish formal, extensive legal briefing on each motion's appropriateness. I assume given the ten-page limit the Court imposed, these statements into my intent and beliefs suffice.

17. Apple wrongly suggests that our petition raising CEO Tim Cook's resignation is unrelated to our lawsuit. Quite the contrary: this litigation explicitly alleges developer retaliation and anticompetitive conduct overseen or permitted by Apple's highest executives, including Mr. Cook. The FAC

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

specifically pleads that Apple retaliated against developers (such as Plaintiffs) for challenging Apple's monopoly practices—precisely the conduct Judge Gonzalez Rogers recently highlighted in the Epic Games litigation when she referred Apple's counsel and witnesses to the DOJ for possible criminal contempt, noting Tim Cook "chose poorly" in overseeing developer related conduct.

18. Accordingly, our request for limited public input on Apple management's conduct and Apple's developer retaliation practices is directly germane to our case and pled allegations. Apple's claim that seeking public comment on these relevant issues amounts to improper commandeering of this Court's processes misrepresents both our intent and the applicable law. It is entirely appropriate, and indeed common, for parties in class and antitrust actions to seek public input and amicus support on precisely such questions of broad public concern and corporate governance.

19. Indeed, Apple itself commonly welcomes amici and public input in other litigation contexts. Apple's citation to inapplicable cases (e.g., *Gill v. Whitford*) addresses situations in which litigants improperly invoke federal courts to address generalized grievances wholly disconnected from specific legal claims. Here, our requests for public input concern specific conduct and claims—developer retaliation and tying practices—that lie at the heart of this litigation, and that have been pleaded in the operative FAC.

20. Apple also argues incorrectly that our request for public input and amicus participation was improper because it came after the Court's dismissal of this case. (Apple Opp'n at 1-3.) But nothing in Local Rule 7-11 or the Federal Rules prohibits parties—especially proposed class representatives in antitrust litigation—from requesting amicus input or limited public comment, even following dismissal. Indeed, amicus participation frequently occurs at post-dismissal and appellate stages, precisely because important issues continue to have public interest implications even after an adverse ruling.

21. Moreover, I did not file their request for public input as a motion for reconsideration of the Court's dismissal order or to reopen the case. Rather, I sought limited amicus input and public comment to address developments regarding Apple's retaliatory practices—practices directly relevant to the sanctions motion that Apple itself initiated after the dismissal. Indeed, Apple has moved for extraordinary sanctions against counsel, placing these issues front and center before the Court, independently of the prior dismissal ruling. Plaintiffs filed their administrative motion to ensure that the Court receives a balanced perspective on these critical questions—not to circumvent or improperly reopen the dismissed case. Apple has not cited any authority holding that seeking amicus support or public input after dismissal is inappropriate, and I have located none. To remove any doubt about our intentions, Plaintiffs clarify unequivocally that their administrative motion requesting public and amicus input was not intended as a motion for reconsideration of the Court's dismissal order. I respectfully request leave to file an appropriate motion for reconsideration within the 28-day timeframe prescribed by Federal Rule of Civil Procedure 59(e).

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

22. In this light, I respectfully bring to the Court's attention a troubling pattern I have witnessed consistently over the past five years litigating against Apple, exemplified once again in Apple's recent filing (Dkt. 90, page 4) opposing Plaintiffs' request for public input and amicus participation. Apple's opposition is indicative of its ongoing strategy to never concede even straightforward matters and, worse, to repeatedly reverse accusations against valid antitrust petitioners by labeling their legitimate advocacy as "improper." This tactic serves to chill and intimidate opponents who dare to question Apple's business practices.

23. Certainly, Apple never concedes core issues, like the fact our tying claim constitutes a properly pleaded per se violation under controlling Supreme Court precedent, such as *Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958). But this refusal to concede even major legal questions is mirrored by Apple's approach to lesser matters as well. Apple's consistent litigation strategy reflects a pattern widely recognized as "DARVO" (Deny, Attack, Reverse Victim and Offender, or simply, 'blame the victim, always')—in seemingly every circumstance, Apple portrays itself as the victim, while the petitioner is depicted as engaging in improper conduct. This matters now, because I am facing $400,000 in bankrupting sanctions as a result of Apple's DARVO strategy, which by implication means Apple's "Antitrust Team" has disregard for the law and social norms, and for the well-being of innocent petitioners. I am not a doctor, but am told that is consistent with conditions that warrant forensic psychiatry evaluation. Indeed, before I am bankrupted by Apple's oppressive motion, I do request the Court allow forensic medical evaluation of the small team that Gonzelez Rogers identified as engaging in probable criminal contempt. That team mostly overlaps with the team overseeing this litigation, to the best of my knowledge.  Surely basic inquiry by a physician into matters like "Is Apple a monopoly? Do they violate Sherman Act?  Did you take measures to block valid petitioners or even retaliate against them? What impact do you think five years of aggressive litigation maneuvers took on the CR I team?" are fair game, given the circumstances here.

24. Specifically at issue here is Apple "reserving" all rights to respond later to a "manifesto" petition concerning Tim Cook's failure to oversee antitrust litigation. That Mr. Cook failed to prevent lies on the witness stand is now fact - not opinion. Our FAC broadly alleges developer retaliation and Apple's intention to subvert antitrust enforcement.  Given this scenario, and our belief that conduct applied in the dismissal of CR II, we sought help from the public. I also "approved for distribution" a Petition which Apple now seeks to strike. Apple calls the Petition "manifesto," consistent with their five year efforts to deride us. But the Court should be aware that no human ever authored the Petition for Tim Cook's resignation, nor did any human spend more than about fifteen minutes on it. I am quite weary of Artificial Intelligence, as I am weary of Big Tech, as the Court knows. We have never done such a test before, but we thought there was an interesting computational legal experiment here. Apple has recently published controversial research that AI LLM's are, in short, not true intelligence. We asked the most powerful commercially available AI, ChatGPT o3 Pro "Deep Research" mode, a simple question:

*"Did Judge Gonzales Rogers' rebuke of Tim Cook's Epic conduct create a legally grounded impetus for his termination as CEO, and if so, write a petition explaining such basis, providing contextual background on critics' views of Apple's demise since Steve Jobs' death."*

8

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Ten minutes later, the Petition was created by AI. I don't have the knowledge to know whether it is indeed 'intelligent,' but I was surprised at the quality of the work - so much so that (after making several minor corrections) I approved it for distribution and public input, to promote conversation on the complex implications herein. This is a matter ripe for discussion, and I request the motion be granted.

25. Hence, there exist no grounds for this legitimate evidence - which is what it is - to be stricken. Moreover, the implications of Apple's response - that it is improper manifesto- further substantiate the allegations in our underlying Sanctions motion. Apple unfairly attempts to chill and intimidate seemingly every single advocate; even an "unintelligent" AI is apparently writing 'manifesto' material Apple deems must be stricken for malicious intent. Think about that. It is nonsensical, I submit to the Court. We now know that Apple and counsel will break the law (in Epic) to subvert fair enforcement of the Sherman Act. The Court is now faced with cross-allegations of litigation harassment. We believe it goes so far as witness intimidation. The Court cannot resolve this issue on the papers, or likely, even in a brief hearing. Whatever tools the Court has at its powers - even forensic psychiatric evaluation of the few at Apple resisting Sherman Act (apparently a handful of counsel, a CFO, and Tim Cook, if I understand the *Epic* ruling correctly, I refer to them now as the "Apple Antitrust Team" of six or so core individuals that should be investigated) - is necessary to stop the internet and nations smartphones from being commandeered by a few individuals with consistent, proven intent to subvert justice, chill opponents, and even seek sanctions to bankrupt them, all to foster their own monopolistic greed.

26. I respectfully urge the Court to consider appropriate judicial remedies, potentially including the appointment of a neutral special master or even forensic psychiatric review, specifically to examine and clarify the intent, motivations, and underlying behavior of those at Apple Antitrust Team responsible for this persistent litigation misconduct.In short, whatever judicial tools the Court has available—whether procedural, forensic, or psychological—should be employed to ensure fairness and accountability. Such measures are fully justified to prevent the internet, smartphones, and app developers nationwide from continuing to be commandeered and intimidated by a few corporate officers and lawyers who have demonstrated a consistent, troubling intent to chill, obstruct, and retaliate against valid antitrust enforcement.

27. Finally, I note that Apple's Response to our Sanction motions proves it is not frivolous. They forfeited and/or failed to substantively address our core concerns. Apple simply never addresses our fraud-on-the-court allegations. Rachel Brass quadruple-downs that Apple had an "express assumption" about CRC during CR I. But she has never explained her email to me, telling me that the CR I plaintiffs, at least "Coronavirus Reporter" were null entities. And the record demonstrates zero express assumption by Apple about CRC, rather , it indicates Brass always cast doubt on the identity of the Plaintiffs and/or their existence or legitimacy, which is consistent with the above conduct I have detailed. In short, I actually agreed with Brass/Gibson Dunn on one of their endless critiques/DARVOs, and now I am being threatened with sanctions. Brass' response does not explain anything, it is rhetoric and procedural knit-picking that forfeits our main points.

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

28. Worse, Brass quadruple-downs on her witness intimidation of Dr. Isaacs. She claims that he was represented by me, but that I didn't represent Greenflight, but that he was pro se, and that he represented Greenflight. These cannot all be true, obviously. The truth, for the clarity of the reader, is that Dr. Isaacs proceeded pro se in CR I as a Greenflight investor – not as Greenflight (which is forbidden by federal rules). He was muzzled, intimidated, and oppressed by Apple's counsel. This is outrage, and it is asinine. I demand justice for my client representative, Dr. Isaacs, who has truly suffered at the hands of Brass and her associates. She has no defense, it is clear. I demand discovery and evidentiary hearing on her sanctions response which constitutes forfeiture.

29. For all these reasons, I respectfully request that the Court decline to impose any sanctions on Plaintiffs or counsel. We sought only to raise genuine antitrust issues that we felt were of great public importance, and we prosecuted this case with conviction and integrity. Now that the Court has ruled, we will abide by that decision and bring this dispute to a close unless the reconsideration motion succeeds . Further punitive measures would be excessive under the circumstances and would serve no positive purpose. We thank the Court for its consideration throughout this case, and we will respect the final judgment of the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 14, 2025, at Manchester, New Hampshire.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

10

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC



American Wealth Protection

Dear Law Admissions Committee,

I am delighted to recommend Dr. Jeffrey Isaacs as a candidate to your JD program. Over the past decade, I have had the privilege of working with Dr. Isaacs in various capacities: first as a client, then as a business partner and ally. Throughout our collaboration, I have consistently been impressed by his tenacity, intelligence, and unwavering drive.

I first met Dr. Isaacs in 2012, when he telephoned our firm seeking assistance with a legal dilemma affecting his post-graduate medical training at Dartmouth, just north of our office in Manchester. I had recently graduated law school myself, and took a keen interest in his case. By way of background, he had entered into a settlement agreement in 2007 with a California medical school. The only consideration of that agreement was a sealing of all academic records, with the intent to allow all parties to the agreement (including a medical school dean, an NIH director, and Dr. Isaacs) to move on with their careers. A second settlement agreement in 2008 acquitted and annulled any and all aspects of academic enrollment at that institution. Despite this, the matter was being held improperly against him, but we didn't know exactly how or why. The matter evolved over the course of the next decade; I worked with former Assistant US Attorney and Northeastern law professor Mark Josephs (deceased) who uncovered that the university was publishing the sealed records. Professor Josephs and I sought declaratory judgement to restore Dr. Isaacs' medical career. The American Academy of Medical Colleges (AAMC) had long before determined that the matter had been expunged; we sought federal declaration to augment the AAMC's position.

Over a decade later, having seen my fair share of injustices in the courtroom, Dr. Isaacs' matter stands out as most remarkable and extraordinary story of one individual's pursuit of justice – and a career – in circumstances that most clearly could not endure. Dr. Isaacs learned the workings of complex litigation and the judicial system from a most unfortunate perspective, to say the least.  But what stands out most to me was his determination to transform this adverse experience and into a force for good.

Having achieved considerable success in the new digital app economy, he came to me with a vision of a case meant to liberate the way smartphones are controlled and censored by the Big Tech. Along with NASA & John Glenn shuttle mission cardiologist Dr. Robert Roberts, he developed the first COVID tracking app – at a time when it was believed confined to Asia and small areas of Europe. Antitrust enforcement had been severely stalled as we started the case. Senators were blocked from bipartisan efforts to rein in Big Tech. Several other well-known efforts, such as *Epic,* were largely abandoned after expending vast resources. Even this year, the entire European Union is struggling to redress Apple's non-compliance with their regulations. We worked tirelessly on claim theories – applying Dr. Isaacs' economics and medical training – in *Coronavirus Reporter v. Apple.* (21-cv-5567-EMC, Nor. Cal.) and *Coronavirus Reporter Corporation v. Apple* (24-cv-53-SVS, Wyo.)

When we embarked on our claim against Apple we possessed limited experience in the specialized field of antitrust litigation. Dr. Isaacs' relentless intellectual curiosity and analytical prowess quickly became invaluable. Together, we developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple. His ability to navigate and understand intricate legal frameworks, in the scope of rapidly evolving global technological change, not only impressed me but also evidences his capability as a legal strategist of the highest caliber.

1000 Elm Street, Suite 800, Manchester, New Hampshire 03101
Tel: 603-622-8100  Fax: 888-912-1497

ER 094

November 11, 2024
Page 2 of 2

A standout moment in our collaboration occurred during a crucial federal court hearing against Apple, represented by attorneys widely considered the best in their field, including Mark Perry and two of his partners at Gibson Dunn. This hearing concerned an injunction that would fundamentally change the way people used their smartphones, and certainly Apple would be prepared. Prior to the hearing, Dr. Isaacs and I participated in countless hours of mock-debate prep. Dr. Isaacs couriered me a copy of Herbert Hovenkamp's antitrust treatise several weeks beforehand. During our review sessions I realized how Dr. Isaacs truly loves teaching and problem solving as rewarding goals in their own right. And the more challenging a subject is, the more he thrives on reducing it to intuitive terms. This trait was invaluable for debate prep in high-stakes litigation.

The hearing was conducted by remote videoconference, and due to a technical issue I lost communication with the court, a scenario that would unsettle many litigators. However, Dr. Isaacs seamlessly stepped in with permission of the US District Judge. He articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues of Sherman relevant economic markets. His performance not only upheld our case but also showcased his exceptional skill. We received numerous phone calls after the hearing, including a DOJ career attorney, saying the same thing: Dr Isaacs confidently beat Gibson Dunn on a debate performance involving the largest monopoly in world history.

The matter is now in its fifth year, and I recently argued our theories to the Ninth Circuit and Judicial Panel on Multidistrict Litigation (JPML). We have already succeeded in raising awareness, and I firmly expect these theories to ultimately prevail – I hope sooner rather than later.

Dr. Isaacs possesses a natural talent for the practice of law; he is, in every sense, a born litigator. Moreover, by the very uniqueness of his experience, he is an unyielding advocate for justice. His insight into legal matters is complemented by his strong ethical compass; he believes deeply in the fairness of the justice system and is motivated by a commitment to justice above all else. This conviction has led him to take on some of the hardest cases imaginable, not merely as a challenge but as a testament to his belief that the legal system can and should provide equitable outcomes and improve the world. His passion for justice, combined with his formidable legal acumen, makes him an asset in any endeavor.

Looking back, from the moment he telephoned my office, it was uncannily clear that he was destined for this profession. His ability to synthesize original arguments on the most complex of subjects is truly remarkable. His writing is artful, demonstrating an innate understanding of the nuances of legal arguments and the art of persuasion. Dr. Isaacs is truly one of the most persistent individuals I have ever encountered. When he commits to a pursuit, he dedicates himself fully, giving 110% until the task is completed. Even his opponents recognize his tireless work ethic, notably mentioning his maintained focus on antitrust reform spanning five years.

I wholeheartedly recommend and endorse Dr. Jeffrey Isaacs' application. Your program will enable him to take on leadership roles that will serve others well. Dr. Isaacs' interdisciplinary background in medicine and economics provides him with a unique perspective that will enrich the classroom. His exceptional communication skills not only make him a persuasive advocate but also enable him to collaborate effectively with professionals across various fields. His commitment to public service and his proven ability to overcome challenges will make him an outstanding law student.

Regards,

Keith Mathews, Esq.
Partner, AWP Legal

1000 Elm Street, Suite 800, Manchester, New Hampshire 03101
Tel: 603-622-8100  Fax: 888-912-1497

ER 095

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION | Case No. 3:24-cv-8660-EMC |
| *on behalf of themselves and all others similarly situated* | |
| Plaintiffs, | **PLAINTIFFS' PROPOSED REPLY IN SUPPORT OF ANTI-SLAPP MOTION** |
| *vs.* | |
| APPLE INC. Defendant. | The Honorable Edward M. Chen |

ER 096

**PLAINTIFFS' REPLY IN SUPPORT OF ANTI-SLAPP MOTION TO STRIKE APPLE'S SANCTIONS MOTION (CAL. CODE CIV. PROC. § 425.16**

**I. APPLE'S SANCTIONS MOTION FUNCTIONS AS A DISGUISED ABUSE-OF-PROCESS ACTION, SUBJECTING IT TO ANTI-SLAPP SCRUTINY.**

Apple insists that anti-SLAPP (CCP §425.16) does not apply because it filed a "motion" rather than a formal complaint. Apple cites limited authority (e.g., *Sheley v. Harrop*) stating anti-SLAPP generally does not apply to routine procedural motions such as joinder or intervention. Apple's sanctions motion is not "routine" or procedural; it seeks extraordinary affirmative relief—a nationwide injunction barring future litigation, punitive fees of roughly $500,000, review of conduct in *Supreme Court and JPML proceeding,* and revocation of counsel's pro hac vice privileges. (Apple Mot. at 1-3). This sweeping punitive relief, against unknown 'associate' non-parties, is well beyond typical sanctions remedies under Rule 11 or §1927, which aim narrowly at specific abusive filings rather than future litigation bans.

In short, Apple provides no case law that a motion like this cannot be construed as an action. It simply provides examples of motions which are not actions. That is like all rectangles are squares, it simply isn't true. This may be a matter of first impression, as best as Undersigned can ascertain, and the Court should certify it for immediate resolution if it has any doubt on the Ninth Circuit's position.

In California, courts have recognized that court filings that are not formal complaint pleadings can qualify as "causes of action" subject to anti-SLAPP if they effectively assert a substantive claim for affirmative relief. Here, Apple's motion seeks remedies comparable to an abuse-of-process or vexatious litigant action under California law. Such claims are unquestionably subject to anti-SLAPP. See *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056–57 (2006) (claims challenging use of litigation process are SLAPPable).

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC

Apple's cases (Sheley, supra) concern purely procedural steps (joinder, intervention) and do not involve substantive demands for punitive injunctive relief or monetary penalties. Those cases do not control here, where Apple is attempting to leverage the sanctions mechanism to obtain what is effectively state-law abuse-of-process relief. Thus, §425.16 applies directly.

## II.   APPLE'S SANCTIONS MOTION TARGETS PROTECTED PETITIONING ACTIVITY UNDER §425.16(e).

Apple next argues that its sanctions motion does not arise from protected petitioning activity because it addresses only "misconduct" within this litigation. This is plainly false. Apple's motion explicitly attacks prior filings in other courts, including Supreme Court petitions, JPML proceedings, and the original Coronavirus Reporter litigation (CR I), along with statements made publicly and to the press. (Apple Mot. at 5-12.) These actions constitute classic protected petitioning activity under §425.16(e)(1)-(2).

The anti-SLAPP statute explicitly protects litigation-related communications, including filings and petitions before any judicial body. See CCP §425.16(e)(1)-(2); *Navellier v. Sletten*, 29 Cal. 4th 82, 90 (2002) ("filing, funding, and prosecution" of litigation is protected). Apple seeks to punish Plaintiffs for precisely such petitioning activities—indeed, it asks this Court to issue a nationwide injunction prohibiting Plaintiffs from exercising their right to petition in the future. This effort to penalize past and chill future petitioning unquestionably triggers anti-SLAPP protection. See Rusheen, 37 Cal. 4th at 1056 (claims designed to "throttle petitioning rights" are SLAPPs). Apple's reliance on narrow cases exempting ministerial motions (e.g., joinder) from anti-SLAPP is misplaced. Those cases simply hold that purely procedural filings that do not seek affirmative relief against petitioning activity are not SLAPPable. Apple's motion, in contrast, expressly seeks affirmative injunctive and monetary relief against Plaintiffs precisely because of their

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC

protected petitioning in prior courts and in public discourse. Thus, Apple's motion squarely falls within the ambit of §425.16.

### III. APPLE'S MOTION IS FUNCTIONALLY A STATE-LAW CLAIM OF ABUSE-OF-PROCESS, NOT A ROUTINE FEDERAL SANCTIONS MOTION.

Apple further argues that anti-SLAPP does not apply because it invokes Rule 11 and federal sanctions standards. But the substance, not the form, determines anti-SLAPP's applicability. See *Mission Beverage,* 15 Cal. App. 5th at 700 (substance over form determines anti-SLAPP applicability). Apple's requested remedies—including a broad filing injunction, pro hac vice revocation, and extensive fees—far exceed what Rule 11 or §1927 typically authorize. Federal courts do not ordinarily grant Rule 11 sanctions that bar future filings or litigation from non-parties for future harms. Such remedies are akin to California state-law vexatious litigant orders or abuse-of-process tort claims. Because Plaintiffs' filed a UCL claim, and Apple attacks it as sanctionable, there exists little question this matter falls within the authority of California Anti-SLAPP statutory law.

This Court should look past Apple's formalism to the actual nature of the relief Apple seeks and recognize it as a disguised state-law-style SLAPP.

**1.** ### IV. APPLE FORFEITED ANY LEGITIMATE DEFENSE TO PLAINTIFFS' ALLEGATIONS OF FRAUD, RETALIATION, AND FLIP-FLOPPING.

Plaintiffs' Anti-SLAPP motion directly argued that Apple's sanctions motion was retaliatory and premised upon distortions of fact and fraud upon the Court. Apple's opposition fails entirely to rebut Plaintiffs' showing that Apple itself engaged in litigation misconduct—including inconsistent positions regarding

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC

Plaintiff entities' existence, status, and litigation capacity. Apple has notably never explained its "flip-flop" regarding Coronavirus Reporter's corporate existence and Dr. Isaacs' pro se representation—key issues underpinning its sanctions request. It has never address the Lawlor new conduct issue in any meaningful way – demonstrating their sanctions motion has zero likelihood to prevail, because CR II extends far beyond the conduct (and timeline) of CR I.

Failure to respond to critical arguments constitutes forfeiture. See *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010) (arguments not raised in opposition brief are forfeited). Apple has thus forfeited any defense to Plaintiffs' arguments that Apple's sanctions motion rests upon factual distortions, fraudulent representations, or retaliatory litigation tactics. This forfeiture alone warrants rejecting Apple's sanctions motion, as Plaintiffs' allegations remain unrebutted.

**THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS; APPLE'S ATTEMPT TO PRECLUDE PLAINTIFFS WHILE IDENTICAL CLAIMS PROCEED IS INEQUITABLE.**

Finally, equity weighs decisively against granting Apple's motion. Apple seeks harsh punitive measures against Plaintiffs and their counsel for raising antitrust tying claims that are currently being pursued by the U.S. Department of Justice and sophisticated developers in active litigation, including Proton AG, PhantomALERT, and (non-tying but overlapping conduct claims) Pure Sweat Basketball. Apple notably fails to address this crucial equitable argument, thereby conceding that its sanctions would unfairly single out Plaintiffs among a broader universe of developers and litigants who have asserted identical or substantially similar antitrust theories against Apple.

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC

Courts recognize the inequity of penalizing early advocates of claims that later gain widespread recognition. See, e.g., *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322 (1955) (claims arising after an initial judgment not barred,). Apple now seeks to weaponize Rule 11 sanctions to immunize itself against these claims, despite the DOJ and others successfully pursuing them elsewhere. Sanctioning Plaintiffs would unfairly chill lawful antitrust advocacy and disincentivize whistleblowers and early claimants from raising emerging antitrust issues. This Court should reject such inequitable and punitive tactics.

### Conclusion

Apple's sanctions motion seeks extraordinary relief that functions precisely as a disguised SLAPP: it retaliates against past protected petitioning and improperly seeks to chill future litigation. Apple forfeited key rebuttals, cites irrelevant narrow cases, and cannot justify punishing Plaintiffs for claims now accepted and pursued by others, including the DOJ. This Court should grant Plaintiffs' Anti-SLAPP motion under CCP §425.16, strike Apple's sanctions motion entirely, and award Plaintiffs fees and costs as provided by the statute.

Submitted on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' EMERGENCY MOTION FOR LITIGATION STAY AND STATUS CONFERENCE**<br><br><br>Date: August 21, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

ER 102

**NOTICE OF EMERGENCY MOTION FOR TEMPORARY STAY AND STATUS CONFERENCE**

PLEASE TAKE NOTICE that on August 21, 2025, at 1:30 p.m. Pacific Time, or as soon thereafter as the matter may be heard before the Honorable Edward M. Chen in Courtroom 5, 17th Floor of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation will and hereby do move pursuant to Federal Rule of Civil Procedure 11(c)(2), 28 U.S.C. § 1927, and the Court's inherent authority, for an order:

(a) Deferring all further briefing and hearings on Apple's sanctions motion until after the Court has resolved the pending issues, specifically:

(b) Plaintiffs' motion for recusal pursuant to 28 U.S.C. § 455(a);

(c) Plaintiffs' request for a status conference addressing representation by attorney Melissa Theriault;

(d) Plaintiffs' request for a declaratory judgment concerning the status of Coring Inc., currently held in abeyance awaiting resolution of the "new conduct" issues unaddressed by the Court's prior dismissal;

(e) Plaintiffs' request for the Department of Justice Antitrust Division to intervene pursuant to applicable statutory authority;

(f) Plaintiffs' request to strike Apple's sanctions motion in light of the Supreme Court's recent decision in Trump v. CASA, Inc., 606 U.S. ___ (2025) (slip op. June 27, 2025), invalidating nationwide injunctions of the type sought by Apple;

(g) Granting Plaintiffs an additional thirty (30) days following resolution of the above-mentioned matters to file any further responses related to Apple's pending sanctions motion; and Authorizing limited, targeted jurisdictional discovery specifically addressing factual issues conceded by Apple's antiSLAPP opposition and related matters concerning a decade of abusive practices by Brass and opposing counsel at Gibson Dunn.

(h) Guidance from the Court as to whether Plaintiffs' cross-allegations of litigation harassment should be filed as a counter-sanctions motion under Rule 11 or consolidated and removed to an independent lawsuit to address all cross-allegations.

This motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; and exhibits thereto; the pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and such oral argument as may be presented at the hearing.

Dated: June 27, 2025                    Keith A. Mathews, Esq.

## TABLE OF CONTENTS

NOTICE OF EMERGENCY MOTION FOR TEMPORARY STAY AND STATUS CONFERENCE ..................................................................................................................I

TABLE OF AUTHORITIES..............................................................................................I

INTRODUCTION................................................................................................................1

ARGUMENT ......................................................................................................................4

   I.     APPLE'S NATIONWIDE FILING BAR IS AN UNAUTHORIZED "UNIVERSAL" INJUNCTION EXCEEDING EQUITABLE AUTHORITY ................................................... 4

   II. A STAY IS NECESSARY TO RESOLVE SERIOUS QUESTIONS ABOUT JUDICIAL IMPARTIALITY .................................................................................................... 7

   III. PLAINTIFFS ARE CURRENTLY WITHOUT CONFLICT-FREE COUNSEL, WARRANTING A CONTINUANCE ...................................................................................... 8

   IV. PARALLEL PROCEEDINGS AND UNRESOLVED CLAIMS COUNSEL IN FAVOR OF A FULL STAY .......................................................................................................... 10

   V.    REVELATIONS IN APPLE'S ANTI-SLAPP OPPOSITION NECESSITATE JUDICIAL INTERVENTION.......................................................................................................... 11

   VI.   APPLE'S CONCESSION THAT GREENFLIGHT LACKED REPRESENTATION IN CR I.... 12

   VII.  APPLE'S DISREGARD FOR THE ANTI-SLAPP PROCESS AND PROCEDURE ................... 15

   VIII. APPLE'S RULE 11 MOTION IS A DISGUISED VEXATIOUS LITIGATION CLAIM............ 16

   IX.   APPLE SEEKS RELIEF BEYOND WHAT ANY FEDERAL SANCTION RULE PERMITS ... 18

   X.    VEXATIOUS LITIGANT ALLEGATIONS REQUIRE A SEPARATE PROCEEDING – WITH FULL DUE PROCESS.................................................................................................. 19

   XI.   NEED FOR A STATUS CONFERENCE AND POTENTIAL REMEDIES............................... 22

CONCLUSION..................................................................................................................24

CERTIFICATE OF SERVICE........................................................................................25

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

## TABLE OF AUTHORITIES

<u>C</u><small>ASES</small>

*AliveCor v. Apple* .......................................................................................................................... 20

*Landis v. N. Am. Co.,*
  299 U.S. 248, 254 (1936). ............................................................................................................ 11

*Lawlor v. National Screen Service* ................................................................................................ 11

*Trump v. CASA*, Inc.,
  602 U.S. ___ (June 27, 2025) ......................................................................................................... 4

*United States v. Holland,*
  519 F.3d 909, 912 (9th Cir. 2008) .................................................................................................. 8

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

## INTRODUCTION

Apple Inc. has repeatedly demonstrated a shameless disregard for the rule of law and a pattern of abusing the judicial process to preserve its dominance. In antitrust disputes and beyond, Apple behaves as if courts are mere hurdles to manipulate rather than authorities to obey. Time and again, the company has flouted court orders, buried opponents in litigation, and even offered false testimony – all in service of maintaining its monopoly power. Such conduct is not just unorthodox; it is contemptuous and corrosive to the integrity of the legal system. One glaring example is Epic Games v. Apple, where Apple was recently found in contempt for willfully defying an injunction aimed at opening the App Store to competition. U.S. District Judge Yvonne Gonzalez Rogers ruled that Apple willfully chose not to comply with her injunction and instead engineered "new anticompetitive barriers" to preserve a revenue stream she had already deemed anticompetitive. Internal documents later exposed that Apple's leadership knowingly chose the most anti-competitive options at every turn – a strategy Apple then tried to hide from the court. In fact, Apple's vice president for finance lied under oath about the company's compliance efforts, giving testimony 'replete with misdirection and outright lies,' according to Judge Gonzalez Rogers. Equally disturbing, Apple's own counsel (from firms including Gibson Dunn) stood by and failed to correct these 'obvious lies' on the witness stand , effectively tolerating perjury in the courtroom. The judge was so appalled that she even referred Apple – and the lying executive – to the U.S. Justice Department for a criminal contempt investigation.

Apple's defiance in the Epic case is not an isolated incident but part of a broader playbook of obstruction that Apple employs to thwart antitrust enforcement. Even the United States Supreme Court has seen Apple's arrogance. In Apple v. Pepper, Apple attempted to escape liability by arguing that App Store consumers had no standing to sue it for monopoly pricing – a convoluted theory that Justice Kavanaugh said "does not make a lot of sense, other than as a way to gerrymander Apple out of this and similar lawsuits."

Apple's interactions with smaller competitors reinforce this picture of a company that thinks itself untouchable. AliveCor's CEO, Priya Abani, has openly described Apple as a "bully" that steals innovations and then uses overwhelming litigation to wear down any challenge. According to Abani, Apple has a habit of taking technology from smaller firms and then "bombard[ing]" those firms with expensive lawsuits and motions that it knows startups cannot afford. This scorched-earth litigation strategy allows Apple to avoid ever being held accountable – an outcome achieved not by merit, but by exhausting its opponents.

The saga of the present case is no different – it is about how Apple has abused and oppressed small developed through the litigation process itself. From the very outset, Apple and its counsel have engaged in relentless, heavy-handed tactics aimed at silencing the plaintiffs and exploiting procedural loopholes to gain advantage. This conduct has been especially egregious against Dr. Jeffrey Isaacs, a disabled pro se litigant attempting to stand up to one of the world's most powerful corporations. What should be a fair contest on the merits has devolved into Apple's war of attrition against a vulnerable opponent, marked by hypocrisy, bullying, and a perversion of the rules, muzzling Isaacs for years—with this court's shameless approval, suggesting an anti-disability sentiment, or something improper, if not that.

One need look no further than Apple's conduct in the present matter for proof of Apple's above-the-law attitude. In this dispute, Apple has responded to good-faith inquiries and legal obligations with the same obstinate stonewalling. When pressed for an explanation for non-compliance with today's SCOTUS CASA ruling, Apple provided nothing but a cursory email lacking any substantive justification, despite repeated requests for a meaningful response – an email that effectively said nothing of substance. Such non-answers and blatant delay tactics demonstrate Apple's contempt not just for its adversary, but for the Court's time and authority. It is a pattern we have seen over and over: Apple believes that if it simply refuses to engage or drags things out long enough, it might avoid the day of reckoning entirely. In effect, Apple seeks to coerce the justice system itself – exploiting procedural complexities and a court's patience in order to escape accountability. Each time a court indulges Apple's dilatory maneuvers or overlooks its defiance, Apple is emboldened to push the boundaries even further. At this point, it is criminal. It is taking a toll on Undersigned counsel, his corporate clients, and their disabled representatives. DOJ referral for criminal investigation is hereby requested, as a tag-along to Gonzales-Rogers similar request this month.

One of Apple's first moves in this case was effectively to gag Dr. Isaacs's participation. Early in the Coronavirus Reporter I proceedings, Apple's attorneys refused to communicate with Dr. Isaacs directly, claiming that he could not appear pro se and that – since Dr. Isaacs is not a lawyer – he was not entitled to speak on behalf of his own app in court. By rigidly enforcing this rule, Apple prevented Dr. Isaacs from engaging in even basic communications with opposing counsel, thereby shutting him out of discussions and strategy. The result was that a disabled plaintiff with no attorney was left voiceless in the critical early stages of his own case.

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

Yet, when it later suited Apple's litigation strategy, the company blatantly reversed its position on Dr. Isaacs's pro se status. In its recent filings (for example, in opposing Plaintiff's anti-SLAPP motion), Apple now conveniently concedes that Dr. Isaacs was acting pro se after all. They treat him as a valid pro se litigant – the very status they previously denied – whenever it serves to hold him accountable or to try to trip him up procedurally. This hypocrisy is jaw-dropping. Apple cannot have it both ways: first muzzling Dr. Isaacs for supposedly needing counsel, then later faulting him as a pro se party. The inconsistent stances reveal that Apple's only real goal is to game the system. They will take whichever side of an argument benefits them in the moment, even if it flatly contradicts what they argued before. Such bad-faith flip-flopping shows a profound disrespect for the judicial process and for basic fairness.

Apple's disregard for fairness is further demonstrated by how it has handled anti-SLAPP protections and other procedural safeguards. By rushing to seek a default-based punishment, Apple signaled that it prefers victory by ambush or procedural trick over a fair adjudication. This is the opposite of what anti-SLAPP is meant to ensure. Apple basically said: never mind free speech rights or the speedy resolution of baseless claims – let's punish the plaintiff first on an imaginary process foul. Taken together, these incidents paint a disturbing picture of Apple's litigation ethos in this matter. Apple has repeatedly shown that it will push the bounds of zealous advocacy into outright abuse. The company's approach here is not to transparently defend its conduct on the merits, but to drown the case in procedural quagmires, exhaust the plaintiff, and avoid a fair fight at all costs. Apple's lawyers – armed with virtually unlimited resources – have filed motion after motion, objection after objection, many of them frivolous or duplicative, knowing that an overburdened court might eventually lose patience with the plaintiff. It's a cynical calculation: overwhelm the system and the person until the clock runs out.

Everyone observing this case can see what's happening. It is Apple – not Plaintiffs, not their counsel – that has made this litigation oppressive and punitive. It is Apple that has harassed a disabled physician through duplicity and delay, all while crying foul and projecting its misdeeds onto him, his "associates" and his companies that have served hundreds of millions of customers. This pattern of conduct has undermined the integrity of the proceedings and makes a mockery of the principle of equal justice under law. When a wealthy corporation can so brazenly abuse the litigation process against small businesses and their hard-

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

working owners, it shakes public confidence in the courts' ability to protect the vulnerable against the powerful.

At this juncture, extraordinary relief is not only warranted but necessary. The plaintiff respectfully urges the Court to consider remedies such as recusal, sanctions, and a stay as measures to halt Apple's abuse and restore fairness. First, the presiding judge – who has witnessed Apple's tactics first-hand – should recuse himself sua sponte if any impartiality might reasonably be questioned. The plaintiff deserves a fresh adjudicator who is not fatigued by or biased from Apple's onslaught. A higher court's intervention via writ of mandamus may be needed to correct the accumulation of errors and abuses that have been allowed to occur in this litigation, particularly if procedural irregularities (like ignoring anti-SLAPP protections or muzzling a disabled pro se plaintiff) have impaired the parties rights. At the very least, a stay of all proceedings should be entered to prevent further prejudice while these serious issues are sorted out. Without a pause and a course-correction, Apple will continue to steamroll forward with its oppressive litigation machine, and any eventual victory for Apple – won under such conditions – would be tainted by profound unfairness. This Court must not allow that to happen. It is time to put a stop to Apple's abusive legal gamesmanship, re-level the playing field, and ensure that justice is not drowned out by brute force. The fate of this case should hinge on the merits of the claims and defenses – not on which side can better exploit the court. Only through decisive action now can we reinstate the principles of fairness and due process that have been trampled in Apple's pursuit of unchecked dominance. Not even the world's richest company is above the law.

## ARGUMENT

### I. APPLE'S NATIONWIDE FILING BAR IS AN UNAUTHORIZED "UNIVERSAL" INJUNCTION EXCEEDING EQUITABLE AUTHORITY

Just today, the Supreme Court issued a decision that fundamentally alters the landscape regarding injunctive relief: *Trump v. CASA*, Inc., 602 U.S. ___ (June 27, 2025). The High Court grounded its holding in broad constitutional limits on federal judicial power. The Court reaffirmed that any equitable relief "must be tailored to redress the plaintiff's particular injury" and "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." In other words, a decree "that sweeps beyond the parties" to a case "exceeds the judicial power conferred by Article III." Nothing in CASA confines this

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

principle to government-defendant cases; it is a core Article III limitation that applies a fortiori to private litigation.

This Supreme Court ruling has direct and immediate implications here. Defendant Apple's pending "Motion for Sanctions" (ECF 70) effectively seeks relief that goes far beyond addressing the instant dispute – including an oppressive attempt to enjoin Plaintiffs from pursuing their claims elsewhere or in the future (a de facto nationwide litigation injunction), or even non-party, unnamed individuals. Under CASA's clarified standard, such universal relief is plainly improper. Article III prohibits one district court from issuing an order that binds other courts or non-parties. To whatever extent Apple's motion asks this Court to bar claims outside this case or to punish protected petitioning activity on a broad scale, it "exceeds the judicial power" and cannot be granted . Apple, its decision makers, and its counsel are on notice that their defiant refusal to comply with CASA warrants follow-on litigation against them in personal capacity. Specifically, Messieurs Kleinbrodt and Brass are alleged to be taking part in vexatious litigation and harassing litigation tactics against Plaintiffs, Roberts, and a disabled individual whom Gibson Dunn has targeted for over a decade in retaliation for a separate political issue.

Accordingly, Plaintiffs submit that Apple's Rule 11/§1927 sanctions motion is now untenable and should be stricken or promptly denied as a matter of law. At minimum, Plaintiffs must be given a fair opportunity to brief the impact of Trump v. CASA on the issues before the Court. Forcing Plaintiffs to meet a filing deadline set before this landmark decision (with barely 4 hours notice to assimilate the new authority) would be highly prejudicial. The Supreme Court has dramatically shifted the legal ground under this case – basic fairness and due process warrant a brief pause so that the parties and the Court can account for this change in law. Indeed, courts routinely allow supplemental briefing or extensions when new Supreme Court precedent emerges that may affect pending motions. Plaintiffs respectfully request that the Court do so here, to ensure any decision accords with the current, binding law.

Apple's nationwide filing bar is an extraordinarily broad prohibition that operates like a prohibited "universal" injunction. It extends to all courts nationwide and covers all future potential claims, not just the case in which it was issued. It purports to bind persons who were not joined as parties or even served in the action (e.g. the "associates" of the named individuals). It is not tailored to any plaintiff's specific injury, but rather preemptively extinguishes the rights of a broad class of non-parties.

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

Such sweeping, preemptive relief—an injunction against the world—falls cleanly within what the Supreme Court has now identified as a "universal injunction." In its decision *Trump v. CASA, Inc.* the Court held that "universal injunctions likely exceed the equitable authority that Congress has given to federal courts." In other words, a federal court lacks power to issue an injunction that, like Apple's filing bar, extends beyond the parties and controversies properly before it. The Judiciary Act of 1789 confers jurisdiction over "all suits in equity," but that grant is limited to the types of remedies "traditionally accorded by courts of equity" at our country's inception. Because no tradition supports an injunction of this breadth, the Apple filing bar lies beyond the court's statutory equitable authority.

English court of equity at the founding era provided no precedent for an order like this. The Supreme Court noted that "universal injunctions are not sufficiently 'analogous' to any relief available in the court of equity in England at the time of the founding." In equity practice, it was a "general rule" that "all persons materially interested [in the suit] [were] to be made parties to it." Injunctive relief was no exception to this rule: an injunction could only bind the defendants actually before the court. As Lord Eldon famously explained, "[Y]ou cannot have an injunction except against a party to the suit." Thus, in the English Chancery there was no mechanism to enjoin the rights or actions of non-parties on a nationwide scale. Indeed, "under longstanding equity practice in England, there was no remedy 'remotely like a national injunction.'" The type of all-encompassing, *erga omnes* ban represented by Apple's filing bar simply did not exist in traditional equity jurisprudence. Nor did early American courts of equity recognize any such sweeping remedy. If anything, historical practice in U.S. courts underscores that relief must be party-specific. An unwavering line of cases established that a court cannot grant remedies to those who are not before it. Neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs. Universal or nationwide injunctions were conspicuously nonexistent for most of the Nation's history. Their absence from 18th and 19th century equity practice effectively settles the question of judicial authority. Simply put, a court never had the power to impose a blanket prospective ban on litigation by non-parties – and it does not have that power today unless Congress affirmatively expanded equitable jurisdiction (which it has not).

Under the Supreme Court's reasoning in *Trump v. CASA*, Apple's nationwide filing bar is precisely the kind of ultra vires remedy that federal courts cannot issue. Equity may be flexible in fashioning relief, but its

ER 111

flexibility "is confined within the broad boundaries of traditional equitable relief." Because a "universal" injunction "lacks a historical pedigree," it "falls outside the bounds of a federal court's equitable authority under the Judiciary Act." Apple's bar lacks any analogous historical counterpart and thus exceeds the court's constitutional and statutory mandate.

Finally, even if Apple argued that such an expansive ban was necessary to obtain "complete relief" from vexatious litigation, that argument cannot justify overstepping the limits of equity. "'Complete relief' is not synonymous with 'universal relief.'" A court may ensure a plaintiff or defendant gets full relief in the case at hand, but it cannot lawfully insulate a party from all possible future claims by others – that would go beyond administering relief "between the parties" and instead confer an unauthorized windfall of immunity. As Justice Barrett's opinion makes clear, when it comes to remedial power, "the answer is not for the court to exceed its power, too." No matter how strongly Apple desired global protection from lawsuits, the judiciary cannot leap outside its jurisdiction and issue a nationwide filing embargo unsupported by equitable tradition or specific authority.

In sum, Apple's nationwide filing bar is an improper universal [or whatever label they call it in their endless contempt of courts, now including the Supreme Court] injunction that finds no warrant in the history or scope of federal equitable power. Under the Supreme Court's holding in *Trump v. CASA*, Inc., such an order "likely exceed[s] the equitable authority that Congress has granted to federal courts," and it cannot stand. It is actively harming Plaintiffs, inflicting damage – just like Apple's improper litigation ban against a disabled individual four years ago (see below) harmed him, yet was ignored by this Court. This must stop. Immediately. The injunction's breathtaking universality – covering all courts, all future claims, and numerous nonparties – makes it null and void under fundamental principles of equity. The Court should therefore strike down the Rule 11 motion, bringing the relief in line with the traditional, party-bound scope of judicial authority. Anything less would condone an arrogation of power that the Supreme Court has now emphatically rejected.

**II. A STAY IS NECESSARY TO RESOLVE SERIOUS QUESTIONS ABOUT JUDICIAL IMPARTIALITY**

Plaintiffs have raised significant concerns regarding the impartiality of the presiding judge and are preparing a motion for recusal under 28 U.S.C. § 455. This is not done lightly. However, events to date – including the Court's handling of certain issues – have created an appearance of bias or prejudgment that

compels careful review. By law, a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The standard is objective: if a reasonable person, knowing all the facts, would doubt the judge's neutrality, recusal is warranted. Importantly, "if it is a close case, the balance tips in favor of recusal." *United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008). This rule exists to preserve public confidence in the justice system, and to avoid even the appearance of partiality. This is not even a close case; Apple has now conceded (see, *infra*) this Court muzzled a disabled *pro se* litigant five years ago, and struck down a sanctions plea for help when he asked the Court to unmuzzle him. This is despicable, not a close call.

Here, Plaintiffs believe there are substantial grounds for recusal (to be detailed in the forthcoming motion), including indications that the Court may have prejudged key aspects of Plaintiffs' claims. Notably, in the prior dismissal order the Court entirely ignored Plaintiffs' allegations of new misconduct and markets that arose after the initial case – suggesting a predetermined outcome. Such omission goes to the heart of Plaintiffs' ability to be heard fairly. Additionally, other developments raise concerns about potential conflicts or biases. While we will not argue the full merits of recusal in this motion, we emphasize that these issues are urgent and non-frivolous. They strike at the very integrity of the proceedings. Attorney Theriault has not responded to a request for her review of this matter, as undersigned sought a non-conflicted opinion – as he did at the outset of this case from Theriault.

Fundamental fairness dictates that major substantive decisions should be stayed until the recusal question is resolved. If the Court's impartiality is in doubt, proceeding with tight deadlines (or ruling on dispositive motions) risks tainting the process and could necessitate vacating those rulings later. Conversely, a short stay causes little harm. Staying proceedings now allows time for a proper hearing on recusal, ensuring that "justice must satisfy the appearance of justice." In the interest of justice – and given that any doubt should be resolved in favor of recusal – Plaintiffs respectfully request the Court pause current deadlines and convene a prompt hearing on the recusal motion. Resolving this threshold issue first will either restore confidence in this tribunal's neutrality or result in assignment to a new judge, before resources are expended on further briefing under a potential cloud of bias.

**III. PLAINTIFFS ARE CURRENTLY WITHOUT CONFLICT-FREE COUNSEL, WARRANTING A CONTINUANCE**

Compounding the above issues, Plaintiffs are effectively deprived of adequate counsel at this critical juncture. The only attorney currently able to act is Keith Mathews, who serves as Plaintiffs' Chief Legal Officer and corporate representative. Undersigned is a loyal and reasonable advocate, but he is laboring under a conflict of interest and practical constraints that severely prejudice Plaintiffs' case. Specifically, as a corporate officer and likely fact witness in matters at issue in the Rule 11 motion, Undersigned Mr. Mathews cannot be expected to vigorously litigate certain points without compromising his duties to the corporation or risking testimony that could be necessary. This is a classic advocate-witness and conflict-of-interest situation. Under professional ethics rules, an attorney who is a principal in the client company has inherent conflicts that can hinder objective representation (e.g., Cal. Rules of Prof. Conduct 1.7 & 3.7). Undersigned himself has acknowledged these conflicts and sought already retained independent assistance to represent Plaintiffs' interests.

That independent counsel is Melissa Theriault, Esq., a highly qualified attorney with law enforcement and DOJ AUSA experience and disability expertise directly relevant to this case. Ms. Theriault was engaged specifically to provide conflict-free, experienced representation, advised from the outset that the res judicate matters would be vigorously contested by Apple. However, despite being a signatory to the FAC, she improperly noticed withdraw (apparently threatened by Apple, see Schwartz emails) before substantive briefing was due. Critically, the Court has not granted any order permitting her withdrawal – meaning Ms. Theriault remains counsel of record for Plaintiffs at this time. Indeed, hereby requested is a status conference to address Ms. Theriault's role and the overall representation issue. The question of who will serve as Plaintiffs' lead counsel pending the antiSLAPP and Rule 11 proceedings is actively pending. Until it is resolved, Plaintiffs are left in limbo with an attorney (undersigned) who is conflicted and an attorney (Ms. Theriault) who is, for whatever reason, failing to comply with the Rules.

It would be profoundly unjust to force Plaintiffs to meet imminent briefing deadlines under these circumstances. The importance of effective, conflict-free counsel cannot be overstated – it is a bedrock of due process. Courts regularly grant continuances when a party's counsel withdraws or is unable to serve, to allow the party to retain new counsel and get up to speed. Here, Mr. Mathews himself, as an officer of the court, is affirmatively asking for such relief due to his conflict. Plaintiffs deeply need Ms. Theriault's participation given her extensive experience with antitrust and government enforcement matters. Plaintiffs

9

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

respectfully submit that a stay and new schedule should be ordered so that Ms. Theriault can be fully brought into the case (or alternate unconflicted counsel engaged) before Plaintiffs are required to file critical briefs. This will ensure Plaintiffs have a fair opportunity to be heard through competent counsel, and it will aid the Court by sharpening the quality of briefing on the complex issues in this lawsuit.

Notably, no party will suffer prejudice from a continuance to sort out representation. In contrast, denying a continuance would gravely prejudice Plaintiffs, who would effectively have to brief multiple complex issues without proper counsel. Such an outcome risks a one-sided presentation and a potential miscarriage of justice. Plaintiffs have acted in good faith and have compelling reasons for the request; Apple cannot credibly claim any real harm from a short delay, especially because the case is currently (improperly) dismissed. Therefore, an extension is not only permissible under Rule 6(b) – it is the only equitable course to ensure both sides can be fully and fairly heard.

## IV. PARALLEL PROCEEDINGS AND UNRESOLVED CLAIMS COUNSEL IN FAVOR OF A FULL STAY

Plaintiffs also seek a stay to prepare a declaratory judgment component involving "The Coring Company" ("Coring") – a related entity and claim that was carved out and held in abeyance previously. By way of background, The Coring Co. filed a sister antitrust suit against Apple in a different forum, which was later transferred to this District. Plaintiffs will request a declaratory judgment as to Apple's liability for newly emerged conduct and markets (the post-2021 developments) which directly include the Coring claims. The Court, however, never addressed those new allegations or the Coring case in its prior dismissal order (despite knowing it was held in abeyance) – effectively leaving that aspect of the case unresolved. In discussions, it was contemplated that the Coring-related claims would await further evidence of Apple's conduct in new markets (like blockchain apps generally) before adjudication. Now, with dismissal of earlier claims, and a potential nationwide ban that would target Coring(a non-party), those issues have resurfaced and become ripe for decision. Yet no ruling has been made; they remain in procedural limbo. It is critical that Plaintiffs be allowed to fully present the Coring declaratory claim so that the entire controversy is resolved on the merits. For the Court to proceed to final judgment (or to sanction Plaintiffs for supposedly repetitive

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

litigation) without ever considering the Coring/new-conduct allegations would be fundamentally unfair and would deprive Plaintiffs of a chance to be heard on evolving facts.

For these reasons, Plaintiffs request a full stay of the case or at least a stay of all impending deadlines until the Court has addressed the status of the Coring declaratory claims and whether Plaintiffs may pursue them (perhaps with an amended pleading to incorporate post-dismissal developments). The Supreme Court has long recognized that the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936). Here, all those factors favor a temporary stay. There are multiple moving pieces and external factors that could significantly affect the posture of this case. Rather than rush piecemeal through briefing under extreme time pressure, the Court should maintain an even balance and grant a stay so that these matters can be sorted out in an orderly fashion. Undersigned has been fighting for a day in court for Coring for four years; we are not seeking to delay for its own sake, but to ensure that when their claims are heard, it is done right – with the proper parties, under the correct law, before an impartial judge, and with all key issues on the table. A short additional delay now serves the interests of justice and will ultimately conserve judicial resources by reducing the need for reconsideration or appeals.

## V. REVELATIONS IN APPLE'S ANTI-SLAPP OPPOSITION NECESSITATE JUDICIAL INTERVENTION

One major revelation from Apple's antiSLAPP opposition brief is that Apple effectively forfeited any rebuttal to Plaintiffs' "new conduct" argument under *Lawlor v. National Screen Service*. In other words, Apple did not dispute that the FAC alleges post-2021 misconduct by Apple – conduct which occurred after the judgment in CR I. Apple's filings conspicuously ignore every single reference to post-2021 activity, even though Plaintiffs' antiSLAPP motion emphasized likelihood to prevail based upon it. By failing to respond on this point, Apple conceded the issue through silence. It is a well-settled principle that when a party fails to oppose an argument, the court may treat it as waived or admitted. Apple's silence here amounts to an admission that the "new conduct" exception to res judicata applies.

Under the Supreme Court's *Lawlor* doctrine, a prior judgment cannot bar a later suit if the latter is based on facts or conduct that occurred after the earlier judgment. In *Lawlor*, the Court held that a second antitrust action was not barred by the first judgment under the doctrine of res judicata, because the plaintiffs sought

relief only for injuries sustained after the first case's judgment. Even if the two suits involve "the same course of wrongful conduct," res judicata will not preclude the second suit so long as the suit alleges new facts or a worsening of the earlier conditions. In our case, the FAC clearly targets post-2021 Apple conduct – e.g. continued or new anti-competitive acts that occurred after CR I ended. Plaintiffs raised this point to counter Apple's claim-preclusion defense. By failing to address it, Apple has forfeited any contention that the CR II claims lack new conduct. Apple's opposition does not contest that new injuries and events unfolded after 2021, which form the basis of the current claims.

This forfeiture is critical because the District Court's Rule 12(b)(6) dismissal earlier this week did not consider any "new conduct" argument at all. The Court's dismissal order was premised on claim preclusion and privity, yet it said nothing about post-judgment conduct or Lawlor. In light of Apple's concession, that omission is stark. It now stands undisputed that the FAC alleges conduct by Apple that occurred after the CR I judgment – meaning those claims could not have been raised in the 2021 suit and are not precluded. Any 12(b)(6) dismissal resting on res judicata is therefore fatally undermined. If the Court assumed the facts were all pre-2021 or identical to CR I, that assumption no longer holds. Because Apple completely failed to address the new-conduct point, the Court should deem it conceded. Consequently, Plaintiffs have at least some claims that are independent of the prior case and must be allowed to proceed (or at minimum, the earlier dismissal must be revisited and vacated). In short, Apple's own opposition confirms that *Lawlor* applies here, freeing the new claims from any res judicata bar. This alone warrants immediate judicial attention and likely reconsideration of the 12(b)(6) dismissal that deliberately refused to address these new facts, under a new post-recusal Court,

## VI.    APPLE'S CONCESSION THAT GREENFLIGHT LACKED REPRESENTATION IN CR I

Perhaps the most breathtaking revelation is Apple's explicit admission that Plaintiff Greenflight Venture Corp. was never represented by counsel in CR I. Apple now concedes there is "no evidence" Undersigned Mathews ever attempted to represent Greenflight in CR I, and indeed, he never did represent Greenflight. Apple knows that Greenflight had no counsel in the first case. This frank concession has far-reaching implications for the integrity of both the prior proceedings and the current case. It means Apple acknowledges

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

– after years of suggesting otherwise – that Dr. Jeffrey Isaacs was proceeding pro se and unrepresented with respect to his shareholder interests in Greenflight in CR I.

Why is this so important? In CR I, Apple's counsel (Ms. Rachel Brass) actively prevented Dr. Isaacs from participating because he was not an attorney, but was, breathtakingly, a "represented" party [hybrid was meant to instill confusion, which it did]. Apple's September 30, 2021 meet-and-confer letter accused Isaacs of improperly attempting to communicate and participate in litigation. Apple took the position that Isaacs could not appear pro se. In other words, Apple's shut Isaacs out of the case (e.g. barring him from meet-and-confer discussions on behalf of the app or any unrepresented entity). Indeed, Apple's team cited ethical rules (California Rule 4.2) to refuse direct contact with Isaacs on the theory that he was "represented" by attorney Mathews or otherwise not permitted to speak for the company. The result was that Isaacs (and nd any shareholder voice for Greenflight ) was silenced in CR I.  Isaacs, as a *pro se* investor/executive, was not allowed to actively represent Greenflight's position, and Greenflight had no independent counsel of its own. Isaacs moved for sanctions about it, in desperation, which this Court denied on "timeliness." It is now abundantly clear Isaacs' sanction motion was critical to the fair adjudication of the case, and this Court blocked it, a long string of years of bias towards Isaacs for unknown reasons that warrant investigation.

Yet now, in its 2025 filings, Apple does an about-face and admits Isaacs truly was a *pro se* participant all along. Apple no longer pretends that Greenflight had an attorney in CR I – effectively conceding that Greenflight was unrepresented and absent from any meaningful participation. This admission gravely undercuts the foundation of the Court's prior rulings on privity and preclusion. In the Rule 12(b)(6) dismissal, the Court accepted Apple's argument that Greenflight's claims were barred because Dr. Isaacs was a party in CR I, thus placing Greenflight in privity with him. That is an extraordinary exception to the normal rule that privity does not extent between corporations; the Court 'pierced a corporate veil' with absolutely zero evidentiary discovery! The Court, in effect, treated Isaacs's role in CR I as sufficient to bind Greenflight (the company) to that judgment – even though Greenflight was not named in CR I. Apple urged this outcome in its motion to dismiss, arguing that Isaacs's involvement in CR I was tantamount to Greenflight being there. The Court must declare what problem it has with Isaacs; it is all but evident, and if it is some grievance with his disabled status, that constitutes judicial misconduct. Recusal will be necessary given these facts; there is

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

no way this Court can credibly proceed in this case, having ignored a disabled pro se Plaintiff's plea for help for five years. This is shameful and the federal courts and citizens of this country deserve better.

Apple's newly-minted admission flips the script: if Greenflight truly had no representation in CR I, and if Apple itself prevented Isaacs from acting for Greenflight, then how can Apple now claim Greenflight's rights were adjudicated or forfeited in that case? Apple cannot have it both ways. It is fundamentally unfair – and legally incoherent – to say on the one hand, "Isaacs cannot act for the company (so we will exclude him)," and on the other hand to claim, "Isaacs's actions bind the company and preclude its claims." Yet that is exactly the contradiction Apple has advanced:

In 2021 Apple told the Court that Isaacs acting pro se for a corporate entity was "improper" and not allowed. Apple's counsel explicitly noted Isaacs was not Greenflight's representative, calling him instead "Mathews' client" [a falsity, playing on 'client representative' misnomer] to emphasize that only the attorney-of-record could speak. At the time, Apple's position was that any attempt by Isaacs to represent the app or Greenflight "violates § 1654" (the statute allowing self-representation). In short, Apple insisted Greenflight was not (and could not be) represented by Isaacs pro se in CR I.

Fast forward to 2025: To defeat Greenflight's claims in CR II, Apple switched its story. In its motion reply, Apple argued Isaacs's role in CR I indeed created privity and "binds Greenflight" to that prior outcome. Apple suddenly portrayed Isaacs as if he had functioned as Greenflight's agent or representative in the first case – the exact scenario Apple had earlier fought to prevent. Apple even suggested that acknowledging Isaacs's pro se status "saves jurisdiction" by ensuring Greenflight was effectively present before the Court.

The Court has seen this all before, and turns a blind eye. The difference today is that Apple even conceded it in their antiSLAPP opposition. The only entity not conceding it at this point in time is the Court, effectively taking an untenable *sua sponte* position. This is unacceptable judicial conduct, to say the least. Judicial estoppel principles forbid a litigant from taking a position clearly inconsistent with one it previously persuaded a court to accept. Here, Apple persuaded Judge Chen to dismiss Greenflight's claims by treating Isaacs as its privy, even though Apple had earlier treated Isaacs as having no authority to represent that company. Now Apple admits the truth: Greenflight was not represented in CR I at all. A post-recusal Court must admit the truth as well.

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

These implications are admittedly profound. It means Greenflight never had its "day in court" in the first lawsuit. Greenflight did not have counsel, was not a named plaintiff, and its would-be representative (Isaacs) was barred from participating on its behalf. Basic due process dictates that a final judgment cannot bind a non-party who was prevented from appearing. If Apple's 2021 stance was correct (that Isaacs couldn't represent Greenflight), then Greenflight was a legal stranger to CR I – and thus should not be bound by that result. Conversely, if the Court is to treat Greenflight as bound through Isaacs's involvement, then it must acknowledge that Apple wrongfully hindered Greenflight's participation by silencing Isaacs. Either scenario is deeply problematic. At minimum, Greenflight has a "fresh slate to proceed in CR II" since it was not actually represented in the prior case. Apple itself now essentially concedes Greenflight was absent in CR I, so there is no equitable basis to preclude Greenflight's claims in the present action.

Furthermore, Apple's handling of this issue raises concerns of misrepresentation or abuse of process. Apple's opposition acknowledges that its prior characterization may have misled the Ninth Circuit and this Court about who the CR I plaintiffs were. For instance, Apple argued in the appeal that "as far as Apple can tell, there is no actual 'Coronavirus Reporter' entity" (implying a null, non-existent plaintiff) – a stark reversal from Rachel Brass's letter confidently stating "Coronavirus Reporter is a Wyoming Corporation". These shifting positions underscore that Apple has been willing to assert whatever version of the facts best suits its tactical needs at the time, even if that means three incompatible descriptions of the plaintiff entities. Now that Apple has let slip that Greenflight truly had no counsel in CR I, the fairness of the prior dismissal of Greenflight (on privity grounds) is impossible to maintain. The Court is left to reconcile this unfair situation. Either: CR I should be reopened or revisited to cure the fact that a pro se participant (Isaacs/Greenflight) was improperly blocked from full participation; or The Court should retract its 12(b)(6) decision and hold that Greenflight is not precluded by CR I, given that Greenflight was effectively excluded and unrepresented in that case.

## VII.    APPLE'S DISREGARD FOR THE ANTI-SLAPP PROCESS AND PROCEDURE

Apple's conduct in pressing its Rule 11 sanctions motion blatantly disrespects the intent and mandates of California's anti-SLAPP law. Under Code of Civil Procedure § 425.16, once Plaintiffs filed their anti-SLAPP motion, further litigation of the claims at issue should have been paused – at least with respect to any proceedings that implicate the allegations subject to the anti-SLAPP motion. The anti-SLAPP statute

automatically stays discovery and freezes the prosecution of targeted claims until the special motion to strike is resolved. This rule exists to prevent exactly what Apple attempted here: forcing a party to fight on other fronts (such as sanctions or evidentiary hearings) while a court is supposed to first determine whether the case has merit or is a chilling SLAPP suit. Apple nevertheless forged ahead and filed a "Reply" in support of its Rule 11 motion – even arguing, incredibly, that Plaintiffs' lack of an opposition by a normal deadline amounted to a forfeiture of the issue. In doing so, Apple brazenly ignored the automatic stay dictated by the anti-SLAPP statute and the well-settled procedure that no response was due while the anti-SLAPP motion was pending. This disregard for the law's mandatory pause on litigation not only violates the spirit of §425.16 – which is to prevent abusive litigation tactics – but also contravenes its letter and clear legislative intent. (The Legislature explicitly directed that the anti-SLAPP law "shall be construed broadly" to curb "abuse of the judicial process" aimed at chilling the right to petition .) Apple's maneuver flouts this public policy. It is more proof of a pattern of Apple being "above the law" and intent to flout their contempt of Court. The Honorable Gonzales Rogers put an end to this conduct, but literally the same month, this Court endorsed Apple's contempt and trampled on petitioners seeking to raise discussion about Big Tech's overreach – something even most Big Tech executives (ie Zuckerberg) welcome. Impermissibly, the Court allowed Apple's irregular filing and has thus far declined to enforce the anti-SLAPP stay. Such indulgence of Apple's maneuver undermines confidence in the Court's impartiality. It suggests a troubling pro-Apple bias – the Court allowed Apple to sidestep a procedure designed to protect litigants from exactly this kind of heavy-handed tactic. This one-sided dispensation to ignore the rules warrants serious concern. At a minimum, the court's failure to uphold the anti-SLAPP stay is legal error; at worst, it betrays a bias that would justify recusal to ensure a fair forum for Plaintiffs.

**VIII.    APPLE'S RULE 11 MOTION IS A DISGUISED VEXATIOUS LITIGATION CLAIM**

Substance must prevail over form. Apple's so-called Rule 11 motion is, in effect, a civil state claim against Plaintiffs for vexatious litigation – a claim that Plaintiffs' filings in this and other venues constitute an abuse of process and harassment of Apple. Apple's motion repeatedly cites Plaintiffs' lawsuits and motions in other tribunals (including appeals to the Supreme Court and petitions to the JPML) as grounds for relief, and it seeks to punish Plaintiffs for pursuing those cases. Anyone (except this Court) can see that Apple and Gibson Dunn are flagrantly bullying the Plaintiffs. Stripped of rhetoric, Apple is accusing Plaintiffs of

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

improperly exercising their fundamental right to petition the government for redress of grievances. In California, however, any "cause of action…arising from any act" of a person's right of petition or free speech in connection with a public issue – which unquestionably includes filing lawsuits and motions in court – is subject to being stricken under the anti-SLAPP statute. Apple's sanctions demand targets Plaintiffs' acts in furtherance of their right of petition (their lawsuits and court filings), meaning Apple's motion itself triggers anti-SLAPP protections. This is precisely the "disturbing increase in lawsuits [or claims] brought primarily to chill" petitioning activity that the California Legislature sought to eradicate.

Crucially, California law provides legitimate avenues to address truly frivolous or harassing litigation – but Apple pointedly did not follow those, at least, not openly but through cloaked Rule 11 motions. For example, if Apple believes it has grounds to declare Plaintiffs "vexatious litigants," it could file a separate malicious prosecution action. Those are the proper (and high-bar) remedies for a party that believes it is the victim of baseless, repetitive litigation. Apple's choice to instead shoehorn its grievance into a Rule 11 motion is an attempt to evade the stricter standards and due process protections of those proceedings. In other words, Apple dressed up a state-law vexatious litigation claim as a sanctions motion, hoping the court would overlook that subterfuge. The anti-SLAPP law exists to prevent exactly this kind of end-run around a plaintiff's constitutional rights. Apple's disregard for the anti-SLAPP stay and its exploitation of a sanctions motion to do the work of a vexatious-litigant lawsuit demonstrate a profound disrespect for the intent of anti-SLAPP protections. Such tactics, if allowed, would severely undermine the rights of citizens (like Plaintiffs) to pursue claims against powerful entities without fear of crushing retaliation.

Apple's year-in-the-making sanctions motion is styled as a routine Rule 11 request. In reality it is a sprawling, hybrid pleading confounding three different federal doctrines Apple—Rule 11, 28 U.S.C. § 1927, or the court's inherent authority. None authorizes that relief Apple seeks. Once those doctrines' textual and doctrinal limits are applied, Apple's paper functions only as a **state-law abuse-of-process claim** aimed at silencing protected petitioning activity. California Code of Civil Procedure § 425.16 therefore supplies the correct procedural filter; Apple's motion should be denied under the anti-SLAPP statute or, alternatively, pared back to the narrow sanctions the federal rules actually permit.

ER 122

17
EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

## IX.    APPLE SEEKS RELIEF BEYOND WHAT ANY FEDERAL SANCTION RULE PERMITS

Apple's motion is also improper because it demands relief that **no federal rule or statute allows** in this context. The company asks for a sweeping order that would reach far beyond this case – essentially an injunction or adjudication against Plaintiffs (and unnamed associates) litigating any Apple related issues from **other proceedings or even future injury**. To say this is unprecedented is an understatement. Neither Rule 11, nor 28 U.S.C. §1927, nor the court's inherent authority provides a *carte blanche* to rewrite history or preempt a litigant's future access to courts on a wholesale basis.

**Rule 11** focuses on sanctioning specific filings in the case at bar that violate the Rule 11(b) standards (e.g. filings made for an "improper purpose, such as to harass" or legal contentions that are unwarranted). It is not a vehicle for imposing forward-looking injunctions or for revisiting the merits of *other courts' decisions*. Rule 11 sanctions, when warranted, are meant to deter misconduct *in the instant litigation* – typically by penalizing the offending filing or awarding attorneys' fees for work caused by that filing. Here, Apple tries to use Rule 11 as a cudgel to collaterally attack Plaintiffs' filings in **completely separate cases** (Supreme Court petitions, JPML motions, appeals in other circuits) which are outside the scope of this Court's purview. There is zero precedent for a Rule 11 sanction that, for example, declares a litigant's Supreme Court petition frivolous and then gags the litigant from further appeals. By design, Rule 11 does **not** confer authority to issue broad injunctions or to adjudicate the propriety of filings in *other jurisdictions*. Apple's attempt to stretch it to those ends is an abuse of the rule. And if it wasn't an abuse of the rule at filing, it certainly is today, given the SCOTUS ruling against universal injunctions.

**28 U.S.C. § 1927** allows shifting of excess costs against an attorney who "unreasonably and vexatiously" multiplies proceedings, but its reach is limited to conduct in the proceedings *before the court issuing sanctions*. It provides for monetary relief (payment of fees and costs) – not injunctions or declaratory relief – and notably applies to attorneys, not the parties themselves. Apple's motion, however, targets the Plaintiffs *themselves* and collateral, prior tribunals – and seeks non-monetary directives far beyond any costs incurred in this single case. Section 1927 simply has no application to the relief sought.

**Inherent authority** is strictly confined and limited by due process and jurisdictional principles. A court's inherent power can never justify a blanket prohibition against future lawsuits by non-parties, nor can it extend beyond the particular case and parties directly before the court. The Supreme Court reiterated these exact

limits in its recent ruling in *Trump v. CASA, Inc.*, 606 U.S. ___ (2025) (slip op. June 27, 2025), holding explicitly that "[r]elief must be limited to the inadequacy that produced the plaintiff's injury in fact. A decree that sweeps beyond the parties exceeds the judicial power conferred by Article III." (slip op. at 12–13).

Apple's requested nationwide injunction—which seeks to preemptively bar not only the plaintiffs but also non-party individuals (such as Isaacs, Roberts, Mathews, and unidentified "associates") from pursuing future claims in **any court in the country**—grossly exceeds this constitutional boundary. Inherent authority is inherently case-specific and party-specific; it provides no vehicle for a court to police future actions not yet filed, especially by non-parties who have never been served or had their day in court.

The Supreme Court's ruling today makes Apple's request not merely excessive, but facially invalid. Plaintiffs have noticed counsel Julian Kleinbrodt and Rachel Brass of their intent to personally sue them and the decision maker responsible at Apple for this harassment; they refuse to retract the filling despite a clear SCOTUS mandate. Compliance with the Supreme Court is measured in *minutes* and Kleinbrodt and Brass have issued a defiant, stubborn notice that they WILL NOT comply with CASA. A nationwide injunction of this kind would be unconstitutional, categorically barred under *CASA*'s binding precedent. Apple's continued insistence on this patently impermissible relief—despite repeated notice and ample opportunity to withdraw—is itself now sanctionable. Federal courts simply have no power to issue prophylactic injunctions barring theoretical future claims, let alone to enforce such injunctions nationwide against non-parties. Allowing Apple's motion to proceed under inherent authority would directly contravene the Supreme Court's express limitation of equitable remedies and would dangerously expand judicial power beyond constitutional limits. Apple's attempt here is plainly improper and should be swiftly denied. Litigation against Apple for this conduct (post-FAC) is hereby noticed as pending.

**X.     VEXATIOUS LITIGANT ALLEGATIONS REQUIRE A SEPARATE PROCEEDING – WITH FULL DUE PROCESS**

If Apple genuinely believes it is being victimized by "vexatious" litigation, the proper course is to file a **separate action or motion** devoted to that issue – one that affords both sides the full spectrum of due process. The law does not lightly permit a defendant to label a plaintiff's efforts as frivolous or harassing; stringent safeguards are in place to separate genuine abuse of the legal system from a litigant's good-faith pursuit of claims. Apple has shown no interest in meeting those safeguards. It wants the *headline* of "Plaintiffs declared vexatious" without the inconvenience of proving it by competent evidence in a fair proceeding, to a jury. But

**Plaintiffs are entitled to defend their litigation history** in a proper forum. We have made clear that if Apple wants to go down that road, then **we are entitled to a full evidentiary hearing and discovery** into Apple's own conduct and litigiousness for against single antitrust advocate it ever faced. That means delving into Apple's pattern of legal tactics and litigation behavior, which is highly relevant to any determination of who is abusing the courts.

For example, in the Epic Games v. Apple case – a landmark antitrust litigation – Apple was found to have **"willfully violated"** a court injunction, essentially flouting a federal judge's order until caught . Judge Gonzalez Rogers issued a scathing 80-page order against Apple in 2025 for this contemptuous behavior , even emphasizing that court orders are "not a negotiation" and admonishing Apple for its blatant disregard of legal mandates. This incident speaks volumes about Apple's approach to the judicial process and undercuts any narrative that Apple is merely an innocent target of frivolous litigation. A party that willfully disobeys court orders (to preserve its commercial dominance) has little credibility to accuse others of abusing process.

In the *AliveCor v. Apple*, Apple fought fiercely to avoid liability – reportedly engaging lobbyists and deploying aggressive legal strategies to delay or derail its opponent's claims. We would seek discovery into those efforts, as they may reveal a pattern of Apple using its vast resources to wear down adversaries and influence outcomes outside of the courtroom. Such information could demonstrate that Apple's cries of being "harassed" by litigation are a classic case of *the pot calling the kettle black* – Apple routinely litigates others into the ground, yet protests when an individual plaintiff refuses to back down against Apple. We also would examine instances where Apple or its counsel may have **misled courts or regulators**. Plaintiffs have reason to believe that Apple (and the law firm representing it) have, on occasion, made deceptive statements under oath or in legal proceedings to advance Apple's interests. If true, this reflects *bad faith* far more egregious than anything Apple accuses Plaintiffs of. Such a track record would bolster Plaintiffs' position that our allegations against Apple – including claims of serious wrongdoing – deserve to be heard and not summarily dismissed as fantasy or "harassment." It would also show that Apple's resort to a punitive sanctions motion is less about genuine vexation and more about **silencing a critical voice** that might expose Apple's misconduct.

In sum, determining whether a litigant is improperly "harassing" the other with baseless filings is a fact-intensive question – one that should be adjudicated in a dedicated proceeding, with both sides allowed to

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

fully develop the record. Plaintiffs emphatically assert that **our claims against Apple are brought in good faith**, to seek redress for real injuries caused by Apple's monopolistic and unlawful practices. Apple obviously disputes that. But the forum to resolve that fundamental dispute is **this lawsuit itself** (on its merits), or a separate malicious-prosecution-type action – *not* a shortcut sanctions motion that presumes Apple's innocence and Plaintiffs' culpability without trial. If Apple truly wants to put Plaintiffs' litigation history on trial, then Apple itself must be prepared to undergo the same scrutiny. That means the "trial" should encompass Apple's history of litigation and lobbying, its conduct in other cases, and its credibility before a fact-finder. Needless to say, that is a tall order and a distraction from the core merits of the current case – which is why such matters are normally bifurcated into separate actions. Apple's attempt to have this court unilaterally decree Plaintiffs as vexatious, without those safeguards, is procedurally and constitutionally improper.

Finally, we note that the Court's acquiescence in Apple's procedurally improper tactics so far has put Plaintiffs in an unfair position. By entertaining Apple's motion (or by allowing it to progress despite the anti-SLAPP stay), the Court is effectively crediting Apple's narrative that Plaintiffs' case is not legitimate – without hearing Plaintiffs' evidence. This not only undermines the purpose of the anti-SLAPP statute but also chills Plaintiffs' own rights. We respectfully urge the Court to reconsider the path taken. The **proper course** is to enforce the anti-SLAPP procedures as the law requires – which would mean halting any further proceedings on Apple's Rule 11 motion, and indeed striking that motion as an independent "claim" seeking relief against protected petitioning activity. Anything less would reward Apple's disregard for the rules. Moreover, to dispel the appearance of bias that has arisen, the Court should carefully re-evaluate its stance in light of the robust protections California law affords to litigants facing exactly this kind of corporate counter-attack. If the Court is unwilling or unable to do so – if it permits Apple to continue flouting the anti-SLAPP stay and pressing an unauthorized sanctions gambit – then Plaintiffs submit that recusal may be warranted or mandamus indicated. A fair adjudication is possible only if the tribunal scrupulously adheres to the law and remains neutral. Right now, Apple's influence and the Court's tolerance of Apple's procedural gamesmanship have tilted the playing field. That must be corrected, either by the Court's own action or by removing the matter to a forum where the rules will be enforced evenhandedly. Plaintiffs simply ask for the

**same procedural respect and justice** that any litigant is due – no less, even if the opponent is the world's largest company. The anti-SLAPP statute, and the integrity of the courts, demand nothing less.

**XI.    NEED FOR A STATUS CONFERENCE AND POTENTIAL REMEDIES**

The above revelations – Apple's forfeiture of the new-conduct issue and its concession regarding Greenflight's non-representation – demand further investigation and judicial action. They are not mere technicalities; they strike at the heart of the case's procedural and substantive fairness. It would be inappropriate for the Court to simply proceed to the next stage (or to enforce any sanctions or judgments) without first unraveling these issues. Plaintiffs have requested an emergency stay, and the newly exposed issues strongly support granting such relief until the Court can sort this out. Specifically, a status conference (and an evidentiary hearing) is urgently needed so the Court can question the parties and clarify how to administer justice going forward. At this conference, Apple should be required to explain its positions (past and present) on the record, and the Court can consider appropriate measures. The following possible actions should be on the agenda:

1. **Reconsideration of the Rule 12(b)(6) Dismissal:** The Court has authority to reconsider or vacate its prior dismissal rulings in order to correct clear error or prevent manifest injustice. In light of Apple's concessions, the premise of the dismissal (that all claims were old and that Greenflight was bound by privity) is now shown to be flawed. The Court should seriously consider **reopening Isaacs' pro se claims** and any other claims premised on post-2021 conduct. As detailed above, Apple has effectively conceded that **Lawlor new conduct** exists here, so any dismissal for claim preclusion cannot stand . Likewise, Greenflight's claim deserves to be heard on the merits, since **it was not truly litigated before**. Reconsideration is warranted to prevent an unjust result where Greenflight is shut out twice – first informally, then formally. The Court can invoke Rule 54(b) (for interlocutory orders) or Rule 60(b) (for any judgment) as needed, because these new developments amount to **"changed circumstances"** and reveal potential injustice.

2. **Evidentiary Hearing and Fact-Finding:** The contradictions in Apple's narratives create factual disputes that **must be resolved before moving forward**. The Court should consider holding a focused evidentiary hearing (as Plaintiffs have suggested) to **resolve Apple's "self-inflicted factual chaos."** Only with a clear, stable factual record can the Court determine appropriate next steps. Apple's antiSLAPP opposition still has no explanation of Brass' email claiming the CR I Plaintiffs were non existant entities. The Court must demand it, or recuse itself for bias.

3. **Sanctions or Other Disciplinary Measures:** The Court should also weigh whether Apple's conduct – in blocking a pro se party, then reversing position to suit its needs – warrants sanctions or other relief. Apple's opposition brief openly acknowledges that its positions have been **mutually exclusive** and tailored to each transient procedural need, amounting to a strategic abuse of process . If the Court finds that Apple (or its counsel) acted in bad faith or manipulated proceedings (for instance, by asserting a "null party" theory on appeal while knowing the truth of the matter), the Court can invoke its inherent powers to impose appropriate sanctions. This could include monetary sanctions, issue preclusion against Apple on certain points, or even vacating prior orders tainted by Apple's misrepresentations. At the very least, **judicial disapproval** should be voiced: a clear statement from

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

the Court that Apple's contradictory stance on Isaacs/Greenflight is not acceptable litigation conduct. The specter of sanctions is not raised lightly – but here Apple's own brief all but admits to a form of procedural gamesmanship that the anti-SLAPP statute was designed to prevent. Thus, the Court should consider whether **Apple's opposition brief has, paradoxically, made a case for sanctions against Apple itself** (even as Apple was seeking sanctions against Plaintiffs). A status conference would allow the Court to hear from Apple directly why it should not be sanctioned or at least ordered to provide sworn clarification of these issues.

4. **Possibility of Reopening CR I or Other Equitable Relief:** Although an extreme remedy, the Court could discuss whether the **prior case (CR I)** should be revisited due to these revelations. The Court does have the power under Rule 60(b) to grant relief from a judgment for, inter alia, *"fraud on the court"* or *"extraordinary circumstances."* The denial of Greenflight's ability to participate, coupled with Apple's potentially misleading representations, may rise to that level. The Court could at least indicate an openness to **equitable relief** that ensures Greenflight's claims are heard either in this case or via some renewed proceeding. Another option is crafting relief that **nullifies the privity finding** from CR I as it pertains to Greenflight, acknowledging that Greenflight cannot be held to a judgment in a case where it had no proper representation. In essence, while reopening CR I in a literal sense is unlikely (given appellate disposition), the Court can achieve the same equitable result by **allowing Greenflight to litigate now** and not treating CR I as binding on it. The status conference would be a forum to explore these possibilities with input from both sides.

Given these revelations, the Court's immediate intervention is warranted. The prudent course is to pause the current proceedings – i.e., grant the requested emergency stay – and convene a status conference to address these matters head-on. It would be unjust to allow Apple to secure a quick victory or enforce a broad sanctions order when the very foundation of those outcomes (no new conduct; Greenflight bound by prior case) has crumbled by Apple's own hand. The Court should bring Apple and Plaintiffs before it to develop a plan for moving forward in a fair manner. This plan might include vacating or reconsidering prior rulings, permitting limited discovery on the "null entity" and representation issues, and ensuring that Dr. Isaacs (and entities associated with him) are not deprived of their rights due to procedural maneuvering by Apple.

The Court has set Apple's Rule 11 sanctions hearing for the very same calendar date as the hearing on Plaintiffs' anti-SLAPP motion. Because discovery and further proceedings on the targeted claims are automatically stayed once an anti-SLAPP motion is filed (Cal. Civ. Proc. Code § 425.16(g)). The practical consequence is that Plaintiffs must defend against a sanctions request—one that directly attacks the very petitioning activity protected by the anti-SLAPP statute—without the statute's intended procedural shield. Scheduling the matters this way therefore nullifies the stay, defeats the Legislature's purpose of providing an early merits screen, and prejudices Plaintiffs' ability to prepare a complete reply. No authority permits bypassing § 425.16's stay for the convenience of a sanctions movant, and the Ninth Circuit has condemned

similar sequencing as legal error. Anti-SLAPP stay "is mandatory and cannot be side-stepped by collateral motions." The Court's *sua sponte* choice to advance Apple's sanctions motion in tandem with—indeed ahead of—full anti-SLAPP briefing signals an appearance of partiality in Apple's favor, compelling at minimum prompt corrective action and, if left unremedied, a renewed request for recusal or writ of mandamus to protect Plaintiffs' statutory rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court GRANT this emergency motion and issue an order providing all current briefing deadlines – including the deadline for Plaintiffs' reply in support of their anti-SLAPP motion (currently due within hours) – shall be stayed or extended. Plaintiffs propose an extension of at least 14 days after the Court resolves the counsel/recusal issues (or such other time as the Court deems proper) for the anti-SLAPP reply and any other affected filings. In addition, the Court should stay all other proceedings or deadlines in this case as needed to address the Coring declaratory judgment issues and to consider any input from the DOJ or other interested entities. The Court shall conduct an expedited status conference (or set deadlines) to address the representation of Plaintiffs (specifically Ms. Theriault's role or substitution of counsel) , and to schedule briefing and hearing on Plaintiffs' forthcoming recusal motion. No substantive motions should be decided until the recusal matter is decided, consistent with 28 U.S.C. § 455 and the need for a neutral tribunal.

Submitted on this 27th day of June, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

EMERGENCY MOTION FOR STAY AND STATUS CONFERENCE
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>        Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>        Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' MOTION PURSUANT TO CALIFORNIA CIVIL CODE PROCEDURE. § 425.16**<br><br><br>Date: August 21, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

ER 130

**NOTICE OF MOTION PURSUANT TO CALIFORNIA CIVIL CODE PROCEDURE. § 425.16**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on August 21, 2025, at 1:30 p.m. Pacific Time, or as soon thereafter as the matter may be heard before the Honorable Edward M. Chen in Courtroom 5, 17th Floor of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation will and hereby do move:

1. Pursuant to California Code of Civil Procedure § 425.16 (the anti-SLAPP statute) for an order striking in its entirety Defendant Apple Inc.'s "Motion for Sanctions" (ECF No. 70) and awarding Plaintiffs their reasonable attorneys' fees and costs; or, in the alternative

2. Pursuant to Federal Rule of Civil Procedure 11(c)(2), 28 U.S.C. § 1927, and the Court's inherent authority, for an order (a) deferring further briefing on Apple's sanctions motion until thirty (30) days after the Court resolves Apple's pending Rule 12(b)(6)/12(d) motion (ECF No. 62) and the status conference with attorney Melissa Theriault, and (b) authorizing limited, targeted jurisdictional discovery under Rule 12(d) with respect to the  disputed "null entity" and related issues raised by Apple's motion.

This motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; and exhibits thereto; the pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and such oral argument as may be presented at the hearing.

Dated: June 13, 2025                    Keith A. Mathews, Esq.

ER 131

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

# TABLE OF CONTENTS

**NOTICE OF MOTION PURSUANT TO CALIFORNIA CIVIL CODE PROCEDURE. § 425.16......I**

**TABLE OF AUTHORITIES.................................................................................................. II**

**INTRODUCTION .............................................................................................................1**

**LEGAL STANDARD.........................................................................................................3**

**ARGUMENT ......................................................................................................................4**

I.    ANTI-SLAPP PRONG ONE: APPLE'S SANCTIONS MOTION TARGETS PROTECTED CONDUCT; SPEECH-SUPPRESSIVE PURPOSE SATISFIES § 425.16(B)(1) .................................... 4

II.   ANTI-SLAPP PRONG TWO: APPLE CANNOT CARRY ITS "PROBABILITY OF PREVAILING" BURDEN *(CAL. CODE CIV. PROC. § 425.16(B)(1))* ........................................ 5

*The Statutory Regimes Apple Invokes Are Narrow, Discretionary, and Conditioned on Procedural Compliance* ....................................................................................................... 6

*A.    Apple's Deliberate Timing and its Many Unused Procedural Alternatives Confirm the Sanctions Motion is a Strategic SLAPP, Not a Genuine Rule 11 Remedy*............................... 7
*B.    Apple's Three-Headed Theory of Representation—Why its Own Documents Doom both the Rule 11 and the Res Judicata 12(b)(6) Motions* ................................................................ 9
*Apple's Contradiction Is Fatal Under Rule 11, Res Judicata, and Anti-SLAPP*................................. 11
*C.    A Naming Defect, Not Misconduct:  Why the "Coronavirus Reporter" Label Cannot Sustain Rule 11 Sanctions*.................................................................................................. 12
*D.    Apple's Own Exhibits Refute Its "Sophisticated Cloaking Scheme" Narrative*......................... 14
*E.    Why Apple's own Developer Program rules created the "ownership disclosure" tangle it now weaponizes* .............................................................................................................. 16
*F.    The unresolved status of former AUSA Melissa Theriault supports evidentiary development over an immediate Rule 11 decision.* ............................................................................... 18
*G.  External confirmations—from Epic, PhantomAlert, Berger Montague, Microsoft, and Hagens Berman—show that Plaintiffs are part of a legitimate, growing antitrust movement.* ......................... 19

III.   GROUNDS FOR IMMEDIATE RELIEF ................................................................... 22

IV.   BALANCING OF EQUITIES AND THE PROPER REMEDY ................................... 24

V. ALTERNATE RELIEF: A BRIEF LANDIS / § 425.16(G) STAY PENDING THRESHOLD RULINGS ...................................................................................................................... 24

**REQUESTED RELIEF .....................................................................................................25**

**CONCLUSION..................................................................................................................25**

**CERTIFICATE OF SERVICE.........................................................................................26**

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

**TABLE OF AUTHORITIES**

C<small>ASES</small>

*Baral v. Schnitt,*
  1 Cal. 5th 376, 396 (2016)................................................................................................ 3, 5
*Barber v. Miller,*
  146 F.3d 707, 710–11 (9th Cir. 1998)................................................................................... 3
*BE&K Constr. v. NLRB,*
  536 U.S. 516, 524-26 (2002) ............................................................................................. 23
*Bulletin Displays, LLC v. Regency Outdoor Advert.,*
  448 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2006) .............................................................. 22
*Chabner v. United of Omaha Life Ins. Co.,*
  225 F.3d 1042, 1048 n.3 (9th Cir. 2000) ........................................................................ 3,24
*Christian v. Mattel, Inc.,*
  286 F.3d 1118, 1127 (9th Cir. 2002)................................................................................... 7
*Cooter & Gell v. Hartmarx,*
  496 U.S. 384, 393 (1990) .................................................................................................... 6
*De Long v. Hennessy,*
  912 F.2d 1144, 1147-49 (9th Cir. 1990).............................................................................. 6
*Fink v. Gomez,*
  239 F.3d 989, 994 (9th Cir. 2001)....................................................................................... 6
*Globetrotter Software, Inc. v. Elan Computer Grp.,*
  63 F. Supp. 2d 1127, 1130-33 (N.D. Cal. 1999) ............................................................... 22
*Goodyear Tire v. Haeger,*
  581 U.S. 101, 108 (2017) .................................................................................................. 23
*Handloser v. HCL Am., Inc.,*
  2020 WL 4700989, at *1 n.1 (N.D. Cal. Aug. 13 2020) ...................................................... 4
*Hilton v. Hallmark Cards,*
  599 F.3d 894, 901-02 (9th Cir. 2010)................................................................................ 22
*Holgate v. Baldwin,*
  425 F.3d 671, 676-78 (9th Cir. 2005)........................................................................... 3,5,14
*Islamic Shura Council v. FBI,*
  757 F.3d 870, 873-74 (9th Cir. 2014)................................................................................ 14
*Jackson v. City of Cerritos,*
  2017 WL 1054980, at *3–4 (C.D. Cal. Mar. 20, 2017) ....................................................... 3
*Keegan Mgmt. Co. v. First Nat'l Bank of Boston,*
  78 F.3d 436 (9th Cir. 1996)................................................................................................. 7
*Klein v. Cheung,*
  20 Cal. App. 5th 1045, 1061-62 (2018) ............................................................................ 19
*Landis v. North American Co.,*
  299 U.S. 248, 254–55 (1936) .......................................................................................... 3,24
*Makaeff v. Trump University, LLC,*
  715 F.3d 254, 261-63 (9th Cir. 2013)............................................................................... 4,6
*New Hampshire v. Maine,*
  532 U.S. 742, 749-50 (2001)........................................................................................... 12,16

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

*Prof'l Real Estate Inv'rs v. Columbia Pictures ("PREI"),*
  508 U.S. 49, 60 (1993) ............................................................................................ 6, 23
*Radcliffe v. Rainbow Construction Co.,*
  254 F.3d 772, 788-89 (9th Cir. 2001)................................................................... 5,8,24
*Ringgold-Lockhart v. Cnty. of L.A.,*
  761 F.3d 1057, 1062-64 (9th Cir. 2014)..................................................................... 6
*Roadway Express v. Piper,*
  447 U.S. 752, 764 (1980) ........................................................................................... 7
*Rusheen v. Cohen,*
  37 Cal. 4th 1048 (2006)............................................................................................. 4
*U.S. ex rel. Newsham v. Lockheed Martin,*
  190 F.3d 963, 971-73 (9th Cir. 1999)........................................................................ 22

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

Apple Inc.'s "Motion for Sanctions"—filed after a full year of strategic silence, and packed with more than two hundred citations to pleadings stretching back to 2021—bears all the hallmarks of a corporate SLAPP. It is directed not at any discrete procedural misstep, but at an antitrust campaign that has increasingly attracted the attention of regulators, rival developers, and the public. Invoking Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority, Apple asks this Court to impose $400,000 in fees, to revoke counsel's *pro hac vice* admission, and—most strikingly—to enter a nationwide injunction that would bar a disabled developer and his associates" (including a world-renowned scientist who saved countless lives) from petitioning any federal court about Apple's conduct. The motion thus improperly seeks to silence a movement by a developer constituency, rather than any purported sanctionable conduct. Congress and the Supreme Court have repeatedly recognized as essential private attorneys general in the enforcement of the Sherman Act and it is beyond dispute that undersigned has raised awareness of this cause and contributed to the advancement of Big Tech oversight. Apple's motion is meant to chill antitrust advocacy work by blatantly parading to the public the risk of speaking out.

Apple's sanctions gambit arrives at a telling moment. Barely a week ago the Ninth Circuit denied Apple's emergency stay request in *Epic Games v. Apple*, leaving undisturbed Judge Gonzalez Rogers' finding of civil contempt and her referral to the United States Attorney for potential criminal contempt. In the wake of that order, *Epic's* chief executive proclaimed that "the long national nightmare of the Apple tax is ended." At the same time, a coalition of antitrust scholars and former enforcement officials has urged the Department of Justice to intensify scrutiny of Apple's "broader pattern of contempt for the rule of law." See https://archive.is/Mxibw.

Microsoft and Hagens Berman have now advanced overlapping theories of liability advanced in our FAC. PhantomAlert's "identical" (in Apple's words) developer action is on appeal with the new support of the accoladed antitrust team at Berger Montague. Plaintiffs here press the next frontier—Apple's censorship and App Store lockdown— a restraint Apple once told this Court was "inseparable" from the operating system but now concedes is a profit center subject to competitive choice.

Rather than address those merits in its pending Rule 12(b)(6) motion—already overloaded with undeveloped and contradictory arguments—Apple has elected to fire a retroactive broadside. Its sanctions

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

motion recycles dozens of snippets from earlier dockets, re-characterizes an inadvertent Rule 7.1 disclosure lapse as a sinister scheme, and artfully omits facts that cut the other way: that Apple itself induced the app naming defect when, in the Ninth Circuit, it argued *against* the existence of the Coronavirus Reporter app as a proper legal entity; that Apple determined the *CR I pro se* representation to be invalid *back in 2021*, and that the second lawyer who signed the original complaint—a former AUSA—found the *non-entity argument coupled with new violations* persuasive enough to file a multi-billion-dollar *class action* antitrust lawsuit against Apple. Apple also ignores the Sur-Reply and Rule 12(d) request Plaintiffs filed on May 14, 2025, which identified corroboration of post-2021 activity by third parties and seeks discovery on the core factual dispute here. Rule 11 does not authorize a litigant to disregard such open factual disputes, much less to deploy them as the basis for a nationwide gag order.

Because Apple's motion targets quintessential petitioning activity—filing Sherman Act complaints about *censorship*, Dr. Roberts' interview with CNBC and dozens of attorney appearances in the press—it is subject to California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16. Under the Ninth Circuit's settled two-step framework, Plaintiffs need only show (1) that Apple's motion arises from protected conduct, which is self-evident, and (2) that Apple cannot demonstrate a probability of prevailing. Apple fails that second step for at least four independent reasons: the live factual controversy over corporate identity that Rule 12(d) channels to summary judgment, the undisputed novelty and public importance of Plaintiffs' *Lawlor*-protected post-2021 claims, Apple's year-long fee racking delay, and the overbreadth of the requested injunction under *De Long* and *Ringgold-Lockhart*. Section 425.16 therefore entitles Plaintiffs to an order striking the sanctions motion in its entirety and awarding mandatory fees.

In the alternative—should the Court wish to reach the merits only after deciding Apple's Rule 12(b)(6)/12(d) motion and after resolving counsel-of-record issues raised by former AUSA Wyoming counsel—Plaintiffs respectfully request a brief, tailored order deferring all sanctions briefing until those steps are complete. That staging would conserve judicial resources by preventing overlapping rounds of argument on res judicata, corporate identity, and evidentiary scope, and would allow Apple to clarify whom, exactly, it proposes to gag before those non-parties are deprived of notice and an opportunity to be heard.

For these reasons, Plaintiffs move (i) to strike Apple's sanctions motion under the anti-SLAPP statute, with an award of fees (approximately $2250), or (ii) to defer the briefing schedule until thirty days after the

Court rules on Apple's pending motion to dismiss and on Mrs. Theriault's status, and until Apple effectuates service on all individuals and entities it seeks to bind.

## LEGAL STANDARD

California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, protects acts in furtherance of the constitutional rights of petition and free speech in connection with public issues from meritless litigation designed to chill such rights. Consistent with the Legislature's directive that this statute 'shall be construed broadly,' § 425.16(a), the Ninth Circuit recognizes California's anti-SLAPP statute as a substantive rule applicable in federal courts sitting in diversity, federal question, or exercising supplemental jurisdiction.

Under Ninth Circuit precedent, the anti-SLAPP analysis employs a two-step, burden-shifting framework. Initially, the moving party must make a prima facie showing that the challenged claim arises from an act of protected petitioning or speech activity, as defined in § 425.16(e). If that burden is met, the non-moving party must then demonstrate, with admissible evidence, a probability of prevailing on the merits of its claims. *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016). This second prong mirrors the standard applied on a motion for summary judgment, requiring the court to consider all admissible evidence presented in the light most favorable to the non-movant.

Federal Rule of Civil Procedure 11, meanwhile, provides a mechanism for sanctions where a pleading or motion is frivolous or filed for an improper purpose. Fed. R. Civ. P. 11(b); *Holgate v. Baldwin*, 425 F.3d 671, 676–78 (9th Cir. 2005). The rule imposes a mandatory safe harbor requirement, requiring service of the exact sanctions motion at least 21 days prior to its filing with the court, thereby giving the opposing party the opportunity to correct or withdraw the contested paper. Fed. R. Civ. P. 11(c)(2); *Barber v. Miller*, 146 F.3d 707, 710–11 (9th Cir. 1998). Courts must consider whether alternative, less severe remedies are sufficient, as Rule 11 sanctions aim primarily to deter misconduct rather than compensate parties.

Federal courts also retain broad discretion under *Landis v. North American Co.*, 299 U.S. 248, 254–55 (1936), to stay or defer proceedings where doing so promotes judicial economy and serves the orderly administration of justice. The Ninth Circuit explicitly recognizes that parallel motions pending before the court—such as dispositive Rule 12(b)(6) motions—can justify deferral of ancillary matters, including sanctions motions, until the primary issue is resolved.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

In an anti-SLAPP motion context, a Rule 11 motion that seeks substantial relief beyond mere sanctions—such as expansive punitive attorney fees, a sweeping injunction, or binding relief affecting non-parties—may effectively function as a standalone lawsuit or action. California courts and the Ninth Circuit have recognized that even ostensibly procedural motions, when they substantively target protected activities and seek broad relief, are treated as "claims" subject to anti-SLAPP protections. For instance, the Ninth Circuit in *Makaeff v. Trump University, LLC*, 715 F.3d 254, 261-63 (9th Cir. 2013), made clear that a pleading styled as a "counterclaim" or ancillary filing seeking expansive injunctive or monetary relief beyond mere procedural redress qualifies as a "cause of action" for anti-SLAPP analysis.

Thus, a Rule 11 motion aimed at sanctioning not only attorneys of record but also non-party advocates, litigants, or affiliated entities, or that attempts to broadly restrict petitioning or speech-related conduct, is properly analyzed as a strategic lawsuit against public participation under California Code of Civil Procedure § 425.16. If the claim fails the second prong of the Anti-SLAPP analysis, any corresponding Rule 11 request effectively becomes moot. *Handloser v. HCL Am., Inc.*, 2020 WL 4700989, at *1 n.1 (N.D. Cal. Aug. 13 2020) (denying Rule 11 request as moot after anti-SLAPP ruling).

Conversely, even if an anti-SLAPP motion does not prevail, courts routinely decline to award Rule 11 sanctions if the underlying challenged pleading or filing was reasonably grounded in fact or law, particularly given the rigorous requirements of Rule 11's safe harbor and objective reasonableness standards.

## ARGUMENT

**I.    ANTI-SLAPP STEP ONE: APPLE'S SANCTIONS MOTION TARGETS PROTECTED CONDUCT; SPEECH-SUPPRESSIVE PURPOSE SATISFIES § 425.16(B)(1)**

The sanctions motion seeks a nationwide injunction against a solo practitioner, his client Greenflight Venture Corporation, a disabled physician and his "affiliates," a category that apparently sweeps in CRC co-owner Dr. Roberts and class actions pending appellate review. California courts deem such measures classic attempts to "throttle the exercise of the right to petition" and thus concisely within § 425.16. *Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006). Apple's deliberate one-year timing, overlapping briefing, and overbroad relief request meet the statute's "strategic litigation" prong and compel dismissal unless Apple can show a probability of prevailing—which it cannot.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

Apple's conscious choice to litigate for a full year before pulling the sanctions trigger, despite having every relevant fact, erases any notion of a genuine Rule 11 purpose.  The motion should be stricken under § 425.16 or, at the very least, deferred until after (i) resolution of the Rule 12(b)(6) motion, (ii) the Theriault status conference, and (iii) targeted jurisdictional discovery.

## II.  ANTI-SLAPP PRONG TWO: APPLE CANNOT CARRY ITS "PROBABILITY OF PREVAILING" BURDEN *(CAL. CODE CIV. PROC. § 425.16(B)(1))*

To survive the second step of the anti-SLAPP analysis Apple must state and substantiate a legally sufficient claim. *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016). The burden is "akin to that of a motion for summary judgment," requiring admissible evidence that would allow a trier of fact to rule for the non-movant. *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018). Apple falls well short for four independent reasons: 1) the FAC clearly targets *post-CR I* activity, 2) Live factual disputes exist, 3) Apple's delay evidences frivolousness, and 4) the Nationwide Injunction is facial overreach.

Apple's April 23 draft targeted only the FAC and the original opposition brief.  The May 14 sur-reply and Rule 12(d) motion requested discovery on the "null entity" narrative and disclosed newly filed related cases corroborating new *Lawlor* claims.  Apple's filings conspicuously ignore every single reference to post-2021 activity, and the sur-reply argued that point extensively. Hence the Rule 11 motion completely fails to address the docket as it stood at the time of filing sanctions.  Rule 11's safe harbor provision is "strictly enforced"; any substantive change after service obliges a fresh 21-day period. *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 788-89 (9th Cir. 2001); *Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir. 2005). Here, numerous forfeited and conceded 12(b)(6) arguments – thoroughly documented in the Sur-Reply – amounts to "change" of circumstances on the Rule 11 foundation. Because Apple never re-served its motion to address those intervening filings, the sanctions request is procedurally barred—foreclosing any likelihood of success as a matter of law.

Rule 11 may not be used to resolve substantial factual disputes. *Atari Interactive, Inc. v. Redbubble, Inc.*, 2019 WL 6723422, at *8 (N.D. Cal. Dec. 10 2019).  Plaintiffs' sur-reply and sworn declarations controvert Apple's central premises (corporate identity, ownership, good-faith investigation, post-2021 conduct).  Until limited discovery is completed—precisely what Rule 12(d) contemplates—Apple cannot

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

meet its clear-and-convincing burden under the Court's inherent power. *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001).

Even unsuccessful litigation is protected unless "objectively baseless" *Prof'l Real Estate Inv'rs v. Columbia Pictures ("PREI"),* 508 U.S. 49, 60 (1993), holding that litigation cannot lose its Noerr-Pennington immunity unless meritless.  Last month, Judge Gonzales Rogers found Apple in civil contempt in *Epic v. Apple*, confirming specific FAC allegations of retaliatory anticompetitive conduct against developers. The Department of Justice filed a Section 2 complaint paralleling Plaintiffs' fore-/after-market theory. *PhantomAlert*, Berger Montague, Microsoft, and Hagens Berman have independently advanced "identical" or related tying and retaliation claims. These developments collectively supply the "reasonable basis in law and fact" that defeats Rule 11. Apple cannot ignore an entire antitrust movement against its company, spelled out loud and clear in the sur-reply, and then file Rule 11 trying to stop it by scapegoating a small-town lawyer. Townsend v. Holman Consulting, 929 F.2d 1358, 1362-63 (9th Cir. 1991) (en banc).

A nationwide pre-filing bar on 'Dr. Isaacs and his associates' flunks the four-factor test for litigant injunctions: notice, adequate record, substantive findings, and narrow tailoring. *De Long v. Hennessy*, 912 F.2d 1144, 1147-49 (9th Cir. 1990); *Ringgold-Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1062-64 (9th Cir. 2014). Apple has not served—let alone proven abuse by—Dr. Roberts, Primary Productions, PhantomAlert, or Coring, all of whom fall within the injunction's sweep.  Overbreadth alone precludes a probability of prevailing. Because Apple cannot satisfy any element of its chosen sanctions regime, its motion collapses at prong two and must be stricken with a fee-shift to Plaintiffs. *Makaeff v. Trump Univ.*, 715 F.3d 254, 262-64 (9th Cir. 2013).

### The Statutory Regimes Apple Invokes Are Narrow, Discretionary, and Conditioned on Procedural Compliance

**Rule 11 (Fed. R. Civ. P. 11)** is aimed at curbing baseless filings, not deterring novel legal arguments or legitimate advocacy. *Cooter & Gell v. Hartmarx*, 496 U.S. 384, 393 (1990).  The Rule is strictly procedural: it polices the moment counsel signs, but it does not punish counsels' refusal to capitulate to an adversary's contested merits position or resolve factual disputes that require discovery. Cf. *Townsend v. Holman*, 929 F.2d 1358, 1366-67 (9th Cir. 1991) (en banc).  Courts therefore deny sanctions where—exactly as here—the non-movant promptly raises colorable factual issues that must be proved, not assumed. See

*Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (reversing sanctions where "factual ambiguities" remained unresolved).

**28 U.S.C. § 1927** reaches only counsel, not parties, and only when counsel's conduct is both objectively unreasonable and undertaken in subjective bad faith. *B.K.B. v. Maui Police*, 276 F.3d 1091, 1106 (9th Cir. 2002). An honest mistake of law, even if the attorney should have known better, is insufficient. *Keegan Mgmt. Co. v. First Nat'l Bank of Boston*, 78 F.3d 436 (9th Cir. 1996). Mathews and Theriault relied on *Epic*, DOJ pleadings, and Apple's own public statements that "Coronavirus Reporter" was not an entity— hardly the stuff of "reckless multiplication." Apple provides zero primary evidence that the FAC signatories had any intent other than to participate in the ongoing antitrust movement against Apple and strictly enforce laws Apple had successfully evaded for two decades.

**Inherent power** is afforded to the courts 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' *Roadway Express v. Piper*, 447 U.S. 752, 764 (1980). The Ninth Circuit insists on a specific finding of bad faith or conduct tantamount to bad faith, supported by clear and convincing evidence. *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). Accurately pleading unsettled antitrust markets—even if ultimately rejected—cannot meet that daunting standard.

### A. Apple's Deliberate Timing and its Many Unused Procedural Alternatives Confirm the Sanctions Motion is a Strategic SLAPP, Not a Genuine Rule 11 Remedy

Apple served its Rule 11 "safe harbor" package on 23 April 2025 and filed the motion on 30 May 2025. The formal lag was five weeks but the strategic delay was much longer: Apple first began touting its res judicata theory in March 2024, when it moved to transfer this action from Wyoming and—at the same time—invoked the same theory before the JPML to oppose Plaintiffs' consolidation request. They were testing the waters to obtain Plaintiffs' early responses, so they could refine their own defense. From early 2024 forward Apple 1) repeatedly paraded upcoming res judicata to the District of Wyoming, to the JPML, and to this Court; 2) chose not to file a declaratory judgment action in this District (or in Wyoming) that would have placed the entire question before the Court without Rule 11 theatrics; 3) chose not to present a contemporaneous Rule 11 motion in Wyoming, where the pleadings originated and where fees, if any, were accruing; and 4) chose not to seek JPML guidance on whether a it should promptly file its res judicata claims

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

somewhere and stay the consolidation proceeding, recognizing the importance of consolidating related claims when an underlying DOJ action alleged developer-targeted conduct.

To be sure, nothing changed from over a year ago[1]. Apple possessed every fact and every exhibit it now brandishes—especially the single Wyoming Secretary of State print-out from *CR I*, a clear hedge that was later disavowed to the Ninth Circuit—well over a year ago.  Rather than move promptly, it waited until after the JPML ruled, ensuring that fifty-plus MDL counsel had already expended time addressing consolidation. It waited until after Plaintiffs filed a Rule 12(d) motion and a sur-reply exposing forfeited 12(b)(6) arguments and factual gaps in Apple's naming defect reversal and requesting discovery (and completely ignored material facts therein). It conveniently filed within days of the April 2025 civil contempt findings in *Epic v. Apple* spotlighting Apple's pattern of defiance; and immediately before the July 10 scheduled MTD hearing, maximizing rhetorical overlap and forcing Plaintiffs to respond simultaneously to dense, citation laden briefs on identical issues.

That sequence betrays a tactical, speech suppressive objective, not a compensatory one.  The Ninth Circuit stresses that a movant's 'knowledge-to-filing' gap, when coupled with ongoing motion practice, undercuts any claim of bona fide Rule 11 purpose and suggests strategic or punitive motives. *Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772, 788-89 (9th Cir. 2001). The sur-reply cast reasonable doubt into Apple's new premise that it "expressly assumed [Coronavirus Reporter ≡ CRC]."  Rather than engage, the sanctions brief re-asserted a Wyoming Corporate extract that raises more questions than it answers,  then treated the matter as closed.  That is precisely the conduct condemned in *Holgate v. Baldwin*, 425 F.3d 671, 677-78 (9th Cir. 2005): a Rule 11 movant must confront—not sidestep—substantial factual disputes.  Because Apple's motion depends on unresolved issues of ownership, standing, and new anticompetitive conduct, evidentiary proceedings will be unavoidable; Rule 11 is therefore premature, and § 425.16 warrants either immediate dismissal or, at minimum, a stay.

---

[1] Except civil and possible criminal contempt ruling against Apple, and findings *Defendant* unnecessarily multiplies related antitrust proceedings.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

**B. Apple's Three-Headed Theory of Representation—Why its Own Documents Doom both the Rule 11 and the Res Judicata 12(b)(6) Motions**

Apple's litigation strategy hinges on a single proposition: CRC's programmer, Isaacs, was simultaneously (i) barred from appearing *pro se* in *CR I,* (ii) validly *pro se* so as to preclude Greenflight, and (iii) never *pro se* at all because both he and Greenflight were Keith Mathews' private "clients."

Those three versions cannot coexist. The documentary trail—Apple's own September 2021 letter, its April 2025 Reply in support of the motion to dismiss, and its May 2025 Rule 11 memorandum—shows Apple adopting whichever story seems momentarily useful, with no regard for consistency, jurisdiction, or ethical duty. That vacillation shatters the "objective reasonableness" predicate of Rule 11, destroys the "identity-of-parties" element of Apple's res judicata defense, and confirms the sanctions motion is a tactical SLAPP.

From the first weeks of *Coronavirus Reporter I* through the present sanctions brief, Apple has marched through at least three mutually inconsistent stories about Jeffrey Isaacs' role in the 2021 action.

The metamorphosis is not a sideshow; it is the load bearing premise of both Apple's Rule 11 motion and its still pending Rule 12(b)(6) res-judicata defense. A careful review of Apple's own exhibits, the *CR I* docket, and the Ninth Circuit filings shows why the premise fails and why Apple's motion, built on that premise, cannot possibly "prevail on the merits" under prong two of the anti-SLAPP analysis.

Apple's bid for a half-million dollars in punitive fees rests on a portrayal of Jeffrey Isaacs' role in the earlier *CR I* litigation that shifts with the wind. When it suits the company to bar Isaacs from direct participation, he is a "neuropsychiatric impaired" layman who may not address the Court; when Apple wishes to fasten the *CR I* judgment on Greenflight, Isaacs is suddenly a valid *pro se* litigant whose personal existence tethers every entity he touches; when Apple seeks to make Mathews alone pay the bill, Isaacs and Greenflight metamorphose once more into long standing private "clients" of counsel in *CR I.* Those three positions cannot be squared with one another, with the documentary record, or with Rule 11's baseline requirement that a sanctions movant rely on a coherent set of facts. The contradiction fatally undermines both the pending sanctions request and the merits defense in Apple's Rule 12(b)(6) reply.

The saga begins with a five page letter dated 30 September 2021, signed by Gibson Dunn partner Rachel Brass and addressed to Keith Mathews and co-counsel Michael Kernan (Rule 11 Mot. Ex. 70-

9

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

3). Apple had received notice that Isaacs—a cofounder of CRC—intended to appear *pro se* in CR I. Brass's response was absolute:

> *"Federal law 'permits either counsel or pro se representation—but not both…. There is no discrete "app" for Mr Isaacs to represent. Nor could Mr Isaacs "represent" any other app—as a pro se litigant he can only represent himself.'"* (Id. at 2, citing *Rowland v. California Men's Colony*, 506 U.S. 194 (1993).)

The letter went so far as to threaten a protective order should Isaacs persist in communicating directly with Apple's lawyers and concluded that "Isaacs may not appear *pro se*." Apple thus staked out the position—an unequivocal hard line—that Isaacs was not a party in his own right, could bind no corporate entity or app, and must remain silent behind counsel. Notably, it never filed a motion and never moved the Court on this position, and therefore, by definition, Isaacs was in CR I *pro se* as he attempted to represent his shareholder interest in Greenflight's Caller-ID app.

Fast forward three-and-a-half years. To defeat the First Amended Complaint in this action, Apple anchors its Rule 12(b)(6) motion to a res judicata argument: *CR I*, it says, decided the very claims alleged here and therefore bars the suit. Yet one difficulty looms: Apple had alleged that the *CR I* corporate plaintiffs were misnamed nonentities, and CR was an app, not a company. To patch that hole Apple's reply brief pivots 180 degrees, proclaiming that jurisdiction survived in *CR I* because Jeffrey Isaacs himself appeared *pro se* and thus "at least one real plaintiff" was before the Court. ECF 64 at 4–6. From that premise Apple leaps to a second: because Isaacs was unquestionably "a party," Greenflight—his "controlled corporate affiliate"—is in privity and bound by CR I. Id. In a flourish of circular logic, the very *pro se* status Apple had branded "improper" in 2021 becomes the jurisdictional keystone of its estoppel defense in 2025.

Apple's Rule 11 motion, filed one month later, unveils a third narrative. In dozens of passages (e.g., Mot. 2, 12 n.11, 22-23) Gibson Dunn now describes Isaacs and Greenflight as "Mathews' clients," treating them as though they had been represented from the very inception of *CR I*. The motion relies on an email in which Mathews informally referred to Isaacs as "my client"—a colloquialism that, according to Apple, proves Greenflight and Isaacs were always under counsel's aegis and must therefore shoulder Apple's fee demand. That depiction is incompatible with both prior iterations. If, as Apple now argues, Isaacs was Mathews' client as early as 2021, then Apple's own letter falsely accused Isaacs of attempting to represent an "app" he had no standing to champion. It is simply untrue. Apple is knit-picking that Attorney Mathews' didn't use corporate vernacular "client representative" when referring to Isaacs' role as liaison between the

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

corporate entities in *CR I* and counsel. There is no evidence Mathews' ever attempted to represent Greenflight in *CR I*, and indeed, he never did represent Greenflight. Apple knows that, and seeks to spin "client" vs "client representative" to reach a false conclusion. It didn't happen. Whatever the Court makes of the unusual CR App vs. CRC controversy – an original creation of Gibson Dunn's Rachel Brass – remains to be seen, but Greenflight, at the very least, has a fresh slate to proceed in *CR II*, and there is no basis for sanctions against it whatsoever.

And if that wasn't complicated enough, the Gordian knot deepens further. Apple simultaneously asserts a shareholder has no Article III standing to bring a Sherman Act claim. They wish to preclude Greenflight in *CR II*, because a shareholder, Isaacs, proceeded in *CR I*. But they simultaneously move to dismiss Greenflight from *CR II*, on the grounds it has no standing as the financier of CRC (setting aside its proprietary and patented[2] Caller-ID app). This exact matter is proceeding in the underlying MTD, and a Rule 11 motion is inappropriate until it is resolved.

**Table Summarizing Legal Consequences of Apple's Contradictions**

| Apple's Position | Sept 2021 Letter | Apr 2025 MTD Reply | May 2025 Rule 11 |
|---|---|---|---|
| Isaacs pro se? | NO – "improper," violates §1654 | YES – saves jurisdiction, binds Greenflight | NO – "Mathews' client" |
| Can Isaacs bind corporations? | Impossible ("no discrete app") | YES – Isaacs's CR I role creates privity | YES by fee liability |
| Mathews' client list | Three corporations only, no Greenflight | Same corporations + Isaacs pro se | Corporations **and** Isaacs/Greenflight |
| Ethical duty under Rule 4.2 | Apple refuses direct contact | — | Implies prior refusal was mistaken |

**Apple's Contradiction Is Fatal Under Rule 11, Res Judicata, and Anti-SLAPP**

A sanctions movant must demonstrate, by reference to a stable factual record, that the targeted filing lacked reasonable evidentiary support. See Fed. R. Civ. P. 11(b)(3). Apple's mutually exclusive depictions

---

[2] The Florida Southern District already concluded, as a matter of law, that Isaacs does not own the Caller-ID patent which enables Greenflight's app. USPTO records are unambiguous that Greenflight owns the patent, therefore, he cannot represent the app *pro se* as he is not a patent holder. Apple omits any mention of *Greenflight vs. Google*, because that court recognized that the unsuccessfully attempted definition of US Internet Content Access Market – which Apple dominates – does not "impugn" counsel and is merely reflective of the difficulty of defining new digital marketplaces. That case is under appeal, and would also improperly be bound by the Rule 11 nationwide injunction as it alleges an Apple Sherman violation.

11
§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

of Isaacs—unrepresented layman, valid *pro se* litigant, and hidden client of counsel—show that the company itself is advancing facts which must be at least partially untrue. Where the movant's own story is internally incoherent, the court cannot find Plaintiffs' contrary view objectively unreasonable. The Ninth Circuit applies estoppel when a party's later position is "clearly inconsistent" with one it previously persuaded a tribunal to accept. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

California Code of Civil Procedure § 425.16 requires a sanctions proponent to establish a "probability of prevailing." The Gordian knot Apple has tied around Isaacs' status demonstrates, on its face, that Apple cannot carry that burden. Apple's shifting narrative is not an innocent mistake. By recasting Isaacs' role to fit each transient procedural need, Apple weaponizes the sanctions process to (i) resurrect a preclusion defense that would otherwise buckle, (ii) saddle a solo practitioner with crushing fees, and (iii) silence a disabled developer who has become a visible critic of Apple's App Store practices. That conduct is the very definition of a "strategic lawsuit against public participation." Section 425.16 exists to stop it.

Apple cannot plausibly maintain that Isaacs was barred from speaking, obligatorily pro se, and never pro se—all at once. The Court should reject the contradictory narrative out of hand, strike the sanctions motion under the anti-SLAPP statute, or at the very least stay all Rule 11 proceedings until an evidentiary hearing resolves Apple's self-inflicted factual chaos.

**C. A Naming Defect, Not Misconduct: Why the "Coronavirus Reporter" Label Cannot Sustain Rule 11 Sanctions**

Apple's Rule 11 motion leans heavily on the premise that Keith Mathews "knowingly misrepresented" the identity of the *CR I* plaintiffs. The centerpiece of that accusation is a single Wyoming Secretary of State extract paired with an October 2021 Meet and Confer letter from Rachel Brass. Yet a careful reading of the same correspondence, Apple's Ninth Circuit briefing, and the present sanctions papers reveals that Apple—not Mathews—has cycled through three mutually exclusive descriptions of "Coronavirus Reporter." Once those gyrations are set out in sequence, the only fair inference is that the dispute concerns an ordinary pleading defect in the still evolving law of digital platform markets, not Rule 11 fraud.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

Brass's 30 September 2021 letter (ECF 70-3) opens with a categorical assertion that "Coronavirus Reporter is a Wyoming Corporation." Fourteen months later, defending the CR I judgment on appeal, Apple performed a *volte face*:

> *"As far as Apple can tell, there is no actual 'Coronavirus Reporter' entity—meaning Apple is being sued by at least one null party."* (9th Cir. No. 22-15166, Dkt. 38 at 7 n.4.)

This was a strategic gambit: if "Coronavirus Reporter" never existed, the Ninth Circuit could sidestep a damages challenge by holding that no real plaintiff had standing to recover. The argument necessarily treated the phrase "Coronavirus Reporter" not as a corporation but as the name of an iPhone application—the very confusion Apple now attributes to Mathews. There was significant basis for this assertion; "Five Unnamed Apps" were identified as Plaintiffs of the pleadings that merged into the *CR I* case.

When Plaintiffs filed in Wyoming, Apple pivoted yet again. In its Rule 12(b)(6) reply (ECF 64) Apple tells this Court that it "expressly assumed" throughout CR I that the named plaintiff was "the Wyoming entity Coronavirus Reporter Corp.," and therefore res judicata binds CRC today. A month later the sanctions motion amplifies that theme, accusing Mathews of "repeatedly mis-represent[ing] [his] corporate identity" (Mot. 1, 14-18) even while insisting that Apple "always" understood the suit to be against a real corporation. Three incompatible stories emerge:

| Apple Filing | Status of "Coronavirus Reporter" | Litigation Objective |
|---|---|---|
| Sept 2021 Brass Letter (ECF 70-3) | **Existing corporation** (requiring counsel) | Block Isaacs's *pro se* involvement |
| 9th Cir. Answer Br. (2022) | **Non-existent entity / mere app name** | Vacate damages exposure, preserve judgment |
| Rule 12 & Rule 11 briefs (2025) | **"Expressly assumed" corporate plaintiff CRC** | Invoke res judicata; shift fees to Mathews & CRC |

Confronted with Apple's 2022 footnote, Mathews undertook the reasonable inquiry FRAP demands. The contemporaneous email chain (70-3 at 4) recites Mathews' surprise that his Plaintiff was a null entity. It further shows Brass replying that "to the extent you are referring to the company listed in Wyoming corporate records … that is not the entity listed on the operative complaint."

Those responses forced counsel to confront a puzzle of Apple's making: the cover sheet of *CR I* bore an undifferentiated label—"Coronavirus Reporter." Given the earlier "Five Unknown Apps" placeholder filed in the New Hampshire SAC, the most plausible reading was that at least some portion of *CR I* attempted to sue in the name of applications rather than their corporate owners. That miscaption is atypical but not

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

nefarious; it reflects the novelty of digital platform antitrust where an "app" is simultaneously product, brand, and sometimes business. Correcting the defect—by naming Coronavirus Reporter Corporation in *CR II*—was thus a curative act, not a culpable one.

Rule 11 sanctions are proper only when the party's position is objectively unreasonable in light of the information available at signing. *Holgate v. Baldwin*, 425 F.3d 671, 676-78 (9th Cir. 2005). When Apple itself has espoused three different factual predicates, Mathews cannot be faulted for adopting the single construction most consistent with the record, namely that earlier pleadings mis-named an application where a corporation should have stood. Courts confronting 'shifting narrative' disputes reject sanctions outright. See *Islamic Shura Council v. FBI*, 757 F.3d 870, 873-74 (9th Cir. 2014) (extended government vacillation about facts undercuts any claim of bona fide Rule 11 purpose).

At bottom, Apple seeks to convert a Rule 15 naming correction into a punitive fee award. The Federal Rules solve such problems through amendment, substitution under Rule 17(a)(3), or limited jurisdictional discovery—not through million-dollar fee petitions. Courts routinely treat mis-captioned digital platform suits as "curable defects," granting leave to rectify rather than punishing counsel. *CR II* does exactly that: it clarifies that CRC, Calid Inc, and Greenflight are the real parties. Moreover, it pleads post-2021 *Lawlor* conduct that could not have been raised before. Apple's motion—filed only after that corrective pleading—therefore targets protected petitioning activity under § 425.16 and should be stricken.

Apple's letter, its Ninth Circuit brief, and its present motions cannot all be true. The company alternately claims "Coronavirus Reporter" was a corporation, an inexistent nullity, and ipso facto CRC—switching theories whenever expedient. Rule 11 does not tolerate such opportunism, nor does the equitable doctrine of judicial estoppel. When the moving party's factual compass spins so wildly, sanctions are not merely unwarranted; they would invert the deterrent purpose of Rule 11. The naming defect has been acknowledged and cured in CR II. The Court should treat the subject accordingly—as an ordinary pleading amendment, not a sanctionable offense—and deny or strike the sanctions motion in its entirety.

## D. Apple's Own Exhibits Refute Its "Sophisticated Cloaking Scheme" Narrative

Apple devotes an entire subsection of its sanctions brief to the proposition that Keith Mathews orchestrated an 'elaborate scheme' to hide the true litigants in *CR I*, supposedly 'using a revolving cast of phantom corporations' so that he and his various clients and client representatives could 'harass Apple from

the shadows.' Sanctions Mot. 15-18. The rhetoric is vivid, but Apple's Exhibit 70-4—an email string it itself placed before the Court—obliterates the theory. Apple's Exhibit 70-4 attaches Mathews' 18 October 2021 response to Rachel Brass, written two weeks after the very "hybrid representation" letter Apple now touts. In that e-mail Mathews could not have been clearer:

> *"As for **my status as CLO**, the fact you only seemed to have just learned this proves our concern that your firm has not conducted due diligence… We have continually **monitored and shared all of our evidence with Dr. Roberts' daughter, a bio-ethics attorney in England.**"*

Mathews thus (a) identified himself as Chief Legal Officer of Coronavirus Reporter Corp., (b) confirmed Dr. Robert Roberts—an eminent cardiologist and major shareholder—was actively supervising the litigation, and (c) disclosed his family members' locations and occupation. Whatever else that message demonstrates, it is the antithesis of a cloaking device.

If Mathews were truly executing a covert plan to obscure ownership, he chose remarkable methods: broadcasting corporate titles, medical affiliations, and familial points of contact in writing to Gibson Dunn. Apple clearly received and archived the message—it is now Exhibit 70-4—yet its sanctions narrative ignores the disclosure entirely. Rule 11 demands that a movant "stop, think and investigate" before charging fraud; Apple's own file cabinet contained the exculpatory evidence it now suppresses. See *Holgate*, 425 F.3d at 677-78 (when movant failed to address evidence already in its possession, sanctions must be denied).

The alleged Rule 7.1 lapse was harmless—Apple always knew the players. Apple's fallback is that the corporate disclosure statement required by Rule 7.1 and Local Rule 3-15 never appeared. True; Plaintiffs should have filed it. But Rule 11 sanctions are not automatic for an omitted form. They require prejudice or objective concealment. Here Apple's own correspondence shows it learned in real time that 1) Isaacs co-founder and software developer; 2) Dr. Roberts was Chief Medical Officer and major shareholder; and 3) Mathews acted as Chief Legal Officer and outside counsel.

Armed with those facts, Apple – not Mathews—filed disingenuous court papers in *CR I* claiming that Dr. Roberts was not an interested party, and that Isaacs was the only connection to medicine[3]. Apple is guilty

---

[3] In CR I Apple dismissed Coronavirus Reporter as an "app with no connection to medicine other than Isaacs' self-promotion." Coronavirus I, Dkt. 64 at 8. Today, facing Roberts' damages claim under CRC, Apple pivots: Dr. Roberts was present all along and is therefore precluded. Compare Sanctions Mot. 23-24 with MTD Reply 8-9. The only through-line is Apple's litigation goal: erase Roberts when medical expertise hurts Apple, resurrect him when preclusion helps Apple, and sanction counsel for whichever theory is not currently convenient.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

of the very practice they seek almost half a million dollars in sanctions for: casting uncertainty on the true identity of the litigating parties. It is rather hypocritical that Apple now claim it was victimized by an absence of 7.1 disclosures because it is beyond indisputable that Apple sought to conceal the true owners of CRC – not Mathews.

Such self-serving shape-shifting is exactly what judicial-estoppel doctrine forbids. *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).  It also reinforces why Apple cannot meet its anti-SLAPP burden:  a movant that must juggle three incompatible factual positions ("app," "null entity," "always CRC") cannot show a probability of prevailing on the merits. A naming defect in frontier digital litigation is not sanctionable misconduct. Digital platform antitrust is still charting the line between apps as products and the entities that publish them.  The confusion that placed an app name on a federal pleading is a curable Rule 15 technicality, not evidence of bad faith.  *CR II* cures the caption, pleads post-2021 misconduct, and proceeds under proper corporate names.

In short, Exhibit 70-4 does not implicate Mathews in deception; it exonerates him.  Apple possessed conclusive proof of corporate ownership, sat on it for years, and now urges sanctions to distract from its own internal inconsistencies.  The Court should reject the invitation, strike the sanctions motion under § 425.16, and—in fairness—consider whether Apple's serial position shifting is itself sanctionable.

### E. Why Apple's own Developer Program rules created the "ownership disclosure" tangle it now weaponizes

A final strand of the timeline involves two separate apps—Bitcoin Lottery and Coronavirus Reporter—whose filing histories Apple has spun into a Rule 11 conspiracy theory.  The history matters because it shows that any mismatch between "account holder" and "true owner" was forced by Apple's own DPLA, a classic contract of adhesion that (i) requires each app to be submitted through an Apple approved "App Store Connect" account, and (ii) allows only the registered account holder—not a contractor, not a friend, not a sister company—to place the software in the system.  See DPLA § 3.2(f) (Apple may "terminate" or "reject submissions" if the account holder is not the "owner and developer" of the software).

Primary Productions LLC is a two member, father & son New Jersey LLC.  To avoid a second $99 annual developer fee, and not complicate its main business of music production, it asked a friend's company, Greenflight, to upload Bitcoin Lottery through Greenflight's existing account.  That benign workaround

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

violates Apple's single owner rule, but it is hardly fraudulent: Apple's internal records show the app was submitted from a Greenflight login, and Apple never complained—until litigation.

When Primary Productions sued in the District of Maine, Apple pounced.  Citing Local Rule 7.1's requirement to list any "person, association, firm, partnership, [or] LLC" holding ≥ 10 % of the plaintiff, Apple filed an Objection to Corporate Disclosure (ECF 15, "Maine Obj."), insinuating that Greenflight must secretly own Primary Productions because Greenflight's account had been used for the upload.  Maine Local Rule 7.1, unlike Rule 7.1 in most districts, demands identification of all ten percent members—not merely parent corporations.  Primary Productions promptly filed an amended disclosure (ECF 16) naming the only two members (father & son).  Apple nevertheless told the Court it had "serious doubts" that Primary Productions was the "real party in interest," Maine Obj. at 2, and cited Coronavirus Reporter as proof that Mathews "cloak[s]" true owners.

Similarly, in January 2020, before COVID-19 reached U.S. shores, the founders of Coronavirus Reporter raced to build a voluntary contact tracing platform but had not yet incorporated.  To get the binary in the App Store review queue before the WHO alarm, they sought assistance that CALID Inc. file the build.  When the Wyoming corporation (Coronavirus Reporter Corp.) was formed in due course, all assets transferred to it, which under normal non-DPLA terms, would be totally appropriate for dealing with a pandemic situation.  As Judge McCafferty observed in docket 32 of CR I (D.N.H.), the true party in interest "remains debatable" because Apple's own user agreements allowed account-based filing, not corporate substitution.

Apple converted these housekeeping glitches into accusations of "false filings," "concealment," and "fraud."  Its Maine objection even suggested Rule 17 dismissal before discovery.  Confronted with that hyperbole, Mathews' response characterized Apple and its DPLA drafters as "henchmen" for using the DPLA to tell every U.S. software entrepreneur "how to run their business."  The word henchmen was pointed, but in context—Apple's threat to brand a high school friend's favor as fraud—it was fair comment on a trillion dollar monopolist enforcing a felonious adhesion contract.  None of this is Rule 11 fodder.

The disputed ownership disclosures stem directly from Apple's own single account rule; the record shows full candor about ownership; and Apple's theory of a "cloaking scheme" collapses on its own exhibits.  Whether Apple's DPLA itself is an unlawful leveraging contract—or an overbroad condition that

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

chills commerce—is a merits question for Rule 12 and discovery, not a predicate for sanctions. The Court in *CR I* never reached it; the Maine court transferred before deciding it. Under *Lawlor*, *Epic*, and the DOJ's 2024 complaint, those issues belong in an evidentiary forum, not in a fee shifting sideshow.

In sum, the Primary Productions and Coronavirus Reporter episodes illustrate how Apple's adhesion contract forces developers into awkward corporate gymnastics and then vilifies them for non-conformity. That background must inform any fair reading of the "henchmen" line—and illustrates why Apple's Rule 11 motion is a strategic SLAPP masquerading as a plea for order.

**F. The unresolved status of former AUSA Melissa Theriault supports evidentiary development over an immediate Rule 11 decision.**

Before filing the Complaint, Plaintiff's retained a former Assistant United States Attorney with internet and antitrust credentials, who entered a Notice of Appearance in Wyoming. She remained counsel of record when the case transferred to this Court. On May 22, 2025—shortly after Apple served its sanctions draft—Theriault filed a "Notice of Withdrawal" which has since been amended to request an *ex parte* conference, which Plaintiffs and undersigned counsel also deem necessary and hereby move the Court to conduct[4]. In defense of Theriault, Plaintiffs' position is that Apple filed an improper Rule 11 Motion meant to intimidate all associates – including counsel. As a signatory to the FAC, Rule 11 applies to Theriault by definition, and Apple's SLAPP would unjustly expand to yet another innocent party, a former federal prosecutor who simply wanted to assist the ongoing Big Tech regulation movement by providing objective advice on her state's local rules and extending the DOJ complaint to WCPA.

The requested *ex parte* conference while Apple's motion is pending would inform the Court about the one lawyer with firsthand knowledge of why the complaint was filed in Wyoming and what due diligence she performed before signing in response to Mathews' disclosures. Absent this, the Court would lose the most efficient source of those facts and almost certainly face a round of Rule 45 subpoenas and privilege fights. The same principle applies with greater force where the lawyer is a former AUSA on a *DOJ-derived* case whose credibility directly rebuts Apple's narrative of "reckless" pleading. Before any retainer was signed, Attorney Mathews and his client representatives met with Theriault and provided detailed

---

[4] Dkt. 71 Amended Notice was requested to be re-filed as a motion by the Court on June 11 ECF entry. This motion hereby requests the relief noticed by Theriault and to stay Rule 11 briefing accordingly.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

information about the *CR I* case and their anticipation that Apple would have "buyer's remorse" and be embarrassed by the fact their own counsel pointed out a critical defect that would permit the CRC case to actually proceed on the merits. The meeting also discussed the new *Lawlor* conduct, specifically the $99 fees and ongoing censorship of new software; all of which are matters that should be discussed further in an *ex parte* conference. But in any case, this fact alone defeats Apple's sanctions motion: Mathews' sought second opinions from objective attorneys during the retainer search process, knowing that Apple would fight vigorously to change their position.

In *Klein v. Cheung*, 20 Cal. App. 5th 1045, 1061-62 (2018*)*, the court held that a sanctions motion selectively targeting one lawyer, while ignoring others who signed the same filing, raised a strong inference of tactical abuse. Apple's decision to omit Theriault from its fee theory—after possibly coercing her to withdraw—mirrors that disapproved tactic. Sanctions litigation that cherry picks adversaries and muzzles rebuttal witnesses is the paradigm § 425.16 was enacted to deter. Until Theriault's status is resolved and a limited evidentiary hearing is completed, any disposition of Apple's motion would risk reversible error. The Court therefore should schedule the *ex parte* conference forthwith and in the interim, deny or defer Apple's sanctions motion under the "minimal merit" test that governs Plaintiffs' special motion to strike.

### G. External confirmations—from Epic, PhantomAlert, Berger Montague, Microsoft, and Hagens Berman—show that Plaintiffs are part of a legitimate, growing antitrust movement.

Over the timespan stretching from *CR I* to present, numerous independent actors, none of whom have any corporate affiliation with Plaintiffs, have converged on similar and related, if not iterative, core theories now before the Court. Their experiences confirm (1) the objective reasonableness of the claims pleaded in the FAC; (2) that Apple's sanctions motion is meant to chill a broader public interest campaign; and (3) that discovery—not summary punishment—is the appropriate next step. There exists a line of 'domino chips' required to disassemble Apple's iPhone monopoly, roughly in the order of anti-steering (i.e. *Epic*) to competing app stores (i.e. EU DMA) to notarization. Apple knows the projected costs and monetary losses of each stage, and the qualitative effects on their ability to control and censor the internet. This was front and center in the most recent hearings with *Epic*, where Apple sought Ninth Circuit stay to prevent "significant costs". Hence, it is reasonable to assume Apple has discoverable documents researching the impact – and likely, their risk-assessment ranking—of the various enforcement stages. This information is absolutely

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

critical to support and prove that Apple's SLAPP exists to silence the "notary stamps" "tying" "censorship" Plaintiffs. The Rule 11 motion cannot fairly proceed unless and until limited discovery on this matter is conducted. The FAC alleges improper tactics like lobbying and developer retaliation, hence this is a *core matter* central to the Complaint, beyond the Rule 11 motion itself.

On 18 April 2025 Judge Gonzalez Rogers found Apple in civil contempt for flouting the *Epic v. Apple* injunction and referred the matter to the U.S. Attorney for potential criminal contempt.  The Ninth Circuit denied Apple's emergency stay on May 27, 2025.  *Epic's* CEO hailed the ruling as ending "the long national nightmare of the Apple tax."  The contempt order rests on two propositions central to Plaintiffs' FAC: (i) Apple uses App Store rules as a gatekeeping lever to foreclose rival distribution models; and (ii) Apple's compliance representations to courts have repeatedly been inaccurate or incomplete.  Those judicial findings—issued after the FAC was filed, but foreshadowed by the FAC's allegations of noncompliance— seriously undercut Apple's contention that Plaintiffs' theories are "objectively frivolous." Apple has lost credibility in the courts and in public opinion. Opposing counsel tolerated lies on the witness stand. USDJ Gonzalez Rogers got tired of endless "whack-a-mole" litigation papers. Undersigned counsel has said the very same thing, repeatedly invoking judicial estoppel, for years. It cannot be ignored any more.

**PhantomAlert and the Berger Montague engagement after Plaintiffs petitioning**

In early 2024, the CEO of PhantomAlert (a navigation alert developer and direct competitor of Coronavirus Reporter) contacted Dr. Isaacs to discuss Apple's uniform rejection of COVID apps.  The developer had read the dozens of news articles about CR App litigation and was sincerely grateful for Dr. Isaacs' 'pioneering' steps towards redressing Big Tech abuses. He explained he had hoped to join the *CR App* class action, and was disappointed in the appellate affirmance.

*PhantomAlert* subsequently retained a boutique Columbia Law-trained antitrust firm to file their own class action for suppressed COVID-19 apps. That counsel conducted an evidentiary session with Dr. Isaacs seeking his knowledge of the various Sherman markets and technology issues intertwined with the cases. Their USDC D.D.C. complaint alleged the identical DOJ "smartphone foremarket / app-distribution aftermarket" and similar "App Store tying" theories as first developed by Mathews and Isaacs.  Key concepts Isaacs explained during that interview appear in that complaint. *PhantomAlert* recently retained the Harvard Law educated team at Berger Montague—a nationwide plaintiffs' firm staffed by former DOJ and FTC

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

attorneys and renowned for antitrust work.  Berger Montague's willingness to front substantial litigation resources is powerful evidence that Plaintiffs' position is not "harassment" but an emerging consensus among knowledgeable practitioners.

Apple apparently got wind of this, and stated to the JPML that the Good Samaritan – who engaged in enterprising partnership with the Ethiopian Government (an early COVID epicenter) to develop his app– was simply "disgruntled like Coronavirus Reporter's team[5]" This is a preview of how Apple would abuse the requested Rule 11 injunction. *PhantomAlert* had *no* knowledge of CRC and Roberts in 2020; it reached its own independent conclusion that Apple violated its Sherman Act, UCL, and First Amendment rights.

Apple seeks an order that would bar these affiliated entities from initiating or joining any future litigation against Apple.  The injunction would prevent Isaacs and Roberts from opting in to a *PhantomAlert* developer class should it prevail in appeal. None of them – or Primary Productions father & son team – could join any future developer – or even consumer – class actions against Apple. Berger Montague could be barred from consulting with Isaacs as a fact witness as *PhantomAlert's* prior counsel did.  Such overbreadth confirms that the motion is strategic: it is designed to foreclose the next wave of developer suits, not to remedy any Rule 11 defect in the existing record.

When evaluating the "minimal merit" prong, courts look to "indicia that the challenged speech or petitioning activity is shared by others in the marketplace of ideas."  715 F.3d 254, 271 (9th Cir. 2013).  The *Epic* contempt findings, *PhantomAlert's* parallel action, and Microsoft and Hagens Bermans recent filings together satisfy that test.  They make Apple's probability of success on its sanctions motion—particularly the sweeping injunction and fee request—vanishingly small, and they reinforce why § 425.16 protection is warranted.

These third-party developments complete the factual backdrop.  They demonstrate that what Apple brands as "serial vexatious litigation" is, in truth, iterative antitrust advocacy that has already persuaded global regulators and sophisticated co-plaintiffs.  Apple's attempt to weaponize Rule 11 against that advocacy necessitates invoking (sparingly) California's anti-SLAPP statute. In any case, undersigned does not represent any of these individuals (Isaacs, Roberts, Primary Production's team, PhantomAlert's founder, etc). Undersigned's only clients are Greenflight, Calid Inc. and CRC. The Rule 11 Motion must necessarily

---

[5] Anyone who has ever met Mr. Scott would say he is the *least* disgruntled person they've ever met.

fail as it did not serve any of the targets in their individual capacity. None consent to service through the now-defunct corporations suing Apple.

### III.    GROUNDS FOR IMMEDIATE RELIEF

California's anti-SLAPP statute applies in federal court so long as it does not conflict with the Federal Rules, and the Ninth Circuit has held that no such conflict exists for § 425.16.  See *U.S. ex rel. Newsham v. Lockheed Martin*, 190 F.3d 963, 971-73 (9th Cir. 1999); *Makaeff v. Trump Univ.*, 715 F.3d 254, 262-63 (9th Cir. 2013); *DC Comics v. Pacific Pictures*, 706 F.3d 1009, 1013-14 (9th Cir. 2013).  District courts have applied the statute to Sherman Act and other federal question claims without difficulty.  See, e.g., *Bulletin Displays, LLC v. Regency Outdoor Advert.*, 448 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2006) (antitrust counterclaim); *Globetrotter Software, Inc. v. Elan Computer Grp.*, 63 F. Supp. 2d 1127, 1130-33 (N.D. Cal. 1999) (patent and Lanham-Act claims).  Nothing in Rules 11 or 12 "answers the same question" as § 425.16's two-step filter for claims aimed at petitioning activity. *Hilton v. Hallmark Cards*, 599 F.3d 894, 901-02 (9th Cir. 2010).  Because Apple's sanctions motion demands nationwide injunctions, punitive fees, and pre-filing restraints against Plaintiffs and non-parties, it functions as a "claim" within the meaning of § 425.16 and is properly subject to a merits testing special motion to strike.

The entire sanctions brief attacks Plaintiffs' "petitioning activity": Sherman Act complaints, a JPML consolidation request, press statements, and innovative market definition research.  Rule 11 is merely the procedural hook; the gravamen is to punish and enjoin litigation itself.  Such efforts fall concisely within § 425.16(e)(1)–(2).

If Apple truly viewed this case as an "open-and-shut" res judicata repeat, it possessed multiple orthodox tools: Declaratory Judgment relief in the Northern District of California (28 U.S.C. § 2201) seeking a ruling that the Wyoming filing was barred; Rule 11 motion in Wyoming the moment the original complaint was filed—well before transfer—eliminating any fee "accrual" it now laments; or Rule 12(c) or Rule 56 motion after transfer, limited to preclusion and filed contemporaneously with its Rule 12(b)(6) brief, avoiding duplicative briefing.

Apple eschewed each path, choosing instead to bank and "test the waters," leverage, and refine its sanctions brief until the external environment was most favorable (*Epic* contempt order, DOJ suit, developer class certification momentum) so that the motion could chill petitioning efforts not only by Plaintiffs but also

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

by *PhantomAlert*, Berger Montague, Hagens Berman, and related petitions. Apple's App Store control – whether you call it notarization or not – is almost certainly the next 'domino' to fall now that the "national tragedy" of the Apple tax is finished. Why not target the disabled physician and small-town Maine attorney who spent five years tirelessly researching the root cause of internet censorship? And to boot, muzzle all of their associates, including a scientist who transformed the field of cardiology as we know it? Apple's request borders on witness retaliation, and this Court should respond accordingly. Apple knew a Wyoming judge wouldn't sanction a well-respected former AUSA at a community serving law firm, for merely filing a complaint almost verbatim to an underlying DOJ antitrust action. That alone foils any Rule 11 motion brought down the pipeline one year later and one week after Wyoming counsel attempted departure from the case.

The Supreme Court has reiterated for over 130 years that "the right of access to the courts is an aspect of the First Amendment right to petition the Government." *BE&K Constr. v. NLRB*, 536 U.S. 516, 524-26 (2002). Even a losing lawsuit is protected unless "objectively baseless" and filed for the purpose of harassment. *Prof'l Real Estate Inv'rs v. Columbia Pictures ("PREI"),* 508 U.S. 49, 60 (1993). Apple's sanctions brief is effectively an antitrust counterclaim under PREI's "sham litigation" doctrine—only without satisfying PREI's two-step test. The Constitution forbids that short circuit.

Monetary sanctions that exceed a party's ability to pay or lack clear limiting standards violate procedural and substantive due process. *Goodyear Tire v. Haeger*, 581 U.S. 101, 108 (2017). Apple demands blanket fees accrued over twelve months of self-chosen litigation—despite no court yet finding Plaintiffs' claims frivolous. That request is punitive, untethered to compensatory necessity, and unconstitutional. In the entire year since case initiation, Plaintiffs have spent approximately one-twentieth the fees Apple now seeks, inclusive of payments to the Wyoming law firm. Apple must provide lode star accounting; none of their submitted work product on this case references post-2021 activity, raising doubts about the exorbitant fees they seek to collect. A declaratory judgement action could have been filed a year ago, and that is effectively what their Rule 11&12 motions are: they do not reference, and refuse to reference, post-2021 activity under *Lawlor*. No matter how convoluted their logic of tangles, doesn't $400,000 in fees to argue that identity exists between the CR app and CRC corporation itself *prove* that the matter is non-trivial? Had this been raised a year ago; it might have permitted JPML consolidation of national importance for developers and consumers alike.

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

## IV.    BALANCING OF EQUITIES AND THE PROPER REMEDY

Apple's one year delay shows no exigency, and a long, unexplained delay weighs against sanctions. *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 789 (9th Cir. 2001) (nine-month wait undermined Rule 11 motion). Prejudice exists to Plaintiffs if an immediate response is compelled. Plaintiffs—startups bankrupted by Apple's conduct, a disabled founder, and counsel confronting potential professional discipline—would be forced to address 200+ citations covering five years of comprehensive advocacy, Ninth Circuit briefing, SCOTUS petitions, and administrative complaint records within days.  The imbalance is obvious; Rule 1's mandate of "just, speedy, and inexpensive" adjudication is not a license to "overload" an opponent by attrition. The Court would be required to take a position on each and every document in Apple's revisionist account. Evidentiary hearings on intent to "multiply the proceedings" would be mandated rather before accepting Apple's word for it; Apple is a known liar to the courts and a fellow judge remarked on their "whack-a-mole" strategy *this month* – direct evidence Apple is the party that is multiplying antitrust proceedings. To Plaintiffs, it is abundantly clear that Apple created a lawsuit-within-a-lawsuit to stall this case and unnecessarily duplicate proceedings. This is not an isolated incident. Apple filed a frivolous emergency stay two weeks ago in *Epic*. Their Supreme Court petition to block the UCL Anti-Steering failed. Their Rule 60 Motion to reopen *Epic* failed. If Apple wants to scrutinize each and every of undersigned's antitrust pleadings, then fairness dictates that Apple's failed litigation tactics – and their hundreds of millions spent on lobbying and suppressing activists like Plaintiffs – must be subject to *evidentiary hearing*.

## V. ALTERNATE RELIEF: A BRIEF LANDIS / § 425.16(G) STAY PENDING THRESHOLD RULINGS

Should the Court decline to strike Apple's motion outright, it should at minimum defer briefing until the predicate issues are resolved. A district court has "broad discretion to stay proceedings" to conserve resources and promote orderly adjudication. When a stay will not prejudice the non-movant and may streamline overlapping questions, it is routinely granted. *Chabner v. United of Omaha Life Ins.*, 225 F.3d 1042, 1048 n.3 (9th Cir. 2000) citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)

All three *Landis Factors* favor a short deferral. Apple concedes its sanctions motion "substantially overlaps" the Rule 12(b)(6)/12(d) briefing.  One ruling may moot or narrow the other, avoiding duplicative analysis of res judicata, corporate identity, and *Lawlor* claims.  Requiring a full Rule 11 response by June 13

§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

would force a small developer and solo counsel to digest 100 external citations and almost 200 references spanning ten dockets involving undersigned—with Attorney Theriault's withdrawal still pending—while simultaneously opposing the Rule 12 motion and a complex evidentiary hearing.  That imbalance risks error and undermines the adversary process.  Apple litigated for a full year after first raising its res judicata theory, then chose the July 10 hearing date.  A 30-day pause—or alignment following the Rule 12 disposition—does not threaten any legitimate interest, particularly given Apple's multi trillion-dollar market capitalization and experienced and resourceful team of lawyers. In any case, undersigned does not represent Roberts, Isaacs, PhantomAlert's CEO, or Primary Productions' owners in any personal capacity, and therefore is unable to respond on their behalf to the injunction which targets innocent petitioners. They need to be served under the appropriate Rules before the Rule 11 motion could proceed.

### REQUESTED RELIEF

For the reasons set forth above Plaintiffs respectfully request that the Court grant a Special Motion to Strike (Cal. Code Civ. Proc. § 425.16) finding that Apple's sanctions motion targets protected litigation activity. In the alternative, we move to defer or stay sanctions briefing and hearing until (a) the Rule 12(b)(6) motion is resolved; (b) the Court rules on counsel Theriault's withdrawal (following the ex-parte conference already requested); and (c) the parties conduct limited, targeted discovery.  Finally, direct Apple to file, within ten (10) days, a short statement identifying each person or entity (including Dr. Roberts, Dr. Isaacs, PhantomAlert, Primary Productions LLC) that would be covered by its proposed pre-filing bar.

### CONCLUSION

Apple's sanctions broadside is not a neutral plea for professional discipline; it is the latest maneuver in a long running strategy to exhaust smaller rivals, discredit lawyers and scientists who press novel antitrust theories, and freeze a nascent developer movement that now includes *Epic*, *PhantomAlert*, Microsoft, and dozens of public interest advocates.  To make that narrative work, Apple must rewrite history, re-litigating a half decade of contentious filings, ignoring its own contradictory representations about "null entities," and recasting a routine corporate disclosure misstep as if it were fraud on the Court.  Rule 11 does not authorize that kind of tactical scorched earth litigation, and California's anti-SLAPP statute was enacted precisely to curb it.

25
§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

Submitted on this 13th day of June, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Special Motion was delivered via ECF to all interested parties.

Executed on this 13th day of June, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

26
§ 425.16 ANTI-SLAPP SPECIAL MOTION
CASE NO. 3:24-CV-8660-EMC

# EXHIBIT A

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

**February 2021 —  Coronavirus Reporter v. Apple, No. 1:21-cv-00047 (D.N.H.)** is filed.  CNBC reporter Kif Leswing contacts counsel, asking about the NASA cardiologist referenced in the complaint.  After consulting Dr. Robert Roberts, Keith Mathews files a First Amended complaint naming Roberts and integrating the interview notes.

### March 2021 —  "*Five Unknown Apps*" Named as Plaintiffs

Several other developers approach counsel; some feared commercial retaliation if identified too early. To keep the spotlight on Apple's conduct rather than on vulnerable innovators, counsel submits a proposed second amended complaint that captioned the matter 'Coronavirus Reporter and "Five Unknown Apps"' as anonymous placeholders. The stratagem, unorthodox but born of safety concerns not deceit, is never accepted for filing in NHD due to pending transfer motion; yet the "app as plaintiff" nomenclature lingers.

### April 2021 — Transfer Motion predicated on Apple's unilateral DPLA.

Apple moves under the DPLA forum selection clause to drag the New Hampshire case to this Court.  Plaintiffs protest that the clause is an adhesive condition of doing any business on iOS and point out the practical dilemma it created: because the DPLA allows only the "account holder" to upload software, the COVID build had been filed from CALID's App Store Connect dashboard even though the development team later incorporated as Coronavirus Reporter Corporation.  During an emergency pandemic, this saved one or two months of administrative red tape at a minimum and was therefore an essential and reasonable tactic. Apple seizes on that technicality—claiming the complaint names an app, not a corporation and meanwhile hinting at Rule 7.1 foul play—while simultaneously insisting the "app" plaintiff is bound by the very clause it says it never signed.  The New Hampshire court, focused on venue, grants transfer without resolving the ownership puzzle Apple itself created.

### May 2021 — Parallel filing in Maine exposes the same DPLA trap.

To streamline the transfer order and confusion about app standing, Mathews voluntarily dismisses in New Hampshire and re-files the claims in CAND, adding CALID Inc. In the same time period he files a separate complaint for Primary Productions, LLC in the District of Maine. Bitcoin Lottery, Primary Productions' app, had likewise been submitted through a friend's Greenflight developer account to avoid a second $99 fee—another workaround necessitated (but prohibited) by Apple's single owner rule. Apple responds with an "Objection to Corporate Disclosure," insinuating (falsely) that Greenflight secretly "owns" Primary Productions because of the upload path—an accusation flatly contradicted by the amended Rule 7.1 statement listing only the father-and-son actual members. In both dockets, Apple thus tried to convert its own restrictive contract (that forces every company making an app to have its own DPLA account ) into a narrative of "concealment," setting the stage for the sanctions broadside it now asks this Court to fully unleash.

**July 2021** — Maine forum transfer granted; USDJ notes—but does not adjudicate—Mathews' "henchmen" remark, a Noerr-Pennington protected characterization of Apple's DPLA drafters and enforcers.

When the District of Maine—again applying Apple's DPLA forum clause—orders Primary Productions transferred to this Court, Gibson Dunn files a decorum letter complaining that Mathews called the firm "Apple's henchmen." The court neither sanctions nor rules on the label; it simply reminds counsel to keep filings civil. Mathews, mindful of the court's preference, now only refers to Gibson Dunn as "Top Ranked," "Big Law," "Seasoned Litigators," and makes clarifications "not to impugn Gibson Dunn's recognition for litigating complex antitrust cases." But expressly preserved is the substantive critique that Gibson Dunn is acting as Apple's contractual enforcers and likely helped draft the DPLA itself (pending discovery).

Crucially, nothing in the Maine docket resolved the merits of Mathews' rhetoric. Under the Noerr-Pennington doctrine, attorneys enjoy First Amendment immunity when petitioning courts, even if their language is sharp edged. The Maine remark rightfully comments on the aggressiveness of the DPLA, and is, again, not meant to impugn Gibson Dunn itself. Had

discovery proceeded, Plaintiffs would have shown that Apple's use of the DPLA—and its demand that developers purchase duplicative $99 accounts for each affiliated entity—amounts to the very "coercive adherence" condemned by Sherman § 2.  The transfer order merely moved the venue; it did not bless Apple's contract or foreclose Plaintiffs' right to describe, in forceful terms, why that contract functions as a felonious monopoly leash on independent developers.

**August & September 2021 —** *CR I* **First Amended Complaint consolidates apps in various lawsuits.**

In the interest of judicial economy the transferred matters are consolidated. Mathews' joins the CR App NHD lawsuit with Primary Productions and CALID App.  Isaacs, *pro se*, joins to "represent Greenflight's Caller-ID app."  Apple's partner Rachel Brass refuses to recognize a *pro se* appearance for a corporate owned app, and instructs her team not to correspond with Isaacs; Isaacs files an (admittedly late) sanctions motion, never reached before the consolidated case is dismissed on market definition grounds.

**December 2021** — One of the "Unknown Apps" seeks independent counsel.  Mathews files *Coring Co. v. Apple*, a blockchain app developer, in the Southern District of Florida (preserving the forum clause objection); the case is transferred here and voluntarily dismissed pending resolution of the main action. It remains held in abeyance to this day to prevent unnecessary duplication of proceedings.

Nothing in this chronology is sinister or even unexpected.  It reflects a dynamic, $80 billion app economy in which Apple controls the lone gateway.  Counsel's effort to aggregate four or five disputed apps into a single "case study" pleading was a sensible bid for judicial efficiency, not the "stalking horse chess game" of Apple's brief.  An evidentiary hearing—should the Rule 11 motion survive Anti-SLAPP review—will confirm as much.

Dismissal on pleading grounds. On 15 December 2021 this Court dismissed the "CAND CR App / CR I" case claims with prejudice for failure to plead a coherent market or antitrust injury, expressly without resolving the competing representations about whether a *pro se* litigant could effectively represent Greenflight's "Caller-ID" App.

**October 22** — In their Opening Brief before the Ninth Circuit Apple leaned hard on its "null entity" theory, arguing the Court lacked Article III jurisdiction because no real corporation had sued it. Undersigned (Mathews) was confused and believed the statement to be false:

---

**10/27/2022 Correspondence: Attorney Mathews seeks clarification from Gibson Dunn Partner Rachel Brass about Ninth Circuit "Null Entity" statement in Apple's Opening Brief. Brass entertains Mathews' confusion, explaining an app cannot be a Plaintiff, thus the null entity status "is true":**

Mr. Mathews,

The statement in Apple's brief is true. As far as Apple is aware, there is no extant entity "Coronavirus Reporter" to which relief could be granted. To the extent that you are referring to the company listed in Wyoming corporate records as "Coronavirus Reporter Corporation," that is not the entity listed on the operative complaint or on any of your briefs, and you have not filed corporate disclosures identifying Coronavirus Reporter Corp. as the appellant in this case—despite our repeated requests that you comply with Local Rules and file such a disclosure below. There is no basis for Apple to retract its brief or meet-and-confer. If you wish to dispute the statement, the proper place to do so is in your reply brief.

Best,
Rachel

<<<<<<>>>>>>

Rachel:

The Answering Brief you filed last week contains the following false statement:
"As far as Apple can tell, there is no actual "Coronavirus Reporter" entity—meaning Apple is being sued by at least one null party to whom no relief could be awarded."

I have informed you on several occasions that I am Chief Legal Officer for Coronavirus Reporter, a Wyoming C Corp. I have informed you that Robert Roberts is a principal shareholder of same corporation. The Wyoming Secretary of State website confirms this company is Active and in Good Standing.

Your representation to the Ninth Circuit that the company is a "nullity," and hence a basis to dismiss the appeal, is knowingly false.

I'm asking you to retract this statement, or Meet & Confer about a Motion to Strike the Answering Brief.

Best Regards
Keith

---

Undersigned Counsel was not aware of the jurisdictional defect of placing an App Name on a cover sheet. Brass informed him of this, clearly referencing the app being named on cover sheet, when she wrote "to the extent that you are referring to the company." In other words, Brass told Mathews that he named an App, not a Company, as a Plaintiff. She suggested he refute this in his Reply, but instead he conceded the point. Gibson Dunn was hoping, it would appear, to close the jurisdictional defect by prompting Mathews' to correct his mistake. That didn't happen, and the defect remains. Should the Rule 11 motion persist, an evidentiary hearing is necessary along with limited discovery into Brass' corresponding work-product.

**March 2024** — Wyoming filing of Coronavirus Reporter Corporation and Greenflight Venture Corporation. The complaint added post-2021 conduct (*Epic* Anti-Steering retaliation fees, EU CTF fees, renewed $99 fees and renewed censorship, CR App v.2.0 and 3.0 losses, 5G environmental concerns, etc.) and incorporated extensive material from the DOJ's 2024 Section 2 complaint against Apple.

**June 2024** — Plaintiffs petitioned the JPML to coordinate the case with the DOJ action in NJD. Nearly fifty plaintiffs' firms did not oppose coordination; Apple did, and the JPML exercised its discretionary authority to deny transfer.

**October 2024** — Apple again invokes DPLA forum selection, contending the Northern District of California was the mandatory venue. The Wyoming court agreed and transferred the case to this Honorable Court on 12 December 2024

*Summary*: CR App lawsuit is filed in NHD and amended to identify Roberts and include his CNBC interview. An old friend of Greenflight's founder, who independently developed a lottery business plan with no contact with Isaacs since *high school* seeks to join the CR lawsuit. Isaacs joins *pro se* in attempt to represent Greenflight's app. Three years later, after Apple engages in civil contempt – and later found of guilty of lying under oath in anti-steering and CTF matters—Isaacs seeks Rule 60 review. Mathews alleges the same for the corporations, and accepts Gibson Dunn's determination that an App has no standing as a legal entity. Apple waits *thirteen* months for a declaratory judgement after learning about the null entity re-filing; meanwhile fifty law firms in a JPML MDL do not oppose consolidation of CRC.

This is pure antitrust advocacy against a *tough* opponent willing to lie under oath, lobby, and retaliate against nearly *every* antitrust petitioner. Not a single shred of evidence points towards any other motive.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CORONAVIRUS REPORTER CORPORATION,
CALID INC.,
GREENFLIGHT VENTURE CORPORATION

   *on behalf of themselves and*
    *all others similarly situated*

             Plaintiffs,

*vs.*

APPLE INC.
             Defendant.

Case No. 3:24-cv-8660-EMC

ER 167

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION**

IT IS SO ORDERED that:

Apple's "Motion for Sanctions" (ECF 70) is **stricken** pursuant to Cal. Code Civ. Proc. § 425.16, and Plaintiffs shall submit a fee affidavit within fourteen (14) days specifying attorney's fees currently estimated at $2,250.00;

**OR**

Briefing and any hearing on ECF 70 are **stayed** pending further order; Plaintiffs' opposition, if necessary, shall be due thirty (30) days after the later of (a) disposition of ECF 62, or (b) resolution of the contested withdrawal of attorney Theriault; and

Within ten (10) days, Apple shall file a clarifying statement (and accompanying proof of service) specifying the persons and entities it seeks to enjoin and the scope of relief requested.

Dated: _____          _____

United States District Judge Edward Chen

RACHEL S. BRASS
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, California  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **Coronavirus Reporter Corporation, Calid Inc., Greenflight Venture Corporation**<br><br>*on behalf of themselves and all others similarly situated.*<br><br>               Plaintiffs,<br><br>    v.<br><br>**Apple Inc.**<br><br>               Defendant. | CASE NO. 3:24-CV-08660<br><br>**DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS**<br><br>Date: July 10, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

Gibson, Dunn & Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 10, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, Courtroom 5, 17th Floor, Federal Courthouse, Defendant Apple Inc., through its undersigned counsel, will, and hereby does, move for sanctions against Plaintiffs Corona-virus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation, as well as Plaintiffs' counsel, Keith Mathews pursuant to Federal Rule of Civil Procedure 11, the Court's inherent authority, and 28 U.S.C. § 1927. This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Julian W. Kleinbrodt and exhibits thereto; the Proposed Order filed herewith; the pleadings and papers on file herein; and such other matters that may be presented to the Court at the hearing.

By: /s/ *Rachel S. Brass*
Rachel S. Brass

RACHEL S. BRASS
rbrass@gibsondunn.com
Julian W. Kleinbrodt
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, California  94111-3715
Telephone:  415.393.8200
Facsimile:   415.393.8306

*Attorneys for Defendant Apple Inc.*

CASE NO. 24-CV-08660
DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should impose sanctions on Plaintiffs and Plaintiffs' counsel pursuant to Fed. R. Civ. P. 11, the Court's inherent authority, or 28 U.S.C. § 1927.

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

ER 171

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ...................................................................................................... 2

   A. The First Three Cases: *Coronavirus Reporter I* ......................................... 2

   B. Plaintiffs Attempt to Bring Their Fourth Case Against Apple .................... 5

   C. Plaintiffs File a Fifth Suit Against Apple ................................................... 6

   D. Plaintiffs Defend Their Duplicative Suit with a Frivolous Corporate-Identity Position ............................................................................................................ 7

III. LEGAL STANDARD ............................................................................................. 9

IV. ARGUMENT ......................................................................................................... 10

   A. The Court Should Sanction Plaintiffs and their Counsel Under Rule 11 ............... 10

     1. Plaintiffs' Assertion of Duplicative, Barred Claims Violates Rule 11 ............... 10

     2. Plaintiffs' "Null Entity Defense" Is Independently Sanctionable ...................... 15

   B. Plaintiffs' Conduct Should be Sanctioned Pursuant to the Court's Inherent Authority ............................................................................................................. 18

   C. Plaintiffs' Conduct Should Be Sanctioned Under 28 U.S.C. § 1927 ................... 20

   D. The Court Should Award of Fees, Revoke Mathews' Admission, and Enjoin Plaintiffs ............................................................................................................. 22

V. CONCLUSION ......................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bartholomew v. Pasadena Tournament of Roses Ass'n, Inc.*,
453 F. App'x 745 (9th Cir. 2011) ................................................................. 12

*Brandt v. Schal Assocs., Inc.*,
960 F.2d 640 (7th Cir. 1992) ....................................................................... 23

*Buster v. Greisen*,
104 F.3d 1186 (9th Cir. 1997) ................................................................ 12, 15

*Caputo v. Tungsten Heavy Powder, Inc.*,
96 F.4th 1111 (9th Cir. 2024) ...................................................................... 23

*Chambers v. Nasco, Inc.*,
501 U.S. 32 (1991) ................................................................... 18, 19, 20, 22

*Christian v. Mattel, Inc.*,
286 F.3d 1118 (9th Cir. 2002) .................................................................. 9, 18

*City of Santa Clarita v. U.S. Dep't of the Interior*,
249 F. App'x 502 (9th Cir. 2007) ................................................................. 20

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ......................................................................... 10, 15, 22

*Coring Co. v. Apple Inc.*,
2022 WL 22762009 (S.D. Fla. Feb. 18, 2022) ............................................... 6

*Coronavirus Reporter v. Apple Inc.*,
2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .......................... 3, 4, 7, 14, 21

*Coronavirus Reporter v. Apple Inc.*,
560 F. Supp. 3d 632 (D.N.H. 2021) ......................................................... 17, 19

*Coronavirus Reporter v. Apple Inc.*,
85 F.4th 948 (9th Cir. 2023) ..................................................................... 2, 3

*De Long v. Hennessy*,
912 F.2d 1144 (9th Cir. 1990) ...................................................................... 24

*Eberhardt v. Walsh*,
122 F.4th 681 (7th Cir. 2024) ...................................................................... 14

*Erickson v. Newmar Corp.*,
87 F.3d 298 (9th Cir. 1996) .......................................................................... 23

*Est. of Blue v. Cnty. of L.A.*,
120 F.3d 982 (9th Cir. 1997) .................................................................... 1, 11

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

ER 173

Gibson, Dunn &
Crutcher LLP

*Fink v. Gomez*,
239 F.3d 989 (9th Cir. 2001) ...................................................................................... 9

*G.C. & K.B. Inv., Inc. v. Wilson*,
326 F.3d 1096 (9th Cir. 2003) ..........................................................................9, 10, 13

*Gaskell v. Weir*,
10 F.3d 626 (9th Cir. 1993) ................................................................................ 11, 22

*Goodyear Tire & Rubber Co. v. Haeger*,
137 S. Ct. 1178 (2017) ....................................................................................18, 19, 22

*In re Grantham Bros.*,
922 F.2d 1438 (9th Cir. 1991) ................................................................................ 15

*In re Hartford Textile Corp.*,
681 F.2d 895 (2d Cir. 1982) .................................................................................... 24

*Hsu v. UBS Fin. Servs., Inc.*,
2021 WL 5233238 (N.D. Cal. Nov. 10, 2021) ........................................................ 14

*Indiezone, Inc. v. Rooke*,
720 F. App'x 333 (9th Cir. 2017) ........................................................................... 20

*Kaass L. v. Wells Fargo Bank, N.A.*,
799 F.3d 1290 (9th Cir. 2015) ................................................................................ 22

*In re Keegan Mgmt. Co., Sec. Lit.*,
78 F.3d 431 (9th Cir. 1996) ............................................................................... 18, 20

*Kunimoto v. Fidell*,
26 F. App'x 630 (9th Cir. 2001) .....................................................................14, 15, 20

*Lahiri v. Universal Music & Video Distrib. Corp.*,
606 F.3d 1216 (9th Cir. 2010) ........................................................................19, 20, 23

*Lake v. Gates*,
130 F.4th 1064 (9th Cir. 2025) ............................................................................... 18

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) .................................................................................... 1

*Methven & Assocs. Pro. Corp. v. Paradies-Stroud*,
2013 WL 12187701 (N.D. Cal. Dec. 19, 2013) ...................................................... 24

*Meyer v. U.S. Bank Nat. Ass'n*,
792 F.3d 923 (8th Cir. 2015) .................................................................................. 13

*Michel v. City of Santa Rosa*
601 F. App'x 466 (9th Cir. 2015) ........................................................................... 22

*Missud v. Nevada*,
861 F. Supp. 2d 1044 (N.D. Cal. 2012) ............................................................. 24, 25

vi

Gibson, Dunn &
Crutcher LLP

*Montana v. United States*,
440 U.S. 147 (1979)................................................................................................ 11, 19

*Optyl Eyewear Fashion Intern. Corp. v. Style Cos.*,
760 F.2d 1045 (9th Cir. 1985) ....................................................................................10

*Orange Prod. Credit Ass'n v. Frontline Ventures Ltd.*,
792 F.2d 797 (9th Cir. 1986) ......................................................................................14

*In re Peoro*,
793 F.2d 1048 (9th Cir. 1986) ............................................................................. 20, 22

*Perlmutter v. Varone*,
2022 WL 1443426 (E.D. Pa. May 6, 2022).................................................................25

*Primary Productions LLC v. Apple Inc.*,
2021 WL 3610507 (D. Me. Aug. 13, 2021) ................................................................19

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006)........................................................................................2

*Ringgold -Lockhart v. Cnty. of L.A.*,
761 F.3d 1057, 1062 (9th Cir. 2014)...........................................................................24

*Robles v. City of Berkeley*,
820 F. App'x 529 (9th Cir. 2020) ...............................................................................24

*Roundtree v. United States*,
40 F.3d 1036 (9th Cir. 1994).................................................................................11, 12

*S. Pac. R. Co. v. United States*,
169 U.S. 1 (1897) ........................................................................................................11

*Schoggen v. Haw. Aviation Cont. Servs., Inc.*,
608 F. App'x 469 (9th Cir. 2015) ...............................................................................12

*Sommer v. Unum Life Ins. Co. of Am.*,
35 F. App'x 489 (9th Cir. 2002)..................................................................................13

*Townsend v. Holman Consulting Corp.*,
929 F.2d 1358 (9th Cir. 1991) ...............................................................................12, 14

*Trulis v. Barton*,
107 F.3d 685 (9th Cir. 1995) .................................................................................21, 22

*Vedatech, Inc. v. St Paul Fire & Marine Ins. Co.*,
2005 WL 1513130 (N.D. Cal. June 22, 2005)............................................................21

*Wages v. Internal Revenue Serv.*,
915 F.2d 1230 (9th Cir. 1990)......................................................................................9

*Wallace v. Hayes*,
2012 WL 12916208 (D. Mont. Mar. 5, 2012)............................................................13

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

ER 175

*Wood v. Santa Barbara Chamber of Com., Inc.*,
  705 F.2d 1515 (9th Cir. 1983) ................................................................................. 24

*Woodhouse v. Meta Platforms*,
  704 F. Supp. 3d 502 (S.D.N.Y. 2023) ...................................................................... 25

*Zaldivar v. City of L.A.*,
  780 F.2d 823 (9th Cir. 1986) ................................................................................... 13

*Zocaras v. Castro*,
  465 F.3d 479 (11th Cir. 2006) ................................................................................. 18

**Statutes**

28 U.S.C. § 1651 ........................................................................................................... 24

28 U.S.C. § 1927 .............................................................................................. 2, 10, 20

**Rules**

Fed. R. Civ. P. 11 ................................................................... 2, 9, 10, 12, 15, 17, 23

N.D. Cal. L.R. 11-3(a)(2) ........................................................................................... 23

N.D. Cal. L.R. 3-15(b)(2) ........................................................................................... 16

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

ER 176

**DOCKET REFERENCE CONVENTIONS**

| Citation | Corresponding Docket |
|---|---|
| Dkt. | *Coronavirus Reporter Corp. v. Apple Inc.*, No. 3:24-cv-08660 (N.D. Cal.) |
| *Coronavirus I*, Dkt. | *Coronavirus Reporter v. Apple Inc.*, No. 1:21-cv-05567 (N.D. Cal.) |
| *Coronavirus I*, No. 22-15166, Dkt. | *Coronavirus Reporter v. Apple Inc.*, No. 22-15166 (9th Cir.) |
| *Coronavirus I*, No. 22-15167, Dkt. | *Coronavirus Reporter v. Apple Inc.*, No. 22-15167 (9th Cir.) |
| *Coring*, Dkt. | *Coring Co. v. Apple Inc.*, No. 9:21-cv-82235 (S.D. Fla.) (after transfer, 3:22-cv-01044 (N.D. Cal.)) |

Gibson, Dunn &
Crutcher LLP

## I.   INTRODUCTION

Over the past four years, Plaintiffs have filed nine duplicative complaints in five lawsuits across seven federal courts.  In each, Plaintiffs claim apps they developed were rejected from Apple's App Store for failure to comply with Apple's guidelines or allegedly "suppressed" on the App Store's search rankings.  This Court rejected Plaintiffs' claims across the board in 2021 in *Coronavirus Reporter v. Apple Inc.*, No. 1:21-cv-05567 (*Coronavirus I*).  The Ninth Circuit affirmed in full.  The Supreme Court denied review.  That should have been the end of this dispute.  But as Apple explained in its pending motion to dismiss, Plaintiffs filed the same claims yet again—this time in Wyoming in an admitted attempt to evade the Court's judgment.  This alone is a sanctionable waste of judicial and party re-sources as there is "no reasonable basis" on which this case "could proceed." *Est. of Blue v. Cnty. of L.A.*, 120 F.3d 982, 985 (9th Cir. 1997).

The problem is not just what Plaintiffs have done but how they have done it.  Plaintiffs and their counsel have repeatedly violated the rules of professional conduct and procedure.  Their filings are replete with factual misrepresentations and frivolous legal claims.  To take one example, Plaintiffs sent defective subpoenas to try to summon Apple's executives to a hearing where the Court had not author-ized live testimony—another abuse of judicial process that is sanctionable in isolation. *See, e.g.*, *Mat-tel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813 (9th Cir. 2003).  Yet this conduct is anything but isolated.  Plaintiffs also moved for multiple preliminary injunctions with no evidence whatsoever, sought a baseless default in clear violation of the Court's Guidelines for Professional Conduct, and made false accusations of "fraud on the court," "RICO violations," "witness intimidation," and much more—despite being warned early on by another court to stop their *ad hominem* attacks.

Plaintiffs' disregard for the facts, law, and rules continues to crescendo.  To maintain their obviously precluded claims, Plaintiffs now assert that the "Coronavirus Reporter" behind *Coronavirus I* is a "non-entity" that cannot bind the plaintiff "Coronavirus Reporter Corp." in this case.  That would mean one of two things: Either counsel signed multiple filings in *Coronavirus I*, all the way to the Supreme Court, on behalf of at least one entity he knew did not exist or, more likely, counsel has repeatedly misrepresented Plaintiffs' corporate identity.  Either is sanctionable.  Apple told Plaintiffs as much and sent them a copy of this motion.  But Plaintiffs have refused to withdraw their case or

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

correct their filings. Four years in, Plaintiffs appear no closer to ending their improper tactics to keep this litigation active, and it is clear they will not stop abusing the judicial system until ordered to do so.

Plaintiffs' repeated transgressions provide multiple grounds for sanctions. First, Plaintiffs have violated Rule 11: This case is harassing and frivolous, and Plaintiffs' defense against *res judicata*—that "Coronavirus Reporter" is a "non-entity" distinct from "Coronavirus Reporter Corporation"—demonstrates a lack of candor. *See* Fed. R. Civ. P. 11. Second, Plaintiffs have maintained this case with the express purposes of frustrating and circumventing this Court's judgments, clear proof of bad faith warranting sanctions under the Court's inherent authority. Third, counsel's cumulative conduct has unreasonably and vexatiously multiplied proceedings in violation of 28 U.S.C. § 1927. The Court should sanction Plaintiffs and their counsel by ordering them to pay Apple for the costs of defending this litigation, revoking counsel's *pro hac vice* admission, and imposing a pre-filing injunction.

## II.   BACKGROUND

### A.  The First Three Cases: *Coronavirus Reporter I*

In 2020, Apple rejected the submission of the Coronavirus Reporter app to the App Store because it violated Apple's App Review Guidelines regarding COVID-related apps. *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 957 (9th Cir. 2023). In response, Plaintiffs' attorney Keith Mathews filed three antitrust lawsuits[1] against Apple on behalf of entities affiliated with Jeffrey Isaacs, whom Mathews also called his "client." *Coronavirus I*, Dkts. 98-4, 98-5, 98-6, 98-7. These cases merged into *Coronavirus I. See* Dkt. 62 at 2–3 (describing *Coronavirus I* litigation).

Plaintiffs filed the *Coronavirus I* complaint on July 20, 2021. By August 23, 2021, Apple notified Plaintiffs that they had failed to file a corporate disclosure statement—as required by Local Rule 3-15 and Federal Rule of Civil Procedure 7.1—or otherwise disclose precisely which entities were suing and who their shareholders were. *See Coronavirus I*, Dkt. 32 at 6. Because Plaintiffs had "submitted no evidence concerning the nature of their businesses or the identity of their shareholders," Apple explained that it would proceed on the assumption that the plaintiff "Coronavirus Reporter" was

---

[1] These cases were: *Coronavirus Reporter v. Apple Inc.*, No. 1:21-cv-00047 (D.N.H.); *Primary Productions LLC v. Apple Inc.*, No. 2:21-cv-00137 (D. Me.); *Coronavirus Reporter v. Apple Inc.*, No. 1:21-cv-05567 (N.D. Cal.). The Court may take judicial notice of filings from these and other federal cases involving the parties. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

2

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

the Wyoming corporation named Coronavirus Reporter Corporation. *Id.*; *Coronavirus I*, Dkt. 33 ¶ 18.

In response, Plaintiffs still did not submit a corporate disclosure and instead filed an Amended Complaint naming four plaintiffs: Jeffrey Isaacs, Calid Inc., Primary Productions, and, still, "Coronavirus Reporter." *Coronavirus I*, Dkt. 41 ¶¶ 27–30. The Amended Complaint stated that "Plaintiff Coronavirus Reporter is a Wyoming Corporation." *Id.* ¶ 27. It also asserted that "Coronavirus Reporter" was a "corporate entity," *id.* ¶ 247, and "also the name of the Plaintiff's iOS application," *id.* ¶ 27; *accord Coronavirus I*, Dkt. 1 ¶¶ 16, 41. Apple therefore continued to litigate against Coronavirus Reporter (and the other plaintiffs) based on the facts alleged—all the while continuing to raise Plaintiffs' failure to file a corporate disclosure in filings and correspondence with Plaintiffs' counsel. *See, e.g.*, Ex. 1 at 1; Ex. 2 at 2; *Coronavirus I*, Dkt. 62 at 6. Plaintiffs never responded to this point or filed the required disclosures, but Mathews continued to submit filings on behalf of "Coronavirus Reporter" in this Court and on appeal. *See, e.g.*, *Coronavirus I*, Dkts. 42, 52, 65, 87 (submissions to this Court); *Coronavirus I*, No. 22-15166, Dkts. 17, 52, 69 (submissions to the Ninth Circuit on appeal from *Coronavirus I*).

While continuing to obscure the identity of the real parties at interest in *Coronavirus I*, Plaintiffs litigated their claims that Apple violated the antitrust (and other) laws by rejecting Plaintiffs' apps or "suppress[ing]" them in search results. *Coronavirus I*, Dkt. 41 ¶¶ 28, 54–56, 85–86, 104–07. This Court dismissed their claims with prejudice. *Coronavirus I*, 2021 WL 5936910, at *20. First, "[t]here [were] several problems . . . with the relevant markets," including Plaintiffs' failure to identify the alleged relevant market with any "clarity" or allege facts that could make them plausible. *Id.* at *8–13. Second, Plaintiffs alleged no antitrust injury, for their "conclusory [allegations] and 'threadbare recitals'" could not salvage claims predicated on "specific [alleged] harms experienced by Plaintiffs or a small group of competitors, rather than harm to the market." *Id.* at 13–15. Third, Plaintiffs' other claims failed for myriad reasons. *Id.* at 15–18. The Ninth Circuit affirmed in full, *Coronavirus I*, 85 F.4th at 956–59, and the Supreme Court denied Plaintiffs' petition for certiorari, 144 S. Ct. 2526 (2024).

Throughout the *Coronavirus I* litigation, Plaintiffs inundated the Court with improper motions and other procedurally irregular filings:

- Without submitting any supporting evidence, Plaintiffs moved for a preliminary injunction

Gibson, Dunn &
Crutcher LLP

ER 180

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

seeking wholesale revision of Apple's App Store and then filed a second motion (also without evidence) before the Court had even decided the first. *Coronavirus I*, Dkt. 20 ¶ 54; *Coronavirus I*, Dkt. 52 ¶¶ 13–20. The Court denied both requests. 2021 WL 5936910, at *18.

- Plaintiffs purported to serve state-court subpoenas on high-level Apple executives and then-FTC Chair Lina Khan to summon them to a motion hearing for which this Court had not authorized live testimony, as required by the Local Rules. *Coronavirus I*, Dkts. 66, 67, 68.

- Plaintiffs filed a "motion to strike" Apple's motion to dismiss, citing Rule 12(f), on the ground that Apple's motion "fail[ed] to meet the heightened pleading standards of *Twombly/Iqbal*," *Coronavirus I*, Dkt. 51 at 3—which this Court rejected out of hand, 2021 WL 5936910, at *18.

- Isaacs twice moved for sanctions, alleging "evidence spoliation" and "fraud on the court," despite the lack of substantiating evidence and both motions' being barred by the plain terms of the Local Rules. *Coronavirus I*, Dkt. 96 at 3; *accord Coronavirus I*, Dkt. 97 at 18. The Court denied both summarily. *Coronavirus I*, Dkt. 100.

- Isaacs filed a "Notice" demanding federal law enforcement open a criminal investigation into Apple and its counsel for exerting "undue influence" on Google to suppress internet search results about Isaacs' entities. *Coronavirus I*, No. 22-15167, Dkt. 60-1 at 6–9. That assertion likewise had no supporting evidence, and the Court never entertained it.

- Even as Plaintiffs petitioned the Supreme Court for review, Isaacs asked this Court to set aside the judgment based on the same arguments the Ninth Circuit rejected. *Coronavirus I*, Dkt. 118. The Court dispatched that request under "bind[ing]" precedent. *Coronavirus I*, Dkt. 129 at 3.

Across a 134-entry (and counting) docket in *Coronavirus I*, the Court has denied every substantive motion Plaintiffs have filed. *See, e.g.*, *Coronavirus I*, 2021 WL 5936910, at *18–19 (granting motion to dismiss while observing the procedural impropriety of Plaintiffs' motion to strike, rejecting as a "nullity" Plaintiffs' "attempt to amend their complaint," and rebuffing as "not relevant" Plaintiffs' request for the Supreme Court to "invoke original jurisdiction and assign a special master").

Not only has the substance of Plaintiffs' filings failed to persuade a court to grant any requested relief, but Plaintiffs have also consistently made unsubstantiated accusations of bad faith, deception, and fraud by Apple and its counsel. For example, at the beginning of *Coronavirus I*, Apple filed a

notice to relate that case to another app developer antitrust case. *Coronavirus I*, Dkt. 15. Plaintiffs filed an opposition, accusing Apple's attorneys of "fraud on the Court," *Coronavirus I*, Dkt. 17 at 3, and threatening to move for sanctions, *id.* at 3, 7. Later, Plaintiffs asserted that Apple's counsel "should be removed from [the] case under California Bar ethics standards" for "repeat RICO violations" in the form of "witness intimidation" because Apple's counsel had sought to communicate through Isaacs' (self-described) counsel rather than directly with Isaacs himself. *Coronavirus I*, Dkt. 60 at 3; *see also Coronavirus I*, Dkt. 87 at 17; *Coronavirus I*, Dkt. 65 at 2 (further unfounded accusations against Apple's counsel). Similarly, on appeal, Isaacs accused Apple's counsel of "dishonesty," committing "fraud on the 'machinery of the court,'" and "threaten[ing]" him, *Coronavirus I*, No. 22-15167, Dkt. 8 at 26, 36, even as Plaintiffs repeatedly misstated the record, *see Coronavirus I*, No. 22-15167, Dkt. 38 at 33 n.7, 46–47.

### B. Plaintiffs Attempt to Bring Their Fourth Case Against Apple

After the Court dismissed *Coronavirus I*, Mathews filed another case against Apple in the Southern District of Florida: *Coring Co. v. Apple Inc.*, No. 9:21-cv-82235 (S.D. Fla.). In this fourth case, *Coring* repeated the allegations in *Coronavirus I* and bluntly acknowledged that the intent of the suit was to circumvent the preclusive effect of *Coronavirus I*. The Complaint stated the hope that "Eleventh Circuit law can finally bring a proper resolution to this important matter," *Coring*, Dkt. 1 ¶ 97, because "Ninth Circuit law" would "prevent redress," *id.* ¶ 105; *see also id.* ¶ 10. Though Plaintiffs again refused to comply with their obligations to file corporate disclosure statements in that case, *Coring*, Dkt. 35 at 3, Apple's investigation revealed that Coring Co., the named plaintiff, was a brand-new entity that had only come into existence in January 2022, nearly a month *after* the complaint had been filed in December 2021 (Ex. 4; *see also Coring*, Dkt. 35 at 6), and that it had been incorporated by Isaacs with Mathews' assistance, Ex. 5.

Apple noted those facts and observed that timing of the suit "raise[d] the question of who authorized the initiation of th[e] case and Coring's filings prior to that date." *Coring*, Dkt. 35 at 6. Apple also observed "that Coring's counsel appear[ed] to have made at least three false representations to the Court as to Coring's status." *Id.* When these facts were brought to the attention of the *Coring* court, it noted the overlap with *Coronavirus Reporter I* and transferred the case to the Northern District of

5

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

California.  *Coring Co. v. Apple Inc.*, 2022 WL 22762009, at *2–3 (S.D. Fla. Feb. 18, 2022).  When the case was assigned to this Court, Coring voluntarily dismissed its case.  *Coring*, No. 3:22-cv-1044, Dkt. 49 (N.D. Cal.).

## C.  Plaintiffs File a Fifth Suit Against Apple

Throughout these cases, Apple repeatedly stated in filings and in private correspondence to Plaintiffs and their counsel that they were engaging in an impermissible pattern of duplicative, vexatious, and frivolous litigation against Apple that must not persist.  *See, e.g.*, *Coronavirus I*, Dkt. 64 at 1–2; Dkt. 74 at 11–13; Exs. 1, 2.  Yet persist it did.  On March 5, 2024, Plaintiffs Coronavirus Reporter Corporation and Calid Inc., again represented by Mathews, filed this lawsuit, *Coronavirus II*, in the District of Wyoming.  Dkt. 1.  *Coronavirus II* simply repackages the allegations from *Coronavirus I*. *See* Dkt. 62 at 6–7 (describing how this case replicates *Coronavirus I*'s claims).  In both suits, Plaintiffs asserted—often using identical language—that: Apple's operation of the App Store constitutes a monopolistic practice, because Apple restricts developers' access to the App Store infrastructure, which Plaintiffs deem "essential facilities" (*compare Coronavirus I*, Dkt. 41 ¶¶ 180–94 *with* Dkt. 30 ¶¶ 315–31); that Apple's $99 developer fee is an unreasonable restraint of trade (*compare Coronavirus I*, Dkt. 41 ¶¶ 195–206, ¶¶ 231–40 *with* Dkt. 30 ¶¶ 306–314); that Apple engaged in "ranking suppression" (*compare Coronavirus I*, Dkt. 41 ¶¶ 207–12 *with* Dkt. 30 ¶¶ 332–37); and that Apple unlawfully tied the App Store or "notary stamps" to iPhones (*compare Coronavirus I*, Dkt. 41 ¶¶ 213–30 *with* Dkt. 30 ¶¶ 287–305).

After Apple filed a motion to transfer venue to the Northern District of California, Plaintiffs sought to preempt a return to this Court.  They amended their Complaint to paste in large verbatim portions of a Department of Justice antitrust complaint against Apple and then moved to transfer this case into multidistrict litigation related to the government's case.  *See* Dkt. 26 at 3–4.  But the Amended Complaint retained a substantial portion of the original, which itself was largely carried over from *Coronavirus I*. *See* Dkt. 62 at 4–5.  The JPML therefore denied Plaintiffs' transfer motion, concluding that the "focus" of Plaintiffs' claims was "significantly different" than those at issue in the MDL.  Dkt. 37 at 1.  The Wyoming court transferred this litigation to the Northern District of California.  Dkt. 44 at 10.

Gibson, Dunn & Crutcher LLP

6

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Throughout *Coronavirus II*, Plaintiffs have continued to engage in just the sort of conduct that had characterized *Coronavirus I*:

- After explicitly agreeing in correspondence that this Court is "best positioned to adjudicate these related matters most efficiently" (Dkt. 38-1 at 5), Plaintiffs refused to stipulate to a transfer (Dkt. 38-1 at 3), opposed Apple's motion to transfer (Dkt. 39 at 2–5), and opposed Apple's motion to relate *Coronavirus I* and *Coronavirus II* (*Coronavirus I*, Dkt. 133).

- Notwithstanding a prior court order on the issue, Dkt. 33, Plaintiffs opposed Apple's case-management motion for entry of a briefing order, instead responding with a lengthy, invective-filled "cross-motion for judicial estoppel" that sought to bar Apple from making certain legal arguments. Dkt. 39 at 5–15.

- Rather than respond to Apple's motion to transfer, Plaintiffs filed a "motion for a more definitive statement" under Rule 12(e), Dkt. 32—even though this Court had already rejected a similar move in *Coronavirus I*, 2021 WL 5936910, at \*18 (denying Plaintiffs' Rule 12(f) motion to strike Apple's motion to dismiss).

- Most recently, Plaintiffs sought entry of default against Apple because Apple had not moved to dismiss even though the Court had stayed the case and the Court's Guidelines for Professional Conduct require consultation with the opposing party prior to filing such a request. *See* Dkt. 55, Dkt. 57 at 3–5. The Clerk denied Plaintiffs' request. Dkt. 59.

Plaintiffs' efforts have been marked, as the Wyoming court observed late last year, by a "reliance on hyperbole," including (false) "claims of injustice delivered by the hands of Apple" and a lack of "effort to ground their argument in legal analysis." Dkt. 44 at 7, 10 n.2; *see also, e.g.*, *Coronavirus I*, Dkt. 17 ¶ 4 (accusing counsel of "fraud on the Court" for filing a related case notice); *Coronavirus I*, Dkt. 20 at 26 n.2 (referencing a non-existent motion to disqualify counsel); *Coronavirus I*, Dkt. 96 at 3–4 (baselessly accusing counsel of "spoliation of critical . . . evidence").

**D. Plaintiffs Defend Their Duplicative Suit with a Frivolous Corporate-Identity Position**

Early in the *Coronavirus II* litigation, Apple disclosed its intent to seek dismissal based on the doctrine of *res judicata*. Dkt. 20 at 8–9. In response, Plaintiffs espoused the view that *Coronavirus II* is not precluded by this Court's judgment in *Coronavirus I* because "Coronavirus Reporter" filed

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

*Coronavirus I* whereas *Coronavirus II* is brought by "Coronavirus Reporter Corporation." Dkt. 39 at 6. According to Plaintiffs and their counsel, that difference is critical because the *Coronavirus I* plaintiff "Coronavirus Reporter" is not an actual entity, and thus this Court's ruling against it could not bind Coronavirus Reporter Corporation. *Id.* at 6–7. Apple cautioned Mathews that this position was frivolous and contrary to his repeated representations to the Court. Kleinbrodt Decl. ¶¶ 8–9 & Exs. 6, 7.

Undeterred, Plaintiffs and their attorney have made this representation a centerpiece of their opposition to Apple's procedural and substantive motions. In one brief, Plaintiffs asserted that they are not bound by *Coronavirus I* because "Wyoming-registered Coronavirus Reporter Corporation" cannot be identical to "the legal non-entity 'Coronavirus Reporter', which is the name of an iPhone application . . . subject to prior litigation involving the app's software developer." Dkt. 39 at 6. Plaintiffs even tried to change the caption of *Coronavirus I* when Apple sought to relate the two cases:

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC [non-entities],<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly<br>situated<br><br>            Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>            Defendant. | Case No. 3:21-cv-5567-EMC<br><br>**OBJECTION TO APPLE'S<br>ADMINISTRATIVE MOTION TO<br>RELATE ACTIONS** |

Dkt. 48 (highlighting added). Plaintiffs have defended their assertion by citing to a footnote in Apple's Ninth Circuit brief positing that "Coronavirus Reporter" corresponded to "no actual . . . entity—meaning Apple [was] being sued by at least one null party." Dkt. 39 at 7–8, 11. Plaintiffs say that their counsel "sought clarification" about Apple's position and then "did not further contest the matter," "waiv[ing] any right to object to Apple's . . . position" and choosing to "rel[y] on [Apple's counsel's] assertion." *Id.* at 8, 10; *see also* Dkt. 43 at 2, 3 n.1 (similar); Dkt. 48 at 1 (similar); Dkt. 63 at 3 & n.1 (similar).

On March 6, 2025, Apple moved to dismiss the Amended Complaint as precluded by the

Gibson, Dunn &
Crutcher LLP

8

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

judgment in *Coronavirus I* given the identity of parties and claims in issue. Dkt. 62 at 5–10. Apple warned Plaintiffs for a final time that their null-entity argument was a frivolous defense against *res judicata*, citing (among other things) Wyoming Secretary of State records demonstrating that only one Wyoming entity with "Coronavirus Reporter" in its name exists. Dkt. 62 at 1, 8–10. In opposition, Plaintiffs nevertheless maintained that not only is Apple "estopped" from raising a *res judicata* defense because of its protestations about Plaintiffs' failure to file corporate disclosures in *Coronavirus I* but also that this Court had "no jurisdiction" over that case because the corporate plaintiffs were "not correctly identified" and "never effectively appear[ed] as [] litigant[s]." Dkt. 63 at 3–5.

To summarize, then, Plaintiffs advance this duplicative case—their fifth against Apple—on the basis that the "Wyoming Corporation" named "Coronavirus Reporter" (*Coronavirus I*, Dkt. 1 ¶ 41) that litigated in *Coronavirus I* in this Court, the Ninth Circuit, and the Supreme Court of the United States never existed and is not the same as the Wyoming Corporation "Coronavirus Reporter Corporation" that brought this lawsuit. Dkt. 30 ¶ 47. That is so, Plaintiffs maintain, even though Mathews had to conduct a "reasonable inquiry into the law and facts before signing pleadings, written motions, and other documents" on behalf of "Coronavirus Reporter" (Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment), *and* he continued to litigate and sign papers on behalf of "Coronavirus Reporter" *after* he supposedly learned it was a "null entity"—which came a full 14 months after Apple first pointed out Plaintiffs' disclosure problem. *See Coronavirus I*, Dkt. 32 at 6. Pursuant to Federal Rule of Civil Procedure 11(c)(2), Apple served Plaintiffs a copy of this motion on April 23. Kleinbrodt Decl. ¶ 12. Plaintiffs have not dismissed the case, withdrawn their filings, or corrected their arguments.

### III.    LEGAL STANDARD

The Court may sanction litigants and counsel pursuant to three powers. First, Rule 11 prohibits representations that are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," that advance factual contentions lacking "evidentiary support," or that have "any improper purpose." Fed. R. Civ. P. 11(b)(2)–(3); *see also G.C. & K.B. Inv., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003). Second, the Court has inherent authority to sanction parties and counsel whose "conduct constituted or was tantamount to bad faith," *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002) (quotation marks omitted), which

Gibson, Dunn &
Crutcher LLP

9

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

may be inferred from a baseless course of conduct, *see Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (recognizing "bad faith . . . includes a broad range of willful improper conduct"). Third, federal statute provides for sanctions against counsel who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927; *see also Optyl Eyewear Fashion Intern. Corp. v. Style Cos.*, 760 F.2d 1045, 1048 (9th Cir. 1985).

## IV.    ARGUMENT

The courts serve a critical function in resolving valid disputes, but this lawsuit has crossed the line. It is time to close the courthouse door not only to this case but also to further repeat cases by Plaintiffs and their counsel. Sanctions are needed to correct and deter this conduct.

### A.    The Court Should Sanction Plaintiffs and their Counsel Under Rule 11

Rule 11 authorizes sanctions against parties and counsel who violate their duty to "conduct[] a reasonable inquiry" and file only "papers . . . [that] are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *see also* Fed. R. Civ. P. 11(c)(1). This standard "is objective," determined with reference to what a "reasonable" litigant would do. *G.C. & K.B. Inv., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003). Plaintiffs have all but admitted they have violated this rule: Either they have repeatedly misrepresented their corporate identity or their counsel litigated a case all the way to the Supreme Court on behalf of at least one entity he did not confirm was real. Whichever is true, Plaintiffs and their counsel should be sanctioned because they (1) flouted "the central purpose of Rule 11" by filing a duplicative suit in intentional disregard of this Court's judgment in *Coronavirus I*, *Cooter & Gell*, 496 U.S. at 393, and (2) are seeking to maintain this case through representations that do not "have evidentiary support," Fed. R. Civ. P. 11(b)(3).

### 1.    Plaintiffs' Assertion of Duplicative, Barred Claims Violates Rule 11

By filing duplicative claims, Plaintiffs and their counsel violated Rule 11. First, "the claims" are clearly barred by *res judicata* and thus are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Second, Plaintiffs have maintained this case for the "improper purpose" of harassing Apple. Fed. R. Civ. P. 11(b)(1). The Court should impose sanctions under Rule 11 on both grounds.

Gibson, Dunn &
Crutcher LLP

10

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

**1.** "A fundamental precept of common-law adjudication," is that "a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction [] cannot be disputed in a subsequent suit between the same parties or their privies.'" *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48–49 (1897)). To that end, "[w]hen a reasonable investigation would reveal that a claim is barred by res judicata or collateral estoppel . . ., Rule 11 sanctions may be imposed." *Est. of Blue*, 120 F.3d at 985; *see also, e.g.*, *Roundtree*, 40 F.3d at 1040 (upholding Rule 11 sanctions where attorney "br[ought] [his] theory to court time after time and has been told that [it] is wrong"); *Gaskell v. Weir*, 10 F.3d 626, 628 (9th Cir. 1993) (upholding sanctions against attorney for filing "patently frivolous" complaint).

As explained in Apple's motion to dismiss, the application of *res judicata* here is straightforward. *See* Dkt. 62 at 5–10. The plaintiffs in this case include the same parties, bringing the same claims against the same defendant on the basis of the same underlying facts, as in *Coronavirus I*. *See id.* at 8–10. The original Complaint in *Coronavirus II* even included language copied from *Coronavirus I*'s allegations about the propriety of venue in the Northern District of California—even though Plaintiffs sued in the District of Wyoming. *See* Dkt. 1 ¶ 21; *Coronavirus I*, Dkt. 1 ¶ 38.[2] And Plaintiffs *knew* this case was duplicative as they expressly alleged in the Complaint that existing Ninth Circuit case law (*i.e.*, the Ninth Circuit's published opinion upholding this Court's judgment) would "prevent redress" for their claims, Dkt. 1 ¶ 127—just as they had conceded when they brought similarly overlapping claims in *Coring*. *See Coring*, Dkt. 1 ¶¶ 10, 97, 105.

Aside from their null-entity defense (discussed *infra* at 12–15), Plaintiffs have argued that *res judicata* does not apply because they added allegations from the Department of Justice's complaint against Apple and because plaintiff Greenflight Ventures was not a party to *Coronavirus I*. These arguments are wrong. *See* Dkt. 62 at 5–10. They are also no defense against sanctions: Coronavirus Reporter and Calid, through their counsel, have reasserted claims based on the same alleged facts about

---

[2] Plaintiffs subsequently blamed this error on a paralegal, who they claimed "accidentally filed the original Complaint with several draft sections from an older antitrust lawsuit clients – including *Coring* and *Primary Productions*." Dkt. 32 at 6. That is wholly implausible, as Plaintiffs made no attempt to fix the error for many months. When they eventually filed an Amended Complaint, they retained the same meritless antitrust claims that had already been rejected by this court in *Coronavirus I*.

11

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

alleged excessive pricing, refusals to deal and access to "essential facilities," search "suppression," and Apple's centralized distribution model—claims this Court rejected in *Coronavirus I*. *See* Dkt. 30 ¶¶ 287–354; Dkt. 62 at 5–10; *see also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363 (9th Cir. 1991) (en banc) (Rule 11 sanctions may be imposed even if only some claims are frivolous). As a result, Apple has to brief, and the Court has to adjudicate, the same exact arguments. *See* Dkt. 62 at 5–10. It is beyond reasonable dispute that Plaintiffs have asked the Court to "revisit the claims and theories rejected" in prior litigation—a "patently frivolous" exercise. *Roundtree*, 40 F.3d at 1040.

Courts routinely impose sanctions in cases like this one. In *Buster v. Greisen*, for example, the plaintiff attempted to bring a second action in state court, seeking to relitigate a prior adverse judgment in federal court. 104 F.3d 1186, 1188 (9th Cir. 1997). The Ninth Circuit affirmed the imposition of Rule 11 sanctions because the case involved "the same parties and the same 'transactional nucleus of fact' as the prior suit and it [sought] to relitigate issues that were conclusively resolved in the prior suit." *Id.* at 1190. As such, the Court held "a reasonable and competent inquiry would have led to" the conclusion that the "suit was barred by the *res judicata* and collateral estoppel effects of the prior judgment." *Id.* Sanctions in such circumstances are appropriate against the litigants and their counsel. *Id.*; *see also, e.g.*, *Schoggen v. Haw. Aviation Cont. Servs., Inc.*, 608 F. App'x 469 (9th Cir. 2015) (affirming sanctions against counsel who filed complaint barred by res judicata); *Bartholomew v. Pasadena Tournament of Roses Ass'n, Inc.*, 453 F. App'x 745 (9th Cir. 2011) (affirming sanctions on *pro se* litigant based on filing of barred, successive suits); *Roundtree*, 40 F.3d at 1040 (affirming sanctions against an attorney who brought repeated, similar claims "time after time" even when "told that he is wrong").

**2.** Plaintiffs also should be sanctioned because they filed this case for "an improper purpose"—to harass Apple. Fed. R. Civ. P. 11(b)(1). Because this is an objective inquiry, a "court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose." *Townsend*, 929 F.2d at 1365. All available evidence indicates Plaintiffs had no legitimate basis to file this suit and did so only to harass Apple.

First, Plaintiffs *admitted* that they filed this case in Wyoming to avoid the preclusive effects of this Court's and the Ninth Circuit's decisions. Dkt. 1 ¶ 127 (describing intent to circumvent transfer

12

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

to Ninth Circuit, where precedent would "prevent redress"). This mirrored earlier admissions elsewhere. *See Coring*, Dkt. 1 ¶¶ 97, 105 (stating purpose of filing in the Southern District of Florida to be avoidance of Ninth Circuit precedent, which would foreclose the plaintiff's claims). Plaintiffs have thus repeatedly conceded improper purpose insofar as they openly seek to deprive Apple of the repose *Coronavirus I*'s final judgment should convey. *See Meyer v. U.S. Bank Nat'l Ass'n*, 792 F.3d 923, 928 (8th Cir. 2015) (sanctions appropriate where plaintiff attempted to "repackage their prior unsuccessful lawsuit under a different cause of action" to avoid *res judicata* bar); *Sommer v. Unum Life Ins. Co. of Am.*, 35 F. App'x 489, 491 (9th Cir. 2002) (sanctions appropriate where plaintiff filed a third suit seeking "another bite at the apple . . . in the hope of a different result").

Second, "[w]ithout question, successive complaints based upon propositions of law previously rejected may constitute harassment under Rule 11." *Zaldivar v. City of L.A.*, 780 F.2d 823, 832 (9th Cir. 1986), *abrogated on other grounds by Cooter & Gell*, 496 U.S. 384 (1990). As the Ninth Circuit explained, successive lawsuits give rise to such an inference where there is "an identity of parties involved in the successive claim, and a clear indication that the proposition urged in the repeat claim was resolved in the earlier one." *Zaldivar*, 780 F.2d at 834. Here, Plaintiffs have not merely brought one successive action, but many. They followed the series of lawsuits that became *Coronavirus I* with *Coring*—an admitted attempt to circumvent the Court's judgment. *See supra* 11. And when that failed, they filed *Coronavirus II* in which *it is undisputed* that (at least some of) the same claims are being disputed. *See* Dkt. 62 at 5–10. Under these circumstances, "the only conclusion is that Rule 11 sanctions are necessary to deter further harassment through frivolous motions and lawsuits." *Wallace v. Hayes*, 2012 WL 12916208, at *4 (D. Mont. Mar. 5, 2012) (imposing sanctions against party and counsel for harassing "successive pleading"); *see also, e.g.*, *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1110 (9th Cir. 2003) (similar).

Third, Plaintiffs' vexatious conduct is further evidence of improper purpose. All of Plaintiffs' substantive submissions have been meritless (*see supra* 4), often violating the plain text of the Local Rules, *see, e.g.*, *Coronavirus I*, Dkt. 100; the direct admonitions of the District's Professional Conduct Guidelines, *see* Dkts. 57 at 3–5, 59; and blackletter, hornbook law, *see Coronavirus I*, 2021 WL 5936910, at *18. Some conduct, like issuing defective subpoenas to Apple's executives to give

13

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn &
Crutcher LLP

testimony, where none had been authorized, or to initiate criminal investigations into Apple and its counsel for legitimate litigation activity, were facially harassing. *See, e.g.*, *Coronavirus I*, Dkt. 66; *Coronavirus I*, No. 22-15167, Dkt. 60 at 6–9. Courts have recognized that similar "parade[s] of motions" "cumulatively suggest a strategy of harassment." *Kunimoto v. Fidell*, 26 F. App'x 630, 633 (9th Cir. 2001); *see also, e.g.*, *Eberhardt v. Walsh*, 122 F.4th 681, 686 (7th Cir. 2024) (finding plaintiff harassed defendant by filing a dozen motions, including multiple preliminary injunction motions, that were "almost entirely denied"); *Hsu v. UBS Fin. Servs., Inc.*, 2021 WL 5233238, at *2 (N.D. Cal. Nov. 10, 2021) (imposing sanctions for filing "indecipherable and incomprehensible" motions with "duplicative and repetitive arguments").

Fourth, Apple warned Plaintiffs repeatedly and expressly that their conduct was sanctionable. Early in the string of cases preceding this one, one court warned Plaintiffs and their counsel "about the use of *ad hominem* references to opposing counsel." *Primary Productions LLC v. Apple Inc.*, No. 2:21-cv-00137, Dkt. 19 (D. Me. Jul. 20, 2021). Plaintiffs were unmoved. *See Coronavirus I*, Dkt. 17 at 3, 7 (accusing Apple and its counsel two weeks later of "fraud on the court," "arrogance," and "fraud and abuses" against Plaintiffs). Apple stressed to Mathews as early as September 2021 that his and his clients' conduct fell short of their professional obligations. Ex. 1 at 1. And in the three-and-a-half years since, Apple has told Plaintiffs on multiple occasions that it would seek redress if they continued to file duplicative cases and litigate them in a vexatious manner. Ex. 1 at 1; Ex. 7 at 3). Yet Plaintiffs have only doubled down on their frivolous arguments, factual misrepresentations, and vitriolic accusations. *See supra* 7. This pattern, too, is compelling evidence that this case is designed to harass Apple. *See Orange Prod. Credit Ass'n v. Frontline Ventures Ltd.*, 792 F.2d 797, 799–801 (9th Cir. 1986) (affirming Rule 11 sanctions where plaintiff "chose to ignore [] warning" and proceeded with suit that it "must have known completely lacked a factual foundation"); *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1361 (9th Cir. 1990) (imposing sanctions where plaintiff ignored affidavits that plainly rendered initial complaint's theory of legal liability baseless and filed frivolous amended complaint repeating the same theory).

Taken together, the record provides more than "ample justification for finding that the complaints were filed for the improper purpose 'of harassing and pressuring the Defendants.'" Kunimoto,

26 F. App'x at 633.  Plaintiffs' long-running campaign of improper, meritless, and harassing litigation should be sanctioned under Rule 11.  *See Buster*, 104 F.3d at 1190 (affirming district court's judgment that successive, duplicative suit "was brought to harass" the defendant and was sanctionable under Rule 11); *In re Grantham Bros.*, 922 F.2d 1438, 1443 (9th Cir. 1991) (affirming imposition of sanctions under Rule 11 on the basis that frivolous collateral attack on prior judgment was intended to "harass or intimidate").

## 2.  Plaintiffs' "Null Entity Defense" Is Independently Sanctionable

Refiling the same claims on behalf of the same parties is precisely the kind of "abusive litigation practice[]" that Rule 11 is designed to prevent.  *Cooter & Gell*, 496 U.S. at 393.  Plaintiffs' defense of their conduct has only added fuel to the fire.  In multiple filings, Plaintiffs and their counsel have advanced the preposterous theory that *Coronavirus I* is not preclusive because the named plaintiff— "Coronavirus Reporter"—is a "non-entity" distinct from the Coronavirus Reporter *Corporation* bringing this case.  Dkt. 39 at 6–10; Dkt. 48 at 1–5.  This, they say, renders *Coronavirus I* a nullity that leaves this case free to proceed.  Dkt. 39 at 10–12; Dkt. 48 at 1; *accord* Dkt. 63 at 4–6.  If true, this would be an extraordinary confession not only of having failed to undertake an adequate investigation before filing *Coronavirus I* but also of having litigated that case in bad faith up to the Supreme Court.  But it is not true:  Overwhelming evidence shows Plaintiffs' argument is a transparent pretext to continue their campaign of harassing litigation against Apple.  *See* Fed. R. Civ. P. 11(b)(3) (providing for sanctions where "factual contentions [do not] have evidentiary support").

From *Coronavirus I*'s inception, Plaintiffs alleged that "Coronavirus Reporter" was "a Wyoming Corporation with officers based in New Hampshire, Vermont, and Upstate NY."  *Coronavirus I*, Dkt. 1 ¶ 41; *see also id.* ¶ 284 (holding out "Coronavirus Reporter" as "Dr. Roberts' . . . organization").  The Amended Complaint echoed that statement.  *Coronavirus I*, Dkt. 41 ¶ 27.  Under Rule 11, each time Mathews signed a filing and submitted it to the Court, he affirmed that the "factual contentions have evidentiary support" based on "an inquiry reasonable under the circumstances."  Fed. R. Civ. P. 11(b), (b)(3).  And even if verifying the identity of his own client had twice escaped a reasonable investigation, Mathews was on notice to verify his client's existence when Apple pointed out Plaintiffs' obligation to file a corporate disclosure on August 23, 2021 (*Coronavirus I*, Dkt. 32 at 6), September

Gibson, Dunn & Crutcher LLP

15

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

6, 2021 (Ex. 1), September 30, 2021 (Ex. 2), and October 27, 2022 (Dkt. 39 at 7). Yet in this Court alone, Mathews submitted 14 substantive filings on behalf of "Coronavirus Reporter."

Plaintiffs also made affirmative representations contrary to the position they now advance. In one filing, Mathews referred to his client as a "corporation, Coronavirus Reporter." *Coronavirus I*, Dkt. 60 at 3 n.1. Isaacs similarly argued for sanctions because, he claimed, Apple "falsely claimed that Dr. Isaacs controls all the Plaintiffs in this case" when "Dr. Roberts is his senior at Coronavirus Reporter, and . . . all litigation by *that Corporation* require Dr. Roberts' authorization as he is a near-majority shareholder." *Coronavirus I*, Dkt. 97 at 11. And an attachment to the Complaint included purported "Coronavirus Reporter (Wyoming) Officer Minutes." *Coronavirus I*, Dkt. 1-1 at 3–4; *see also Coronavirus I*, No. 22-15166, Dkt. 2 at 1 (representing "Coronavirus Reporter" was an "app developer[]"). Contrary to their current representations, Plaintiffs at no point in *Coronavirus I* "conceded" that Coronavirus Reporter was a non-entity prosecuting the case. Dkt. 63 at 3.

Plaintiffs recently have said that Mathews learned that his client was a "null entity" after Apple filed its answering brief in the Ninth Circuit, Dkt. 39 at 7–8, which pointed out in a footnote that there is "no actual 'Coronavirus Reporter' entity" and that Plaintiffs had refused to file the required corporate disclosure. *Coronavirus I*, No. 22-15166, Dkt. 38 at 6, 7 n.4. That story strains credulity. Plaintiffs have not explained why, for example, Mathews took Apple's assertion on faith at that time but never investigated Plaintiffs' failure to perfect their disclosures when Apple had previously pointed them out. *See* N.D. Cal. L.R. 3-15(b)(2) (requiring disclosure of "any" "entities" that have "a financial interest of any kind" or "any other kind of interest that could be substantially affected" by the litigation). Nor have Plaintiffs explained why Mathews accepted as true that his client was a "null entity" when he had earlier held himself out as his client's Chief Legal Officer. Ex. 3. And those are but a few of the unanswered questions created by Plaintiffs' timeline: Who authorized Mathews to file a suit on behalf of "Coronavirus Reporter" if it was not an entity? To which entity did Mathews think he was referring given that there is only one Wyoming corporation with "Coronavirus Reporter" in its name? *See* Dkt. 62-2. And why did Mathews continue to sign briefs and present oral argument on behalf of

16

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn &
Crutcher LLP

"Coronavirus Reporter" even after he purportedly realized it was not a real entity after all? *See Coronavirus I*, No. 22-15166, Dkts. 52, 63, 65, 69, 73.[3]

Plaintiffs' asserted timeline does not excuse their conduct in any event. For one thing, it all but admits Mathews did not undertake a reasonable investigation before repeatedly referring to "Coronavirus Reporter" as a corporate litigant. *See, e.g.*, *Coronavirus I*, Dkt. 1 ¶¶ 94, 281, 288, Dkt. 20 ¶ 5, Dkt. ¶¶ 71, 247, Dkt. 87 at 17. For another, it means Mathews violated his duty of candor after he purportedly learned that his client was a non-entity by filing a reply brief and *en banc* petition in the Ninth Circuit, *Coronavirus I*, No. 22-15166, Dkts. 52, 69, as well as multiple applications and petitions with the Supreme Court on behalf of "Coronavirus Reporter." *See* Supreme Court Docket Nos. 23A718, 23-1089. Plaintiffs' explanation—that Mathews petitioned the United States Supreme Court "in an abundance of caution to reserve all possibilities for curing the defect," Dkt. 63 at 3 n.1—makes no sense. Not only did Apple first point out that the corporate plaintiffs had not filed proper disclosures in August 2021, but Mathews also took no steps at any point to "cure" the supposed defect of representing a non-existent party from the time he supposedly learned his client did not exist to when he submitted a certiorari petition in April 2024. *See supra* 16. In other words, Plaintiffs purport to *admit* that they did not "certif[y] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that their "factual contentions ha[d] evidentiary support." Fed. R. Civ. P. 11(b)(3). Plaintiffs' argument does not stand up because it is a post-hoc excuse designed to keep this litigation alive when there is no good-faith basis to do so.

To make matters worse, Plaintiffs have recently *expanded* their claim to assert that "all three named corporate entities" in *Coronavirus I* were never before the Court. Dkt. 63 at 4. Plaintiffs do not explain how Calid Inc. or Primary Productions LLC are null entities too. *See id.* But this argument only underscores Plaintiffs' problem: If the "defects" with Plaintiffs' "corporate entities" were "obvious" as they now contend, Dkt. 63 at 4, then any reasonable investigation would have uncovered those

---

[3] In Plaintiffs' first suit against Apple, the court noted Plaintiffs' evasiveness about corporate identity created "an open question as to whether plaintiff is the real party in interest with standing to bring this action." *Coronavirus Reporter v. Apple Inc.*, 560 F. Supp. 3d 632, 638 n.5 (D.N.H. 2021). But that Court took judicial notice of the fact that "Coronavirus Reporter" "share[d] its corporate name" with "Coronavirus Reporter Corporation." *Id.* at 638. Plaintiffs have not explained how their counsel read this order—as he must do—yet did not confirm his own client's identity. *See* Fed. R. Civ. P. 11(b)(3).

17

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn &
Crutcher LLP

errors before Plaintiffs filed suit—or in any of the dozens of submissions they made in *Coronavirus I*. Indeed, Plaintiffs have not attempted to explain how Mathews, consistent with Rule 11, litigated *Coronavirus I* for years where it was "obvious" that he did not represent *any* actual party. *See id.*

Either Plaintiffs' null entity defense in this case is a lie or Plaintiffs obfuscated their identities in *Coronavirus I* to litigate that case to the Supreme Court on behalf of at least one entity they knew did not exist. The overwhelming evidence indicates that the former is true. But whatever the case may be, Mathews "either failed to conduct the reasonable and factual legal inquiry required under Rule 11, or [] conducted such an inquiry and filed this lawsuit anyway"—and "[i]n either event, . . . no reasonable attorney would have found the complaint to be well-founded." *Lake v. Gates*, 130 F.4th 1064, 1069 (9th Cir. 2025) (cleaned up); *see also Zocaras v. Castro*, 465 F.3d 479, 484 (11th Cir. 2006) ("A trial is not a masquerade party nor is it a game of judicial hide-n-seek where the plaintiff may offer the defendant the added challenge of uncovering his real name" because "Rule 10(a) requires that the name of the parties be disclosed in the complaint [and] Rule 11 forbids lying in pleadings, motions, and other papers filed with the court."). Plaintiffs and their counsel violated Rule 11 and have subjected this Court and Apple to extensive, unwarranted litigation as a result.

**B. Plaintiffs' Conduct Should be Sanctioned Pursuant to the Court's Inherent Authority**

Plaintiffs have not only made specific misrepresentations that violate Rule 11 but also acted in bad faith by filing and defending their frivolous claims. The Court has the inherent power to impose sanctions when a party has engaged in conduct that "constituted or was tantamount to bad faith." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002). This "extends to a full range of litigation abuses," *Chambers v. Nasco, Inc.*, 501 U.S. 32, 46 (1991), including when a "plaintiff initiates a case in complete bad faith." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110 (2017); *see also In re Keegan Mgmt. Co., Sec. Lit.*, 78 F.3d 431, 435 (9th Cir. 1996) (stating that "[t]he filing of a complaint may be sanctioned pursuant to . . . a court's inherent power"). Importantly, courts exercise their inherent authority where a plaintiff not only "filed false and frivolous pleadings" that can be "reached by Rule 11" but also improperly attempted to "deprive th[e] Court of jurisdiction" and engaged in other "tactics of delay, oppression, [and] harassment." *Chambers*, 501 U.S. at 41. That is what Plaintiffs have done here.

First, Plaintiffs filed this frivolous case without (or in spite of) any reasonable investigation into its merits. Plaintiffs' claims are barred by *res judicata*—obviously so, *see supra* 10–12—and Plaintiffs' estoppel arguments are baseless, as explained in Apple's reply in support of its motion to dismiss, Dkt. 62 at 5–10. Plaintiffs' claims also are meritless because they fall prey to the same, threshold flaws this Court adjudicated, and the Ninth Circuit affirmed, in *Coronavirus I*. *See* Dkt. 62 at 10–16. Indeed, Plaintiffs' opposition to Apple's motion to dismiss rehashes many of the same arguments, concerning the same theories of liability, that were advanced, considered, and rejected in *Coronavirus I*. *Compare, e.g.*, Dkt. 63 at 9–15 (standing), 15–18 (tying), 20 (refusal to deal), 21–22 ($99 fees), 22–23 (essential facilities), 24–25 (UCL), *with Coronavirus I*, Dkt. 57 at 11–12 (standing), 13–16 (tying), 8–10 (refusal to deal), 8–11 ($99 fees), 10–11 (essential facilities); Dkt. 53 at 1–2 (UCL). This is thus the "exceptional case" in which "a plaintiff initiates a case in complete bad faith," and "all [of Apple's] legal expenses in the suit [have been] caused solely by [Plaintiffs'] fraudulent and brazenly unethical efforts." *Goodyear Tire & Rubber Co.*, 581 U.S. at 110–11 (cleaned up).[4]

Second, Plaintiffs filed this case in Wyoming for the express purpose of evading this Court's jurisdiction, where they knew their claims were foreclosed by the Ninth Circuit's binding precedent. Dkt. 1 ¶ 127. They did so despite agreeing to a forum-selection clause to litigate in this Court. *Id.*; *see also Coronavirus Reporter*, 560 F. Supp. 3d at 638–42 (applying forum-selection clause in DPLA and transferring case to the Northern District of California); *Primary Prods. LLC v. Apple Inc.*, 2021 WL 3610507, at *1–2 (D. Me. Aug. 13, 2021) (same). And when Apple sought to invoke that clause, Plaintiffs even tried to move the case to another jurisdiction, *see* MDL No. 3113, Dkts. 124, 133 (J.P.M.L.), despite having no real defense to the enforceability of the parties' agreement, *see* Dkt. 44 at 5–11. By "hav[ing] the case assigned to a new judge who would be unfamiliar with the protracted history of th[e] litigation," *Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010), Plaintiffs betrayed their intent to assault the "central" purpose of civil courts, "the conclusive resolution of disputes." *Montana*, 440 U.S. at 153–54.

---

[4] At a minimum, the Court should award Apple its fees incurred in filing its motion to dismiss and all subsequent filings—all of which were incurred after Apple informed Plaintiffs that their "null entity" argument was frivolous and sanctionable.

Gibson, Dunn & Crutcher LLP

ER 196

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Third, Plaintiffs have amplified the problem posed by this frivolous case through "a series of meritless motions and pleadings and delaying actions." *Chambers*, 501 U.S. at 38. For example, Plaintiffs responded to Apple's motion to transfer venue with a combined opposition and "cross-motion for judicial estoppel," Dkt. 39, that sought to preempt Apple from arguing *res judicata*—which Judge Skavdahl rightly refused to consider. Dkt. 41. Then, without warning, Plaintiffs asked the Clerk to enter default against Apple even though they had no basis for doing so and violated the Court's Professionalism Guidelines in the process. *See* Dkt. 57 at 4. And now, Plaintiffs have tried to forestall dismissal with a "null entity defense" that is pretextual, false, and asserted in bad faith. *See supra* 15–18. That "abuses the judicial process," *Chambers*, 501 U.S. at 44–45, and sanctions are needed to "put[] 'an end to [plaintiffs'] continued misuse of the federal court system.'" *Kunimoto*, 26 F. App'x at 633; *see also Lahiri*, 606 F.3d at 1221–23 (affirming sanctions under court's inherent authority for frivolous copyright claim that "even a cursory investigation" would have revealed to be without merit); *City of Santa Clarita v. U.S. Dep't of the Interior*, 249 F. App'x 502, 505 (9th Cir. 2007) (affirming sanctions under district court's inherent authority when plaintiffs brought claims barred by res judicata and where "plaintiffs had engaged in a series of unwarranted and harassing legal and administrative proceedings over many years"); *Indiezone, Inc. v. Rooke*, 720 F. App'x 333, 337 (9th Cir. 2017) (upholding inherent authority sanctions where "appellants had submitted multiple misleading and false declarations and fraudulent documents in bad faith in order to create a sham plaintiff").

**C. Plaintiffs' Counsel's Conduct Should Be Sanctioned Under 28 U.S.C. § 1927**

The Court also should sanction Mathews under 28 U.S.C. § 1927. Section 1927 authorizes sanctions against "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. This requires an attorney to act with "recklessness or [in] bad faith." *Barber v. Miller*, 146 F.3d 707, 711 (9th Cir. 1998). Mathews has done so here.

In the first place, Mathews unreasonably protracted this litigation by filing this case. Sanctions are appropriate "when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Keegan*, 78 F.3d at 436. As explained above, there is incontrovertible proof that Mathews was at least reckless in filing frivolous claims (*see supra* 10–15) and sought to harass Apple as he did so (*see supra* 12–15). Either suffices, as it is beyond

Gibson, Dunn & Crutcher LLP

20

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

dispute that Mathews has "multipl[ied] proceedings" as a result. *See, e.g.*, *In re Peoro*, 793 F.2d 1048, 1051 (9th Cir. 1986) (affirming award of attorney fees under § 1927 where complaint was "barred by the doctrine of *res judicata* and [was] undoubtedly unmeritorious in the first instance"); *Trulis v. Barton*, 107 F.3d 685, 692 (9th Cir. 1995) (finding abuse of discretion where district court declined to impose sanctions under § 1927 for "maintenance of [a] suit" when plaintiff was "well aware" that it was precluded); *Vedatech, Inc. v. St Paul Fire & Marine Ins. Co.*, 2005 WL 1513130, at *16–17 (N.D. Cal. June 22, 2005) (finding bad faith and imposing sanctions under § 1927 where a party ignored its opponents' "repeated[] and clear[]" explanation that their claim was foreclosed by precedent).

Although that is enough to warrant sanctions, there is much more. Beginning in *Coronavirus I*, Mathews signed his name to several frivolous filings. He moved for *two* sweeping preliminary injunctions without *any* evidentiary support—the second occurring *after* Apple had cited authority demonstrating this was a fatal failure. *Coronavirus I*, Dkts. 20, 32, 52. Plaintiffs sought to "strike" Apple's motion to dismiss, claiming it "fail[ed] to meet the heightened pleading standards of *Twombly/Iqbal*," *Coronavirus I*, Dkt. 51 at 3—a nonsensical argument that proliferated briefing on Apple's straightforward motion to dismiss. *See Coronavirus I*, 2021 WL 5936910, at *18. After the Court granted Apple's motion to dismiss, Mathews filed a motion for reconsideration that ignored the requirements for such a motion while also falsely accusing Apple's attorneys of "witness intimidation." *Coronavirus I*, Dkt. 87 at 17. Mathews' misconduct has continued in this case: Apple had to file a motion to transfer to enforce a forum-selection clause Mathews knew existed and was binding on Plaintiffs (Dkt. 19), oppose Plaintiffs' meritless attempt to transfer this case into an MDL (Dkt. 28), disabuse an improper motion about judicial estoppel (Dkt. 40), move (over Plaintiffs' objection) for a briefing schedule on the transfer motion (Dkts. 38, 39), and oppose a needless attempt to enter default (Dkt. 57). And now, Plaintiffs are prolonging this case through a vexatious "null entity" defense. *See supra* 15–18.

The resulting burdens on the federal courts generally and this Court specifically, and Apple, have been significant. Between *Coronavirus I* and *Coronavirus II* alone, the docket now stretches across 197 entries—and going. Kleinbrodt Decl. ¶ 11. While Mathews has not prevailed on a substantive motion even once, Apple has spent considerable resources defending against them. *Id.* ¶¶ 10–11. And eight separate courts (and counting) have now taken time away from their busy dockets to deal

Gibson, Dunn & Crutcher LLP

21

with Plaintiffs' prolific submissions. *See id.* Sanctions under Section 1927 are more than warranted. *See In re Peoro*, 792 F.3d at 1052 (imposing monetary sanctions against serial litigant who had brought repeated frivolous claims in various bankruptcy proceedings).

### D. The Court Should Award Fees, Revoke Mathews' Admission, and Enjoin Plaintiffs

By rule, statute, and inherent authority, the Court has wide discretion to impose a variety of sanctions. *See Cooter & Gell*, 496 U.S. at 407. Here, the Court should impose three: attorneys' fees to compensate Apple for the cost of defending against Plaintiffs' frivolous and vexatious claims; revocation of Mathews' *pro hac vice* admission; and a pre-filing injunction against Plaintiffs.

**1.** The Court should award Apple reasonable fees for the entirety of its defense in this case. The Court may order Plaintiffs and Mathews to pay these fees under Rule 11 and its inherent authority, and it may further order Mathews to do so pursuant to Section 1927. *See Cooter & Gell*, 496 U.S. at 406–07 (Rule 11); *Chambers*, 501 U.S. at 45 (inherent authority); *Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1293–94 (9th Cir. 2015) (Section 1927). Apple is entitled to the entirety of its fees in defending this case. As the Supreme Court explained in *Goodyear*, "[i]f a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may again make a blanket award." 581 U.S. at 110; *see also Michel v. City of Santa Rosa* 601 F. App'x 466, 468 (9th Cir. 2015) (same under Rule 11). That is the case here: Plaintiffs brought *Coronavirus II* in bad faith from its inception—asserting claims and factual assertions that any reasonable party would know were frivolous—and this case only persists because of Plaintiffs' most recent "null entity" ruse. *See supra* 15–18.

Here, Apple respectfully requests $400,000 for which Plaintiffs and Mathews should be jointly and severally liable (or, if the Court finds sanctions appropriate only under § 1927, then payable by Mathews and his firm, Associated Attorneys of New England). *See Gaskell*, 10 F.3d at 629 ("[A]ll attorney fees reasonably incurred in defending against the claims asserted in the complaint form the proper basis for sanctions."). That amount is below what Apple has in fact spent defending this case alone, and it does not even account for the significant costs it has borne to defeat Plaintiffs' claims in the cases Plaintiffs brought before this one. Kleinbrodt Decl. ¶¶ 10–11. Such fees are reasonable in light of counsel's experience, expertise, and the number of briefs counsel has had to prepare in this

Gibson, Dunn & Crutcher LLP

22

case (and in other, related cases) as a result of Plaintiffs' litigation tactics. *Id.*; *see Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1158 (9th Cir. 2024) (imposing over $197,000 in sanctions on attorneys under § 1927); *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 652 & n.4 (7th Cir. 1992) (imposing over $440,000 in sanctions under Rule 11); *Lahiri*, 606 F.3d at 1222–23 (awarding over $250,000 in attorney fees and costs as sanction under court's inherent authority).[5]

**2.**  The Court also should revoke Mathews' admission *pro hac vice* pursuant to its inherent authority and Rule 11.  *See* Fed. R. Civ. P. 11(c)(1) (authorizing courts to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11] or is responsible for the violation"); *Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir. 1996) (noting that district judges "have an arsenal of sanctions they can impose for unethical behavior" including "the disqualification of counsel").  In seeking admission, Mathews warranted to the Court that he would "abide by the Standards of Professional Conduct" and "become familiar with the Local Rules."  N.D. Cal. L.R. 11-3(a)(2).  He has violated those obligations time and again.  *See, e.g.*, Dkt. 57 at 4 (explaining Mathews' failure to abide by Rules of Professional Conduct in requesting entry of default); *supra* 2–3 (listing Mathews' repeated refusal to abide by Local Rule requiring submission of corporate-disclosure information).

Mathews now has a lengthy record demonstrating his inability or unwillingness to comport himself with the professional standards required by this Court.  Even after an early admonishment "caution[ing] [Mathews] about the use of *ad hominem* references to opposing counsel," *Primary Prods.*, No. 2:21-cv-00137, Dkt. 19 (D. Me. July 20, 2021), Mathews' filings have remained filled with invective.  *See, e.g.*, *Coronavirus I*, Dkt. 17 at 3 (accusing Apple of "fraud on the Court"); *Coronavirus I*, Dkt. 87 at 17, 25 (accusing Apple of "witness intimidation").  Mathews has likewise shown consistent disregard for the Court's Local Rules and Guidelines for Professional Conduct—despite Apple repeatedly directing him to them.  Exs. 1, 5.  And he has propagated Plaintiffs' false representations, including most recently its "null entity" defense that he knows is baseless given his self-described position as "CLO" of Coronavirus Reporter.  Ex. 3; *see also* Dkt. 62-4 (annual report identifying Mathews as "Treasurer or Fiscal Agent" of Coronavirus Reporter Corporation).  Because "[t]he Court has no

---

[5] If the Court prefers that Apple further substantiate the amount of its fees or their reasonableness, Apple is prepared to submit a more detailed application.

23

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn &
Crutcher LLP

assurance that [Mathews] will stop making statements in court filings that are at best disingenuous, that [Mathews] will practice with care, or that he will comply with Court Orders and the Local Rules," the Court should revoke his admission. *Methven & Assocs. Pro. Corp. v. Paradies-Stroud*, 2013 WL 12187701, at *1 (N.D. Cal. Dec. 19, 2013); *see also Robles v. City of Berkeley*, 820 F. App'x 529, 531 (9th Cir. 2020) (affirming district court's exercise of discretion to revoke *pro hac vice* admission in the interest of the "ethical and orderly administration of justice").

**3.**  Pursuant to its inherent authority and the All Writs Act, 28 U.S.C. § 1651, the Court also should impose a pre-filing injunction on Plaintiffs, Mathews, and Isaacs.  *See In re Hartford Textile Corp.*, 681 F.2d 895, 897 (2d Cir. 1982) ("The equity power of a court to give injunctive relief against vexatious litigation is an ancient one which has been codified in the All Writs Statute, 28 U.S.C. § 1651(a).").  To deem someone a vexatious litigant and enter an attendant injunction, the Court must ensure: "(1) the plaintiff is given adequate notice and an opportunity to oppose the order; (2) the Court compiles an adequate record for review; (3) the Court makes substantive findings as to the frivolous or harassing nature of the litigant's actions; and (4) the order is narrowly tailored to closely fit the specific vice encountered." *Missud v. Nevada*, 861 F. Supp. 2d 1044, 1055 (N.D. Cal. 2012) (Chen, J.) (citing *De Long v. Hennessey*, 912 F.2d 1144, 1145–48 (9th Cir. 1990).  The notice requirement is satisfied with the filing of this motion as the Court already has before it "a listing of all the cases and motions that [should] le[ad] the district court to conclude that a vexatious litigant order was needed." *Ringgold -Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1062 (9th Cir. 2014).   And the other requirements for such an injunction—which turn on "both the number and content of the filings as indicia of the frivolousness of the litigant's claims," *Missud*, 861 F. Supp. 2d at 1057 (citation omitted)—are easily met.

As the Ninth Circuit has explained, a "general pattern of litigation in a particular case may be vexatious enough to warrant an injunction in anticipation of future attempts to relitigate old claims." *Wood v. Santa Barbara Chamber of Com.*, 705 F.2d 1515, 1524 (9th Cir. 1983); *see also De Long*, 912 F.2d at 1148 ("Flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.").  Here, Plaintiffs have "shown [their] intention continually to relitigate claims that have been previously dismissed." *Wood*, 705 F.2d at 1523–24.  After this Court dismissed Plaintiffs'

24

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

claims, Mathews filed a copycat case in Florida, which he dismissed as soon as it was transferred to this Court. *Coring*, Dkt. 49. Isaacs similarly filed a meritless motion to reopen *Coronavirus I* after the Ninth Circuit affirmed this Court's decision, *Coronavirus I*, Dkt. 118, the denial of which is now the subject of yet another Ninth Circuit appeal, *Coronavirus I*, Dkt. 130. And, of course, Plaintiffs have now brought *Coronavirus II* even though it is barred by *res judicata*. The point is unmistakable: Plaintiffs will not stop suing Apple—ignoring this Court's prior judgment—unless and until they are enjoined from doing so. *See Missud*, 861 F. Supp. 2d at 1060 ("Without question, successive complaints based upon propositions of law previously rejected may constitute harassment under Rule 11.").

That injunction should enjoin Plaintiffs, Mathews, and Isaacs from suing Apple in any federal court. A nationwide injunction is necessary given Plaintiffs' extraordinary history of forum shopping: They have filed cases in five federal district courts, repeatedly admitting to filing outside this district to avoid the preclusive effects of this Court's ruling in *Coronavirus I*. *Coring*, Dkt. 1 ¶ 105; Dkt. 1 ¶ 127. Under the extraordinary circumstances here, an injunction limited to this district would only encourage continued forum-shopping; a nationwide injunction is needed to afford Apple complete relief from Plaintiffs' improper harassment. *See Woodhouse v. Meta Platforms*, 704 F. Supp. 3d 502, 505 (S.D.N.Y. 2023) (imposing nationwide pre-filing injunction because of vexatious litigant's "history of filing frivolous lawsuits" in district courts around the country and "making fantastical claims" against defendants and their attorneys); *Perlmutter v. Varone*, 2022 WL 1443426, at *4 (E.D. Pa. May 6, 2022) (same because plaintiffs had "filed frivolous suits in multiple districts"). And the injunction also should bind not only the *Coronavirus II* plaintiffs but also Mathews, Isaacs, and any entity owned by or affiliated with Isaacs in light of their repeated use of affiliated entities as stalking horses for Isaacs himself. *See Woodhouse*, 704 F. Supp. 3d at 505 (noting vexatious litigant's "use of [a corporation] as a vehicle for such specious litigation").

## V.    CONCLUSION

Sanctions are needed to discourage further abuse of the judicial system and to compensate Apple for the cost of litigating and relitigating Plaintiffs' frivolous claims. Apple respectfully requests that the Court: (1) impose $400,000 in joint and several compensatory sanctions; (2) revoke Mathews' *pro hac vice* admission; and (3) impose a pre-filing injunction.

25

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Gibson, Dunn & Crutcher LLP

DATED: May 30, 2025                    Respectfully submitted,

                                       GIBSON, DUNN & CRUTCHER LLP


                                       By: /s/ *Rachel S. Brass*
                                           Rachel S. Brass

                                           RACHEL S. BRASS
                                           rbrass@gibsondunn.com
                                           Julian W. Kleinbrodt
                                           jkleinbrodt@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
                                           One Embarcadero Center
                                           Suite 2600
                                           San Francisco, California  94111-3715
                                           Telephone:      415.393.8200
                                           Facsimile:      415.393.8306

                                       *Attorneys for Apple Inc.*

Gibson, Dunn &
Crutcher LLP

ER 203

DEFENDANT APPLE INC.'S MOTION FOR SANCTIONS
CASE NO. 3:24-CV-08660

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>      Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>      Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' MOTION FOR RULE 12(d) CONVERSION AND LEAVE TO FILE SUR-REPLY**<br><br><br>Date: July 10, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

ER 204

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A LIMITED SUR-REPLY AND TO CONVERT DEFENDANT'S RULE 12(b)(6) MOTION AS ONE FOR SUMMARY JUDGMENT UNDER RULE 12(d)**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Civil Local Rule 7-3(d), Plaintiffs hereby respectfully move this Court for an order granting leave to file the attached proposed Sur-Reply (attached hereto as Exhibit A) in response to Defendant Apple Inc.'s Reply in Support of its Motion to Dismiss (Dkt. No. 64).

Pursuant to Federal Rule of Civil Procedure 12(d), Plaintiffs further request that, because Apple's Reply relies on materials outside the pleadings—including over $20billion of disputed Annual Developer, link-tax, and CTF fees, accrued between 2022 and 2025, and fresh (disputed) factual assertions regarding corporate ownership and privity—the Court (i) treat Apple's Rule 12(b)(6) motion as one for summary judgment, or, in the alternative, (ii) strike or disregard those extra-pleading materials until the parties have had an opportunity for discovery consistent with Rule 56(d).

Plaintiffs request that this Motion be heard at the Court's earliest convenience, or at such date and time as may be set by the Court. The underlying motion is scheduled for July 10, over six weeks from now. This motion is timely filed under the same time allocation granted to Apple's Reply. This motion may be heard in consolidation with Apple's motion, or adjudicated earlier to streamline the hearing process. This Motion is based upon this Notice, the Memorandum of Points and Authorities below, the attached proposed Sur-Reply (Exhibit A), the pleadings and papers on file, and any further evidence or argument the Court may receive.

This combined request promotes judicial economy by ensuring that the Court and the parties address the evidentiary posture of Apple's motion in a single, orderly proceeding.

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................................. **1**

**INTRODUCTION** ............................................................................................................................. **1**

**LEGAL STANDARD** ....................................................................................................................... **2**

**ARGUMENT** .................................................................................................................................... **3**

I.   APPLE'S MOTION AND REPLY ARE REPLETE WITH DIRECT OR UNDERLYING FACTUAL ASSERTIONS THAT TRIGGER RULE 12(D). ................................................................................................................. 3

II.   RELEVANT MARKET DEFINITIONS DESERVE FURTHER EXPERT SCRUTINY ................................... 6

III.   RES JUDICATA ARGUMENTS IGNORE FOUR YEARS OF NEW CONDUCT .................................... 9

IV.   NEWLY-RAISED *BEVERAGE* CITATION DOES NOT DEFEAT VALID UCL CLAIMS ............................... 11

*The UCL "Unlawful" Prong Precisely Captures Apple's Ongoing Malicious Compliance; The FAC Precedes Microsoft amicus and Hagens Berman Class Action by One Year* ........................................ *13*

**CONCLUSION** .............................................................................................................................. **16**

**CERTIFICATE OF SERVICE** ....................................................................................................... **16**

## TABLE OF AUTHORITIES

### CASES

*Amadeo v. Principal Mut. Life Ins. Co.*,
290 F.3d 1152, 1159 (9th Cir. 2002) ................................................................................. 11

*Beverage v. Apple Inc.*,
93 Cal. App. 5th 1049 (2023) ........................................................................................... 11

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982)............................................................................................................ 8

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163, 187 (1999) .............................................................................................. 12

*Dale v. S & S Builders, LLC*,
188 P.3d 554, 559-60 (Wyo. 2008) .................................................................................. 13

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155, 173 n.19 (2004).......................................................................................... 15

*Hamilton Materials, Inc. v. Dow Chem. Corp.*,
494 F.3d 1203, 1207 (9th Cir. 2007) .................................................................................. 2

*Hennegan v. Pacifico Creative Serv., Inc.*,
787 F.2d 1299, 1301 (9th Cir. 1986) ................................................................................ 10

*Hill v. Opus Corp.*,
841 F. Supp. 2d 1070, 1082 (C.D. Cal. 2011) .................................................................... 2

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
11 F.3d 1460 (9th Cir. 1993) .............................................................................................. 9

*Kaiser Found. v. Abbott*,
552 F.3d 1033, 1042-43 (9th Cir. 2009).............................................................................. 9

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988, 999 (9th Cir. 2018) ...................................................................................... 6

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal.4th 1134, 1148 (2003) ........................................................................................... 14

*Kwikset Corp. v. Super. Ct.*,
51 Cal. 4th 310, 322-323 (2011)........................................................................................ 14

*Lawlor v. National Screen Service Corp.*,
349 U.S. 322 (1955)......................................................................................................... 9,15

*Lee v. City of Los Angeles*,
250 F.3d 668, 688 (9th Cir. 2001) ................................................................................... 2, 4

*MetroNet v. Qwest*,
383 F.3d 1124, 1131-33 (9th Cir. 2004)............................................................................. 8

*Nationwide Biweekly Admin., Inc. v. Superior Ct.*,
9 Cal. 5th 279, 303 (2020)................................................................................................ 12

*New Hampshire v. Maine*,
532 U.S. 742, 749-51 (2001) ............................................................................................ 13

*Nilsson v. Louisiana Hydrolec*,
854 F.2d 1538, 1548 (9th Cir. 1988) .................................................................................. 6

*Provenz v. Miller*,
102 F.3d 1478, 1483 (9th Cir. 1996) .................................................................................. 2

*Pure Sweat Basketball v. Apple*,
No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025) ...................................................... 15

*Retlaw Broad. Co. v. NLRB*,
   53 F.3d 1002, 1005 n.1 (9th Cir. 1995) ................................................................................. 6
*Rubert-Torres v. Hospital San Pablo*,
   205 F.3d 472, 475-76 (1st Cir. 2000) ................................................................................... 2
*SaurikIT, LLC v. Apple Inc.*,
   2023 WL 8946200 (9th Cir. Dec. 28, 2023) ......................................................................... 9
*SEC v. Sabrdaran*,
   252 F. Supp. 3d 866, 889 (N.D. Cal. 2017) .......................................................................... 2
*United States v. Dreyer*,
   804 F.3d 1266, 1277 (9th Cir. 2015) ................................................................................... 12
*United States v. Ritchie*,
   342 F.3d 903, 907 (9th Cir. 2003) ........................................................................................ 3
*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321, 338 (1971) ..................................................................................................... 11

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

## INTRODUCTION

Apple's over-loaded[1] Rule 12(b)(6) motion rests on a host of disputed facts outside the pleadings and factual incongruities Apple is judicially estopped from advancing. It asks the Court—on a paper record—to extinguish a comprehensive developer class action that challenges the most profitable monopoly in history for ongoing, industry-wide exclusionary conduct. This DOJ-complaint based antitrust/developer-protection lawsuit alleges that Apple weaponizes its notarization gate to censor scientists, publishers, and developers broadly, retaliates against antitrust complainants (conduct the *Epic* court found credible enough to label "developer intimidation"); and openly defies regulatory orders—so brazenly that it was found in civil contempt earlier this month. Dismissing such claims on a pleading technicality before discovery would squander the Court's prior investment in understanding Apple's platform practices (*Epic*, *CR I*) and risk compounding the "Big Tech oligarchy" concerns President Biden identified as a national priority in his farewell speech. A measured Rule 56 process, by contrast, will elucidate the issues through targeted discovery, allow the parties and the Court to compile a coherent evidentiary record, and preserve appellate review on a full, not piecemeal, foundation.

Pursuant to Civil Local Rule 7-3(d), Plaintiffs respectfully request leave of the Court to file the attached proposed Sur-Reply (attached hereto as Exhibit A) in response to Defendant Apple Inc.'s Reply in Support of its Motion to Dismiss (Dkt. No. 64). Plaintiffs seek leave because Apple's Reply raises significant new arguments, inaccurately characterizes Plaintiffs' claims, and introduces previously unmentioned legal authority and factual matters not raised in Apple's original Motion to Dismiss (Dkt. No. 50).

In addition, Rule 12(d) mandates that a motion to dismiss "must" be converted to one for summary judgment when matters outside the pleadings are presented and not excluded. Apple's Reply attaches and relies upon documents never referenced in, or integral to, the First Amended Complaint—e.g., outdated Wyoming corporate filings, internal counsel e-mail chains, and contested assertions regarding ownership and control of the plaintiff entities. (See Reply at 3–6 & Exs. 1-6.) Ninth Circuit precedent holds that such

---

[1] Apple's Reply introduces over fifteen new cases, and advances over one hundred conceptually independent arguments. This extraordinary density is atypical even for complex antitrust cases. In a Reply, sandbagging new arguments is especially improper, and warrants striking the document or deferring this motion until thorough discovery has concluded for all relevant issues.

submissions trigger conversion or exclusion. See *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Rubert-Torres v. Hospital San Pablo*, 205 F.3d 472, 475-76 (1st Cir. 2000). Accordingly, Plaintiffs respectfully request that the Court either (a) convert the motion and allow targeted discovery under Rule 56(d), or (b) exclude the extra-record evidence; if the Court elects the latter course, the attached Sur-Reply is necessary to rebut Apple's newly injected factual matter and legal authorities.

Granting this limited relief accords with the strong public interest in adjudicating, on a complete factual record, claims that challenge the competitive practices of the world's largest corporation—especially where the same defendant has recently been found in contempt for withholding material information and providing misleading testimony in related antitrust litigation. Resolving Apple's Rule 12(b)(6) motion on an incomplete and contested factual predicate would risk premature dismissal of issues central to the competitive integrity of the smartphone ecosystem.

## LEGAL STANDARD

If matters outside the pleadings are submitted, the motion must be treated as one for summary judgment under Rule 56. See *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007).

Under Civil Local Rule 7-3(d), once a reply brief has been filed, "no additional memoranda, papers or letters may be filed without prior Court approval," except under specific, enumerated circumstances. Courts in this District routinely grant leave to file a sur-reply when the moving party's reply brief raises new arguments, new authorities, or mischaracterizes prior filings, which the non-moving party has had no opportunity to address. See, e.g., *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1082 (C.D. Cal. 2011) (holding a district court may allow a surreply when the moving party in a reply brief introduces new arguments or evidence); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (affirming district court's consideration of a sur-reply filed in response to new issues raised in reply).

Granting leave to file a sur-reply ensures fairness, promotes judicial efficiency, and facilitates a fully informed decision on the merits. See *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 889 (N.D. Cal. 2017). Such leave is appropriately granted when a party would otherwise lack an adequate opportunity to respond to new and potentially dispositive arguments raised for the first time in a reply brief. Id.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

## ARGUMENT

**I.     APPLE'S MOTION AND REPLY ARE REPLETE WITH DIRECT OR UNDERLYING FACTUAL ASSERTIONS THAT TRIGGER RULE 12(D).**

Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment."  A defendant may not rely on extra-pleading evidence to dispute the complaint's well-pled allegations while simultaneously seeking the procedural advantages of a Rule 12 dismissal.  Apple has done exactly that.  Its motion and reply contain factual averments, exhibits, and litigational narratives that reach far beyond the four corners of the FAC and beyond documents of which judicial notice is proper.  In substance—if not in label—Apple has already crossed the Rule 56 line and the Court must either (a) exclude the extrinsic material or (b) convert the motion and allow discovery.  See *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

Apple's resources dwarf those of the independent developers and public-interest plaintiffs suing here.  Granting a premature dismissal would reward a defendant already adjudged willing to "reverse-engineer justifications" and "tolerate perjury" to defend its business model.  Apple's is aware of its resources and part of its playbook appears to be wearing down enforcement efforts. This is evidenced by last week's Ninth Circuit stay request that incredulously seems to fault USDJ Gonzales Rogers for Defendant's own civil contempt. Apple's tactics must be uniformly challenged if there is any hope of standing up to this monopoly which opportunistically uses courts, political parties, and nations to preserve the *status quo*. Allowing limited discovery under Rule 56 imposes minimal incremental burden on Apple but affords Plaintiffs a fair chance to prove allegations that, if true, directly affect competition, innovation, and consumer choice for hundreds of millions of Americans. Accordingly, the Court should, pursuant to Rule 12(d), convert the motion into one for summary judgment and set an orderly discovery schedule.  Anything less would risk dismissing a serious challenge to a single company that controls the global internet, without the factual transparency that justice and the public interest demand.

Apple now argues for the first time that it "proceeded throughout the [2021] litigation on the express assumption that the 'Wyoming Corporation' that wrote the 'Coronavirus Reporter' app was 'Coronavirus Reporter Corporation.'" (Reply Br. at 3.) This belated – and highly inconsistent – assertion constitutes a

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

significant factual representation that necessarily exceeds the scope of a Rule 12(b)(6) motion. A motion to dismiss under Rule 12(b)(6) must be decided based solely on the facts as pled in the complaint and judicially noticeable materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Apple's attempt to introduce extrinsic factual allegations—its purported "express assumption"—not only definitively transforms its Rule 12 motion into one for summary judgment under Rule 56, but it further highlights how Apple's subjective belief regarding the identity of the plaintiffs in *Coronavirus I* is sharply disputed, by their own divergent statements, and cannot be resolved on the pleadings. Defendant's assertion is not found anywhere in the Complaint or judicially noticeable documents. It is certainly not found, nor consistent, with an assertion made to the Ninth Circuit. It is clearly a new factual assertion, reliant upon internal beliefs or unexpressed assumptions about Apple management. By making this statement, Apple places at issue facts about its internal litigation assumptions, intentions, and understandings. This is exactly the kind of assertion that would typically require affidavits, depositions, discovery, or at least a factual hearing to resolve.

The Reply rings of rationalizations that the CAND court has seen in recent weeks with this same Defendant. Apple's pronouncement is not a legal argument drawn from the FAC; it is a brand-new factual claim about Apple's own state of mind[2]. And it flatly contradicts the position Apple and Gibson Dunn championed in the Ninth Circuit, where they told the panel that no 'Coronavirus Reporter' entity existed and that, if that named Plaintiff somehow prevailed, there would be no one to whom damages could be paid. Apple cannot have it both ways. Either the "mis-spelling" was so trivial that Gibson Dunn's jurisdictional footnote was a calculated attempt to discredit the Plaintiffs, tip the appeal, and/or avoid paying a judgment, or the original footnote was accurate—meaning Apple's present story is contrived. There are no other reasonable possibilities. Resolving which of those two mutually exclusive narratives is true turns on internal

---

[2] Apple further argues that because "scores" of litigation filings exist in *Coronavirus Reporter*, the plaintiffs must have properly existed as legal entities. This reasoning is fundamentally flawed. Defects in party identification are routine in American jurisprudence and regularly lead to the nullification of litigation and judgments. Courts nationwide dismiss or nullify actions and citations every day due to failures to properly identify legal entities or parties. The volume of filings does not cure a fundamental defect in party identification. Identification is a basic tenet in litigation, critical for jurisdiction and enforceability. Apple's new factual allegation about its own "express assumption" implicitly concedes that the precise identity of "Coronavirus Reporter" was indeed contested and unclear during the underlying litigation.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

emails, litigation memoranda, and witness testimony that lie well beyond the pleadings. The contradiction also echoes the misconduct catalogued in *Epic v. Apple*, where Judge Gonzales Rogers found Apple had "reverse-engineered, litigation-ready justifications" and Gibson Dunn tolerated "lies on the witness stand" to defend the very business practices at issue here. Given that history, Apple's new 'we always assumed CRC existed' assertion only demonstrates why a Rule 12(b)(6) dismissal would be improper: the Court must permit discovery to test Apple's credibility before it can credit any story about who was—or was not—believed to be Plaintiff in *CR I*. The Court must thus reject Apple's belated factual assertions as procedurally improper and substantively disputed, or else afford Plaintiffs a fair opportunity for discovery and an evidentiary determination as required under Rule 56. In any case, as detailed in the proposed Sur-Reply, this case is a comprehensive developer lawsuit for significant post-2022 conduct. Apple conflates the importance of the purported identity between Plaintiffs; even if discovery somehow proved Apple's new position[3], the substantial Class Action Developer Compensation Fund would be largely unaffected (a pro se developer's share of App Version 1.0 damages would be carved out; it is a negligible piece of the prayer for relief).

In its reply Apple quotes (and characterizes) private e-mails between Gibson Dunn and Plaintiffs' counsel to argue that Plaintiffs "conceded" certain corporate-identity points. Private communications are obviously outside the pleadings; Apple uses them to create a factual narrative about what both sides "understood" or "assumed." Those are disputed inferences, improper on a motion to dismiss. Apple also states as fact that CRC's programmer "owns" or "controls" each plaintiff, that he is the "sole officer," and thus that every entity is in privity with him for res-judicata purposes. None of that appears in the complaint; it depends on corporate minutes, stock ledgers, and other evidence Plaintiffs have never had a chance to test. It is also not true and doesn't reconcile Apple's divergent statements on Dr. Roberts' ownership and control. Party-identity and privity issues necessarily turn on record evidence, not facial pleading. Moreover, Apple seems to improperly suggest that these entities are shell corporations meant to cloak litigation. That is unfair, and untrue. All corporations were founded by differing shareholders between 2012-2016, long before this litigation existed. They developed unrelated apps, each encountering development fees approaching hundreds of thousands of dollars, and/or months or years of work by differing owners, had apps used by

---

[3] Undersigned counsel is prepared to submit corporate documentation, at the Court's request, showing shareholder diversity and business activity clearly distinguishing the different entities.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

millions of distinct users, and so forth. This is not the simplistic one-entity litigation Gibson Dunn pretends it is, and that matter alone should press for discovery.

The Ninth Circuit permits notice of public records only for "the existence of the document, not for the truth of the matters asserted." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Apple relies on a jumble of mis-placed quotations and auxiliary documents to establish the truth of disputed facts (e.g., that EU CTF fees don't impact US developers, that Dr. Roberts was ever an officer of CRC, that annual transactions don't accrue new harms to DPLA signatories, etc.). That exceeds the Rule 12 boundary and triggers Rule 12(d).[4] Plaintiffs respectfully request that the Court exclude all material beyond the pleadings and decide the motion strictly on the FAC and documents properly incorporated therein or convert Apple's Rule 12(b)(6) motion to one for summary judgment under Rule 56, defer ruling, and set a discovery schedule so that Plaintiffs may rebut Apple's factual assertions. Apple cannot have it both ways—using evidentiary matter to attack the complaint while insisting on the narrow Rule 12(b)(6) lens.

## II.    RELEVANT MARKET DEFINITIONS DESERVE FURTHER EXPERT SCRUTINY

Apple's over-loaded Reply purports that the FAC's four markets 'fail' – even the government's smartphone market – because the "smartphone device market is not relevant here." And its reasoning, if it can be called that, relies upon a wholly disingenuous reading of Supreme Court *McCready* standards, along with baseless criticism of a straightforward truism that "[n]othing in the FAC states or implies that every mention of 'market' is a standalone antitrust market." The Reply is part and parcel of an attempt to over-complicate this proceeding via dozens of new case references and densely packed but thinly argued assertions, which Plaintiffs estimate to exceed over one-hundred distinct conceptual arguments in a fifteen paged double-spaced Reply, which consistently violates *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995). See also *Nilsson v. Louisiana Hydrolec*, 854 F.2d 1538, 1548 (9th Cir. 1988) (issues not "specifically and distinctly argued" are waived).

---

[4] The Reply alleges "knots" in Plaintiffs arguments, but ironically it is Apple and opposing counsel who are tied in knots trying to escape the very simple jurisdictional defect they pointed out to the Ninth Circuit in 2022. Cross-allegations of "gamesmanship" only raise the obvious question: why did opposing counsel wait to raise a critical naming defect discovery to the USCA, when its client had the "express assumption" that there was no naming defect? These are not trivial matters, and need to be investigated, particularly if they represent a pattern of misrepresentation.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

In order to reduce the burden of Apple's congested MTD, Plaintiffs submit to the Court that although four relevant markets have been pled, all causes of action could survive under the guidance of the DOJ-defined smartphone market. The remaining markets – for Apps, App Stores, and Notary Stamps, have been pled out of an abundance of caution and in efforts to define a comprehensive developer class action complaint. Experts will debate these in due course, but the Court should rest assured that the DOJ's Smartphone market suffices for stating a claim. The underlying DOJ complaint simply if not elegantly alleges just one relevant foremarket: the smartphone (or alternative performance smartphone). The DOJ pleading infers that a singular smartphone market adequately captures all the anticompetitive conduct alleged (Sherlocking, retaliation, API restrictions, etc) towards consumers and developers. Even if Apple were to succeed in dismissing our additional markets, the primary foremarket is sufficient for the class claims to proceed under leveraging principals. Apple leverages its monopoly in the smartphone market through the profitable and exclusionary practice of notarization. Under *Kodak* and *McCready*, one need not prove that "notary stamps" independently compete or previously existed as a standalone market. Instead, a claim simply needs to show that 1) Apple has monopoly power in smartphones, 2) Apple imposed notarization requirements as an exclusionary practice leveraging that monopoly and 3) Developers and consumers are directly harmed by that exclusionary practice (again, plausibly alleged).

The FAC explicitly describes notarization as an artificial and exclusionary practice, not a genuine product or service for which independent consumer or developer demand would naturally arise. (FAC ¶¶ 295–297. Nonetheless it is now a multi-billion dollar economic reality. Apple "created an artificial demand" for notarization stamps by imposing technological and contractual requirements that no previous smartphone or computing device required. (FAC ¶ 297, 299). Apple leveraged monopoly power in the smartphone market (around 75% U.S. market share) into mandatory notarization requirements, directly harming developers who cannot distribute apps and consumers who cannot freely access software. (FAC ¶ 290–293, 299–305). These allegations suffice under *Kodak* and *McCready*, without separately establishing a fully competitive market for notarization. A leveraging antitrust theory does not strictly require the existence of a fully independent, recognized market for the secondary product or service. Rather, leveraging occurs when a monopolist uses its dominance in one market (e.g., smartphones) to harm competition, exclude rivals, or extract additional

7

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

revenue or control from another product or related practice, even if that second "product" isn't independently competitive or previously existing in commerce.

Hence, even assuming *arguendo* the validity of Apple's critiques on the notarization market, the FAC's leveraging theory serves as a back-stop pursuant to *McCready*. Developers do not need to compete directly in smartphones to have standing. As developers, class members are injured precisely by Apple's leveraging conduct—its mandatory notarization practices (and app store exclusivity)—which block app distribution unless developers acquiesce to Apple's monopolistic demands. Similarly, consumers are harmed by artificially limited app availability and increased prices or diminished quality of apps—classic antitrust injuries. Thus, the FAC describes exactly the type of leveraging conduct and direct harm recognized as actionable antitrust injuries under *McCready* and *Kodak*.

Apple's "back-to-front" critique confuses direction with mechanism. The gravamen of our theory is that Apple wields its entrenched fore-market power (iPhones) both (i) to extract rents in two captive after-markets (App-Store distribution and notarization) and (ii) to preserve that very device monopoly by stifling disruptive apps. That is the archetype of monopoly leveraging the Ninth Circuit described in *Alaska Airlines v. United*—"use of power in Market A to impose restraints in Market B in order either to monopolize B or to reinforce A." 948 F.2d 536, 549 (9th Cir. 1991). Apple's reply seizes only on branch (ii) and claims it is "reverse" leveraging because the challenged restraints lie outside the smartphone market. But *Alaska Airlines*, *Kodak*, and post-*Kodak* decisions—including *MetroNet v. Qwest*, 383 F.3d 1124, 1131-33 (9th Cir. 2004)—make clear that leveraging can proceed in either causal direction so long as the monopolist's conduct in the secondary sphere "tends to entrench or enlarge" its primary monopoly. Id.

Nor does *McCready* help Apple. To be sure, Apple fundamentally misstates the Supreme Court's holding in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). The Supreme Court there conferred standing on a plaintiff injured downstream when Blue Shield used market power in the plan-administration market to punish psychologists and their patients—actors wholly outside the defendant's own market. 457 U.S. 465, 479-80 (1982). What mattered was that Blue Shield's exclusion of psychologists was a reasonably foreseeable and necessary step in protecting its dominance. Id. at 479. Here, the FAC pleads exactly that nexus: Apple's censorship and notarization padlock are the essential instruments by which Apple (a) extracts supra-competitive fees from developers and (b) throttles rival functionality (cloud gaming, super-apps,

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

COVID safety apps) that would lower switching costs and erode iPhone share. FAC ¶¶ 13-15, 266-273, 295-305. Apple's rejection of our COVID tracker was not an "incidental" injury; it was the very means of maintaining the walled garden the DOJ now labels anticompetitive.

Finally, Apple misreads *Brunswick* and *Philip Morris*, after improperly introducing them, along with dozens of other new case citations. Those cases reject claims where plaintiffs suffer only derivative or "ripple" effects unconnected to the challenged restraint. Here, developers are the direct target of Apple's scheme: they are compelled to buy Apple's tied notarization (or pay 30 % commissions) because Apple commands the only lawful path to reach iPhone users. That is classic antitrust injury. See *Kaiser Found. v. Abbott*, 552 F.3d 1033, 1042-43 (9th Cir. 2009) (generics excluded by patented formulations had standing although they did not sell in the monopolized brand-drug market).

In short, the FAC alleges a straightforward leveraging paradigm recognized by *Kodak*, *Alaska Airlines*, and *McCready*: Apple's smartphone monopoly is leveraged through exclusionary notarization and App-Store rules that both monetize and perpetuate that monopoly. Apple's "directionality" objection is therefore no basis for dismissal.

### III.    RES JUDICATA ARGUMENTS IGNORE FOUR YEARS OF NEW CONDUCT

Apple fundamentally misconceives the doctrine of res judicata, misapplies controlling Supreme Court and Ninth Circuit precedents, introduces numerous waived and contradictory arguments, and ultimately seeks to evade meaningful adjudication by exploiting procedural technicalities. Under opposing counsel's theory, Plaintiffs are somehow at fault for accepting—or believing—Apple's own (black letter law) assertion that a party naming defect must be properly cured before jurisdiction may be conferred. The Court should reject Apple's attempt to invoke preclusion against Plaintiffs' current, independently actionable claims under the Sherman Act, particularly given Apple's own previous assertions and the applicable standards under *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955).

In its Reply brief, Defendant Apple Inc. introduces new and previously unmentioned authorities—specifically *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460 (9th Cir. 1993), and *SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023)—to escape that Plaintiffs' *Lawlor* applicable claims; Apple contends the annual $99 Developer Fee constitute the "same conduct" previously litigated. (Reply at 2.) This eleventh-hour argument, conveniently tucked away in a footnote, was not raised

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

in Apple's original Motion to Dismiss, thus depriving Plaintiffs of an opportunity to address these authorities and Apple's interpretation thereof. A Sur-Reply is therefore appropriate to provide the Court with complete briefing on these new and critical issues.

Contrary to Apple's representation, each year's fee constitutes a "newly actionable event," legally and factually distinct from the previous years' fees. Indeed, the Ninth Circuit has explicitly recognized that ongoing periodic payments made pursuant to an evolving contractual or licensing relationship may trigger new actionable claims. See, e.g., *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986) (holding periodic payment obligations constitute separate actionable events for purposes of claim accrual).

Apple's invocation of the "every day is a new day" principle from *Dual–Deck* fundamentally misconstrues the facts and legal circumstances underlying Plaintiffs' claims. *Dual–Deck* concerned the defendants' alleged ongoing anticompetitive conduct—specifically, a conspiracy to prevent the plaintiff from selling its dual-deck videocassette recorders (VCRs). The Ninth Circuit held that *res judicata* barred the plaintiff's second suit because it alleged essentially the same continuous unlawful prevention of sales. Even though plaintiffs alleged ongoing harm each "new day," the court found this to be the continuation of the same underlying conspiracy rather than distinct new actionable events or transactions. Critical distinction exists from this case. *Dual-Deck* was ongoing, continuous and static restriction imposed passively by defendants' conspiracy—no new affirmative sales transactions occurred between the parties day-to-day. But in the case of the DPLA, developers affirmatively pay a new, discrete $99 membership renewal fee to Apple, constituting a distinct transactional injury rather than passive, continuous harm.

In sharp contrast, here, the annual $99 fee is imposed under *annually revised* Developer Program Licensing Agreements ("DPLAs") terms which Apple *unilaterally* revises. Indeed, Plaintiffs' FAC specifically alleges Apple's imposition of new conditions, new restrictions, and materially altered obligations associated with the DPLA and corresponding fee payment each year since the dismissal of Coronavirus Reporter I. (FAC ¶¶ 99–106, 251–259). Thus, Apple's reliance on *Dual–Deck* is categorically misplaced. Extending it to this conduct would have the effect of reversing *Lawlor*.

Apple's Reply inaccurately asserts for the first time that this Court previously adjudicated and resolved the legality of the annual $99 fee in *Coronavirus I,* when, in fact, the Court's ruling in CR I expressly

10

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

focused on insufficient market allegations, not on the legality or merits of the Developer Program License Agreement or the $99 fee itself. (Reply at 2–3.) Plaintiffs' Sur-Reply is thus necessary to correct Apple's misleading characterizations, to clarify the Court's actual rulings, and to ensure that the present motion is adjudicated on an accurate and fully developed record. The *Coronavirus I* dismissal, upheld by the Ninth Circuit (85 F.4th 948 (9th Cir. 2023)), hinged on the plaintiffs' failure to adequately allege a viable relevant market for antitrust injury. At no point did the district court's substantive analysis directly resolve the legality, reasonableness, or lawfulness of the annual $99 fee itself, nor did it address or dismiss this fee-based claim on the merits. Instead, *Coronavirus I* explicitly turned on broader issues of market definition and antitrust standing—issues distinct from whether each annual fee constitutes newly actionable conduct. A prior judgment cannot have preclusive effect for issues neither explicitly nor implicitly adjudicated. See *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002) (Res judicata does not bar claims that the court explicitly declined to adjudicate.).

If Apple's position were accepted, it would effectively immunize it from ever being challenged for ongoing monopolistic or abusive practices—precisely the outcome the Supreme Court warned against in *Lawlor*. Courts typically interpret *Dual–Deck* narrowly to avoid nullifying *Lawlor's* protective policy for plaintiffs. Each year, Apple issues new DPLA terms[5], forcing developers to repeatedly accede to altered and often more restrictive conditions under threat of market exclusion. To foreclose challenges based on these annual changes merely because Apple describes the fee as the same nominal amount would grant Apple precisely the kind of "perpetual immunity from antitrust accountability" explicitly rejected by controlling precedent. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

## IV.     NEWLY-RAISED *BEVERAGE* CITATION DOES NOT DEFEAT VALID UCL CLAIMS

The Reply mis-casts *Beverage v. Apple Inc.*, 93 Cal. App. 5th 1049 (2023)—a California Court of Appeal decision affirming dismissal of purely price-based antitrust/UCL claims brought by iOS consumers who alleged that Apple's 30 percent commission was supracompetitive. *Beverage* held only that, on those pleadings, the UCL "unfair" prong did not survive once the parallel Sherman-Act price-fixing theory failed,

---

[5] *SaurikIT* concerned one paragraph which had not changed. The $99 fee represents consideration paid for the DPLA agreement in totality, which has changed each and every year since its inception.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

because the complaint alleged no independent unfairness beyond Apple's allegedly excessive price. Id. at 1061-62.

Apple conspicuously fails to substantively respond to numerous central allegations set forth in Plaintiffs' FAC, thereby forfeiting its opportunity to dispute critical aspects of Plaintiffs' claims. Specifically, Apple makes no meaningful reply regarding Plaintiffs' detailed allegations regarding Apple's deceptive and fraudulent "Sherlocking" practices, through which Apple allegedly misappropriates developers' intellectual property without fair compensation (FAC ¶¶348-349). Plaintiffs' allegations that Apple "chilled the free expression of app developers" (FAC ¶343) and related post-CR I conduct is not addressed in any substantive way and similarly forfeited. Likewise, Apple is silent on retaliation against developers (¶350) and related conduct meant to punish or prevent them from benefitting from antitrust enforcement (FAC ¶340, "non-compliance affects US-based developers"). In short, Apple creates a strawman to distract from years of post-CRI conduct, neglecting to address comprehensive recent allegations the FAC invokes. Because Apple failed to directly engage these allegations in its Reply, it has waived or forfeited its ability to meaningfully contest their sufficiency at this stage. See *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) (arguments raised for the first time in reply briefs or inadequately addressed are deemed waived).

For these reasons, the narrow *Beverage* holding does not control here; our UCL allegations are qualitatively different. *Beverage* involved no claim of censorship, retaliatory de-ranking, gate-keeping, deceptive "Sherlocking," malicious-compliance fees, or coercive notarization, all of which are conduct with a qualitative component that goes beyond mere market economics. Plaintiffs allege multiple, non-price forms of unfairness that violate public policy irrespective of Sherman-Act liability. (FAC ¶¶ 341-349, 346.) The California Supreme Court has expressly recognized that such conduct is independently actionable under the UCL. See *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999); *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 303 (2020) (holding that overlapping factual allegations do not alone defeat a claim of independent unfairness under the UCL.). *Beverage* turned on price; this case turns on conduct: mandatory notarization padlocks, Core-Technology Fees and link fees, censorship and suppression of pandemic-response and video-calling apps, "Sherlocking" and covert ranking manipulation. No such allegations were before the *Beverage* court. *Cel-Tech* and *Nationwide Biweekly* make clear that overlapping facts do not bar an independent unfairness theory. 9 Cal. 5th at 303.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

Apple's own litigation posture confirms unfair-prong independence. In the Ninth Circuit Apple insisted that "censorship is not an antitrust injury." (*Apple Br.*, *Coronavirus I*, No. 21-16785, at 34.) Having disclaimed Sherman Act liability for censorship, Apple cannot now argue that our censorship-based UCL theory rises and falls with the Sherman Act. Judicial estoppel bars that bait-and-switch. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001).

Apple's brief conflates deceptive practices (§40-12-105(a)(i)-(xiv)) with the statute's separate prohibition of unfair practices (§40-12-105(a)(xv)). The latter mirrors the UCL's "unfair" prong and reaches oppressive or unscrupulous conduct even absent a false statement. See *Dale v. S & S Builders, LLC*, 188 P.3d 554, 559-60 (Wyo. 2008) (recognizing broad remedial purpose). Our WCPA count pleads both deception (Sherlocking, false neutrality) and unfair coercion (mandatory notarization, malicious compliance). (FAC ¶¶ 346-349, 352-353.)

### The UCL "Unlawful" Prong Precisely Captures Apple's Ongoing Malicious Compliance; The FAC Precedes Microsoft amicus and Hagens Berman Class Action by One Year

Apple's reply suggests Plaintiffs' claims must be dismissed because they purportedly "re-litigate" conduct previously raised. Defendant attempts to pigeon-hole this case into *anything* narrower than the generalized present-day developer class action that it is. Apple's characterization ignores well-pled allegations of new, unlawful conduct—including significant regulatory non-compliance that resulted in damages to US-based developers. Plaintiffs are not only first-to-file on these issues but have also appropriately pled actionable claims under the UCL's unlawful prong for which restitutionary monetary relief is available.

Events that transpired since Apple filed their Reply validate Plaintiffs' class action UCL claims. The FAC unequivocally alleged Apple's deliberate "malicious compliance" with two distinct legal mandates, the *Epic v. Apple* Injunction and European Union DMA. Plaintiffs specifically alleged that Apple intentionally evaded the *Epic* injunction, harming developers and warranting class action relief under UCL "unlawful" prong. Significantly, over one year after Plaintiffs filed this allegation, the allegation was proven. Thus, not only have Plaintiffs accurately anticipated Apple's unlawful behavior, but they were demonstrably the first private class action to formally bring these allegations – and seek damages under UCL – in a federal lawsuit.

Plaintiffs' UCL cause of action explicitly targets the unlawfulness of Apple's 2023-2025 UCL misconduct. Plaintiffs expressly pled the following "Unlawful" claim:

> "Apple is similarly [like CTF] in malicious compliance of a verdict in *Epic v. Apple*. This conduct again seeks to charge for notary stamps and IAP fees, through an improper commission on developers (FAC ¶ 76)… Apple is presently in malicious compliance with an *Epic* order from the CAND District, whereby they charge developers for links to non-Apple payment systems. These charges, like the EU CTF, are only feasible and/or enforceable because of Apple's notary stamp padlock on iOS. Apple's malicious compliance with the Epic order therefore serves as evidence that Apple intends to charge, directly or indirectly, for notary stamps and/or notarization services. (FAC ¶ 223) … Apple's CTF practices are similarly unlawful [under UCL] as they contravene the legal rules set out in the European Union's Digital Markets Act (DMA)…. Although the DMA is European legislation, its principles reflect global standards for fair competition, and … non-compliance affects [i.e. damages] US-based developers who wish to distribute apps in Europe, including Greenflight and CRC." (FAC ¶ 340.)

This allegation directly captures Apple's broader 2023-2025 strategy of circumventing regulatory mandates—including the *Epic* injunction. FAC ¶¶ 75-77, 223, and references to "CTF practices" as a notary stamp work-around to regulatory enforcement all encompass Apple's contemporaneous U.S. and European unlawful acts. Thus, the recent *Epic* finding fully corroborates already-pled UCL "unlawful" prong.

The California Supreme Court confirms that plaintiffs alleging UCL claims based on violations of court orders, statutes, or regulations can properly seek restitutionary disgorgement of improperly retained fees—exactly the remedy Plaintiffs pursue here. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003); *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014) (disgorgement/restitution proper for violations of law). Plaintiffs seek precisely that restitutionary relief—recovery of illicit transaction fees (CTF fees, anti-steering fees, and mandatory developer fees)—which Apple only retains by unlawfully evading judicial and regulatory mandates. Plaintiffs CRC and Greenflight both alleged direct injury arising from Apple's unlawful conduct. Under the UCL, standing is available to any plaintiff that "lost money or property as a result of" unfair competition. Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322-323 (2011). Apple's malicious compliance with the *Epic* injunction and DMA directly and demonstrably cost Plaintiffs money, establishing clear standing. This is post-CR I conduct and Plaintiffs are representative of the putative class members.

Two days after the *Epic* Court found Apple guilty of "willfully" evading the *Epic* anti-steering injunction and referring the matter for potential criminal prosecution, a separate developer class, *Pure Sweat*

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

*Basketball v. Apple*, No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025), commenced suit seeking restitution of the very same transaction fees. A week later, Microsoft filed a related *amicus* brief (25-2935-YGR, Dkt 25.1) which details the damages that developer faced from Apple's non-compliance.

Apple's newly raised argument under 15 U.S.C. § 6a does not bar the CTF claims (which are not discussed in Microsoft or Pure Sweat) from similarly applying. Section 6a excludes foreign conduct only when it "does not have a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. 15 U.S.C. § 6a(1)(A). Apple's DMA response plainly clears that bar: all U.S. developers must stay in the worldwide DPLA—a California governed contract—and must accept the EU "Alternative Terms Addendum" through the same developer account before they can publish in Europe. Every Core Technology Fee invoice and link-entitlement fee is therefore issued against the same Cupertino anchored contractual relationship and debited to the same developer account already used to pay the annual $ 99 fee. In no circumstance does § 6a bar the UCL/WCPA unfair-practice counts, which are predicated on Apple's California centric contracting abuse and domestic link-tax scheme. Once any one domestic component of the conduct survives § 6a, the entire case remains properly before the Court. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 173 n.19 (2004).

Microsoft's *amicus* brief and *Pure Sweat's* near-identical class action claim therefore both corroborate that (i) Apple's challenged conduct is post-*Coronavirus I*; (ii) it is regarded by multiple stakeholders as independently actionable; and (iii) the economic harm to developers is concrete and ongoing. Under *Lawlor v. Nat'l Screen Serv.*, 349 U.S. 322, 328 (1955), such subsequent misconduct is not barred by res judicata, and its contemporaneous recognition by other plaintiffs all but proves the futility of Apple's Rule 12(b)(6) attempt to dismiss new-conduct claims at the pleading stage. The fact that multiple developers now pursue the same post-2023 injunction misconduct completely and totally refutes Apple's suggestion that Plaintiffs 'manufacture' injury. A respected plaintiffs' shop (Hagens Berman – lead counsel in *In re Tobacco*, *e-Books*, etc.) would not file on a frivolous theory. Nor would Microsoft. The FAC referred to CTF and anti-link conduct as exploitation of notary stamps; the *Epic* Court earlier this month characterized it as "motive to protect its illegal revenue stream and institute a new de facto anticompetitive Structure". Vernacular aside, the Microsoft/Hagens allegations concern the same identical conduct; our FAC simply emphasizes the tie-in to notarization as the technical means by which Apple thwarts enforcement. Their

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

entries vouch for economic substantiality of "unlawful" conduct and more than suggests that Apple's "no market / no injury" refrain is contrived

## CONCLUSION

Any reasonable reading of the motion papers and responses indicates that the parties have significant disputed facts and require discovery to support their respective positions. The Court should not devote important resources to Defendant's Rule 12(b)(6) motion but rather should be briefed with all available facts at a Summary Judgement proceeding.

Executed on this 26th day of May, 2025.

Respectfully Submitted,

/s/ Keith Mathews

Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Motion for Leave to File Sur-Reply was delivered via ECF to all interested parties.

Executed on this 26th day of May, 2025.

/s/ Keith Mathews

Keith Mathews

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' SUR-REPLY IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS** |

ER 225

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**...................................................................................................... **II**

**INTRODUCTION** ....................................................................................................................1

**ARGUMENT** ...........................................................................................................................1

    I.    THE PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA................................... 1
    II.   APPLE STRIVES TO IMPROPERLY EXTEND EPIC GAMES TYING LAW........................... 5
    III.  PLAINTIFFS ADEQUATELY ALLEGE RELEVANT ANTITRUST MARKETS...................... 8
    IV.  APPLE'S $99 DEV FEE CONSTITUTES ACTIONABLE EXCLUSIONARY CONDUCT ...... 10
    V.   THE UCL CLAIM COVERS EXTENSIVE UNFAIR PRACTICES CONDUCT........................ 12

**CONCLUSION**........................................................................................................................15

**CERTIFICATE OF SERVICE**................................................................................................16

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

# TABLE OF AUTHORITIES

CASES

*Agostini v. Felton,*
  521 U.S. 203, 215 (1997) ................................................................................................ 2
*Beverage v. Apple Inc.,*
  101 Cal. App. 5th 736 (2024) ........................................................................................ 13
*Coronavirus Reporter v. Apple Inc.,*
  85 F.4th 948, 958 (9th Cir. 2023) ................................................................................... 4
*Eastman Kodak Co. v. Image Technical Services,*
  504 U.S. 451, 462–63 (1992) .......................................................................................... 9
*Epic Games v. Apple,*
  67 F.4th 946 (9th Cir. 2023) ........................................................................................... 5
*Golden Gate Pharm. Services v. Pfizer,*
  433 F. App'x 598 (9th Cir. 2011) .................................................................................. 10
*Gray v. County of Fresno,*
  2019 WL 1746846, at *3 (E.D. Cal. Apr. 18 2019) ...................................................... 14
*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
  392 U.S. 481, 502 n.15 (1968) ........................................................................................ 1
*Hennegan v. Pacifico Creative Serv., Inc.,*
  787 F.2d 1299, 1301–02 (9th Cir. 1986) ........................................................................ 2
*Hospital Building Co. v. Trustees of Rex Hospital,*
  425 U.S. 738, 746 (1976) ................................................................................................ 2
*Illinois Tool Works, Inc. v. Independent Ink, Inc.,*
  547 U.S. 28, 37 (2006) .................................................................................................... 6
*In re Dual–Deck Video Cassette Recorder Antitrust Litig.,*
  11 F.3d 1460 (9th Cir. 1993) ......................................................................................... 11
*Int'l Union of Operating Eng'rs v. Karr,*
  994 F.2d 1426 (9th Cir. 1993) ........................................................................................ 3
*John Doe 1 v. Abbott Lab'ys,*
  571 F.3d 930, 934 (9th Cir. 2009) ................................................................................. 11
*Kellam Energy v. Duncan,*
  668 F. Supp. 861 (D. Del. 1987) ..................................................................................... 7
*Kendall v. Visa,*
  518 F.3d 1042, 1048 (9th Cir. 2008) ............................................................................... 7
*Key v. Qualcomm,*
  129 F.4th 1129 (9th Cir. 2025) ........................................................................................ 7
*LN Mgmt., LLC v. JPMorgan Chase Bank,*
  957 F.3d 943 (9th Cir. 2020) ........................................................................................... 5
*Media Rights Techs., Inc. v. Microsoft Corp.,*
  922 F.3d 1014, 1021 (9th Cir. 2019) ............................................................................... 9
*Microsoft,*
  253 F.3d at 84–87 ............................................................................................................ 7
New Hampshire v. Maine,
  532 U.S. 742, 749–51 (2001) ........................................................................................... 4
*Newcal Indus., Inc. v. Ikon Office Solutions,*
  513 F.3d 1038, 1044–46 (9th Cir. 2008) ......................................................................... 9

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

*Nicklas v. Prof. Ass'n, LLC*,
2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018) ................................................................. 14

*Northern Pac. Ry. Co. v. United States*,
356 U.S. 1, 5–6 (1958) .......................................................................................................... 6

Pure Sweat Basketball v. Apple,
No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025) ........................................................ 3

*Retlaw Broad. Co. v. NLRB*,
53 F.3d 1002, 1005 n.1 (9th Cir. 1995) ............................................................................... 6

*Rick-Mik Enters., Inc. v. Equilon Enters.*,
Inc., 532 F.3d 963, 971 (9th Cir. 2008) ............................................................................... 8

*Rowland v. California Men's Colony*,
506 U.S. 194, 201–02 (1993) ............................................................................................... 5

*Samsung Electronics Co. v. Panasonic Corp.*,
747 F.3d 1199, 1203-04 (9th Cir. 2014) .............................................................................. 12

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ............................................................................................... 14

*Sports Racing Servs. v. Sports Car Club of Am.*,
131 F.3d 874, 887 (10th Cir. 1997) ..................................................................................... 6

*Turtle Island Restoration Network v. U.S. Dep't of State*,
673 F.3d 914 (9th Cir. 2012) ............................................................................................... 3

*United States v. Dreyer,*
*804 F.3d 1266, 1277 n.2 (9th Cir. 2015)* ............................................................................ 3

*United States v. High Country Broadcasting Co.*,
3 F.3d 1244, 1245 (9th Cir. 1993) ....................................................................................... 5

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP,
540 U.S. 398, 407 (2004) ..................................................................................................... 11

*Zeller v. Optavia, LLC*,
2022 WL 17858032, at *6 (S.D. Cal. Dec. 22, 2022) ......................................................... 14

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

At the outset, Apple's reply entirely fails to grapple with the controlling principle articulated by the Supreme Court in *Lawlor*: subsequent lawsuits based upon new, independently actionable transactions or injuries are not precluded merely because similar allegations were raised in prior litigation. 349 U.S. at 328; accord *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968). Instead of addressing this critical authority directly, Apple's reply attempts to dismiss the Plaintiffs' detailed allegations of post-2021 conduct as insubstantial, asserting—without citation or support—that Plaintiffs fail to allege new, subsequent transactions. See Apple Reply at 7–8.

Apple's *res judicata* position fares no better. The Reply makes clear that the company faults Plaintiffs for *conceding* the naming defect their own counsel *discovered* and *raised to the Ninth Circuit*. Put very simply, Apple changes tack on technicality after technicality, in order to drag antitrust litigation on for another two decades. It works[1] – Apple has successfully evaded dozens and dozens of antitrust actions at the 12(b)(6) threshold, post-injunction stage, and even EU national level on thin technicalities. The list is too numerous to cite here. But now, the Court faces a situation where Apple's own technicality allows a case to proceed on the merits, in conjunction with new issues corroborated by DOJ, Microsoft, and Hagens Berman. Why should Apple decide which technicalities matter? This Generalized Developer Class Action, based on meticulously researched anticompetitive conduct compiled by DOJ and undersigned counsel, is ripe for adjudication.

**ARGUMENT**

**I.    THE PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA**

Apple was given a fair chance to reconcile conflicting argument on shareholder antitrust standing, but the Reply failed to address it.  It contains no meaningful resolution of Apple's divergent arguments that Greenflight lacks Article III standing as financier of CRC, yet Greenflight's programmer somehow had shareholder standing to represent Greenflight's corporate losses and thereby preclude this case. What's more, Apple somehow claims that Dr. Roberts' damages are precluded by the same *pro se* litigation. None of their

---

[1] At least, it worked until this month, when the Honorable Yvonne Gonzales Rogers made global news for legally recognizing Apple's contempt.

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Reply enlightens these arguments, and makes clear that Apple in fact seeks discovery as to who owns CRC. The Supreme Court explicitly recognizes that antitrust defendants frequently misuse Rule 12(b)(6) motions by advancing technical exceptions to evade substantive merits adjudication. See *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976). Apple's reply is plentiful with technical exceptions (over one-hundred approximately) which just don't make any sense when viewed from the perspective of the forest versus the trees.

Contrary to Apple's assertions, Plaintiffs expressly challenge the assertion that this case claims are identical to *any* previous lawsuit. The FAC is a comprehensive developer class action lawsuit that covers millions of developers for *escalating* antitrust conduct. Notably, Apple's claim that "many of those [DOJ] allegations expressly date back many years before Coronavirus I" directly concedes that many claims *do not* date back. And even setting aside the new DOJ allegations, the CR App itself was to launch subsequent versions approximately one and two years after filing of the CR lawsuit. See FAC ¶95, "vaccination status (in version 2.0 late 2021), vaccination details (version 3.0 late 2022)."

Contrary to Apple's bare assertions, the FAC explicitly identifies multiple actionable, new events and subsequent transactions, each independently sufficient to trigger *Lawlor's* rule against res judicata. For instance, Plaintiffs specifically allege ongoing annual renewals of Apple's anticompetitive $99 Developer Program fee, each constituting separate actionable violations postdating the CR I judgment. FAC ¶¶ 308–14. Courts have routinely recognized that each separate renewal or continued payment represents a distinct act of harm sufficient to trigger new claims. See, e.g., *Hennegan v. Pacifico Creative Serv., Inc.,* 787 F.2d 1299, 1301–02 (9th Cir. 1986) (ongoing payments under an anticompetitive agreement constitute new actionable harms).

Introduction of the "Core Technology Fee" and "Malicious Compliance" are unequivocal examples of post CR-I conduct. Apple imposed new technical restrictions and monetization schemes, specifically in response to the European Union's Digital Markets Act (DMA) and the *Epic Games* injunction, that materially expanded and modified Apple's prior challenged conduct. FAC ¶¶ 221–24. Courts explicitly recognize such materially new implementations—even if motivated by earlier regulatory events—as constituting subsequent and separately actionable conduct. See *Agostini v. Felton,* 521 U.S. 203, 215 (1997) (holding subsequent regulatory compliance actions independently actionable despite prior litigation addressing related issues).

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

The malicious compliance represents anti-enforcement conduct and retaliation against developers, particularly in the case of *Epic* anti-steering link tax. Plaintiffs specifically pled Apple's retaliatory suppression of developers (by no means limited to the above two examples) who pressed antitrust claims in the wake of *Epic* and *Coronavirus I* litigation. FAC ¶¶ 128–32, 332–37, 350. These subsequent retaliatory acts are textbook examples of new actionable antitrust injuries that are never precluded by earlier judgments. See *Lawlor*, 349 U.S. at 328 (affirming subsequent litigation against retaliatory conduct arising post-judgment). Penalties to developers who sought to benefit from the *Epic* anti-steering injunction, and CTF fees are just two (known) components of Apple's retaliation schemes and have spawned similar class actions in the past week, after Apple filed its reply. Apple's failure to substantively address these post-2021 events waives its ability to contest their significance for res judicata purposes. See *United States v. Dreyer,* 804 F.3d 1266, 1277 n.2 (9th Cir. 2015). Accordingly, under *Lawlor*, Plaintiffs' current claims based on these new transactional facts plainly survive res judicata.

Similarly, Apple's reliance on *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914 (9th Cir. 2012), and *Int'l Union of Operating Eng'rs v. Karr*, 994 F.2d 1426 (9th Cir. 1993), is misplaced. Those cases involved static, continuous practices already adjudicated, not distinct transactional injuries recurring annually as in the instant case. And Apple cannot escape liability under 15 U.S.C. § 6a for new conduct in the EU, because the FAC reasonably describes how US app developers routinely distribute apps in Europe, and are impacted by the non-compliance because Apple takes CTF fees from their US-originating platform membership. Similarly (see, infra, UCL section), Apple is wrong that "This case also has nothing to do with the link entitlement program at issue in *Epic*." This class action covers US developer damages for CTF and *Epic* link non-compliance. Numerous filings this month[2] confirm the ripeness of this issue first raised by Plaintiffs over a year ago.

Apple's attempt to downplay its prior USCA statements in *Coronavirus I* as limited solely to judicial recusal procedures (i.e. disclosure statements) is disingenuous and contradicted by the record. Apple's Ninth Circuit filing explicitly argued that "no relief could be awarded" because the plaintiffs lacked proper corporate existence. How could judicial recusal procedures preclude damages payment? Contrary to Apple's

---

[2] See Microsoft *amicus* brief dated May 20, 2025 (25-2935-YGR, Dkt 25.1) and *Pure Sweat Basketball v. Apple*, No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025).

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

current assertions, this was *not* a procedural argument regarding judicial recusal. Instead, it was a substantive assertion directly bearing upon whether Apple would pay a judgment if "non-entity" plaintiffs prevailed on appeal. Put very simply, Apple (or Gibson Dunn) flagged a fairly straightforward (uncommon only in that they chose to wait until appeal to announce the defect) naming defect: each and every corporate plaintiff was mis-spelled. CR was severely defective, missing any corporate type identifier; the other two had punctuation errors that would be analogous to 'Burger-King Whopper' being named a defendant. Curing these defects would have required amendment to cure, which never happened.

Apple's res judicata theory succeeds only if the Court accepts Apple's new story that Coronavirus Reporter Corporation was a properly identified plaintiff in the first suit—precisely the opposite of what Apple told the Ninth Circuit.  Judicial estoppel is triggered when a litigant "plays fast and loose with the courts"; resolving it requires a factual look at Apple's earlier representations, not a facial review of Plaintiffs' complaint.  See *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).  That inquiry cannot be completed within Rule 12(b)(6)'s four-corner limit.

Specifically, Apple's reply claims that Coronavirus Reporter Corporation (CRC), Calid Inc., and Greenflight Venture Corporation were somehow properly parties or in privity with parties from CR I. Yet Apple previously persuaded the Ninth Circuit to affirm dismissal by characterizing the original corporate plaintiffs as "non-entities" or "null parties" incapable of pursuing any relief. *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 958 (9th Cir. 2023). Apple's assertion now that these entities were validly constituted plaintiffs at the time of CR I contradicts that successful earlier position, triggering judicial estoppel. Judicial estoppel precludes Apple from now asserting that the plaintiffs named in CR I are identical or in privity with those here because Apple explicitly—and successfully—argued before the Ninth Circuit that the CR I plaintiffs were legally nonexistent entities and thus incapable of maintaining the suit or recovering any judgment. See *New Hampshire*, 532 U.S. at 749–51 (judicial estoppel applies when a litigant's earlier position is clearly inconsistent with its current stance, the prior position was successfully advanced, and the party gains unfair advantage from the inconsistency). Apple raises a speculative defense that they never benefitted from their original assertion – but that requires assuming what might have happened on the underlying appeal, had undersigned counsel not conceded the point.

ER 232

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Apple's Reply newly argues privity based solely on Dr. Jeffrey Isaacs' supposed control over Greenflight. Reply 9–10. However, it conspicuously fails to address controlling federal precedent prohibiting a pro se individual from representing a corporate entity. The Supreme Court unequivocally holds that corporations can appear in federal court only through licensed counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993). It is thus legally impossible—and Apple cites no authority otherwise—for Dr. Isaacs' *pro se* appearance in CR I to have effectively represented or bound Greenflight Venture Corporation, an independent corporate entity. Carried to its logical conclusion, this would mean Dr. Isaacs' pro se litigation now precludes Dr. Roberts – whom Apple said was never involved in CR I – from collecting damages. That is inherently unfair and defies common sense. The Ninth Circuit specifically emphasizes that a corporate entity cannot be bound by the pro se appearance of an individual shareholder or officer. See *United States v. High Country Broadcasting Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993). Apple's privity theory thus rests on a legally prohibited premise, failing as a matter of federal procedural law.

Apple cites *LN Mgmt., LLC v. JPMorgan Chase Bank*, 957 F.3d 943 (9th Cir. 2020), but this case does not hold that the existence of one plaintiff automatically establishes jurisdiction over all other improperly identified or nonexistent entities. Apple thus misapplies the case law governing jurisdictional attachment and corporate entity standing. And that case in no way reconciles that larger problem, even if the Court doesn't estop Apple's argument: a shareholder has no antitrust standing to sue for corporate antitrust injury.

## II.   APPLE STRIVES TO IMPROPERLY EXTEND EPIC GAMES TYING LAW

Apple initially argued that *Epic Games v. Apple*, 67 F.4th 946 (9th Cir. 2023), mandates application of the rule of reason to all ties involving software platforms. (Mot. at 20.) In response, Plaintiffs explained *Epic's* holding was explicitly limited to a software-to-software tying arrangement (the App Store platform and In-App Purchase system), and thus did not apply to Plaintiffs' hardware-to-software tying claim (the iPhone hardware device to the App Store or notarization services). (Opp. at 15–16.) Plaintiffs clearly distinguished the FAC's hardware-based tying allegations from the software-platform context discussed in *Epic*, noting Tim Cook's testimony that Apple primarily "sells devices," not operating systems. (Id.)

Critically, Apple's Reply did not substantively address Plaintiffs' core distinction between hardware and software tying. Instead, Apple merely restated—without additional authority or analysis—its earlier

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

assertion that *Epic* broadly covers ties involving "highly innovative" software platforms, regardless of hardware involvement. (Reply at 12.) By declining to address Plaintiffs' central argument—that *Epic* was expressly limited to software-to-software tying—Apple effectively conceded this crucial point.

The Court should not permit this improper attempt to alter and expand *Epic*. Under controlling Ninth Circuit precedent, such a failure constitutes forfeiture. See *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995) (Holding that arguments not substantively addressed in briefing are deemed forfeited.) By merely restating its original argument without responding substantively to Plaintiffs' distinctions, Apple waived any attempt to extend *Epic's* holding beyond its stated context. It would now be inappropriate for Apple to seek a surreptitious extension of *Epic's* narrowly cabined ruling through this Court.

Courts applying established Supreme Court precedent recognize per se liability for product-to-service or hardware-to-service ties. See, e.g., *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 37 (2006) (acknowledging per se liability for tying involving physical goods). Apple's attempt to avoid per se scrutiny by recharacterizing this as a "software platform" tie thus misstates both the FAC and controlling Ninth Circuit and Supreme Court precedent. Even if a rule-of-reason standard applied, Plaintiffs' detailed allegations of Apple's substantial foreclosure of approximately 75% of the U.S. performance-smartphone market and roughly 80% share of revenue in U.S. app distribution markets would establish anticompetitive harm sufficient to withstand dismissal. (FAC ¶¶ 290, 298, 305.) Apple's Reply fails to challenge Plaintiffs' detailed market share and foreclosure allegations, effectively conceding them.

Apple additionally argues Plaintiffs are neither "coerced purchasers" nor "excluded competitors" of the allegedly tied products (Apple Reply at 12–13; citing *Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 887 (10th Cir. 1997)). However, this misrepresents the detailed allegations in the FAC. Plaintiffs explicitly plead they are competitors or potential competitors in the tied market—alternative app-distribution services or independent notarization services—who have been unlawfully foreclosed by Apple's contractual and technical restraints. (FAC ¶¶ 289, 292, 297–299, 323.) Plaintiffs detail feasible alternative distribution methods, specifically website-based distribution or third-party code-signing, that would be "trivial" to implement absent Apple's coercive restrictions. (Id. ¶ 292.) Apple's attempt to conflate "PC

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

stores" with "app distribution websites" should be disregarded by the Court as noise meant to instill confusion and disrupt this proceeding.

Apple asserts the absence of a relevant "agreement" because its EULA and DPLA allegedly contain no specific clause agreeing to preload the App Store. (Apple Reply at 13.) This misses the mark. The FAC explicitly alleges that the DPLA and EULA contain bilateral constraints—developers must exclusively use Apple's notarization and distribution system as a precondition for market access. (FAC ¶¶ 289–295, 298–299.) Under settled antitrust law, such coercive contractual restrictions can indeed constitute actionable agreements. In any case, developers cannot modify users iPhones for open-access, without violating Apple's terms. The D.C. Circuit in *Microsoft* explicitly rejected attempts to label similar restrictions as mere "product design decisions," holding that tying via contractually enforced software integration constitutes actionable tying. *Microsoft*, 253 F.3d at 84–87. Thus, Apple's attempt to portray these restrictions as unilateral design choices ignores settled law recognizing that coercive licensing agreements coupled with technical enforcement mechanisms satisfy the Sherman Act's "concerted action" requirement. Id.; see also *Kendall v. Visa*, 518 F.3d 1042, 1048 (9th Cir. 2008) (recognizing contractual agreements between parties enforced by technology as actionable under Section 1).

Apple's argument that no separate market demand exists for notarization services because the notary stamp is algorithmically bound to iOS (Apple Reply at 13–14, citing *Key v. Qualcomm*, 129 F.4th 1129 (9th Cir. 2025)) misconstrues controlling precedent. The FAC alleges—and Apple's recent practices in the EU confirm—that independent code-signing is a viable, monetizable service market. (FAC ¶¶ 295, 298–299.) Indeed, Apple's introduction of a distinct, monetized "Core Technology Fee" in Europe conclusively demonstrates that notarization is neither inherently tied nor technically indispensable to the iPhone. Rather, it constitutes an artificially created barrier to independent code-signing, exactly the scenario recognized by *Eastman Kodak*. 504 U.S. at 462–64 (finding distinct market for service and parts despite manufacturer's restrictions).

Apple wrongly claims no antitrust injury arises from tying a "free" product to consumers (App Store access) to the iPhone, citing *Kellam Energy v. Duncan*, 668 F. Supp. 861 (D. Del. 1987). Apple again ignores modern antitrust jurisprudence, including the landmark *Microsoft* tying decision; foreclosure, not monetary cost, is central to tying analysis. *Microsoft*, 253 F.3d at 84 (holding that a zero-priced browser bundled with

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

an OS caused actionable foreclosure). Here, Plaintiffs allege precisely this type of foreclosure: Apple's contractual and technical restrictions effectively force both developers and users to adopt a single, exclusive distribution pathway—eliminating competition in the tied market. The coercion is real, and the injury—foreclosure of rival distribution services—is actionable under current antitrust law, irrespective of the zero-dollar sticker price of the App Store to end users. See *Rick-Mik Enters., Inc. v. Equilon Enters*., Inc., 532 F.3d 963, 971 (9th Cir. 2008) (recognizing coercion even without direct consumer payment).

## III.    PLAINTIFFS ADEQUATELY ALLEGE RELEVANT ANTITRUST MARKETS

Apple's favored tactic of cherry-picking isolated paragraphs (FAC ¶¶ 127, 133, 162) and labeling them as "undefined markets" (Reply 10–11) exemplifies precisely the technical, meritless arguments Rule 12(b)(6) disfavors. Read fairly and in context, these references clearly serve as factual illustrations or background context, not standalone Sherman Act market definitions. See FAC ¶¶ 115–142 (explicitly identifying four defined markets). Plaintiffs unequivocally state that their antitrust claims are predicated on four relevant markets: (1) smartphones/performance smartphones, (2) U.S. smartphone apps, (3) U.S. smartphone app distribution services ("App Stores"), and (4) iPhone notary stamps. (FAC ¶¶ 205–230.) Apple's insistence on ignoring Plaintiffs' explicit framing, to instead extract confusion from ordinary background references, undermines Rule 12's policy preference for adjudication on merits rather than technicalities. Apple selectively highlights isolated phrases from the FAC, questioning every aspect of submarkets and even why general app stores include all "genres of apps." Apple even argues the DOJ defined market for smartphones is "irrelevant" to this case about the iPhone monopoly. Leveraging principles are discarded as "misplaced allusion." Defendant's scattershot Reply is noise to confuse the proceeding.

Apple's persistent invocation of collateral estoppel from CR I (Reply 10–11) is misplaced; collateral estoppel does not apply to allegations concerning new transactions, facts, and conduct occurring after the first suit. Apple newly asserts that the DOJ smartphone market fails under *PhantomALERT v. Apple*. But *PhantomALERT*—an unpublished, non-binding district court decision currently under appeal in the D.C. Circuit—differs markedly in context and scope. That case does not incorporate the entire DOJ complaint, and it is limited solely to the 2020 COVID issue. Plaintiffs here allege a systemic exclusionary scheme starting from Apple's dominance in smartphone markets, leveraging power downstream into app distribution and notarization aftermarkets (FAC ¶¶ 264–286). Such leveraging precisely fits the scenario the Supreme

ER 236

Court endorsed in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 462–63 (1992), and the Ninth Circuit recognized in *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044–46 (9th Cir. 2008). Apple completely ignores these precedents.

Apple's then turns to purported contradictions involving the Microsoft app store allegations. Apple critiques Plaintiffs' reference to Microsoft's "former" mobile app store, emphasizing the FAC's verb-tense usage as a "fatal" contradiction (Reply 11). Their Reply, as best as undersigned counsel can interpret, posits that verb tense somehow disproves the Microsoft Store (for the defunct Microsoft Phone) ever competed as a smartphone app store. Yet, Plaintiffs clarified this the Microsoft Phone Store was an illustrative example of a failed, past mobile store, not a current competitive alternative (FAC ¶¶ 205–212). Apple's attempt to exploit verb tense as grounds for dismissal precisely exemplifies the type of trivial objection Rule 12(b)(6) disfavors. Under *Brown Shoe*, this is clearly in the turf of fact-finding. The Court should not waste precious resources on Apple's 12(b)(6) but rather should convert the motion under Rule 12(d) and await a more informed basis for adjudication.

Defendant's use of hyper-technicalities is problematic because they have a track record of advancing such arguments only to backtrack when it suits them. Indeed, a pattern emerges which embodies precisely the "fast and loose" gamesmanship that the Supreme Court warned against in *New Hampshire v. Maine*. Apple advanced arguments regarding entity naming status to the Ninth Circuit, only to reverse course years later and blame Plaintiffs for accepting Apple's very own technicality. Apple's latest suggestion that minor linguistic variations mandate dismissal starkly conflicts with the liberality afforded pleadings under federal antitrust law. The Ninth Circuit explicitly disfavors premature dismissal of antitrust claims precisely because such procedural entanglements "can often obscure substantial questions" best resolved through discovery and merits adjudication. See *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019).

Apple further contends, newly in Reply, that Plaintiffs have not sufficiently pled consumer "awareness" necessary to sustain a single-brand aftermarket for iPhone notary stamps under *Kodak* (Reply 12). Yet the FAC pleads meaningful ex-ante awareness of notarization requirements: "iPhone device user often is locked in to their device, or has substantial barriers to exit" (FAC ¶ 290). This is exactly the information-cost lock-in scenario contemplated by *Eastman Kodak*, 504 U.S. at 473–77, which Apple

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

ignores. And ex-ante awareness cannot extend to cases where an iPhone purchaser has no choice to choose iPhone, based on past purchases dating back a decade ago, where surely *ex ante* awareness didn't exist, in light of the US Copyright decision and allegations about "every other computing platform in history" permitting open access to a purchased device. Finally, even assuming *arguendo* that *ex ante* awareness didn't exist, the conduct is still unfair under UCL (see infra).

Finally, Apple newly cites *Golden Gate Pharm. Services v. Pfizer*, 433 F. App'x 598 (9th Cir. 2011), asserting Plaintiffs' markets are overly broad (Reply 12). But *Golden Gate* invalidated an implausibly vast "all pharmaceuticals" market without functional coherence. Plaintiffs, by contrast, have alleged narrower functional categories—smartphone devices, smartphone apps, app distribution, and notarization stamps— precisely delineated by product function, economic realities, and interchangeability. Apple's broad-brush analogy to *Golden Gate* is therefore unavailing. At some point, the pattern is obvious: Apple is pitching literally hundreds of arguments, hoping one sticks. That alone warrants denial of the motion.

In sum, Apple's Reply exemplifies precisely why Rule 12(b)(6) dismissal is a disfavored mechanism in antitrust litigation. Apple repeatedly advances hyper-technical arguments—verb-tense disputes, isolated factual sentences, and non-binding, factually distinct district court dicta—while ignoring core factual allegations, key precedents, and forfeiting meaningful responses to Plaintiffs' clarifications. Plaintiffs' FAC plainly and plausibly alleges four coherent, economically justified markets. Apple's scattergun attempt to dismiss these serious allegations on technicalities alone warrants denial.

## IV.   APPLE'S $99 DEV FEE CONSTITUTES ACTIONABLE EXCLUSIONARY CONDUCT

Apple's reply continues to fundamentally misconstrue the nature of Plaintiffs' claim regarding the $99 Developer Program fee, erroneously characterizing it merely as permissible "monopoly pricing" or a lawful charge for "intellectual property licensing" (Reply at 14). This position overlooks—and thus forfeits— key factual and legal points raised by Plaintiffs, while relying on plainly inapplicable precedent.

First, Apple notably fails to rebut the detailed Congressional findings cited in Plaintiffs' Opposition, which specifically concluded that Apple's mandatory $99 developer fee generates supra-competitive revenues of over $20 billion, significantly exceeding Apple's legitimate costs associated with the provision of such services (Opp. at 21; FAC ¶ 312). The absence of a substantive response on this critical point constitutes forfeiture. Under Ninth Circuit *Retlaw* precedent, arguments raised by the opposing party that

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

remain unrebutted in reply briefing are waived. Thus, at this stage, the Court must take Plaintiffs' allegations regarding these Congressional findings as undisputed for the purposes of Rule 12 analysis.

Second, Apple likewise leaves entirely unanswered Plaintiffs' well-pleaded allegations that the $99 fee serves as an anticompetitive notarization toll precisely because Apple simultaneously forecloses all alternative channels for app distribution. Plaintiffs explicitly pled that the $99 fee is coercive—not due to a mere preference or convenience, but due to Apple's explicit contractual and technological barriers to any competing app-distribution platforms or sideloading. FAC ¶¶ 308–14. In practical terms, developers face a binary choice: either pay Apple's mandatory fee annually or be completely excluded from the iPhone's installed user base, a critical consumer segment comprising hundreds of millions of individuals (FAC ¶¶ 310–11). This linkage transforms Apple's fee into a vehicle of exclusionary conduct rather than a standard licensing arrangement.

Apple invokes *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004), and *John Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009), reiterating that monopoly power and monopoly pricing alone do not constitute a Sherman Act violation. Yet Apple overlooks *Trinko's* important qualification: monopoly prices coupled with exclusionary conduct designed to maintain or enhance monopoly power do indeed violate antitrust law. *Trinko*, 540 U.S. at 407. Here, Plaintiffs allege precisely such exclusionary conduct—Apple uses the compulsory $99 annual charge in conjunction with a complete prohibition on alternative distribution channels to fortify and maintain its monopoly power. FAC ¶¶ 308–314. Apple's reliance on *Trinko* once again conveniently misses the crux of Plaintiffs' exclusionary conduct argument entirely.

Apple's invocation of *In re Dual–Deck Video Cassette Recorder Antitrust Litig*., 11 F.3d 1460 (9th Cir. 1993), claiming that new $99 transactions constitute nothing more than the repetitive conduct already adjudicated, misstates the nature of the transactions, overlooks essential distinctions in the present litigation, and is unsupported by controlling precedent. Apple incorrectly relies on *Dual–Deck*, asserting that repeated annual payments of the developer fee constitute mere continuation of previously adjudicated conduct. See *Dual–Deck*, 11 F.3d at 1464. However, a careful reading of Ninth Circuit authority clarifies that the $99 annual developer fee is precisely the type of recurrent conduct that creates a distinct transactional basis for new claims. In *Lawlor v. National Screen Serv. Corp*., 349 U.S. 322, 328 (1955), the Supreme Court made

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

clear that "[w]hile the [initial] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." Here, each annual $99 fee constitutes a new payment, made pursuant to annually revised contractual terms and conditions, which inherently cannot be precluded by a prior judgment.

Notably, the Ninth Circuit clarified this point in *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-04 (9th Cir. 2014), stating explicitly that "continuing violations involving periodic charges or changing terms" constitute new and actionable antitrust conduct, distinct from the repetitive daily identical transactions at issue in *Dual–Deck*. Accordingly, the "every day is a new day" defense does not apply because the $99 fee is imposed annually under newly issued contract terms.

In sum, Apple's Reply fails to rebut Plaintiffs' detailed allegations regarding Congressional findings, the mandatory and exclusionary nature of the $99 fee, its chilling effect on innovation, and its distinctness from legitimate IP licensing. Sony doesn't charge movie producers for the technology in viewer's television sets, and Apple's idea would be absurd, applied to any other industry. Apple's invocation of *Epic*, *Trinko*, and *Doe* does not rescue its argument but rather evidences its fundamental strawman mischaracterization of the nature of the challenged fee. Plaintiffs have thus amply stated a plausible claim for exclusionary conduct actionable under Section 2 of the Sherman Act.

## V.      THE UCL CLAIM COVERS EXTENSIVE UNFAIR PRACTICES CONDUCT

Apple attempts to evade the broader and independent fairness principles articulated in *Cel-Tech* and *Nationwide Biweekly* by incorrectly asserting that the notarization and censorship practices at issue cannot constitute independent unfairness if there is no corresponding antitrust violation. This contention misstates the law and mischaracterizes Plaintiffs' allegations. The notarization requirement is independently unfair under the UCL because it arbitrarily restricts consumer and developer rights to freely use devices consumers have lawfully purchased (FAC ¶346). Plaintiffs analogize this unfairness to purchasing a VCR or CD player and then requiring manufacturer permission for each use—a clearly arbitrary and oppressive practice without legitimate justification (Id.). Moreover, the notarization policy enables Apple's censorship practices, allowing Apple to engage in non-transparent, selective suppression of speech, stifling important scientific innovations, public health applications, and chilling independent app developer speech (FAC ¶¶341-344).

The FAC also elucidates how notarization enables Apple's malicious compliance with regulatory efforts such as EU DMA and *Epic* anti-steering, thereby exacerbating developer injury. Apple's policies thus inherently implicate deeply rooted public policy concerns about transparency, consumer autonomy, and the free dissemination of ideas, making them precisely the type of practices the UCL independently seeks to redress.

Similarly, Plaintiffs assert that Apple's deceptive representations regarding the App Store's neutrality constitute independently actionable unfairness under both UCL and WCPA (FAC ¶347-349). Consumers and developers reasonably rely upon Apple's marketing of neutrality and fairness; however, Apple's undisclosed practice of "Sherlocking," preferential treatment, and censorship clearly violates consumer expectations and established notions of fairness. In short, Apple does not market what they say in court: that censorship is permissible and practiced by Apple upon 80% of the population. Such conduct constitutes precisely the type of deception and unjust enrichment prohibited by both California and Wyoming consumer protection statutes. (FAC ¶¶ 347-349, Wyo. Stat. §40-12-105(a)(xv)).

Apple's own contempt briefing filed last week confirms the distinction. In its emergency-stay motion (9th Cir. No. 25-2935, Dkt 7-1 at 23-24), Apple cites *Beverage* only for the narrow proposition that courts may hesitate to impose state-law "rate-setting.[3]" Simultaneously, Apple concedes the contempt order rests on new conduct—"a series of contrivances" (malicious compliance) implemented after the original *Epic* trial. Those same contrivances (link tax, CTF, etc) are pled in the FAC as post-2023 unfair practices (FAC ¶¶ 75-78, 221-223, 340). Apple's stay brief therefore illustrates that the UCL/WCPA counts are grounded in fresh misconduct unaddressed in *Coronavirus I* and untouched by *Beverage*.

---

[3] Apple excessively touts *Beverage v. Apple Inc.*, 101 Cal. App. 5th 736 (2024), as though it were a universal solvent for every UCL challenge to—but *Beverage* addressed only a price-based theory (the traditional 30 % commission) and never confronted Apple's newer, non-price restraints, such as (i) the *per-transaction "link fee"* that attaches whenever a user follows a developer's out-of-app link, (ii) *scare-screen friction* inserted to deter such linking, or (iii) the *Core-Technology/Notarization charges* Apple now layers on developers. The Court of Appeal expressly limited its holding to "Apple's uniform commission structure" and did not pass on the legality of Apple's subsequent tactics for preserving that structure. 101 Cal. App. 5th at 746–50. Apple's heavy reliance on *Beverage* therefore highlights exactly why this Court must adjudicate the notarization-enabled link tax: left unchecked, Apple will cite that narrow pricing opinion to cloak any successor scheme—no matter how coercive or deceptive—in presumed legality, and will again argue (as it does in the *Epic* contempt appeal) that *Beverage* compels immunity. A merits determination here on the *unfairness* of the notarization regime is essential to foreclose that maneuver and to prevent further contempt.

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

The stay motion candidly admits that Apple created the post-injunction fee framework because management feared "hundreds of millions to billions" in lost commission revenue. That is textbook malicious compliance—leveraging monopoly power in smartphones to impose new tolls on developers who attempt lawful steering. Those facts, now sworn in Apple's own appellate filings, directly corroborate FAC ¶¶ 75-78, 221-223, 340 and put Apple's scienter beyond plausibility. Accordingly, *Beverage* offers Apple no safe harbor; our UCL and WCPA claims proceed on well-pled, stand-alone theories of unfairness and deception. *Beverage* is raised for the first time in the Reply; Rule 12 arguments not developed in the opening brief are waived. See *Gray v. County of Fresno*, 2019 WL 1746846, at *3 (E.D. Cal. Apr. 18 2019).

Apple also superficially invokes *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), arguing that Plaintiffs have an adequate remedy at law, and thus, equitable relief under the UCL is unavailable. Apple's reliance on *Sonner*, however, is misplaced. In *Sonner*, the Ninth Circuit specifically addressed the availability of equitable restitution under the UCL only after a party had voluntarily dismissed claims for damages at trial to strategically evade a jury trial (Sonner, 971 F.3d at 837-838). Unlike *Sonner*, Plaintiffs here have consistently pleaded multiple independent forms of equitable and injunctive relief targeting Apple's ongoing unfair and deceptive business practices (FAC ¶351). Crucially, Plaintiffs' claims under the UCL are not solely duplicative of remedies at law because the claims address ongoing and prospective harms, including continued censorship, notarization, regulatory evasion, and unfair marketplace manipulation that monetary damages alone would inadequately remedy (FAC ¶¶346-349). Courts have clarified post-*Sonner* that equitable remedies remain appropriate where legal remedies are incomplete or inadequate, particularly for prospective harm or ongoing unfair conduct (*Zeller v. Optavia, LLC*, 2022 WL 17858032, at *6 (S.D. Cal. Dec. 22, 2022)). Plaintiffs thus adequately plead entitlement to equitable relief distinct from legal remedies.

Finally, Apple says the Wyoming Consumer Protection Act (WCPA) claim fails under *Nicklas v. Prof. Ass'n, LLC*, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018), because Plaintiffs supposedly plead no deception. But Nicklas merely demands that a complaint allege a "deceptive practice" — i.e., conduct "likely to mislead consumers." Plaintiffs do just that: Apple marketed the App Store as an "open, fair and secure marketplace" (FAC ¶¶ 48-50, 85, 97, 100-102, 114, 124-127) that complies with government laws while imposing misleading and/or secretive arbitrary gate-keeping, retaliatory suppression and anti-steering

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

rules. Those factual allegations fit *Nicklas's* definition of a deceptive or unfair practice, so the case provides no basis to dismiss the WCPA count.

## CONCLUSION

Apple's Rule 12 motion dissolves once the governing cases are placed beside the facts actually pleaded. *Lawlor* and the Ninth Circuit's decision in *Samsung v. Panasonic* teach that claim-preclusion never bars relief for fresh, independently actionable transactions that occur after an earlier judgment. Here, every restraint we challenge—the annual $99 developer fee, the brand-new Core Technology Fee, the post-*Epic* "link tax," and the revised DPLA clauses—is re-imposed each year under newly drafted contracts. That is the polar opposite of the static, day-to-day conduct in *Dual-Deck*. Each new exaction is a new injury; under *Lawlor* those claims simply could not have been brought in 2021.

Apple's privity argument collapses under its own weight. It simultaneously insists that Greenflight (a corporation) has no standing because it is just a shareholder, and that the same corporation is bound by the prior *pro se* action prosecuted by a *shareholder*. None of the res judicata cases Apple cites involved a *pro se* shareholder. Likewise, Apple previously told the Ninth Circuit that "no Coronavirus Reporter entity existed," securing affirmance on that basis; it may not now pivot and claim the very entity it disavowed is identical to today's plaintiff. Either way, identity-of-parties fails.

On the merits, the First Amended Complaint pleads the same smartphone foremarket DOJ relies on, plus three aftermarkets, complete with unchallenged market share and foreclosure figures. Apple's objections are grammar quarrels and verb-tense nit-picks—not Rule 12 defects. Its own contempt finding in *Epic* confirms that the "malicious-compliance" allegations are real, current, and damaging.

Because the operative complaint targets post-2021 conduct, new contractual terms, and new monetary exactions, and because Apple's privity theory is legally untenable, dismissal under Rule 12(b)(6) is impossible. At most, Apple may test its defenses on a full evidentiary record under Rule 56. The Court should therefore deny the motion to dismiss (or convert it under Rule 12(d)) and permit discovery to proceed.

After two decades of controlling how Americans access the internet, it is time for proper adjudication of the underlying conduct.

Date: May 26th, 2025

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Respectfully Submitted,

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

### CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Opposition was delivered via ECF to all interested parties.

Executed on this 26th day of May, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

PLAINTIFFS' SUR-REPLY TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

RACHEL S. BRASS (SBN 219301)
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, CA  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Coronavirus Reporter Corporation, Calid Inc., Greenflight Venture Corporation, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>Apple Inc<br><br>Defendant. | CASE NO. 3:24-CV-08660-EMC<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: May 22, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

    I.     Plaintiffs' Claims are Barred by Res Judicata (Claims 1–9) ......................................1

    II.    Plaintiffs Lack Antitrust and Article III Standing (Claims 1–9) ...............................5

         A.    Plaintiffs Lack Standing for Their App Rejection and Suppression
             Claims (5–9) ....................................................................................................6

         B.    Plaintiffs Lack Standing for Their Smartphone Monopolization Claims
             (1–4) ................................................................................................................7

         C.    Plaintiff Greenflight Lacks Standing (1-9) ....................................................10

    III.   Plaintiffs Fail To Plead Antitrust Violations (Claims 1–8) ......................................10

         A.    The FAC Does Not Adequately Allege the Relevant Markets .....................10

         B.    Plaintiffs' Antitrust Claims Fail For Additional Reasons .............................12

    IV.   Plaintiffs' State-Law Claims Fail as Well (Claim 9) ...............................................15

CONCLUSION ..................................................................................................................15

ER 246

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ........................................................................ 13, 14

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) .................................................................................. 8

*Alivecor, Inc. v. Apple Inc.*,
2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ....................................................... 15

*Allen v. Wright*,
468 U.S. 737 (1984) ................................................................................................ 9

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ................................................................................ 7

*Am. President Lines, LLC v. Matson, Inc.*,
2025 WL 870383 (D.D.C. Mar. 19, 2025) .......................................................... 12

*Arizona v. Tohono O'odham Nation*,
818 F.3d 549 (9th Cir. 2016) .................................................................................. 4

*Arunachalam v. Fremont Bancorporation*,
2015 WL 12806552 (N.D. Cal. May 4, 2015) ....................................................... 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .............................................................................................. 12

*Ass'n of Wash. Public Hosp. Dist. v. Philip Morris, Inc.*,
241 F.3d 696 (9th Cir. 2001) .................................................................................. 9

*ATL Corp. v. City of Seattle*,
532 F. App'x 673 (9th Cir. 2013) ........................................................................... 5

*Bakay v. Apple Inc.*,
2024 WL 3381034 (N.D. Cal. July 11, 2024)......................................................... 9

*Belton v. Comcast Cable Holdings, LLC*,
151 Cal. App. 4th 1224 (2007) ............................................................................. 15

*Beverage v. Apple Inc.*,
101 Cal. App. 5th 736 (2024) ............................................................................... 15

*Blue Shield of Virgina v. McCready*,
457 U.S. 465 (1982).................................................................................................8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).................................................................................................8

iii

Gibson, Dunn &
Crutcher LLP

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)..................................................................................................14

*Coronavirus Reporter v. Apple Inc.*,
144 S. Ct. 2526 (2024).................................................................................................4

*Coronavirus Reporter v. Apple Inc.*,
2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)......................................... 1, 2, 3, 4, 6, 7, 10

*Coronavirus Reporter v. Apple Inc.*,
85 F.4th 948 (9th Cir. 2023)...........................................................................4, 6, 10, 11

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,
11 F.3d 1460 (9th Cir.1993)..........................................................................................2

*Eastman v. Union Pac. R.R. Co.*,
493 F.3d 1151 (10th Cir. 2007) ....................................................................................4

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021)...................................................................... 7, 14

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................................. 6, 13

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015)............................................................................8

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)......................................................................................12

*Gamboa v. Apple Inc.*,
2025 WL 660190 (N.D. Cal. Feb. 28, 2025) .................................................................13

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
433 F. App'x 598 (9th Cir. 2011) ...............................................................................11

*In re Gottheiner*,
703 F.2d 1136 (9th Cir. 1983) ......................................................................................5

*Harnett v. Billman*,
800 F.2d 1308 (4th Cir. 1986) ......................................................................................2

*Hogan v. Amazon.com, Inc.*,
2025 WL 869202 (9th Cir. Mar. 20, 2025).....................................................................8

*Int'l Union of Operating Eng'rs-Emps. Constr. Indus. Pension, Welfare & Training
Tr. Funds v. Karr*,
994 F.2d 1426 (9th Cir. 1993) ......................................................................................2

*JamSports & Ent., LLC v. Paradama Prods., Inc.*,
336 F. Supp. 2d 824 (N.D. Ill. 2004) ..........................................................................14

*John Doe 1 v. Abbott Lab'ys*,
571 F.3d 930 (9th Cir. 2009)................................................................................ 10, 14

iv

Gibson, Dunn &
Crutcher LLP

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ................................................................................ 14

*Key v. Qualcomm, Inc.*,
    129 F.4th 1129 (9th Cir. 2025) .............................................................................. 14

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ................................................................................... 9

*Lawlor v. National Screen Serv. Corp.*,
    349 U.S. 322 (1955) .................................................................................................. 2

*LN Mgmt., LLC v. JPMorgan Chase Bank*,
    957 F.3d 943 (9th Cir. 2020) ................................................................................... 3

*Lunn v. City of L.A.*,
    629 F. Supp. 3d 1007 (C.D. Cal. 2022) ................................................................ 12

*McPherson v. Toro*,
    2023 WL 7647289 (E.D. Va. Nov. 14, 2023) ......................................................... 2

*Mintz v. Mark Bartelstein & Assocs.*,
    906 F. Supp. 2d 1017 (C.D. Cal. 2012) .................................................................. 3

*Mpoyo v. Litton Electro-Optical Sys.*,
    430 F.3d 985 (9th Cir. 2005) ................................................................................... 1

*New Hampshire*, 532 U.S. 749 ...................................................................................... 4

*In re NFL's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................................. 6

*Nicklas v. Prof. Ass'n, LLC.*,
    2018 WL 8619646 (D. Wyo. Sept. 26, 2018) ....................................................... 15

*Ore. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ................................................................................... 8

*PhantomALERT v. Apple Inc.*,
    --- F. Supp. 3d ---, 2025 WL 71888 (D.D.C. Jan. 10, 2025) ................................ 7, 9, 11

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ................................................................................... 7

*S.E.C. v. Neman*,
    2015 WL 12745802 (C.D. Cal. Dec. 8, 2015) ........................................................ 5

*SaurikIT, LLC v. Apple Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) ........................................................... 2

*In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2022 WL 710192 (W.D. Mo. Mar. 9, 2022) ......................................................... 15

*Solinger v. A. M. Recs., Inc.*,
    718 F.2d 298 (9th Cir. 1983) ................................................................................. 10

Gibson, Dunn &
Crutcher LLP

v

*Sonner v. Premier Nutrition*,
  971 F.3d 834 (9th Cir. 2020) ..................................................................................................15

*Stein v. United Artists Corp.*,
  691 F.2d 885 (9th Cir. 1982) ..................................................................................................10

*Stromberg v. Qualcomm*,
  14 F.4th 1059 (9th Cir. 2021) ...................................................................................................6

*Turtle Island Restoration Network v. U.S. Dep't of State*,
  673 F.3d 914 (9th Cir. 2012) ............................................................................................... 1, 3

*United States v. A.H. Fischer Lumber Co.*,
  162 F.2d 872 (4th Cir. 1947) ....................................................................................................4

*Unlockd Media, Inc. Liq. Trust v. Google LLC*,
  2025 WL 563460 (N.D. Cal. Feb. 20, 2025) ............................................................................7

*Yniguez v. State of Ariz.*,
  939 F.2d 727 (9th Cir. 1991) ....................................................................................................4

**Statutes**

15 U.S.C. § 6a ....................................................................................................................................2

Wyo. Stat. § 40-12-108(a) ...............................................................................................................15

Wyo. Stat. § 40-12-110(a) ...............................................................................................................15

**Rules**

Fed. R. Civ. P. 11 ...............................................................................................................................4

Fed. R. Civ. P. 17 ...............................................................................................................................4

Gibson, Dunn &
Crutcher LLP

## INTRODUCTION

As Plaintiffs would have it, this case asks "whether an iPhone owner truly owns their device or remains perpetually subject to [Apple's] unilateral control over what software can run on it." Opp. 1. But arguing that "smartphone devices" are "the property of the users, the general public, and should exist as a 'common carrier' free from Apple's control" is the theory Plaintiffs tried and lost in *Coronavirus I*. *Coronavirus I*, Dkt. 41 ¶ 78. Faced with a clear *res judicata* bar, Plaintiffs tie themselves in knots: They argue that every entity prosecuting *Coronavirus I* was fake, and the real plaintiffs (with the same names) in this case can assert the same claims because Apple's alleged conduct against other developers has continued. *See* Opp. 3–9. That argument fails as a matter of common sense, logic, and law. And even if Plaintiffs' claims are not precluded, they are once again foreclosed by binding precedent many times over. The Court should dismiss Plaintiffs' claims with prejudice.

## ARGUMENT

### I. Plaintiffs' Claims are Barred by Res Judicata (Claims 1–9)

Plaintiffs offer no basis on which their claims can proceed under the "well-established res judicata test" because there is an identity of claims, a final judgment on the merits, and identity of parties. *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

**1.** Plaintiffs do not contest the fundamental identity of claims between this case and *Coronavirus I*. *See* Mot. 6–7. They concede, for example, that this case challenges Apple's alleged "lockdown on iOS app distribution," Opp. 1—just as *Coronavirus I* "challenge[d] Apple's allegedly monopolist operation of its 'App Store.'" 2021 WL 5936910, at *1. Plaintiffs also do not dispute that they lifted allegations and claims directly from *Coronavirus I* and assert the same alleged injuries. *See* Mot. 6–7. Thus, their claims "'could conveniently [have been] tried together'" with those in *Coronavirus I*. *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).

Plaintiffs insist this case is based on "new, subsequent transactions." Opp. 8. But they do not cite a single paragraph of the Complaint to substantiate that argument. *See id.* This case, like *Coronavirus I*, concerns Apple's alleged suppression or rejection of the Coronavirus Reporter, CALID, and Webcaller apps. FAC ¶¶ 93–114, 119–33; *Coronavirus I*, Dkt. 41 ¶¶ 30, 46–82, 94–102, 105–07. These apps were allegedly either rejected, "abandoned," or suppressed by the time the Court dismissed

Gibson, Dunn & Crutcher LLP

1

*Coronavirus I. Coronavirus I*, 2021 WL 5936910, at *2 (N.D. Cal. Nov. 302, 2021); FAC ¶¶ 105, 128, 132. Whatever conduct Plaintiffs claim "persisted and materially expanded" involved *other* "developers," Opp. 8–9, the conduct giving rise to *Plaintiffs' claims* "antedate[s] the original action." *Int'l Union of Operating Eng'rs-Emps. Constr. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993). That distinguishes this case from *Lawlor v. National Screen Service Corp.*, in which the challenged conduct was "*all* subsequent to" the prior judgment. 349 U.S. 322, 328 (1955) (emphasis added); *see also McPherson v. Toro*, 2023 WL 7647289, at *5 (E.D. Va. Nov. 14, 2023) (explaining *Lawlor*'s "narrower" holding in rejecting argument akin to Plaintiffs').[1]

Similar is Plaintiffs' assertion that the claims they copied from the Department of Justice's complaint (Claims 1–4) "were unavailable" when they filed *Coronavirus I.* Opp. 9. To the contrary, many of those allegations expressly date back many years before *Coronavirus I* (Dkt. 31-1 ¶¶ 66, 69, 71, 76, 101)—relying on alleged comments made in 2010, 2013, 2016, and 2019 (*id.* ¶¶ 3, 93). Plaintiffs allege no theory of liability that accrued after *Coronavirus I* concluded. That is dispositive because, "[f]or purposes of res judicata, it is not necessary to ask if the plaintiff knew of his present claim at the time of the former judgment, for it is the existence of the present claim, not party awareness of it, that controls." *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986). And again, even if it were true that the allegations borrowed from the Government's case reflect "deeper patterns of . . . conduct" (Opp. 9), that does not change the ultimate fact that Plaintiffs' claims here arise from the same alleged grievance, and seek to redress the same alleged injury, as *Coronavirus I. See* Mot. 7.

Plaintiffs gesture at Apple's response to European laws and the *Epic* injunction but fail to show how either matters here. Opp. 9. Plaintiffs allege U.S. markets, FAC ¶¶ 231–37; Apple's business model changes in Europe are well beyond the ambit of this case. *See* 15 U.S.C. § 6a (claims cannot be premised on foreign conduct without a "direct, substantial, and reasonably foreseeable effect" on U.S.

---

[1] Plaintiffs assert they continued to pay an annual $99 developer fee. Opp. 8. But they challenged that fee in *Coronavirus I* too (*Coronavirus I*, Dkt. 41 ¶¶ 231–240), and claims remain precluded where "[d]istinct conduct is alleged only in the limited sense that every day is a new day, so doing the same thing today as yesterday is distinct from what was done yesterday." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464 (9th Cir. 1993); *see also SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (plaintiffs do not allege a new antitrust violation where the "term in question" of challenged agreement has not changed).

Gibson, Dunn &
Crutcher LLP

commerce).  This case also has nothing to do with the link entitlement program at issue in *Epic*, which Plaintiffs allege merely "serves as evidence that Apple intends to charge . . . for notary stamps and/or notarization services," FAC ¶ 223—a theory litigated in *Coronavirus I*.  2021 WL 5936910, at *4.  Notably, they ignore cases like *Turtle Island*, which reject attempts, like Plaintiffs', to evade *res judicata* by asserting new "'example[s]'" of alleged "long-standing practice[s]."  673 F.3d at 918.  Otherwise, "there would be nothing stopping [Plaintiffs] from bringing a new general challenge" to Apple's longstanding practices "based on next year's . . . decisions, and every year from now on."  *Id.* at 919.

**2.** Acknowledging that a dismissal with prejudice is a final judgment on the merits, Plaintiffs argue that *Coronavirus I* is not preclusive because "jurisdiction never attache[d]."  Opp. 5.  That is wrong: Even accepting Plaintiffs' null-entity argument (which is wrong, *see infra* at 3–5), some plaintiffs were properly named (*e.g.*, Jeffrey Isaacs).  The Court therefore had jurisdiction to decide *Coronavirus I*, and its dismissal is a final judgment with preclusive effect.  *See LN Mgmt., LLC v. JPMorgan Chase Bank*, 957 F.3d 943, 952 (9th Cir. 2020) (recognizing that while "a plaintiff without legal existence" lacks Article III standing, jurisdiction attaches if there is "'*a* real plaintiff at the inception of the suit'" (emphasis added)).  The lone case Plaintiffs cite to suggest otherwise is a contract and tort suit, *Mintz v. Mark Bartelstein & Assocs.*, 906 F. Supp. 2d 1017, 1024 (C.D. Cal. 2012); it says nothing about a court's jurisdiction over a case involving a "misnamed" entity.  Opp. 4–5.

**3.** To fend off *res judicata*, Plaintiffs devote most of their brief trying to escape the inescapable: That the parties to this case are the same as, or otherwise bound by, the parties in *Coronavirus I*.  *See* Mot. 9–10.  Neither of their arguments persuade.

*First*, Plaintiffs argue that none of the three corporate plaintiffs in *Coronavirus I* in fact existed and that Apple is judicially estopped from arguing otherwise.  Opp. 3–6.  But the comment on which Plaintiffs seize concerned only one plaintiff (Coronavirus Reporter), and Plaintiffs mischaracterize the statement.  In a footnote, Apple pointed out that Plaintiffs had failed multiple times to file proper corporate disclosure statements, and that "Coronavirus Reporter" did not, strictly speaking, refer to a real entity.  *Coronavirus I*, No. 22-15166, Dkt. 38 at 6, 7 & n.4 (9th Cir.).  Apple's concern—that Plaintiffs could have been obfuscating the real parties in interest (*see*, *e.g.*, *Coronavirus I*, Dkt. 32 at 6)—has borne out in this case.  Regardless, Apple did not seek affirmance based on a lack of jurisdiction over

Gibson, Dunn & Crutcher LLP

3

"Coronavirus Reporter" and had proceeded throughout the litigation on the express assumption that the "Wyoming Corporation" called "Coronavirus Reporter" was "Coronavirus Reporter Corporation." *Id.*

Even if Plaintiffs could characterize Apple's current position as inconsistent with the one it struck in *Coronavirus I*, estoppel does not apply because Apple did not "succeed[] in persuading a court to accept [its] former position." *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007); *see also Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 559 (9th Cir. 2016). Plaintiffs seek to rewrite history by arguing they "conceded" the point and the Ninth Circuit adopted it. Opp. 3. That's fiction. Plaintiffs cite no such concession because there was none. And the Ninth Circuit affirmed the dismissal of *Coronavirus I* because Plaintiffs failed to state a plausible antitrust, contract, fraud, or racketeering claim. 85 F.4th 948, 957–59 (9th Cir. 2023). No court in *Coronavirus I* addressed Apple's complaints that Plaintiffs failed to disclose the real parties in interest as required by Federal and Local Rules. *See Coronavirus I*, 2021 WL 5936910 at *18–20; *Coronavirus I*, 85 F.4th at 959; *Coronavirus I*, 144 S. Ct. 2526, 2526 (2024).[2]

Estoppel aside, Plaintiffs cannot square their current position—that *none* of the entity plaintiffs in *Coronavirus I* existed, Opp. 5—with their scores of representations and course of conduct to the contrary. *See* Mot. 3, 8–9. Plaintiffs' limp rejoinder is that they filed a certiorari petition on behalf of nonexistent entities "in an abundance of caution to reserve all possibilities for curing the defect." Opp. 3 n.1. That explains nothing. Plaintiffs never informed the Supreme Court of this supposed caveat— despite the jurisdictional significance Plaintiffs now ascribe to it. *See* Pet. For Writ of Cert. at 5, *Coronavirus Rep. v. Apple Inc.*, No. 23-1089 (Apr. 3, 2024). It also leaves several problems unanswered: What was the "Wyoming corporation" called "Coronavirus Reporter" if not "Coronavirus Reporter Corporation"? *Coronavirus I*, Dkt. 41 ¶ 27. And if Calid Inc. "lack[s] legal identity," Opp. 3, why is it a plaintiff in this case? "A suit at law is not a children's game, but a serious effort on the part of adult

---

[2] If anyone should be estopped, it is Plaintiffs. The corporate plaintiffs in *Coronavirus I* represented they were "the real party in interest" on whose behalf "[a]n action must be prosecuted." Fed. R. Civ. P. 17; *see also* Fed. R. Civ. P. 11. In so doing, they induced this Court and others to invest "valuable judicial resources evaluating" their claims on the merits. *Yniguez v. State of Ariz.*, 939 F.2d 727, 739 (9th Cir. 1991). And if they were allowed a redo by adding a "Corp." to one entity's name—or by adding another entity that, they now say, is the actual developer of record—they would secure an unfair, second chance to relitigate claims already put to rest. *See New Hampshire*, 532 U.S. at 749–50.

4

Gibson, Dunn & Crutcher LLP

human beings to administer justice." *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 873 (4th Cir. 1947). To maintain that counsel conducted a reasonable investigation yet missed that none of his clients existed makes a mockery of that process—at the Court's and Apple's expense.

*Second*, Plaintiffs argue that *Coronavirus I* was litigated "*pro se*," and a *pro se* party cannot bind a corporation. Opp. 7–8. The premise is false: Plaintiffs do not explain how Calid Inc. or Primary Productions LLC—plaintiffs to *Coronvairus I* represented by counsel—were supposedly misidentified. *See id.* at 4–6. This argument also conflates individual non-lawyers' ability to represent a corporation in federal court (*see id.* at 6–7) and individual litigants' ability to bind corporate entities in subsequent litigation (*see* Mot. 9). The latter is at issue here, and Plaintiffs do not respond to binding precedent holding that individuals and entities share a "'substantial identity'" where "a person owns most or all of the shares in a corporation and controls the affairs of the corporation." *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983); *see also* Mot. 9–10. Contrary to Plaintiffs' assertion (Opp. 6), courts bind corporate plaintiffs in such circumstances. *See*, *e.g.*, *ATL Corp. v. City of Seattle*, 532 F. App'x 673, 674–75 (9th Cir. 2013); *S.E.C. v. Neman*, 2015 WL 12745802, at *10 (C.D. Cal. Dec. 8, 2015).

Plaintiffs also argue that Isaacs cannot bind Greenflight because he is a mere "shareholder." Opp. 8. But the allegation they cite says Greenflight is one of "*his* controlled entities." *Id.* (brackets removed, emphasis added); *see also Coronavirus I*, Dkt. 41 ¶ 30 (similar). That is consistent with corporate and litigation filings—which Plaintiffs ignore—showing Isaacs owns Greenflight, is its chief and sole officer, and controls the company. *See* Mot. 9. Thus, Greenflight is "so closely related to the interest of [Isaacs] to be fairly considered to have had [its] day in court," and *Coronavirus I* binds it no less than the other *Coronavirus II* plaintiffs. *In re Gottheiner*, 703 F.2d at 1139 (finding privity between corporation and its sole, controlling shareholder); *see also Arunachalam v. Fremont Bancorporation*, 2015 WL 12806552, at *2 (N.D. Cal. May 4, 2015) (similar).

## II.    Plaintiffs Lack Antitrust and Article III Standing (Claims 1–9)

Preclusion aside, Plaintiffs lack standing to bring this lawsuit. Plaintiffs do not dispute that they must allege both Article III and antitrust standing. *See* Mot. 10. But the confused arguments in their opposition—which conflate their claims and run afoul of controlling precedent—provide no basis for constitutional or statutory standing. For this reason too, the Court should dismiss Plaintiffs' claims.

**A.    Plaintiffs Lack Standing for Their App Rejection and Suppression Claims (5–9)**

The "primary focus" of this lawsuit remains the same as *Coronavirus I*: "Apple's control over access to the App Store" and "rejection of Plaintiffs' (and other developers') apps." Dkt. 37 at 2. That case failed because antitrust claims require "injury to competition in the market as a whole," yet Plaintiffs' claims over rejected and suppressed apps were "confined to specific harms experienced by Plaintiffs or a small group of competitors." *Coronavirus I*, 2021 WL 5936910, at *13–16 (quotation marks omitted); *accord Coronavirus I*, 85 F.4th at 956. Plaintiffs point to no "extraordinary difference" here to change the result. *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021).

Plaintiffs' main claim is that by "blocking entire classes of apps and cross-platform services," Apple "diminishes the total number of meaningful offerings on iOS." Opp. 10. That is the same theory—that Apple "injures competition by excluding a number of developers from launching"—peddled to establish antitrust standing in *Coronavirus I*, 2021 WL 5936910, at *14. It fails for the same reason. This is not *antitrust* injury because Apple's curation "may well serve the best interests of consumers" and, in doing so, "increase[] interbrand competition." *Id.*; *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (harm from "the normal circumstances of free competition" is not antitrust injury). Just as antitrust law doesn't prevent a newspaper "decid[ing] which advertisements may properly be posted or which to accept," *Coronavirus I*, 2021 WL 5936910, at *15, it also does not require Apple to carry any app or "categor[y]" of app. Even if that reduces "choice," "output" and "app availability" in some sense, Opp. 10, it is an intrabrand restraint that differentiates Apple and thereby enhances interbrand competition with other platforms—"the primary goal of the antitrust laws." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 987 (9th Cir. 2023).

None of the allegations Plaintiffs cite to "show marketwide harm" differ from those rejected in *Coronavirus I*. Opp. 10. Paragraph 88 just identifies Apple's COVID-19 app policy. FAC ¶ 88. Paragraphs 129–32 are about Apple's alleged rejection and suppression of Plaintiffs' apps, copied almost verbatim from *Coronavirus I*. *Compare* FAC ¶¶ 129–32 *with Coronavirus I*, Dkt. 41 ¶¶ 95–97, 104–05. Paragraph 149 does not even mention app rejection, much less Plaintiffs' apps. FAC ¶ 149. And the allegations that Apple "stifled innovation," reduced "consumer choice," and "disadvantage[ed] developers" (FAC ¶¶ 164–65) are no different from those deemed "conclusory" and "insufficient" in

6

Gibson, Dunn &
Crutcher LLP

*Coronavirus I*, 2021 WL 5936910, at \*14; *see* Mot. 11–12.

Nor do Plaintiffs plausibly allege that Apple "reject[s] or bur[ies] rival apps" to "self-prefer-enc[e]" its own. Opp. 11. The Complaint actually alleges that Apple both publishes and promotes apps—including COVID-tracing and video-conferencing apps—that compete with its own. FAC ¶¶ 106, 121, 344. The Complaint acknowledges that there were many such apps, including those developed by other third-party developers. *See id.* That some such apps are rejected means only that the rejection of Plaintiffs' apps shifted sales from one seller to one another. Plaintiffs do not mention, much less distinguish, cases like *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987), and *Unlockd Media, Inc. Liquidation Tr. v. Google LLC*, 2025 WL 563460, at \*4 (N.D. Cal. Feb. 20, 2025), that hold such allegations are not enough to establish standing. *See* Mot. 11–12.

### B. Plaintiffs Lack Standing for Their Smartphone Monopolization Claims (1–4)

Plaintiffs' opposition confirms they lack standing to bring their smartphone-related claims.

**1.** First, Plaintiffs do not dispute they may have "antitrust injury" (and thus antitrust standing) only if they "suffer[] [their] injury in the market where competition is being restrained." *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999); *see also* Mot. 13–14. To try to shoehorn their claims within that rule, Plaintiffs now assert that Apple's restrictions on app creation, distribution, and APIs were "'anticompetitive acts' in the smartphone market" that "directly curtail[]" developers. Opp. 11. Not so. Smartphones are "devices" that "consumers purchase," FAC ¶ 198, whereas APIs and app distribution are technologies or services Apple provides to *developers*. *Id.* ¶¶ 35, 40. Whether that happens in the "apps market," the "app distribution" markets, or somewhere else entirely, it certainly is not in the market where "devices" are "independent[ly]" bought and sold—the relevant "area of effective competition" for these claims. FAC ¶¶ 202, 226; *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1016–21 (N.D. Cal. 2021) (finding mobile game apps transactions market to be relevant market for challenge to restraints on distribution and services to developers).

Therein lies the "mismatch" between "the market allegedly controlled by Apple and the market where [Plaintiffs] are allegedly injured." *PhantomALERT v. Apple Inc.*, --- F. Supp. 3d --- , 2025 WL 71888, at \*6 (D.D.C. Jan. 10, 2025). Courts in this Circuit routinely dismiss antitrust claims premised on alleged harm in a market distinct from the one allegedly restrained. *See Hogan v. Amazon.com,*

7

Gibson, Dunn &
Crutcher LLP

*Inc.*, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) (rejecting antitrust claim when injuries occurred in different market from one in which competition was restrained); *see also* Mot. 13–14 (collecting additional cases). Plaintiffs grapple with none of these decisions. They instead invoke *Blue Shield of Virgina v. McCready*, 457 U.S. 465 (1982). Opp. 12. But *McCready* provides an "exceedingly narrow" exception where "injuring the plaintiff is a necessary part of the anticompetitive scheme." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028 (N.D. Cal. 2015). Plaintiffs never explain how rejecting their COVID app or de-ranking their video-conferencing apps is a necessary part of "decreasing barriers to switching to another smartphone" in the alleged relevant market. FAC ¶ 13. Plus, Plaintiffs do not dispute they "are neither 'consumers' nor 'competitors' in the [alleged] relevant market." *Ore. Labor-ers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) (rejecting argument that *McCready* authorizes claims by plaintiff that does not participate in the relevant market).

Plaintiffs try to avoid the mismatch by casting their claims as "leveraging." Opp. 11–12. Monopoly leveraging refers to a theory in which a party with monopoly power in one market uses that power anticompetitively to foreclose, and thereby monopolize, a second market. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991). But in arguing that Apple uses alleged power in the smartphone market to "impose unilateral constraints on third-party developers." Opp. 11–12, Plaintiffs invoke a theory that bears no relation to their allegations. The Complaint has it the other way around: It says Apple "suppress[es] technologies" in one (or more) *non-device* markets to prevent "increased competition among smartphones." FAC ¶¶ 13–15. References to leveraging therefore solve nothing: Plaintiffs' claims are premised on alleged monopolization of a smartphone market, so alleged "barriers to distribution" and lost opportunity to "launch[] or monetiz[e]" apps, Opp. 11, cannot be antitrust injury as they do not "reflect the anticompetitive effect" of Apple's conduct *on the allegedly monopolized smartphone market*. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also* FAC at 104 (seeking damages for lost revenue and sales of suppressed apps). Indeed, Plaintiffs claim to suffer these alleged harms in the "underlying … app markets" *regardless* of whether smartphone prices are higher, phone quality is lower, or fewer phones are sold. Opp. 13; *see also id.* at 10. As *PhantomALERT* explains, "Apple's alleged power in the smartphone market is at best tangential to the injuries" Plaintiffs assert, meaning Plaintiffs suffered "no 'antitrust injury' in the

Gibson, Dunn &
Crutcher LLP

8

smartphone market." 2025 WL 71888, at *6.[3]

**2.** Even if Plaintiffs plead injury causally related to smartphone competition, it is too "specula-tive" and "attenuated" to confer antitrust standing. *Bakay v. Apple Inc.*, 2024 WL 3381034, at *5–7 (N.D. Cal. July 11, 2024). As Apple explained, Plaintiffs' theory assumes—against all logic—that had Apple only allowed their COVID and cross-platform apps onto iOS, Android stores would have done the same, consumers would have been empowered to switch to Android devices, their "expectations" and "demand for apps" would have increased, and developers like Plaintiffs would be better off. Mot. 14; *see also* FAC ¶ 165. Plaintiffs say it is "improper" to assess these allegations "at the motion stage" because of their "specificity." Opp. 13. But that conflates specificity with attenuation: Even a specific theory can be too attenuated to confer antitrust standing. *See, e.g.*, *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696, 703 (9th Cir. 2001) (medical costs too remote from conspiracy to suppress information about smoking harm); *Bakay*, 2024 WL 3381034, at *6 (smartphone prices too remote from mobile web-browser restraints).

Regardless, Plaintiffs' theory also "falls short of plausibility." *Bakay*, 2024 WL 3381034, at *6. Plaintiffs do not defend their attenuated chain of implausible inference on inference. *See* Opp. 13. They instead ask the Court to look past their theory's "chain-of-causation leap" and look at developer harm in the "underlying . . . app markets." Opp. 13. That would rewrite their Complaint: This alleged harm in the "underlying app markets," Plaintiffs acknowledge, stems from "Apple's single mandated channel" and "suppress[ion] of apps." *Id.* In other words, this is the theory put forward in Plaintiffs' *other* claims—holdovers from *Coronavirus I*—not the claims concerning alleged monopolization of a smartphone market. And even if Plaintiffs had tried to tie their alleged harm to the challenged smartphone monopolization, such a theory would entail a highly speculative inquiry: Their claim that a different COVID app had "five million daily users" provides no guide to measure their lost "goodwill and revenues," much less that of thousands of diverse developers across the "smartphone ecosystem." Opp. 13–14; *see also Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (no antitrust standing where claims required "entirely speculative" creation of "a technological universe").

---

[3] For the same reason, Plaintiffs fail to allege "causation" between the "illegal conduct and injury" as Article III demands. *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see also* Mot. 12–13.

9

Gibson, Dunn & Crutcher LLP

### C.    Plaintiff Greenflight Lacks Standing (1-9)

Finally, Greenflight independently lacks standing because its only alleged connection to this case is as an investor in the other plaintiffs.  FAC ¶¶ 49, 128, 131.  Plaintiffs do not deny that investors cannot recover for antitrust harms done to corporations in which they invest.  Nor do they dispute that Greenflight seeks damages for the same lost goodwill and revenues as another plaintiff, FAC at 104 E.b—raising the very risk of "double recovery" that the no-shareholder-standing rule guards against. *See Stein v. United Artists Corp.*, 691 F.2d 885, 896–97 (9th Cir. 1982).  That is dispositive of Green-flight's standing.  *See, e.g., id.*; *Solinger v. A. M. Recs., Inc.*, 718 F.2d 298, 299 (9th Cir. 1983).

Plaintiffs claim Greenflight has standing because "[i]ts" Caller-ID app was subject to "ranking suppression."  Opp. 14.  Setting aside Plaintiffs' past representation that this app belonged to Isaacs, *see supra* at 5, the Complaint's only mention of Caller-ID says it "ranked in the App Store Top-10 for many years"—not that it was suppressed.  FAC ¶ 49.  Plaintiffs cannot now "amend their complaint through motion practice."  *Coronavirus I*, 2021 WL 5936910, at *7.  And if Caller ID had been suppressed—as alleged in *Coronavirus I* (*see Coronavirus I*, Dkt. 41 ¶ 30)—then Plaintiffs cannot say, as they now do, that Greenflight "had no direct stockholder stake in" that case.  Opp. 7.  Nor can Green-flight assert standing because it allegedly paid Apple's $99 developer fee.  *See id.* at 14–15.  Antitrust injury must be causally connected to "anticompetitive conduct," *Coronavirus I*, 85 F.4th at 957, and "'[s]imply possessing monopoly power and charging monopoly prices does not violate'" the antitrust laws. *John Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009); *see infra* at 14.  Whether or not Greenflight's claims are precluded by *Coronavirus I*, it lacks antitrust standing to bring them.

### III.   Plaintiffs Fail To Plead Antitrust Violations (Claims 1–8)

### A.    The FAC Does Not Adequately Allege the Relevant Markets

The plausibility of Plaintiffs' markets was already decided by this Court, 2021 WL 5936910, at *6–13, and affirmed by the Court of Appeals, 85 F.4th at 954–57.  Even if Plaintiffs are not estopped from repeating their claims, their market allegations here fail for the same reasons.  *See* Mot. 16–18.

To start, Plaintiffs ask the Court to ignore their many references to undefined markets as mere "factual observations."  Opp. 19; *see, e.g.*, FAC ¶¶ 127, 133, 162.  But Plaintiffs' arguments belie that excuse and point up the problem.  Elsewhere in their brief, for example, Plaintiffs argue that Apple's

Gibson, Dunn & Crutcher LLP

10

conduct "bottleneck[ed] the app market and sub-sectors" and "damage[d] the app markets"—without explaining which "sub-sectors" or "app markets" correspond to which "markets" or "factual observations." Opp. 9–11. Thus, the problem is not, as Plaintiffs now argue, that they are trying to "define more than one market." Opp. 20. To use Plaintiffs' words, it is that "[n]othing in the FAC states or implies that every mention of 'market' is a *standalone antitrust market*." *Id.* at 19; *see Coronavirus I*, 85 F.4th at 956 (rejecting antitrust complaint where markets "lack sufficient clarity").

In any event, the four markets on which Plaintiffs now focus—"smartphone[s]," "smartphone apps," "app stores," and "iPhone notary stamps," Opp. 18–19—each fail. Start with the alleged smartphone market. Plaintiffs say they lifted these allegations "verbatim" from the Government's complaint. Opp. 19. Even so, that does not change that a smartphone device market is not *relevant* here. As Apple pointed out, *PhantomALERT* considered similar arguments from a developer asserting similar claims and deemed the same exact market irrelevant because it isn't the one from which Plaintiffs' "asserted harms derive." 2025 WL 71888, at *6. Plaintiffs acknowledge as much and have no response aside from their misplaced allusion to "leveraging." Opp. 12 n.2; *see also supra* at 8.

Nor do they patch up the problems with their other alleged markets. To remedy "confusion" about their "U.S. smartphone apps" and "U.S. smartphone app distribution services" markets, Plaintiffs "clarify" that the latter does not include PC apps. Opp. 19. But the Complaint does not refer to a defunct "*former* phone app store," *id.* (emphasis added); it alleges a current "[a]lternative[] to the App Store" (*i.e.*, Microsoft's PC marketplace). FAC ¶ 207. And if "app distribution services" is a single-brand market as Plaintiffs suggest, *id.* ¶ 210, then there should be no "[a]lternatives" at all, *id.* ¶ 207. The notion of an "app market" also remains hopelessly vague and overbroad: To which of Plaintiffs' claims does that market relate, and how are all genres of apps—from mobile gaming to health apps, to COVID-19 trackers—in a single market? *Golden Gate Pharm. Servs. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (rejecting alleged "pharmaceutical industry" market as too "broad"). As for the "single-brand aftermarket" for "Notary Stamps," Opp. 18–19, Plaintiffs do not point to alleged facts that "iOS consumers lacked awareness" of Apple's alleged notary-stamp restraints "when buying an iPhone"—one of the same problems that doomed this alleged market in *Coronavirus I*, 85 F.4th at 956; *see* FAC ¶¶ 219–30 (failing to allege consumer awareness). There are many dispositive flaws to which

Gibson, Dunn &
Crutcher LLP

11

Apple pointed, and Plaintiffs simply ignore.  *See* Mot. 17–18.

**B.      Plaintiffs' Antitrust Claims Fail For Additional Reasons**

Plaintiffs also fail to allege the required "element of anticompetitive conduct," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020), for all five of their antitrust theories: (1) refusal-to-deal, (2) tying, (3) excessive pricing, (4) essential facilities, and (5) ranking manipulation.  *See* Mot. 18–23.

**1. Refusal to Deal (Claims 1-4).**  Plaintiffs' smartphone monopolization claims, lifted from the Government's complaint, fail under long-established precedent.  Mot. 18–20.  Rather than try to defend those claims, Plaintiffs argue that they can challenge Apple's "refus[al] to distribute Plaintiffs' COVID app," under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  Opp. 20.  Apple's rejection of the Coronavirus Reporter app has no bearing on Plaintiffs' theory of smartphone monopolization, which concerns alleged restrictions on "access to APIs that have impeded apps and technologies including . . . super apps, cloud streaming, messaging, wearables, and digital wallets."  FAC ¶¶ 263–86.  Plaintiffs have therefore forfeited their first four claims.  *See Lunn v. City of L.A.*, 629 F. Supp. 3d 1007, 1014 (C.D. Cal. 2022) ("'Where a party fails to address arguments against a claim raised in a motion to dismiss, the claims are abandoned and dismissal is appropriate.'").

*Aspen*'s "limited exception" to the general no-duty-to-deal rule affords Plaintiffs no relief.  Opp. 20.  To start, Apple, in its role as a platform operator, is not refusing to deal with Plaintiffs as a competitor in the allegedly monopolized market.  *See Am. President Lines, LLC v. Matson, Inc.*, 2025 WL 870383, at *15 (D.D.C. Mar. 19, 2025).  Regardless, an alleged monopolist can have a duty to deal only if it "unilaterally terminate[d] a voluntary and profitable course of dealing" and "sacrifice[d] short-term benefits in order to obtain higher profits in the long run" from competitors' exclusion.  *Qualcomm*, 969 F.3d at 993–94 (cleaned up).  Apple terminated no preexisting course of dealing when it rejected Plaintiffs' COVID app.  *See* FAC ¶ 102.  And Plaintiffs' claim that Apple sacrificed profits by "relinquish[ing] immediate developer fees and commissions," Opp. 20, is belied by allegations that they continued to pay the $99 developer fee while offering Coronavirus Reporter as a free app (for which Apple collects no commission).  FAC ¶¶ 96, 252, 352.

**2. Tying (Claim 5).**  Plaintiffs argue at length that they challenge a tie subject to the *per se* rule.  Opp. 15–16.  They are wrong: Ties involving "highly innovative" "'software that serves as a platform

Gibson, Dunn &
Crutcher LLP

12

for third-party applications'"—whether integrated into other software or a hardware device—are subject to the rule of reason. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 997–98 (9th Cir. 2023). Regardless, Plaintiffs have not pleaded a plausible tying claim under any standard. *See* Mot. 20.

At the outset, Plaintiffs cannot establish standing to challenge the alleged tie. *See* Mot. 20–21. To suggest they were prevented from entering the alleged tied market (for app stores or notary stamps), Plaintiffs suggest it would be "trivial[]" for them to offer a competing app store. Opp. 16. But the allegation to which they point states, in conclusory fashion, that it "would be trivial to launch [such a store] *on their website*," FAC ¶ 292 (emphasis added)—and Plaintiffs maintain now that "desktop PC app storefronts" are *not* a "relevant distribution channel[]." Opp. 19. To the extent Plaintiffs mean to suggest that they could offer direct distribution of their own apps on their websites (called "sideloading"), that restriction is not the product of any alleged tie but rather a technical limit encoded in iOS. FAC ¶ 323. As Apple pointed out, alleged losses stemming from the lack of distribution of *Plaintiffs'* apps is not the result of the alleged tie—Apple's inclusion of the App Store on iPhones. *See* Mot. 21.

Nor do Plaintiffs salvage the other defects in their tying claim. Plaintiffs contend, for example, that "Apple's *EULA* and *DPLA*" are the agreements giving rise to the concerted action required to state a Section 1 claim. *See* Opp. 16. But they point to no actual provision in which Apple supposedly agrees with anyone to preload the App Store onto iPhones. *See* Mot. 21. And if Plaintiffs contend Apple's prohibition on sideloading is a "negative tie"—an alleged "agreement not to purchase [the tied product] from Apple's rivals," *Gamboa v. Apple Inc.*, 2025 WL 660190, at *5 (N.D. Cal. Feb. 28, 2025)—the Complaint says Apple has *unilateral* control over the "sideloading utilities," FAC ¶ 323, that "disallow" alternative distribution, *id.* ¶ 293. This is the same problem that led Judge Lee in *Gamboa*, 2025 WL 660190, at *5, to dismiss a similar claim asserting Apple tied iCloud to its mobile devices, and Plaintiffs offer no reason to reach a different result here.

These are far from the only problems. Plaintiffs also fail to explain how there is separate demand for iOS notary stamps—a "hardware constraint" "algorithmically bound" to the iPhone, FAC ¶¶ 219, 295—separate from smartphone devices themselves. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (plaintiff must allege defendant "'tied together the sale of two distinct products or services'"). Nor can Plaintiffs distinguish the Ninth Circuit's recent decision

Gibson, Dunn &
Crutcher LLP

13

in *Key v. Qualcomm, Inc.*, 129 F.4th 1129 (9th Cir. 2025), as a case with "no potential rival suppliers being excluded." Opp. 18. If "only Apple's proprietary code signature can unlock iOS usage" and "'no other platform in history required a notary stamp,'" *id.* at 19, 22, then no other developer would offer supposed notary stamps absent the alleged tie. *See Key*, 129 F.4th at 1139. That means consumers here only allegedly buy (at no cost) "something that he or she would not buy elsewhere"—with no attendant foreclosure of a supposed market for notary stamps. *Id.*

**3. $99 Fees (Claim 6).** Plaintiffs do not dispute that "'[s]imply possessing monopoly power and charging monopoly prices does not violate § 2.'" *John Doe 1*, 571 F.3d at 934. They therefore try to reframe their claim around "restrictions on alternative app channels." Opp. 21–22. That is inconsistent with their allegations. *See* FAC ¶ 308. It also would simply collapse this claim into the theory put forth in others—and therefore fail for the same reasons.

**4. Essential Facilities (Claim 7).** Without disputing the Supreme Court's "skepticism" about essential facilities claims, Plaintiffs maintain that Apple's "notarization control" is an essential facility because it "eliminates *a* direct path to launching applications." Opp. 22 (emphasis added). But that is not the standard: "A facility is not essential even if it is widely preferred by consumers and producers in the market, as long as there is an alternative (albeit inferior) venue." *JamSports & Ent., LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 839 (N.D. Ill. 2004). Accordingly, Plaintiffs' recognition of "other distribution channels" is anything but a "straw-man," Opp. 22; those allegations admit that "multiple avenues *do exist* to distribute the content to the consumer"—fatal to their claim. *Epic*, 559 F. Supp. 3d at 1050–51. For similar reasons, Apple's supposed control over notary stamps does not "carr[y] with it the power to *eliminate* competition in the downstream market," *Aerotec*, 836 F.3d at 1185 (emphasis added), because notary stamps have nothing to do with those alternatives, FAC ¶ 299.

**5. Ranking Manipulation (Claim 8).** Plaintiffs also fail to meaningfully engage with Apple's argument that Section 1 claims cannot proceed without an illegal agreement. Mot. 23–24; *see Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775–76 (1984). "Arrangements" that "facilitate Apple's preferential search outcomes," Opp. 23, are not alleged. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008) (Section 1 claim requires facts supporting alleged agreement). Nor do Plaintiffs engage with the cases rejected claims like theirs on other grounds. *See* Mot. 24.

Gibson, Dunn &
Crutcher LLP

## IV.    Plaintiffs' State-Law Claims Fail as Well (Claim 9)

**1. California's Unfair Competition Law.**  While Plaintiffs insist that their UCL claim is not "'derivative'" of their antitrust theories, Opp. 24, they adduce no distinct, coherent alternative.  California courts have made clear that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Beverage v. Apple Inc.*, 101 Cal. App. 5th 736, 751 (2024); *see also*, *e.g.*, *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1240 (2007) (rejecting "attempt to restate . . . tying theory under the unfairness prong" as a "separate inquiry into essentially the same question . . . would only invite conflict and uncertainty").

Plaintiffs also fail to explain how "$4.2 billion" in damages, Opp. 24, would be inadequate.  *See* Mot. 25.  Plaintiffs point out that "the UCL contemplates injunctive relief," Opp. 24, but the fact a statute authorizes an injunction, and Plaintiffs seek one, does not mean they allege the federal prerequisites to such relief.  *See*, *e.g.*, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  And while Plaintiffs assert (falsely) that "Apple's conduct 'cost lives,'" they cite no "ongoing" injury to themselves.  Opp. 24.  They also fail to explain how their contemplated injunction could be administrable.  *See Alivecor, Inc. v. Apple Inc.*, 2024 WL 591864, at *16 (N.D. Cal. Feb. 13, 2024).

**2. Wyoming Consumer Protection Act.**  Plaintiffs' WCPA claims also fail for the same reasons as their antitrust claims.  *See* Wyo. Stat. § 40-12-110(a)(i).  Beyond this, Plaintiffs argue not all developers are "commercial entities," Opp. 25, but a consumer under the WCPA is one who "purchase[s] the product for personal use." *In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg.*, *Sales Pracs., & Prods. Liab. Litig.*, 2022 WL 710192, at *25 (W.D. Mo. Mar. 9, 2022); *see also* Wyo. Stat. § 40-12-108(a).  According to Plaintiffs' own characterization, app developers are not consumers in that sense because they are procuring technology from Apple to provide apps to users.  Dkt. 30 ¶ 353.  Plaintiffs also ignore the need to allege reliance on a misrepresentation—yet another fatal defect.  *See*, *e.g.*, *Nicklas v. Prof. Assistance, LLC.*, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018).

## CONCLUSION

The Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

15

Gibson, Dunn & Crutcher LLP

DATED: April 28, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Julian W. Kleinbrodt*
Julian W. Kleinbrodt

RACHEL S. BRASS
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, California  94111-3715
Telephone:       415.393.8200
Facsimile:        415.393.8306

*Attorneys for Defendant Apple Inc.*

APPLE'S REPLY I.S.O. MOT. TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 266

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>                     Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>                     Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS** |

ER 267

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................... II

INTRODUCTION ..............................................................................................................1

LEGAL STANDARD........................................................................................................2

ARGUMENT .....................................................................................................................3

I.     THE PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY NULL PARTIES ........................... 3

       A.     *Judicial Estoppel Bars Apple's Contradictory Positions* ............................................... 3

       B.     *Res Judicata Requires a Valid Adverse Party and Identification in the First Action* .................. 4

       C.     *A Pro Se Appearance Cannot Bind A Corporation* ......................................................... 6

       D.     *No Identity of Claims: New Transactions Are Independently Actionable Under Lawlor* ............ 8

II.    PLAINTIFFS HAVE ARTICLE III STANDING ........................................................... 9

       A.     *App Censorship Harms Marketwide Competition* ......................................................... 9

       B.     *Plaintiffs Have Standing to Challenge Apple's Smartphone Monopolization(Counts 1-4)* ....... 11

       C.     *Apple's "Speculative Causation" Improper at the Motion Stage* ..................................... 13

       D.     *Greenflight Has Independent Standing as a Repeated Fee-Paying Apple Developer* ............... 14

III.   TYING A SMARTPHONE DEVICE TO SEPARATE PRODUCTS (APP STORE AND
NOTARY STAMPS) IS *PER SE* CONDUCT UNDER *NORTHERN PACIFIC* ................................... 15

IV.    PLAINTIFFS PLAUSIBLY ALLEGE FOUR DISCRETE RELEVANT MARKETS ................. 18

V.     APPLE'S CONDUCT FITS THE ASPEN EXCEPTION ............................................. 20

VI.    APPLE'S $99 DEVELOPER FEE IS A SUPRA-COMPETITIVE TOLL ................................... 21

VII.   AN ESSENTIAL FACILITY EXISTS IN APPLE'S NOTARY STAMPS................................. 22

VIII.  RANKING MANIPULATION IS ANTICOMPETITIVE CONDUCT ....................................... 23

IX.    UCL CLAIM SEEKS NON-MONETARY RELIEF FOR UNFAIR PRACTICES ..................... 24

CONCLUSION................................................................................................................25

CERTIFICATE OF SERVICE.........................................................................................26

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

# TABLE OF AUTHORITIES

CASES

*Agostini v. Felton*,
521 U.S. 203, 215 (1997) ..................................................................................................... 9

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) ..................................................................................................... 2

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
472 U.S. 585 (1985) .......................................................................................................... 20

*Blue Shield of Va. v. McCready*,
457 U.S. 465, 478–79 (1982) ............................................................................................ 12

*Brown Shoe Co. v. United States*,
370 U.S. 294, 324 (1962) ..................................................................................................... 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .......................................................................................................... 10

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163, 180 (1999) .............................................................................................. 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......................................................................................................... 17

*Epic Games, Inc. v. Apple*,
559 F. Supp. 3d 898, 1019 (N.D. Cal. 2021) ................................................................... 23

*Gonzalez v. Banco Cent. Corp.*,
27 F.3d 751, 755 (1st Cir. 1994) ......................................................................................... 4

*Headwaters Inc. v. U.S. Forest Serv.*,
399 F.3d 1047, 1053 (9th Cir. 2005) .................................................................................. 6

*Illinois Tool Works, Inc. v. Independent Ink, Inc.*,
547 U.S. 28, 37 (2006) ...................................................................................................... 16

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103, 1120–21 (N.D. Cal. 2012) ........................................................... 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) .............................................................................. 25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2, 14–15 (1984) .................................................................................................. 18

ER 269

*Kellam Energy, Inc. v. Duncan*,
  668 F. Supp. 861 (D. Del. 1987)................................................................................ 16

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179, 189 (1997)........................................................................................... 9

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322, 328 (1955)........................................................................................ 8,24

*Mintz v. Mark Bartelstein*,
  906 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012) ......................................................... 4

*New Hampshire v. Maine*,
  532 U.S. 742, 749–51 (2001)..................................................................................... 3

*Newcal Indus. v. Ikon Office Sols.*,
  513 F.3d 1038, 1045 (9th Cir. 2008) ........................................................................ 2

*Rowland v. Cal. Men's Colony*,
  506 U.S. 194, 201–02 (1993)..................................................................................... 6

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574, 577 (1999)........................................................................................... 5

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422, 431 (2007)........................................................................................... 6

*Sonner v. Premier Nutrition*,
  971 F.3d 834, 844 (9th Cir. 2020) .......................................................................... 24

*Steel Co. v. Citizens for Better Environment*,
  523 U.S. 83, 94–95 (1998)......................................................................................... 5

*Stewart v. U.S. Bancorp*,
  297 F.3d 953, 957 (9th Cir. 2002) ............................................................................ 5

*Taylor v. Sturgell*,
  553 U.S. 880, 893–95 (2008) ..................................................................................... 5

*United States v. High Country Broad. Co.*,
  3 F.3d 1244, 1245 (9th Cir. 1993) ............................................................................ 7

*United States v. Microsoft Corp.*,
  253 F.3d 34, 84 (D.C. Cir. 2001).............................................................................. 16

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

This is an antitrust case which affects almost every American's freedom to access the internet. It asks a deceptively simple but profoundly significant question: whether an iPhone owner truly owns their device or remains perpetually subject to Apple Inc.'s ("Apple") unilateral control over what software can run on it. Plaintiffs Coronavirus Reporter Corporation ("CRC"), CALID Inc. ("CALID"), and Greenflight Venture Corporation ("Greenflight") allege Apple uses a digital "notarization" scheme to censor and block innovative apps while perpetuating an artificially locked computing platform.

The controversy surrounding notarization has been around nearly as long as the iPhone itself. In 2010, the U.S. Copyright Office explicitly recognized consumers' right to bypass Apple's notarization restrictions—then known as "jailbreaking"—because notarization unlawfully restricted consumers' control over their purchased iPhones. Instead of complying, Apple doubled down, strengthening its notarization system, circumventing federal intent, and ensuring that this very problem persists fifteen years later.

This particular motion concerns a lawsuit filed in this Court in 2021, which Apple labels "Coronavirus I" or "CR I." In that proceeding, Plaintiffs' founder was the first to attempt to define a Sherman Act relevant market as straightforward as Apple's notarization digital product itself. Apple claimed that the notarization function was too "integrated" to be considered a separate product. But no sooner than the ink had dried on CR I, Apple began to implement line-item charges called "Core Technology Fees" for these stamps in Europe. The company has similarly engaged in "malicious compliance" to defy the *Epic* UCL anti-steering injunction by effectively charging for notarization services within the United States (see *Exhibit A*).

In short, all recent attempts to curb Apple's conduct – and the largest monopoly in the history – have met intense resistance. Beyond the DMA and *Epic*, the "Open App Markets Act," once enjoyed bipartisan support, but was oddly removed from the Senate floor. Apple invoked "market mismatch" and "copy-and-paste" arguments (identical to this motion) to defeat *PhantomALERT*, a similar COVID-app class action which was filed as a result of the *Coronavirus I* Ninth Circuit affirmance. As here, that developer simply sought a forum to challenge Apple's lockdown on iOS app distribution, a matter that continues to gain urgency as more developers, legislators, and even foreign regulators push back against Apple's singular control.

1

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

The Court may properly take judicial notice and view the current motion in light of recent promotional material published on Opposing Counsel's website, featuring a Law360 article titled "Competition Group of the Year" (Feb. 26, 2025). In that article, Gibson Dunn specifically highlights it "got Apple out of a $200 billion" claim in the original *Coronavirus Reporter* litigation, characterizing it as representative of the complex, high-stakes litigation responsible for earning the firm national recognition.  This matter is not raised to impugn Opposing Counsel's accolades for defending exceptionally challenging antitrust cases. However, both positions cannot simultaneously be correct. Either Gibson Dunn's endorsement of the Law360 article significantly exaggerates the plausibility of the case, raising potential discrepancy under ABA Model Rule 7.1 litigation results advertising, or Apple has materially understated the accuracy of Plaintiffs' claims to this Court. This inconsistency warrants judicial scrutiny and weighs against granting Apple's motions for dismissal at the pleading stage. If CR I truly merits celebration as a landmark antitrust victory, the present litigation likewise deserves thorough judicial consideration—not summary dismissal for *failing to state a claim for relief*.

The Court should permit this matter to proceed on the merits, thereby either ending Apple's grievances of "déjà vu" – the inevitable result of its own repeated success in squashing legitimate antitrust suits and subverting regulatory initiatives – or finally ending the notarization monopoly itself. This is not a question to be kicked down the road any longer.

## LEGAL STANDARD

Under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw every reasonable inference in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In antitrust cases, courts are especially reluctant to resolve questions of relevant market boundaries on the pleadings. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (market definition often involves "deeply fact-intensive inquiries," thus inappropriate at the motion to dismiss stage). *Brown Shoe* factors—such as industry recognition or cross-elasticity of demand—are matters for fact-finding, not early dismissal. *Newcal Indus. v. Ikon Office Sols.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

**ARGUMENT**

**A. Apple Is Judicially Estopped From Its Res Judicata Argument**

Apple's invocation of *res judicata* founders on its own prior litigation stance, in which it disclaimed any corporate plaintiff's legal existence in *CR I*. There, Apple's counsel maintained that no valid entity had sued it, stressing that the named plaintiffs were incorrectly identified and mere "null parties" incapable of receiving damages. See, e.g., Apple App. Br. at 7 n.4 (9th Cir. 2022) (stating "as far as Apple can tell, there is no actual 'Coronavirus Reporter' entity—meaning Apple is being sued by *at least one* null party *to whom no relief could be awarded*"). The practical outcome of Apple's argument was that the CR I dismissal would never bind or benefit any actual corporation, since, by Apple's own logic, no legal entity was before the Court. Defendant's unopposed insistence that no legally cognizable corporate plaintiff existed estops a 180-degree pivot claiming, for *res judicata* purposes, that a "non-entity" in *CR I* is in fact identical to *CRC*.

**I.      THE PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY NULL PARTIES**

**A.      Judicial Estoppel Bars Apple's Contradictory Positions**

The equitable doctrine of judicial estoppel precludes a litigant from asserting a position in one proceeding, prevailing on that basis, and then adopting an inconsistent stance in a subsequent case simply because its interests have changed. See *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001) (identifying factors for judicial estoppel, including that (1) a party's current position is "clearly inconsistent" with its prior stance, (2) it previously succeeded in persuading a court to accept that earlier position, and (3) the inconsistency would grant the party an unfair advantage). Apple's posture here meets all three criteria. First, Apple now contradicts its earlier unequivocal representations that no corporate entity existed in CR I. Apple had informed the Ninth Circuit that CR I's "plaintiffs" were improperly named and lacked legal identity, thus meriting dismissal. Second, Apple succeeded with that argument. Undersigned counsel conceded and did not oppose[1]. Apple's insistence that no one could be paid damages plainly fortified the USCA's conclusion to affirm a case that purportedly made "no effort" to define interchangeability and didn't even properly identify

---

[1] That a subsequent SCOTUS petition was filed concerning leave to amend *CR I* is consistent. Undersigned counsel proceeded in an abundance of caution to reserve all possibilities for curing the defect.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

the parties. Third, Apple would now gain an unfair advantage were it free to claim that the exact corporate entity it labeled a non-entity is in fact the same corporation over which it now invokes claim preclusion. See *New Hampshire*, 532 U.S. at 751 ("courts must guard the judiciary's integrity by preventing litigants from playing fast and loose"). Apple should not be permitted to reap the benefit of res judicata by asserting diametrically opposite assertions about CR I's corporate plaintiffs.

The Motion's conflicting stance on party identification is unfortunately not Apple's only full reversal that occurred since 2022. Apple also incredulously seeks to equate corporate identity by pointing to Dr. Robert Roberts' involvement in both cases, implying that both CR and CRC must be the same "Coronavirus" entities because Dr. Roberts serves as a "Chief Medical Officer" for both. That is demonstrably inconsistent with Apple's prior stance in CR I, where it insisted that the plaintiff's "only connection to medicine" was Dr. Jeffrey Isaacs—dismissing *any* separate medical leadership on multiple occasions. Apple cannot now fill that gap in by citing Dr. Roberts' presence here as proof that CR I indeed had a legitimate corporate existence. This abrupt reversal violates the principle that a party "cannot blow hot and cold as the occasion demands." *New Hampshire*, 532 U.S. at 749 (paraphrased).

## B. Res Judicata Requires a Valid Adverse Party and Identification in the First Action

Res judicata fundamentally necessitates that the prior lawsuit involved an actual legal entity capable of asserting or defending rights. See *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 755 (1st Cir. 1994) (holding the party against whom preclusion is asserted must have been a party or privy in the first action). By designating the CR I plaintiffs as a "null party" or "non-entity," Apple undercut the essential premise that *CR I*'s dismissal can bind a real corporate plaintiff. The Court should reject Apple's belated attempt to resuscitate the previously disclaimed "non-entity" into a valid corporate litigant for res judicata purposes. Gibson Dunn had it right – a lawsuit against "Mc'Donalds" or "Burger-King," with no identification of the corporation type (Corp, Inc, LLC) and incorrect punctuation clearly could not proceed unless corrected through amendment. In *CR I*, all three named corporate entities had such defects. Gibson Dunn simply has buyer's remorse – wishing it hadn't pointed out the obvious: no jurisdiction exists over an entity that is not correctly identified.  When a corporate name is so flawed or incomplete that no lawful corporation was joined, prior dismissal cannot now preclude a distinct Wyoming corporation's claims. *Mintz v. Mark Bartelstein*, 906 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012), while discussing misnomer in the context of defendants, stands

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

for the broader point that a court does not obtain jurisdiction over an entity—plaintiff or defendant—if it is not actually named or is misnamed to the point of being a "null party." Where a non-entity is named as the plaintiff, the real corporation never effectively appears as a litigant. Any judgment "in its favor" or "against it" is illusory and incapable of res judicata effect. See *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (res judicata requires the same parties or parties in privity).

Per Gibson Dunn's own declaration, there never existed jurisdiction over the non-entities in CR I. Although a Rule 12(b)(6) dismissal typically operates "on the merits" under Fed. R. Civ. P. 41(b), that principle assumes the dismissed action featured an actual, properly identified party. Apple effectively stymied any "merits" adjudication in CR I by an unopposed assertion to the Ninth Circuit that no real corporate entity could be paid. Having done so, it cannot now claim that CR I validly adjudicated the interests of the real Wyoming corporation. Under *New Hampshire v. Maine*, Apple's reversal is precisely the type of "blatant inconsistency" that judicial estoppel aims to prevent.

It is axiomatic that "before a federal court can adjudicate the merits of a claim, it must first establish jurisdiction over the parties." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999); see also *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998) (Without jurisdiction the court cannot proceed at all in any cause.). A Rule 12(b)(6) dismissal—such as the *CR I* ruling Apple now relies upon for res judicata—presupposes that the parties before the court were properly named and identified, enabling the court to lawfully exercise jurisdiction. If a party is defectively identified to the point that it constitutes a "null party," jurisdiction never attaches in the first instance, and any dismissal under Rule 12(b)(6) is ineffective for purposes of res judicata. *Citizens for Better Environment*, 523 U.S. at 94–95. By explicitly challenging and highlighting jurisdictional defects, Apple confirmed that jurisdictional issues were antecedent to any merits decision under Rule 12(b)(6). Where jurisdiction is defective due to party misidentification, as Apple itself argued, the law is clear that no substantive judgment can issue. Indeed, the Ninth Circuit explicitly holds that jurisdictional defects preclude subsequent invocation of res judicata: "[A] dismissal for lack of jurisdiction is not an adjudication on the merits and therefore cannot operate as res judicata." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 957 (9th Cir. 2002). Thus, Apple's own successful arguments regarding non-existent plaintiffs in CR I compel the conclusion that the prior dismissal—rooted in an antecedent jurisdictional defect—cannot bind CRC. Where jurisdictional impediments bar initial adjudication on the merits,

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

subsequent litigation by properly formed, validly identified entities remains unaffected. *See Ruhrgas*, 526 U.S. at 577; *Stewart*, 297 F.3d at 957.

Even if Apple were to emphasize that the District Court's dismissal in *Coronavirus Reporter I* referenced Rule 12(b)(6), reliance on such labels overlooks the settled principle that jurisdictional defects are logically antecedent and must be resolved before reaching merits questions. See *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (Without jurisdiction the court cannot proceed at all in any cause; jurisdiction is power to declare the law.)

Apple previously raised precisely this issue of defective identification as grounds that "no relief could be awarded" – not, as they now purport, to complain about non-compliance with judicial recusal procedures unrelated to the litigation itself. The motion before the court is fatally flawed. It states "there is only one Wyoming entity called 'Coronavirus Reporter,' and it was the plaintiff in the last case as well as this one." That is simply not what opposing counsel told the Ninth Circuit.  Not by any stretch of the imagination.

**C.      A *Pro Se* Appearance Cannot Bind A Corporation**

Apple erroneously argues that Plaintiffs have all effectively been represented by Dr. Jeffrey Isaacs, *pro se*. Indeed, "a corporation may appear in federal court only through licensed counsel." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993). *Pro se* representation of a corporation is an impermissible feat. Hence, no identity of parties or "privity" can be established; the law does not permit an individual to identify as, nor represent, a corporation.

Apple's reliance on *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005), to show that Greenflight Venture Corporation was "represented" by Dr. Isaacs in *CR I* is fundamentally misplaced. Although *Headwaters* recognizes that certain relationships between corporate officers or shareholders and their businesses can establish privity for purposes of res judicata, it presupposes that the corporation itself was *properly* represented in the prior litigation. That predicate is missing here because Dr. Isaacs appeared *pro se* in CR I.  Apple has not provided a single citation of a case where a *pro se* officer's appearance resulted in res judicata against the company itself – because none exist. Any claim that Dr. Isaacs—appearing *pro se*—could have "represented" Greenflight runs directly afoul of black-letter federal law.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Recently, in *Greenflight & Isaacs v. Google*, the Southern District of Florida *sua sponte* severed Dr. Isaacs from the litigation to eliminate potential concerns about *pro se* representation of a corporation. If Isaacs' and Greenflight's claims had been truly interchangeable, there would be no need to separate them—yet that District Court recognized that an individual cannot simply represent the claims of a distinct corporate entity. Apple's attempt to bundle Dr. Isaacs's *pro se* litigation with Greenflight's separate corporate interests contravenes basic federal procedure. Apple's privity argument improperly asks this Court to treat Dr. Isaacs as though he had full authority to bind every corporate entity in which he is an officer, a programmer (Primary Productions), or a shareholder—something that federal courts explicitly forbid for good reason.  *United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993) (holding default judgment proper because corporation could not appear *pro se* through its president).

Apple's similar suggestion that Greenflight Venture Corporation was somehow obligated to appear or disclose itself in *CR I* is misplaced for multiple reasons. Merely funding a programming project (here, an app) does not trigger the stringent requirements of Federal Rule of Civil Procedure 19 (mandatory joinder) or Local Rule 3-15(b)(2) (certification of interested entities). Greenflight had no direct stockholder stake in the case as filed, let alone an obligation to disclose itself as an interested party in litigation which Apple itself insisted was brought by a "non-entity." Apple's protest that Greenflight "could have been joined" overlooks a core principle of civil litigation: potential plaintiffs are ordinarily free to bring or withhold their claims. *See* Fed. R. Civ. P. 20 (permissive, not compulsory, joinder). By analogy, *Phanto*mAlert acted autonomously, as did *Coring*, independently choosing (as of right) when to file their own action, rather than interject themselves in different lawsuits. If anything, Greenflight's "opt-out," a misnomer as it wasn't really an opt-out at all, avoided the confusion of having a third-party funder or distinct corporate interests entangled with an already murky *pro se* suit, which transpired in Florida Southern District.

Moreover, Apple entirely omits that Greenflight, representative of the class members, suffered losses when "Apple censored its apps, Sherlocked its ideas, restricted and/or manipulated app search rankings, and charged over $1000 in supra-competitive DPLA fees." FAC ¶ 49. Apple's alleged conduct regarding Greenflight's Top Ten Caller-ID app is simply not subject to res judicata. Greenflight is a direct signatory to the DPLA and pays Apple $99 each year in supra-competitive fees. Even if Greenflight's first decade of fees were mentioned by reference in *CR I* ("Dr Jeffrey D. Isaacs paid nearly a decade in these fees, either directly

7

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

or through [his] controlled entities" (*CR I* FAC ¶ 175), by Apple's own admission, a shareholder does not have antitrust standing for such investment losses, hence res judicata cannot apply from *CR I*'s mere discussion of Greenflight's. Once again, Apple cannot have it both ways. In their Motion they simultaneously assert Greenflight had representation in CR I through a shareholder (presumably with no standing), but also assert such investors lack antitrust standing in the present CRC lawsuit. Apple must choose a position on shareholder antitrust standing *before* Plaintiffs, let alone the Court, can engage in a fair analysis.

Greenflight paid its annual fees via its direct DPLA contractual obligations. Dr. Isaacs was not a party to that contract, he didn't have standing to represent the corporate claim, and therefore there is no res judicata with respect to Greenflight.  In any case, each independent annual $99 fee transaction is ongoing conduct per *Lawlor*, so the court need not engage the circular complexities of this five-year old matter, because new transactions have accrued. These complexities are precisely why a 12(b)(6) dismissal is a 'particularly disfavored procedure.' Nearly all the confusion Apple has stirred – from shifting views on everything from corporate nomenclature to investor standing – would have been easily and promptly resolved had CR I progressed to discovery. Summary judgement or trial is the appropriate place to determine such issues with finality.

**D.    No Identity of Claims: New Transactions Are Independently Actionable Under *Lawlor***

Even if the Court were inclined to entertain Apple's res judicata arguments on corporate identity, there is plainly no identity of claims between *CR I* and the current litigation. Res judicata bars only those claims arising from the same nucleus of operative facts. It does not preclude claims based on new, subsequent transactions.

Apple's assertion of claim preclusion fails under the Supreme Court's clear directive that "res judicata does not bar claims arising from conduct occurring after the prior judgment." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955). The FAC and the DOJ's parallel allegations show that Apple's allegedly anticompetitive practices—censorship, "Sherlocking", forced notarization, and retaliatory measures—persisted and materially expanded post-CR I. Apple's suppression of COVID-19 and other health-critical apps continued *beyond* the CR I timeframe, "cost[ing] lives." As *Lawlor* held, a subsequent suit is not barred when "the conduct complained of in the second suit was all subsequent." 349 U.S. at 328.  Plaintiffs allege Apple *escalated* notary stamp restrictions (i.e. DMA and UCL malicious compliance) and retaliated against

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

developers *after* CR I. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) similarly recognizes that each new act of anticompetitive conduct can give rise to a fresh claim.

The Department of Justice's antitrust research reveals new acts and deeper patterns of Apple's conduct, i.e. Tim Cook's crooked instruction to demand a "grandmother buy an iPhone" to communicate with her grandchildren. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("each overt act that is part of the [violation] … starts the statutory period running again and brings with it the damages."). These novel facts were unavailable at the time of CR I and thus cannot be *res judicata*. Apple's "malicious compliance" with new regulations including EU DMA and *Epic* UCL injunction further anticompetitive tying and notarization allegations in ways not possible at the time of *CR I*. This matter is the entire subject of a Ninth Circuit Rule 60 appeal incorporated fully herein. *Agostini v. Felton*, 521 U.S. 203, 215 (1997) recognizing that a prior judgment does not encompass subsequent events that changed the legal context.

## II.   PLAINTIFFS HAVE ARTICLE III STANDING

### A.   App Censorship Harms Marketwide Competition

The FAC cites evidence from Plaintiffs' own experiences and the DOJ's parallel allegations to demonstrate Apple's "Guidelines" block entire classes of apps, including cross-platform and public-health apps, under the guise of "protecting consumers." Far from "conclusory," the FAC (1) supplies extensive allegations that Apple has deployed its review Guidelines as a self-interested, pretextual tool to exclude, delay, or degrade competing and cross-platform apps, (2) identifies plausible marketwide harm to innovation and consumer choice, and (3) delineates how Apple's conduct increased switching costs, dampened cross-platform interoperability, and thereby reduced total market output.

Building on the Government's well-researched theories, the operative complaint spells out Apple's recurring pattern of app approval denials designed not to ensure "security, functionality, and reliability," but to undercut potential competition and impose "self-preferencing." The FAC incorporates DOJ claims describing how Apple "selectively enforces its distribution rules" to penalize or delay third-party apps, especially those that might facilitate easy migration off iOS or challenge Apple's services. FAC ¶¶ 13–14, 15, 79–86. Plaintiffs cite cross-platform video apps that Apple suppressed or refused under Guidelines, only to introduce near-identical functionality in FaceTime. Id. ¶¶ 115–26. Similarly, Apple's blanket rejection of

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

COVID-19 startup apps while favoring its own underbaked COVID tool evidences Apple's refusal to allow an entire class of pandemic-tracking competitors, thereby bottlenecking the app market and sub-sectors. Id. ¶¶ 87–114. Plaintiffs specifically allege that Apple's refusal to allow certain COVID-19 apps "cost lives" (FAC ¶ 341), and potentially blocks or deters future environmental or health-critical apps (¶ 342). Apple's own data shows COVID-tracking apps can in fact save lives (¶ 341), reinforcing that the suppression of entire categories was an antitrust injury, if not moral injury stemming from the iOS ecosystem. That is not a trivial "one-competitor-loses" scenario, but classic marketwide damage to new entry and essential consumer information. These allegations refute Apple's position that there is no "factual basis" to believe Apple used its Guidelines pretextually. On the contrary, the Complaint provides a specific pattern of Apple exploiting review policies to monetize its ecosystem and preserve iPhone lock-in.

Apple insists that the allegations do not show marketwide harm—that the claimed injuries concern only "one competitor displacing another." But the FAC goes well beyond "shifting sales," explaining that Apple's systematic self-preferencing chills innovation and reduces overall app availability, thereby harming consumers and developers at large. FAC ¶¶ 162–65. For instance, Plaintiffs illustrate how Apple's review-based censorship limits essential new products (e.g., epidemiological data-collection apps) and deters cross-platform apps from even entering the iOS market. Id. ¶¶ 88, 129–32, 149. Apple's claim that Plaintiffs simply want to "shift sales" misunderstands the complaint. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), does not preclude liability where, as here, "competition itself" is restrained. By removing key app categories, or self-preferencing their own inferior products, Apple diminishes overall output and variety on iOS, harming developers and consumers. FAC ¶¶ 164–65: "stifled innovation," "reduced consumer choice."

By blocking entire classes of apps and cross-platform services, Apple diminishes the total number of meaningful offerings on iOS. This not only reduces the "output" of new apps to consumers but also hampers cross-platform competition. The complaint alleges that these artificially limited app offerings maintain Apple's inflated prices and lock-in strategies. Id. ¶¶ 28, 136, 161–65.

*CR I* found the prior complaint "conclusory" because it lacked the kind of broad category factual specificity now included. Relying on language from CR I that Apple's curation "may well serve the best interests of consumers" overlooks the Court's caveat that such curation is lawful absent factual allegations

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

of pretext. 85 F.4th at 957. Here, Plaintiffs do provide factual support for pretext—namely, Apple's decision to reject or bury rival apps while offering or developing its own competing solutions (¶¶ 88, 112), or pushing strategic partners instead (¶ 344). Nothing in *CR I* or the Ninth Circuit's ruling forbids the current allegations with newly available evidence and enhanced factual support. The Ninth Circuit has never held that all curation is inherently procompetitive or immune from scrutiny. Rather, these are factual inquiries unsuited for a Rule 12 motion.

### B.    Plaintiffs Have Standing to Challenge Apple's Smartphone Monopolization(Counts 1-4)

Apple's attempt to confine Plaintiffs' smartphone monopolization claims to an allegation of "inflated iPhone device prices" misunderstands both the Complaint and the Department of Justice's parallel allegations. Contrary to Apple's assertion, the Government has not narrowly claimed that Apple's monopoly power manifests only in higher device prices; the DOJ Complaint explicitly identifies Apple's contractual and technological restrictions on *app creation, app distribution, and API access*—restraints that harm developers and consumers alike. See FAC ¶ 202 highlighting app creation, distribution and API access. Plaintiffs here allege precisely that these same "anticompetitive acts" in the smartphone market not only raise consumer switching costs but also directly curtail the viability of competing apps and services, inflicting cognizable antitrust injury on developers. Apple unreasonably lumps the DOJ allegations into a "device-price" theory (¶¶ 86, 241). But as the Complaint clarifies (¶¶ 15, 202, 205–12), the Government's suit includes claims that Apple's smartphone monopoly power harms developers by restricting app creation, distribution, and cross-platform innovations. Plaintiffs, who incorporate that same leveraging theory formally in FAC ¶ 202, thereby suffer direct competitive injury. In reality, the DOJ Sherman cause of action—incorporated verbatim into Plaintiffs' FAC at paragraph 202 —targets Apple's practice of "imped[ing] apps and technologies" and enumerates multiple categories of developer-facing restrictions.

Apple asserts there exists a "fundamental disconnect" because Plaintiffs are not iPhone purchasers. But the FAC (like the DOJ complaint) explains how Apple leverages its smartphone dominance to impose unilateral constraints on third-party developers—including barriers to app distribution, self-preferential policies, and API gating—that reduce the overall supply and quality of apps. These measures do not merely affect iPhone prices: they prevent developers (such as Plaintiffs) from launching or monetizing their own innovative products, thus chilling competition within—and emanating from—the smartphone foremarket.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Apple plainly errs in the notion that "the government alleges *only* that Apple maintains a smartphone monopoly to charge consumers supra-competitive prices." (Mot. at 12.) Thus, the Government has put Apple on notice that these same anticompetitive behaviors harm innovation and entry from developers—just as Plaintiffs plead. Apple can hardly dismiss these integrated allegations as limited to iPhone pricing, when it has itself defiantly complained in public statements that the DOJ has cast too broad a net, encompassing Apple's tight control over iOS and its harmful effects for the app economy.

The Supreme Court in *Blue Shield of Va. v. McCready*, 457 U.S. 465, 478–79 (1982) recognized that a plaintiff need not buy the alleged tying product if they are otherwise *directly harmed* by the defendant's monopoly in that product. Here, Apple leverages its iPhone dominance to impose constraints on developers (¶ 162–65). The fact that Plaintiffs are not iPhone purchasers does not preclude them from pleading that Apple's device-level power inflicts direct injury on their intertwined app businesses.

Apple labels the smartphone foremarket and "app creation/distribution" aftermarkets as "mismatched.[2]" Yet the Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) directly refutes that argument: *Kodak* embraced a primary product market (copiers) plus derivative service/parts aftermarkets where the defendant's power in the first market let it monopolize the second. Likewise, Apple's power over iPhone devices (the foremarket) enables it to set restrictive conditions for iOS app development (the aftermarket). (FAC ¶¶ 12–15, 205–12.) In any case, there is no mismatch under *McCready* when the markets, and injuries, are intertwined.

Plaintiffs' incorporation of the meticulously researched DOJ lawsuit is not a defect—such practice is routine, and in the interest of judicial economy. Imagine if every JPML participant overhauled the lead complaint— the result would be entirely cumbersome and inefficient. The Court should be wary of Apple's attempt to paint the FAC as a "lifted" hack. Plaintiffs refined comprehensive improvements and supplemented the DOJ's FAC to serve as a class action for developers. Opposing Counsel consistently derides undersigned counsel's allegations as amateur— then boasts how a victory merits their national #1

---

[2] Opposing Counsel similarly convinced The Honorable Trevor McFadden "there is a mismatch between the market allegedly controlled by Apple and the market where PhantomALERT is allegedly injured." But like CRC, that case invoked straightforward Section 2 leveraging concepts: "The App Store thus constitutes a relevant market itself, over which Apple has a monopoly, because iPhone users are substantially locked-in to their iPhones" (24-cv-786, Dkt.17, ¶81-82).

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Competition ranking. Notably, Apple has filed a pending 12(b)(6) motion in the DOJ case, asserting that its performance smartphone market simply doesn't cover the alleged conduct in the app space. Plaintiffs' supplemental allegations of new single-brand notary stamp claims, SSNDQ metrics on software, and app distribution tying conduct, yield a powerful augmentation to the DOJ work-product, not a mere hack.

### C.    Apple's "Speculative Causation" Improper at the Motion Stage

Apple urges dismissal by recasting Plaintiffs' alleged damages as "speculative" and "too complex" (Mot. at 13–14). The Supreme Court has long recognized that antitrust plaintiffs need only plausibly allege a "reasonably direct" link between the challenged conduct and harm. See *Associated Gen. Contractors*, 459 U.S. at 534. Plaintiffs do precisely that here: Apple's gating of iOS app creation and distribution directly reduces available app choices, raises barriers for rival innovations, and locks consumers more deeply into iPhone usage. *FAC* ¶¶ 28, 136, 164–65. This case fundamentally challenges whether Apple's restrictive practices—its curation, notary-stamp requirement, and "App Store–only" policy—diminish the independence of developers and stifle the output of innovative apps. *FAC* ¶¶ 15, 162–65, 343. It covers a vast sum of damages when the putative class is counted. Gibson Dunn won Competition Group of the Year for their work in getting Apple off the hook for $200 billion (a conservative amount) in CR I. Under well-settled Rule 12 standards, a court must accept these factual allegations as true, even if Apple believes them "complex" or "impossible."

Apple's long-winded theory that it is all too "speculative" overlooks the FAC's specificity. First of all, there are direct comparable damages available here. A London teaching hospital launched a similar app months after CRC's "first mover," and obtained "peak usage of five million daily users." FAC 106. This is hardly speculative by any definition, and such comparable damage estimates are *routine* in litigation, and financial software valuations in general. More generally, suppressed cross-platform technologies (¶¶ 15, 129–30) show immediate and measurable developer harm—not some chain-of-causation leap. Reduced consumer choice (¶ 164) is a recognized antitrust injury, not a "far-fetched hypothetical." Lock-in and higher overall app distribution costs (¶¶ 162–63) naturally flow from Apple's single mandated channel. The fact that DOJ links this conduct back to higher iPhone prices doesn't negate the underlying damage done to the app markets, which are an integral – and novel – part of Plaintiffs' Complaint.

13

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

The mere fact that quantifying such injuries may be complex and, like all damages estimates, requiring skilled due diligence, does not justify a Rule 12(b)(6) dismissal. See *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120–21 (N.D. Cal. 2012) (complex causation issues are reserved for later factual development). Apple essentially argues it is too late to imagine a freer smartphone ecosystem. That is precisely the *status quo* a monopolist invokes to fend off antitrust scrutiny. But the law demands that allegations of artificially constrained innovation and output (¶¶ 15, 343) receive a merits determination—especially where Apple's own conduct is alleged to block entire categories of critical apps (¶ 341). Courts are not permitted to adopt a defendant's self-serving view of "complex impossibility" at the pleading stage. Apple's "speculation" attack is no basis for dismissal. Plaintiffs offer specific factual detail, show a plausible chain of injury, and cite Apple's own policies restricting independence of developers and app availability. Whether Apple's restraints truly degrade output, hamper cross-platform apps, and entrench inflated prices is a fact question ill-suited for a Rule 12 motion.

**D.      Greenflight Has Independent Standing as a Repeated Fee-Paying Apple Developer**

Apple's less than candid challenge to Greenflight's standing relies on mischaracterizing it solely as a "financier." But the record, including Apple's own jurisdictional arguments supporting transfer from Wyoming, shows that Greenflight "repeatedly" signed the DPLA and paid Apple Developer Fees over the past decade. Like Calid, it has its own relationship with Apple. If they were "identical," Apple would only charge them as a single entity. They are, by every definition, legally distinct entities, with different owners, different products, and different damage allegations. Apple will have the opportunity to fully discover these differences as the case progresses. Far from being just a financial backer of the COVID-19 app, Greenflight has entered into Apple's DPLA "again and again," incurring over $1,000 in forced annual fees. Each of those independent transactions as per *Lawlor* constitutes a fresh injury giving rise to antitrust claims. The transactions are entirely distinct from any transactions in CR I, and took place *after* CR I was filed.

Although Greenflight provided emergency funding for the Coronavirus Reporter app (FAC ¶¶ 49, 128), that is not the primary basis of its standing here. Its standing stems from the repeated fees Apple extracted through the DPLA and from Greenflight's *continuing* inability to freely access the iOS userbase without Apple's anticompetitive conditions. *Id.* ¶¶ 308–15. Its "Top Ranked" Caller-ID app was subject to ranking suppression and the retaliatory conduct described in the State Competition causes of action.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Greenflight's claims target Apple's ongoing developer fees and notary-stamp constraints—not simply investment losses from the early COVID era. This presents a direct business injury under antitrust and consumer-protection theories and makes Greenflight a prime candidate to represent the putative classes in Sherman Act and UCL claims. As Apple is fully aware, res judicata cannot reach an entity that never litigated its damages. Greenflight's independent claims about developer fees, its own Caller-ID app, and the general rights of DPLA signatories per UCL and WCPA must go forward.

In short, Greenflight's claims alone warrant full adjudication of the forced App Store and Notary Stamp agreements it has repeatedly signed over the years, not just its minor *pro bono* emergency investment meant to help bootstrap 'Coronavirus Reporter.'

## III.    TYING A SMARTPHONE DEVICE TO SEPARATE PRODUCTS (APP STORE AND NOTARY STAMPS) IS *PER SE* CONDUCT UNDER *NORTHERN PACIFIC*

Apple's "product design" defense does not shield what amounts to tying under the Sherman Act. *Microsoft*, too, attempted to label the bundling of Internet Explorer into Windows as a mere "design choice," but the D.C. Circuit treated it as tying, not purely internal integration. See *United States v. Microsoft Corp*., 253 F.3d 34, 84–95 (D.C. Cir. 2001). Once a defendant with market power requires a second product or service be taken with the tying product, whether by code integration or contract, the "choice of design" characterization does not exempt it from scrutiny. The key inquiry is coercion—does the defendant leverage its dominance in one market (iPhone devices) to force consumers or developers to accept a second, separate product (App Store/notarization) with no meaningful alternative? If so, it is tying, even if engineered as "design." Just as Microsoft's bundling of IE foreclosed competing browsers, Apple's "design" locking iPhones to the App Store forecloses competing app-distribution channels. This is textbook tying subject to antitrust scrutiny.

Apple's motion mistakenly applies a "rule of reason" analysis borrowed from *Epic* Games (and *Microsoft* tying precedent) on the theory that "software platforms" cannot trigger a *per se* rule. But the tying product here is not iOS software alone; it is Apple's iPhone hardware device—as Apple's CEO Tim Cook made clear in the *Epic* trial, testifying that Apple "sells devices, not operating systems." That distinction is decisive. Apple cites *Epic* to argue that all "platform tying" is subject to rule-of-reason. But the *Epic* panel specifically addressed tying *software to software* (the iOS in-app payment system) and concluded it fell under

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

the *Microsoft* line of "platform" tying. Here, the tie is fundamentally an iPhone *device*—a physical good—to a distinct product or service (the App Store or notary stamps). Because iPhone devices and app distribution (or notary stamps) are separate products with discrete consumer/developer demand, *per se* liability is properly triggered. Cf. *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 37 (2006) (recognizing per se rule for product-to-product tie, absent a showing the products are functionally inseparable).

When a defendant conditions the purchase of a physical product on also obtaining a separate product or service, *per se* tying principles apply. See *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Furthermore, as discussed in the pending *CR I* Rule 60 appeal to the Ninth Circuit, neither the District Court nor the appellate affirmance discussed tying claims. This *per se* tying claim is a valid and novel issue.

Apple contends Plaintiffs do not adequately plead "who, what, when, where, and how" of the alleged anticompetitive agreement tie, but the FAC expressly states Apple's *EULA* and *DPLA* prohibit developers from distributing iOS-compatible apps outside the App Store by imposing "notarization" and other constraints. FAC ¶¶ 15, 228–30, 292. Without Apple's "stamp of approval," no iPhone can run third-party code, thereby coercing developers to distribute apps exclusively via Apple's Store. (Id. ¶¶ 295, 298–99.) But for these "coercive" restrictions, Plaintiffs (and others) could trivially offer independent app distribution channels (e.g., a web-based store). *Id*. ¶ 292. Even assuming *arguendo* that an agreement did not exist, the tying conduct would be covered under the Section 2 leveraging claims.

In short, Apple "conditions the sale of" or "use of" an iPhone (tying product) on mandatory use of the App Store (tied product). The fact that the App Store is nominally zero-priced to end users does not eliminate a tie. Modern antitrust doctrine recognizes that intangible and free products can still be tied under the Sherman Act. See *United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001) (browser offered "free" to consumers still subject to tying analysis). Here, iPhones are sold, while the App Store—though "free" at point of download—operates alongside notarization procedures as Apple's tollbooth for app distribution, generating direct and indirect revenues (commissions and fees) from developers and ultimately restricting competition.

Apple cites *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861 (D. Del. 1987), suggesting no tie exists if "consumers do not actually purchase or lease the unwanted product." But *Kellam* involved a completely unwanted product that consumers never paid for, never used, and had no reason to acquire. By contrast, the

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

App Store is far from "unwanted"; consumers must use it (to get apps), and developers must engage with it to reach iPhone owners—given no lawful sideloading alternative. Courts have recognized that "forcing" a zero-priced product on consumers can indeed be actionable tying if it "substantially forecloses competition" for an alternative distribution channel. *See* DOJ 2020 Vertical Merger Guidelines (acknowledging vertical integration can harm competition even with nominally "free" add-ons). Apple's argument fails to grapple with the reality that the App Store is effectively mandatory for iOS distribution and thus "coerced" onto users and developers alike. Logically, it follows that were Apple to stop bundling the App Store with the iPhone, consumers would seek out alternatives, and if that failed (because Apple prohibited third-party app stores or notary stamps), iPhone sales would halt, as they would be rendered into 'bricked' devices.

Apple cites the dictum "forcing a consumer to buy something [they] would not buy elsewhere does not injure competition," attempting to trivialize the notary stamp tie. This argument not only misconstrues *Key v. Qualcomm* but also ignores classic tying law under *Kodak* and *Northern Pacific*. Under *Northern Pacific*, and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the critical harm in a tying arrangement is foreclosure—i.e., whether the tying party's monopoly power in one market leverages sales or purchases of a distinct product in a second market, depriving potential rivals of access. It is no defense to say consumers or developers "wouldn't buy the product elsewhere" if such an alternative never arises because the monopolist prevents competitive entry. In other words, 'lack of present alternatives' is precisely the outcome that the Sherman Act forbids when it flows from unlawful tying.

Apple suggests that because no one competes to sell alternative "notary stamps," there is no competition to harm. But the absence of competing notary stamp providers proves the foreclosure: Apple's iOS kernel code enforces a *strict requirement* that only Apple-issued digital signatures will function on the iPhone. (FAC ¶¶ 219, 228–29.) This wholly precludes any rival from entering a "digital signing" or "notarization" market. Thus, developers are compelled to accept Apple's stamp if they want to access the billions of iOS users—an archetypal tying scenario. The fact that forced demand does not spontaneously arise in a foreclosed market is the harm itself. *See Eastman Kodak*, 504 U.S. at 488 (holding that tying can exist despite the absence of present competition in the tied product, because the defendant's conduct "prevented it from emerging").

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Apple misapplies *Key v. Qualcomm*, which dealt with patent licenses—purely artificial rights that consumers would never independently buy, with no potential rival suppliers being excluded. By stark contrast, notarization stamps are digital services inherently valuable to consumers and developers, who would immediately purchase them from third-party vendors if Apple permitted competition. They let consumers run software – the main (and sole) reason to buy an iPhone. Apple's exclusive tie thus directly forecloses actual and potential rivals, causing precisely the competitive injury *Key v. Qualcomm* found lacking. Apple distorts *Key v. Qualcomm* to claim no injury if "consumers would not buy [the tied product] elsewhere." In *Key*, there was neither an enforced requirement nor a separate product market that Qualcomm's customers were being forced to enter. By contrast, Apple's notary stamp is a mandatory second product (or service) that developers (the "consumers" in this context) must "buy" or procure—there is no optional route, nor any other firm that can compete to offer iOS signatures. *Key* simply does not control a scenario where the defendant has effectively walled off all rival notarization or code-signing solutions.

Indeed, Apple's recent introduction of a distinct, monetized "Core Technology Fee" in the European Union conclusively shows that notarization is neither a technical necessity nor inseparable from the iPhone's design. Thus, Plaintiffs' allegations do not arise from Apple's internal design choices, but from Apple's extrinsic contractual restraints and commercial practices that condition access to end-user devices upon additional purchases of a separate and unnecessary service. Whether the second product is "unwanted" or "free" is immaterial if the arrangement forecloses a potential rival market and burdens consumers or developers with no alternative. See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14–15 (1984) (tying liability can arise even if the second product is not individually purchased in a separate transaction, so long as it is "forced" or coerced). Apple's notary-stamp practice functionally erases any rival's ability to supply iOS code signing, thereby harming innovation, raising fees for developers, and—ultimately—reducing competition in app distribution. That is precisely the textbook tying harm the Sherman Act targets.

## IV. PLAINTIFFS PLAUSIBLY ALLEGE FOUR DISCRETE RELEVANT MARKETS

Apple reverts to its *Coronavirus I* playbook by cherry-picking references to "markets" and portraying them as a chaotic jumble. In reality, Plaintiffs' Complaint carefully delineates four discrete markets—(1) the smartphone or (alternatively) performance smartphone foremarket, (2) U.S. smartphone apps (i.e., the software application market), (3) U.S. smartphone app distribution services ("app stores"), and (4) iPhone

notary stamps. Each is plausibly alleged with reference to cross-elasticity of demand and interchangeability and reasonably defines all representative substitutes, if they exist. Apple's claims of internal contradictions stem from misunderstanding or mischaracterizing basic distinctions.

The Performance Smartphone market, nearly verbatim to the DOJ's alleged market, cites reasonable substitutes and explains the minimal cross-elasticity with low-end phones. The U.S. Smartphone Apps market is a separate (downstream) market comprising software applications (apps) for smartphones. Plaintiffs specifically reference the unique "zero-price" dimension of many consumer-facing apps and discuss how conventional SSNIP tests are inapplicable, thus employing an SSNDQ (Small but Significant Non-Transitory Decrease in Quality) analysis. *Id*. ¶¶ 214–16. App Distribution Services ("App Store" market) concerns the distribution of apps to end users. To clarify, the relevant distribution channels are limited to smartphone apps, not desktop PC app storefronts. The lone reference to a "Microsoft Store" was to Microsoft's former phone app store—*not* a PC software store. Apple devotes a page to discrediting any notion that PC stores and smartphone app stores are in the same market. But the Complaint never lumps them together. Plaintiffs consistently limit the app distribution services market to "U.S. smartphone" channels. (Id. ¶¶ 205, 208.) Apple's suggestion that Plaintiffs propose merging PC software distribution is a misreading.

Lastly, iPhone Notary Stamps is a single-brand aftermarket because only Apple's proprietary code signature can unlock iOS usage. *Id*. ¶¶ 219–30. By design, no interchangeable substitute exists, rendering it a separate relevant market. Plaintiffs allege there are no functional substitutes (id. ¶¶ 219–26), meeting the single-brand rule recognized in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 462–63 (1992).

Apple seizes on passages like "Apple . . . has maintained dominance in the video communication market" (FAC ¶ 133) to claim Plaintiffs "fail to define" that as a Sherman market. But that line is *not* pled as a relevant antitrust market; it is a factual observation illustrating one of the many technologies that Apple restrains to protect its smartphone monopoly. *Id*. ¶¶ 115–26. Likewise, references to "content creation," "automotive infotainment," or "financial services" illustrate Apple's reach and potential future expansions— not additional distinct "Sherman markets." Nothing in the FAC states or implies that every mention of "market" is a *standalone antitrust market*.

Apple's manufactured confusion over "U.S. Smartphone Apps" vs. "U.S. Smartphone App Distribution Services" ignores the straightforward difference: "U.S. Smartphone Apps" are the software

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

products themselves. Plaintiffs define this market by examining cross-elasticity among different apps for the iOS ecosystem. *Id*. ¶¶ 213–19. "App Stores" are the distribution channels, i.e., the mechanism by which those apps are delivered to end users. *Id*. ¶¶ 205–12. These are obviously distinct, with separate purposes, like a car dealer is different from a car. Plaintiffs briefly allege that Apple exerts *monopsony* power in the app market from a developer's perspective—only to point out that Apple alone sets terms and is the only entity that actually pays developers for iOS apps. Id. ¶¶ 217, 231–34.

The fact that Plaintiffs define more than one market—encompassing a smartphone foremarket plus separate aftermarkets for apps, distribution, and single-brand stamping—does not violate antitrust pleading standards. *See Newcal Indus. v. Ikon Office Sols*., 513 F.3d 1038, 1044–46 (9th Cir. 2008) ("[A] complaint may allege alternative relevant markets reflecting potential submarkets or aftermarkets.").

In short, Apple again attempts to instill confusion out of routine references and factual illustrations. The FAC plainly sets forth four relevant markets. Apple's "scattergun" accusation replicates a tactic it used in *CR I* but overlooks the far more detailed, DOJ-informed allegations in the present complaint. The Court should reject Apple's mischaracterization and allow these properly alleged markets to proceed.

## V.    APPLE'S CONDUCT FITS THE ASPEN EXCEPTION

Apple's argument that it owes "no duty to deal" under *Colgate* and *Trinko* overlooks *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985). In *Aspen*, the Supreme Court recognized a "limited exception" to the general rule where the defendant (1) forgoes short-term benefits and (2) competes with the excluded party in a secondary market. *Id*. at 608–11. Plaintiffs' allegations (FAC ¶¶ 88, 102, 112, 265) demonstrate precisely that scenario.

The Complaint explains that Apple launched its own COVID-19 solution, thereby competing with third-party COVID apps (e.g., Coronavirus Reporter). FAC ¶¶ 87–88, 102. Thus, Apple was not merely refusing to deal with random developers; it refused to distribute Plaintiffs' COVID app while pushing its own competing product, which ultimately failed. Apple thereby relinquished immediate developer fees and commissions it otherwise would have collected on Plaintiffs' COVID-19 app, choosing to focus on their own brand goodwill. *Id*. ¶¶ 265, 271–72. This short-term sacrifice parallels *Aspen Skiing*, where the defendant turned away profitable lift-ticket transactions to disadvantage a competitor, signifying "exclusionary" rather than "benign" refusal to deal. *Aspen Skiing*, 472 U.S. at 608.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

## VI.    APPLE'S $99 DEVELOPER FEE IS A SUPRA-COMPETITIVE TOLL

Apple's defense of its $99 annual Developer Program fee relies on a conflation of "intellectual property licensing" with a monopolistic toll on developers who have no alternative means to reach iPhone users. Five years ago, a bipartisan House Subcommittee concluded Apple's $99 annual developer charge yields over $20 billion in supra-competitive revenue—money that far exceeds any legitimate cost-based rationale. This legislative finding undercuts Apple's narrative that the fee merely compensates for intangible IP or covers Apple's overhead. While Apple cites *Epic* and *Trinko* to say it can charge for its IP, the reality is that Apple's $99 fee does not reflect a simple "licensing" choice but a compulsory imposition on developers—one that multiple investigations have identified as an anticompetitive extraction amounting to billions of dollars in aggregate.

Apple's invocation of "IP licensing" ignores the fundamental question central to this lawsuit: Who owns the iPhone—Apple or the user who purchased it? If users truly own their devices, then developers should be able to access that userbase without paying Apple a forced entry fee. Apple's contrived claim of "protecting IP" rings hollow because developers do not seek to use Apple's intellectual property gratuitously; they seek to provide software to iPhone owners who already paid Apple for the device and thus are entitled to run programs of their choosing. That Apple imposes an additional $99 simply to access a consumer who already purchased the phone illustrates how the fee departs from legitimate IP protection and becomes a barrier to competition.

In *Epic*, the court recognized Apple can lawfully charge for the direct use of its proprietary code or brand. But that principle presupposes a genuine license for actual IP, such as Apple's frameworks or trademark usage. By contrast, the Developer Program membership is a pervasive requirement that every developer must pay annually—regardless of whether they rely on advanced Apple patents or simply want their code to run on a piece of hardware the consumer owns. This structure does not reflect a voluntary IP arrangement. In any case, the facts alleged here differ substantially from *Epic* and warrant discovery.

Apple quotes *Trinko* to emphasize that "mere possession of monopoly power" or "charging monopoly prices" is not unlawful. But *Trinko* also recognizes that exclusionary or anticompetitive conduct that entrenches that power is actionable. 540 U.S. at 407. The Complaint details how Apple's restrictions on alternative app channels, combined with the $99 mandatory fee, *excludes* lower-priced or free developer

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

paths, thereby magnifying Apple's control over its iOS platform. *FAC* ¶¶ 308–14. Thus, the relevant question is not merely whether Apple can charge for its IP but whether Apple wields its iPhone distribution monopoly to force an artificially high developer subscription fee which bundles notarization.

Many smaller or independent developers cannot afford to repeatedly pay a $99 barrier for experimental or low-margin apps, which chills new entrants and diminishes overall app output, itself constituting a considerable antitrust injury. This is the exact scenario the Sherman Act aims to prevent—leveraging device-market dominance to impose supra-competitive fees that curb new competitors. Apple's attempt to categorize every mandatory payment as a permissible IP license ignores these concrete market effects. Plaintiffs do not demand that Apple "give away its IP for free."

## VII.    AN ESSENTIAL FACILITY EXISTS IN APPLE'S NOTARY STAMPS

Apple dismisses Plaintiffs' essential facilities claim by pointing to *Trinko's* skepticism about the doctrine and asserting developers can distribute via "other avenues." But the FAC (¶¶ 219–30, 315–31) details how Apple's notary stamps form a unique gatekeeping mechanism for iOS. FAC ¶ 219 highlights that "no other platform in history required a notary stamp," detailing how Apple alone provides these digital signatures essential to launching any iOS app. See *MCI Commc'ns v. AT&T*, 708 F.2d 1081, 1132 (7th Cir. 1983) (facility "essential" if "competitors cannot practically or reasonably duplicate" it). If there is a case for essential facility, notary stamps prevail: they are essential to executing each piece of software code on every iPhone – a task that happens billions of times each day. Apple's notarization control eliminates a direct path to launching applications. And Apple's straw-man about other distribution channels (Android, web) is unavailing, as those platforms do not allow iPhone software to launch, which is the fundamental conduct at issue here that affects over 80% of Americans and 100% in this single-brand market.

FAC ¶ 323 alleges "Apple competes with developers" for app distribution and blocks them from directly distributing iOS apps without Apple's stamp. That forecloses potential alternative "stamp providers" or open-sideload methods. Apple's references to Google Play or Microsoft Store (FAC ¶ 207) are irrelevant because they do not access the iOS user base nor do they permit software to run on the vast majority of smartphones that implement iOS. Hence, Apple's "control of the facility carries with it the power to eliminate competition." *Aerotec*, 836 F.3d at 1185. Notary stamps are essential precisely because the iPhone ceases to function without them.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Apple incorrectly equates 'existence of some limited access' with no essential facility. But *MCI* confirms that imposing onerous or unfair terms on a crucial input can violate the Sherman Act. FAC ¶ 324 specifically pleads that Apple's mandated "terms of access" are so restrictive and censored that they effectively block or degrade competitor apps— i.e. Apple has not provided "meaningful access" on fair terms. In short, Apple's proprietary notary stamps are a single-brand essential facility for iOS distribution: no rival 'unlock code' exists. By denying or conditioning them under pretextual guidelines, supposed IP licensing fees, and forced supra-competitive developer fees, Apple leverages its smartphone monopoly to exclude or impair rivals in downstream app markets. That is precisely the scenario the essential facilities doctrine addresses. The Court should reject Apple's attempt to dismiss this claim at the pleading stage.

## VIII.    RANKING MANIPULATION IS ANTICOMPETITIVE CONDUCT

Apple reduces Plaintiffs' ranking-manipulation claim to a single premise—"Apple alone manipulates search"—but the Complaint identifies agreements (e.g., Developer Licensing Terms, EULA, strategic partner arrangements) that facilitate Apple's preferential search outcomes. Moreover, *Dreamstime* does not bar such claims: the Ninth Circuit emphasized Section 1 liability could arise when linked to properly alleged facts demonstrating harm to competition. The FAC "game theory" allegations (¶ 337) explain that search suppression is not a zero-sum scenario. That critical allegation separates Plaintiffs' allegations from *Dreamstime*, and warrants independent adjudication on Section 2. In any case, the Ninth Circuit recognized ranking manipulation can support antitrust claims if it plausibly restricts competition beyond a single competitor. (See *Dreamstime*, 2019 WL 341579, at *3.) Plaintiffs describe a broader pattern than *Dreamstime* did—Apple consistently burying or demoting cross-platform or threatening apps—thus impacting competition in various app categories, not merely "hurt[ing] one developer."

FAC ¶¶ 332–37 describe Apple's App Store ranking manipulation intertwined with the DPLA and Apple's pacts with favored large apps. Where Apple "contractually" imposes rules skewing search results (¶ 335), it is not purely unilateral. See *Epic Games, Inc. v. Apple*, 559 F. Supp. 3d 898, 1019 (N.D. Cal. 2021) (recognizing Apple's developer agreements as "contracts" within Section 1's ambit).

Apple's argument that "degrading search" would disadvantage Apple is unavailing. It also defies the House Subcommittee's findings that the App Store is already "inefficient" and fosters missed or buried apps. FAC ¶ 344. By selectively harming competitive threats while maintaining major partner apps, Apple may

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

protect its long-term ecosystem dominance. See *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (recognizing strategic short-term "loss" can preserve long-term monopoly).

## IX.    UCL CLAIM SEEKS NON-MONETARY RELIEF FOR UNFAIR PRACTICES

Apple's cursory two-paragraph challenge to Plaintiffs' California UCL claim ignores multiple detailed allegations in the FAC (¶¶ 340–354) showing post-*Coronavirus I* ongoing misconduct, much of which cannot be redressed by monetary damages. Apple thus forfeits its argument by failing to grapple with the core UCL allegations. Apple's conduct "cost lives." Apple's "Censorship of Apps" has had lethal consequences – which are also alleged in PhantomAlert. Plaintiffs identify the risk that Apple's "censorship mechanism" similarly blocks crucial new apps—e.g., those examining "environmental risks of microwave radiation (i.e. 5G) … potential harm to marine and aviary life," etc. ¶ *342*. This is ongoing and beyond the scope of conventional damages. Under *Lawlor*, continuing misconduct is actionable despite prior litigation.

Apple's notary requirement "imposes an unfair barrier to entry for developers, and [is] unfair to consumers who pay for their devices." Plaintiffs seek injunctive relief enjoining Apple from continuing that gatekeeping. FAC ¶ *346*. Money alone cannot remedy a nation locked down by selective notarization.

 The alleged conduct—censorship, "Sherlocking" (¶ 348), retaliatory measures (¶ 350), and $99 fees (¶ 351)—all qualify as "unfair or fraudulent" under the UCL. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (UCL sweeps 'anything that can be called a business practice' that offends public policy or is substantially injurious). Plaintiffs' claim is not "derivative" tethered solely to the Sherman Act. Apple's continuing censorship, developer lockout, and forced fees harm the public interest in open innovation and crisis-related apps (¶¶ 341–42). Apple wrongly insists Plaintiffs seek "adequate" $4.2 billion. FAC ¶ *342* explicitly demands an injunction to prevent Apple's censorship of scientifically important or emergency-related apps. FAC¶ *351* seeks "an order enjoining Apple from continuing its unlawful, unfair, and fraudulent business practices," including the $99 notary fee barrier. This is precisely the kind of structural remedy the UCL contemplates.

Here, pursuant to *Sonner v. Premier Nutrition*, 971 F.3d 834, 844 (9th Cir. 2020), these ongoing harms—costing lives, blocking critical environmental/health apps, censoring all software —demonstrate the inadequacy of purely monetary relief, making injunctive relief essential. The "private attorney general" purpose of the UCL contemplates injunctive relief to halt unfair practices that harm broader consumer

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

welfare. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003). Plaintiffs' request for injunctions against Apple's anti-competitive conditions—such as requiring open distribution channels—precisely fits this rationale.

Apple's arguments about the WCPA fail for similar reasons. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) does not hold that *all* anticompetitive conduct is barred from WCPA coverage; it merely recognizes that state law might not permit duplicative suits. FAC ¶ *353* clarifies that developers "are consumers of Apple's notarization fee products" under Wyo. Stat. § 40-12-108(a), debunking Apple's claim that Plaintiffs are automatically excluded because they are "commercial entities." Many developers are students and are *not* commercial entities- they just want to develop apps for their friends, family, schoolwork, and are blocked from doing so.

Apple is conspicuously silent on FAC ¶ 350 allegations "illegal conduct under the definitions of WCPA and UCL such as retaliation against antitrust advocates and discovery into improper lobbying tactics." Because Apple's motion to dismiss lumps these allegations under a short "derivative" label, it effectively overlooks the WCPA's broad bar against "unfair or deceptive acts" and thus waives its argument on the substance of these claims.

## CONCLUSION

After two decades of controlling how Americans access the internet, it is time for proper adjudication of the underlying conduct. Apple's motion should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend.

Submitted on this 7th day of April, 2025.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC