**No. 25 - _____**

# In the United States Court of Appeals for the Ninth Circuit

In re CORONAVIRUS REPORTER CORPORATION, CALID INC.,
and GREENFLIGHT VENTURE CORPORATION,

*Petitioners,*

*v.*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

*and*

APPLE INC.

*Real Party in Interest.*

On Petition for a Writ of Mandamus to the United States District Court
for the Northern District of California
No. 3:24-cv-08660 (Chen, J)

**EXCERPTS OF RECORD –VOLUME 3**

KEITH MATHEWS
AMERICAN WEALTH PROTECTION
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Attorney for Petitioners*

ER 296

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFF CORONAVIRUS REPORTER COPORATION'S MOTION FOR SANCTIONS**<br><br><br>Date: August 21, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

ER 297

## NOTICE OF MOTION AND MOTION FOR SANCTIONS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on August 21, 2025, at 1:30 p.m. Pacific Time, or as soon thereafter as the matter may be heard before the Honorable Edward M. Chen in Courtroom 5, 17th Floor of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Coronavirus Reporter Corporation will and hereby does move for sanctions against Defendant APPLE INC. and its counsel GIBSON, DUNN & CRUTCHER LLP , RACHEL BRASS, AND JULIAN KLEINBRODT under (1) the Court's inherent authority, (2) 28 U.S.C. § 1927, and (3) Federal Rule 11(c)(3).

This Motion is based on the Memorandum of Points and Authorities, requested discovery, requested evidentiary hearing, all records on file, and any oral argument the Court may permit. The Plaintiff notes that a cross-motion pursuant to Rule 11 & § 1927 is pending by Defendant Apple; the Court may properly sever both motions into a distinct lawsuit so that this antitrust case may proceed without delay.

Dated: June 30, 2025

Keith A. Mathews, Esq.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

# TABLE OF CONTENTS

**NOTICE OF MOTION PURSUANT TO CALIFORNIA CIVIL CODE PROCEDURE. § 425.16......I**

**TABLE OF AUTHORITIES................................................................................................ II**

**INTRODUCTION ............................................................................................................1**

    I.    APPLE'S FRAUD ON THE COURT: SHIFTING NARRATIVES AND PERVERSION OF JUSTICE............................................................................................................ 6

        *Cloaking Dr. Roberts and Contradicting His Role (CR I vs. CR II)*...................................... 6

        *Misrepresenting the Plaintiff's Existence (the "Corporation vs App" Discovery by Brass)* ................ 7

        *Silencing a Pro Se Litigant Through Threats and Intimidation*....................................... 8

        *False Claims About "Notarization" Inseparability from Operating Systems* ....................... 8

        *Cumulative Effect: An Nullified Judgment and the Need to Start Anew*............................... 10

        *Gibson Dunn's Pattern of Misconduct and Lack of Credibility* ...................................... 11

        *The Unfair Disparity: Others Validate Dr. Roberts' Claims While Apple Seeks to Silence Him* ....... 13

**LEGAL STANDARD.....................................................................................................14**

**ARGUMENT ...............................................................................................................14**

    I.    THE NEED FOR IMMEDIATE INVESTIGATION AND A $20 MILLION SANCTION ......... 14

ADDITIONAL REMEDIES AND SUPPLEMENTAL CLAIMS ...........................................18

    II.    DISGORGEMENT OF ILL-GOTTEN PROFITS.......................................................... 18

    III.    ADA RETALIATION CLAIM.............................................................................. 19

    IV.    DISQUALIFICATION OF COUNSEL (WITNESS-ADVOCATE RULE) ............................... 19

    V.    PARTIAL DEFAULT AS A SANCTION FOR FRAUD ON THE COURT ............................... 20

    VI.    CIVIL RICO CLAIM (SEVERED OR AMENDED)..................................................... 21

**CONCLUSION.............................................................................................................22**

**CERTIFICATE OF SERVICE......................................................................................24**

i

MOTION FOR SANCTIONS

CASE NO. 3:24-CV-8660-EMC

## TABLE OF AUTHORITIES

C<small>ASES</small>

*B.K.B. v. Maui Police Dep't,*
  276 F.3d 1091, 1107 (9th Cir. 2002) -----------------------------------------------------------------------------------14

*Chambers v. NASCO, Inc.,*
  501 U.S. 32, 44–46 (1991) -------------------------------------------------------------------------------------------14

*Chevron/Ecuador Environmental Litigation*
  (2010-2012)--------------------------------------------------------------------------------------------------------------12

*Epic Games v. Apple*
  N.D. Cal. 2020-2021 ---------------------------------------------------------------------------------------------------11

*Facebook User Privacy MDL*
  N.D. Cal. 2018-2022 ---------------------------------------------------------------------------------------------------11

*Trump v. CASA, Inc*
  *US, June 27 2025 Slip opinion* ----------------------------------------------------------------------------------- 3

S<small>TATUTES</small>

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ---------------------------------------21

R<small>ULES</small>

Model Rule of Professional Conduct 3.7 ------------------------------------------------------------------------------19

Rule 11(c)(3)--------------------------------------------------------------------------------------------------------------14

**INTRODUCTION**

For five years, Apple Inc. and its lawyers at Gibson, Dunn & Crutcher have dragged Plaintiff Coronavirus Reporter Corporation ("CRC") and its founder, Dr. Robert Roberts through a litigation quagmire built on frivolous, bad-faith arguments and outright contradictions. This cadre of attorneys – behaving more like corporate bullies than officers of the court – have wasted countless hours of the Court's and years of Dr. Roberts' time, all while besmirching the reputation of a world-renowned cardiologist with sham claims. Their scorched-earth tactics have one goal: delay and obfuscation, so that Apple can escape accountability. The behavior on display is as shameful as it is unlawful, and it demands this Court's immediate intervention.

Dr. Robert Roberts is no ordinary litigant. He is a celebrated cardiologist and researcher whose life-saving innovations have literally altered the course of medicine. Among his many achievements, Dr. Roberts developed the first quantitative test for MBCK (creatine kinase-MB), which became the gold-standard diagnostic for heart attacks worldwide for over three decades. This breakthrough – along with subsequent cardiac biomarkers like troponin – revolutionized heart attack care by enabling rapid, accurate diagnosis and treatment. Thanks to such advancements in cardiac science and medicine, the U.S. heart attack death rate has plummeted by nearly 90% since 1970 – a stunning decline to which Dr. Roberts' contributions fundamentally paved the way. He served as Chief of Cardiology at Baylor College of Medicine for over two decades and later led the University of Ottawa Heart Institute. He co-edited the premier cardiology textbook Hurst's The Heart for 25 years, and his accolades include the Distinguished Scientist Award of the American College of Cardiology, among many others. Millions of people are alive today in part due to Dr. Roberts' trailblazing work in cardiac care. In short, Dr. Roberts is a hero of modern medicine.

It is against this backdrop – a veteran physician-scientist who has devoted his life to saving others – that Dr. Roberts answered the call during the COVID-19 crisis. In early 2020, he helped develop the "Coronavirus Reporter" smartphone app to empower individuals to track COVID-19 symptoms and virus spread in real time. This app, created by experts in both medicine and software, had life-saving potential. Around the world, similar COVID tracking apps proved immensely valuable: for example, the U.K.'s ZOE COVID Symptom Study app (launched months after Roberts' app) attracted more than 4 million daily users, becoming the world's largest ongoing COVID study. Dr. Roberts' app sought to do the same in the United States as a first-mover initiative. Unfortunately, Apple chose to block this heroic effort. Citing a rigid App

Store policy that only "official" (government or hospital-affiliated, and Roberts' app was hospital affiliated, he wrote a letter to Apple from University of Arizona endorsing it) COVID-19 apps would be allowed, Apple refused to let Coronavirus Reporter onto the App Store. The result: a potentially vital COVID tracking tool – created by a former President of the American College of Cardiology – was silenced at the height of a global pandemic, simply because Apple wanted to play gatekeeper. The point of the internet – to democratize information – was clearly thwarted by Apple.

Instead of engaging with Dr. Roberts in good faith or acknowledging the public health importance of his app, Apple (through its lawyers at Gibson Dunn) set out to bury his small company through legal warfare. In mid-2021, Undersigned filed suit against Apple for this exclusion (Case No. 3:21-cv-05567-EMC, referred to here as "CR I"). Rather than litigate the merits honestly, Apple's attorneys deployed a barrage of technicalities and falsehoods to get the case tossed out before any discovery. They denied Dr. Roberts' very involvement in his own project, misrepresented the identity of the plaintiff, and shamelessly attacked the standing of the people behind the app. Gibson Dunn's strategy was to portray the lawsuit as a nullity – to convince the Court that there was no real plaintiff and thus no case at all. They even went so far as to threaten Dr. Roberts' co-developer (Mr. Jeffrey Isaacs) against appearing in the case, insisting that "Isaacs may not appear pro se" and that Coronavirus Reporter was a "nonexistent" entity unworthy of the Court's time. By erasing the actual people behind the app and painting the plaintiff as a phantom, Apple's lawyers managed to mislead the Court into dismissing a wrongly discredited CR I on procedural grounds. Judge Edward Chen, relying on Apple's distortions, granted dismissal and accepted Apple's assertion that it had no duty to distribute apps "inconsistent with its policies" and even accepted blatant falsehoods that Apple's notarization scheme was an "inseparable component of iOS." The truth was never reached; Apple won that round by litigating around the merits, not on them.

Fast forward to late 2024. After the improper dismissal of the first case, Dr. Roberts and his colleagues regrouped and joined a new lawsuit (Case No. 3:24-cv-08660-EMC, "CR II", which importantly alleged materially new conduct in addition to the CR matter) to finally get a fair hearing on Apple's conduct. But Apple and Gibson Dunn responded with jaw-dropping hypocrisy. The very same individuals whom Apple previously erased as non-participants in CR I (Dr. Roberts and Mr. Isaacs) were now central to Apple's defense – so central that Apple absurdly claims CR II should be barred by res judicata and even subject Dr.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

Roberts to a sweeping nationwide injunction stemming from CR I. In other words, Apple's story has flipped 180 degrees: after spending CR I pretending Dr. Roberts wasn't there at all, Apple now argues Dr. Roberts was there all along (so much so that he is bound by the outcome of CR I). The same Dr. Isaacs whom Apple's counsel said had "no discrete app [he] can represent" and "no capacity" to appear in court and blocked his participation is suddenly, in Apple's new narrative, a key figure whose involvement magically ties everyone – including Dr. Roberts and even unrelated third parties – to Apple's desired preclusion result. As one filing in this case succinctly observed, Apple's positions have "shifted with the wind" to fit its needs of the moment. When it suited Apple in 2021, Isaacs and Coronavirus Reporter were nobodies with no rights; when it suits Apple in 2025, Isaacs becomes the linchpin to slam the courthouse doors on Dr. Roberts. This is litigation as warfare, not advocacy. It is a textbook fraud on the court, and it exemplifies the shamefulness of what is happening here: a group of brutally shameless attorneys at Gibson Dunn, on Apple's dime, have wasted five years of an 85-year-old doctor's life with frivolous, contradictory arguments that pervert the course of justice.

Most egregious of all, Apple and Gibson Dunn are now asking this Court for an extraordinary gag order to permanently silence Dr. Roberts and anyone associated with him, Dr. Isaacs, or any of their companies. In a Rule 11 and 28 U.S.C. § 1927 sanctions motion filed in CR II, Apple seeks a **"nationwide injunction"** forbidding the doctors, their companies, counsel, and even unrelated app developers from filing *any* related litigation against Apple. Apple literally wants to bar all their "affiliates" from ever petitioning any court about Apple's misconduct. Such overreach is not only procedurally improper; it is oppressive and unconstitutional. It is a blatant attempt to obtain through sanctions what Apple could not obtain on the merits: a lifetime of immunity from this **world hero's** claims and from others who would dare challenge its App Store practices. Rule 11 is meant to deter baseless filings, not serve as a corporate cudgel to "throttle the exercise of the right to petition" by one's adversaries. Apple's gambit here betrays its true motive – not to correct any frivolous filing, but to punish and silence Dr. Roberts and his colleagues forever. The Court should see this for what it is: a tyrannical move by a $3 trillion Goliath to stomp out a David who had the courage to stand up.

**Notably, Apple persisted in demanding this universal gag order even after the U.S. Supreme Court unequivocally outlawed such injunctions.** On June 27, 2025, the Supreme Court decided *Trump v. CASA, Inc.* – a case explicitly holding that district courts lack equitable authority to issue **"universal"**

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

**(nationwide) injunctions** beyond the parties in the case . In light of this decision, undersigned counsel immediately urged Apple's attorneys to withdraw their request for a nationwide injunction against Dr. Roberts and others. Rather than retreat from relief that the Supreme Court has now deemed improper, Apple's counsel flatly refused. Undersigned even asked that the issue be escalated to Apple CEO Tim Cook (given the gravity of seeking relief that offends separation-of-powers principles), but Apple provided no meaningful response aside from a blanket refusal to stand down. In short, Apple doubled down on an **illegitimate demand** for a court order silencing non-parties, **thumbing its nose at the Supreme Court's mandate**. This episode is emblematic of Apple's arrogance over the past five years – a belief that the rules simply do not apply to them – and it casts further doubt on the good faith of Apple's motions in this case.

**Apple's and Gibson Dunn's hypocrisy is also laid bare by their public boasting about the very litigation they belittle in court.** In January 2025, Law360 honored Gibson Dunn as its "Competition Group of the Year," specifically crediting the firm for **getting "Apple out of a $200 billion lawsuit"** accusing Apple of monopolistically booting COVID-19 tracking and other apps from the App Store. The case being referenced is **Dr. Roberts' own lawsuit** – the *Coronavirus Reporter* matter – which Gibson Dunn succeeded in having dismissed. What's astounding is that, **inside the courtroom, Apple's lawyers portrayed that case as frivolous and even denied Dr. Roberts' involvement**, yet **outside the courtroom they trumpet the win as a monumental accomplishment** (even attaching a colossal dollar value to the claims). Gibson Dunn cannot have it both ways. **If Dr. Roberts was a "non-entity" and his claims a sham (as they told Judge Chen), defeating him would not be worthy of bragging rights**. The fact that Gibson Dunn touts this outcome in the press demonstrates the **real significance of the case** – undermining Apple's litigation position that the suit was baseless. This Law360 accolade is thus more than just puffery; it is an admission against interest. It confirms that Apple and its counsel *knew* Dr. Roberts and his app were legitimate and important, even as they told the Court the opposite. Such two-faced conduct – misleading the tribunal while bragging in media – further evidences the **bad faith and fraud on the court** at issue in these sanctions proceedings.

This Motion for Sanctions is Dr. Roberts' response to Apple's perversion of justice. We present it with a plea for the Court to finally **restore integrity** to these proceedings. Given the extraordinary misconduct at issue, Plaintiffs respectfully request that the Court *either* (a) exercise its inherent powers

(and/or proceed under Rule 11(c)(3) on its own initiative) to sanction Apple and its counsel, even if that means treating this motion as an independent action, **or** (b) if the Court is inclined to entertain Apple's pending Rule 11 motion in this case, to consider this a cross-motion under Rule 11 and §1927 so that Apple's conduct is scrutinized side-by-side. In either scenario, the egregious, bad-faith behavior of Apple and Gibson Dunn must be addressed now, before it yields yet another miscarriage of justice. We candidly note that under Rule 11's standard "safe harbor" process (Rule 11(c)(2)), a party must serve a motion and wait 21 days – but in this case, Gibson Dunn's pattern of retaliation and dishonesty convinces us that any such advance notice would only invite further abusive tactics. Thus, we urge the Court to invoke its authority under Rule 11(c)(3) (sua sponte, if the Court concurs that the matter is egregious) and under its inherent power to immediately investigate and sanction this misconduct. The Court can, if it prefers, **sever** the sanctions issues into a separate proceeding (to be overseen by a neutral judge or special master) or consolidate them with Apple's own motion – whatever best serves the interests of justice. The key is that the **truth** must finally be uncovered and the **fraud on the court** remedied. No outcome in this litigation can be trusted until Apple's house of lies is swept away.

In the pages that follow, we detail the factual and legal basis for sanctions. We begin by recounting Apple's and Gibson Dunn's multiple acts of **fraud on the court** – from denying Dr. Roberts' role, to misrepresenting the plaintiff's existence, to silencing a pro se litigant, to making false technical claims – all of which corrupted the previous proceedings. We then turn to Gibson Dunn's broader **pattern of misconduct** in other cases, showing that what has happened here is part of a larger modus operandi of that firm's "win-at-all-costs" ethos. Finally, we explain why immediate action is required: we outline specific steps for the Court to take (from expedited discovery to an evidentiary hearing), and we argue that a monetary penalty of **$20 million** is warranted to punish and deter Apple and Gibson Dunn's conduct.

Apple and its lawyers have run a **shameful course** in this matter – lying, bullying, and contradicting themselves at every turn to avoid a fair fight on the merits. This Court now faces a moment of truth: Will it allow a multibillion-dollar Goliath and its hired guns to trample an 85-year-old physician-scientist and silence him with a bogus injunction? Or will it stand up for the rule of law and say, "**Enough is enough**"? Dr. Robert Roberts – a man who has saved millions of lives – deserves far better from our justice system. We urge the

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

Court to grant this motion, impose severe sanctions on Apple and Gibson Dunn, and thereby send an unmistakable message that no litigant (no matter how powerful) is above the law or beyond the truth.

## I. APPLE'S FRAUD ON THE COURT: SHIFTING NARRATIVES AND PERVERSION OF JUSTICE

Apple's litigation tactics in this case amount to a brazen **fraud on the court**. From 2021 to present, Apple (through Gibson Dunn) has advanced **contradictory factual narratives** to suit its shifting litigation goals, blatantly misleading judges and abusing procedural rules. These aren't minor inconsistencies – they strike at the heart of the case and have perverted the judicial process. We detail below the most egregious examples of Apple's fraud: (1) erasing Dr. Roberts' very role in the first lawsuit, (2) misrepresenting the existence of the plaintiff entity, (3) silencing a key pro se litigant through intimidation, and (4) making false claims about technical "security" issues to dodge antitrust scrutiny. Any one of these would be sanctionable; together, they reveal a deliberate pattern of deception that invalidates Apple's purported "victory" in CR I and taints its conduct in CR II. The Court cannot permit a judgment or legal advantage obtained by such fraud to stand.

**Cloaking Dr. Roberts and Contradicting His Role (CR I vs. CR II)**

**In CR I (2021)** – Apple's counsel *denied Dr. Roberts' very existence in the project* to gain a public relations advantage. Gibson Dunn attorney Rachel Brass told Judge Chen, in substance, that the Coronavirus Reporter app had "no connection to medicine" via any doctor, casting Dr. Isaacs as the only person of note. Apple's filings **falsely portrayed Dr. Isaacs as acting alone**, despite firm evidence that Roberts served as Chief Medical Officer of the app's developer company. This was a calculated lie designed to eliminate the most credible and sympathetic plaintiff (Dr. Roberts) from the case. By erasing Dr. Roberts from the narrative, Apple could caricature the suit as the work of a non-practicing physician and deflect attention from the app's medical legitimacy. It is hard to imagine a more perverse distortion: Apple knew full well that Dr. Roberts was a driving force behind the app (their own records and correspondence and even a CNBC interview showed his involvement), yet in open court they pretended he didn't exist. This lie succeeded in misleading the Court. The dismissal of CR I obviously influenced by Apple's smear campaign. As a matter

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

of law, **judgments procured by fraud on the court cannot be allowed to stand.** Apple's deceit regarding Dr. Roberts' role is precisely such a fraud.

**In CR II (2024–25)** – Apple has done an about-face, unequivocally *confessing* that Dr. Roberts was integral all along. To try to bar CR II, Apple now argues that Dr. Roberts' claims are precluded because he (and those associated with him) were supposedly represented or in privity in CR I. Apple's recent motions insist that Dr. Roberts binds the prior judgment. Apple cannot have it both ways. **If Dr. Roberts was a nobody in CR I, he can't be bound by it; if he is bound by it, then Apple lied when it said he was a nobody.** By pivoting to assert Dr. Roberts' centrality now, Apple implicitly admits that its earlier stance was false. This self-contradiction is the **smoking gun** of fraud on the court. Indeed, Apple's own Rule 11 sanctions motion lays bare the truth: Apple asks to enjoin Dr. Roberts nationwide, which is an admission that he is a key party in interest. How could Apple seek to gag a man who, according to Apple's CR I position, had "no involvement"? The answer: it cannot, **unless** its CR I position was a lie. The Court has been whipsawed by Apple's factual flip-flops. Such manipulative inconsistency is not an innocent mistake; it is **intentional inconsistency**, i.e. fraud. The Ninth Circuit has held that "extended… vacillation about facts" undermines any claim of a bona fide position. Apple's vacillation about the very status of the plaintiff indicates a knowing attempt to mislead. The appropriate remedy is to **vacate** the tainted dismissal of CR I and hold Apple to account for this conduct before proceeding further.

**Misrepresenting the Plaintiff's Existence (the "Corporation vs App" Discovery by Brass)**

A second layer – there exist many – of Apple's fraud was its discovery that **"Coronavirus Reporter" was not a legal entity** and thus the suit was a nullity. Apple's counsel sneered to the Ninth Circuit that "Coronavirus Reporter" was just an app name, a *"non-existent"* phantom with no corporate standing. Apple convinced the Court that the suit was improperly brought, leading to dismissal and affirmance. But in subsequent proceedings, Apple has pleaded the reverse of the truth they discovered: *of course* there was a real company and real people behind CR I, including Roberts. In CR II, Apple fraudulently asserts it always "assumed" the plaintiff was the corporation – a claim made only to argue preclusion. So, once again, Apple spoke out of both sides of its mouth: telling the Ninth Circuit that no corporation existed, then telling Judge Chen in 2025 that it "always" understood a corporation existed (so as to bind that corporation). **This is**

**outright fraud.** Gibson Dunn obtained dismissal, claimed it was based in part on the lack of a valid Plaintiff, and now wants to use that dismissal against the very entity whose existence it previously denied. The only appropriate cure is to void that dismissal and start with a clean slate, with the real parties acknowledged and the merits addressed.

### Silencing a Pro Se Litigant Through Threats and Intimidation

Apple's fraud on the court was not limited to paper filings; it extended to bullying a key participant outside of the courtroom. In CR I, when co-founder Jeffrey Isaacs – who suffers from serious neurological disabilities – attempted to assert his rights by filing pro se, Gibson Dunn moved swiftly to shut him up. On September 30, 2021, Ms. Brass sent Mr. Isaacs a **threatening letter** (later filed as ECF 70-3) that made Apple's position coercively clear: *"Isaacs may not appear pro se…."* The letter went on to demand that Isaacs cease communicating and warned that Apple would seek a *protective order* if he continued trying to participate in the litigation. This was a gross abuse of legal process. Never did Apple move the Court to clarify, they just enjoyed bullying a disabled Isaacs. Apple had *not* obtained any court order at that point barring Isaacs' participation; they simply used their big-law firm letterhead to intimidate a pro se litigant into effectively ceasing prosecution of his case, or materially impeding it. The result was that Dr. Isaacs – a key witness to Apple's conduct and a co-developer of the app – was effectively silenced in CR I. This underhanded maneuver deprived the Court of material facts and is yet another facet of **fraud on the court**. An attorney's duty of candor and fairness encompasses not using trickery to keep relevant parties out of the courtroom. By strong-arming Isaacs into the shadows, Apple and Gibson Dunn interfered with the rightful adjudication of the case. Such conduct cannot be countenanced. It further justifies vacating the prior judgment and restarting proceedings free of Apple's taint. We urge the Court to inquire into this incident specifically: who authorized the Brass letter, on what legal basis, what do internal communications reveal, and with what intent?

### False Claims About "Notarization" Inseparability from Operating Systems

Finally, Apple has continuously made **false or unsubstantiated technical claims** to avoid scrutiny of its App Store monopoly – another species of misrepresentation that has hamstrung this litigation. A core

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

issue in these cases is Apple's requirement that all iOS apps be **notarized** (approved and signed) by Apple, and that distribution be through Apple's App Store unless an app meets Apple's strict exceptions. Apple's justification is "security." It argues that its closed system is inseparable from iPhone security, and thus any attempt to allow outside apps (or even allow Apple-approved apps outside the App Store) would compromise iOS safety. This claim has been Apple's magic talisman to wave off antitrust claims, not just here but in other cases (e.g., *Epic Games v. Apple*). **But there is a serious question whether this claim is actually true.** Plaintiffs have long contended that Apple's "notarization = security" narrative is overblown or false – that Apple *could* allow third-party app distribution or alternate notarization methods without endangering users, but chooses not to in order to preserve its monopoly rents. Undersigned sought, five years ago, an evidentiary hearing to challenge Apple on this point. Apple fought tooth and nail to prevent any such inquiry, and the Court deferred to Apple's assertions without proof. In retrospect, given Apple's demonstrated willingness to mislead, it was error to simply trust Apple's technical say-so. Indeed, recent developments validate our skepticism. Apple is now facing mandates (from the EU's Digital Markets Act, for example) to allow sideloading and third-party app stores, and its response has been revealing. Internally, Apple has treated these pro-competition measures as dominoes to be toppled in sequence – first fighting off any easing of its anti-steering rules, then resisting sideloading, then, ultimately, guarding the **notarization control** as its last line of defense. Apple knows that if a court or regulator finds that independent notarization or security vetting is feasible, Apple loses its monopoly chokehold. Therefore, Apple's lawyers have every incentive to perpetuate the **myth** that only Apple can be trusted to approve apps and that any other system is dangerously untenable. This myth was injected into CR I and colored the Court's view of the case. It was effectively a factual misrepresentation used to justify dismissal (i.e., "notarization is an inseparable component of iOS"). We now know from industry developments that this is a falsity. Apple's notarization in the EU serves no purpose other than to extract a CTF. It is now clear as day fraud on the court. The Court must recognize that Apple's say-so on notarization was not sacrosanct truth, and that allowing Apple to escape antitrust review by hiding behind such false claims was an error induced by Apple's aggressive misinformation. As part of the sanction and remedial measures, we urge the Court to permit a fulsome examination of Apple's internal ESI on notarization, which will be nothing less than damning. No more taking Apple at its word – that word has proven worthless in light of Apple's conduct elsewhere. The pattern is clear: Apple will cite "security" and

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

"policy" as fig leaves for anticompetitive behavior, and its lawyers will back up those claims even to the point of tolerating false testimony. This Court should no longer be a passive recipient of such narratives. Exposing the truth is part of curing the fraud on the court that has occurred.

**Cumulative Effect: An Nullified Judgment and the Need to Start Anew**

Viewed in totality, Apple's misconduct in CR I & II was **so egregious** that the resulting dismissals are incurably tainted. Apple achieved dismissal not by persuading the Court on the law or facts, but by **poisoning the process** – by conjuring a fake procedural defect (a "non-existent" plaintiff), by hiding the true identity and involvement of key people, by intimidating a co-plaintiff, and by feeding the Court dubious assertions as if they were facts. This is precisely what the doctrine of *fraud on the court* is meant to address. When a party's dishonesty undermines the integrity of the proceedings, the normal interest in finality yields to the paramount interest in justice. Here, justice demands that the slate be wiped clean of Apple's fraud. The Court should exercise its inherent authority to **vacate the dismissal of CR I & II** (and any orders built upon it) due to Apple's fraud.

Apple's pattern of deceit here is not an isolated lapse. It is part of a **broader pattern** of Gibson Dunn's litigation behavior, and it foreshadows the lengths to which they will go if unchecked. In *Epic Games v. Apple,* a federal judge found that Apple **"willfully"** violated a court injunction and that an Apple executive gave testimony "replete with misdirection and outright lies" which neither Apple **"nor its counsel"** corrected. Judge Gonzalez Rogers was so outraged that she referred the matter to the U.S. Attorney for a possible **criminal contempt** investigation. She observed that Apple's conduct was a "gross miscalculation" born of arrogance that the Court would tolerate such defiance. We see the same arrogance here: Apple (and its counsel) seemingly believed they could pull the wool over the Court's eyes with impunity. Similarly, in the Facebook privacy litigation, Judge Chhabria sanctioned Gibson Dunn and its client for a "sustained, concerted, bad-faith effort" to make the case unbearably difficult – behavior he described as "unusually egregious" and motivated by a desire to *wear down* the opposition through obstinacy. Again, we see parallels: Gibson Dunn's approach to Dr. Roberts' case has been to throw every obstacle and contradiction out, hoping Plaintiffs would tire or go broke. In the Chevron/Ecuador matter, Gibson Dunn lawyers were caught harassing a non-party witness in bad faith, leading Magistrate Judge Thomas Coffin to sanction them and conclude the deposition was "*meant to harass*". The *Chevron* saga in fact is replete with Gibson Dunn

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

misconduct – including outright false statements to forums – and even earlier, Gibson Dunn's tactics earned it a $20 million sanction in Montana in 2003 for harassment of a witness. This firm has a recorded history of crossing ethical lines when representing powerful clients, and Apple is no exception.

All of this is to say: the **fraud on the court in our case was not a one-off accident**. It was a conscious strategy, consistent with Gibson Dunn's corporate culture of winning by any means necessary. The Court, as guardian of justice, must take strong action to dissuade Apple and its counsel from ever thinking they can play fast and loose with the truth in this courtroom again.

### Gibson Dunn's Pattern of Misconduct and Lack of Credibility

Apple's ability to perpetrate the above-described fraud on the court is no doubt enabled by its chosen counsel, **Gibson, Dunn & Crutcher** – a firm that has cultivated a notorious reputation for "anything goes" litigation tactics. To fully appreciate the need for sanctions here, the Court should consider Gibson Dunn's **pattern of misconduct** in other high-profile cases. Time and again, judges have called out Gibson Dunn for egregious behavior: lying or tolerating lies, abusing the discovery process, multiplying proceedings, and harassing opponents. This history means two things for our case: (1) the representations and excuses coming from Gibson Dunn lawyers should be given zero credence without verification; and (2) the misconduct we've seen here is likely part of a deliberate playbook, not an aberration. We expand a few key examples mentioned above:

- **Epic Games v. Apple (N.D. Cal. 2020-2021):** If Gibson Dunn was willing to tolerate "outright lies" in a case of Epic's magnitude, there is every reason to suspect they would lie (and have lied) in a case involving a smaller opponent like Dr. Roberts. Indeed, some of the same lawyers (e.g., Mark Perry) have been involved in both matters. Their credibility is nil.
- **Facebook User Privacy MDL (N.D. Cal. 2018-2022):** Gibson Dunn represented Facebook (now Meta) in the Cambridge Analytica data privacy litigation. Their conduct was so obstructive that Judge Vince Chhabria imposed nearly **$925,000 in sanctions** on Facebook and Gibson Dunn for "delay, misdirection and frivolous arguments" during discovery. He described Gibson Dunn's tactics as a *"sustained, concerted, bad-faith effort"* to throw obstacle after obstacle in front of the plaintiffs, with the aim of wearing them down. Judge Chhabria was "long critical" of Gibson Dunn's handling of the case and said their discovery obstruction was *"unusually egregious,"* designed to force a cheap settlement. This directly parallels what Dr. Roberts has experienced: Gibson Dunn using every procedural trick (meritless motions, frivolous arguments about standing or identity, endless delays) to avoid a merits resolution and to bleed the plaintiffs dry. It also shows that Gibson Dunn habitually **misdirects** courts – raising red herrings, advancing baseless points – to confuse and exhaust judges and opposing counsel. When we tell the Court that Apple's ever-changing story here was strategic, not accidental, the Facebook case is proof-positive. Gibson Dunn's modus operandi is to **flip narratives, conceal evidence, and generally act in bad faith** if it serves their client's interests.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

- **Chevron/Ecuador Environmental Litigation (2010-2012):** Gibson Dunn's "kill or be killed" approach has been documented in the long-running litigation over Chevron's pollution in Ecuador. In a 2011 Oregon discovery proceeding, Magistrate Judge Thomas Coffin sanctioned Gibson Dunn attorneys for **harassing a non-party witness**, finding the deposition was partly *"meant to harass"* and ordering Chevron (their client) to pay the witness's legal fees. The harassment included Gibson Dunn's lawyer deliberately misstating the witness's testimony and flouting deposition rules, to the point the court had to step in. Once sanctions were imposed, Gibson Dunn abruptly backed off and withdrew that discovery action – a tacit admission that they had no substantive justification for it aside from harassment. Furthermore, reports indicate Gibson Dunn engaged in **widespread misconduct** in the Chevron case: dozens of vexatious subpoenas against anyone connected to the plaintiffs, discovery abuses across the country, even attempting to mislead Congress with false statements about the case.

These examples are just a sampling. Other courts have rebuked Gibson Dunn for shady practices – California state court calling a Gibson Dunn suit "designed to harass" and suppress speech; another Gibson Dunn case hit with sanctions for a frivolous SLAPP to silence a filmmaker; etc.). The consistent theme is a lack of credibility and lack of respect for the truth. Gibson Dunn attorneys, including those here, have been caught with Apple lying to this District Court for this (Apple Sherman Act and UCL) matter. They view litigation not as a truth-seeking process, but as a battlefield where victory is the only goal and rules are meant to be bent or broken. It is in this context that the Court should evaluate Apple's submissions in our case. When Apple's lawyers make representations about what happened in 2021 or who said what, the Court should demand proof, not take them at their word.

This pattern amplifies the need for sanctions: A slap on the wrist or small fine will not deter a repeat offender of this magnitude. Gibson Dunn has likely budgeted occasional sanctions into its litigation strategy (as a cost of doing business while serving deep-pocket clients). To truly deter, the sanction must be significant (hence our $20 million proposal before unjust enrichment factoring; even that is 'pocket change' to Dunn, let alone Apple) and it must potentially threaten what the firm values most – its reputation or its ability to appear before courts unhindered. Judges in prior cases have referred Gibson Dunn's conduct to disciplinary boards or hinted at contempt; we urge this Court to do the same if the evidence we've presented holds true. Only by hitting them hard – in public reputation, in pocketbook, or both – will this firm possibly reconsider its ways. And only by sanctioning Apple's counsel can the Court send a message that it will not be a party to Gibson Dunn's next ethical transgression.

In sum, Gibson Dunn's history shows that what occurred in Dr. Roberts' case was not an anomaly. It was enabled by a corporate culture that prioritizes winning over truth. The shamefulness of Gibson Dunn's

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

conduct here is magnified by Dr. Roberts' stature: they have effectively attempted to gaslight and steamroll a celebrated doctor who stepped up in a pandemic. If they can do that to him, they'll do it to anyone – unless courts draw a line. We ask this Court to draw that line decisively, here and now.

**The Unfair Disparity: Others Validate Dr. Roberts' Claims While Apple Seeks to Silence Him**

Even as Apple and Gibson Dunn disparage Dr. Roberts and paint him as a vexatious litigant, independent developments in the tech and legal world have **validated the very claims he brought**. It is important for the Court to understand that Dr. Roberts was not alone or quixotic in challenging Apple's App Store practices – he was **first** and he was **right**, and others have since followed on the same issues. Yet there is a glaring disparity: those other challengers are getting a chance to be heard (with competent representation and the prospect of class relief), while Dr. Roberts' case was snuffed out prematurely through Apple's machinations. Fundamental fairness, as well as consistency in the law, demand that Dr. Roberts get the same opportunity to pursue his claims as these others. We highlight one key example: **PhantomAlert, Inc.** and its class action.

PhantomAlert is a small app developer known originally for police radar speed alert apps. In 2020, after COVID-19 hit, PhantomAlert created a **contact-tracing app** to help users report exposures – a functionality akin to what Coronavirus Reporter offered. Unsurprisingly, Apple **denied** PhantomAlert's app from the App Store for the same reason: it wasn't government-sanctioned. In January 2025, Judge Trevor McFadden granted Apple's motion to dismiss PhantomAlert's complaint, based on Gibson Dunn's argument it was "identical" to CR I. PhantomAlert engaged an **antitrust team from Berger Montague**, a leading plaintiffs' class-action firm (with Harvard-educated attorneys possessing significant DOJ experience in tech antitrust). In other words, heavy hitters in the legal community looked at these claims and decided they have merit and value. PhantomAlert's case is now on appeal (regarding the dismissal) with the backing of first-rate counsel and a potential nationwide class of developers.

Why is this relevant here? Because it demonstrates that Dr. Roberts' crusade was **neither frivolous nor isolated**. He was ahead of the curve in February 2020 trying to launch a life-saving app. He was among the first to call out Apple's misuse of its App Store rules during a global emergency. Now, years later, others are echoing those same complaints: that Apple's conduct was anticompetitive, harmed small developers, and arguably violated laws like the Sherman Act and state unfair competition laws.

Apple essentially "picked off" Dr. Roberts as the tip of the spear, hoping that would deter others. To some extent, it worked for a while – others might have been hesitant watching what happened to him. But now that others have rallied (PhantomAlert, etc.), Apple is panicking, hence its bid for a global anti-suit injunction. This Court should not reward Apple for its strategy of selective suppression. If anything, **Dr. Roberts' case deserves greater respect** given who he is and what he tried to do.

We submit that equity and justice require leveling the playing field. If PhantomAlert and others will have their day in court (with class actions or otherwise), then Dr. Roberts – the pioneer of this cause – must have his day as well. It would be a bitter irony if the originator of the COVID app antitrust theory is the only one barred from litigating it due to procedural shenanigans and vendetta of Gibson Dunn.

## LEGAL STANDARD

Inherent power. A court may fashion an appropriate sanction for conduct which abuses the judicial process including fee-shifting, default, or contempt. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991).

28 U.S.C. § 1927. An attorney who so multiplies the proceedings … unreasonably and vexatiously may be required to satisfy the excess costs, expenses, and attorneys' fees reasonably incurred. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002).

Additionally, Plaintiffs request the Court independently consider exercising its sua sponte authority under Rule 11(c)(3), given the egregious nature of Defendants' misconduct.

## ARGUMENT

### I. THE NEED FOR IMMEDIATE INVESTIGATION AND A $20 MILLION SANCTION

Apple and Gibson Dunn's misconduct in this case is so severe that it calls for the **strongest sanctions** this Court can impose. Five years of lies, delays, and abuse have not only prejudiced Dr. Roberts, but have also made a mockery of this Court's processes. To restore integrity, we urge the Court to take swift and decisive action under its inherent powers, 28 U.S.C. § 1927, and even consider applying Rule 11(c)(3) sua sponte. Specifically, the Court should initiate a thorough investigation of Apple's and Gibson Dunn's litigation conduct and impose sanctions commensurate with the egregiousness of their actions. We outline below a set of recommended steps and remedies. These include targeted discovery to uncover the truth, an evidentiary hearing to put Gibson Dunn's lawyers under oath, referrals for disciplinary or criminal

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

proceedings if warranted, a **monetary sanction of $20,000,000**, unjust enrichment reallocation, and additional relief to neutralize the fruits of Apple's misconduct (such as vacating the prior dismissal and ensuring a fair path forward for Dr. Roberts' claims). **Nothing short of this comprehensive approach will suffice** – Apple's behavior has been that bad, and justice delayed any longer will be justice denied.

**1. Immediate Court-Ordered Discovery into Gibson Dunn's Communications and Representations:** The Court should order Apple and its counsel to turn over, on an expedited basis, all communications, filings, and internal documents relevant to the inconsistent positions and factual misrepresentations outlined above. This should include their entire file on Apple related antitrust litigation, or more narrowly, the CR I & II files. At a minimum, correspondence or emails in which Gibson Dunn discussed or decided how to characterize the plaintiff (app vs. corporation), their due diligence on Apple's notarization mechanism and economic effects, internal drafts or notes from 2021 where Apple's team formulated the "non-entity" theory, and communications from 2024-25 where they decided to invoke Dr. Roberts and Isaacs for preclusion. The goal is to trace the evolution of Apple's narrative in their own words – to see if, as we suspect, **Gibson Dunn consciously re-crafted the story at each phase knowing it was contrary to what they said earlier**. We request that the Court set a very short deadline for production, and consider appointing a special master or magistrate to oversee compliance. The specter of spoliation or foot-dragging is real – Gibson Dunn has a history of delay and obstruction and Apple just last month lied to this District Court and resisted document production. The Court should warn that any failure to fully and timely comply will be met with severe consequences (up to default or contempt). By compelling this production, the Court will quickly get to the bottom of whether Apple's counsel lied or deliberately misled the Court. Documents often tell the story: if internal emails show, for instance, that Ms. Brass believed her "no entity" email and later suggested otherwise, that's a smoking gun of bad faith. We need to see those smoking guns.

**2. Evidentiary Hearing with Witness Testimony (Including Gibson Dunn Attorneys and Apple representative):** After expedited document production, the Court should hold an evidentiary hearing where the key players testify under oath. This would likely include Attorney Rachel Brass, Perry, Kleinbrodt, and any other Gibson Dunn lawyers who signed filings or letters with the misrepresentations (and any relevant Apple in-house counsel or executives who directed strategy). They should be questioned about the factual bases (or lack thereof) for their claims in CR I and CR II. For example, Brass should be asked: *"On what*

*basis did you tell the Court in 2021 that Coronavirus Reporter was not a company or that Dr. Roberts was not involved? Were you aware of the Wyoming corporation and Dr. Roberts' role at that time? If so, why did deny their existance?"* Similarly: *"How do you reconcile Apple's statement in 2021 that Isaacs 'could not appear' with your current claim that Isaacs was effectively the prior plaintiff whose outcome binds everyone? Did you ever inform Judge Chen of Dr. Roberts' true role?"* The hearing would serve two purposes: to allow the Court to **observe the demeanor and credibility** (or lack thereof) of Apple's counsel, and to create a clear record of what misrepresentations were made. If the attorneys attempt to justify their actions, the Court can probe those explanations. If they take responsibility or reveal instructions from Apple, that is informative too. We also would call Dr. Isaacs and Dr. Roberts to testify to their interactions with Apple's counsel – for instance, Dr. Isaacs can authenticate the intimidation letter and describe its impact, and Dr. Roberts can testify how he was marginalized. Ultimately, this hearing will inform the Court's decision on sanctions and possible further action (like referrals). The importance of having lawyers speak under oath is underscored by the *Epic* case – there, once evidence came out, Judge Gonzalez Rogers bluntly noted the lies and the failure of counsel to correct them. We expect a similarly rigorous application of the law here.

**3. Referral to Disciplinary Authorities or DOJ if Appropriate:** If the evidence confirms that Apple's counsel engaged in deceit or serious misconduct, the Court should not hesitate to refer them to the relevant State Bar for investigation of ethical violations. Lying to a tribunal, framing false narratives, or abusing procedure to stifle a party are potential breaches of rules of professional conduct (e.g., ABA Model Rules 3.3, 4.4, etc.). Additionally, if perjury by a witness or subornation of perjury by counsel is uncovered, a referral to the Department of Justice for perjury or obstruction of justice should be considered. We note that in *Epic*, Judge Gonzalez Rogers explicitly referred Apple (and implicitly its counsel) for a criminal contempt inquiry, because false testimony had been given about Apple's compliance with an injunction. Federal courts have inherent power to protect themselves from fraud; sometimes that involves asking prosecutors to step in when the fraud is egregious. Here, Apple's about-face on facts might not violate a specific statute, but if any sworn declarations or statements were made that are proven false (and made knowingly), that could be perjury.

**4. Monetary Sanctions of $20,000,000 (Jointly and Severally Against Apple and Gibson Dunn):** The Court should impose a monetary sanction that is *punitive* and *deterrent*, not merely compensatory. We

propose **$20 million** for several reasons. First, this approximate figure represents about a small fraction of what Apple has likely paid Gibson Dunn to carry out its anti-competitive legal strategy. Imposing $20M as a sanction effectively **claws back** one year of ill-gotten gains and forces a wealthy defendant and a wealthy law firm to feel a pinch. To Apple (a $3T company), and even Gibson Dunn (a $2B/year firm), smaller sanctions (like the $925k in the Facebook case) are unfortunately just "loose change". Judge Chhabria himself noted that $925k was "loose change" to these actors – indeed Meta/Facebook agreed to pay $725 million to settle that case, dwarfing the sanction. We need to speak in a language Apple understands: dollars and shareholder impact. $20M is an amount that might get noticed by Apple's board or at least within Gibson Dunn's partnership (perhaps affecting bonuses). It is also symbolically significant because, as noted, Gibson Dunn once faced a $20M sanction in 2003 – apparently one of the largest ever against a law firm. That history shows that only very large numbers prompt soul-searching. Second, $20M is proportional to the harm. Dr. Roberts and his team spent five years fighting for a chance to be heard – five years of lost opportunity (the app never got launched), five years of litigation stress and expense, and incalculable damage to their morale and reputations. In antitrust terms, if Coronavirus Reporter had launched and been even moderately successful, it could have been worth hundreds of millions in value (especially at the height of COVID app demand). Apple's misconduct robbed them of that chance. While sanctions are not damages per se, this amount recognizes that the consequences here were enormous – not a trivial discovery spat, but the derailment of a lifesaving innovation and antitrust claim. Third, **deterrence**: We want to deter both Apple and *other litigants* from similar tactics. If a mere reprimand or small fine is given, Apple and firms like Gibson Dunn will continue with business as usual (calculating that they saved more by winning than the cost of sanction). But a $20M hit, publicly awarded, would make headlines and force some internal accountability. It would tell every lawyer in this case and others: do not lie or abuse procedure in the Northern District of California, or you will pay dearly. It would also resonate in Big Tech boardrooms: maybe it's better to litigate honestly than risk sanctions that meaningfully impact the bottom line. We stress that this $20M should be **joint and several** on Apple and Gibson Dunn. Apple must not be allowed to offload it entirely onto its firm (or vice versa); both should feel it.

     **5. Vacatur of the CR I Dismissal and Other Appropriate Relief:** In addition to punitive measures, the Court must correct the litigation record by nullifying any outcome tainted by Apple's fraud. That means

**vacating the judgment of dismissal in CR I** (the 2021 case) under the Court's inherent power to address fraud on the court. The dismissal was obtained under false pretenses; it cannot be allowed to stand as a bar to anything. Once vacated, Apple's whole preclusion argument in CR II collapses – appropriately so, since one cannot derive preclusive effect from a fraudulent judgment. The Court should also deny Apple's pending Rule 11/§1927 motion in CR II, not only because it's baseless but also as a further sanction (indeed, that motion is an abusive filing that itself warrants being stricken and is pending antiSLAPP adjudication). Furthermore, we ask the Court to entertain a **fresh look at the merits** of Dr. Roberts' claims. Procedurally, this could mean reopening CR I and consolidating it with CR II, or simply proceeding in CR II but recognizing that it is unencumbered by the prior case. As part of remedying the situation, it may be appropriate for Judge Chen to recuse or for the case to be reassigned to ensure a completely fresh perspective. CRC, Undersigned and Dr. Roberts needs to know that the next decisions will be made on a clean record by a neutral arbiter not subconsciously affected by Apple's prior distortions. In any event, any injunction or extraordinary relief Apple seeks against Dr. Roberts should be off the table. An 85 year old hero should not be dragged through the mud in a Gibson Dunn-esque evil ploy. In fact, as a sanction, the Court could **enjoin Apple** from seeking any similar gag orders in this or related cases, since Apple has shown it wields Rule 11 for improper purposes. The Court should also consider granting leave for Plaintiffs to amend or supplement their complaint as needed, and to pursue expedited merits discovery, as a way to make up for lost time. Essentially, the litigation should resume as if it were filed anew, but with the knowledge of Apple's conduct informing a tighter leash on Apple's future litigation behavior.

**Additional Remedies and Supplemental Claims**

## II.    DISGORGEMENT OF ILL-GOTTEN PROFITS

Plaintiffs seek **disgorgement of Apple's monopoly profits** as an equitable remedy. A foundational principle of antitrust law is that a monopolist **"must not be permitted to profit from the violation"** of the law. Allowing Apple to retain billions in ill-gotten gains from its exclusionary **App Store notarization scheme** would undermine deterrence. Courts have broad authority to deprive a violator of unlawful gains – for example, California's Unfair Competition Law expressly permits orders **"necessary to restore to any person in interest any money or property…which may have been acquired"** by means of unfair practices.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

Here, Apple's **"notarization" requirement** (and parallel App Store restrictions) allegedly yielded approximately **$20 billion per year** each of the past five years in unjust revenue. We therefore ask that the Court, as part of final relief, compel Apple to **disgorge these ill-gotten profits**, returning value to those harmed and preventing Apple from being unjustly enriched by its prolonged monopoly. Such disgorgement is appropriate to **"prevent the violator from profiting"** from illegal conduct and to **restore** the status quo that would have existed absent Apple's unfair monopoly.

## III.   ADA RETALIATION CLAIM

Plaintiff also asserts a claim under the **Americans with Disabilities Act (ADA) for retaliation**, given that a key team member's disability was brought to Apple's attention and met with reprisals. The ADA's anti-retaliation provision, 42 U.S.C. § 12203, **broadly prohibits any person from discriminating against an individual for opposing disability-based wrongdoing or participating in an ADA proceeding**. In this case, Dr. **Isaacs** (a Plaintiff) repeatedly **warned Apple** that its policies were adversely impacting him due to his documented disability – effectively **opposing practices made unlawful by the ADA** – yet Apple doubled down and **punished him for speaking out**. For instance, Plaintiffs allege that after Dr. Isaacs objected to Apple's discriminatory rejection of their app (and requested disability accommodations), Apple responded by further **impeding his access and retaliating against his development account**, which **impaired his ability to participate in this litigation**. Such alleged conduct fits squarely within ADA retaliation: *"No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]…"* In other words, Apple cannot lawfully **"target" a developer's disability or retaliatory complaints** with punitive measures. We invoke the ADA's protections to seek relief for this retaliation, which may include injunctive orders and other equitable remedies (as authorized by ADA §12203(c)) to undo the harm and **ensure a fair, unbiased proceeding** going forward.

## IV.   DISQUALIFICATION OF COUNSEL (WITNESS-ADVOCATE RULE)

Plaintiffs move to **disqualify Apple's counsel, Gibson Dunn & Crutcher, under the "lawyer-as-witness" rule** (Model Rule of Professional Conduct 3.7), given the likelihood that key attorneys are necessary witnesses in this matter. The advocate-witness rule exists to prevent prejudice and confusion that arise when an attorney serves as both a zealous advocate and a witness on contested factual issues. As the

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

California Supreme Court has observed, **"an attorney who attempts to be both advocate and witness impairs his credibility as a witness and diminishes his effectiveness as an advocate."** Here, certain Gibson Dunn attorneys have firsthand knowledge of disputed events making their testimony **highly relevant**. If those same lawyers continue as trial counsel, the trier of fact could be **"confused or misled"**: a lawyer is expected to argue based on evidence, but as a witness the lawyer would be providing evidence based on personal knowledge. The dual role blurs the line between advocacy and evidence, raising the risk that the attorney's statements **"may not be clear [as to] whether [they] should be taken as proof or as an analysis of the proof."** Model Rule 3.7 (adopted in substance by California's Rules) therefore **prohibits a lawyer from acting as advocate in a proceeding if the lawyer is likely to be a necessary witness**, absent narrow exceptions. The rule aims to avoid **the appearance of impropriety and unfair prejudice** to the opposing party. In this case, Apple's counsel have effectively made themselves witnesses through their statements and actions (e.g. by **pleading specific factual representations on Apple's behalf and possibly orchestrating the alleged cover-up of Apple's conduct, tolerating lies on the witness stand, etc, etc**). This creates an untenable conflict. Even if another attorney at the firm were to conduct the trial, the **"stake" of the lawyer-witness's firm in the outcome could still undermine objectivity** . Courts retain discretion to disqualify counsel in such scenarios to preserve **the integrity of the proceedings and public trust in the justice system**. Accordingly, Plaintiffs ask that Gibson Dunn be disqualified as litigation counsel, or at minimum that any individual lawyer likely to testify withdraw from any advocacy role at trial. Apple should be required to retain conflict-free counsel who will not serve as witnesses, or else formally waive the advocate-witness conflict (if waiver is permissible) and proceed at its peril. We seek the Court's intervention to **enforce Model Rule 3.7's mandate**, thereby eliminating a serious ethical conflict and ensuring a fair trial.

## V.  PARTIAL DEFAULT AS A SANCTION FOR FRAUD ON THE COURT

Given the **egregious pattern of litigation misconduct** by Apple, Plaintiffs urge the Court to enter a **partial default judgment** against Apple on specific claims or issues as a sanction for **fraud on the court**. Federal courts possess inherent authority – as well as authority under Fed. R. Civ. P. 37 – to impose terminating sanctions when a party's bad-faith conduct undermines the judicial process. This includes the power to render a **default judgment** on some or all claims in extreme situations. An order of default is a **"drastic sanction,"** reserved for cases of deliberate misconduct showing a **"contumacious…disregard of**

**the court's authority."** Here, we contend Apple has perpetrated a fraud on this Court by repeatedly misrepresenting material facts – for example, suggesting that macOS **notarization was inseparable from iOS** (a claim now shown false by our First Amended Complaint's evidence that those features are in fact severable), Dr Roberts participation in CRC, Dr Isaacs pro se status, etc. Such misrepresentations, coupled with Apple's concealment of evidence and improper interference with witnesses, amount to a **systematic abuse of the judicial process**. Courts have made clear that when a party **fabricates evidence, perjures itself, or otherwise "intentionally distort[s] the discovery and trial process," the appropriate remedy is default judgment**. Lesser sanctions would not suffice to purge the prejudice and signal that such behavior will not be tolerated. For instance, in one case a plaintiff who attached a **forged contract** as the "centerpiece" of his complaint had his entire suit dismissed as a sanction. Likewise, if a defendant engages in egregious discovery abuse or fraud, courts may **enter default on liability** as a punitive and remedial measure. We request a tailored application of that principle here: at minimum, a **default judgment on the issue of Apple's liability** for the claims tainted by its misconduct (such as the UCL claim regarding notarization and monopoly maintenance) is warranted. This Court's broad discretion in fashioning sanctions includes the ability to strike Apple's defenses or render judgment on particular issues where Apple's fraud has "infected" the fairness of the adjudication. By imposing a **partial default**, the Court would protect the integrity of these proceedings and ensure that Apple does not benefit from having **defrauded the Court**. In sum, the severity and deliberate nature of Apple's litigation abuses call for a commensurately severe response – one that **strips Apple of its defenses** on certain claims and allows this case to proceed directly to an assessment of appropriate relief.

## VI.  CIVIL RICO CLAIM (SEVERED OR AMENDED)

Finally, Plaintiffs seek the Court's guidance on pursuing a **Civil RICO claim** (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962) based on Apple's ongoing scheme of developer retaliation and fraud. We initially pleaded a RICO cause of action – alleging that Apple and its agents engaged in a pattern of racketeering acts (mail and wire fraud, among others) to maintain its App Store monopoly and retaliate against developers – but that claim was dismissed at the Rule 12 stage. The new evidence squarely invokes multiple excessive predicate act violations and a refreshed claim. We respectfully submit that a RICO theory remains viable if properly refined. **By statute, a § 1962(c) RICO claim requires** the plaintiff to allege **"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (predicate acts) (5)**

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

causing injury to the plaintiff's business or property." We believe the facts here – including Apple's systematic suppression of rival apps and appropriation of developers' ideas through fraudulent App Review practices – satisfy these elements. However, to address the Court's prior concerns, we will **clarify the RICO "enterprise" distinct from Apple** itself. The Ninth Circuit affirmed dismissal of our earlier RICO claim because, as pleaded, it impermissibly made Apple the RICO person and effectively the enterprise (by naming Apple's own management, counsel, and associates). A corporation **cannot be both the liable "person" and part of the associated enterprise** under RICO. In a **revised RICO claim**, we would allege an enterprise comprising entities and individuals separate from Apple (for example, a group of co-conspirators or shell entities used by Apple to further the scheme), thereby satisfying the distinctness requirement. We are prepared to **file a new, separate action** for civil RICO – to avoid complicating the current case – or, if the Court prefers, to **amend the present complaint** to add the RICO count (since it arises from the same nucleus of facts as our other claims). In the interest of judicial economy, an amended pleading might be appropriate if the Court is inclined to permit it; alternatively, severance of the RICO allegations into a new case could be ordered. **We respectfully request guidance** on the preferred procedure. Our aim is to ensure the RICO claim is heard on its merits, given the gravity of Apple's alleged misconduct. The RICO statute was designed to **reach concerted schemes of fraud and coercion** like those at issue – and to provide treble damages and attorneys' fees to parties injured by such racketeering. While we will follow the Court's direction on timing and format, we did not want to waive this important claim. In short, Plaintiffs stand ready to **re-plead a focused RICO cause of action**, either here or in a new action, to hold Apple fully accountable under the law's harshest anti-fraud provisions. We ask the Court to indicate how it wishes us to proceed so that the RICO allegations can be properly adjudicated.

## CONCLUSION

We finally return to the **human element**: Dr. Robert Roberts. This 85-year-old man has given society immeasurable gifts – people literally live who would have died, because of his work. In the twilight of his career, instead of enjoying retirement, he threw himself into combating a once-in-a-century pandemic, only to be met with obstruction and character assassination by Apple's lawyers. The **shamefulness** of Apple's conduct is amplified by Dr. Roberts' stature. Had Apple simply told the truth and litigated the case on the merits, we likely would have a resolution by now – one that, whichever way it went, would at least show

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

respect for the issues. Instead, Apple chose the path of maximum resistance and maximum disrespect. They treated Dr. Roberts as a pest to be exterminated rather than an opponent to be respected. This offends not just legal standards, but basic decency. A sanctions order in this case is not merely about punishing rule-breaking; it is about **standing up for the principle that truth and fairness matter, no matter who the parties are**. If the courts won't protect a person like Dr. Roberts from being railroaded by falsehoods, who will they protect?

Accordingly, we urge the Court to grant this motion in full, ordering the investigations and sanctions outlined above. This Court has the opportunity to set right a profound wrong, to salvage a case that carries implications for public health and competition, and to deter future misconduct by one of the world's most powerful companies and one of its most aggressive law firms. Justice delayed has been justice denied for too long in this matter. It's time to end that delay. Let the truth come out, let the chips fall where they may for Apple and Gibson Dunn, and let Dr. Roberts have the fair day in court that he – and the public interest – deserve.

Enough is enough. Apple and Gibson Dunn have spent five years weaving a web of lies and obstruction to avoid answering for Apple's conduct, **wasting the Court's time and Dr. Roberts' time** in the process. Their tactics – from pretending a renowned doctor didn't send Apple a letter on his University professorship letterhead in March 2020 confirming his role in the app, to talking out of both sides of their mouth about who the plaintiff is, to trying to gag anyone who challenges them – are beyond the pale.

For the foregoing reasons, Plaintiffs urge the Court to grant this Motion, impose all appropriate sanctions (monetary, declaratory, and procedural), including a $20 million penalty and such other relief as discussed, and to take whatever additional steps are necessary to purge the taint of Apple's fraud from this case. Only by doing so can the Court ensure that this case – and others like it – proceed on the *truth*, not on a tapestry of lies. Dr. Roberts has earned his day in court; the law demands he get it. Justice and the integrity of this Court demand nothing less.

Submitted on this 30th day of June, 2025.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

RACHEL S. BRASS
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, CA  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Apple Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| Coronavirus Reporter Corporation, Calid Inc., Greenflight Venture Corporation<br><br>*on behalf of themselves and all others similarly situated.*<br><br>Plaintiffs,<br><br>v.<br><br>Apple Inc.<br><br>Defendant. | CASE NO. 3:24-CV-08660-EMC<br><br>**DEFENDANT APPLE INC,'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: May 22, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

Gibson, Dunn & Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 22, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, Courtroom 5, 17th Floor, Federal Courthouse, Defendant Apple Inc., through its undersigned counsel, will, and hereby does, move to dismiss Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation's First Amended Complaint. *See* Fed. R. Civ. P. 12(b)(1) & 12(b)(6). This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Julian W. Kleinbrodt and exhibits thereto; the Proposed Order filed herewith; the pleadings and papers on file herein; and such other matters that may be presented to the Court at the hearing.

By: /s/ *Julian W. Kleinbrodt*
Julian W. Kleinbrodt

GIBSON, DUNN & CRUTCHER LLP
RACHEL S. BRASS
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT
jkleinbrodt@gibsondunn.com
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

ii

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Fist Amended Complaint should be dismissed with prejudice because:

I.      Claim preclusion bars Plaintiffs' claims.

II.     Plaintiffs lack standing because:

  A.     Plaintiffs fail to allege antitrust injury associated with their app rejection and suppression claims (Claims 5–9).

  B.     Plaintiffs (a) fail to allege a concrete, redressable injury, as required for Article III standing, or (b) direct theory of harm suffered in the allegedly restrained market, as required for antitrust injury and standing, for their smartphone monopolization claims (Claims 1–4).

  C.     Plaintiff Greenflight Venture Corporation independently lacks antitrust standing (Claims 1–9).

III.    Plaintiffs' fail to allege the essential elements of their claims, including:

  A.     A plausible relevant market (Claims 1–8).

  B.     A plausible theory of anticompetitive conduct under the Sherman Act (Claims 1–8).

  C.     Additional elements required to state a claim under the California Unfair Competition Law (UCL) or Wyoming Consumer Protection Act (WCPA) (Claim 9).

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 326

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................................1

BACKGROUND...................................................................................................................2

    **I.**     **This Court Dismisses *Coronavirus I*.................................................................2**

    **II.**     **Plaintiffs File Duplicative Cases, Including this Case in the District of Wyoming..........................................................................................................3**

LEGAL STANDARD ...........................................................................................................5

ARGUMENT.........................................................................................................................5

    **I.**     **Plaintiffs' Claims Are Precluded by This Court's Judgment (Claims 1–9) ..........5**

        A.     There Is an Identity of Claims with *Coronavirus I* .........................................6

        B.     The Court Rendered a Final Judgment on the Merits in *Coronavirus I* ...........7

        C.     There Is an Identity of Parties with *Coronavirus I* .........................................8

    **II.**     **Plaintiffs Lack Article III and Antitrust Standing (Claims 1–9)........................10**

        A.     Plaintiffs Lack Standing for Their App Rejection and Suppression Claims (5–9) .............................................................................................10

        B.     Plaintiffs Lack Standing for Their Smartphone Monopolization Claims (1–4) ..................................................................................................12

        C.     Greenflight Independently Lacks Standing (Claims 1–9) ..............................15

    **III.**     **Plaintiffs' Claims Fail Many Times Over on Other Grounds (Claims 1–9)........16**

        A.     Plaintiffs' Federal Claims Fail on Several Grounds (Claims 1–8)................16

            1.     Plaintiffs Do Not Allege a Plausible Relevant Market (Claims 1–8)..................................................................................................16

            2.     Plaintiffs Fail to Allege Anticompetitive Conduct (Claims 1–8) .......18

                (a)     Plaintiffs Fail to State a Refusal-to-Deal Claim (Claims 1–4)....................................................................................18

                (b)     Plaintiffs Fail to State a Tying Claim (Claim 5) ....................20

                (c)     Plaintiffs Fail to State a Claim for Supracompetitive Fees (Claim 6) ..........................................................................22

                (d)     Plaintiffs Fail to State an "Essential Facilities" Claim (Claim 7) .............................................................................22

                (e)     Plaintiffs Fail to State a "Ranking Manipulation" Claim (Claim 8) .............................................................................23

        B.     Plaintiffs' State Law Claim Fails (Claim 9) .................................................25

CONCLUSION....................................................................................................................25

Gibson, Dunn &
Crutcher LLP

iv

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) ...................................................................................24

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ................................................................... 19, 20, 22, 23

*Alaska Airlines v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) ...................................................................................24

*Alivecor, Inc. v. Apple Inc.*,
2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ...............................................................25

*Allen v. Wright*,
468 U.S. 737 (1984) ...............................................................................................13

*Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*,
876 F.2d 266 (2d Cir. 1989) ......................................................................................9

*Am. Ad Mgmt., Inc. v. Ge. Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) .................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................5

*Ass'n of Wash. Pub. Hosp. Dists. v. Phillip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) .............................................................................. 14, 15

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ................................................................................11

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ...............................................................................................14

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ...............................................................................................11

*Bakay v. Apple Inc.*,
2024 WL 3381034 (N.D. Cal. July 11, 2024) .......................................................... 13, 14

*Beard v. Sheet Metal Workers Union*,
908 F.2d 474 (9th Cir. 1990) .....................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................. 5, 11

*Beverage v. Apple Inc.*,
101 Cal. App. 5th 736 (2024) ..................................................................................25

*Bhan v. NME Hospitals, Inc.*,
772 F.2d 1467 (9th Cir. 1985) ...................................................................................1

v

Gibson, Dunn &
Crutcher LLP

*Blix Inc. v. Apple Inc.*,
  2021 WL 2895654 (D. Del. July 9, 2021) ................................................................. 20

*Brignac v. Yelp Inc.*,
  2019 WL 2372251 (N.D. Cal. June 5, 2019) ........................................................... 16

*Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................................ 11

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ................................................................................................ 11

*Cetacean Cmty. v. Bush*,
  386 F.3d 1169 (9th Cir. 2004) ................................................................................... 5

*Cont'l Auto. Sys. Inc. v. Avanci, LLC*,
  485 F. Supp. 3d 712 (N.D. Tex. 2020) ................................................................... 22

*Coring Co. v. Apple Inc.*,
  2022 WL 22762009 (S.D. Fla. Feb. 18, 2022) .......................................................... 3

*Coronavirus Reporter v. Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ...................... 1, 2, 3, 6, 7, 8, 11, 12, 16, 17, 18, 23

*Coronavirus Reporter v. Apple Inc.*,
  85 F.4th 948 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024)
  ............................................................................ 1, 2, 3, 8, 11, 12, 16, 17, 18

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
  520 F. Supp. 2d 1199 (C.D. Cal. 2007) ................................................................... 21

*Dreamstime.com, LLC v. Google, LLC*,
  2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ........................................................... 24

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................................................ 25

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................................... 18, 22, 23

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) ......................................................................... 12, 20, 23

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) .................................................................... 14

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................................... 18, 20

*Gamboa v. Apple Inc.*,
  2025 WL -----, at *-- (N.D. Cal. Feb. 28, 2025) .................................................... 21

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ................................................................................. 11

vi

Gibson, Dunn &
Crutcher LLP

*In re Gottheiner*,
703 F.2d 1136 (9th Cir. 1983) ............................................................................................. 10

*Greenflight Venture Corp. v. Google LLC*,
2025 WL 385476 (S.D. Fla. Feb. 4, 2025) ............................................................................ 9

*Headwaters Inc. v. U.S. Forest Serv.*,
399 F.3d 1047 (9th Cir. 2005) ............................................................................................. 10

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ............................................................................................. 18

*Hiser v. Franklin*,
94 F.3d 1287 (9th Cir. 1996) ................................................................................................. 7

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ............................................................................................................. 16

*Hynh v. Quora*,
508 F. Supp. 633 (C.D. Cal. 2020) ..................................................................................... 25

*Ill. Tool Works, Inc. v. Ind. Ink, Inc.*,
547 U.S. 28 (2006) .............................................................................................................. 20

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999) ........................................................................................... 19

*John Doe 1 v. Abbott Lab'ys*,
571 F.3d 930 (9th Cir. 2009) ............................................................................................... 22

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 987 (N.D. Cal. 2019) ................................................................................. 14

*Kane v. Donovan*,
2017 WL 6541362 (S.D. Cal. Dec. 21, 2017) ....................................................................... 4

*Kellam Energy, Inc. v. Duncan*,
668 F. Supp. 861 (D. Del. 1987) ......................................................................................... 21

*Kendall v. Visa*,
518 F.3d 1042 (9th Cir. 2008) ............................................................................................. 21

*Key v. Qualcomm Inc.*,
--- F.4th ---, 2025 WL 597604 (9th Cir. Feb. 25, 2025) ..................................................... 22

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ............................................................................................... 15

*L.A. Mem'l Coliseum Comm'n v. NFL*,
791 F.2d 1356 (9th Cir. 1986) ............................................................................................. 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................................................................ 14

Gibson, Dunn &
Crutcher LLP

vii

*Littlejohn v. United States*,
321 F.3d 915 (9th Cir. 2003) ........................................................................................... 5

*Lorenzo v. Qualcomm Inc.*,
603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................................................ 14

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) ...................................................................................... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................................... 12

*Motul S.A. v. USA Wholesale Lubricant, Inc.*,
686 F. Supp. 3d 900 (N.D. Cal. 2023) ............................................................................ 2

*Mpoyo v. Litton Electro-Optical Sys.*,
430 F.3d 985 (9th Cir. 2005) .......................................................................................... 8

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) ....................................................................................... 20

*Nicklas v. Prof. Ass'n, LLC.*,
2018 WL 8619646 (D. Wyo. Sept. 26, 2018) ............................................................... 25

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ............................................................................... 19, 20

*Official Airline Guides, Inc. v. FTC*,
630 F.2d 920 (2d Cir. 1980) .......................................................................................... 24

*Oltz v. St. Peter's Cmty. Hosp.*,
861 F.2d 1440 (9th Cir. 1988) ...................................................................................... 16

*Or. Laborers-Emps. v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) ........................................................................................ 15

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001) .............................................................................. 5, 6, 7, 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................................................. 19, 20

*Parr v. Cougle*,
--- F.4th ---, 2025 WL 444834 (5th Cir. Feb. 10, 2025) ............................................... 13

*PhantomALERT v. Apple Inc.*,
2025 WL 71888 (D.D.C. Jan. 10, 2025) ............................................................. 13, 18, 25

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
890 F.2d 139 (9th Cir. 1989) ........................................................................................ 16

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................................................. 12, 17, 18

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER.331

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
 442 F.3d 741 (9th Cir. 2006)................................................................................2

*Rick-Mik Enters., Inc. v. Equilon Enters., Inc.*,
 532 F.3d 963 (9th Cir. 2008)..............................................................................21

*Robi v. Five Platters, Inc.*,
 838 F.2d 318 (9th Cir. 1988)..............................................................................11

*Rutman Wine Co. v. E. & J. Gallo Winery*,
 829 F.2d 729 (9th Cir. 1987)..............................................................................11

*Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers*,
 888 F.2d 604 (9th Cir. 1989)..............................................................................14

*Sayre v. Google, Inc.*,
 2019 WL 6036703 (N.D. Cal. Nov. 14, 2019)....................................................23

*In re Schimmels*,
 127 F.3d 875 (9th Cir. 1997)................................................................................8

*Serv. Empls. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
 249 F.3d 1068 (D.C. Cir. 2001)..........................................................................21

*In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prods. Liab. Litig.*,
 2022 WL 710192 (W.D. Mo. Mar. 9, 2022)........................................................25

*Solinger v. A. & M. Recs., Inc.*,
 718 F.2d 298 (9th Cir. 1983)........................................................................ 15, 16

*Somers v. Apple Inc.*,
 729 F.3d 953 (9th Cir. 2013)..............................................................................11

*Sonner v. Premier Nutrition Corp.*,
 971 F.3d 834 (9th Cir. 2020)..............................................................................25

*Sports Racing Servs. Inc. v. Sports Car Club of Am., Inc.*,
 131 F. 3d 874 (10th Cir. 1997)...........................................................................21

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
 580 F. Supp. 2d 896 (N.D. Cal. 2008).................................................................25

*Stromberg v. Qualcomm Inc.*,
 14 F.4th 1059 (9th Cir. 2021).............................................................................11

*Summit Health, Ltd. v. Pinhas*,
 500 U.S. 322 (1991)...........................................................................................21

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
 322 F.3d 1064 (9th Cir. 2003)..........................................................................8, 9

*Taylor v. Sturgell*,
 553 U.S. 880 (2008)...................................................................................7, 9, 10

Gibson, Dunn &
Crutcher LLP

ix

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER.332

*Theme Promotions, Inc. v. News Am. Mktg.*,
546 F.3d 991 (9th Cir. 2008) ................................................................................ 14

*Thompson v. Barrett Daffin Frappier Treder & Weiss*,
2021 WL 5002414 (9th Cir. 2021) ........................................................................ 7

*Townshend v. Rockwell Int'l Corp.*,
2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ...................................................... 19

*Turtle Island Restoration Network v. U.S. Dep't of State*,
673 F.3d 914 (9th Cir. 2012) ................................................................................. 6

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) ............................................................................................ 19

*United States v. Liquidators of Eur. Fed. Credit Bank*,
630 F.3d 1139 (9th Cir. 2011) ............................................................................... 7

*Unlockd Media, Inc. Liquidation Trust v. Google LLC*,
2025 WL 563460 (N.D. Cal. Feb. 20, 2025) ...................................................... 12

*Verizon Commc'ns v. L. Offices of Curtis V. Trinko*,
540 U.S. 398 (2004) ........................................................................... 19, 22, 23, 24

*Whitepages, Inc. v. Isaacs*,
196 F. Supp. 3d 1128 (N.D. Cal. 2016) ................................................................ 9

*Zoslaw v. MCA Distrib. Corp.*,
693 F.2d 870 (9th Cir. 1982) .............................................................................. 24

**Statutes**

Wyo. Stat. §20-4-114 ............................................................................................ 25

Wyo. Stat. §40-12-108(a) ..................................................................................... 25

Wyo. Stat. §40-12-110(a)(ii) ................................................................................ 25

**Other Authorities**

Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles
Applied to Intellectual Property* §13.03 (3d ed. 2020 supp.) ............................. 22

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013-2023) .................. 15

**Rules**

Fed. R. Civ. P. 19 ................................................................................................. 10

Fed. R. Civ. P. 20 ................................................................................................. 10

Fed. R. Civ. P. 41(b) .............................................................................................. 8

N.D. Cal. L.R. Civ. 3-15(b)(2) ............................................................................ 10

Gibson, Dunn &
Crutcher LLP

x

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 333

**INTRODUCTION**

This case is déjà vu all over again. In 2021, Jeffrey Isaacs and entities with which he is affiliated sued Apple Inc. claiming that it violated the antitrust laws by rejecting or suppressing their apps on the App Store. This Court put an end to those meritless claims in *Coronavirus Reporter v. Apple Inc.*, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021), and the Ninth Circuit affirmed. *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 953 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024). But for the fifth time in four years, Isaacs' entities have filed suit rehashing the same grievances: that "Apple rejected the Coronavirus Reporter app," "suppressed [the WebCaller app] in rankings," and otherwise denied users "unrestricted use of their smartphones." FAC ¶¶ 37, 102, 119. The Court should enforce its judgment's preclusive effect and dismiss this case with prejudice.

*First*, Plaintiffs' claims are barred by *res judicata*. This case arises from the same alleged injuries, presses the same theories of anticompetitive conduct, and borrows the same alleged markets from *Coronavirus I*. The only differences are those manufactured by Plaintiffs' amendment, which added a new entity, Greenflight Ventures Corporation, and copied swaths of allegations from the Department of Justice's unrelated complaint in *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.). Neither suffices. Greenflight shares an identity with the *Coronavirus I* plaintiffs, including Isaacs, its sole owner, director, and CEO; and the claims concerning alleged monopolization of a smartphone market, cribbed from the government's complaint, could have been brought in Plaintiffs' prior suit. Nor can Plaintiffs escape preclusion with the audacious argument that Plaintiff Coronavirus Reporter Corporation is not the "Coronavirus Reporter" corporation that prosecuted *Coronavirus I*—a frivolous assertion Plaintiffs have previewed in past filings. *See, e.g.*, Dkt. 39 at 6–12.

*Second*, Plaintiffs lack standing. As this Court held in *Coronavirus I*, Plaintiffs' app-rejection and ranking-suppression theories do not give rise to antitrust injury—a prerequisite to antitrust standing. 2021 WL 5936910, at *14–15. The lifted monopolization claims fare no better because Plaintiffs are developers, not "participant[s] in the [allegedly monopolized smartphone] market." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). And Greenflight has another problem: It is a mere "investor," FAC ¶ 250, that lacks antitrust standing under decades of blackletter law.

*Third*, Plaintiffs' claims fail for myriad other reasons. Like *Coronavirus I*, Plaintiffs fail to

Gibson, Dunn & Crutcher LLP

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 334

allege plausible relevant markets. *See* 2021 WL 5936910, at \*7. The problems with their theories of anticompetitive conduct also are legion: They allege Section 1 claims for which they identify no agreement, claim violations of Section 2 based on the settled right of a firm to decide the terms on which it will deal, and otherwise run afoul of bedrock antitrust law. Apple respectfully requests that the Court dismiss the First Amended Complaint with prejudice.

**BACKGROUND**

In 2020, Apple rejected the submission of the Coronavirus Reporter app to the App Store because it violated Apple's App Review Guidelines regarding COVID-related apps. *Coronavirus I*, 85 F.4th at 957. In the five years since, Jeffrey Isaacs and his affiliated entities have filed successive suits arguing that Apple violated the antitrust laws in doing so. New window dressing aside, Plaintiffs now press the same claims, under the same theories, that this Court rejected in *Coronavirus I*—bringing the total to five cases, and nine complaints, against Apple.

### I. This Court Dismisses *Coronavirus I*

Through a series of transfers, dismissals, and amendments, many of Plaintiffs' prior suits merged into one: *Coronavirus I*. *See Coronavirus I*, 2021 WL 5936910, at \*1. The four plaintiffs were Jeffrey Isaacs, Primary Productions LLC, CALID Inc., and "Coronavirus Reporter," which the Complaint described as "a Wyoming Corporation with officers based in New Hampshire, Vermont, and Upstate NY." *Coronavirus I*, Dkt. 1 ¶ 41; *see also id.* ¶¶ 16, 41 (alleging additional facts about the "corporation" Coronavirus Reporter).[1] Plaintiffs did not file corporate disclosures required by the Federal and Local Rules even after Apple pointed out the deficiency. *See*, *e.g.*, *Coronavirus I*, Dkts. 32 at 6, 62 at 6, 91-2 at 9. Apple thus proceeded on the express assumption that "Coronavirus Reporter" was the Wyoming corporation Coronavirus Reporter Corporation. *Coronavirus I*, Dkt. 32 at 6.

While obscuring the real parties in interest, Plaintiffs litigated their claims that Apple violated the antitrust (and other) laws by rejecting Plaintiffs' apps or "suppressing" them in search results.

---

[1] References to the "*Coronavirus I* Dkt." refer to Case No. 3:21-cv-05567-EMC (N.D. Cal.). References to the "*Coronavirus I* CA9 Dkt." refer Case No. 22-15166 (9th Cir.). And references to the "*Coring* Dkt." refer to Case No. 3:22-cv-01044 (S.D. Fla.). The Court may take judicial notice of these filings and orders. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). The Court also may take judicial notice of Exhibits 1–6, which are records from state Secretaries of State. *Motul S.A. v. USA Wholesale Lubricant, Inc.*, 686 F. Supp. 3d 900, 910 (N.D. Cal. 2023).

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 335

Gibson, Dunn & Crutcher LLP

*Coronavirus I*, Dkt. 41 ¶¶ 28, 54–56, 85–86, 104–07. This, Plaintiffs asserted, violated Sections 1 and 2 of the Sherman Act under a variety of theories from tying to "essential facilities." *Id.* ¶¶ 41, 78, 166–67, 181–82, 210–11, 239, 269–71. This Court denied Plaintiffs' two motions for preliminary injunctions and dismissed their claims with prejudice. *Coronavirus I*, 2021 WL 5936910, at *20. First, "[t]here [were] several problems . . . with the relevant markets," including Plaintiffs' failure to identify the alleged relevant market with any "clarity" or allege facts that could make them plausible. *Id.* at 8–13. Second, Plaintiffs alleged no antitrust injury, for their "conclusory [allegations] and 'threadbare recitals'" could not salvage claims predicated on "specific [alleged] harms experienced by Plaintiffs or a small group of competitors, rather than harm to the market." *Id.* at 13–15. Third, Plaintiffs' other claims failed for myriad reasons. *Id.* at 15–20.

The Ninth Circuit affirmed in full. Because Plaintiffs continued to withhold required information about the corporate entities behind the case, Apple noted in a footnote that "[a]s far as Apple can tell, there is no actual 'Coronavirus Reporter' entity—meaning Apple is being sued by at least one null party to whom no relief could be awarded." *Coronavirus I* CA9 Dkt. 38 at 7 n.4. But Plaintiffs never suggested that there was in fact a "non-entity" in their midst, and their counsel continued to hold himself out thereafter as the attorney for "Coronavirus Reporter." *E.g.*, *Coronavirus I* CA9 Dkts. 51-1, 52, 73. The Ninth Circuit resolved the case on the merits: The "fifteen 'relevant markets' . . . alleged in scattergun fashion," the Court held, were insufficiently pled, and Plaintiffs also "did not demonstrate that the Defendant-Appellee undertook anticompetitive conduct in that market sufficient to harm the competitive process as a whole." *Coronavirus I*, 85 F.4th at 956–57. The Court thus upheld the dismissal with prejudice against "Plaintiffs-Appellants," including "Coronavirus Reporter." *Id.* at 953.

## II.     Plaintiffs File Duplicative Cases, Including this Case in the District of Wyoming

After another scrapped attempt to sue Apple in the Southern District of Florida, *Coring Co. v. Apple Inc.*, 2022 WL 22762009, at *3 (S.D. Fla. Feb. 18, 2022), Plaintiffs Coronavirus Reporter Corporation and Calid Inc. filed this duplicative lawsuit on March 5, 2024 in the District of Wyoming. *See* Dkt. 1. They challenged the same alleged rejection and "suppression" of the same apps under the same theories—lifting almost-verbatim from *Coronavirus I* that Apple implemented an "interstate

Gibson, Dunn & Crutcher LLP

restriction" of smartphone "userbase access" (*compare* Dkt. 1 ¶¶ 141–53 *with Coronavirus I*, Dkt. 41 ¶¶ 160–79); restricted access to "essential facilities" (*compare* Dkt. 1 ¶¶ 154–72 *with Coronavirus I*, Dkt. 41 ¶¶ 180–94); imposed an "unreasonable restraint of trade" through its Developer Program License Agreement (*compare* Dkt. 1 ¶¶ 173–84 *with Coronavirus I*, Dkt. 41 ¶¶ 195–206); engaged in "ranking suppression as restraint of interstate trade" (*compare* Dkt. 1 ¶¶ 185–190 *with Coronavirus I*, Dkt. 41 ¶¶ 207–12); "t[ied] the App Store, notary stamps, and software onboarding to the iOS device market" (*compare* Dkt. 1 ¶¶ 191–205 *with Coronavirus I*, Dkt. 41 ¶¶ 213–30); and "violat[ed] . . . [the] Sherman Act § 2 - $99 fee illegality" (*compare* Dkt. 1 ¶¶ 206–15 *with Coronavirus I*, Dkt. 41 ¶¶ 231–40). Conceding the duplication, Plaintiffs since have asserted that "counsel's paralegal accidentally filed the original Complaint with several draft sections from an older antitrust lawsuit clients [sic] – including *Coring* and *Primary Productions*." Dkt. 32 at 6.

Plaintiffs then vied to keep this case out of this Court. After Apple moved to transfer (Dkt. 19), Plaintiffs filed an amended complaint adding another entity plaintiff, Greenflight Venture Corporation (FAC ¶ 49), and copying portions of the Department of Justice's unrelated suit against Apple (*id.* ¶¶ 1–3, 8–20, 23–35, 40–43, 45–46, 50–53, 79–86, 134–60, 167–204, 231–34, 238–48, 264–86, and p. 138 at B–D, F[2])—without removing the claims cribbed from *Coronavirus I* (*id.* ¶¶ 287–354). Plaintiffs next petitioned the JPML to move the case to the District of New Jersey, where private actions paralleling the Department of Justice's case are pending. *See* Dkt. 37 at 1. The JPML rejected that request, concluding the "plaintiffs, markets, and injuries at issue here are distinct from the MDL." *Id.* at 2. The Wyoming Court then ordered this case transferred here, where the Court related it to *Coronavirus I*. Dkts. 44 & 53.

The Amended Complaint now before the Court is a mishmash borne of this tortuous history. At its core, this case remains a clone of *Coronavirus I*: The bulk of Plaintiffs' claims (claims 5–9) concern alleged "censoring . . . and downranking" of their apps. FAC ¶ 343. Plaintiffs specifically challenge Apple's alleged "tying [of] app distribution to [the] iPhone," denials of access to "essential

---

[2] Plaintiffs also purport to incorporate by reference the entirety of the Government's complaint. FAC ¶ 31. That is improper under Federal Rule of Civil Procedure 10(c). *See Kane v. Donovan*, 2017 WL 6541362, at *3 (S.D. Cal. Dec. 21, 2017) (collecting cases). Regardless, none of those allegations could save Plaintiffs' case for the reasons the reasons set forth below.

Gibson, Dunn & Crutcher LLP

facilities," "ranking manipulation," and "requir[ing] developers to pay $99" through which, Plaintiffs say, Apple unlawfully restrained or monopolized markets for "US Smartphone Apps," "App Stores," and "iPhone Notary Stamps." *Id.* ¶¶ 6, 205, 213, 219, 308, 320, 332.  But the first, second, third, and fourth claims repeat allegations from the Department of Justice's complaint concerning Apple's alleged monopolization of a smartphone market (or, in the alternative, "performance smartphone" market)— even though Plaintiffs, who are not alleged iPhone purchasers, have no discernible connection to the government's allegations.  *Id.* ¶¶ 264–86; *see also* Dkt. 37 at 2 (observing Plaintiffs seek "to challenge Apple's rejection of plaintiffs' (and other developers') apps—not supracompetitive prices or less functional iPhones").  Plaintiffs bring their federal (but not state-law) claims on behalf of two putative classes, one for "[a]ll U.S. Smartphone developers of any free app (zero-priced) that suffered economic losses through disallowance, censorship, and/or ranking suppression on the App Store" and another for "[a]ny US [Performance] Smartphone developer who paid a $99 annual subscription fee to Apple for access to its userbase and/or app 'notarization.'"  FAC ¶¶ 252, 254 (emphasis omitted).

### LEGAL STANDARD

A complaint should be dismissed if the plaintiff does not allege "sufficient factual matter, accepted as true," to establish subject-matter jurisdiction or "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

### ARGUMENT

Plaintiffs' endless attempts to bring antitrust claims against Apple must stop.  They cannot relitigate a case they already lost on the merits (§ I).  And even if Plaintiffs were not estopped from doing so, they lack standing to bring their claims (§ II)—all of which fail on the merits anyways (§ III).

### I.    Plaintiffs' Claims Are Precluded by This Court's Judgment (Claims 1–9)

"After a claim or issue is properly litigated, that should be the end of the matter for the parties to that action." *Littlejohn v. United States*, 321 F.3d 915, 919 (9th Cir. 2003).  The doctrine of claim preclusion bars a party from relitigating a claim or cause of action "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quotation marks omitted).  This Court's

Gibson, Dunn &
Crutcher LLP

decision in *Coronavirus I* precludes relitigation of Plaintiffs' claims here.

### A.      There Is an Identity of Claims with *Coronavirus I*

Claims are barred where they "arise out of the same transactional nucleus of facts" as those in a predecessor case. *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).  This turns on whether the "two suits . . . are related to the same set of facts and whether they could conveniently be tried together." *Id.*  Thus, claims share an identity where, as here, they "are related to the same set of facts" even if there is "some difference in the nature of the claims." *Owens*, 244 F.3d at 713–14.

The gravamen of Plaintiffs' claims in this case are no different than in *Coronavirus I*.  As the JPML put it, this case was "brought to challenge Apple's rejection of plaintiffs' (and other developers') apps" with a "primary focus" on "Apple's control over access to the App Store," Dkt. 37 at 2—just as *Coronavirus I* was "br[ought] . . . to challenge Apple's allegedly monopolist operation of its 'App Store' through 'curation' and 'censor[ship]' of smartphone apps." 2021 WL 5936910, at *1.  Great swaths of the complaints are nearly identical. *Compare Coronavirus I*, Dkt. 42 ¶¶ 4, 5, 27, 40, 46–67, 95–97, 105–06, 135, 140, 148–59, 181–94, 196, 210–11, and p. 106 n.5 *with* FAC ¶¶ 36, 37, 47, 69, 94–114, 129–32, 228–30, 251–62, 320–31, 333–35, and p. 104 n.1. And at its core, the Complaint here objects to the same rejection or alleged suppression of apps (FAC ¶ 343) involving the same alleged "US smartphone" foremarket alongside aftermarkets for "App[s]," "Notary stamp[s]," and "app distribution services," FAC ¶¶ 205, 257, 311, 233, 305; *see also Coronavirus I*, Dkt. 41 ¶¶ 11, 109, 124, 144, 183, 234 (alleging same markets).

The identity of claims is clearest among those that are direct carryovers from *Coronavirus I*. *See* FAC ¶¶ 287–354.  In claims 5–9, Plaintiffs parrot the same theories they pressed and lost: that Apple engaged in monopolistic practices in operating the App Store in violation of Section 2 of the Sherman Act (*compare Coronavirus I*, Dkt. 41 ¶¶ 160–79 *with* FAC ¶¶ 263–86); restricted access to the App Store or notary stamps, which they deem "essential facilities" (*compare Coronavirus I*, Dkt. 41 ¶¶ 180–94 *with* FAC ¶¶ 315–31); imposed the Developer Program License Agreement as an "unreasonable restraint of trade," including by charging a $99 fee to developers who wished to distribute apps on the App Store (*compare Coronavirus I*, Dkt. 41 ¶¶ 195–206, ¶¶ 231–40 *with*

Gibson, Dunn &
Crutcher LLP

6

FAC ¶¶ 287–314); engaged in "ranking suppression" (*compare Coronavirus I*, Dkt. 41 ¶¶ 207–12 *with* FAC ¶¶ 332–37); and tied the App Store or notary stamps to iPhones (*compare Coronavirus I*, Dkt. 41 ¶¶ 213–30 *with* FAC ¶¶ 287–305. The Court's "final judgment forecloses 'successive litigation of the very same claim[s].'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).[3]

Plaintiffs' other claims (1–4), copied from the Department of Justice's complaint, are precluded too. These claims arise from the same grievance—Apple's alleged rejection or suppression of Plaintiffs' apps, *see* FAC ¶¶ 161–65, 263–86—and give rise to the same supposed injury (a loss of "goodwill, sponsorship, costs, and charges") at issue in *Coronavirus I*. *Compare* FAC at 104 part E *with Coronavirus I*, Dkt. 41 at 106 part B. As a result, there is no reason Plaintiffs could not have brought their current claims in *Coronavirus I*, where they likewise maintained that Apple controlled a smartphone market, "disadvantaged developers," and "inhibit[ed] the introduction of novel and potentially disruptive technologies." FAC ¶¶ 164–65; *see also Coronavirus I*, Dkt. 41 ¶¶ 89, 234, 269–70. Where, as here, "the injury [a plaintiff] seeks to redress remains the same," claim preclusion bars subsequent relitigation even if "the labels and forms of [the] claims vary at times from those raised in [the] earlier actions." *Thompson v. Barrett Daffin Frappier Treder & Weiss*, 2021 WL 5002414, at *1 (9th Cir. Oct. 28, 2021); *see also United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir. 2011) (claims precluded where "there was no reason why the plaintiff could not have brought the claim in the first action" as "the harm arose at the same time"); *Owens*, 244 F.3d at 714 (claims precluded though brought under different statutes because they sought to redress the same alleged discrimination).

### B.    The Court Rendered a Final Judgment on the Merits in *Coronavirus I*

The second element of claim preclusion is easily met. The Court dismissed Plaintiffs' prior antitrust claims for failure to allege a relevant market or antitrust injury—both necessary elements of antitrust claims—and reduced that decision to judgment. *Coronavirus I*, 2021 WL 5936910, at

---

[3] Nor can Plaintiffs evade preclusion by asserting a derivative claim under state law. *See* FAC ¶¶ 338–54. The "concern behind claim preclusion is that a plaintiff should not be able to relitigate the same facts under a different legal theory." *Hiser v. Franklin*, 94 F.3d 1287, 1292 (9th Cir. 1996). Plaintiffs' ninth claim, which merely duplicates the same theories based on the same alleged injuries (*see, e.g.*, FAC ¶¶ 339, 341–43, 346) under different statutes, also could have been brought in *Coronavirus I*. *See Coronavirus I*, 2021 WL 5936910, at *19 (noting Plaintiffs attempted to bring a state-law claim).

7

Gibson, Dunn & Crutcher LLP

*13–14. The Ninth Circuit affirmed. *Coronavirus I*, 85 F.4th at 953. By rule, the Court's dismissal with prejudice "operates as an adjudication on the merits," Fed. R. Civ. P. 41(b), and is a final judgment that "bars a later suit under res judicata." *Beard v. Sheet Metal Workers Union*, 908 F.2d 474, 477 n.3 (9th Cir. 1990); *see also*, *e.g.*, *Owens*, 244 F.3d at 714 (dismissal with prejudice is an adjudication on the merits); *In re Schimmels*, 127 F.3d 875, 884 (9th Cir. 1997) (same).

### C. There Is an Identity of Parties with *Coronavirus I*

Finally, the three plaintiffs here are bound by *Coronavirus I*. There appears to be no dispute that Plaintiff Calid Inc. was a party to *Coronavirus I*. *See Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005) (identity of parties is obvious where "[t]he plaintiff and defendant are identical in both actions"). The two other Plaintiffs, Coronavirus Reporter Corporation and Greenflight Venture Corporation, also were parties to *Coronavirus I* or are in privity with parties that were. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (*res judicata* applies where "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest").

1. It should be beyond reasonable dispute that Plaintiff Coronavirus Reporter Corporation also was a party to *Coronavirus I*. After all, the "Coronavirus Reporter" that brought *Coronavirus I* said it was a "Wyoming Corporation," for whom "Dr. Robert Roberts" was the "Chief Medical Officer," that developed the eponymous app at the center of that case. *Coronavirus I*, Dkt. 41 ¶ 27. The "Coronavirus Reporter Corporation" prosecuting this case likewise is a "Wyoming C Corporation," for whom Dr. Roberts is the chief medical officer, that developed the same "Coronavirus Reporter . . . iPhone application." FAC ¶ 47. For good measure, Wyoming's Secretary of State has records for only one entity with "Coronavirus Reporter" in its name: Coronavirus Reporter Corporation, the treasurer and director of which is Plaintiffs' counsel. Kleinbrodt Decl. Exs. 1–5 (search results, corporate listing, and 2022–24 annual reports).

Yet Plaintiffs now maintain the "Coronavirus Reporter" from *Coronavirus I* is a "legal non-entity" and therefore not "identical" to the "Wyoming-registered Coronavirus Reporter Corporation" prosecuting this case. Dkt. 39 at 6. But that would mean Plaintiffs' counsel filed dozens of documents, and issued subpoenas, on behalf of a client that did not exist. *See*, *e.g.*,

Gibson, Dunn &
Crutcher LLP

8

*Coronavirus I*, Dkts. 1, 20, 41, 51, 66-1, 83.  While Plaintiffs have sought to blame Apple—suggesting their counsel learned Coronavirus Reporter was a non-entity when, on appeal, Apple noted Plaintiffs' failure to properly disclose the corporate entities behind the lawsuits, Dkt. 39 at 7–8—this outlandish assertion cannot be squared with Apple's objections earlier in the litigation (*e.g.*, *Coronavirus I*, Dkts. 32 at 6, 62 at 6, 91-2 at 9) or the filings "Coronavirus Reporter" made *after* that point (*e.g.*, *Coronavirus I* CA9 Dkts. 51-1, 52, 73).  There is only one Wyoming entity called "Coronavirus Reporter," and it was the plaintiff in the last case as well as this one.

**2.**  Greenflight also is bound by the Court's judgment because it shares a "substantial identity" with the *Coronavirus I* plaintiffs.  *Tahoe-Sierra*, 322 F.3d at 1081.  Privity in this context "is a flexible concept dependent on the particular relationship between the parties" and exists "[e]ven when the parties are not identical . . . when there is sufficient commonality of interest." *Id.* at 1081–82; *see also Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989) ("The issue is one of substance rather than the names in the caption of the case; the inquiry is not limited to a traditional privity analysis.").  For example, it includes "a non-party whose interests were represented adequately by a party in the original suit" as well as one with an "express or implied legal relationship by which [the party] to the first suit [is] accountable to [the non-party] who file[s] a subsequent suit with identical issues." *Tahoe-Sierra*, 322 F.3d at 1082.  This ensures "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Taylor*, 553 U.S. at 895.

Greenflight is a stand-in for Jeffrey Isaacs, the serial litigant (and *Coronavirus I* plaintiff) behind these cases.  Greenflight not only is "a startup company founded by CEO Jeffrey Isaacs," *Whitepages, Inc. v. Isaacs*, 196 F. Supp. 3d 1128, 1130 (N.D. Cal. 2016), but also (in Isaacs' own words) is "own[ed] and control[led]" by him. *Greenflight Venture Corp. v. Google LLC*, 2025 WL 385476, at *1 (S.D. Fla. Feb. 4, 2025); *see also* Kleinbrodt Decl. Ex. 6 (corporate filing listing Isaacs as the CEO and sole officer and director of Greenflight).  The alleged acts and injuries ascribed to Greenflight in this case (*e.g.*, FAC ¶ 130 & p. 104 E.b), were attributed to Isaacs or his other entities in *Coronavirus I* (*e.g.*, *Coronavirus I*, Dkt. 41 ¶¶ 97, 30, 106).  And Greenflight's interest in this case is merely "[a]s a financial backer of the CR App." Dkt. 39 at 12; *accord* FAC

9

Gibson, Dunn & Crutcher LLP

¶ 49.  Greenflight thus was represented by Isaacs (and the other plaintiffs) in *Coronavirus I* and is bound by the judgment.  *See Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005) (explaining "corporations and their officers or shareholders" are in privity); *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983) ("When a person owns most or all of the shares in a corporation and controls the affairs of the corporation, it is presumed that in any litigation involving that corporation the individual has sufficient commonality of interest.").

To exempt Greenflight from the judgment's preclusive effect would reward Plaintiffs for gamesmanship.  According to the Complaint, Greenflight "provided the entire funding for Calid and [Coronavirus Reporter Corporation's] development."  FAC ¶ 49.  If true, that fact should have been disclosed in *Coronavirus I.  See* N.D. Cal. L.R. Civ. 3-15(b)(2) (requiring disclosure of entities with "a financial interest of any kind in the subject matter in controversy or in a party to the proceeding").  Greenflight then could have been joined to the case to the extent it had any colorable claim.  *See* Fed. R. Civ. P. 19 & 20.  But Plaintiffs repeatedly refused to make the relevant disclosures.  Worse, they now admit they did so in order for Greenflight to "opt out" of the prior case and later "litigate its claims independently."  Dkt. 39 at 13.  Allowing Greenflight to prosecute duplicative claims now not only would reward Plaintiffs' dereliction of this Court's rules but also force Apple to shoulder the precise kind of "relitigat[ion] through a proxy" that claim preclusion seeks to abate.  *Taylor*, 553 U.S. at 895.  The Court therefore should dismiss the entire complaint as barred by *res judicata*.

## II.   Plaintiffs Lack Article III and Antitrust Standing (Claims 1–9)

Plaintiffs also lack Article III and antitrust standing.  As in any case, the threshold inquiry is whether a plaintiff satisfies Article III's standing requirements.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998).  If so, an antitrust plaintiff must "meet[] the more demanding standard for *antitrust* standing."  *Id.* (cleaned up).  Plaintiffs do not.

### A.   Plaintiffs Lack Standing for Their App Rejection and Suppression Claims (5–9)

The antitrust standing doctrine limits the "class of persons" who can sue to ensure that a plaintiff is an efficient party to enforce the antitrust laws.  *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1363 (9th Cir. 1986).  To that end, causal antitrust injury is "necessary, but not always sufficient,

Gibson, Dunn &
Crutcher LLP

10

to establish" antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). It is therefore "a substantive element of an antitrust claim" that "must be alleged at the pleading stage." *Somers v. Apple Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). Plaintiffs are precluded from rearguing that their allegations of app rejection or suppression give rise to antitrust injury, an issue this Court resolved in *Coronavirus I*, 2021 WL 5936910, at *14–15. *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) ("The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding."). But even if they were not barred from making these arguments again, the same result should follow, as the Ninth Circuit's conclusions in *Coronavirus I* are still binding here. *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1074 (9th Cir. 2021) (legal rulings have "preclusive effect" on "overlapping facts and claims").

To allege antitrust injury, a plaintiff must identify substantial harm to "competition in the market as a whole," *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013), and allege their own injury was "attributable to an anti-competitive aspect of the practice," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). But Plaintiffs allege only that Apple rejected apps pursuant to its Guidelines or suppressed certain apps in search rankings in favor of others. *See* FAC ¶¶ 5–6, 69, 71, 102, 105, 129–30, 132, 218. As the Ninth Circuit held, "[d]isapproval of [Plaintiffs'] apps on grounds ostensibly designed to protect consumers, absent factual allegations to believe that these disapprovals occurred for pretextual reasons, does not suffice to demonstrate anticompetitive conduct." *Coronavirus I*, 85 F.4th at 957; *see also Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 192 (10th Cir. 2025) ("Declining to enter a business relationship with a nascent startup is not a cognizable antitrust injury."). That is because merely shifting sales from one seller to one another (*see* FAC ¶ 162–63) "is not enough to establish an impact on competition." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987); *see also Cargill*, 479 U.S. at 115 ("The loss of profits to . . . competitors . . . [is] not of concern under the antitrust laws."). After all, antitrust law protects "competition[,] not competitors." *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Plaintiffs' references to marketwide injury are conclusory. *See Twombly*, 550 U.S. at 555. Plaintiffs allege, for example, that "Apple's practices . . . stifled innovation by creating insurmountable

Gibson, Dunn &
Crutcher LLP

11

barriers for smaller developers," which "led to a homogenization of available apps" and "reduc[ed] consumer choice." FAC ¶ 164. They likewise claim that Apple somehow "depress[ed] the overall demand for apps" because "[c]onsumers lowered expectation[s] from App Store inefficiencies" and thereby (somehow) "disadvantage[d] developers." *Id.* ¶ 165. But these allegations are no different than those this Court deemed "conclusory" and "insufficient" in *Coronavirus I*, 2021 WL 5936910, at *14; missing still are plausible allegations explaining how the challenged conduct increased prices or decreased output in the relevant markets. *See Unlockd Media, Inc. Liquidation Trust v. Google LLC*, 2025 WL 563460, at *4 (N.D. Cal. Feb. 20, 2025) (dismissing app-rejection claim because "Plaintiff's argument collapses into a single conclusory point: Google's conduct caused harm to the market because consumers, advertisers, and publishers were unable to benefit from Plaintiff's innovative business model."); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) (similar).

Plaintiffs cannot allege marketwide injury because, as the Ninth Circuit held, Apple's curation is procompetitive. *Coronavirus I*, 85 F.4th at 957. The App Store is a two-sided transaction platform, and Apple's enforcement of "'Guidelines' regarding security, functionality and reliability . . . is consistent with 'normal circumstances of free competition' and may well serve the best interests of consumers." *Coronavirus I*, 2021 WL 5936910, at *14; *see also Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 994 (9th Cir. 2023). Indeed, this approach differentiates Apple from its competitors and thus "ultimately increases consumer choice." *Coronavirus I*, 2021 WL 5936910, at *14. Yet Plaintiffs' "alleged theory of antitrust injury fails to give any consideration of the consumer-side of the two-sided transaction market"—"undermin[ing] Plaintiffs' theory of antitrust injury." *Id.*

**B.     Plaintiffs Lack Standing for Their Smartphone Monopolization Claims (1–4)**

Plaintiffs also lack standing to bring their remaining claims, copied from the Department of Justice's complaint. To start, Plaintiffs do not allege the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), because allegations that Apple inflated the prices paid by *consumers* for *iPhone devices* have no connection to Plaintiffs' claims as *developers* of allegedly rejected or suppressed *apps*. Nor can Plaintiffs satisfy the more demanding threshold for statutory standing.

**1.** Plaintiffs fail to draw a "line of causation between the [alleged] illegal conduct and injury."

12

*Allen v. Wright*, 468 U.S. 737, 752 (1984). They allege that Apple used its alleged "control of app distribution or control of APIs" (application programming interfaces, which are software tools that make development more efficient) to suppress certain kinds of apps or technologies. FAC ¶ 15. This, the Complaint says, "increase[s] switching costs" between smartphones—"reinforc[ing] the moat around [Apple's alleged] smartphone monopoly." *Id.* ¶¶ 86, 241. The government alleges this allows Apple to maintain a monopoly over smartphones and thereby charge consumers supracompetitive prices for iPhones. *See* Dkt. 37 at 1–2. But therein lies the problem: Plaintiffs are not iPhone purchasers, and they allege no injury traceable to alleged monopolization of a smartphone market. That is a "fundamental, and fatal, disconnect" between the alleged "injury and [Apple's] challenged conduct." *Parr v. Cougle*, 127 F.4th 967, 975 (5th Cir. 2025).

**2.** For similar reasons, Plaintiffs lack antitrust standing because they did not "suffer[] [their alleged] injury in the market where competition is being restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Plaintiffs challenge Apple's alleged "control of app distribution or control of APIs," which, they say, "prohibit[s] . . . alternative app distribution channels" and bar[s] . . . apps." FAC ¶¶ 15, 162–63. That is wrong, but those are neither restraints nor injuries in an alleged market in which smartphone "devices" are "independent[ly]" bought and sold, *id.* ¶¶ 202, 226; rather, they appear to operate in the alleged "market for US Smartphone App Distribution Services" or "app market," *id.* ¶¶ 205–12. Either way, "there is a mismatch between the market allegedly controlled by Apple and the market where [Plaintiffs are] allegedly injured." *PhantomALERT v. Apple Inc.*, --- F. Supp. 3d ---, 2025 WL 71888, at *6 (D.D.C. Jan. 10, 2025).

Plaintiffs themselves acknowledge that *PhantomALERT* is "similar" to this case. Dkt. 32 at 3. There, like here, a developer sued Apple for rejecting its COVID-19 app. *PhantomALERT*, 2025 WL 71888, at *1. And there, like here, the developer "copy-and-past[ed] language" from the government's suit, including allegations about an alleged "smartphone market." *Id.* at *6. The court recognized the problem: The alleged smartphone market was "not the market from which PhantomALERT's asserted harms derive[d]," nor had "PhantomALERT, as an app developer," suffered "injury in the smartphone market." *Id.* The Court therefore dismissed the complaint and deemed amendment futile. *Id.* at *9; *see also*, *e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *7 (N.D. Cal. July 11, 2024) (dismissing

Gibson, Dunn &
Crutcher LLP

developer's claims challenging Apple's WebKit guideline because that restraint was in a different market than the alleged injury of paying supracompetitive prices for iPhones); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009) (similar); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015) (similar).  This Court should do the same.

**3.**  Even setting aside these problems, Plaintiffs lack antitrust standing to challenge Apple's alleged monopolization of a smartphone market under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–45 (1983).  This standard "incorporate[s] a requirement of proximate causation."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  But Plaintiffs' claims go far beyond the "first step," *AGC*, 459 U.S. at 534, and are instead "'derivative and indirect' or 'secondary, consequential, or remote.'" *Theme Promotions, Inc. v. News Am. Mktg.*, 546 F.3d 991, 1004 (9th Cir. 2008).

Plaintiffs' causal theory is anything but clear, but it appears to go something like this.  Plaintiffs claim Apple "suppress[ed]" "COVID-19 Tracking Apps" and "Cross-Platform Video Apps" like theirs.  FAC ¶ 15.  If Apple (and, presumably, Google) did not "impair[]" these apps, Plaintiffs say third parties would develop them for both iOS and Android.  *Id.* ¶ 136.  Plaintiffs then assume that these apps would "provide a high-quality user experience on any smartphone." *Id.* ¶ 13.  If that is so, Plaintiffs presume, a critical mass of consumers would become "less reliant on the iPhone" or more prone to switching "to a non-Apple smartphone." *Id.* ¶ 1.  And for some inexplicable reason, consumers' newfound desire to buy non-Apple devices would somehow increase "the overall demand for apps" to the benefit of "COVID-19 Tracking" and "Cross-Platform Video" app developers. *Id.* ¶¶ 15, 165.  At best, "between that cause and purported effect" in this multi-chapter story "lies a gulf of uncertainty." *Bakay*, 2024 WL 3381034, at *6; *see also Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 703 (9th Cir. 2001) (hospital districts lacked standing for derivative injuries suffered by smokers in the absence of a "*direct* link between the alleged misconduct" of defendant tobacco companies and plaintiffs' damages); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 987, 912–13 (N.D. Cal. 2019) (purchasers of final products such as cell phones and computers lacked antitrust standing to sue manufacturers of chip components).

The Complaint also is replete with allegations that belie this theory—making it too "speculative and complex." *Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec.*

Gibson, Dunn & Crutcher LLP

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

*Workers*, 888 F.2d 604, 608 (9th Cir. 1989). For example, Plaintiffs spend much of the Complaint bemoaning Apple's alleged impediments to third-party messaging services (on which they cannot premise their own claims as they did not develop a messaging app). *See, e.g.*, FAC ¶¶ 15, 28, 38, 134, 149. But if messaging is "one of the biggest reasons iPhone users do not switch," *id.* ¶ 146, then it does not follow that lifting alleged restraints on COVID-19 tracking and cross-platform video apps would induce the switching Plaintiffs presuppose. To the contrary, Plaintiffs say Apple's native COVID-tracing app "failed to obtain a user base in the United States"—without any apparent impact on how many customers purchased iPhones. *Id.* ¶ 108. Plaintiffs similarly concede that Apple *permits and "promote[s]"* cross-platform videoconferencing apps—also without any apparent, appreciable effect on switching between smartphone devices. *Id.* ¶¶ 120, 122, 124. The Complaint offers no basis to believe Plaintiffs' many just-so assumptions are plausible.

On top of all this, courts routinely conclude plaintiffs lack standing where damages are based on "the sheerest sort of speculation" given the attendant "difficulty of ascertaining" and "complexity involved in calculating" them. *Or. Laborers-Emps. v. Philip Morris Inc.*, 185 F.3d 957, 965 (9th Cir. 1999). Plaintiffs assert they alone are entitled to over $4 billion in goodwill and revenue. FAC ¶¶ 15, 165 & p. 104. Tracing the goodwill and revenue each developer would have obtained but for Apple's alleged restrictions would require the Court "to create in hindsight a technological universe that never came into existence"—an exercise courts recognize is "entirely speculative and beyond the competence of a judicial proceeding." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006). This too militates in favor of dismissal. *See Ass'n of Wash. Pub. Hosp. Dists.*, 241 F.3d at 701–04; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013–2023) (dismissal is appropriate "[o]nce it becomes clear—especially early in the litigation—that damage measurements will be unduly speculative").

## C.    Greenflight Independently Lacks Standing (Claims 1–9)

Greenflight lacks antitrust standing for another reason: Its alleged injury is only the squandered investment it made in other entities' development of the Coronavirus Reporter, CALID, and WebCaller apps. *See* FAC ¶¶ 49, 128, 131. It is long-established in this Circuit that a plaintiff cannot use the antitrust laws to recover for the reduced value of an investment in "the offended corporation." *Solinger*

15

Gibson, Dunn &
Crutcher LLP

*v. A. & M. Recs., Inc.*, 718 F.2d 298, 299 (9th Cir. 1983). That is because the entity subjected to the alleged anticompetitive practices, not its investor, is "the injured party, if anyone." *Id.*; *see also*, *e.g.*, *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (a "receiver of royalties does not establish antitrust standing by showing its receipts are down"). Were it otherwise, plaintiffs "at too remote a distance" could sue based on "complain[ts] of harm flowing merely from the misfortunes visited upon a third person." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69 (1992). Plus, "there would be the possibility of a double recovery," *Brignac v. Yelp Inc.*, 2019 WL 2372251, at *3 (N.D. Cal. June 5, 2019) (Chen, J.)—an acute problem here since Greenflight claims damages for the same goodwill and revenues demanded by other plaintiffs. FAC at 104 E.b.

## III.    Plaintiffs' Claims Fail Many Times Over on Other Grounds (Claims 1–9)

There are myriad other reasons to dismiss Plaintiffs' claims. To start, Plaintiffs do not allege plausible relevant markets—a threshold defect in each antitrust claim. Plaintiffs' individual theories of anticompetitive conduct also are foreclosed by well-established antitrust law. And Plaintiffs' final derivative claim under California and Wyoming state law falters for all the same reasons and more still.

### A.    Plaintiffs' Federal Claims Fail on Several Grounds (Claims 1–8)

#### 1.    Plaintiffs Do Not Allege a Plausible Relevant Market (Claims 1–8)

"A threshold step in any antitrust case is to accurately define the relevant market." *Coronavirus I*, 85 F.4th at 955. The relevant market "defines the relevant field in which meaningful competition is said to exist." *Id.* (internal quotation marks omitted). It has two components: a product market and a geographic market. *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988). The product market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.* "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Coronavirus I*, 85 F.4th at 955. As with antitrust injury, Plaintiffs should be collaterally estopped from rearguing the plausibility of their alleged markets—an issue this Court decided thrice over in *Coronavirus I*, 2021 WL 5936910, at *6–12. Regardless, Plaintiffs' allegations fare no better this time around.

As in *Coronavirus I*, the Complaint "lacks clarity as to the relevant product markets for Plaintiffs' antitrust claims." 2021 WL 5936910, at *7. Plaintiffs focus most on an alleged

Gibson, Dunn & Crutcher LLP

"smartphone" (or "performance smartphone") foremarket and alleged aftermarkets for "US Smartphone Apps," "App Stores," and "iPhone Notary Stamps." FAC ¶¶ 6, 205, 213, 219, 308, 320, 332. But even still, other undefined markets dot the Complaint. For example, Plaintiffs allege "Apple has maintained its dominance in the video communication market"—a purported market Plaintiffs do not define or revisit when setting out their claims. *Id.* ¶ 133. They also allege Apple "will likely extend and entrench its iPhone monopoly to other markets and parts of the economy." *Id.* ¶ 3. This appears to include "automative, content creation and entertainment, and financial services industries," about which Plaintiffs make various allegations but define no actual alleged markets. *See, e.g.*, *id.* ¶¶ 20, 63, 142. And in several other cases, it is anyone's guess what Plaintiffs mean with their unadorned references to "markets" or "marketplaces." *See, e.g.*, *id.* ¶¶ 127, 162. These "scattergun" allegations do not suffice. *Coronavirus I*, 85 F.4th at 956.

Even the alleged markets on which Plaintiffs focus are inherently contradictory. For example, Plaintiffs allege a market for "App Stores." FAC ¶ 205. Plaintiffs first appear to limit this alleged market to mobile stores. *See id.* (alleging market is limited to "apps for installation to users in the aforementioned US smartphone market"). But in their next breath, Plaintiffs allege the market is broader: "This market is plead for digital app stores," the Complaint says, including PC "[a]lternatives" like the "Microsoft Store." *Id.* ¶¶ 207–08. Then, Plaintiffs pivot yet again to say the market may "be a single-brand downstream market." *Id.* ¶ 210. Irreconcilable allegations like these are enough to dismiss Plaintiffs' claims. *Coronavirus I*, 2021 WL 5936910, at *8. But Plaintiffs also do not explain why the alleged market can include mobile and PC stores while excluding "[d]istribution . . . through web apps [or] by web access"—no less "fatal to [Plaintiffs'] proposed market definition," as this Court held when confronted with similar allegations. *Reilly*, 578 F. Supp. 3d at 1108.

These problems are only the start. If Apple's App Store competes with PC stores like the Microsoft Store, for example, then why is the alleged app market limited to "US smartphone/performance *smartphone* apps"? FAC ¶ 218 (emphasis added). The Complaint does not say. Nor do Plaintiffs coherently explain how this "app market" is distinct from the alleged "App Store market." *See id.* ¶¶ 205–18. Plaintiffs allege that in the "U.S. Smartphone Apps" market, Apple "is a monopsony purchaser of US smartphone apps, at least on the retail side." *Id.* ¶ 217. But elsewhere,

Gibson, Dunn & Crutcher LLP

Plaintiffs say the "retail side of [the] app market" is a synonym for the "Smartphone App Distribution Services" (i.e., "App Store") market. *Id.* ¶ 212. What is more, Plaintiffs' market definitions continue to push a "theoretical framework [that] does not align with the economic reality." *Coronavirus I*, 2021 WL 5936910, at *12. Plaintiffs' definitions assume that Apple buys apps from developers and resells them to consumers. FAC ¶¶ 217, 257. But as the Court already observed, the App Store is a two-sided transaction platform through which "[d]evelopers are engaged in a transaction with consumers, not selling to Apple." *Coronavirus I*, 2021 WL 5936910, at *12. The list of problems goes on. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) (finding a market for "game transactions, rather than app transactions in general," contrary to Plaintiffs' allegations).

At bottom, Plaintiffs' allegations do not make sense because they are not drawn by reference to cross-elasticity of demand. *See Coronavirus I*, 85 F.4th at 955. Had Plaintiffs done so, the Complaint would not brim with inconsistencies about which products or services are included in each market or where one market ends and others begin. Nor would there be multiple, admitted instances in which Plaintiffs' alleged markets have indeterminate boundaries. *See* FAC ¶¶ 205, 208, 216. While Plaintiffs suggest a jury can sort all this out at trial, *id.*, the Ninth Circuit has made clear that Plaintiffs must "demonstrate the cross-elasticity" at the pleadings. *Coronavirus I*, 85 F.4th at 956; *accord Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Once again, Plaintiffs' failure "to adequately allege a relevant market" requires dismissal. *Coronavirus I*, 2021 WL 5936910, at *7; *see also, e.g.*, *Reilly*, 578 F. Supp. 3d at 1108 (dismissing case where plaintiff failed to analyze cross-elasticity of demand in its complaint); *PhantomALERT*, 2025 WL 71888, at *8 (similar).

### 2.   Plaintiffs Fail to Allege Anticompetitive Conduct (Claims 1–8)

To state an antitrust claim, a plaintiff also must plead anticompetitive conduct. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). Section 1 of the Sherman Act requires "*concerted* anticompetitive conduct" while Section 2 "targets *independent* anticompetitive conduct." *Id.* at 989–90 (emphasis added). Plaintiffs allege neither here.

### (a)   Plaintiffs Fail to State a Refusal-to-Deal Claim (Claims 1–4)

Plaintiffs' Section 2 claims for monopolization or attempted monopolization of a smartphone market or, alternatively, performance smartphone market run afoul of well-established antitrust law.

Gibson, Dunn & Crutcher LLP

18

*See* FAC ¶¶ 263–86.  For over a century, the Supreme Court has held that a "trader or manufacturer" has "the long recognized right . . . freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *accord Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *Verizon Commc'ns v. L. Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).  That is because "experience teaches" that a company's unilateral decisions about the parties with which it will deal "almost never harm[s] consumers." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013).  Absent rare cases, then, antitrust law does not impose a "duty to deal"—and "certainly . . . no duty to deal under terms and conditions that [third parties] find commercially advantageous." *linkLine*, 555 U.S. at 450.

This bedrock principle forecloses Plaintiffs' claims for monopolization or attempted monopolization of a smartphone or performance smartphone market.  Plaintiffs claim that Apple monopolized this market by "impos[ing] stringent criteria" on COVID-19 apps; "restrict[ing]" access to certain "APIs that would allow for cross-platform videoconferencing" and "cross-platform messaging" apps; and failing to enable "capabilities" that developers can access to create other "third-party apps and services."  FAC ¶¶ 88, 115, 136.  In other words, Plaintiffs fault Apple for disallowing certain apps from its platform and withholding access to certain proprietary software tools. That is the precise kind of conduct to which refusal-to-deal law applies.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (withholding "technical data" is a lawful refusal to deal); *Novell*, 731 F.3d at 1067–69 (withholding access to APIs); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999) (refusing "access to proprietary information . . . and technical services").

This alleged conduct is inactionable for several reasons.  To start, Apple has not *refused* to deal: Plaintiffs acknowledge that Apple allows COVID-19 and "cross-platform video" apps pursuant to specific "criteria."  FAC ¶¶ 87, 122.  That Apple will not give developers "unrestricted use" of its intellectual property, *id.* ¶ 37, is merely a refusal to deal on the "terms and conditions" Plaintiffs prefer—which does not violate the antitrust laws.  *Aerotec*, 836 F.3d at 1184; *see also Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000) (because intellectual property carries "the legal right to refuse to license . . ., the existence of a predicate condition to a license agreement cannot state an antitrust violation").  Nor can Plaintiffs establish the "one, limited" exception

Gibson, Dunn & Crutcher LLP

19

to the general lawfulness of refusals to deal. *Qualcomm*, 969 F.3d at 993. Plaintiffs are not, as required, rival smartphone makers. FAC ¶¶ 47–49; *see linkLine*, 555 U.S. 448–49. And Apple did not terminate a voluntary course of dealing (since some entities never allegedly entered into a contract with Apple, and the rest never had their license agreements canceled) or offer the relevant services to similarly situated customers—each a prerequisite to a duty to deal. *See Qualcomm*, 969 F.3d at 993–94.

Courts have rejected such claims like Plaintiffs' time and again. In *New York v. Meta Platforms, Inc.*, the D.C. Circuit held that a policy disallowing developers from publishing certain apps or offering them in certain ways was a lawful refusal to deal. 66 F.4th 288, 306 (D.C. Cir. 2023). In *Novell*, the Tenth Circuit rejected a claim against Microsoft for withdrawing access to certain Windows APIs a rival wanted to use for its own office software suite. 731 F.3d at 1067–74. And in *Blix Inc. v. Apple Inc.*, the court rejected a claim that Apple "abus[ed] power over key distribution channels" by removing an app from the Mac App Store for violating Apple's Guidelines. 2020 WL 7027494, at *1, 8 (D. Del. Nov. 30, 2020). So too here: Because Apple has "no antitrust duty to deal," it "is under no obligation to provide [third parties] with a 'sufficient' level of service." *Meta*, 66 F.4th at 306 (citation omitted).

### (b)    Plaintiffs Fail to State a Tying Claim (Claim 5)

A tie "conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Aerotec*, 836 F.3d at 1178. This alone does not raise competitive concerns as many "tying arrangements may well be procompetitive." *Ill. Tool Works, Inc. v. Ind. Ink, Inc.*, 547 U.S. 28, 36 (2006). Rather, a tie may give rise to liability where "a seller with 'market power in one market'" uses the tie to "extend[] its market power to an entirely distinct market" by foreclosing competition for the tied product. *Aerotec*, 836 F.3d at 1178. Plaintiffs allege that Apple violates Section 1 of the Sherman Act by unlawfully tying "App Store distribution service and/or digital Notary Stamps" to the iPhone. FAC ¶¶ 288–89. Because Plaintiffs' claim implicates "software that serves as a platform for third-party applications," the rule of reason, not the *per se* rule, governs. *Epic*, 67 F.4th at 997 (cleaned up). Regardless, each of Plaintiffs' theories fail under either analytical framework.

**1.** Plaintiffs' first theory appears to be that Apple ties the App Store to the iPhone. *See* FAC ¶ 289. But only "two types of parties may have standing to challenge illegal tying arrangements—the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying

20

Gibson, Dunn & Crutcher LLP

plaintiff), and the competitor who is restrained from entering the market for the tied product." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 887 (10th Cir. 1997). Plaintiffs are neither users who "purchase" the App Store nor developers of competing app stores. FAC ¶¶ 47–49; *see Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210–11 (C.D. Cal. 2007) (plaintiff lacked antitrust standing when it neither sold nor purchased the tied product). Their alleged injuries— loss of app revenue—is not the result of Apple's inclusion of the App Store on iPhones. *See, e.g., Serv. Empls. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001).

Even if Plaintiffs had standing to assert this claim, they do not allege a violation of Section 1. The "essence of any violation of § 1 is the illegal agreement itself." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991). But the Complaint says Apple "has exclusive control over iOS," FAC ¶¶ 38, 187, 210, and nowhere suggests that Apple agreed with anyone to put the App Store on iPhones, let alone set out "who, did what, to whom (or with whom), where, and when." *Kendall v. Visa*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also Gamboa v. Apple Inc.*, 2025 WL 660190, at *5 (N.D. Cal. Feb. 28, 2025) (rejecting tying claim for lack of agreement). Moreover, "[t]he App Store is installed *free* on all iPhone smartphone devices"—giving users free access to a wide variety of apps, the vast majority of which also are available at no cost. FAC ¶ 210 (emphasis added). This, too, forecloses Plaintiffs' tying claim. *See Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) (no tie where consumers do not "actually purchase or lease the unwanted product").

**2.** Plaintiffs' second tying theory is that Apple violates Section 1 of the Sherman Act by unlawfully tying "digital Notary Stamps" to the iPhone. FAC ¶¶ 288–89. Again, there is no alleged agreement that could give rise to liability under Section 1; "[w]hat Plaintiffs are really challenging is Apple's product design decision." *Gamboa*, 2025 WL 660190, at *6; *see* FAC ¶ 219, 222, 295 (alleging notary stamps are a "hardware constraint[] implemented by Apple" "[t]hrough its algorithmic control of the iOS kernel" as part of "the iOS platform"). Nor is this a cogent tying theory at all. *Consumers* buy iPhones while *developers* allegedly buy "notary stamps." *Id.* ¶ 295. Because these are "independent purchase[s]," *id.* ¶ 226, Apple does not coerce anyone into buying notary stamps as part of an iPhone purchase—as required for a tie. *See Rick-Mik Enters., Inc. v. Equilon Enters., Inc.*, 532 F.3d 963, 971 (9th Cir. 2008). And even if it did, this purported tie would not foreclose any competition

Gibson, Dunn & Crutcher LLP

in the allegedly tied market: Plaintiffs allege that notary stamps are "an unnecessary single-brand" market as no other "platform in history required a notary stamp," FAC ¶¶ 219, 305, so absent the alleged tie, developers would not buy them from anyone. *See Key v. Qualcomm Inc.*, --- F.4th ---, 2025 WL 597604, at *6 (9th Cir. Feb. 25, 2025) ("[F]orcing a consumer to buy something that he or she would not buy elsewhere does not injure competition.").

### (c) Plaintiffs Fail to State a Claim for Supracompetitive Fees (Claim 6)

The Complaint further claims that Apple's $99 annual Developer Program fee is "supra-competitive" and unlawful. FAC ¶¶ 308–11. This claim rests on the mistaken premise that Apple's intellectual property should be "free from Apple's control" altogether. *Id.* ¶ 92. But the antitrust laws do not require Apple to give away its intellectual property for free or at a price that Plaintiffs subjectively believe to be fair. *See Epic*, 559 F. Supp. 3d at 1042 ("Apple is entitled to license its intellectual property for a fee, and to . . . guard against the uncompensated use of its intellectual property."). Even if Apple were a monopolist (which it is not) and the fee were supracompetitive (which it is not), "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. Thus, "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2." *John Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009); *see also*, *e.g.*, *Cont'l Auto. Sys. Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 732–34 (N.D. Tex. 2020) (rejecting Section 2 for "extract[ing] supra-competitive royalty rates"). Plaintiffs' claim should be dismissed.

### (d) Plaintiffs Fail to State an "Essential Facilities" Claim (Claim 7)

Plaintiffs next allege that Apple's rejection of Coronavirus Reporter is an unlawful refusal to deal or violation of the essential facilities doctrine. FAC ¶¶ 315–31. But as explained above, Plaintiffs cannot establish that Apple has a duty to deal under this Court's precedent. *Supra* 18–20. Nor can they state an essential facilities claim, an even rarer "variation on a refusal to deal claim." *Aerotec*, 836 F.3d at 1184. Indeed, this doctrine has never been recognized by the Supreme Court, *Trinko*, 540 U.S. at 411, and there is "no case in which a United States court consciously held that an intellectual property right was itself an essential facility that must be licensed on reasonable and nondiscriminatory terms." Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to*

Gibson, Dunn & Crutcher LLP

22

*Intellectual Property* § 13.03 [C][2] (3d ed. 2020 supp.).  This Court should not be the first.

To begin, Plaintiffs claim "[n]otary stamps and sideloading utilities" are essential facilities. FAC ¶ 323.  But "a facility is essential only if control of the facility carries with it the power to eliminate competition in the downstream market" and "is otherwise unavailable."  *Aerotec*, 836 F.3d at 1185 (internal quotation marks omitted).  Neither is true here.  For one thing, Apple's alleged control of these facilities does not eliminate competition "in the US smartphone app market."  FAC ¶ 323.  As Plaintiffs allege, "Apple competes with developers" in that market, *id.* ¶ 323, and Apple's control over its *own* App Store cannot foreclose competition in a *multibrand* market in which developers can distribute software through Google Play, the Microsoft Store, and other "[a]lternatives," *id.* ¶ 207; *see also Epic*, 559 F. Supp. 3d at 1050–51 (recognizing developers have "multiple avenues" for "distribution of mobile apps").  What is more, Plaintiffs can sideload on Google, "a free bypass . . . for developers to reach their audience."  FAC ¶ 229; *see also id.* ¶ 313.  "The availability of these other avenues of distribution, even if they are not the preferred or ideal methods, is dispositive of [Plaintiffs'] claim." *Epic*, 559 F. Supp. 3d at 1051; *see also Sayre v. Google, Inc.*, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019) (recognizing access to "Google Play is not essential because [plaintiff's app] could reach consumers by employing potential alternative channels of distribution").

Moreover, Plaintiffs *do have* "access to the iOS userbase."  FAC ¶ 324.  Developers need merely comply with Apple's App Review Guidelines to submit apps for distribution through the App Store, FAC ¶ 35, and at least three of Plaintiffs' apps were approved for distribution.  *See Coronavirus I*, 2021 WL 5936910, at *2.  Plaintiffs' real gripe is that they do not like the *terms* of access.  Merely refusing to deal in a manner "conducive to [Plaintiffs'] existing business model" or on their preferred terms is not unlawful.  *Aerotec*, 836 F.3d at 1185; *see also Epic*, 559 F. Supp. 3d at 1051 ("The [essential facilities] doctrine does not demand an ideal or preferred standard.").  Because "access exists" here, "the [essential facility] doctrine serves no purpose."  *Trinko*, 540 U.S. at 411.

**(e)      Plaintiffs Fail to State a "Ranking Manipulation" Claim (Claim 8)**

Plaintiffs also challenge Apple's alleged "ranking manipulation" under Sections 1 and 2 of the Sherman Act.  FAC ¶¶ 332–37.  Again, any Section 1 theory fails for lack of an agreement: The Complaint asserts that Apple alone "manipulat[es]" and "control[s]" search rankings.  *Id.* ¶ 127.

Gibson, Dunn & Crutcher LLP

23

Regardless, Plaintiffs' claim fails multiple times over.

According to Plaintiffs, Apple uses ranking suppression to "leverage[] its monopolies in the US Smartphone/Performance smartphone markets, and US app distribution services markets" to "protect all of their monopolized interests" in other "critical markets." FAC ¶ 337. That theory fails at the outset because Plaintiffs do not explain what "these critical markets" are, *id.*, much less allege that ranking suppression gives Apple "a dangerous probability of success in monopolizing a second market." *Trinko*, 540 U.S. at 415 n.4 (internal quotation marks omitted). Nor does the Complaint explain why Apple would try to do so: Degrading search functionalities would *disadvantage* Apple because it prevents "consumers [finding] developers through their preferred means of search," making the App Store less attractive on one side of the platform and diminishing the "network effects" that Plaintiffs say "protect" Apple's alleged monopoly in the first place. FAC ¶¶ 238, 335; *see also Alaska Airlines v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) ("Every act exploiting monopoly power to the disadvantage of the monopoly's customers hastens the monopoly's end by making the potential competition more attractive."). "Antitrust claims must make economic sense," *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998), and this one does not.

In any event, the alleged ranking suppression does not harm competition in any market for the reasons discussed above. *Supra* 10–12. Judge Alsup reached the same conclusion in *Dreamstime.com, LLC v. Google, LLC*, where a stock image company sued Google under Section 2 after its website plummeted in Google's search rankings. 2019 WL 341579, at *3 (N.D. Cal. Jan. 28, 2019). The plaintiff claimed that Google's suppression of stock photo suppliers allowed it to maintain a monopoly in the market for search advertising. *Id.* But the court rebuffed this argument, concluding that such conduct is "not in and of itself injurious to competition in the relevant market"; rather "the only harm to competition alleged is that [Google] hurt [the Plaintiff] and [its] ability to act as a consumer in that market." *Id.* at 6. Other courts similarly have rejected claims based on allegations that a company "favor[s] strategic partners." FAC ¶ 344; *see Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 886–87 (9th Cir. 1982) (charging more favorable prices to plaintiff's rivals did not violate the Sherman Act); *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 925–28 (2d Cir. 1980) (rejecting claim that dominant flight schedule-provider favored major airlines over smaller carriers). This Court should do so too.

Gibson, Dunn & Crutcher LLP

### B.      Plaintiffs' State Law Claim Fails (Claim 9)

Last, Plaintiffs assert a violation of the California Unfair Competition Law (UCL) or Wyoming Consumer Protection Act (WCPA).  FAC ¶ 338.  These "[s]tate [c]ompetition" theories are derivative of, and fail for the same reasons as, Plaintiffs' federal claims.  *Id.*; *see* Wyo. Stat. § 40-12-110(a)(ii); *Beverage v. Apple Inc.*, 101 Cal. App. 5th 736, 747 (2024).  Each also fails on independent grounds.

There are three additional defects in Plaintiffs' WCPA claim.  First, Wyoming has a separate antitrust statute (Wyo. Stat. § 20-4-114), and the state has "declined to extend the reach of the WCPA where the legislature has elsewhere addressed the problems identified by a plaintiff."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. 2008).  Second, Plaintiffs have no right of action because they are not consumers under the WCPA: "[D]evelopers are primarily commercial entities" who allegedly purchase Apple's "notarization fee products" to "engage in transactions with Apple that have significant consumer implications," FAC ¶¶ 353, not consumers who "purchase the product for personal use," *In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2022 WL 710192, at *25 (W.D. Mo. Mar. 9, 2022); *see also* (Wyo. Stat. § 40-12-108(a).  Third, Plaintiffs do not allege, as they must, reliance on any representations by Apple.  *See*, *e.g.*, *Nicklas v. Prof. Ass'n, LLC.*, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018).

Plaintiffs cannot state a UCL claim for the additional reason that they do not allege an entitlement to equitable remedies, including the lack of adequate remedy at law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *see also Hynh v. Quora*, 508 F. Supp. 3d 633, 662 (N.D. Cal. 2020) (collecting cases).  Plaintiffs seek $4.2 billion in pre-trebled damages, Dkt. 1 at 104–05, and nowhere explain why that sum would be "inadequate."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also PhantomALERT*, 2025 WL 71888, at *9 (dismissing developer's similar UCL claim for failure to plead inadequacy of damages).  Nor do Plaintiffs explain how the Court could "micromanage" Apple's APIs, Guidelines, and overall ecosystem—as Plaintiffs' sweeping claims contemplate—without potentially chilling competition.  *Alivecor, Inc. v. Apple Inc.*, 2024 WL 591864, at *16 (N.D. Cal. Feb. 13, 2024).  Each of these problems dooms Plaintiffs' UCL claim.

### CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.

Gibson, Dunn &
Crutcher LLP

DATED: March 6, 2025                    Respectfully submitted,


                                        GIBSON, DUNN & CRUTCHER LLP


                                        By: */s/ Julian W. Kleinbrodt*

                                            Julian W. Kleinbrodt


                                            RACHEL S. BRASS
                                            rbrass@gibsondunn.com
                                            JULIAN W. KLEINBRODT
                                            jkleinbrodt@gibsondunn.com
                                            GIBSON, DUNN & CRUTCHER LLP
                                            One Embarcadero Center
                                            Suite 2600
                                            San Francisco, California  94111-3715
                                            Telephone:       415.393.8200
                                            Facsimile:       415.393.8306

                                        *Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

ER 359

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
(603) 622-8100
keith@awplegal.com

Melissa R Theriault #6-4266
Woodhouse Roden Ames & Brennan, LLC
1912 Capitol Ave. Suite 500
Cheyenne, WY 82001
(307) 432-9399
melissa@wrablaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION <br><br> *on behalf of themselves and all others similarly situated* <br><br> Plaintiffs, <br><br> *vs.* <br><br> APPLE INC. <br> Defendant. | Case No. **24-cv-53-SWS** <br><br> **SHERMAN ACT ANTITRUST CLASS ACTION** <br><br> **FIRST AMENDED COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

ER 360

I.      Introduction ...................................................................................................................... 4
II.     Defendant Apple Inc. ...................................................................................................... 10
A.      Apple launched the iPod, iTunes, and the iTunes Store against the backdrop of *United States v. Microsoft* ................................................................................................................................. 12
B.      Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution ................................................................................................................ 14
III.    Class Action Plaintiffs ..................................................................................................... 18
IV.     Smartphones As Platforms .............................................................................................. 19
V.      Related Global Antitrust Proceedings .......................................................................... 23
VI.     Apple Unlawfully Maintains Its Monopoly Power ....................................................... 26
A.      Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution ............................................................................................................ 26
i.      COVID-19 Tracking Apps: Apple's Exclusionary Tactics Against Independent Scientists and Developers ...................................................................................................................................... 29
B.      Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition ........................ 38
i.      Cross-platform Videoconferencing: Apple protects its smartphone monopoly by degrading and undermining cross-platform video apps ......................................................................................... 38
C.      Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services ............................... 46
VII.    Anticompetitive Effects ................................................................................................... 49
A.      Apple's conduct harms the competitive process .......................................................... 49
B.      Apple has every incentive to use its monopoly playbook in the future .......................... 53
C.      Antitrust Injury Experienced by Class Member Developers of Free Apps ..................... 54
VIII.   Privacy, Security, and Other Alleged Countervailing Factors Do Not Justify Apple's Anticompetitive Conduct ............................................................................................................... 56
IX.     The Smartphone Industry ............................................................................................... 58
A.      Background ..................................................................................................................... 58
B.      Smartphone Hardware ................................................................................................... 59
C.      Smartphone Operating Systems, Applications, and Other Software .............................. 60
D.      Relevant Markets ........................................................................................................... 62
i.      Performance smartphones are a relevant product market ............................................. 63
ii.     Smartphones are a broader relevant product market ..................................................... 64
iii.    App Distribution Services ("App Stores") is a relevant market ...................................... 65
iv.     There is a relevant Sherman market for US Smartphone Apps ("software") .................. 66
v.      There is a relevant Sherman market for iPhone Notary Stamps ..................................... 69
vi.     The United States is a relevant geographic market for performance smartphones and smartphones and downstream markets ............................................................................................ 72
E.      Apple has monopoly power in the smartphone and performance smartphone markets ......... 74
X.      Jurisdiction and Venue .................................................................................................... 78
XI.     Putative Class Definitions ............................................................................................... 79
XII.    Violations Alleged ............................................................................................................ 82
A.      First Claim for Relief: Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2 ................................................................................. 82

B.      Second Claim for Relief, in the Alternative: Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2 ........................................ 83
C.      Third Claim for Relief: Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2 ....................................................................................................... 84
D.      Fourth Claim for Relief, in the Alternative: Attempted Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2 .......................................................... 85
E.      Fifth Claim for Relief: Illegal Tying Between [Performance] Smartphones/iPhone Devices and Notary Stamps / App Stores ..................................................................................................... 86
F.      Sixth Claim for Relief: Supra-competitive $99 Fee Class Action Recovery Fund ............... 90
G.      Seventh Claim for Relief: *Aspen Skiing Co. v. Aspen Highlands* Exclusionary Conduct ...... 92
H.      Eighth Claim for Relief: Ranking Manipulation ................................................................... 95
I.      Ninth Claim for Relief: Violation of Wyoming Consumer Protection Act and California Unfair Competition Law ................................................................................................................ 97
**XIII.   Request for Relief** ........................................................................................................ **103**

## PLAINTIFFS' AMENDED SHERMAN ACT CLASS ACTION COMPLAINT

### I.   Introduction

1.      For many years, Apple has built a dominant iPhone platform and ecosystem that has driven the company's astronomical valuation. At the same time, it has long understood that disruptive technologies and innovative apps, products, and services threatened that dominance by making users less reliant on the iPhone or making it easier to switch to a non-Apple smartphone.

2.      Rather than respond to competitive threats by offering lower smartphone prices to consumers or better monetization for developers, Apple would meet competitive threats by imposing a series of shapeshifting rules and restrictions in its App Store guidelines and developer agreements that would allow Apple to extract higher fees, thwart innovation, offer a less secure or degraded user experience, and throttle competitive alternatives. It has deployed this playbook across many technologies, products, and services, including cross-platform video apps, COVID-19 apps, and many others.

3.      Critically, Apple's anticompetitive conduct not only limits competition in the smartphone market, but also reverberates through the industries that are affected by these restrictions, including financial services, fitness, gaming, social media, news media, entertainment, and more. Unless Apple's anticompetitive and exclusionary conduct is stopped, it will likely extend and entrench its iPhone monopoly to other markets and parts of the economy. For example, Apple is rapidly expanding its influence and growing its power in the automotive, content creation and entertainment, and financial services industries–and often by doing so in exclusionary ways that further reinforce and deepen the competitive moat around the iPhone.

4.      The significance of the litigation against Apple Inc. before this Court transcends mere economic concerns. It calls to question the very fabric of our societal order, defined and heavily

influenced under the shadow of Apple's internet dominance. Apple's conduct, unchecked for over a decade, impacts this nation on both a cultural and economic basis.

5.      As described herein, the Defendant's restraint of trade amounts to censorship of app developers, whose free distribution of creative works is subject to Apple's authoritarian controls. For those apps that Apple does approve, the company requires compensation, representing a modern-day Stamp Tax.

6.      Apple's censorship mechanism functions primarily by tying app distribution to its iPhone smartphone, using a digital "notary stamp" to mark each piece of software approved in the App Store. This illegal *per se* tying, as elucidated in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958), threatens the very pillars of free commerce and discourse over the internet.

7.      This developer class action is about freeing smartphone markets from Apple's anticompetitive and exclusionary conduct, restoring competition, and preserving innovation for the future. Plaintiffs and class members seek to redress Defendant Apple Inc.'s conduct that violates the Sherman Act of 1890 in the relevant markets for United States smartphones and/or performance smartphones, their software applications ("apps"), and their distribution channels ("app stores").

_____

8.      The Apple Computer Company, as it was then called, was founded in 1976 to make and market personal computers. From its inception, Apple had a knack for expensive, high-end design and niche marketing relative to its competitors. But it struggled to compete against rivals that offered lower prices and more programs. After two decades, Apple struggled to compete against Windows personal computers and by the late 1990s, it was on the brink of bankruptcy.

9.      Apple's experience with Mac's easy to use GUI operating system, for decades considered a luxury many could not afford, ultimately set the stage for Apple's most successful product yet. In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software

applications, called "apps," built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone, having based that product off the success of the iPod mass-consumer device, combined with MacOS. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive to its users and the iPhone platform more broadly. Apple invited and capitalized on the work of these third parties while maintaining control and monetizing that work for itself. The value of third parties' work served an important purpose for Apple. Indeed, as early as 2010, then-CEO Steve Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

10.     That strategy paid off. Over more than 15 years, Apple has built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight control over how third parties innovate and monetize on and off the smartphone in ways that were anticompetitive and exclusionary.

11.     Apple keenly understands that while a community of developers is indispensable to the success of the iPhone, they also pose an existential threat to its extraordinary profits by empowering

consumers to "think different" and choose perfectly functional, less-expensive alternative smartphones.

12. Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to force these participants to pay substantial fees. At the same time, Apple restricts its platform participants' ability to negotiate or compete down its fees through alternative app stores, censors apps that do not further their own strategic interests and partnerships, and more.

13. In order to protect that model, Apple reduces competition in the markets for performance smartphones and smartphones generally. It does this by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

14. Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an intermediary between product creators such as developers on the one hand and users on the other.

15. This complaint highlights Plaintiffs' examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple repeatedly chooses to make its products worse for consumers to prevent competition from emerging. These examples

below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher prices and less innovation for users and developers. Apple has used one or both mechanisms (control of app distribution or control of APIs) to suppress the following technologies, amongst others: COVID-19 Tracking Apps, Cross-Platform Video Apps, and the incorporated DOJ case-studies of Super-Apps, Cloud Streaming Apps, Messaging Apps and Digital Wallets.

16. By maintaining its monopoly over smartphones, Apple is able to harm consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated by forcing users to use only Apple- authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

17. Of course, this is not the story Apple presents to the world. For decades, Apple branded itself a nimble, innovative upstart. In 1998, Apple co-founder Steve Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the Department of Justice" in hopes of getting Microsoft "to play fair." But even at that time, Apple did not face the same types of restrictions it imposes on third parties today; Apple users could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each song downloaded from Apple's iTunes store. Similarly, when Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

ER 367

18.     The ramifications of Apple's anticompetitive conduct are not always obvious in the immediate term. But they are no less harmful and even more widespread, affecting all smartphone consumers and developers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, such as COVID-19 tracking apps and cross-platform video apps, when Apple will censor or self-preference their own apps. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market never get off the ground. What's more, Apple itself has less incentive to innovate because it has insulated itself from competition.

19.     Moreover, according to the DOJ, Apple has demonstrated its ability to use its smartphone monopoly to impose fee structures and manipulate app review to inhibit aggrieved parties from taking advantage of regulatory and judicial solutions imposed on Apple that attempt to narrowly remedy harm from its conduct.

20.     Smartphones have so revolutionized American life that it can be hard to imagine a world beyond the one that Apple, a self-interested monopolist, deems "good enough." But under our system of antitrust laws, as the DOJ remarked, "good enough" is, quite simply, not enough. Consumers, competition, and the competitive process—not Apple alone—should decide what options consumers should have. And competition, not Apple's self-interested business strategies, should be the catalyst for innovation essential to our daily lives, not only in the smartphone market but in closely related industries like personal entertainment, automotive infotainment, and even more innovations that have not yet been imagined. Competition is what will ensure that Apple's conduct and business decisions do not thwart the next Apple.

21.     For nearly fifteen years, the internet as most Americans know it has been crafted and controlled by Apple Inc's exploitative policies. This has resulted in consequences that are admittedly difficult to assess, as for many it is difficult to now imagine a world without the iPhone.

But what we do know is that Apple monetized people's attention, encouraging addicting apps and services that now constitute about a third – and growing – portion of Apple's profits. In other words, Apple as an ongoing concern requires increasing monetization of daily activities, rather than sale of hardware.

22.     Apple's censorship of the internet is increasingly authoritarian. With the Coronavirus Reporter app, Apple prevented a world-renowned scientist from distributing a competing COVID app. We are approaching twenty years of an internet controlled by Apple. The internet has transformed our lives. But a free internet – one that could grow without Apple's corporate vice – is something we have never experienced as a nation. The time to liberate the nation's internet is now – not six months or six years from now.

23.     Protecting competition, inherent freedoms and autonomy of consumers and developers alike, and the innovation that competition inevitably ushers is why Plaintiffs bring this lawsuit under the Sherman Act to challenge Apple's maintenance of its monopoly over smartphone markets, which affect hundreds of millions of Americans every day. Plaintiffs bring this case to rid smartphone markets of Apple's monopolization and exclusionary conduct and to ensure that the next generation of innovators can upend the technological world as we know it with new and transformative technologies. Plaintiffs and class members hereby express their gratitude for the tireless work of Department of Justice Antitrust Division officials who have diligently researched the underlying claim theories upon which this developer compensation fund lawsuit is based upon.

## II.     Defendant Apple Inc.

24.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97

billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

25. The iPhone, Apple's signature product, is the primary driver of Apple's growth and profitability, routinely commanding profit margins of more than 30 percent on devices alone—significantly higher than its smartphone competitors. iPhone sales have made up a majority of Apple's annual revenue every year since 2012.

26. Apple increasingly extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (e.g., Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (e.g., tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services.

27. Apple's U.S. market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade.

28. Apple's smartphone market shares understate Apple's dominance and likely growth in key demographics, including among younger American consumers. For example, one- third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung,

Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone. iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.

29. In fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $77 billion on stock buybacks during the same year.

30. Apple was founded in 1976. During its first 25 years, the company focused in large part on producing and marketing personal computers. Although the market for personal computers expanded over the next several decades, Apple struggled to gain customer adoption for its higher-priced products relative to its lower-cost competitors, including IBM and Microsoft. In the late 1990s, Apple significantly restructured the company and embarked on a new strategy focused not just on selling personal computers, but also consumer devices like the iPod, which led to the development of the iPhone.

### A. Apple launched the iPod, iTunes, and the iTunes Store against the backdrop of *United States v. Microsoft*

31. When Apple began developing mobile consumer devices, it did so against the backdrop of *United States v. Microsoft*, which created new opportunities for innovation in areas that would become critical to the success of Apple's consumer devices and the company itself. For example, the iPod did not achieve widespread adoption until Apple developed a cross-platform version of the iPod and iTunes for Microsoft's Windows operating system, at the time the dominant operating system for personal computers. In the absence of the consent decree in *United States v. Microsoft*, it would have been more difficult for Apple to achieve this success and ultimately launch the iPhone.

Apple's development of cross-platform technologies, including Quicktime and iTunes, are described in detail in *United States v. Apple Inc.* That Department of Justice antitrust complaint is incorporated herein by reference as Exhibit A. Plaintiffs and class members assert all allegations of the DOJ complaint; to the extent any minor differences exist between the two complaints, they shall be considered alternate claims for jury deliberation.

32.     Within a year of launching the iPhone, Apple invited third-party developers to create native apps for the iPhone. Apple released its first software development kit—essentially the digital tools for building native apps on Apple's operating system (iOS)—to encourage and enable third-party developers to create native apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the trademarked slogan: "There's an app for that."

33.     Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares— over 70 percent of the performance smartphone market and over 65 percent of the broader smartphone market—likely understate its monopoly power today.

34.     While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives understand that third-party products and services can, in their own words, be "fundamentally disruptive" to its smartphone monopoly, decreasing users' dependence on Apple and the iPhone and increasing competitive pressure on Apple. Apple therefore willingly sacrifices the short-term benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**B. Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution**

35.     Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute native iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power over developers by imposing contractual restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines. Under these guidelines, Apple has sole discretion to review and approve all apps and app updates. Apple selectively exercises that discretion to its own benefit, deviating from or changing its guidelines when it suits Apple's interests and allowing Apple executives to control app reviews and decide whether to approve individual apps or updates. Apple often enforces its App Store rules arbitrarily. And it frequently uses App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

36.     Apple today wields authoritarian control over the vast network of interconnected smartphones that, combined, represent an extraordinary computational-communications capability ("network effect"). After the United States government spent decades building DARPA, what is now known as the Internet, we as a nation collectively invested in putting a smartphone, an amalgamation of a screen, sensors, operating system, and communication radios, in the hands of nearly every citizen, forming a network with capabilities amounting to science-fiction of prior generations. But it is Apple that benefits from growing "services revenue" representing its own tax on nearly the entire internet economy created in large part by the United States government and its taxpayers.

14

37.     This action asserts that the vast network capabilities of interconnected smartphones are the property of the customers who paid for them. Apple iPhone users should enjoy unrestricted use of their smartphones to run necessary applications, such as COVID-19 Tracking Apps or cross-platform video apps, that ultimately are the *raison d'être* of this network. Free markets should define what apps are selected by end-users, as opposed to Apple's regime.

38.     By requiring all apps be sourced from the App Store, Apple has exclusive control over iOS applications and their ability to access that national internet backbone. Apple has profited immensely from the existence of the national TCP/IP internet backbone, ARPANET. Without the internet, and the taxpayer dollars that built it, the Apple "ecosystem" would be non-existent.  The Apple smartphone ecosystem is essentially a sub-net of the internet connecting compatible Apple devices over a common graphical user interface (GUI).

39.     The Apple iOS platform and ecosystem operates over the entire internet connected network of the iPhone userbase. The inherent value of the ecosystem ultimately derives from decades of government initiatives to developer the national internet backbone, and Apple's decades of research into Mac software usability. The confluence of these two technologies permitted Apple to obtain their present-day monopoly derived from the undeniably strong "network effect" of hundreds of millions of interconnected devices.

40.     Apple also controls app creation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide native apps on the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement (DPLA). That agreement requires developers to use public APIs only "in the manner prescribed by Apple." It also prohibits third-party apps from using APIs that Apple designates as "private." Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality

developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

41.     Developers cannot avoid Apple's control of app distribution and app creation by making web apps—apps created using standard programming languages for web-based content and available over the internet—as an alternative to native apps. Many iPhone users do not look for or know how to find web apps, causing web apps to constitute only a small fraction of app usage. Apple recognizes that web apps are not a good alternative to native apps for developers. As one Apple executive acknowledged, "[d]evelopers can't make much money on the web." Regardless, Apple can still control the functionality of web apps because Apple requires all web browsers on the iPhone to use WebKit, Apple's browser engine—the key software components that third-party browsers use to display web content.

42.     Nor can developers rely on alternative app stores even though this would benefit developers and users. For example, developers cannot offer iPhone users an app store that only offers apps curated for use by children, which would provide opportunities to improve privacy, security, and child safety. By contrast, Apple allows certain enterprise and public sector customers to offer versions of app stores with more curated apps to better protect privacy and security.

43.     Apple's control over both app distribution and app creation gives Apple tremendous power. For example, Apple designates as "private" the APIs needed to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but even if they did,

16

doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes functionality that Apple does not like, Apple can and does exercise its discretion to simply block the app from the App Store.

44.     This API restriction is in stark contrast to the history of Mac OS. Mac OS built its success as a relatively open-architecture platform, where developers could access API and low-level operating system calls. They did so by adding "System Extensions," "Control Panels," and other operating system add-ons that fundamentally improved the Mac experience by allowing competition and innovation into the core of the Mac experience. iOS restricted all of these abilities, key to the Mac's success, as soon as they realized they could monopolize the smartphone sector without handing over access to developers.

45.     Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services. Instead, Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and pressure those participants pose to Apple's smartphone monopoly.

46.     This complaint focuses on Apple's use of its dominance to impose contracts and rules that restrict the behavior and design decisions of companies *other* than Apple. Apple's iPhone success functionally relies upon and profits immensely from access to the taxpayer-funded national internet backbone, and longstanding government efforts to foster competition amongst technology firms. Because the App Store engages in Sherlocking and Self-preferencing, and rejects some 40,000 apps

per week, it causes millions of person-years of economic losses, and a vastly sub-optimal "network effect" of the Internet connected smartphones and performance smartphones.

## III.    Class Action Plaintiffs

47.    Plaintiff Coronavirus Reporter Corporation is a Wyoming C Corporation. Coronavirus Reporter is also the name of the Plaintiff's iPhone application, which attempted to use the national internet backbone for the first time in the history of pandemics to allow citizens to self-report and geolocate emerging epidemiological trends. Written in February 2020, it is believed to have been the first-mover in the entire group of "COVID-19 tracking startups" banned by Apple on March 6, 2020. The company appointed renowned cardiologist Dr. Robert Roberts as Chief Medical Officer. *See Exhibit B – Dr. Roberts' CV*. Dr Roberts at all times has had full and final authority over the app, which comprised his team's medical scientific work product.

48.    CALID Inc. (hereafter "CALID") is a Wyoming C corporation founded in 2016. CALID paid nearly a decade of $99 Apple Developer Program mandated subscription fees to participate in the Apple ecosystem. CALID paid the $99 fee as recently as October 2023. Each annual supra-competitive subscription fee constitutes an independent transaction that constitutes evidence of Sherman Act violation.

49.    Greenflight Venture Corporation (hereafter "Greenflight" or "GFVC") is a Florida C Corporation, founded in 2013. Greenflight has invested in dozens of technology initiatives over the years. It provided the entire funding for Calid and CRC's development, positioning Greenflight to benefit from venture investments. The majority of Greenflight's investment funds stemmed from an iOS App "Caller ID," ranked in the App Store Top-10 for many years, as well as OkCaller.com, ranked nearly a decade in Google SERPs Top-10 for phone lookup. Greenflight, like other Plaintiffs and class members, suffered losses when Apple censored its apps, Sherlocked its ideas, restricted and/or manipulated app search rankings, and charged over $1000 in supra-competitive DPLA fees.

18
ER 377

### IV.  Smartphones As Platforms

50.  Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. This cluster of services and features results in a distinct product for consumers and developers. For example, smartphones not only make phone calls, but also allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet.

51.  Platforms such as smartphones bring together different groups that benefit from each other's participation on the platform. A food delivery app, for example, is a multi-sided platform that brings together restaurants, couriers, and consumers. A two-sided platform, for example, may bring together service providers on the one hand and consumers on the other. The technology and economics of a smartphone platform are fundamentally different from the technology and economics of a simultaneous transaction platform, such as a credit card, because smartphone platforms compete over device features and pricing in ways that do not directly relate to app store transactions. Whereas credit card transactions reflect a single simultaneous action that requires both sides of the transaction for either side to exist, consumers value smartphone platforms for a variety of reasons separate from their ability to facilitate a simultaneous transaction. Consumers care about non-transactional components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

52.  The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. In order to create these economic benefits for itself and its users, Apple has partially opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or

19

overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were only opened to third parties when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

53.     In contrast, limiting the features and functionality created by third-party developers—and therefore available to iPhone users—makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do so, such as protecting its monopoly profits.

54.     The iOS Platform is part of the broader All Historic Computing Platforms, which includes Windows, Mac, Android, and potentially early predecessors Atari and Commodore. In this historical sense, a platform such as Windows references compatible devices, programming tools, and accessories. It is important to clarify that consumers purchase products within such platforms; devices may be compatible within the specifications of a platform, but are not inherently a software platform *per se*.

55.     Like historic computing platforms, consumer electronics like TVs and VCRs were developed to provide access to compatible content. TVs facilitated access to broadcast content, while VCRs allowed users to record, store, and play back that content at their convenience. Early personal computers, similarly, were developed to run software applications that perform a wide

range of tasks, from word processing to complex calculations and even gaming. These devices became essential tools for accessing and interacting with creative works developed by third parties.

56.     The iPhone, and by extension, other smartphones, are modern continuations of this lineage. Initially conceptualized as a device to make calls, store information, and later, access the internet, the iPhone's primary function has expanded significantly. Today, it serves as a gateway to a myriad of applications, fostering a digital ecosystem where software developers can create and distribute content ranging from productivity tools to entertainment apps. This evolutionary trajectory underscores the smartphone's role as a device aimed at running network interactive software applications, similar to how VCRs were designed to play tapes and televisions to display broadcast content.

57.     By way of background, Apple CEO Tim Cook has acknowledged, in another antitrust trial, that users primarily purchase devices, not the software ecosystems that accompany them. This admission underscores the dissonance between Apple's public positioning of iOS as the heart of the iPhone experience and the historical role of devices as conduits to the broader world of software and content.

58.     The acknowledgement of a iOS as computing platform in no way whatsoever intends to amplify Apple's restrictive control over the software ecosystem, veiling the hardware's fundamental purpose: to serve users as a medium for accessing and running third-party applications. Apple's conflation of "walled garden ecosystems" with the iOS platform reveals a concerning oversight of the fundamental nature of devices — they are, at their core, tools designed to deliver access to technological innovations and creative content, not restrict or monetize every aspect of access to that platform.

59.     By treating iOS as more than what it essentially is — akin to the BIOS of a CD player, alarm clock, or VCR — one risks legitimizing Apple's gatekeeping role, whereby the company

21
ER 380

imposes arbitrary constraints on which software can run on its hardware and under what conditions. This approach is starkly antithetical to the historical development and societal role of technological devices, which have always been about expanding user access to content and functionalities, not curtailing it.

60.     By tightly integrating iOS with the iPhone's hardware, Apple has erected barriers that limit the device's potential and the opportunities for software developers. This integration acts as both a gate and a toll booth, with Apple deciding which apps can access the market and imposing a "tax" on transactions within those apps. Far from being a neutral platform facilitating software distribution, iOS has become a tool for Apple to exert undue influence over the digital marketplace, engaging in practices that border on censorship.

61.     In essence, Apple's model resembles a hypothetical pay-per-view VCR that charges users each time they wish to play a movie — a concept that would have been deemed absurdly restrictive in the era of physical media devices. The key distinction lies in the control exerted over the software, turning the iPhone from a device that should empower users into one that channels them into a monetized, Apple-controlled experience.

62.     Clear precedent set by decades of technological development evidences that devices served as platforms in a literal sense, enabling access to a wide range of third-party innovations without imposing restrictive controls or fees. Only by recognizing the iPhone as a device primarily meant to run software, in line with the tradition of VCRs, TVs, and computers, can we ensure that technological innovation continues to thrive in an open, competitive environment. While iOS may be bundled with a device, like Windows computers are often bundled with low-priced OEM versions of Windows, or an alarm clock is "bundled" with a BIOS, fundamentally, consumers purchase hardware iPhone devices, each a part of the iOS platform specification.

## V.  Related Global Antitrust Proceedings

63.     This case is an unprecedented confrontation with the largest monopoly in history, Apple Inc.—a $3 trillion behemoth whose market valuation eclipses that of the classic textbook example, the British East India Company, by tenfold. With iPhone's 65% market share, the vast majority of Americans find themselves with limited alternatives for conducting the essential tasks of daily life. Defendant's illegal trust operations extend beyond economic ambitions; this case concerns Apple's desire to censor industries from health care to automotive, and effect cultural political development on a worldwide basis. Apple's control over their userbase forms the largest censorship and surveillance network in world history.

64.     There exist reasons the Sherman Act was legislated to preempt one company taking on monopoly powers that could ultimately endanger not only the progress of scientific medical work like Dr. Roberts' COVID app, but even geopolitical entities. This Complaint describes an "international consensus," which Apple cannot refute exists, that denounces Apple's anticompetitive censorship.

65.     Every effort until now has failed to deter Apple. In 2010, the United States Copyright Office recognized the right of iPhone users to utilize their property free from Apple's control:

> *"the activity of an iPhone owner who modifies his or her iPhone's firmware/operating system in order to make it interoperable with an application that Apple has not approved, but that the iPhone owner wishes to run on the iPhone, fits comfortably within the four corners of fair use."*

66.     Apple swiftly maneuvered around the Copyright Office's decision by implementing aggressive changes to its programming code.

67.      The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust, incorporated herein and referred to as the "House report." *See Exhibit C.*

23

68.    Described is Apple's history of "closely monitoring the success of apps in the App Store, only to copy the most successful." Called "Sherlocking," Apple "takes other companies innovative features," which was the case with Coronavirus Reporter and Facetime 15/WebCaller. Plaintiffs and class members have experienced such anti-competitive behavior as described in the report.

69.    Apple benefits immensely from a ranking system that favors their own rival apps, according to the report. Some searches reveal "14 Apple apps before showing results from rivals." The report documents that Apple "holds [competitor apps] to a different standard" than its own apps, which is precisely what happened to Plaintiff CRC, and other class members. Such ranking unfairness has directly harmed Plaintiffs and class members.

70.    This Complaint corroborates the Subcommittee Report revelation that Apple "closely monitors the success of apps in the App Store, only to copy the most successful. Apple takes other companies innovative features." Plaintiffs' software products were subjected to the conduct spotlighted in the Subcommittee Report. As a result, Plaintiffs have standing to bring a tying cause of action similar to that advanced by multiple academic papers on the Apple monopoly, such as Loyola Law Review's *Epic Games v. Apple: Tech-Tying and the Future of Antitrust*.

71.    The House Report additionally details how Apple makes $2.7 billion annually simply from charging developers $99 to access their platform. This supra-competitive fee is more than quadruple the fee of the nearest rival, and has directly harmed Plaintiffs and class members.

72.    The Subcommittee remarked on unambiguous legislative intent regarding Court enforcement of Sherman:

> *"courts have adopted the view that underenforcement of the antitrust laws is preferable to overenforcement, a position at odds with the clear legislative intent of the antitrust laws."*

73.     When the United States sought regulation of AT&T, concerns mounted that telecommunication quality and cost would suffer from government intervention. That of course was plain wrong, as a telecommunications revolution occurred the following decade. The stakes here are higher than in 1984: 80% of commerce now takes place on Apple devices, and the entire free speech of a nation depends on its "network effect" infrastructure. Like Microsoft, and AT&T, redressing Apple's monopoly should usher in the benefits of improved competition.

74.     The bipartisan Senate "Open App Markets Act" introduced in 2021 by Senior Senator Blumenthal. The Act's Section 3(d) on "interoperability" requires the App Store allow direct app loading and eliminate search ranking self-preference. Seventy-three percent of Americans supported now-disappeared 2023 legislation in the United States Senate to address app censorship and self-preferencing, which Senior Senator Blumenthal described as the "most offensive practice of how [Apple] strangles new app development." Senate Majority Leader Chuck Schumer of California never brought the bill to floor vote.

75.     A European Commission investigation into the App Store resulted in the Digital Markets Act legislation, which recently went into effect and which mandates App Store modifications similar to this complaint and Open App Markets Act. At time of filing, Apple engaged in malicious compliance with the DMA by directly charging for notary stamps on an annual basis. Apple calls their notary stamp charges a "Core Technology Fee" (CTF) which costs about fifty euro cent per app. The EU recently issued a notice that the CTF violates the DMA, and indeed, Apple is willfully violating the DMA in order to protect its notary stamp monopoly.

76.     Apple is similarly in malicious compliance of a verdict in *Epic v. Apple*, 20-cv-5640-YGR. This conduct again seeks to charge for notary stamps and IAP fees, through an improper commission on developers.

77.     Apple's DMA and Epic's non-compliance is possible because Apple requires notarization of all apps. In other words, if Apple didn't implement notarization locks on iPhones, they would have no ability to block compliance with the DMA and *Epic* verdict. It therefore is evident that Apple obtains profits – and is fighting vigorously to maintain these profits - from notarization techniques. This evidences the existence of a market for notary stamps and services fees.

78.     A developer class action antitrust lawsuit filed in 2019 alleged App store violations of Sherman in the app distribution aftermarket. *Cameron et al v, Apple*, 19-cv-3074-YGR. The *Cameron* class is restricted to app developers who sold apps for non-zero prices. The case settled with little to no meaningful changes in the smartphone market. Nonetheless, it formed Developer Compensation Fund, serving as precedent for the fund sought in this case.

## VI.     Apple Unlawfully Maintains Its Monopoly Power

### A.  Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution

79.     Apple's internal documents show that, soon after the iPhone's introduction and notwithstanding its success, the company began to fear that disintermediation of its platform and the commoditization of the iPhone would threaten Apple's substantial profits from iPhone sales and related revenue streams.

80.     Accordingly, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products, and services. Apple often claims these rules and restrictions are necessary to protect user privacy or security, but Apple's documents tell a different story. In reality, Apple imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its iPhone platform fees and/or for the importance of the iPhone platform itself.

81.     Three aspects of Apple's efforts to protect and exploit its smartphone monopoly are worth noting. First, Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple influences the direction of innovation both on and off the iPhone.

82.     Second, Apple drives iPhone users away from products and services that compete with or threaten Apple. In doing so, Apple increases the cost and friction of switching from the iPhone to another smartphone and generates extraordinary profits through subscription services (like Apple's proprietary music, gaming, cloud storage, and news services), advertisements within the App Store, and accessories like headphones and smartwatches.

83.     Third, Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. For most of the last 15 years, Apple collected a tax in the form of a 30 percent commission on the price of any app downloaded from the App Store, a 30 percent tax on in-app purchases, and fees to access the tools needed to develop iPhone native apps in the first place. While Apple has reduced the tax it collects from a subset of developers, Apple still extracts 30 percent from many app makers. Apple also generates substantial and increasing revenue by charging developers to help users find their apps in the App Store— something that, for years, Apple told developers was part of the reason they paid a 30 percent tax in the first place. For example, Apple will sell keyword searches for an app to someone other than the owner of the app. Apple is able to command these rents from companies of all sizes, including some of the largest and most sophisticated companies in the world.

84.     As Apple exercised its control of app distribution and app creation, Apple slowed its own iPhone innovation and extracted more revenue and profit from its existing customers through subscriptions, advertising, and cloud services. These services increase the cost of switching from

the iPhone to another smartphone because many of these services—including its proprietary gaming, cloud storage, and news service—are exclusive to the Apple ecosystem, causing significant frictions for iPhone users who try to use alternative services on another smartphone. Moreover, Apple's conduct demonstrates that Apple recognized the importance of digital products and services for the success of the iPhone while at the same time it restricted the development and growth of non-iPhone products and services—especially those that might make it easier for users to switch from the iPhone to another smartphone.

85. Each step in Apple's course of conduct built and reinforced the moat around its smartphone monopoly. The cumulative effect of this course of conduct has been to maintain and entrench Apple's smartphone monopoly at the expense of the users, developers, and other third parties who helped make the iPhone what it is today. Despite major technological changes over the years, Apple's power to control app creation and distribution and extract fees from developers has remained largely the same, unconstrained by competitive pressures or market forces. That this conduct is impervious to competition reflects the success of Apple's efforts to create and maintain its smartphone monopoly, the strength of that monopoly, and the durability of Apple's power.

86. Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting distinct products and services, including COVID-19 Tracking Apps and Cross-Platform Video Apps. Further Examples cited in *United States v. Apple* include super apps, cloud streaming apps, messaging apps, smartwatches, and digital wallets. Those are incorporated herein via Exhibit A. By stifling these technologies, and many others, Apple reinforces the moat around its smartphone monopoly not by making its products more attractive to users, but by discouraging innovation that threatens Apple's smartphone monopoly or the disintermediation of the iPhone. Apple continues to expand and shift the scope and categories of

28

anticompetitive conduct such that the cumulative anticompetitive effect of Apple's conduct is even more powerful than that of each exclusionary act standing alone.

### i. COVID-19 Tracking Apps: Apple's Exclusionary Tactics Against Independent Scientists and Developers

87. Apple's approach to managing the distribution of COVID-19 related apps on its App Store during the pandemic highlights a broader strategy that has significant implications for competition, innovation, and scientific advancement. As the crisis unfolded, there was an urgent public need for timely and accurate health information and tracking tools. Independent scientists and small developers quickly mobilized to create applications that could serve this demand by providing novel solutions for tracking and analyzing the spread of the virus.

88. However, Apple imposed stringent criteria for which apps could be hosted on its platform, prioritizing applications from established health organizations and large institutions. This policy aimed to ensure that only institutional apps, vetted by Apple, were acceptable for public distribution, in Apple's opinion. However, the effect of this screening was problematic. First, it significantly limited the variety of available tools at a time when rapid innovation and deployment could save lives. Second, it solidified Apple's control over its app ecosystem, reinforcing its gatekeeper status at a time when digital solutions were more vital than ever. Third, it ignored a long history of independent scientists contributing to medical advancement.

89. By excluding smaller developers and independent scientists from contributing their expertise and innovative solutions, Apple not only curtailed a potentially diverse set of tools that could have aided in the pandemic response but also stifled the competitive dynamics that drive technological advancement. This exclusion extends beyond mere market dominance; it touches on the ethical implications of corporate decisions that may prioritize strategic interests or brand

goodwill over immediate public health needs. It squarely put brand goodwill above independent scientists, which amounted to corporate censorship of open science, given Apple's monopoly.

90.     Apple's partnerships with large institutions for the development of COVID-19 apps further illustrate this point. While these collaborations can bring substantial resources and expertise to bear on public health challenges, they also enable Apple to maintain tight control over the narrative and technological responses to the crisis. This control can be seen as part of a broader strategy to manage its public image and cultivate government and institutional partnerships that reinforce its market position.

91.     In essence, Apple's management of app submissions during the pandemic serves as a case study in how platform owners can use crises to reinforce their own market power while potentially sidelining more nimble, innovative competitors. This approach, while it may align with a company's strategic goals and a purported desire to ensure information reliability, raises significant questions about the balance between control and innovation, particularly in times of public emergency where rapid response and a diversity of solutions are crucial.

92.     There exist tens of millions of individuals in the United States who do not know how to access the internet without using an iPhone device. These individuals rely upon access to the internet to perform critical commerce activity, engage in protected free speech, and obtain lifesaving medical advice and treatments. They typically access the internet through native apps, which are favored by customers by almost 90% over web browser apps. Native apps provide more functionality, some of which is critical with a COVID-19 app. GPS, altimeters, and other devices cannot be reasonably accessed without native app permission. Apple's competing COVID-19 app uses native device functionality, and independent COVID-19 apps would have been severely disadvantaged to rely on a web browser with limited-to-none SDK access. As such, Apple's monopoly over US smartphones/performance smartphones results in a *de facto* monopoly of access

to the national internet backbone, which may be termed the smartphone enhanced internet backbone and/or iPhone userbase. This collective network of hundreds of millions of smartphone devices – including their sophisticated sensors – is simply not Apple's property. It is the property of the users, the general public, and should exist untethered and free from Apple's control.

93.     Dr. Robert Roberts, the Chief Medical Officer for Coronavirus Reporter, is a widely recognized figure in academia whose work has impacted the lives of many. Prerequisite to nearly every cardiac procedure or hospital screening for myocardial infarction ("heart attack") is laboratory blood analysis to detect damaged cardiac muscle tissue. In the 1980s, Dr. Roberts pioneered the MBCK blood test used for two decades as a "gold standard," and which directly laid the foundation for the current troponin lab test. Dr. Roberts earned the trust of NASA as Shuttle Cardiologist. Apple, however, deprived its userbase the benefit of Dr. Roberts' scientific expertise and dedication towards saving lives, when the Defendant corporation improperly blocked his app in February 2020 to develop their own. Apple's SARS-CoV-2 tracing system never reached widespread availability or implementation in the United States.  Dr. Roberts' voluntary symptom reporting app, the first of its kind, was exactly the app needed four years ago, at the onset of the pandemic. Notably, Apple blocked the entire class of independent COVID apps, even those with institutional affiliation such as Dr. Roberts, a Director of Cardiac Translational Research at University of Arizona and former CEO of Ottawa Heart Institute.

94.      At the time Plaintiff Coronavirus Reporter Corporation submitted their app to the App Store, there were zero coronavirus-specific apps on the United States App Store. A keyword search for COVID or Coronavirus yielded no results.

95.     Their nimble team allowed them to create the first COVID app by a world renowned researcher, and what would have been the first COVID app on the App Store. The team included NASA's former Lead Cardiologist, as well as a front-line Emergency Room physician and a

Dartmouth trained computer scientist who personally developed apps used by half a billion users. Dr Roberts had full and final authority over all functionality of the medical app, as Chief Medical Officer of Coronavirus Reporter. The Coronavirus Reporter app was developed by a world-class medical team with specific area expertise necessary and appropriate to combine health care epidemiology research with large-scale data operations. This combined expertise would allow this startup COVID app to be first-to-market.

96.     The Coronavirus Reporter app was developed in February 2020. The app team, and the application they developed, was ready for deployment when COVID was just arriving in the United States. The Coronavirus Reporter app, had it been allowed, would have provided useful epidemiological medical informatics data, as it provided a medium for open and free symptom and related information exchange by the general public that could then be analyzed by Roberts' team and affiliated scientists at the University of Arizona or elsewhere. Users could submit their own symptoms, lockdown status, vaccination status (in version 2.0 late 2021), vaccination details (version 3.0 late 2022) and see reports by their neighbors.

97.     Despite being launched as a startup, the app had ties to academia and had every intent to share the data in a responsible and open fashion with other researches. Apple's conduct halted this important initiative, mostly so they could be the first to manage such a network of affiliated entities.

98.     By offering a trustworthy and direct reporting of primary source data, Coronavirus Reporter would in all likelihood have prevented substantial morbidity and mortality. Expert analysis will be presented at jury trial showing that Apple's refusal of early apps like Plaintiff's caused no less than two-thousand deaths in the United States, according to Apple's own research. Many "Covid deniers" might have concluded differently by monitoring primary source data, as opposed to "vetted" (i.e. delayed) and politically influenced government and institutional data. For this reason,

Plaintiffs state this was an historical app, for the first time in the history of pandemics, one could watch primary-source global data, from the safety of being at home on their iPhone.

99.    The app provided both informal location contact tracing, and pandemic situational awareness. This was implemented using a familiar and intuitive geolocation screen to report symptoms and view nearby outbreaks.



100.    Little was known about COVID symptoms at the time, and the app was meant to develop with nimbleness and plasticity as situations emerged. In other words, the same skills CRC employed to have the first COVID app, would allow for many future-improved versions that could advance epidemiological study of the pandemic, such as vaccination self-reporting and breakthrough case data collection.



101.    The app sought user reported symptoms and COVID related questionnaire items drafted by a front-line ER physician. The public demanded this information that simply wasn't yet available from mainstream medical institutions. In other words, a social media/crowdsourced app provided a useful tool for pandemic awareness in terms of real time information sharing with peers.



12:54

# Coronavirus
Tracking & Info

This app allows for community reporting of symptoms related to the novel coronavirus. The map view allows you to quickly see 'hot zones' of fever & symptom outbreaks reported by other app users. Users may also report school/work closures and self-quarantine status. Your profile report submission allows you to share valuable data with other users and epidemiology researchers to better understand this rapidly emerging health concern. This app is designed to provide public transparency of an evolving pandemic that is currently unavailable from other sources. Specifically, the true infection incidence rate of COVID-19 is unknown as many with mild symptoms are not registered by public authorities and hospitals. Additionally, there are shortages in lab test kits globally; Vice President Pence confirmed today that the United States has such a shortage. The COVID-19 Coronavirus appears to have originated in Wuhan, China in late 2019. Official estimates place the number of infections just short of 100,000 individuals and 5000 fatalities as of

| Check-In | Maps | About | Settings |

102. Apple rejected the Coronavirus Reporter app on March 6, 2020, knowing apps from large institutions and strategic partners were in the pipeline but not yet ready. Apple specifically strategized to prevent the Coronavirus Reporter app, and *all* COVID startup firms, from setting a precedent or amassing a user base, which could jeopardize its own pipeline and/or the first-mover advantage of desirable institutional partners of a monopolistic trust.

103.    In the weeks following the initial rejection, with knowledge of CRC's correspondence, Apple broadened the App Store requirements for a COVID app from insurance companies to any healthcare company with deep-rooted credentials. Plaintiff told Apple in no uncertain words that permitting insurance companies, but not other companies, was absurd. After said communication, Apple seems to have subsequently dropped the insurance company exclusivity clause. But Apple maintained its ban on small startups, favoring large institutions. Apple defined these larger institutions as "deeply credentialed," but ignored the fact that Plaintiff had a deeply-credential medical startup.

104.    Medical history is plentiful with examples of startups that revolutionized medicine. In his CNBC interview, Dr Roberts cited that "Penicillin was invented by a startup, it was a two-person effort. Thankfully Apple wasn't in a position to block the invention of penicillin." The development of penicillin required contributions from independent scientists, university teams, and government agencies, and spanned over a decade.

105.    Defendant Apple denied an internal appeal to the App Review Board and permanently disallowed the app on March 26, 2020. Apple internal discussions with its own partners, at the time, were already discussing their own proprietary COVID app. Apple was also looking to form partnerships with other leading institutions to develop COVID apps, that would further cement Apple's own monopolistic trust and medial endeavors.

106.    About one month after rejecting the app, Apple permitted several employees at a London teaching hospital to distribute a COVID app on the App Store that functioned nearly identically to Coronavirus Reporter. That competing app obtained the so-called first mover advantage, and is reached a peak usage of five million individuals daily.

107.    Apple ultimately launched its own Covid app, a competing product to Dr. Roberts app. As of today's filing, four years after Dr. Roberts' app would have been available to 100% of the world,

Apple's app fell well short of its goals and failed to achieve substantial results in helping the pandemic. Apple's app is built-in (bundled) with iOS and hence does not show as a typical app. But nonetheless, it competes as a COVID-19 application.

108.   The Apple contact tracing app generally underperformed expectations and failed to obtain a user base in the United States. Nonetheless, research by a Turing/Oxford team into the epidemiological impact of the app suggests the UK version of the app has prevented 600,000 coronavirus cases since it was launched. Coronavirus Reporter was ready months before other world-class COVID app products, and would likewise have prevented deaths in the US and other countries where the NHS/Apple app did not succeed.  Deaths would have been prevented through both the informal contact tracing geolocation functionality, as well as "situational awareness" offered by the app that does not exist in the UK/Apple app. Apple's denial of the Coronavirus Reporter app resulted in unnecessary deaths.

109.   We assert this is the first time in history a corporation was able to prevent a Professor of Medicine and internationally acclaimed scientist, who had saved countless lives through his MBCK discovery, from contributing to an emergency pandemic.

110.   Apple did knowingly and willfully prevent the inventor of MBCK from publishing a competing COVID app. Apple knowingly blocked a competing COVID app that covered the entire US population at least 18 months before their own bundled app.

111.   Defendant Apple knowing and willfully prevented Dr Roberts, inventor of a heart attack test used by millions, from assisting citizens over the internet during the early days of the pandemic, which would have been historical. History lost an important invention, or at the very least, an attempted medical informatics endeavor never before attempted in the history of pandemics. Apple knew, or should have known, that curtailing such expert assistance could have caused increased incidence and mortality due to COVID-19.

112. Blocking all startups from assisting with COVID app development likely cost lives. The flagrant Sherman Act violation seriously, dangerously, and recklessly constrained competition – here, much needed medical innovation.

113. Apple's willful denial of Dr Roberts' medical app, and other startup COVID apps, was directly assented to by key Apple leadership. These leaders willfully blocked an app that would have saved lives, according to their own research in conjunction with Oxford. In doing so, Apple disregarded long-established medical norms to an extent that was breathtaking.

114. Apple's App Review Board did not possess anyone with better COVID insight or credentials Coronavirus Reporter's Chief Medical Officer, though Apple acted as if they did have some sort of superior knowledge, confounding and conflating their market power with medical expertise. In sum, censoring Dr. Roberts, trusted by NASA for John Glenn's final mission, was an assault on science, and certainly un-American.

**B. Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition**

**i. Cross-platform Videoconferencing: Apple protects its smartphone monopoly by degrading and undermining cross-platform video apps**

115. For years, Apple has restricted APIs that would allow for cross-platform videoconferencing, mirroring its strategy with messaging apps. Just as Apple undermined cross-platform messaging to maintain its dominance, it similarly stifled innovation in cross-platform video communication by delaying support for WebRTC, an open framework developed by Google for real-time communication in web browsers and mobile applications.

116. WebRTC allows developers to create applications that can perform real-time video and audio communication across different platforms without the need for additional plugins or proprietary software. This innovation had the potential to revolutionize videoconferencing by

enabling seamless communication between users on different devices and operating systems. However, Apple recognized that supporting WebRTC would diminish the exclusivity of FaceTime, its proprietary video calling service, which only functions within the Apple ecosystem.

117. As with its handling of cross-platform messaging, Apple deliberately delayed the adoption and promotion of WebRTC. This delay prevented the proliferation of cross-platform video applications that could have rivaled FaceTime and offered users more flexible communication options. During this period, users were constrained to using FaceTime with other iOS users or resorting to specific applications like Skype, which required separate installations and were less integrated.

118. The potential of WebRTC was evident early on, as it allowed for the development of video apps that did not require users to install any special software. This technology promised a more open and competitive landscape for video communication, reducing the friction for users and developers alike. However, Apple's reluctance to support WebRTC effectively stifled this potential for years, delaying the advent of innovative cross-platform video solutions.

119. One notable example of the impact of Apple's restrictive API policies is the WebCaller, a cross-platform videoconferencing utility developed by Plaintiffs GFVC and Calid Inc. WebCaller leveraged WebRTC to provide "weblinks" to video sessions, allowing anyone to join a videoconference from any platform with ease. Such cross-platforms weblinks were indeed novel, and in hindsight, they were revolutionary and contributed to the fundamental to the success of Zoom and other cross-platform services which finally gained popularity during the pandemic. Yet despite innovating cross platform weblinks, WebCaller struggled to gain traction due to Apple's delayed API restrictions, in conjunction with other anticompetitive conduct.

120. Despite being one of the first cross-platform, easy-to-use WebRTC interfaces, WebCaller was suppressed in rankings for two year. App Store users were unaware that WebRTC had been

released, which permitted improved videoconferencing experience through apps like WebCaller – using weblinks to permit any internet user from joining a videoconference.

121. In is uncontested that WebCaller's innovative features were the future for videoconferencing, as competitors like Microsoft, Zoom, and Google ultimately developed similar apps during the pandemic that caused FaceTime to lose market share.

122. Apple engaged in preferential treatment of video apps, again picking and choosing who they wanted to form partnerships with. Like COVID-19 Apps, Apple knew cross-platform video was inevitable, and promoted those who benefitted them over small developers.

123. Furthermore, Apple's preferential treatment of certain apps over others is evident in its interactions with competing video app developers. For instance, Apple provided guidance and support to Chinese app developers like TikTok, which helped them grow and succeed on the App Store. In contrast, WebCaller received no such support and was buried in the App Store rankings, making it difficult for users to discover and download the app.

124. TikTok is a cross-platform video app that uses API tools to avoid users needing to download a client, like Skype. As documented in the House Report, Apple systematically helped certain Chinese firms navigate the App Store and gave them top visibility in App Store search. Despite TikTok being linked to national security issues and addictive behavior in young persons, it grew exponentially due to Apple's assistance, whereas WebCaller was ignored and suppressed by Apple. In simple terms, Apple's anticompetitive conduct changed history by bringing us TikTok, meanwhile tanking more benevolent communications tools such as WebCaller.

125. This example demonstrates Apple's careful control of App Store success stories; the general public is unaware of the years-long jockeying for new technologies like WebRTC. They simply see the apps – as puppet strings – pulled by monopolist Apple after deliberate weighing of the company's strategic interests. Meanwhile developers invest years of their lives in creative, valuable

software concepts, only to be discarded by Apple. This example is intended to advocate for the return to public interest and healthy innovation from independent developers in the app markets.

126.     This deliberate stifling of competition is consistent with the findings of the House Judiciary Subcommittee on Antitrust, which highlighted Apple's practice of "Sherlocking" – where the company copies features from third-party apps and integrates them into its own products, often to the detriment of the original developers. In this case, Apple introduced FaceTime 15 with weblink features similar to those WebCaller had perfected years earlier, but only after it had secured its own strategic advantages for itself and its partners, like TikTok.

127.     Apple's manipulation of the App Store rankings and its selective support for certain apps over others are clear examples of anti-competitive behavior. By controlling which apps succeed and which fail, Apple not only undermines competition but also deprives consumers of the benefits of innovation and choice. The case of WebCaller illustrates how Apple's API restrictions, ranking manipulations, and preferential treatment policies have a far-reaching impact on the market, stifling innovation and entrenching its monopoly power.

128.     Greenflight had spent almost a decade working on bringing cross-platform video to the public. It first funded CALID (Calendar IDentifier) in 2014 as a cross-platform system to schedule videoconferences. with an initial focus on telehealth. The flexible and highly functional CALID platform allows scheduling of any resource entity – which could range from its focus on telehealth videoconferencing, to a birdwatching tour. Apple denied the CALID app originally because it sought to use direct credit card payments, which have a 2% transaction fee. Apple demanded CALID use their IAP system, which has a 30% inefficient transaction fee. CALID was approved after it implemented IAP purchases. CALID was forced to abandon work on the platform largely in part due to these inefficiencies. CALID was subject to ranking suppression because it competed with Apple's own apps and cronies' apps. The app was typically invisible on App Store searches.

129.    Apple initially rejected the CALID app, claiming it didn't provide any "smartphone enhanced" experience, i.e., no "added functionality" in comparison to a basic website. They also rejected the app because it didn't use IAP purchases. CALID offered iOS users WebRTC videoconferencing on top of a flexible scheduling platform. However, CALID was limited to the App, as WebRTC was not available on Safari at the time.



ABOUT CALID

**CALID.com is an online marketplace platform that allows people to meet online, learn about each other's offerings, and subsequently book appointments directly with one another. Members who join CALID.com are able to host listings, to sign up for and schedule appointments, or both. A listing on our site is also referred to as a CALID, aka Calendar Identifier. You can think of a CALID as a social media page, but in addition to traditional social media pages which have photos and text, a CALID page also allows scheduling. Members may have as many CALID listings as they have skills to offer or things to rent. A CALID listing can exist for practically anything that can be scheduled -- including services (eg lessons, outdoor activities, expert consultations) and rentals (eg cars, houses, computers, equipments).**



### Explore a world of CALIDs

Discover activities and cultural excursions in your hometown - or across the globe. CALID's scheduling system works seamlessly between time zones, allowing for powerful yet easy-to-use global scheduling. CALID's listings marketplace is as diverse as its user base. Join today and contribute to our unique social platform.



## Foster eco-efficiency

CALID was founded with a vision of fostering ecological sustainability. Our Founders believed that creating a system that encouraged *sharing* would translate to reduction in unnecessary resource use. The greater the participation in CALID, the better the economies of sharing and resource savings. Videoconferencing is available as an option on any CALID reservation, further reducing unnecessary travel. We depend on members like you to create thoughtful listings to further these goals.





130. Apple finally conceded that CALID offered something beyond a basic website, and approved CALID for distribution once IAP was added. This resulted in users having a 40% commission loss (30% to Apple, and 10% to CALID). Greenflight abandoned the platform, as it felt the 40% friction made it unethical and untenable to most practitioners.

131. Once Apple implemented WebRTC on Safari, Greenflight then invested in transforming CALID into WebCaller, a cross-platform videoconferencing utility. Unique to WebCaller, it provided weblinks to WebRTC sessions. This meant anyone could join a videoconference – on any platform – with no special add-ons or software. This was a couple years before the "zoom" revolution of the pandemic. Microsoft, Amazon, and Google use WebRTC weblinks almost exactly as specified by WebCaller, with final products that look very familiar to WebCaller, which preceded them by several years.




132.    But Apple had suppressed WebCaller for two years, and it only attained a handful of downloads despite being one of the first cross-platform, easy to use WebRTC interfaces. When Apple introduced FaceTime 15, it relied upon the same exact weblink features WebCaller perfected two years earlier.

133.    In summary, Apple's restrictive API policies for cross-platform videoconferencing, exemplified by its handling of WebRTC, TikTok and WebCaller, demonstrate a clear pattern of anti-competitive behavior. By delaying support for WebRTC and selectively suppressing competing apps, Apple has maintained its dominance in the video communication market at the expense of innovation and consumer choice. This conduct not only mirrors its approach to cross-platform messaging but also highlights the broader implications of its monopolistic practices for the technology industry and beyond.

134. To Apple, complying with Sherman Act's civil and criminal statutes is apparently a laughing matter. In 2022, Apple's CEO Tim Cook was asked whether Apple would fix iPhone-to-Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."

### C. Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services

135. The exclusionary and anticompetitive acts described above are part of Apple's ongoing course of conduct to build and maintain its smartphone monopoly. They are hardly exhaustive. Rather, they exemplify the innovation Apple has stifled and Apple's overall strategy of using its power over app distribution and app creation to selectively block threatening innovations.

136. Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware, facilitate switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling the development of cross-platform technologies. For instance, Apple has undermined third-party location trackable devices that fully function across platforms. Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime. Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit. Protocols that Apple has placed around new "eSIM" technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number. Apple has impeded cross-platform cloud storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult. Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones. And Apple has worsened its users' experience by making it

difficult for iPhone users to use superior voice and AI assistants and steering users to use Siri as a voice assistant.

137.    Ultimately, the strategies Apple has employed to date are not the only ones Apple can use to achieve its anticompetitive and lucrative ends. As technology evolves, Apple continues to evolve and shift its anticompetitive behavior to protect its monopoly power.

138.    For example, in recent years, Apple has increasingly moved into offering its own subscription services, including news, games, video, music, cloud storage, and fitness subscriptions that could be used to keep users tethered to the platform. These subscription services and other ancillary fees are a significant part of Apple's net revenue. These subscriptions services can also increase switching costs among iPhone users. If an Apple user can only access their subscription service on an iPhone, they may experience significant costs, time, lost content, and other frictions if they attempt to switch to a non-Apple smartphone or subscription service.

139.    These subscription services can also increase Apple's power over content creators and newspapers, among others, by exerting control over how audiences access their work, decreasing traffic to their websites and apps, and positioning Apple as the middleman or tollbooth operator in the relationship between creators and users. In so doing, Apple takes on outsize importance and control in the creative economy, which may diminish incentives to fund, make, and distribute artistic expression.

140.    In addition, when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple reportedly allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app. As discussed in the Global Antitrust Proceeding section, this conduct evidences that Apple willfully

violates antitrust enforcement court orders, by charging for its notarization stamps and services monopoly. Apple could not enforce such link-out charges, but for the anticompetitive DPLA and hardware notarization algorithms.

141. Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers. For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well. The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car. At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct.

142. Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone. Apple's smartphone dominance extends to CarPlay, an Apple infotainment system that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car. Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. After leveraging its smartphone dominance to car infotainment systems, Apple has told automakers that the next generation of Apple CarPlay will take over all of the screens, sensors, and gauges in a car, forcing users to experience driving as an iPhone-centric experience if they want to use any of the features provided by CarPlay. Here too, Apple leverages its iPhone user base to exert more power over its trading partners, including American carmakers, in future innovation. By applying the same playbook of restrictions to CarPlay, Apple further locks-in the power of the iPhone by preventing

the development of other disintermediating technologies that interoperate with the phone but reside off device.

## VII.    Anticompetitive Effects

### A.  Apple's conduct harms the competitive process

143.    As described above, Apple protects its monopoly power in smartphones and performance smartphones by using its control over app distribution and app creation to suppress or delay apps, innovations, and technologies that would reduce user switching costs or simply allow users to discover, purchase, and use their own apps and content without having to rely on Apple. As a result, Apple faces less competition from rival smartphones and less competitive pressure from innovative, cross-platform technologies not because Apple makes its own products better but because it makes other products worse. With the benefit of less competition, Apple extracts extraordinary profits and regulates innovation to serve its interests. This leaves all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. Left unchallenged, Apple will continue to use and strengthen its smartphone monopoly to dictate how companies can create and distribute apps in the future so that they cannot threaten Apple's smartphone monopolies.

144.    Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain as meaningful competitors to Apple in the premium smartphone market.

145.    Even when users consider these alternatives, Apple's conduct has increased the technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative smartphone. This undermines competition and entrenches Apple's monopoly power.

146.    For example, according to user surveys, one of the biggest reasons iPhone users do not switch to rival smartphones today is to avoid the problems Apple has created for cross-platform

messaging. Likewise, Apple exercised its control over app distribution and app creation to impede the development and growth of super apps, depriving users of technology that would have facilitated switching by decreasing user's dependence on Apple and the iPhone. Apple took a similar approach to cloud streaming apps, delaying or suppressing technology that would have made it easier for users to switch to cheaper smartphones. Apple also used its control over app creation, including its control over critical APIs, to impose technical and contractual restrictions on messaging apps, third-party smartwatches, and digital wallets, undermining cross-platform technologies that would have helped users overcome switching costs and friction and ultimately increased smartphone competition.

147.   Apple's conduct has delayed or suppressed the emergence of cross-platform technologies that would put competitive pressure on Apple's ability to extract extraordinary profits from users and developers. For example, if developers could distribute their programs through super apps or cloud streaming apps, rather than the App Store, it would put competitive pressure on Apple's ability to control app distribution and app creation as well as the taxes Apple imposes on developers who want to distribute apps to iPhone users. Similarly, third-party digital wallets, or other apps with tap-to-pay functionality, would benefit users and developers by putting more competitive pressure on Apple as well. For example, digital wallets could eventually provide developers an alternative way to process payments and manage customer relationships, forcing Apple to compete more aggressively by lowering fees and improving quality, which would ultimately benefit users. Instead, Apple continues to exert its power over customers and financial institutions when users pay for something with their phone—in the App Store, in an app, or increasingly in the physical world with tap-to-pay.

148.   Apple's conduct has harmed users in other ways. For example, third-party digital wallets would reduce Apple's ability to charge banks high fees when users make payments using Apple

Wallet, which ultimately cost consumers through higher prices or other reductions in quality. Alternative digital wallets could also provide smartphone users better rewards, e.g., cash back, as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to go through Apple. But these tap-to-pay digital wallet products and services do not exist today because of Apple.

149.    Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud streaming apps, because of the threat they pose to Apple's smartphone monopolies. As a result, several developers have abandoned plans to develop super apps and cloud-based gaming apps even after making substantial investments in bringing them to market. Apple's conduct may have also slowed the development of innovative, high-compute apps related to education, artificial intelligence, and productivity as well. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

150.    Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini

program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

151.    Apple's documents and conduct show that Apple is motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets.

152.    For example, Apple sacrificed substantial revenues it could have earned from super apps, mini programs, cloud streaming apps, and other third-party apps and accessories. In particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud streamed gaming apps would offer iPhone users access to popular services (including games) and in turn generate significant revenue for Apple through subscriptions and in-app purchases.

153.    Instead, Apple preferred the long-term benefit of reduced smartphone competition to the revenue it would generate from cloud gaming, super apps, and mini programs or the quality (and consumer demand) increase that would flow from this innovation. Apple has also used its control over app distribution and app creation to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

154.    The harms to smartphone competition caused by Apple's conduct are amplified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple ran its App Store the same way it does today.

Apple does not allow that choice, however, because if it did developers could write their programs for any smartphone rather than specifically for iOS, just as internet browsers and Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems not just Windows. That would lower users' switching costs and reduce users' and developers' dependence on Apple and the iPhone.

155.  Apple's smartphone monopoly gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple is forced to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. For example, Apple has stated plans to adopt RCS due to market and international regulatory pressure. But Apple continues to contractually restrict third parties from accessing other APIs and features that would enable cross-platform messaging apps. In another instance, Apple was enjoined from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force companies to comply with Apple's policies that may contradict local laws by delaying the review of the offending companies' apps.

**B.  Apple has every incentive to use its monopoly playbook in the future**

156.  Apple's conduct does not just impact the past and present but poses significant risk to the development of new innovations. Apple may use its smartphone monopoly playbook to acquire or maintain power over next-frontier devices and technologies. As Apple grows its dominance, Apple

may continue delaying or stifling the innovations of cross-platform companies, in order to lock users into Apple devices.

157.     Apple has countless products and services—AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash. These provide future avenues for Apple to engage in anticompetitive conduct and the ability to circumvent remedies. Appropriate forward-looking remedies are necessary to ensure that Apple cannot use these products and services to further entrench its monopoly power.

158.     Apple's conduct extends beyond just monopoly profits and even affects the flow of speech. For example, Apple is rapidly expanding its role as a TV and movie producer and has exercised that role to control content.

159.     Apple has also attempted to use its monopoly to collect user data and stifle innovation in the automotive industry by, among other things, impeding the development of digital key technologies by requiring them to be offered in Apple's proprietary wallet product and creating new single points of power over emerging uses of the iPhone. These acts further reinforce Apple's power in the iPhone by locking in Apple's services and excluding other alternative technologies that have the potential to disintermediate Apple's iPhone.

160.     Finally, Apple's monopolization of smartphone markets gives it tremendous power over the lives of millions of Americans. Today, Apple uses that power to undermine rival smartphones, suppress innovative technologies, and stymie consumer choice. Tomorrow, Apple may use its power to force its own users (and their data) to become its next profitable product.

## C.  Antitrust Injury Experienced by Class Member Developers of Free Apps

161.     Plaintiffs and class members assert direct and quantifiable antitrust injuries as a result of Apple Inc.'s restrictive practices, which have not only stifled innovation and competition within the

iPhone/Smartphone app development sectors but have also led to direct economic harm to Plaintiffs and similarly situated developers. This section outlines the specific nature of these injuries.

162. Direct Economic Harm: Plaintiffs and class members have incurred significant development costs under the expectation of a fair and competitive marketplace. Apple's monopolistic control and exclusionary practices, including self-preferencing of Apple products, the imposition of notarization requirements and the prohibition of alternative app distribution channels, have directly prevented Plaintiffs from realizing returns on their investments. This direct economic harm is quantifiable in terms of development expenditures that could not be recouped due to Apple's anticompetitive barriers.

163. Lost Revenue and Market Opportunity: By effectively barring Plaintiffs' and class member apps from the App Store or subjecting them to suppressive ranking algorithms, Apple has deprived Plaintiffs of access to a critical mass of potential users, directly resulting in lost revenue and market opportunity. These losses are a direct consequence of Apple's unlawful conduct, quantifiable through economic analysis comparing potential earnings in a competitive market versus the constrained environment created by Apple.

164. Innovation Stifling: Apple's practices have not only caused immediate economic harm but have also stifled innovation by creating insurmountable barriers for smaller developers. This has led to a homogenization of available apps, reducing consumer choice and inhibiting the introduction of novel and potentially disruptive technologies into the marketplace.

165. Consumer Harm as Proxy for Developer Injury: The reduction in consumer choice resulting from Apple's monopolistic control harms developers by depressing the overall demand for apps. Consumers lowered expectation from App Store inefficiencies constitutes an antitrust injury for developers, too, as it reflects a market manipulation that disadvantages developers who are prepared to offer more innovative or cost-effective alternatives.

166. The injuries suffered by Plaintiffs and class members as a result of Apple's anticompetitive conduct are thus both direct and consequential, with the class representing a sizeable economic antitrust injury, in and of itself.

**VIII.   Privacy, Security, and Other Alleged Countervailing Factors Do Not Justify Apple's Anticompetitive Conduct**

167. There are no valid, procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's moat building has not resulted in lower prices, higher output, improved innovation, or a better user experience for smartphone users.

168. Apple markets itself on the basis of privacy and security to differentiate itself from what competition is left in the smartphone market. But this does not justify Apple's monopolistic and anticompetitive conduct. Apple imposes contractual restraints on app creation and distribution, imposes hefty fees on many types of smartphone interactions, and conditionally restricts API access on its smartphone platform simply because it can. There are limited if any competitive constraints on this conduct. As a point of comparison, Apple does not engage in such conduct on its Mac laptops and computers. It gives developers the freedom to distribute software directly to consumers on Mac without going through an Apple-controlled app store and without paying Apple app store fees. This still provides a safe and secure experience for Mac users, demonstrating that Apple's control over app distribution and creation on the iPhone is substantially more restrictive than necessary to protect user privacy and security.

169. In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. In particular, when an iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in a process that could otherwise occur directly

between the user and card issuer introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more curated selection of apps that better protect user privacy and security. Indeed, Apple allows enterprise and public sector customers to offer more curated app stores on employee iPhones because it better protects privacy and security.

170.　Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's conduct. If Apple wanted to, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users.

171.　Similarly, Apple is willing to sacrifice user privacy and security in other ways so long as doing so benefits Apple. For example, Apple allows developers to distribute apps through its App Store that collect vast amounts of personal and sensitive data about users— including children—at the expense of its users' privacy and security. Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts massive payments from Google to set its search engine as the default in the Safari web browser even though Apple recognizes that other search engines better protect user privacy.

172.　Finally, Apple selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

173.　Ultimately, Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help Apple protect its monopoly

power. Apple's conduct underscores the pretextual nature of any claim that Apple's conduct is justified by protecting user privacy or security.

## IX.    The Smartphone Industry

### A.  Background

174.    Mobile phones are portable devices that enable communications over radio frequencies instead of telephone landlines. These signals are transmitted by equipment covering distinct geographic areas, or "cells," which is why mobile phones were called cell phones. The first commercial cell phones became available in the 1980s. Since then, improvements in both cell phone components and wireless technology have made it possible to transfer large volumes of data around the globe in a short period. As a result, mobile phones began to offer a wider array of features and the adoption of mobile phones dramatically increased. Today, nearly all American adults own a mobile phone.

175.    Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. Smartphones not only make phone calls, but allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet. Consumers choose between smartphones based, in part, on their functionality. Today, smartphone functionality is driven in large part, though not exclusively, by a combination of hardware and software components. Thus, in a competitive market, smartphone manufacturers would compete and innovate to provide the best functionality.

176.    Although consumers could replace some smartphone functionality with separate devices such as by always carrying a camera and laptop, they generally prefer to access this combination of functionality as part of a single device. Thus, phones with some but not all of these features are not reasonable substitutes for smartphones. For example, a Canon or Nikon camera is not a substitute

for an Apple or Samsung smartphone notwithstanding that both these products are capable of taking digital pictures.

### B. Smartphone Hardware

177.    A smartphone's hardware includes the frame and screen. Higher performing smartphones are typically constructed from better materials like glass and metal instead of plastic, manufactured to higher standards that make them more durable (e.g., water and dust proof), and have higher quality displays.

178.    A smartphone's hardware also includes the semiconductor chipsets that run the smartphone: central processing of software instructions, graphics, video, display, memory, data storage, and connection to wireless networks. Chipsets that offer superior performance—faster processing and network connections, better graphics, more storage—are costly. As a result, smartphone manufacturers typically include them only in more expensive performance smartphones.

179.    Smartphone hardware includes other important components like cameras, and position and motion sensors. Performance smartphones typically have higher quality cameras, better battery life, wireless charging, and advanced biometrics such as face scanning.

180.    Smartphones also contain several types of antennas that allow the phone to communicate with other smartphones, accessories, or other devices using standard communication protocols such as Wi-Fi, Bluetooth, and Near-Field Communications (NFC).

181.    Wi-Fi is a wireless networking technology that uses radio waves to provide wireless high-speed Internet access through mobile devices, computers, printers, and other equipment. "Wi-Fi," in particular, refers to IEEE 802.11 standards that define the protocols that enable communications with current Wi-Fi-enabled wireless devices such as wireless routers and access points.

182.    Bluetooth is a wireless standard that allows smartphones to use shortwave radios to communicate with accessories like headphones and smartwatches. An industry- wide Bluetooth

standard specifies technological requirements to ensure that all Bluetooth devices can recognize and interact with each other. A typical Bluetooth signal has a range of about 30 feet.

183. Near Field Communication (NFC) allows smartphones to interact with NFC- enabled devices like a credit card terminal at a coffee shop. NFC relies on short- range wireless technologies, including radio signals, to communicate and share information. To operate, two NFC-enabled devices must typically be within four centimeters or less of one another.

184. Three device manufacturers, Apple, Samsung, and Google, account for approximately 94 percent of all smartphones by revenue in the United States. Apple and Samsung alone account for approximately 90 percent of all smartphone revenues in the United States.

185. Cloud-based technologies are run using hardware and software in remote computing centers ("the cloud") rather than by hardware and software on a smartphone. The user experiences the technology on the phone but the complex computing that generates the rich experience and that executes the user's commands happens in the cloud. Thus, cloud apps can deliver rich experiences on smartphones with less capable hardware than iPhones currently contain.

### C. Smartphone Operating Systems, Applications, and Other Software

186. In addition to hardware, smartphones include various software components that make a smartphone more attractive to users.

187. The most important software component is a smartphone's operating system, the foundational software that manages both the hardware and other software programs on the device. All iPhones are preloaded (bundled) with Apple's proprietary, exclusive iPhone operating system called iOS. The only other significant mobile operating system in the United States is Google's Android, which works with smartphones manufactured by Samsung, Google, Motorola, and smaller players. Software applications, known as "apps," are programs that perform specific tasks at the smartphone user's request, such as sending messages, playing music, or web browsing. Apps

depend on a smartphone's operating system to function. For example, to make a video call, apps must communicate with a smartphone's operating system to access various hardware components on the phone, such as the camera, microphone, and speaker. Apps communicate with a smartphone's operating system through application programming interfaces (APIs).

188. Apps that work with a particular smartphone operating system are called native apps. Thus, Apple's native iOS apps work with iPhone and native Android apps work with Android smartphones.

189. Most app developers do not view Android as a substitute for iOS or iOS as a substitute for Android. The overwhelming majority of users choose a single phone and do not "multi-home" by carrying an Android phone and the iPhone at the same time. Thus, a developer cannot reach iPhone users on Android or Android users on iPhones. Due to the lack of user multi-homing, most developers create native apps for both iOS and Android to reach the greatest number of smartphone users. For example, a food delivery or ride-sharing app cannot develop an app just for Android phones or just for the iPhone. Developing for both platforms is often necessary for developers to reach the scale they need to be viable.

190. It is also important to develop apps for the iPhone and other smartphone platforms because most apps are increasingly "social" in nature and require users on one platform to reach users on the other. For example, the developer of a dating app must enable its users on iPhones to meet users on Android and vice-versa. A money-sharing app must enable users on Android devices to send money to users on iPhones and vice versa.

191. App developers typically provide a similar user experience for native apps on iPhones and Android smartphones to minimize the resources and risks of maintaining different features across different smartphones. Even so, developers must program native apps to work with a specific

operating system and so they do not always interoperate or synchronize across different operating systems.

192.    Middleware is software that provides similar APIs and functionality across a diverse set of operating systems and devices. This allows developers to create cross-platform applications without having to write separate code for individual operating systems or devices because developers can rely on the APIs exposed by the middleware rather than APIs that only work on specific operating systems or devices. Apple has long understood how middleware can help promote competition and its myriad benefits, including increased innovation and output, by increasing scale and interoperability. As Apple's then-Senior Vice President of Software Engineering testified during the government's landmark monopolization case in *United States v. Microsoft*: "Because we have created QuickTime for both Windows and Macintosh computers, developers can write a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems." In the context of smartphones, examples of middleware include internet browsers, internet or cloud-based apps, super apps, and smartwatches, among other products and services. While not meeting the technical definition of middleware, certain other products and services may nonetheless have the same economic impact as middleware, such as eliminating the added expense of porting a product or experience across hardware or operating systems. For the purposes of this complaint middleware refers to both technical middleware and to products and services that, while not technically middleware, have the same economic effect.

### D.  Relevant Markets

193.    All smartphones compete against each other in a broad relevant market. But industry participants, including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to

compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a narrower submarket that excludes this tier. Regardless of how the market is drawn, however, Apple's conduct is unlawful.

### i. **Performance smartphones are a relevant product market**

194. Performance smartphones are a narrower relevant product market within the broader smartphone market. This narrower market includes those smartphones that compete with most iPhones and excludes the lowest-end smartphones, which industry participants sometimes refer to as "entry-level" smartphones.

195. Industry participants recognize performance smartphones as distinct and frequently group smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship."

196. Apple has also long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. Apple's own documents indicate it does not view entry-level smartphones as competing with the iPhone and other performance smartphones.

197. Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (e.g., plastic instead of metal and glass). They have lower-performance components such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

198. Consumers typically purchase performance smartphones under different terms than entry-level smartphones. Consumers generally use entry-level smartphones along with pre-paid service plans. By contrast, consumers usually purchase performance smartphones for use with post-paid

service plans that include promotional discounts to consumers who purchase performance smartphones.

199. Because of these differences, among others, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones.

200. Moreover, competition from non-performance smartphones is not sufficient today to prevent Apple from exercising monopoly power in the performance smartphone market.

### ii. Smartphones are a broader relevant product market

201. Smartphones are a relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer displays, less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

202. Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

203. Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

204. Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

### iii.   App Distribution Services ("App Stores") is a relevant market

205.   There exists a relevant market for US Smartphone App Distribution Services, which sell or otherwise provide apps for installation to users in the aforementioned US smartphone market. Hence it may be considered a related, downstream, or after market to the [Performance] Smartphone foremarkets, based upon a jury's *Brown Shoe* fact-finding.

206.   To benefit fully from their smartphone, owners install apps written by third-party developers, which provide added functionality. The apps may be work utilities such as word processors, banking tools, references like encyclopedias, games, home alarm systems, health monitoring systems, and so forth.

207.   Within this market, the Apple App Store handles over 80% of smartphone software sales and distribution as measured by profit. Alternatives to the App Store are Google Play, Microsoft Store, and some third-party jailbreaking products like Cydia. Additionally, developers like Plaintiffs can easily offer software distribution websites that would compete as an App Distribution Service, but for Notary Stamp requirements. Apps could even be emailed to consumers from developers, which would be a readily available form of distribution service in a non-constrained market.

208.   Traditional brick-and-mortar software stores were the primary App Distribution Service for All Historic Computing Platforms until the advent of the Smartphone. Brick-and-mortar stores could be a part of this relevant market, except Apple's notarization requirement disallows them. This market is plead for digital app stores, but a jury, engaged in *Brown Shoe* fact-finding, may take into consideration historical brick-and-mortar stores, and may conclude they are, or should be, a part of this market.

209.   An app distribution service (whether for smartphones, or all historic computing platforms) typically has a retail store front, and could have an institutional purchasing side that buys from software developers. In this sense, it could take on the role of publisher, akin to the book industry.

210. Typically, consumers do not pay for Smartphone App Distribution Services directly, it is a zero-priced service product where consumer's choice of service depends upon factors like quality of selection and convenience, rather than price. The App Store is installed free on all iPhone smartphone devices, and Google Play is installed free on all Android phones. Hence there is no traditional elasticity of demand for these service-products, because there is no price delta denominator. A jury may even find this is to be a single-brand downstream market, as they did in *Epic v. Google*. For initial pleading purposes, and because Apple holds an 80% share, it suffices to plead that the alleged relevant market is for all US smartphone app distribution services.

211. Competitors in this market earn profit by charging a commission on software sales or monetizing user attention, or potentially, payments from developers to promote their apps. An inefficiency in this market, i.e. where there was one monopoly seller of apps, or monopsonist buyer of institutional apps, could create a dangerous scenario where consumers pay supra-competitive rates (such as 30%) on a bottlenecked offering of software.

212. US Smartphone App Distribution Services importantly distribute free apps, which consumers use to carry out daily tasks of life. An inefficiency in this market could create a dangerous scenario whereby a monopolist/monopsonist could censor and control essential life tasks through restrictive conduct. Smartphone App Distribution Services may be referred to as "app stores," "software stores," "app distribution points," and "retail side of app market" for contextual clarity.

#### iv. There is a relevant Sherman market for US Smartphone Apps ("software")

213. To be useful to consumers, a smartphone must be able to run software applications, or "apps." The app market may be considered related and/or downstream to the US [performance] smartphone foremarket. Apps let users perform most of the functions associated with mobile

66

devices—tasks like navigation, web browsing, ordering groceries, playing games, and communicating through email and text messaging. A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), and SDKs ("software development kits") which app developers use to create apps that are compatible with the OS.

214. Apps may be free or have a non-zero price to consumers, but even a free app has a wholesale valuation. Analogously, every film has a price sold to a film studio. A made-for-TV show, free through ad sponsorship or unlimited streaming agreements, has a price paid to its creators by the TV network or streaming service. Likewise, an author is paid for book rights by a publishing house. Apps are thereby priced by either their cost to consumer, or their total net valuation paid to a creator-developer. Entities (apps) within the US Smartphone/Performance smartphone app market each have a work-product value – their total valuation as a creative product. A jury during *Brown Show* factfinding may focus on the consumer value of apps individually, which are free in this case, or the work-product value of the creation generally. Antitrust injury in this market, i.e. a censored or suppressed app, is measured as the lost value to the economy, and is equal to or greater than the app's inherent valuation. In other words, the antitrust injury for reduced output and selection of zero priced apps is a non-zero amount.

215. The vast majority of apps are free, such as Facebook, Instagram, Snapchat, Google Search, etc. Defining a relevant market for free apps has been a "challenge," according to an authoritative "*Antitrust and Big Tech*" report to the United States Congress (full report, incorporated herein by reference, available at https://sgp.fas.org/crs/misc/R45910.pdf). As the report explains:

> "[Antitrust experts] maintain that antitrust law has an important role to play in zero-price markets. Some of these commentators have argued that zero-price transactions are not in fact "free" to consumers, and that consumers ultimately "pay" for putatively "free" goods and services with both their attention and personal data. According to this line of argument, many of these consumers may actually be *overpaying*. That is, some observers have argued that certain "free" products and

services may have *negative* equilibrium prices under competitive conditions, meaning that firms in the relevant markets would *pay consumers* for their attention and the use of their data if faced with sufficiently robust competition.

Other commentators have argued that firms offering zero-price products and services can compete on a variety of nonprice dimensions such as quality and privacy, and that antitrust law can promote consumer welfare in zero-price markets by ensuring that companies engage in these types of nonprice competition. This argument appears to have persuaded regulators at the DOJ. In a February 2019 speech, Makan Delrahim—the head of the Justice Department's Antitrust Division—contended that antitrust law applies "in full" to zero-price markets because firms offering "free" products and services compete on a variety of dimensions other than price.

While many observers accordingly agree that zero-price markets are not categorically immune from antitrust scrutiny, the optimal approach to defining the scope of such markets remains open to debate.

Some commentators have argued that regulators should modify the SSNIP test to account for *quality-adjusted* prices, creating a new methodology called the "small but significant and non-transitory decrease in quality" (SSNDQ) test. According to these academics, decreases in the quality of "free" services (e.g., a decline in the privacy protections offered by a social network) are tantamount to increases in the quality-adjusted prices of those services. Under the SSNDQ test, then, a firm offering "free" goods or services would possess monopoly power if it had the ability to profitably raise its quality-adjusted prices significantly above competitive levels… The SSNIP test as traditionally administered is accordingly "inoperable" in a number of zero-price technology markets."

216.    Plaintiffs intend to present at jury trial SSNDQ tests from experts to demonstrate the metrics applicable to free apps under Sherman Act precedent. Alternatively, the "*Brown Shoe*" test may be inapplicable to free digital goods, requiring the Court to interpret the original language of the Sherman Act, and/or develop a "modified Brown Shoe" test. Plaintiffs will similarly prove the wholesale, "work-product" value of apps. Hence a jury will be informed of all possible valuation metrics with regard to the market for US Smartphone/Performance smartphone Apps.

217.    There is no direct symmetry in transactions or valuation between the demand and supply side of apps. Apple could, and indeed did, purchase a weather app for millions of dollars from a developer, but then distributed it for free. In short, an app has a work-product valuation by its author – often in excess of millions of dollars – and a demand price by consumers – often free, or a

68

small amount. Apple is the only merchant of record selling iOS apps to consumers – all App Store purchases show as "Apple Inc" on credit card receipts. As such, Plaintiffs allege apple is a monopsony purchaser of US smartphone apps, at least on the retail side.

218.   In sum, there is a relevant market for US smartphone/performance smartphone apps. The market is subject to bottleneck constraint, as Apple censors apps and reduces the available pool of creative projects. This creates substantial antitrust injury in the form of censorship, limited availability, and reduction on quality and competitiveness of apps to consumers, and in compensation to developers for their work-product.

### v.   There is a relevant Sherman market for iPhone Notary Stamps

219.   Due to hardware constraints implemented by Apple, software may only run on iPhones that has a "mark" of notarization approval by Apple. This is a digital product, essentially invented by Apple. No other significant computer platform in history required a notary stamp from the manufacturer to run software. Notary stamps are not an integral component of smartphone, performance smartphone, operating system, or All Historic Computing platforms. The notary stamp is the main mechanism whereby Apple censors and limits software distribution and choice, and creates an antitrust injury.

220.   Apple has, since about a year after the release of the iPhone, required notary stamps and charged developers and consumers for them, indirectly. The stamps are subsidized through Apple's $99 developer fee, and their 30% commission on app sales.

221.   Undersigned counsel first invoked the notary stamp theory in 2021. Notably, in 2024 it became apparent Apple was willing to engage in contempt of a US District Court, and the EU DMA, to fight for its ability to charge directly for notary stamps. This is evidenced by the fact that Apple's "malicious compliance" with the European Digital Markets Act turns on their direct charges to developers for notary stamps.

222.   Apple now charges European app developers annually for these developer stamps, essentially maintaining much censorship authority over consumer apps despite DMA intent otherwise. The EU has recently determined that Apple violated the DMA by charging the Core Technology Fee. Charging a CTF is only enforceable through notary stamps. In other words, if the iOS platform didn't have a "padlock" notary stamp requirement, EU developers wouldn't have to pay a CTF. Therefore, the CTF is evidence of present day direct charges for notary stamps in the EU markets, which replaces ongoing notary stamp charges like the $99 fee and 30% commissions other global markets.

223.   Similarly, Apple is presently in malicious compliance with an *Epic* order from the CAND District, whereby they charge developers for links to non-Apple payment systems. These charges, like the EU CTF, are only feasible and/or enforceable because of Apple's notary stamp padlock on iOS. Apple's malicious compliance with the *Epic* order therefore serves as evidence that Apple intends to charge, directly or indirectly, for notary stamps and/or notarization services.

224.   Charging for notary stamps is particularly pernicious conduct and has little historical basis. It would be akin to a TV requiring manufacturer approval to watch each film, after a consumer rightfully purchased the TV. Hence notary stamps controlling a dominant computing platform like iOS evoke "Big Brother" authoritarian connotations of censorship and control.

225.   To the extent the performance smartphone markets represent a platform, notary stamps are not an integral part of the platform, and are not exempt under *Microsoft* tying precedent. Notary stamps serve no practical purpose other than to extract supra-competitive rents for Apple, and therefore do not meet the criteria set by *Microsoft*. Moreover, like All Historic Computing Platforms, the consumer ultimately purchases a device. Tim Cook testified in *Epic* that Apple sells iPhone devices to consumers. Whether the platform amongst All Historic Computing Platforms is

Mac, Windows compatible PCs, Atari, Commodore, Android, or iPhone – it is clear the consumer purchases primarily the device.

226. This is evidenced by the fact that consumers often look to run alternate operating systems on their devices. For example, on Mac, many users run Windows or Linux operating systems. Android users would run iOS, if permitted, and iOS users would run Android, or even Mac, if permitted. A consumer purchases a smartphone platform compatible device, and an associated bundling of the operating system. The device itself is the independent purchase, and notary stamps are not a component under any definition.

227. In the context of the smartphone connected internet, notary stamps are not high technology. They are analogous to a turnstile entrance at a circus fair, a toll booth, a governor on a performance racing car, or a padlock on a VCR. Not only are they not high technology, they do not represent integral functionality of a computing device or an operating system. To wit, they are the opposite: reduced functionality and reduced value of the host device.

228. The citizens of our country have invested around a trillion dollars in the iPhone "network effect" which forms an essential part of daily life and commerce. Vast functionality in this network effect is possible, given its inherent, combined computing power and communications. Unfortunately, the executor of these network computations and communications – the app – is subject to an availability bottleneck. Apple must issue a "notarization" or digital encryption signature, in order for an app to launch and access this network. Apple is the sole producer of these notarization stamps. A citizen trying to use an app made by a developer is unable to do so without a notarization stamp from Apple. Apple issues these stamps to developers and ultimately end-users using the App Store Connect developer portal, which has a $99 annual fee to each developer. Additionally, Apple requires the developer to sign a contract of adhesion – the DPLA – granting Apple purported full discretion as to whether or not to issue the stamps.

71

229. Notarization requirements allow Apple to extract supracompetitive profits for userbase access rights to iPhone users. Apple charges developers like Plaintiffs and class members $99 for these partial, limited access rights. The nearest competitor, Android, charges $29 annually for rights, and offers a free bypass sideloading way for developers to reach their audience.

230. This itself is indicative of anticompetitive restraint in the market, as pointed out by the Subcommittee House Report. There is simply no way for a developer to directly access the Smartphone userbase. A developer who foregoes Apple misses out on 65% the market – and 80% of 'app spending' capability. Dr. Roberts' app wouldn't have been scientifically valid, if it only accessed half the country's smartphone users. Other Plaintiffs would not, and did not, achieve critical mass for app success.

vi. **The United States is a relevant geographic market for performance smartphones and smartphones and downstream markets**

231. The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the United States demand services offered by U.S. retailers when they purchase a smartphone. For example, consumers who purchase a smartphone from their mobile carrier can get assistance with activating their new device, setting it up, and transferring important content like apps, messages, photos, and video to their new smartphone. A smartphone purchased abroad for use in the United States might be incompatible with the consumer's domestic carrier, may not have the necessary radio technology to take advantage of the carrier's highest speed connections, the carrier might not be able to offer support during setup or subsequently, or the phone's warranty may be invalid.

232. Consumers must also purchase smartphones through a U.S. retailer if they want to take advantage of valuable promotions offered by their mobile carrier. These same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries.

233.    Finally, potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

234.    Consumers in the United States could not avoid or defeat an increase in the price of performance smartphones or smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China than they do in the United States due to less competition.

235.    The United States is a relevant geographic market for US Smartphone App Distribution Services.  The apps available, and desirable, to consumers vary on a country-by-country basis. For instance, app stores frequently have country-specific "storefronts," and U.S. consumers cannot access the storefront available to users in another country. Apple also sets certain app distribution and payment requirements for developers on a country-by-country basis, including in-app sales currency and price range requirements. Legal restrictions on apps vary by country. In this light, and due to language and cultural differences, and regulatory requirements, App distribution services available in other countries are not reasonable substitutes for app distribution services in the United States.

73

236.    The United States is a relevant geographic market for Smartphone Apps. The apps available, and desirable, to consumers vary on a country-by-country basis. Apps are made in different languages and cultural norms to appeal to different countries. Some apps are restricted or illegal in certain countries. Localization, such as currency and time and date formatting, vary by country. A US developer may not want divert limited resources and budget to making an app work in every country, and as a solution, typically will write their app in American English, intended for a United States audience. The developer may value their app solely on the expected revenue to be obtained from US based consumers.

237.    As discussed above, Apple sells notary stamps directly in the European Union as a CTF. The exact digital form of notary stamps, and pricing and distribution thereof, varies by legal jurisdiction. An appropriate notary stamp relevant market is the United States, as antitrust enforcement varies by country, and Apple's ability to charge for notary stamps largely depends upon such statutory law implementation.

### E. Apple has monopoly power in the smartphone and performance smartphone markets

238.    Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

239.    In the U.S. market for performance smartphones, where Apple views itself as competing, Apple estimates its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones—including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones— Apple's share is more than 65 percent by revenue. Similarly, even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones—especially performance smartphones that run sophisticated apps.

240.    Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

241.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smartphones. This barrier is increasingly impenetrable. Nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. At least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter

by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

242.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service. Because most smartphones are bought through mobile carriers including Verizon, which has its operations headquarters in the NJ district, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

243.    Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, APIs, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the "stickiness" of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

244.    Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. Past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

245.    Apple's monopoly power is separately demonstrated by direct indicia. For example, Apple can and does profitably forego innovation without fear of losing customers to competitors. For example, Apple's vice president of iPhone marketing explained in February 2020: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."

246.    Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers—as much as 30 percent when users

purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1 billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau suggest these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

247. Apple increasingly charges developers additional fees to promote their apps in the App Store as well. In fact, this is one of the fastest-growing parts of Apple's services business, with revenue "increasing by more than a third to $4.4B in FY 2022."

248. These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

## X. Jurisdiction and Venue

249. Jurisdiction in this Court arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 15 U.S.C. § 26 (Clayton Antitrust Act). Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because the parties reside in different districts and the amount in controversy exceeds $75,000. This Court has subject matter jurisdiction, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332 (d), because the proposed class of up to twenty million Apple developers exceeds 100 members, the amount in controversy exceeds $5,000,000, and at least one member of the class of plaintiffs is a citizen of a state different from Defendant Apple Inc., a California corporation.

250. Venue in the Wyoming District is proper under 15 U.S.C. § 22, which states that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business. Apple transacts business in Wyoming. Plaintiffs CRC and Calid are Wyoming Corporations. GFVC is an investor and/or benefactor with ongoing pecuniary interests in Wyoming

corporations including CRC and Calid. Apple's developer agreement contains a forum selection clause assigning venue to California Northern District. This Complaint submits that the forum selection clause violates the intent of Sherman Act and constitutes a contract of adhesion.

### XI.    Putative Class Definitions

251.    Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

252.    Plaintiffs bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *All U.S. Smartphone developers of any free app (zero-priced) that suffered economic losses through disallowance, censorship, and/or ranking suppression on the App Store.*

253.    Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

254.    Plaintiffs also bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *Any US [Performance] Smartphone developer who paid a $99 annual subscription fee to Apple for access to its userbase and/or app "notarization."*

255.    Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

256.    **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but upon information and belief, supported by Apple's

past statements, the classes will consist of approximately two million iPhone developers, and therefore individual joinder in this case is impracticable.

257. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Whether there is a U.S. market for [performance] smartphones; whether there is a U.S. market for apps and app distribution services; c. whether there is a U.S. market for iPhone notary stamps, d) Whether Apple has unlawfully monopolized, or attempted to monopolize, the above markets, including by way of the contractual terms, policies, practices, mandates, and restraints described herein; d. Whether competition in these markets has been restrained and harmed by Apple's monopolization, or attempted monopolization, of each market; e. Alternatively, whether Apple has behaved as a monopsonist, or attempted monopsonist, in the wholesale app markets; f. Whether plaintiffs and members of the proposed classes are entitled to declaratory or injunctive relief to halt Apple's unlawful practices, and to their attorney fees, costs, and expenses; g. Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiffs and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

258. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Apple's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

259. **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel able to engage, and experienced

with, complex litigation. Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members he seeks to represent.

260. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of Plaintiffs' proposed classes would prevent these undesirable outcomes.

261. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Apple has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

262. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

# XII.    Violations Alleged

## A.  First Claim for Relief: Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2

263.    Plaintiffs restates, re-alleges, and incorporates by reference each of the allegations set forth in the prior sections of this Complaint as if fully set forth herein.

264.    Performance smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

265.    Apple has willfully monopolized the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

266.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

267.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts as described herein have had harmful effects and incurred damages on competition, consumers, and developers including Plaintiffs and class members.

268. Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

### B. Second Claim for Relief, in the Alternative: Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2

269. Plaintiffs incorporate the allegations of the prior sections as if set forth fully herein.

270. Performance smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

271. Apple has attempted to monopolize the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

272. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

273. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts as described herein have had harmful effects and incurred damages on competition, consumers, and developers including Plaintiffs and class members.

274.    In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the performance smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the performance smartphone market in the United States, in violation of Section 2 of the Sherman Act.

## C. Third Claim for Relief: Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2

275.    Plaintiffs incorporate the allegations of the prior sections as if set forth fully herein.

276.    Smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

277.    Apple has willfully monopolized the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

278.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

279.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts as described herein have had harmful effects and incurred damages on competition, consumers, and developers including Plaintiffs and class members.

280.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

**D. Fourth Claim for Relief, in the Alternative: Attempted Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2**

281.    Plaintiffs incorporate the allegations of the prior sections as if set forth fully herein.

282.    Smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

283.    Apple has attempted to monopolize the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

284.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

285.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts as described herein have had harmful effects and incurred damages on competition, consumers, and developers including Plaintiffs and class members.

286. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the smartphone market in the United States, in violation of Section 2 of the Sherman Act.

### E. Fifth Claim for Relief: Illegal Tying Between [Performance] Smartphones/iPhone Devices and Notary Stamps / App Stores

287. Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the prior sections of this Complaint as if fully set forth herein.

288. Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".15 U.S.C. § 1.

289. Through its End User Agreement with iPhone users, hardware constraints, and its kernel notarization requirements, Apple has unlawfully created a tie from the iPhone performance smartphone to the App Store distribution service and/or digital Notary Stamps.

290. Apple has sufficient economic power in the tying market, the US Smartphone and/or Performance smartphone market, because its iPhone holds at least 65% of this market. Moreover, the iPhone device user often is locked in to their device, or has substantial barriers to exit. As such, the user has no choice but to accept the App Store offerings (Apple's curated apps, favoring their own competing products) and Notary Stamp requirement which are mandated by the EULA and DPLA. Apple's forced agreement with DPLA signatories (developers) constitutes a bilateral agreement, limiting both consumers and developers proper fair use of the iPhone [performance] smartphone.

291. Apple is able to unlawfully condition access to the iPhone device to the use of a second product—App Store app distribution service. Through its End User License Agreement and

unlawful policies like DPLA, Apple expressly conditions the use of its devices on its "walled garden" app store marketplace – which is subject to severe bottleneck constraints on developer work-product availability and selection. This amounts to a *per se* unlawful tying arrangement, pernicious conduct under *Northern Pacific*, and a dangerously inefficient one that denies users the benefit of the network they invested in.

292.   The tying product, Apple's iPhone U.S. smartphone/performance smartphone device, is distinct from the tied product, Apple's App Store. App developers such as Plaintiffs have apps, and effectively their own "app store" that would be trivial to launch on their website, but for Apple's EULA/DPLA based notarization requirements. End users are coerced into using the App Store, harming consumers developers.

293.   Developers similarly could email apps to their customers, in addition to allowing them to be installed from a website. Apple prevents developers and other entities from offering such competing app distribution services, by disallowing all valid distribution channels other than the App Store. This restriction to a single app store is not a feature of any device or platform, rather, it is an exclusionary anticompetitive technique meant to collect fees, rather than advance the primary purpose of a consumer iPhone purchase – to run apps.

294.   Apple's unlawful tying arrangement thus ties separate products that are in separate markets and coerces Plaintiffs and third-party end users to rely on both of Apple's products. The tying to a device (iPhone) in the performance smartphone foremarket is not immune to *per se* rules subsequent to *Microsoft* because the tying product is not a software platform, it is a hardware device. In the words of Tim Cook, "Apple sells devices."

295.   Secondly, Apple is able to unlawfully condition access to iPhone smartphone/performance smartphone device to the use of a second product—notary stamps. Through its algorithmic control of the iOS kernel and tightly linked hardware constraints, the end user is contractually and

87
ER 446

algorithmically bound to use apps with Notary Stamps. Censored developers are unable to purchase or obtain them, to the tune of 40,000 denials per week. This amounts to a *per se* unlawful tying arrangement, and a dangerously inefficient one that denies users the choice and selection of diverse apps. Neither the iPhone device nor the notary stamp qualify as "software platforms" under *Microsoft.*

296. The notary stamp requirement as implemented in iOS is a crude turnstile meant to collect fees for Apple, meanwhile disabling key functionality of the performance smartphone. It serves no pro-competitive purpose. Consumers purchasing smartphones, like consumers of All Historic Computing Devices, do not wish to pay for such a turnstile, toll booth, padlock, governor, and so forth.

297. The tying product, Apple's iPhone performance smartphone device, is distinct from the tied product, notary stamps, because such a 'permission ticket' to launch an app is separate and distinct from a smartphone, which in this case, is derived from a Mac OS computing platform. Apple's unlawful tying arrangement thus ties two separate products that are in separate markets and coerces Plaintiffs and third-party end users to rely on both of Apple's products. Apple created an artificial demand for notary stamps by implementing kernel algorithms backed by the purported authority of DPLA & EULA.

298. Apple's conduct has downstream and collateral effects that foreclosed, and continues to foreclose, competition in the US Smartphone App market affecting a staggering volume of commerce in these markets.

299. No other major computing platform in history required use of a single software store, administrated by the computer hardware manufacturer. Similarly, no major computing platform required notary stamps issued by the hardware manufacturer, for permission to run software and

lifetime manufacturer earnings on software purchases. This tying is egregious and pernicious and unprecedented in All Historic Computing Platforms.

300.     Apple has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Apple's conduct or its purported justifications.

301.     In the alternative only, even if Apple's conduct does not constitute a *per se* illegal tie, an analysis of Apple's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal by coercing end-users into using its App Store and notary stamps.

302.     Apple's conduct harms those Plaintiffs and class members which, as a direct result of Apple's conduct, including censorship and anti-competitive controls, harm their ability to efficiently distribute their apps and be compensated fairly for their creative work product. Censored developers cannot distribute their work-product to consumers.

303.     The U.S. Supreme Court has held that "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of demand for the two items." Thus, the most important factor in determining whether two distinct products are being tied together is whether customers want to purchase the products separately. If customers are not interested in purchasing the products separately, there is little risk the tie could foreclose any separate sales of the products. Here, all tied products meet the SCOTUS requirement for consumer interest. Clearly, consumers are interested in purchasing apps separately from smartphones/performance smartphones. Consumers also want permission to run these apps (notary stamps), and fought for "jailbreaking rights" to the US Copyright Office in 2010, which was granted.

304. A party seeking to defend such a *per se* tying arrangement on the basis of competitive justifications bears a heavy burden of proof; the defense is difficult to establish and has been successful only under limited circumstances.

305. Apple's tying arrangement additionally violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2 (see Above Counts). Apple holds monopoly power in the US Performance smartphone Markets. It uses this power to obtain and achieve monopoly power in the US App Distribution Services, where it holds 80% share of revenue. By tying these two distinct markets, Apple is able to leverage and reinforce both monopolies. Similarly, it leverages the [performance] smartphone monopoly to implement an unnecessary single-brand notary stamp market.

## F. Sixth Claim for Relief: Supra-competitive $99 Fee Class Action Recovery Fund

306. Plaintiffs repeat and re-allege each and every allegation of the preceding sections as if fully stated under this count.

307. Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".15 U.S.C. § 1.

308. Through its DPLA agreement, Apple requires developers pay $99 annually for access notary stamps, app store distribution, and generally, access to the iPhone smartphone/performance smartphone userbase. This contract of adhesion forces developers into consenting to this bilateral arrangement, because Apple holds monopoly control over [performance] smartphone users and their inherent ability to install and download software.

309.    This conduct therefore has detrimental impacts on the US Smartphone App relevant market. Specifically, charging this supra-competitive fee dissuades and hinders developers from producing apps, and therefore reduces the quality, selection and overall competitive health of the US Smartphone App market.

310.    Apple's conduct additionally violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2 (see Above Counts). Apple holds monopoly power in the market for US Smartphones, and downstream App Stores. Apple's requirement that developers pay $99 to access the App Store reinforces and leverages their monopolies in the smartphone, performance smartphone, and app distribution services market.

311.    Apple unlawfully restrains trade and maintains its monopoly powers in the relevant markets, by issuing an illegal demand of money from 20 million aspiring developers. Apple extracts $99 each year from any aspiring developer – many being college students or recent, indebted graduates – if they wish to access the App Store access the userbase of the US Smartphone Market.

312.    The Congressional Subcommittee refers to this as an illegal tax that amounted to nearly $20 billion over the last ten years. The Subcommittee states that the $99 fee is nowhere near Apple's actual cost to notarize and run the software platforms. (See p.340-359 in Subcommittee Report).

313.    When iPhone was first introduced, Steve Jobs promised to charge developers just enough to cover Apple's costs. Unfortunately this evolved into one of the largest illegal taxes in history. By way of comparison, Google charges $25 to developers to join their program, and this is optional. Any developer may write an Android app and sell it or email it to a consumer for sideloading, without Google's permission.

314.    Not only are Apple's developer fees an illegal tax exceeding $1000 for each of these developers over their career, but they heavily impede interstate commerce. A developer who does

91
ER 450

not pay this tax, perhaps because they cannot afford it, will not produce apps. App output is restricted unless one assumes that 100% of developers can afford to pay this tax without consequence to their productivity. Clearly such an assumption is not reasonable. Hence, interstate commerce of valuable digital assets – smartphone apps— is severely restricted by this illegal demand. The illegal demand to 20 million developers – nearly every computer programmer on the planet – is used to fund the growth of Apple's monopoly, and must be enjoined by this Court, as mandated by the Sherman Act. The intent and wishes of Steve Jobs must be upheld.

## G. Seventh Claim for Relief: *Aspen Skiing Co. v. Aspen Highlands* Exclusionary Conduct

315. Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the prior sections of this Complaint as if fully set forth herein.

316. *Aspen Skiing Co. V. Aspen Highlands Skiing Corp.* (472 U.S. 585, 1985) unequivocally broadens the examination of monopolistic behavior beyond the boundaries of market definition into the realm of exclusionary conduct. The Supreme Court has provided vital precedent, recognizing that a monopolist's refusal to deal with competitors, absent a credible efficiency rationale, can constitute a standalone concern under the purview of antitrust enforcement. The operative conduct under scrutiny is exclusion of rivals, not the defendant's power within a strictly defined market.

317. The record demonstrates that *Coronavirus Reporter* was a competing app to Apple's own Covid-19 SDK applications. Plaintiffs present allegations that mirror the factual antecedents of *Aspen Skiing*—articulating a pattern of exclusionary actions directed against competitors by Apple which bore no relation to efficiency or consumer benefit, instead stifling innovation, competition, and market accessibility. This conduct, tantamount to the exclusionary practices in *Aspen Skiing*, where the Supreme Court found monopoly leveraging absent a detailed market analysis, calls for substance over strict formality in identifying antitrust violations.

318.    To save lives, CRC needed to utilize GPS and other systems not readily available on websites. Apple excluded Covid-19 app rivals, in order to build their own brand goodwill and strategic partnerships. As the DOJ Complaint alleges, Apple's conduct routinely sacrifices short-term profits to build out their long-term smartphone monopoly. COVID tracking apps are a significant part of the broader US Smartphone Apps relevant market described above. In fact, one recently filed Class Action lawsuit in the DC District alleges that COVID-19 tracking startup apps constitute their own relevant sub-market. The DC case includes Coronavirus Reporter Corporation in its putative class definitions.

319.    Damages accrued to Plaintiffs and class members when Apple sacrificed short-term gains from distribution of Plaintiffs competing apps, COVID or otherwise, to achieve a long-term strategic advantage on their own competing apps, such as Facetime and their COVID tracking software, and the [performance] smartphone monopoly, generally. This is directly analogous to *Aspen*, because developers were excluded from the App Store facilities for strategic reasons. Developers who signed the DPLA had a pre-existing business relationship with Apple.

320.    Sherman Act essential facilities doctrine is a similar but distinct theory from *Aspen's* exclusionary conduct doctrine. Most essential facility cases considered by district courts during the past decade rely on the four-prong test enunciated in *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891 (1983), a case challenging AT&T's use of local telephone networks to thwart competition in the long distance telephone service market. There, the court held that "to establish liability under the essential facilities doctrine [a plaintiff must show]: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1132-33."

321.    Apple's conduct violates all four elements of the *MCI* test.

322.    Apple competes with developers in the US smartphone/performance smartphone app market, as well as the US smartphone/performance smartphone app distribution services market. It is also a monopolist/monopsonist US smartphone app distribution services market.

323.    Apple controls an essential facility necessary to compete in these markets. Apple controls its smartphone userbase through notarization and digital signature requirements, and restriction of sideloading software. A developer is unable compete in the US smartphone app market, without these notary stamps and sideloading utilities. Apple restricts the entire US App market (both sides, institutional and retail distribution) by excluding developers from these two technologies. Notary stamps and sideloading utilities are therefore essential facilities under Apple's control.

324.    Apple engages in exclusionary behavior that denies essential facilities to Plaintiffs and other app developers. Apple routinely denies notary stamps to developers, as it did with Plaintiffs. Contractually, it denies access to the iOS userbase through restrictive DPLA App Store policies.

325.    Because Apple has its own apps in the US smartphone app market, by definition Apple excludes competitors. Apple does so by leveraging its control over the App Store, performance smartphone device, and operating system.

326.    App developers are unable to reasonably or practically duplicate the entire infrastructure for the notary stamps. Notary stamps cannot be reproduced because they contain encryption codes. Despite using advanced encryption, the notary stamps amount to nothing more than a money collecting device, akin to a turnstile, meant to charge perpetual fees to the public. Apple's exclusionary practices, blocking programmers from accessing a network of billions of computers paid for by their owners, is truly unprecedented.

327. In fact, providing tools to openly access a computing platform userbase is exactly what Apple has done for forty years with the Mac product ecosystem, a respected and successful computing platform that laid the foundation for iOS.

328. Apple's denial of access to iOS users and networks has no legitimate business purpose, and serves only to assist Apple in maintaining its unlawful monopoly position in the increasingly critically important app market.

329. Apple's conduct affects a substantial volume of interstate as well as foreign commerce. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

330. As an app developer, Plaintiffs and class members have been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction terminates Apple's anti-competitive conduct.

331. Apple's exclusionary behavior blocked an entire class of COVID-19 tracking startups, a subset of the US smartphone apps market, from contributing to a public health emergency. Lives were likely lost, and Apple's behavior must now be dealt with by the Court to prevent a worse tragedy from occurring in the future. To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## H. Eighth Claim for Relief: Ranking Manipulation

332. Plaintiffs repeat and re-allege each and every allegation contained herein as if fully stated under this count.

333.    Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".15 U.S.C. § 1.

334.    In the relevant market of U.S. Smartphone Apps, Apple unlawfully restricts trade, through app ranking manipulation and/or suppression. When an app isn't listed in a critical directory, such as the App Store rankings, or is ranked below where it should fairly be, fewer customers can discover the app. This results in customers defaulting to bundled apps, i.e. Apple's preinstalled apps, or to Apple's (and strategic partners) other apps given self-preferential treatment in the App Store rankings. By leveraging its market power or monopoly in the smartphone market, and requiring customers to use the App Store rankings, Apple is able to restrain trade downstream, in the smartphone app market.

335.    By not listing an App correctly on the app store, i.e. censoring, downranking, or suppressing it, the consumers simply cannot find developers through their preferred means of search (App Store). When a business isn't listed under the correct keywords, or any keywords, on the primary directory of all iOS apps, interstate commerce is restricted. Transparent information enables efficient commerce; the App Store is the opposite, and results in substantial quantities of inefficient app installs.

336.    Apple's "zero-sum game" defense is specifically disputed, which claims that downranking one app leads to the up-ranking of another, and therefore no restraint of trade occurs in suppressing individual apps. This is because app rankings are not a perfectly efficient equilibrium. Consumer behavior tends to select the first few apps in a list, and ignores the lower ones. Hence when Apple consistently ranks its own products, and its partners, higher in app lists, there is a net detriment to lower ranked apps that may be better quality. Alternatively, the purported zero-sum equilibrium of app ranking requires specialized analysis by game-theory experts during discovery.

337.    Apple's conduct likewise violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2. Apple leverages its monopolies in the US Smartphone/Performance smartphone markets, and US app distribution services markets to self-preference their own apps and strategic partners, like TikTok over WebCaller, and protect all of their monopolized interests. Apple's conduct in self-preferential App Store rankings restricts interstate trade in these critical markets and must be enjoined by this Honorable Court.

## I.    Ninth Claim for Relief: Violation of Wyoming Consumer Protection Act and California Unfair Competition Law

338.    Plaintiffs repeat and re-allege each and every allegation contained herein as if fully stated under this count. Wyoming Consumer Protection Act ("WCPA") and California Unfair Competition Law ("UCL") are hereby referred to collectively as "State Competition Laws."

339.    Apple violates State Competition Laws by engaging in Unlawful, Unfair, and or Deceptive Conduct. Apple's unlawful acts violate Sherman Act, and include imposing contractual restrictions, fees, and taxes on app creation and distribution that stifle competition and innovation. Specifically, Apple has:

•    Controlled App Creation and Distribution: Apple exercises its control over app creation and distribution to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that prevent developers from creating apps that could threaten Apple's dominance. This conduct stifles innovation and limits consumer choice.

•    Extracted Monopoly Rents: Apple extracts significant fees from developers, including excessive commission on app sales and other fees are designed to benefit Apple's bottom line by maintaining its monopoly power rather than enhancing consumer welfare.

• Maintained Exclusive Control Over APIs: Apple restricts access to APIs necessary for app functionality, limiting the ability of developers to create competitive apps that offer similar or superior functionality to Apple's own apps.

340. Apple's CTF practices are similarly unlawful as they contravene the legal rules set out in the European Union's Digital Markets Act (DMA), which aims to ensure fair competition and prevent gatekeepers from abusing their market position. Although the DMA is European legislation, its principles reflect global standards for fair competition, and non-compliance affects US-based developers who wish to distribute apps in Europe, including Greenflight and CRC.

341. Apple's business practices are unfair because they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers and developers. The unfair practices notably include Censorship of Apps. Apple's practice of censoring apps from independent developers and scientists during critical times, such as the COVID-19 pandemic, demonstrates a clear violation of fair business practices. Apple's decision to exclude certain apps from the App Store, while allowing similar apps from large institutions, is a significant restraint on trade and innovation. Apple's own research proved that COVID-19 tracking apps saved lives. By delaying the first mover, CRC, by several months, Apple's conduct cost lives. Similarly, ongoing reduction in the quality of COVID-19 tracking startups, and subsequent versions by CRC, cost lives. That is inherently unfair conduct under the State Competition Laws.

342. Left unchecked, Apple's conduct inevitably will censor essential future discoveries by independent scientists. What if a leading independent researcher wrote an app to ascertain environmental risks of microwave radiation (i.e. 5G)? Or potential harm to marine and aviary life from a new technology? We already know the answer – Apple will censor the apps if they feel threatened, even at the cost of human lives and environmental stewardship. This is not just a case

98
ER 457

about COVID-19: it is a case against allowing one actor – the largest monopoly in history – to restrict the important works of independent scientists, petitioners, writers, and thinkers.

343. Apple's argument to the Ninth Circuit that "censorship is not an antitrust injury" is hereby contested as declaration of unfair business practices. Even if censorship does not constitute a direct antitrust injury under the Sherman Act, it undeniably constitutes unfair conduct under the UCL and WCPA. By arbitrarily censoring apps like Coronavirus Reporter and downranking apps like WebCaller, Apple has chilled the free expression of app developers, particularly disadvantaging smaller developers and harming public welfare. Apple surely recognizes this inherent unfairness: they based their first 1984 Mac ad on such a Big Brother concept.

344. Apple engages in preferential treatment when it supports certain apps, like TikTok, while suppressing others like WebCaller. This selective support distorts the competitive landscape and deprives consumers of the benefits of a diverse and competitive market. The manipulation of App Store rankings, to favor strategic partners over independent developers, exemplifies this unfair conduct. Developers of cross-platform video apps would not invest in costly programming efforts, if they knew the scales were usually tipped in favor of partners like TikTok.

345. The unfair practices of Apple extend to all fifty states, including harm to consumers and developers in Wyoming and California. Apple has management in California, North Carolina, Texas, and London. Senior level decisions stemming from its headquarters in California have significant impacts on US-based developers including Plaintiffs and class members. Decisions made at Apple's California headquarters determine compliance with DMA, Sherman Act, and additionally the accessibility and visibility of apps on a national and international scale, demonstrating a direct link to unfair competition practices within the state of California. Extraterritorial enforcement of UCL is therefore appropriate, similar to the DOJ's State Competition Laws being adjudicated in New Jersey District.

346.    Apple's requirement for app notarization effectively curtails the network effect of its platform. By requiring Apple's permission to run any app on its devices, Apple imposes an unfair barrier to entry for developers, and unfair situation for the consumers who pay for their devices. This practice can be likened to requiring a VCR or CD player to obtain approval from Sony for every film or music album played, which is fundamentally unfair and not what consumers expect when purchasing a product. Consumers who purchase iPhones should be permitted to access a wide variety of apps, with the understanding that Apple will not censor their choices.

347.    Apple's actions are also *de facto* fraudulent under the WCPA and UCL because they are likely to deceive developers and consumers and/or incur unjust enrichment from their work products. Apple's representations about the App Review submission process being a fair and neutral venue are false and misleading. Consumers believe they have a competitive selection of apps, but are defrauded in cases such as TikTok, where better video communication tools may have existed, but for Apple's anticompetitive conduct. As explained earlier, when consumers suffer from such conduct, developers also are harmed. Apple falsely represents that the App Store is a neutral platform that provides honest and fair opportunities in ranking and distribution for all developers. In reality, Apple uses its control over app distribution to favor its own apps and those of its strategic partners, deceiving developers and consumers about the true nature of the App Store. For example, apps like TikTok are given preferential assistance "navigating" the app store and are approved and ranked favorably to compensate partners, in this case, the Chinese government.

348.    Apple engages in the practice of "Sherlocking," where it reviews and appropriates ideas from developers' app submissions for its own benefit. Apple's ability to review and analyze bulk submissions, learn from them, and then integrate these ideas into its own products without compensation to the original developers is fundamentally unfair. This practice amounts to systemic fraud or unjust enrichment. Apple does not disclose how it uses app submissions to inform its own

product development, does not compensate developers who materially contribute to Apple projects without their consent, and therefore deceives developers who trust the platform to protect their intellectual property.

349. The end result is that Apple charges developers $99 each year to Sherlock their ideas, censor them, then fund or otherwise assist competitors such as TikTok. That is inherently unfair, and/or fraudulent, as no reasonable person would voluntarily choose to pay this fee. They would find another app distribution point, but that doesn't exist. This is a monopoly situation where developers, including creative professionals, scientists, authors and painters, must appease a monopoly to distribute their creative work-product. That is inherently unfair and deceptive.

350. Developers who actually protested such conduct, such as *Epic* and Plaintiffs, were routinely met with retaliatory actions by Apple. Discovery is necessary to reveal the full extent of how the largest monopoly in history endeavored to dissuade Sherman Act enforcement actions such as this case. Apple's lobbying efforts alone for the Open App Markets Act were estimated around $100 million. Unlike lobbying, direct retaliation against antitrust advocates represents potential violation of 18 USC §1512, and therefore is illegal conduct under the definitions of WCPA and UCL.

351. Plaintiffs and class members all incurred damages from such conduct, and seek relief under the WCPA and UCL including an order enjoining Apple from continuing its unlawful, unfair, and fraudulent business practices, including but not limited to its restrictive app creation and distribution policies, API restrictions, and manipulation of App Store rankings. Restitution to Plaintiffs and other affected developers for the fees and commissions extracted by Apple through its anticompetitive practices is hereby sought. The $99 Annual Fee is specifically subject to restitution as an improper charge.

352. Under Wyoming Law 40-12-105(a)(xv), "A person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer

transaction, he knowingly Engages in unfair or deceptive acts or practices." Under Wyoming 40-12-108(b), a class action remedy is permitted for damages suffered by consumers as a result of such unlawful deceptive trade practice. Plaintiffs seek actual damages for the deceptive practices employed by Apple, including the $99 developer fee that was unfairly charged, as well as losses from Sherlocking and ranking manipulation.

353.    Case law supports a broad interpretation of consumer protection statutes to include any party engaging in a transaction covered by the statute. The principles established in *Federal Trade Commission v. Sperry & Hutchinson Co.* highlight that consumer protection laws are designed to prevent unfair practices in their incipiency, thereby offering broad remedies (405 U.S. 233, 239 (1972)). Under Wyo. Stat. § 40-12-105(a), the WCPA aims to prevent deceptive and unfair business practices, which aligns with the broader goals of consumer protection statutes. This is crucial when addressing anticompetitive practices that harm both developers and consumers. While developers are primarily commercial entities, they engage in transactions with Apple that have significant consumer implications, particularly when these practices reduce market competition and innovation, thereby impacting end consumers. By way of clarification, developers are consumers of Apple's notarization fee products pursuant to 40-12-108(a), and subject to unfair practices directly affecting consumer transactions, pursuant to 40-12-102(a)(ii).

354.    Wyoming Consumer Protection Act (WCPA) mandates a two-year statute of limitations following the unfair or anticompetitive transaction.  By seeking restitution under California's UCL and damages under Wyoming's Consumer Protection Act, Plaintiffs request relief to the fullest extent allowable under either jurisdiction's laws.

## XIII.    Request for Relief

WHEREFORE, to remedy these illegal acts The Plaintiffs and class members respectfully request that this Honorable Court:

A.  Certify this case as a developer class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all developers of apps that were censored, disallowed or subject to ranking manipulation, or subject to excessive $99 DPLA/notarization fees between today's filing date and four years prior.

B.  Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.  Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the performance smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.  Enjoin Apple from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

   a.  preventing Apple from using its control of app distribution to undermine cross-platform technologies such as super apps, cloud streaming apps, and COVID-19 tracking apps, among others;

   b.  preventing Apple from using private APIs to undermine cross-platform technologies like WebRTC Apps, messaging, smartwatches, and digital wallets, among others; and

    c.  preventing Apple from using the terms and conditions of its contracts with developers, accessory makers, consumers, or others to obtain, maintain, extend, or entrench a monopoly.

Issue a permanent injunction restraining Defendant from requiring notary stamps to launch iPhone applications, and from charging $99 annual developer fees to subsidize notary stamp techniques; and any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Apple's unlawful conduct;

E.  Order treble damages compensating the Class Members through a "Developer Compensation Fund" based on developer submission of damages computed by project expenditures, dedicated person-hours, and other metrics, estimated in the billions[1] USD; and to Lead Plaintiffs:

    a.  Plaintiff Coronavirus Reporter Corporation, the first-mover in the COVID tracking sector, suffered losses of no less than $200 million in goodwill, sponsorships, costs and charges for its version 1.0 through 3.0 apps, intended for launch in 2020, 2021 and 2022 respectively.

    b.  Plaintiff CALID Inc., suffered platform losses in brand goodwill, revenues, operating costs and charges. The "WebCaller" application it managed on behalf of developer and investor Greenflight was Sherlocked by Apple to create FaceTime 15, suffering losses greater than $4 billion USD.

---

[1] By creating an inefficient bottleneck on the entire US smartphone app market, Apple put itself in a precarious liability position for lost value creation. Take for example the Robinhood IPO, which carried a $35 billion valuation. If Apple blocked just one single app from succeeding at this level, it would be liable for $105 billion (3x). If it had succeeded in previous efforts to takedown Elon Musk's Twitter, valued at $50 billion, it would be liable for $150 billion in treble damages. Our estimate assumes 500 apps were suppressed or rejected, with an average valuation of $60million. $200 billion is under ten percent of Apple's market valuation, and it seems reasonable that the aforementioned anti-competitive behaviors would have accrued at least a 10% accrual to Apple's worth. Apple's restrictive practices create negative externalities: thousands of rejected apps represent substantial lost value creation to the US economy.

F.  Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

G.  Grant any further relief as may be fair and just.

Respectfully submitted, this 26th day of July 2024.

/s/ Keith Mathews
Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
(603) 622-8100
keith@awplegal.com

/s/ Melissa R Theriault
Melissa R Theriault #6-4266
Woodhouse Roden Ames & Brennan, LLC
1912 Capitol Ave. Suite 500
Cheyenne, WY 82001
(307) 432-9399
melissa@wrablaw.com